UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20- 30663 |
| The Roman Catholic Diocese of Syracuse, New York, | ) ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF STEPHEN BREEN REGARDING THE
DIOCESE'S ASSETS AND OPERATIONS AND IN SUPPORT OF
THE CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Pursuant to 28 U.S.C. § 1746, Stephen Breen hereby declares and states as follows:

1.      I am a certified public accountant and the Chief Financial Officer ("CFO") for The Roman Catholic Diocese of Syracuse, New York (the "Diocese") and have served in such capacity since 2018.  In my capacity as CFO, I am familiar with the assets, liabilities and sources of income for the Diocese.  Prior to being appointed as the Diocese's CFO, I held leadership roles at The Cortland Companies, including chief financial officer and global business leader, was a partner in Baasch, Winters & Breen, an accounting firm in Syracuse, New York and also previously worked at Coopers & Lybrand.  I am a graduate of C.W. Post College and I serve on the board of directors for the SUNY ESF College Foundation and Clear Path for Veterans.

2.      I make this Declaration based upon: (a) my personal knowledge of certain facts stated herein, (b) information supplied to me by others associated with the Diocese, (c) my review of relevant documents, and (d) upon my experience and knowledge of Diocesan operations.  If I were called to testify, I would testify to the facts as set forth herein.  I am authorized by the Diocese to submit this Declaration.

3.      On June 19, 2020 (the "Petition Date"), the Diocese will file a voluntary petition under chapter 11 of title 11 of the United States Code (11 U.S.C. § 101 *et seq*., the "Bankruptcy Code") commencing its chapter 11 reorganization case (this "Chapter 11 Case").

4.      Contemporaneously with the petition, the Diocese will also be filing a number of motions and applications seeking various types of relief on an expedited basis (collectively the "First Day Motions").  The First Day Motions seek relief aimed at facilitating a smooth transition into this Chapter 11 Case, permitting the Diocese to continue its mission by maintaining employee compensation, maintaining the goodwill and morale of the employees, parishioners, clerics and others who rely on the programs and services provided by the Diocese and preserving and maintaining the property available to satisfy the Diocese's creditors.  I have reviewed each of the First Day Motions and am familiar with their contents.  I respectfully submit that all of the First Day Motions are vital to the Diocese's reorganization efforts and expedited approval of the First Day Motions is important to the Diocese's successful reorganization.

## OPERATIONS

5.      The Diocese, through its administrative offices (a) provides operational support to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese (each, an "Other Catholic Entity" or "OCE") in support of their shared charitable, humanitarian and religious missions; (b) conducts school operations by managing tuition and scholarship payments, employee payroll, and other school related operating expenses for separately incorporated Diocesan schools, as well as providing parish schools with financial, operational and educational support; and (c) provides comprehensive risk management services to the OCEs through the Diocese's insurance program.

3557083.7

a. ***Operational Support***.   The Diocese provides operational and functional support to the OCEs in the areas of finance, building & properties, legal, human resources, stewardship and communications, canonical tribunal, schools, evangelization and catechesis, pastoral services and clergy services.

b. ***School Operations***.   The Diocesan Catholic School Office serves as an administrative and educational resource for 22 Diocesan and parish schools by developing system-wide policies and regulations that govern the entire school system in conjunction with authority of each school's lay boards, as well as providing a superintendent to oversee the implementation of such policies and regulations.

c. ***Risk Management***.   The Diocese maintains and manages a risk management program which provides a broad array of insurance coverage for the Diocese and OCEs.  The Diocese also sponsors a medical self-insurance program which provides coverage for employees of the Diocese and other participating OCEs.  The risk management and health insurance programs are more fully described in the discussion below with respect to the Diocese's Insurance Motion (defined below).

## THE DIOCESE'S FINANCES

6.   The Diocese is a not-for-profit Religious Corporation formed by special act of the New York State legislature.

7.   The Diocese operates on a fiscal year ending June 30.  As of June 30, 2019, the date of the Diocese's most recent audited financials, the Diocese had total assets of approximately $38.2

3557083.7

million, total liabilities of approximately \$35.8 million[1], and net assets of approximately \$2.4 million.  As of the Petition Date, the Diocese estimates that it has total assets of approximately \$37.7 million, known and/or reasonably ascertainable liabilities of approximately \$37.8 million, and potential liabilities which could be in excess of tens of millions of dollars relating to contingent and unliquidated claims arising under the New York Child Victims Act.

8.      The primary sources of funding for the Diocese's programmatic services[2] are contributions, grants and service fees collected by the Diocese, with the largest portion of such funding coming from grants made by The Foundation of the Roman Catholic Diocese of Syracuse, Inc. (the "Foundation") which raises money to support the Diocese as well as other Catholic entities and initiatives through its annual HOPE Appeal.  For the three most recently completed fiscal years the Diocese has expended approximately \$4.7 to \$4.8 million in providing its various programmatic services and has on an annual basis received contributions, grants and service fees in roughly the same amounts.

9.      While its programmatic services are revenue neutral, the Diocese has, over the same periods, experienced positive net revenue of between \$1.9 million and \$2.7 million per year with respect to its risk management and insurance operations, the Catholic schools office, physical plant upkeep and maintenance activities, and central administrative service functions.  The Diocese has also recognized positive investment returns.  The primary source of revenue used by the Diocese to support these operational functions comes from parish assessments.  The Diocese assesses

---

[1]  Total liabilities calculated as of June 30, 2019 do not include contingent and unliquidated liabilities relating to newly-revived claims under the New York Child Victims Act.

[2]  The Diocese's programmatic services include, among other things, Faith Formation, Tuition Assistance, Catholic School Office Support, Community Service, Pastoral, Evangelization, Hospital Ministry, Youth and Young Adult, Communications, and Marriage Tribunal.

3557083.7

parishes an annual amount based primarily on historical parish offertory.  Assessments are due on a monthly basis.  Assessments are collected for general Diocesan purposes and also for dedicated purposes such as education and clergy retirement.

10.      In February 2018, the Diocese established its Independent Reconciliation and Compensation Program ("IRCP") to address the claims of victims of clergy sexual abuse of minors.  The Diocese engaged Kenneth Feinberg and Camille Biros (the "Administrators") to design, implement and administer a program for the submission, evaluation and settlement of individual claims which had been previously brought to the attention of the Diocese.  The IRCP was modeled after similar programs established by the Archdiocese of New York and the Dioceses of Brooklyn and Rockville Center, all of which were also administered by Mr. Feinberg and Ms. Biros.  Participation by claimants in the IRCP was purely voluntary and all eligibility decisions and settlement amounts under the IRCP were left to the discretion of the Administrators.  No aggregate cap was imposed upon the settlements proposed under the IRCP, and the Diocese agreed to pay the amount deemed appropriate by the Administrators in each case.

11.      A total of 88 claims were submitted to the IRCP.  At the conclusion of the program 80 of those cases were successfully resolved by settlement.  With respect to the eight cases which were not resolved, three claimants were deemed ineligible by the Administrators, three claimants did not respond to the Administrator's proposed settlement terms, and two claimants declined to settle their claims.  The Diocese expended approximately $12.7 million in connection with the IRCP, including just under $11 million paid in compensation to abuse victims, with the balance going to the program's administrative costs.

3557083.7

12.     On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  New York's Governor signed the legislation on February 14, 2019. This legislation modified the statute of limitations and created a limited "window" during which victims of child sex abuse whose claim may have been time-barred may commence a timely civil action.  In addition, the CVA extends the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.

13.     From the opening of the CVA window on August 14, 2019 through the Petition Date, approximately 100 lawsuits have been filed against the Diocese by plaintiffs who are seeking damages as a result of alleged abuse.  In addition, demand letters and or notices have been received from other claimants who have not yet commenced lawsuits against the Diocese.  The Diocese anticipates that as many as 150 or more individuals may assert abuse claims for which they may seek to hold the Diocese responsible.  The Diocese believes that some of the CVA claims it will face are covered by insurance, however the Diocese anticipates that some insurance carriers will deny or raise defenses to coverage.

14.     The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies under the CVA.  In light of the mounting costs of litigation and potential exposure to CVA claims, the Diocese has determined that the prudent course of action at this time is to pursue a financial restructuring through this Chapter 11 Case.

3557083.7

## <u>PURPOSE AND GOALS OF THE CHAPTER 11 FILING</u>

15.     The Diocese does not seek to avoid responsibility for any past misconduct by clergy or for any acts or omissions of the Diocese relating to such misconduct.  The Diocese does not seek bankruptcy relief to hide the truth or deny any person a day in court.  In fact, the Diocese is committed to pursuing the truth and has never prohibited any person from telling his/her story or speaking his/her truth in public.  The Diocese has publicly disclosed known perpetrators.  The Diocese has made and requires criminal referrals to be made for all credible allegations of sexual abuse.  Both Bishop Lucia and his predecessor, Bishop Emeritus Cunningham have acknowledged past shortcomings by the Diocese and have attempted to offer aid and comfort to abuse victims.  The Diocese has established standards for the training and background assessment of all employees, clerics and volunteers who will likely interact with children and young people.

16.     The Diocese has commenced this Chapter 11 Case (a) to maximize its assets (including any available insurance assets) in order to provide the greatest recovery for the greatest number of abuse victims; (b) to provide an orderly claims administration process that will ensure fairness in distribution and avoid the inherent inequities in the proverbial "race to the courthouse" that would otherwise result in the most aggressive litigants depleting the Diocese's assets at the expense of other claimants; and (c) to achieve certainty with respect to the Diocese's unliquidated and contingent liabilities in a manner that will allow the Diocese to reorganize and continue to fulfil its charitable, humanitarian and religious mission in service of the Catholic faith.

17.     A swift exit from bankruptcy is of the utmost importance given the Diocese's limited resources and because it is a not-for-profit religious corporation.  The Diocese is dependent upon the charity of its faithful to sustain its very existence.  The pendency of this Chapter 11 Case

3557083.7

may impact the Diocese's ability to effectively raise funds if donors become concerned about the

ability of the Diocese to successfully reorganize.  I respectfully submit that the best way to alleviate

any of these concerns is to emerge from chapter 11 as soon as possible.

## FIRST DAY MOTIONS

18.    To further the Diocesan mission and continue operations while this Chapter 11 Case

is pending, the Diocese respectfully requests that the following First Day Motions be granted.[3]

**I.    Motion for Entry of an Order Authorizing the Diocese to File Portions of Schedule F, the Statement of Financial Affairs, the Master Creditor Mailing Matrix, Certain Certificates of Service and Other Pleadings and Documents Under Seal (the "<u>Motion to File Under Seal</u>")**

19.    Many of the unsecured creditors in this Chapter 11 Case are individuals whose

claims against the Diocese are premised on allegations of sexual abuse ("<u>Abuse Claimants</u>").

Some Abuse Claimants have filed tort claims against the Diocese following the passage of New

York's Child Victims Act (the "<u>CVA Plaintiffs</u>").  Many, but not all, of the CVA Plaintiffs have

elected to file their litigation claims against the Diocese pseudonymously, with their real identity

to be revealed only to the defendants in the course of litigation and with the understanding that

their identities would not be publicly disclosed.  Other Abuse Claimants are non-litigants who

contacted the Diocese pre-petition, either with or without the assistance of counsel, and asserted

claims of abuse by Diocesan employees or agents with the understanding that the Diocese would

protect their identities and keep their claims confidential.  The Diocese has previously entered into

out-of-court settlements with some of those Abuse Claimants where the Diocese agreed to keep

---

[3] Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the respective First Day Motions.

3557083.7

the Abuse Claimant's name confidential but did not require the Abuse Claimant to keep the settlement confidential.

20.     In light of the sensitive nature of the claims of the CVA Plaintiffs and other Abuse Claimants, to avoid causing unnecessary additional anguish or embarrassment, and to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, the Diocese submits that it would be inappropriate and potentially harmful to require the public disclosure of identifying information relating to individuals who have, either informally, formally, or through filing a lawsuit, notified the Diocese of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to Diocesan supervision (the "Confidential Information").

21.     The Diocese has been operating under confidentiality restrictions for some time, and believes that it is imperative that the decision to come forward and identify oneself as an Abuse Claimant be left to the individuals in question, and that such accommodations can be made without adversely affecting the rights of any other parties in interest.

22.     By this Motion, the Diocese respectfully requests permission to protect the identities of CVA Plaintiffs and other Abuse Claimants while providing them notice of this Chapter 11 Case and notice of such events and motions as is required by the Bankruptcy Code and applicable Bankruptcy Rules.  The Diocese further seeks to share names and contact information for CVA Plaintiffs and other Abuse Claimants with the Court and Bankruptcy Clerk under seal. The Diocese also seeks to file under seal a portion of the Statement of Financial Affairs, as well as certain certificates of service, that contain Confidential Information.

3557083.7

23.     It is proposed that CVA Plaintiffs and those Abuse Claimants currently represented by counsel be given notices in the Diocese's Chapter 11 Case only through their respective counsel, and that service on their respective counsel be considered adequate service.  The Diocese, through this Motion, seeks leave of the Court to serve notice of this Chapter 11 Case, and other requisite notices, directly on Abuse Claimants who have advised the Diocese of potential claims but have not yet identified counsel, without disclosing those Abuse Claimants' names or addresses to other parties.  The Diocese believes that it has contact information for some, but not all, of these Abuse Claimants.

24.     Item seven of Official Form 207 (Statement of Financial Affairs) requires the Diocese to disclose all pending legal actions in which the Diocese is a party, including the case title and case number.  The Diocese is seeking authority to redact its responses to item seven on the publicly filed Statement of Financial Affairs and to file under seal such portion of its responses to item seven which contain the name, case number and any other identifying information relating to Abuse Claimants who have filed lawsuits against the Diocese in their own name.

25.     Similarly, the Diocese will be required from time to time to serve notice of certain pleadings, orders and other events with respect this Chapter 11 Case upon various parties in interest, including, on occasion, Abuse Claimants and individuals who may have been accused of perpetrating acts of abuse or of engaging in other improper and/or illegal conduct.  The Diocese is seeking authority to redact from such certificates of service the names and addresses of all Abuse Claimants to protect their privacy.  Additionally, while the Diocese has no intention of concealing the identity of confirmed perpetrators (in fact, the Diocese publishes on its website a list of those individuals against whom substantiated allegations of abuse of a minor have been made) the

3557083.7

Diocese respectfully submits that for public safety reasons it should be allowed to redact the address of any confirmed perpetrators, and the name and address of any alleged perpetrators, from any publicly filed certificates of service to reduce the risk of vigilantism or other breaches of the peace.  The Diocese seeks authority to file unredacted copies of all such certificates of service under seal.

26.     Because the Diocese has already been ordered by state courts to maintain the confidentiality of CVA Plaintiff identifying information in several cases, it has a legal duty to protect the identities of these CVA Plaintiffs.  Moreover, the Diocese strongly believes that it has a moral and ethical duty to protect the identities of all Abuse Claimants unless they choose to identify themselves.  Such individuals should not be required to make their identities public in order to participate in this chapter 11 case.  Subject to the limitations imposed by sections 107(b) and (c) of the Bankruptcy Code, the Diocese has no intention to oppose any steps by individual Abuse Claimants who wish to make their identities public or to disclose Confidential Information regarding their claims; however, the Diocese believes that such a decision should be of the Abuse Claimants' own accord.

27.     In addition to the filing of the Master Creditor Mailing Matrix under seal, the Diocese will file a redacted version of the Master Creditor Mailing Matrix on the docket for use by other parties seeking to provide notice in this chapter 11 case.  The Diocese also intends to seek approval of the retention of a claims noticing agent to help fulfill these confidential noticing procedures, to keep claimants informed of developments in the chapter 11 case, and to assist in the claims and solicitation processes with respect to all Abuse Claimants and other creditors in this chapter 11 case.

3557083.7

28.    Although some Abuse Claimants filed suit against the Diocese in their own name, they may have done so without being aware that it was possible to file suit using a pseudonym. Additonally, even if an Abuse Claimant knowingly assented to having his or her name included as part of the public record in a private lawsuit, they likely did not contemplate at the time that their lawsuit would be included among the disclosures required of the Diocese in connection with this Chapter 11 Case.  The Diocese further submits that the media scrutiny and exposure afforded to this Chapter 11 Case is well beyond the scope of what any individual Abuse Claimant could have reasonably expected.  Therefore, to afford the greatest degree of privacy possible to such Abuse Claimants, the Diocese respectfully submits that their names should be shielded from public disclosure until and unless the Abuse Claimant themselves elects to make their identities public.

29.    Regrettably, many claims asserted against the Diocese relate to alleged instances of abuse of minors.  The Diocese has been able to substantiate some, but by no means all, such allegations.  However, even in the case of allegations that have been substantiated by the Diocese following an independent investigation, the alleged abuse perpetrators may not have been criminally charged, tried, or convicted, found liable in a civil capacity, or otherwise accorded due process of law and the opportunity to defend themselves before any court of competent jurisdiction.   Moreover, even where those individuals are responsible for the acts of abuse they are alleged to have committed, the Diocese respectfully submits that identifying such individuals as alleged abusers, and publishing their names and addresses in certificates of service required to be filed in this Chapter 11 Case, will create an undue risk to the physical well-being of such individuals, as well as the general public safety.  Persons understandably enraged over the accusations asserted by the Abuse Claimants may seek to obtain "justice" through acts of

3557083.7

vigilantism or harassment, and may otherwise pursue retaliation by causing disturbances and breaches of the peace where such alleged perpetrators reside. Accordingly, the Diocese respectfully suggests that prudence dictates that the addresses of such alleged perpetrators and, in the case of individuals against whom allegations have not yet been substantiated, their names, be redacted and withheld from the public record with respect to any certificates of service that may otherwise be required to be filed in this Chapter 11 Case.

II.     **Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, and (B) Granting Adequate Protection (the "Cash Collateral Motion")**

30.     The Diocese seeks to use cash collateral and provide its secured lenders with adequate protection of their collateral interests.

31.     As of the Petition Date, the Diocese is indebted to KeyBank National Association ("Key") pursuant to the following transactions and documents:[4]

(i)     Business Loan Agreement, together with Amendment No. 1 thereto, each dated as of March 16, 2020 (the "Key Loan Agreement"), pursuant to which Key (a) made available to the Diocese a $7,300,000 revolving loan consisting of a $2,000,000 working capital line of credit (the "Key Line of Credit")[5] and (b) a commitment to issue letters of credit on behalf of the Diocese in the aggregate not to exceed $5,300,000;

(ii)    Promissory Note in the original principal amount of $7,300,000 dated as of March 16, 2020 evidencing the Diocese's obligations to Key under the Key Loan Agreement (the "Key Promissory Note");

(iii)   $5,300,000 Letter of Credit (the "Key Letter of Credit") issued by Key to the New York State Worker's Compensation Board (the "WCB") to secure

---

[4] In addition to the documents specifically listed below, on April 17, 2020, the Diocese obtained through Key a $1.2 million loan guaranteed by the United States Small Business Administration (SBA), which the Diocese anticipates may be forgiven pursuant to the SBA's Paycheck Protection Program which was established by the recently enacted CARES Act.

[5] As of the Petition Date, the Diocese has not drawn upon the Key Line of Credit.

3557083.7

the Diocese's obligations under its self-insured worker's compensation program;[6]

    (iv)    Commercial Pledge Agreement, together with Amendment 1 thereto, each dated as of March 16, 2020 (the "Key Pledge Agreement"), pursuant to which the Diocese pledged all of its property in the possession of, or subject to the control of Key including, without limitation, its interest in approximately $7.6 million of securities held in a blocked investment account at Key (the "Blocked Key Account"), to secure its obligations to repay Key for any amounts drawn on the Key Line of Credit or the Key Letter of Credit;

    (v)    Control Agreement and Acknowledgement of Pledge and Security Agreement dated as of March 16, 2020 (the "Key Control Agreement"), pursuant to which the Diocese acknowledged that Key is in possession and/or control of the Blocked Key Account and other collateral pledged pursuant to the Key Pledge Agreement.

    32.    The Key Loan Agreement, Key Promissory Note, Key Letter of Credit, Key Pledge Agreement, and Key Control Agreement are collectively referred to herein as the "Key Secured Debt Documents" and the securities held in the Blocked Key Account, as well as any cash or other collateral subject to Key's lien under the Prepetition Key Secured Debt Documents, are collectively referred to in this Motion as the "Prepetition Key Collateral."

    33.    As of the Petition Date, the Diocese is also indebted to NBT Bank, National Association ("NBT") pursuant to the following transactions and documents:

    (i)    Loan Agreement dated as of February 25, 2020 (the "NBT Loan Agreement"), pursuant to which NBT made two term loans to the Diocese, each in the original principal amount of $3,250,000, for a total loan amount of $6,500,000;

    (ii)    Term I Loan Note dated February 25, 2020 in the original principal amount of $3,250,000 (the "NBT Term I Note");

---

[6] As of the date of this Motion, the WCB has made no attempt to draw upon the Key Letter of Credit and, upon information and belief, there exists no cause for the WCB to do so.

3557083.7

(iii)   Term II Loan Note dated February 25, 2020 in the original principal amount of $3,250,000 (the "NBT Term II Note" and together with the NBT Term I Note, the "NBT Notes"); and

(iv)   Specific Security Agreement (Pledged Account) dated February 25, 2020, (as amended, the "NBT Security Agreement"), pursuant to which the Diocese pledged its interest in an investment account established at NBT Bank (the "Blocked NBT Account"), including the Diocese's interest in approximately $9.8 million of investment property held therein, to secure its obligations to NBT under the NBT Loan Agreement and the NBT Notes.

34.   The NBT Loan Agreement, NBT Notes, and NBT Security Agreement are collectively referred to herein as the "NBT Secured Debt Documents" and the investment property held in the Blocked NBT Account is referred to as the "Prepetition NBT Collateral."  The Key Secured Debt Documents and the NBT Secured Debt Documents are referred to collectively as the "Prepetition Secured Debt Documents" and the Prepetition Key Collateral and the Prepetition NBT Collateral are referred to collectively as the "Prepetition Collateral."

35.   The Diocese seeks to use cash (other than cash or securities held in the Blocked Key Account) existing on or after the Petition Date that may be part of the Prepetition Key Collateral (the "Cash Collateral").  Additionally, the Diocese seeks the ability to continue to manage its investments in the Blocked Key Account and Blocked NBT Account in accordance with its prepetition practices and the Prepetition Secured Debt Documents, and to provide Key and NBT with adequate protection of their respective interests in the Prepetition Collateral by making regular payments of principal and interest in accordance with the Prepetition Secured Debt Documents and providing rollover liens.

36.   The Diocese has consulted with Key regarding its continued use of Cash Collateral and Key has indicated that it supports the relief requested herein.

3557083.7

37.    The Diocese has an urgent need to use Cash Collateral.  Pursuant to the Key Pledge

Agreement and Key Control Agreement, the Prepetition Key Collateral includes, among other

things, cash held by the Diocese in several accounts at Key, including, without limitation, the

Diocese's primary operating account (the "Operating Account"), as well as a segregated account

for the Diocese's drug education program (the "Drug Ed. Account").

38.    As described more fully in the discussion below regarding the Diocese's motion

seeking entry of an order authorizing the continued maintenance of its bank accounts, the Diocese

relies upon its Operating Account to collect accounts receivable and to fund the majority of its

disbursements, including for payroll, vendor and utility payments, and other expenses.  The

Diocese also relies upon the cash in the Drug Ed. Account to support the continued initiatives of

its drug education program.  Because the majority of the Diocese's unencumbered and unrestricted

funds are held at Key, absent the ability to use Cash Collateral, the Diocese would not be able to

pay wages, utility charges, and other critical business and operating expenses, nor could it continue

to provide drug education services.

39.    In order to adequately protect any interest Key may have in the Cash Collateral, the

Diocese proposes to (a) make payments of principal and interest, if and to the extent they become

due under the Key Secured Debt Documents (the "Key Adequate Protection Payments") and

(b) grant Key, to the extent of any diminution in the value of its interest in the Prepetition Key

Collateral, and effective as of the Petition Date, perfected replacement security interests in, and

valid, binding, enforceable and perfected liens (the "Key Rollover Liens"), on all of the Diocese's

cash, deposit accounts, and investment property in the possession of, or subject to the control of,

Key, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter

3557083.7

created, acquired or arising (collectively, the "Postpetition Key Collateral") provided, however, that the Postpetition Key Collateral shall not include, and the Key Rollover Liens shall not attach to, any funds or property held by the Diocese (i) for the purpose of administering its insurance programs or health plan, (ii) which represent trust fund taxes or employee payroll deductions, or (iii) which are endowed funds or subject to donor restrictions on use.

40.    Because the Diocese has not drawn anything on the Key Line of Credit, nor has the WCB drawn on the Key Letter of Credit, the Diocese does not anticipate that any Key Adequate Protection Payments will be due at this time.  Furthermore, because the value of the Blocked Key Account is already in excess of Key's aggregate potential exposure under the Key Line of Credit and the Key Letter of Credit, the Diocese submits that the proposed Key Rollover Liens, together with any Key Adequate Protection Payments that may become due, more than adequately protect Key's interest (if any) in the Cash Collateral.

41.    In order to adequately protect any interest NBT may have in the Prepetition NBT Collateral, the Diocese proposes to (a) continue to make regular payments of principal and interest, when and to the extent they become due under the NBT Secured Debt Documents (the "NBT Adequate Protection Payments") and (b)  grant NBT, to the extent of any diminution in the value of its interest in the Prepetition NBT Collateral, and effective as of the Petition Date, perfected replacement security interests in, and valid, binding, enforceable and perfected liens (the "NBT Rollover Liens"), on all of the Diocese's investment property held in the Blocked NBT Account, and all proceeds of the foregoing, whether in existence on the Petition Date or thereafter created, acquired or arising (collectively, the "Postpetition NBT Collateral").  As of the Petition Date the Blocked NBT Account contained securities valued at approximately $9.8 million.  Accordingly,

3557083.7

NBT is oversecured with respect to the $6.5 million in term loans it has extended to the Diocese. The Diocese therefore submits that NBT will be adequately protected by the NBT Adequate Protection Payments and the issuance of the NBT Rollover Liens.

42.     The Diocese seeks interim approval of the use of Cash Collateral through July 31, 2020 to pay only (i) reasonable and necessary expenses to be incurred in the ordinary course in connection with the operation of its business and fulfilment of its religious mission, (ii) administrative expenses incurred in connection with this Chapter 11 Case, and (iii) employee wages and such other payments as may be authorized by separate order of the Court.  Following a final hearing, the Diocese seeks authorization to use Cash Collateral as it shall deem necessary or appropriate in the exercise of its business judgment, subject only to the Bankruptcy Code's limitations on payment of prepetition claims as the same may be modified by any order of this Court authorizing such payments.

**III.     Motion for Entry of Interim and Final Orders Authorizing the Diocese to (A) Pay Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Medical and Other Benefits and (C) Continue Employee Benefit Programs (the "<u>Wages Motion</u>")**

43.     By this Motion, the Diocese respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Diocese in its discretion to (a) pay prepetition compensation, reimbursable business expenses, benefit plans, deductions and payroll taxes, all as described herein, (b) pay and honor medical and other benefit plans, on a post-petition basis, and (c) continue employee benefit programs.

44.     The Diocese's employees are essential to the administration of the Diocese's Chapter 11 Case, preservation of assets and continuation of the Diocese's mission.  In addition to providing religious guidance and facilitating religious services and activities in the Diocese, the

3557083.7

Diocese's employees also provide other critical functions including, without limitation, finance, human resources, risk management, informational technology, legal, catholic education, evangelization and catechesis, stewardship and communications, pastoral and clergy services, canonical tribunal, archives and building and grounds maintenance. Without these employees, the Diocese would be unable to provide these services to individuals of the Roman Catholic faith and the parishes and schools within the Diocese and would also be unable to provide necessary support for a plan of reorganization to benefit all creditors.

45.    The Diocese currently employs 158 employees, including both non-clergy employees and active priests (the "Employees"), including 58 full time employees, 62 part time employees and 37 per diem employees. Thirty-seven (37) of the Employees are salaried and 116 are paid on an hourly basis. All of the Employees are non-union employees, and none are entitled to commissions.

46.    The vast majority of the Employees rely exclusively on the compensation and benefits they receive from the Diocese to provide for their daily living expenses. If the Diocese were not permitted to continue paying such compensation and benefits in the ordinary course of its business, the Employees would likely be exposed to significant financial difficulties.

47.    To minimize the personal hardship that the Employees would suffer if prepetition obligations are not paid when due or as expected, and to maintain morale and stability in the Diocese during this critical time, the Diocese seeks authorization to (a) pay and honor, in its sole discretion, certain prepetition claims for compensation, reimbursable business expenses, and benefit plans, and all other benefits that the Diocese has historically provided to its Employees in the ordinary course of business, each as described below (collectively, the "Employee Wages and

3557083.7

Benefits"), (b) pay all administrative costs associated with Employee Wages and Benefits, (c) continue to pay and provide the Employee Wages and Benefits in the ordinary course of business on and following the Petition Date, and (d) withhold (as applicable) and remit deductions and payroll taxes as described below.

48.    *Compensation*.  The Employees are paid bi-weekly in arrears on the subsequent Thursday following the pay period ending on Saturday.  There are 6 days of wages earned by the Employees prior to the Petition Date that constitute prepetition wages which are due to be paid on July 2, 2020.  Based upon historical data, the average bi-weekly aggregate payroll for the Diocese's Employees is approximately $144,000, including applicable taxes and deductions.

49.    The Diocese estimates that total prepetition unpaid compensation for the Employees as of the Petition Date totals approximately $51,000 (the "Unpaid Compensation"). The Diocese believes that it does not owe any Employee a prepetition amount in excess of the $13,650 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code. Accordingly, the Diocese is not seeking authority to pay any amount over the $13,650 cap to any Employee.

50.    Items of Unpaid Compensation are due and owing on the Petition Date because, among other things:

a.  the Chapter 11 Case was filed during the Diocese's regular payroll periods;

b.  some checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

- 20 -

3557083.7

c. Employees have not yet been paid all of their salaries and wages for services performed prior to the Petition Date because the Diocese pays payroll in arrears.

51. ***Reimbursable Business Expenses***.  Prior to the Petition Date and in the ordinary course of business, the Diocese has reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Diocese ("Business Expenses").  As of the Petition Date, the Diocese has approximately $114 in unpaid Business Expenses for Employees.  It is also possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Diocese after the Petition Date.

52. The Business Expenses are incurred by Employees on the Diocese's behalf and with the understanding that they will be reimbursed.  Accordingly, to avoid harming Employees who may have incurred Business Expenses, the Diocese requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with prepetition practices; (b) modify their prepetition policies relating thereto as they deem appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

53. ***Benefit Plans***.  The Diocese provides eligible Employees and their eligible dependents with various employee benefits as follows (collectively, the "Benefit Plans"):

a. *Health Plan.*  The Diocese provides its employees with medical coverage through a voluntary self-insured health program (the "Health Plan") for its eligible Employees. The Diocese also coordinates and administers the Health Plan on behalf of employees of other Catholic entities and their dependents, in addition to its own Employees.  Excellus Blue Cross Blue Shield ("Excellus") serves as third-party administrator and assists in processing claims.  The

3557083.7

Diocese pays approximately $48,000 per month to Excellus for administrative fees.  The Health

Plan covers approximately 1,240 individuals, including Diocese Employees and their dependents.

The Diocese receives contributions from other Catholic entities for coverage of their employees

and employees' dependents.  Benefit Plans Administrative Services, Inc. acts as a third-party

consultant for the purpose of establishing appropriate financial contributions from each

participating employer.  If an Employee or any other participant requires extraordinary levels of

medical care, the Health Plan maintains a stop-loss policy with Excellus Health Plan, Inc., which

provides coverage for claims of any individual in excess of $300,000 per year.  Average monthly

premiums for stop-loss coverage is approximately $27,000.  The Diocese maintains reserves in a

segregated account for the Health Plan in the amount of approximately $405,000, which it believes

to be sufficient to cover all known and anticipated claims under the Health Plan as of the Petition

Date.

      b.     *Dental Plans*.  The Diocese provides dental coverage through Lifetime

Benefits Solutions for its eligible Employees. The participating Employees pay the entire amount

of the monthly dental plan premiums, approximately $31 per month for a single employee and $94

for family coverage, through payroll deductions on a pre-tax basis.  As of the Petition Date, the

Diocese is current with respect to its payment obligations under its dental plan.

      c.     *Vision Plan*.  The Diocese sponsors a vision plan for its eligible Employees

through Lifetime Benefits Solutions (Davis Vision).  The participating Employees pay the entire

amount of the monthly vision plan premiums, approximately $6 per month for a single employee

and $14 for family coverage, through payroll deductions on a pre-tax basis.  As of the Petition

3557083.7

Date, the Diocese is As of the Petition Date, the Diocese owes $6,380 to Lifetime Benefits

Solutions (Davis Vision) for premiums due under the vision plan.

        d.      *Paid Time Off ("PTO")*.  The Diocese provides PTO for its Employees, the

amount and accrual rate of which is based generally on an Employee's length of service with the

Diocese.  Ordinarily, when an Employee elects to take PTO, that Employee is paid his or her

regular hourly or salaried rate.  When an Employee ceases employment with the Diocese, they are

paid their regular hourly or salaried rate for PTO earned but not taken on a pro-rata basis.  The

Diocese estimates that its Employees have accrued $188,000 of unused PTO as of May 31, 2020.

This amount, however, is not a current cash payment obligation, as Employees are only entitled to

cash payment for accrued and unused PTO when employment is terminated.  Any such payout of

PTO to a terminated Employee would be subject to the cap imposed by section 507(a)(4) of the

Bankruptcy Code for any pre-petition portion of this payment.  Moreover, the Diocese anticipates

that its Employees will utilize any accrued PTO in the ordinary course of business, which will not

create any cash flow requirements beyond the Diocese's normal payroll obligations.

        e.      *New York State Short-Term Disability Insurance*.  The Diocese provides

short-term disability benefits for all of its Employees as required by New York State law through

Sun Life Financial.  Such benefits are available for non-work-related disability for up to 26 weeks

within any 52-week period at 50% of an Employee's average weekly earnings up to $170 weekly.

The Diocese pays approximately $305,000 in premiums to Sun Life Financial each year, in

quarterly installments.  As of the Petition Date, the Diocese is current with respect to its payment

obligations for short-term disability benefits.

3557083.7

f.      *Long-Term Disability Insurance*.      The Diocese sponsors long-term disability benefits covering eligible Employees.   The Diocese pays approximately $5,833 per month, in advance, to Sun Life Financial for this benefit.  As of the Petition Date, the Diocese is current with respect to its long-term disability insurance premium payments to Sun Life Financial. AFLAC also provides long-term disability and cancer policy coverage to employees.  As of the Petition Date, the Diocese owes $3,516 to AFLAC for premiums under these policies.

g.      *Life Insurance*.    The Diocese sponsors group term basic life insurance for its Employees pursuant to policies provided by Sun Life Financial.  The premiums for the basic life insurance coverage are fully paid by the Diocese, and enrollment in this benefit is required for all eligible Employees.  Eligible Employees receive life insurance benefits equal to their annual salary rounded up to the next highest thousand.  The basic life insurance plan also includes an Accidental Death and Dismemberment benefit equal to the same amount.  The Diocese pays Sun Life Financial approximately $12,333 per month, in advance, for this benefit. As of the Petition Date, the Diocese is current with respect to its payment obligations to Sun Life Financial.

h.      *Flexible Spending Plans*. The Diocese sponsors flexible spending plans for its Employees. Lifetime Benefit Solutions manages the flexible spending plans and charges the Diocese an administrative fee of $115 per month.  As of the Petition Date, the Diocese is current with respect to its payment obligations for withholdings and administrative fees under the flexible spending plans.

i.      *403(b) Plan*.   The Diocese also offers all Employees the opportunity to participate in a defined contribution qualified retirement plan under section 403(b) of the Internal Revenue Code.   Participating Employees may elect to contribute either a percentage of their

3557083.7

compensation or a flat dollar amount on a pre-tax basis through payroll deduction. Employees hired by the Diocese before July 1, 2011, are not eligible for a match to their contributions and may only contribute to the 403(b) on a contributory basis. For eligible Employees hired on or after July 1, 2011, the Diocese matches 50% of the first 6% of pay contributed by the eligible Employee. Mutual of America administers the plan. As of the pay period end date of June 18, 2020, the Diocese's contributions and employer matches under the 403(b) Plan were current.

j.    *Retirement Plans*.    The Diocese also contributes to a multi-employer defined benefit pension plan for eligible Employees, (the "Lay Plan") that was frozen as of July 1, 2011. New hires after July 1, 2011 are not eligible to participate in the Lay Plan, but receive an employer match under the 403(b) Plan, as described above. Lay Plan participants may participate in the 403(b) Plan but are not entitled to receive an employer match. The Lay Plan provides retirement income to the Employees of the Diocese, as well as employees of parishes, cemeteries and schools affiliated with the Diocese. The Lay Plan is noncontributory and covers Employees who meet certain minimum service requirements. The Diocese makes contributions to the Lay Plan throughout the year as cash flow permits in amounts ranging between $750,000 and $1,000,000. The Diocese's allocable portion of the total underfunded liability owed to the Lay Plan as of June 30, 2019 was approximately $18.6 million.

54.    *Employee Assistance Program*.    The Diocese provides an employee assistance program to all Employees and their family members who may need help with personal or behavioral problems. Through this program, the Diocese sponsors up to six visits for confidential advice and short-term counseling for any Employee or member of an Employee's family. The approximate monthly cost to the Diocese related to the employee assistance program is $1,633.

3557083.7

55.    *Workers' Compensation*.  The Diocese provides workers' compensation benefits (the "Workers' Compensation Benefits") to all of its Employees.  These benefits are covered primarily under the Diocese's self-insured workers' compensation insurance program, which is administered by Triad Group for the first $650,000 per occurrence with respect to any workers compensation claims.  This benefit is also addressed in the *Motion For Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Insurance Program and Health Plan; and (II) Authorizing the Payment of Prepetition Obligations In Respect Thereof*, filed contemporaneously herewith.  Triad Group charges $73,000 annually for workers' compensation claims administration.  The Diocese is current in its payment obligations to Triad Group as of the Petition Date.

56.    Excess workers compensation coverage is provided by Safety National Casualty Corporation and the policy contains a $650,000 per occurrence self-insured retention with respect to workers compensation claims.  The annual workers' compensation premium paid to Safety National Casualty Corporation is approximately $87,000 and was paid in July of 2019 for the Diocese's 2019-2020 fiscal year. The Diocese does not believe there are any outstanding payments due to Safety National Casualty Corporation for excess workers compensation coverage premiums.  The Diocese maintains an accounting reserve of approximately $4,000,000[7] in respect of its workers compensation obligations.  Payment of these obligations is supported by a $5,300,000 letter of credit issued by Key Bank in favor of the Workers Compensation Board, collateralized by the Diocese's investment account at Key Bank.

---

[7] Current as of June 30, 2019.

3557083.7

57.     Failure to maintain workers compensation insurance could result in the institution of administrative or legal proceedings against the Diocese and its officers.   By this Motion, the Diocese seeks authority to continue paying and/or contesting in good faith, as appropriate in the Diocese's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of such claims and wage loss makeup obligations, as they become due in the ordinary course of the Diocese's business.

58.     ***Deductions***. During each applicable pay period, the Diocese routinely withholds certain amounts from Employees' pay that the Diocese is required to transmit to third parties. Some examples of such withholding include 403(b) contributions, charitable donations, child support payments, wage garnishments and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, legally-ordered deductions, fees and assessments and miscellaneous deductions) (collectively, the "Deductions").

59.     The Diocese forwards the Deductions to the appropriate third-party recipients.  On average, the Diocese deducts approximately $9,200 in non-tax items from its Employees' paychecks each bi-weekly pay period.  Due to the commencement of the Chapter 11 Case, however, certain Deductions that were deducted from Employees' payments may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

60.     ***Payroll Taxes***. Further, the Diocese is required by law to withhold from its Employees' wages amounts related to federal and state income taxes and Social Security and Medicare taxes for remittance to the appropriate federal or state taxing authority (collectively the

3557083.7

"Withheld Amounts").  On average, the Diocese pays approximately $29,750 in payroll taxes, including deductions from its Employees' paychecks and employer contributions, for each bi-weekly pay period.  The Diocese must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes").  The Diocese believes that accrued but unpaid Payroll Taxes as of the Petition Date totals approximately $40,200.

61.    The Diocese believes that the Deductions and Payroll Taxes, to the extent that they remain in the Diocese's possession, constitute monies held in trust and therefore are not property of the Diocese's bankruptcy estate.  Accordingly, by this Motion the Diocese seeks authorization, but not direction, to forward any unpaid Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes to the appropriate third-party recipients and taxing authorities on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

62.    To facilitate the other relief requested herein, the Diocese requests that the Court authorize and direct all banks and other financial institutions at which the Diocese maintains an account, to receive, process, honor and pay (provided that sufficient funds are on deposit in the applicable accounts to cover such payments) any and all prepetition and post-petition checks issued or to be issued, and fund transfers requested or to be requested, by the Diocese on account of Employee Wages and Benefits that were not honored or paid as of the Petition Date, whether presented or requested prior to or after the Petition Date.  The Diocese also seeks the authority to issue new prepetition checks, or effect new fund transfers, to satisfy the Employee Wages and

3557083.7

Benefits to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

63.     The Diocese's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date exceed the sum of $13,650, which amount is allowable as a priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.   Moreover, the Diocese only seeks authority to make payments to Employees up to the combined statutory maximum of $13,650 on account of wages and compensation earned within 180 days before the date of the filing of a petition, allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

64.     Based upon the foregoing, the Diocese respectfully requests that the Court enter an Order authorizing the Diocese to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits.   Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees provide to the Diocese and ultimately, the Diocese's ability to successfully administer its Chapter 11 Case.

IV.     **Motion for Entry of Interim and Final Orders (I) Authorizing the Continued Maintenance of the Diocese's Insurance Program and Health Plan; and (II) Authorizing Payment of Prepetition Obligations in Respect Thereof (the "Insurance Motion")**

65.     By this Motion, the Diocese requests that the Court enter interim and final orders , (i) authorizing the Diocese to continue to maintain the Diocese's insurance program for the benefit of the Diocese and other participating Catholic entities (the "Insurance Program") and the Diocese's self-insured health plan (the "Health Plan", and, collectively with the Insurance Program, the "Coverage Programs"); and (ii) authorizing, but not directing, the Diocese to pay any

3557083.7

prepetition claims, premiums, obligations and other administrative costs of the Coverage Programs.

66.     To the extent liability coverage may be available under the Diocese's insurance policies for newly-revived claims made pursuant to the New York Child Victims Act (the "CVA"), the Diocese is not seeking authority to pay such claims at this time.  The Diocese proposes to address all CVA claims, as well as any indemnity coverage which may be available to cover them, in connection with its plan of reorganization.  The Diocese does intend however to continue to pay any necessary costs of defense, up to the amount of any applicable deductible or self-insured retention ("SIR"), consistent with its past practices under the Insurance Program.

67.     An order granting the relief requested herein is necessary to minimize unnecessary disruption to the Diocese and other participants in the Coverage Programs and to continue the insurance coverage funded with their premium payments.  The Diocese is not requesting the assumption or rejection of any executory contracts in connection with this Motion.

### *The Insurance Program*

68.     The Diocese has historically ensured that the Diocese and other participating Catholic entities within the territory of the Diocese (collectively, the "Insurance Program Participants") have adequate insurance protection at a reasonable price by spreading risk among a large number of participants and leveraging their collective buying power to secure coverage at favorable rates.

69.     The Diocese coordinates and administers an insurance program providing coverage and risk management services for itself and each of the Insurance Program Participants.  The Insurance Program currently provides coverage, subject in certain instances to a deductible or self-

3557083.7

insured retention ("SIR") for (i) direct and indirect property casualty, business interruption and equipment breakdown, (ii) general liability claims, including personal injury, employee benefits, sexual misconduct, employment practices, directors and officers, school board legal liability, cyber liability, errors and omissions, as well as automobile liability, among others, and (iii) workers' compensation and unemployment.

70.    Third party insurance brokers assist the Diocese in purchasing appropriate primary and excess coverage and to administer various risk management programs.  The Diocese also utilizes third party claims administrators to oversee the administration and payment of unemployment and workers' compensation claims in compliance with New York law.

71.    The Diocese funds the Insurance Program primarily by billing each Insurance Program Participant a ratable portion of the projected overall cost of administering the program and paying claims, using allocation methodologies which consider numerous different ratable exposure bases.  The Diocese strives to achieve a consistent and fair allocation of premium costs among the Insurance Program Participants.  For fiscal year 2020-2021, the Diocese has budgeted approximately $25.7 million in premium revenue related to providing the Insurance Program.  This premium revenue is used to pay administrative costs of the program, to pay claims for losses (including any defense costs) that are within the applicable policies' deductible or SIR, and to pay premiums to carriers for primary and excess coverage.

72.    Under the Insurance Program, the Diocese is responsible for paying all claims for losses by any Insurance Program Participant, including any SIR or deductible amount, up to the point coverage becomes available from a traditional commercial insurance carrier.

3557083.7

73.    The Diocese has a primary liability policy with National Catholic Risk Retention Group (the "Primary Liability Policy") which provides coverage up to $750,000 per occurrence for general, automobile, directors and officers, school board legal, employment practices, employee benefits, errors and omissions, volunteer attorney E&O, cyber security, and sexual misconduct liability claims with a SIR of $250,000 per occurrence.  The Diocese also has an excess liability policy with Catholic Mutual Relief Society of America ("Catholic Mutual") for property and casualty claims with per occurrence limits of up to $39 million and aggregate limits of up to $79 million per location for general liability claims (the "Excess Casualty Policy")[8], and a boiler and machinery policy with Catholic Mutual with a total insured value of $1,465,310,000, and policy coverage limits of up to $100 million per occurrence (the "Boiler and Machinery Policy"), subject to a $300,000 deductible per occurrence.

74.    The Diocese also maintains a crime insurance policy with Federal Insurance Company that provides coverage for employee theft, premises, transit,  forgery, computer fraud, fund transfer fraud, money orders and counterfeit currency, credit card forgery, client, expenses, and social engineering,  with coverage limits of up to $2,000,000 and a deductible of $15,000 per occurrence.

75.    The Diocese also maintains a cyber insurance policy with Illinois National Insurance Company with an aggregate coverage limit of $3,000,000 and a SIR of $25,000, and a fiduciary insurance policy with Travelers Casualty and Surety Company of America with an aggregate coverage limit of $5,000,000.

---

[8]  Certain lines of coverage under the Excess Casualty Policy are subject to lower per occurrence and aggregate sublimits.

3557083.7

76.     The Diocese also maintains as part of its Insurance Program a health care professional liability policy and a healthcare professional liability excess policy with Catholic Mutual with aggregate coverage limits of $1,000,000 and $2,000,000, respectfully, and a special events policy with Great Divide Insurance with aggregate and per occurrence limits of up to $1,000,000.

77.     Finally, the Diocese maintains an excess workers compensation policy with Safety National Casualty Corporation with statutory coverage limits (the "Workers' Compensation Excess Policy"). The Workers' Compensation Excess Policy contains a $650,000 per occurrence SIR with respect to worker's compensation claims.

78.     While modern-day liability coverage under the Insurance Program is in many instances limited to claims made during the applicable policy period, there are also older liability policies dating back to at least 1967 which were written on an occurrence basis, and which may be available to provide coverage for historical liabilities of the Diocese, subject to the satisfaction of any applicable deductible or SIR under those policies.

79.     If there are surplus Insurance Program funds remaining at the end of a fiscal year after payment of all costs and expenses related to the program, such surplus funds are deposited by the Diocese into a segregated reserve account and used to offset future obligations under the program.

80.     The Diocese employs two full-time claims professionals with a combined sixty years of insurance claims handling experience who establish the case-specific reserves for each claim. As of the Petition Date, the Insurance Program had established case-specific reserves in the amount of approximately $1,300,000 for liability and property damage claims pursuant to the

3557083.7

Primary Liability Policy, Excess Casualty Policy, and the Boiler and Machinery Policy, and $4,000,000 for workers' compensation claims in connection with the Workers' Compensation Excess Policy.  Reserves for workers' compensation claims are held in an investment account at Key Bank that collateralizes a letter of credit issued by Key Bank in favor of the Workers Compensation Board.  All other program reserves are held in an investment account managed by Morgan Stanley.

81.     The Insurance Program provides a practical, cost-effective way to manage risk for the Insurance Program Participants under a single, comprehensive insurance program.  If the Insurance Program is not continued, the Diocese, together with each of the Insurance Program Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties.  Upon information and belief, each of the Diocese and the other Insurance Program Participants would incur substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the Insurance Program.  Moreover, without the broad collective risk profile provided by the Insurance Program, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

82.     The Diocese seeks to continue to maintain the Insurance Program for itself and on the behalf of the Insurance Program Participants and to pay claims under the Insurance Program in accordance with past practice and in the ordinary course of business.  The Diocese believes that the maintenance of the Insurance Program is in the best interest of the estate and its creditors.

***The Health Plan***

- 34 -

83.    The Diocese also coordinates and administers the Health Plan, which provides voluntary self-insured medical coverage for Diocesan employees, employees of other Catholic entities, and their dependents (the Diocese, together with such other participating employers, the "Health Plan Participants").  The Health Plan currently provides health insurance coverage for approximately 1,240 individuals.

84.    The Health Plan utilizes a third-party administrator to assist the Diocese in processing claims and utilizes a third-party consultant in establishing appropriate financial contributions for the Health Plan Participants and their employees.  Excellus Blue Cross Blue Shield ("Excellus") serves as the administrator.

85.    As the administrator for the Health Plan, Excellus evaluates reimbursement claims submitted by healthcare providers, determines the appropriate amounts owed, and coordinates payment of claims.  Excellus bills the amount of any allowed claims and a per-capita administrative fee to the Health Plan on a weekly basis.  The dollar value of claims payable to Excellus in any given billing cycle varies depending upon the medical services utilized from time to time by Health Plan beneficiaries.  The administrative fee paid to Excellus is, on average, approximately $48,000 per month.

86.    Each of the Health Plan Participants pays premiums to cover the costs of providing coverage for its respective employees and their dependents under the Health Plan.  Health Plan premiums are paid on a per-head basis and are calculated based upon the prior year's claim experience.

87.    In the event a Health Plan beneficiary requires extraordinary levels of medical care, the Health Plan maintains a stop-loss policy with Excellus Health Plan, Inc., which provides

3557083.7

coverage for claims of any individual in excess of $300,000 per year. Premiums for the stop-loss policy are paid directly to Excellus Health Plan, Inc. The Diocese estimates that the ongoing monthly cost associated with maintaining Health Plan stop-loss coverage is approximately $27,000.

88.    As of the Petition Date, the Diocese estimates that it has reserves for the Health Plan of approximately $405,000, which it believes to be sufficient to cover all known and anticipated claims under the program as of the Petition Date.

89.    A majority of the funds used to fund the Coverage Programs are derived from sources other than the Diocese for the purpose of providing risk management services to parishes and other participating Catholic entities. The Diocese believes that it holds these funds in trust for the benefit of the other participating entities.

90.    The continuance of the Coverage Programs is essential to the Diocese's ability to minimize disruption during this Chapter 11 Case and to maximize the value of its estate for the benefit of its creditors. Thus, the Diocese respectfully requests authorization (but not direction) to fully retain in place the existing Coverage Programs and to honor prepetition obligations related thereto. The Diocese further respectfully requests authorization to renew or obtain replacement insurance coverage in its discretion with respect to the continued maintenance of the Coverage Programs.

3557083.7

**V.     Motion for Interim and Final Orders (A) Authorizing, But Not Directing, the Diocese to (I) Continue Using Existing Bank Accounts, Banking Practices and Business Forms, (II) Maintain Investment Accounts and Practices, and (III) Continue Using Credit Cards, and (B) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) (the "Cash Management Motion")**

91.     By this Motion, the Diocese respectfully requests that the Court enter interim and final orders authorizing the Diocese (i) continue to use, with the same account numbers, its existing Bank Accounts (as defined below), (ii) treat the Bank Accounts as debtor-in-possession accounts; (iii) continue to use, in their present form, all correspondence and business forms (including, without limitation, letterhead, purchase orders and invoices) and other documents relating to its Bank Accounts existing immediately before the Petition Date, without reference to its status as a debtor-in-possession; (iv) maintain its prepetition investment practices, and (v) continue use of credit cards.

### *Bank Accounts and Investment Accounts*

92.     All of the Bank Accounts are maintained at KeyBank National Association ("KeyBank").   The Diocese further requests that the Court authorize KeyBank to continue to maintain, service and administer the Bank Accounts, including charging any undisputed, outstanding service charges owed to KeyBank on the Petition Date, and that KeyBank be authorized and directed to receive, process, honor, and pay (i) all post-petition checks, drafts, wire transfers and other electronic payment requests (to the extent of funds on deposit) together with (ii) any prepetition checks or payment requests, but solely to the extent they relate to payments or obligations approved by separate order of this Court.

3557083.7

93.     The Diocese's primary banking relationship is with KeyBank.  In the ordinary course of business, the Diocese utilizes the following accounts to receive, hold and distribute funds (collectively, the "Bank Accounts"), both of which are described in more detail below:

| Account name | Depositary Institution | Last four digits of account number |
| --- | --- | --- |
| Operating Account | KeyBank | 3487 |
| Drug Education Account | KeyBank | 2830 |

94.     *Operating Account (xx3487)*.  The Operating Account is the Diocese's primary bank account and is used for the vast majority of cash receipts and disbursements, including collection of contributions and assessments and payment of payroll disbursements and most other operating expenses.

95.     *Drug Education Account (xx2830)*. The Drug Education Account is a segregated account required by New York State in connection with state-sponsored drug education programs offered at the various schools affiliated with the Diocese.  Outgoing payments are made from the Drug Education Account to drug counselors providing the educational programs, and the Diocese, in return, receives offsetting funding from both New York State and schools that benefit from such programs.

96.     In addition to its Bank Accounts, the Diocese maintains the following investment accounts in the ordinary course of its business (collectively, the "Investment Accounts" and together with the Bank Accounts, the "Accounts"), each of which is described in more detail below:

| Account name | Depositary Institution | Last four digits of account number |
| --- | --- | --- |
| CSO Carbini Scholarships | SDIF | 1123 |
| CSO Cabrini Team Health | SDIF | 0023 |
| CSO Eastern Region School Subsidy | SDIF | 2733 |
| CSO Gala Funds | SDIF | 2753 |

3557083.7

| CSO Laptop Program | SDIF | 0003 |
|---|---|---|
| CSO Operating Mandated Services | SDIF | 0003 |
| CSO Student Accident Insurance | SDIF | 1073 |
| CSO Technology | SDIF | 2273 |
| CSO Title Funds | SDIF | 2273 |
| CSO Western Region School Subsidy | SDIF | 2593 |
| CSO Yeazel Education Fund | SDIF | 0013 |
| Roman Catholic Diocese of Syracuse #1 MAG | KeyBank | 6734 |
| Roman Catholic Diocese of Syracuse #2 MAG | KeyBank | 6735 |
| Roman Catholic Diocese of Syracuse (Pool C) | Morgan Stanley | 6-093 |
| Roman Catholic Diocese of Syracuse (Pool C) | Morgan Stanley | 9-093 |
| FBO Roman Catholic Diocese of Syracuse | NBT Bank | B561 |

### *Syracuse Diocesan Investment Fund, Inc.*

97.     The Diocese maintains several accounts with the Syracuse Diocesan Investment

Fund, Inc. ("SDIF"), a not-for-profit corporation formed in 2010 to enable the Diocese, along with

parishes, cemeteries, and various other separately incorporated Catholic entities, to pool their

investments to achieve collective benefits.  SDIF is maintained in conformity with Canon Law and

the New York State Prudent Management of Institutional Funds Act.  SDIF's affairs are governed

by its Certificate of Incorporation and By-laws.  As SDIF is a separate and distinct legal entity, the

debts and liabilities of SDIF lie solely with SDIF and are not guaranteed or payable by the Roman

Catholic Church, the Diocese or any other person or entity.  Similarly, the debts and liabilities of

the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable

by SDIF.  As of the Petition Date, SDIF had approximately $45.6 million in total assets under

management, of which approximately $2,257,000 represent Diocesan funds.  All of the Diocese's

investments in SDIF are comprised of special purpose funds which are dedicated to supporting

Catholic schools within the territory of the Diocese.

3557083.7

98.     SDIF's purpose is to maximize investment returns through economies of scale and to provide participants with the opportunity to invest in harmony with the teaching and beliefs of the Roman Catholic Church.  SDIF provides for administration and protection of temporal goods, as required by Canon Law.   SDIF is exempted from certain federal and state securities laws pursuant to the Philanthropy Protection Act of 1995.

99.     SDIF manages both a short-term fund which seeks to provide current income while maintaining liquidity by investing primarily in investment grade short-term equity securities, as well as a long-term fund which seeks to provide a blend of capital growth and current income by investing in fixed income securities.

100.     SDIF retains multiple investment managers, namely, the Knights of Columbus, Vanguard, and Discipline Capital Management (the "Investment Managers"), to provide investment advice regarding appropriate investments and to manage various portfolios of securities.  The Investment Managers are registered with the Securities and Exchange Commission as "investment advisers" pursuant to the Investment Advisers Act of 1940. The performance of Investment Managers is reviewed and evaluated quarterly.  Custody services for SDIF are provided by M&T Bank.  Accounting and allocation services are provided by Dermody, Burke and Brown.

101.     The Diocese's investments in SDIF are held in eleven separate accounts, each of which is described below:

a.     *Catholic School Office - Cabrini Scholarships (xx1223).*  Funds in this investment account originate from a restricted grant for from the Mother Cabrini Health Foundation and are used to fund tuition scholarships for students at Catholic schools within the Diocese;

3557083.7

b.  *Catholic School Office - Cabrini Team Health (xx0023).*  Funds in this investment account originate from a restricted grant by the Mother Cabrini Health Foundation to provide healthcare resources to students of various Catholic schools within the Diocese and their family members;

c.  *Catholic School Office - Eastern Region (xx2733).*  Funds in this investment account originate from contributions by parishes within the Diocese's Eastern Region which have been designated to support Catholic schools within the Diocese;

d.  *Catholic School Office - Western Region (xx2593).*  Funds in this investment account originate from contributions by parishes within the Diocese's Western Region which have been designated to support Catholic schools within the Diocese;

e.  *Catholic School Office - Gala Fund (xx2753).*  Funds in this investment account originate from the net proceeds of the annual gala held to support Catholic schools within the Diocese and are used to fund scholarship awards;

f.  *Catholic School Office - Laptop Program (xx0003).*  Funds in this investment account originate from contributions from Catholic schools within the Diocese which have been designated for the purpose of furnishing students with laptops;

g.  *Catholic School Office - Operating Mandated Services (xx0003).*  Funds in this investment account originate from New York State for mandated school services such as testing, attendance and regents exams;

3557083.7

h.  *Catholic School Office - Student Accident Insurance (xx1073).*  Funds in this investment account originate from Catholic schools within the Diocese to pay premiums for boiler insurance and accident insurance;

i.  *Catholic School Office - Technology (xx2273).*  Funds in this investment account originate from federal technology rebates awarded to Catholic schools within the Diocese and are used for technology expenses in Catholic schools;

j.  *Catholic School Office - Title Funds (xx2773).*  Funds in this investment account originate from federal educational funds made available under Titles I-VII of the Elementary and Secondary Education Act which have been distributed by New York State to support the Diocese's educational initiatives, including support to Catholic schools within the Diocese.  .

k.  *Catholic School Office - Yeazel Education Fund (xx0013).*  Funds in this investment account originate from scholarship grants received from the Msgr. Yeazel Scholarship Fund.

### *Collateral Investment Accounts*

102.    The Diocese maintains accounts at KeyBank and at NBT Bank for the purpose of collateralizing certain financial accommodations extended to the Diocese by these banks.

103.    With respect to KeyBank, the Diocese is indebted to KeyBank pursuant to a promissory note and loan agreement which made available to the Diocese a $7,300,000 revolving loan consisting of a $2,000,000 working capital line of credit (the "Line of Credit") and a $5,300,000 letter of credit (the "WCB LOC").  The Diocese is self-insured for workers compensation claims, and, like most self-insured organizations, the New York State Worker's

Compensation Board (the "WCB") has required that the Diocese post security to cover potential workers compensation liabilities. The WCB LOC is issued by KeyBank to the WCB to secure the Diocese's obligations under its self-insured worker's compensation program.

104.    The Diocese's repayment obligations under the Line of Credit and WCB LOC are collateralized by the following blocked investment accounts held at KeyBank, which, as of the Petition Date, had an aggregate value of approximately $7.6 million:

       a.   *Roman Catholic Diocese of Syracuse (#1 MAG) (xx6734)*. An investment account managed by KeyBank which invests in investment grade short-term equity securities;

       b.   *Roman Catholic Diocese of Syracuse (#2 MAG) (xx6735)*. An investment account managed by KeyBank which invests in long-term fixed income securities.

105.    The Debtor also collateralizes approximately $6.5 million in term loans extended by NBT Bank (the "NBT Term Loans") with the following blocked investment account at NBT Bank, which as of the Petition Date had a value of approximately $9.8 million:

       a.   *FBO Roman Catholic Diocese of Syracuse (xxB561)*. An investment account managed by NBT Bank which invests in a mix of short-term equity securities and long-term fixed income securities.

### *Insurance Investment Fund*

106.    The Diocese also maintains reserves related to its insurance programs in the following investment accounts held and managed by Morgan Stanley which, as of the Petition Date, had an aggregate value of approximately $7.5 million:

3557083.7

    a. *Roman Catholic Diocese of Syracuse (Pool C) (xx6-093)*. An investment account which invests in long-term fixed income securities;

    b. *Roman Catholic Diocese of Syracuse (Pool C) (xx9-093)*. An investment account which invests primarily in investment grade short term equity securities.

### Credit Cards

107.    The Diocese utilizes visa credit cards (the "Credit Cards") issued by KeyBank to manage business expenses for the Diocese and its employees. The aggregate credit limit for the Diocese's Credit Card program is $100,000, however each card issued to Diocesan personnel has a lower individual limit, with most cards limited to $5,000 or less. On average, the Diocese incurs approximately $10,000 per month in charges on the Credit Cards, and the balances on the Credit Cards have traditionally been paid in full at the end of each billing cycle in the ordinary course of business. As of the Petition Date the Diocese anticipates that the balance on the Credit Cards will be approximately $15,095.

108.    The Diocese has requested KeyBank's consent to maintain the Credit Card program in place. To the extent KeyBank agrees to maintain the Credit Card program, the Diocese seeks authority to continue to use and pay the Credit Cards in the ordinary course of business, including any prepetition amounts that may be owed with respect to such Credit Cards.

### Business Forms

109.    In the ordinary course of business, the Diocese uses checks associated with the Bank Accounts as a method of paying many of its accounts payable. Additionally, the Diocese

3557083.7

uses a variety of correspondence and business forms including, but not limited to, letterhead, purchase orders and invoices.

110.     To minimize the expense and disruption to the Diocese's estate associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of employees, vendors and suppliers, the Diocese seeks authority to continue to use all correspondence and business forms as they existed immediately prior to the Petition Date, without reference to the Diocese's status as debtor-in-possession. The Diocese will use its reasonable best efforts to mark "debtor-in-possession" on newly issued payment checks as soon as reasonably practicable following the Petition Date.

### The Diocese's Banking Practices and Accounts are Essential to the Diocese's Ongoing Operations and Restructuring Efforts.

111.     The Diocese has a long-standing relationship with KeyBank and a long-established practice with respect to its use of its Bank Accounts.  The Diocese respectfully requests that the Court authorize it to continue using its prepetition Bank Accounts rather than closing them and opening new post-petition accounts.

112.     Closing the Diocese's Bank Accounts would cause disruption to the Diocese's operations and fulfillment of its mission.  If the Diocese were required to open new accounts as of the Petition Date, it would unnecessarily distract the Diocese's key business office personnel in an office that is already operating at maximum capacity.  In addition, changing accounts would also cause disruptions in essential deposit and automated debit activity, potentially leading to loss of revenue, missed payments or overdraws and therefore causing harm to the Diocese's operations. Specifically, key operating expenses such as payroll and associated payroll taxes, payments for

3557083.7

health insurance claims under the Diocese's health plan, and workers compensation payments are all automatically withdrawn from the Diocese's operating account.  As a result, the Diocese respectfully submits it is appropriate to maintain its prepetition Bank Accounts and practices.

113.    The continued use of the existing Bank Accounts will facilitate the Diocese's transition into this chapter 11 case by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in payment of post-petition debts.  The Diocese respectfully submits that parties in interest will not be harmed by the continued maintenance of its Bank Accounts because, with the assistance of professionals, the Diocese has implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

### *Strict Adherence to the U.S. Trustee's Guidelines Would Cause Substantial Disruption to Diocese's Operations.*

114.    The U.S. Trustee has promulgated Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines")[9] which purport to require debtors in bankruptcy to: (a)  close all existing bank accounts and open new debtor-in-possession accounts; (b)  maintain a separate debtor-in-possession account for cash collateral; and (c)  obtain checks that bear the designation "debtor in possession," unless the bankruptcy court orders otherwise.

115.    The Diocese respectfully submits that in order to allow it to continue to operate its business in the ordinary course, it should be relieved of strict adherence to the U.S. Trustee Guidelines with respect to the maintenance of its existing Bank Accounts and banking practices.

---

[9]  *See* https://www.justice.gov/ust-regions-r02/file/region_2_operating_guidelines.pdf/download.

3557083.7

116.    One of the purposes of the U.S. Trustee Guidelines is to provide a clear line of demarcation between prepetition and post-petition claims and payments to help prevent inadvertent payment of prepetition claims, by voiding checks drawn before the Petition Date.  As discussed below, the Diocese will ensure a separation between pre and post-petition financial activity through clear record keeping.

117.    The Diocese submits that maintaining the existing Bank Accounts will facilitate the Diocese's ability to collect, deposit and account for receipts and pay post-petition bills.  Closing the Bank Accounts would require the Diocese to open new accounts and arrange alternative procedures for electronic and manual transfers to and from the Bank Accounts.  The result would be a disruption of processing payments, and similarly would disrupt wire transfers, payroll obligations, and post-petition obligations to vendors and other creditors.

118.    The Diocese also requests authority to preserve various reporting and accounting mechanisms, such as signatory authorizations and accounting systems central to the maintenance of the Bank Accounts.  The interruption or termination of such reporting and accounting mechanisms would undermine the utility of the Bank Accounts.  In accordance with existing practices, the Diocese will maintain strict records of all receipts and disbursements from the Bank Accounts during the pendency of this case and will ensure that its records properly distinguish between pre-petition and post-petition transactions and report accordingly to the U.S. Trustee.

119.    The Diocese also respectfully submits that maintenance of the Bank Accounts will avoid delays in payments to administrative creditors, ensure a smooth transition into chapter 11, and facilitate the Diocese's efforts to complete this Chapter 11 Case expeditiously and successfully.  Thus, the Diocese respectfully requests that its existing Bank Accounts be deemed

3557083.7

debtor-in-possession accounts and that the maintenance and continued use of those accounts (in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period) be authorized, subject only to a prohibition against honoring prepetition checks without specific authorization from this Court.

120.    Strict adherence to the U.S. Trustee Guidelines in this Chapter 11 Case would significantly disrupt the ordinary financial operations of the Diocese, reducing efficiencies and causing unnecessary expense, while providing little benefit to creditors.  The Diocese respectfully requests that the Court waive the requirements of the U.S. Trustee Guidelines in this Chapter 11 Case as requested herein.

### The Diocese Should be Granted Authority to Use Existing Business Forms and Checks.

121.    To minimize expenses and disruption to the Diocese's chapter 11 estate, the Diocese respectfully requests authority to continue to use all correspondence and business forms (including letterhead, purchase orders, envelopes, charitable solicitation material, invoices and the like) as such forms were in existence immediately before the Petition Date, without reference to the Diocese's status as debtor-in-possession.  The Diocese also requests authorization to use the existing check stock without the "debtor-in-possession" label for checks that it manually writes. As soon as practicable after the Petition Date, the Diocese will include "debtor-in-possession" or "DIP" on the checks it prints electronically.

122.    By virtue of the nature and scope of the Diocese's operations and the number of suppliers of goods and services with whom the Diocese transacts on a regular basis, it is important that the Diocese be permitted to continue to use its existing checks and other business forms without alteration or change, except as requested herein.  Indeed, changing business forms is

3557083.7

unnecessary and unduly burdensome, as it would appear that the parties doing business with the Diocese will be aware of the Diocese's status as debtor-in-possession as a result of the anticipated media coverage of this Chapter 11 Case and because the Diocese intends to distribute communications and notices of commencement of this Chapter 11 Case to such parties. Moreover, if the Diocese is required to change its current business forms, the new forms may cause confusion to the Diocesan employees, vendors and donors. The Diocese also believes that it would be costly and disruptive to cease using all existing forms and to purchase new stationery and business forms. Accordingly, the Diocese seeks a waiver of the U.S. Trustee Guidelines with respect to the continued use of its business forms and checks.

### *The Diocese Should Be Authorized to Continue Using Debit, Wire and ACH Payments.*

123. The Diocese requests further relief from adherence to the U.S. Trustee Guidelines to the extent doing so would require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the nature of the Diocese's operations, in certain instances, it may be necessary for the Diocese to conduct transactions by debit, wire or ACH Payments and other similar methods, as discussed above. The Diocese maintains accurate records and will be able to properly account for any such transactions. The Diocese, therefore, requests that its banks and other financial institutions be authorized to continue to pay, honor and execute any and all debit instructions, wires and ACH Payments issued and drawn on the Bank Accounts after the Petition Date.

3557083.7

***The Diocese Should Be Authorized to Honor Certain Prepetition Obligations Related to its Accounts.***

124.    In accordance with its contractual arrangements with the various financial institutions where it maintains its Accounts, the Diocese incurs periodic service charges, management or administrative charges, and other fees, costs, charges and expenses in connection with the maintenance of the Accounts (collectively, the "Service Charges").  Payment of the prepetition Service Charges is in the best interests of the Diocese and all parties in interest in this Chapter 11 Case, as it will prevent any disruption to the Accounts.  Further, in many instances, the financial institutions have setoff rights for the Service Charges and therefore payment of prepetition Service Charges should not alter the rights of unsecured creditors in this Chapter 11 Case.  Accordingly, by this Motion, the Diocese also seeks authority to pay, at the Diocese's sole discretion, prepetition Service Charges, if any.

***The Court Should Authorize the Diocese to Continue to Maintain and Utilize the Investment Accounts, and Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code with Respect to the Investment Accounts.***

125.    The Diocese respectfully requests authority to continue its prepetition investment practices and to maintain each of its Investment Accounts in the ordinary course of business.

126.    By retaining its prepetition investment practices and Investment Accounts, the Diocese will be able to earn reasonable returns on its investments, as contemplated by section 345(a) of the Bankruptcy Code, without incurring the administrative costs and compliance risk associated with converting its holdings to cash or U.S. Government Securities.

3557083.7

127.    The Diocese's investment practices are overseen by independent professional outside financial advisors who ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment.  Moreover, the Diocese is itself a large, financially sophisticated organization that employs a professional accounting staff devoted to proper oversight and management of the Diocese's finances.  Accordingly, the Diocese is not seeking to make unnecessarily risky or speculative investments, but merely to deploy its resources consistent with the recommendations of its professional advisors in an organized and diversified manner as most institutions of similar size do in the ordinary course.

128.    The Diocese has approximately $27 million in its various Investment Accounts. The Diocese has a long track record of responsibly investing its funds (both restricted and unrestricted) to achieve reasonable growth with limited risk.  If the Diocese were forced to liquidate its current holdings and instead invest in treasury securities or to maintain a collateralized deposit account in strict compliance with section 345(b), it would not be able to obtain a comparable rate of interest or growth, and the reduced income available could force the Diocese to curtail portions of its mission.  In addition, the Diocese respectfully submits that the sheer size of its investments will make it difficult and unnecessarily expensive, if not outright impossible, to obtain a bond or collateral securities to cover the full amount invested in in the Investment Accounts and/or to find an authorized depository willing to take on such a deposit.

129.    Each of the financial institutions with which the Investment Accounts are held, are large, stable, and financially secure institutions.

3557083.7

130.    Forcing the Diocese to liquidate the Investment Accounts and set up alternative arrangements would require a substantial amount of time and effort which would distract from the Diocese's ability to focus on its goal of reorganizing and confirming a plan of reorganization. Moreover, because several of the Investment Accounts serve as collateral for the Diocese's obligations to KeyBank and NBT Bank, liquidating those accounts to ensure strict compliance with section 345(b) would require the Diocese to breach its contractual commitments to those banks, potentially also causing the Diocese to fall out of compliance with the WCB under New York law.

131.    The Diocese respectfully submits that appropriate safeguards are in place which render strict adherence with the investment requirements of section 345(b) unnecessary.  First, the Diocese is already subject to statutory requirements under New York State laws which mandate the prudent and responsible investment of its funds.   Second, the Diocese has engaged the assistance of independent professional outside financial advisors who actively monitor the Diocese's Investment Account portfolios and ensure that a diversified mix of investments is maintained to achieve moderate targeted growth with minimal exposure to down-side risk in any particular investment.  Third, the Diocese's investments are comprised primarily of professionally managed mutual funds and other securities which are widely traded and thus exposed to constant market scrutiny and valuation – reducing the risk of unexpected or severe fluctuations in value and avoiding unduly speculative investments in favor of steady growth over a long-term investment horizon.  Fourth, the size and diversification built into the Diocese's portfolios means that any increase or decrease in value of a particular investment is unlikely to have a substantial impact on the overall value of the Diocese's holdings.

3557083.7

132.    The Diocese's estate will suffer if it is not allowed to continue its existing investment program.  As noted above, the Diocese will lose out on a valuable source of  growth which it simply will not be able to replicate if forced to comply with the requirements of section 345(b).  Second, it is highly unlikely that the Diocese could even procure a bond or collateral security to cover the significant amount of investments currently held in the Investment Accounts. Even if such security could be obtained, it would almost certainly be at an extraordinary expense to the Diocese's estate and would need to be funded out of unrestricted funds, to the detriment of the Diocese's creditors.  Accordingly, the only realistic way for the Diocese to strictly comply with section 345(b) would be to liquidate the holdings in each of the Investment Accounts, reducing the current investment positions to cash, and then to place such cash into a deposit account with one of the U.S. Trustee's authorized depositories.  The Diocese respectfully submits that doing so would be neither practical nor prudent, and that doing so would put the Diocese at risk of failing to comply with its state law obligations under the New York Prudent Management of Institutional Funds Act to act as a prudent investor of the funds placed under its control, as well as to violate its contractual obligations to KeyBank and NBT Bank with respect to their respective interests held as collateral in the Investment Accounts.  If the Diocese were forced to liquidate its current holdings in the Investment Accounts and instead maintain cash in a collateralized deposit account in strict compliance with section 345(b), it would immediately suffer reduced growth and would be forced to reduce its spending at the expense of its ability to carry out its ministries and mission. Moreover, the reduction in growth inherent in disinvesting from the Investment Accounts would negatively affect creditors to the extent Investment Account funds may be unrestricted and available to pay creditor claims.  Lastly, the Diocese has contractual obligations to KeyBank and

3557083.7

NBT Bank to maintain the Investment Accounts which collateralize their respective interests.  In the event the Diocese is unable to do so, it could find itself in default and at risk of having the Line of Credit, WCB LOC or NBT Term Loan terminated.  Termination of the WCB LOC would cause the Diocese to fall out of compliance with its obligations under New York law as a self-insured employer and termination of either the Line of Credit or the NBT Term Loan would negatively impact the Diocese's liquidity.

***The Court Should Approve the Diocese's Continued Use of the Credit Cards in the Ordinary Course of Business***

133.    Continued use of the Credit Cards is integral to the stability of the Diocese's operations.  Absent an order clearly authorizing the Diocese to continue to use and pay the Credit Cards, KeyBank, may cancel or restrict the use of the Credit Cards or the extension of further trade credit.  Moreover, KeyBank may seek to set-off any amounts owing against cash in the Diocese's Bank Accounts held at KeyBank.  If that were to occur, it would be costly, disruptive to the Diocese's operations, burdensome to it's the Diocese's estate, and time-consuming for the Diocese to establish new payment card and/or trade credit programs with alternate providers.  To avoid any disruption in its operations, the Diocese could be forced to ask employees to front the cost of purchases and expenses on their own (and seek reimbursement later), which could be a personal hardship and would more than likely damage the Diocese's relationships with such employees.  Furthermore, it would be burdensome for the Diocese to seek to establish new credit programs.  Accordingly, the Diocese seeks authorization for the continued use of its Credit Cards and authorization to pay any outstanding amounts owing with respect to such Credit Cards.

3557083.7

**VI.     Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service on Account of Prepetition Amounts Due, (B) Determining Adequate Assurance of Payment For Post-Petition Utility Services Under 11 U.S.C. § 366, and (C) Establishing Procedures for Determining Adequate Assurance of Payment (the "<u>Utilities Motion</u>")**

134.     By this Motion, the Diocese respectfully requests that the Court enter interim and final orders, (a) prohibiting those utility companies that provide service to the Diocese (each a "<u>Utility Company</u>" and, collectively, the "<u>Utility Companies</u>") from altering, refusing or discontinuing service on account of prepetition amounts due, (b) determining that the Diocese's furnishing of deposits to Utility Companies, upon their timely request for adequate assurance, in an amount equal to two weeks of the Diocese's estimated average usage as calculated over the past year, constitutes adequate assurance of payment, and (c) establishing a procedure to address assertions by Utility Companies that they are entitled to additional adequate assurance.

135.     The Diocese's ongoing operations require the Diocese to maintain uninterrupted utility services, including electricity, natural gas, telephone, water, waste removal, internet and other services.  Termination of a utility service would cause immediate and irreparable harm to the Diocese's operations and critical reorganization efforts.

136.     The Diocese receives utility services from several different providers for multiple facilities.  These facilities include: the Convent property at 420 Montgomery Street, Syracuse, New York; the School property at 424 Montgomery Street, Syracuse, New York; and the Chancery properties at 240 and 245 East Onondaga Street, Syracuse, New York.

137.     The Diocese is generally current with respect to the payment of its prepetition obligations for all utility services and none of the Utility Companies hold prepetition deposits.

3557083.7

138.    Pursuant to section 366(c) of the Bankruptcy Code, the Diocese proposes to provide

the Utility Companies adequate assurance of payment as follows:

(a)    Upon request, the Diocese will provide each Utility Company a cash deposit (each,

a "Deposit") in an amount equal to two weeks of the estimated cost of its utility consumption from

each Utility Company, rounded to the nearest dollar.  A Deposit will be calculated using an average

charge over the past year's invoices.  If a Utility Company provides the Diocese with services

under multiple accounts, then the Diocese may provide that Utility Company with separate

Deposits or with one Deposit that equals two weeks of the aggregate estimated usage under all of

the Diocese's accounts with that Utility Company.  A Deposit shall be provided within 10 business

days of the receipt, by the Diocese or its bankruptcy counsel, of a written request from a Utility

Company for adequate assurance under the Bankruptcy Code.

(b)    In the event that a Utility Company believes that the proposed Deposit does not

constitute adequate assurance of payment that is satisfactory to that Utility Company within the

meaning of section 366 of the Bankruptcy Code, the Utility Company, no later than 20 days

following the entry of the interim order with respect to this Motion, must serve upon the Diocese

and Diocese's counsel, and file with the Court, a specific request for adequate assurance (each, an

"Assurance Request").    An Assurance Request must include: (i) the location and account

number(s) for which utility services are provided; (ii) the outstanding balance (if any) on the

account and a summary of the Diocese's payment history; (iii) the reasons why a Deposit does not

constitute satisfactory adequate assurance of payment; and (iv) a proposal of what would constitute

satisfactory adequate assurance of payment.  Without further order of the Court, the Diocese may,

in its discretion, enter into agreements to provide additional adequate assurance to any Utility

3557083.7

Company. Failure by a Utility Company to timely file and serve an Assurance Request will result in the Utility Company waiving any right to request additional adequate assurance of payment beyond a Deposit and each such Utility Company will be deemed to have received adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

(c)    In the event that a Utility Company timely submits an Assurance Request and the parties cannot promptly resolve such Assurance Request on a consensual basis, the Court shall determine the appropriate amount of adequate assurance and the Diocese will schedule a hearing on shortened notice and serve notice of such hearing on the Utility Company by overnight mail or hand delivery. Each Utility Company submitting an Assurance Request shall be prohibited from altering, refusing or discontinuing service to the Diocese until, after a hearing on adequate assurance, the Court issues an order authorizing such action.

139.    The Diocese submits that the above proposed procedure and adequate assurance to Utility Companies sufficiently addresses the requirements of section 366 of the Bankruptcy Code.

**VII.    Motion for Entry of an Order Pursuant to Bankruptcy Rules 1007(c) and 9006(b)(1) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs (the "<u>Motion to Extend Time to File Schedules</u>")**

140.    By this Motion, the Diocese respectfully requests that the Court enter an order extending the time to file the Schedules and Statements through and including August 3, 2020 (an extension of 31 days, for a total of 45 days from the Petition Date), without prejudice to the Diocese's ability to request additional time should it become necessary.

141.    The Diocese anticipates that there will be more than 200 creditors and interested parties involved in this Chapter 11 Case, including approximately 150 individuals whose claims

3557083.7

relate to alleged instances of abuse and whose names and other identifying information will be sought to be filed under seal to protect their privacy in accordance with the *Motion for an Order Authorizing the Diocese to file Portions of Schedule F, the Statement of Financial Affairs, the Master Creditor Mailing Matrix, Certain Certificates of Service and Other Pleadings and Documents Under Seal* filed contemporaneously herewith.  Given the need for confidentiality, preparing the Schedules and Statements accurately and with sufficient detail and adherence to confidentiality requires significant attention from the Diocese's personnel and advisors.   Further, the Diocese's personnel will be heavily involved with public relations outreach in the days following the Petition Date, to facilitate the stabilization of the Diocese's operations and in support of its mission.

142.    The Diocese submits that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Diocese make a smoother transition into chapter 11 and, therefore, will ultimately maximize the value of the Diocese's estate for the benefit of creditors and all parties in interest. Consequently, it is in the best interests of the Diocese and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Diocese with a total of 45 days from the Petition Date to file the Schedules and Statements.

143.    The Diocese submits that this extension should not prevent the Schedules and Statement of Financial Affairs from being filed sufficiently in advance of the initial meeting of creditors.

3557083.7

**VIII.    Applications to Appoint Stretto as Notice and Claims Agent and as Administrative Advisor (the "<u>Stretto Applications</u>")**

144.    The Diocese is seeking separate orders appointing Stretto[10] as the notice and claims agent for this Chapter 11 Case (the "<u>Claims Agent</u>") and authorizing the retention of Stretto to assist the Diocese as an advisor with respect to certain case management and administrative tasks (the "<u>Administrative Advisor</u>").

145.    The Diocese anticipates that there will be more than 200 creditors or other interested entities to be noticed in these cases, including over 150 individuals whose claims relate to alleged instances of abuse and whose names and other identifying information the Diocese is seeking to maintain under seal out of respect for their privacy.  Utilization of a Claims Agent will relieve the Court and the Diocese of a significant administrative burden, and will also provide a mechanism by which proofs of claim can be filed confidentially and by which any party in interest who wishes to effect notice on all creditors, including those whose names and addresses are filed under seal, may do so without the necessity to disclose any confidential identifying information. Moreover, Stretto's expertise in serving as an Administrative Advisor will assist the Diocese in carrying out its duties and obligations under chapter 11, particularly as it relates to soliciting and tabulating votes with respect to a proposed chapter 11 plan of reorganization.

146.    The Diocese respectfully submits that authorizing the relief requested in the Stretto Applications is in the best interests of the Diocese's estate and all parties in interest, and particularly appropriate in this Chapter 11 Case due to not only the large number of creditors and parties-in-interest involved but also due to the confidential nature of many of the claims and

---

[10]    Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.

3557083.7

claimants' identities.  Accordingly, the Diocese respectfully requests that the Court approve Stretto as both Claims Agent and Administrative Advisor.

## <u>CONCLUSION</u>

147.    For the reasons set forth herein, and in the First Day Motions, the Diocese respectfully requests that the Court grant the relief requested in the First Day Motions and provide such other and further relief as the Court may deem just and proper.

148.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*[signature page follows]*

3557083.7

Dated:  June 19, 2020

/s/  Stephen Breen

Stephen Breen
Chief Financial Officer

3557083.7