UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 20-30663-5-wak |
| The Roman Catholic Diocese of Syracuse, New York, | Chapter 11 |
| Debtor. | |

**LONDON MARKET INSURERS' OPPOSITION TO MOTION FOR ENTRY OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT; (II) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES; (III) APPROVING THE FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING ON JOINT PLAN; (IV) APPROVING THE FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES; (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE JOINT AMENDED PLAN; AND (VI) GRANTING RELATED RELIEF**

## TABLE OF CONTENTS

**Page**

. INTRODUCTION ..................................................................................................1

II. BACKGROUND .................................................................................................4

    A. The LMI Policies ................................................................................... 4

    B. The Adversary Proceeding..................................................................... 9

    C. Summary of the Plan ........................................................................... 10

III. ARGUMENT ....................................................................................................15

    A. Approval of the Disclosure Statement Should Be Denied Because the Plan
       is Patently Unconfirmable..................................................................... 15

        (a) The Plan is patently unconfirmable because the Trustee has an
             irreconcilable conflict. ............................................................... 16

        (b) The Plan is patently unconfirmable because it requires the Court to
             approve the transfer of non-debtor property. ............................................. 18

    B. The Disclosure Statement Provides Inadequate and Misleading Information
       ......................................................................................................... 19

        (a) The Disclosure Statement fails to disclose the Trustee's disabling
             conflict. ................................................................................... 20

        (b) The Disclosure Statement fails to alert creditors that the failure to
             satisfy the conditions precedent to coverage, set forth in the LMI
             Policies, would void coverage. ................................................... 21

        (c) The Disclosure Statement fails to disclose that the LMI Policies are
             executory contracts that must be assumed, and that adequate
             assurance of future performance must be provided by any assignee
             before any interest thereunder could be assigned. .................................... 21

            (1) New York law determines whether there are material
                 unperformed obligations on both sides of the LMI Polices...........21

            (2) The Debtor and LMI have material unperformed obligations
                 pursuant to the LMI Policies........................................................22

            (3) The Debtor must assume the LMI Policies and the Trust
                 must provide adequate assurance of future performance...............23

(4)    The Disclosure Statement must disclose that LMI contend that the LMI Policies are executory contracts that must be assumed, with adequate assurance of future performance provided by an assignee, before the Ambiguous Insurance Assignment may occur.................................................................24

(d)    The Disclosure Statement is inadequate because the Ambiguous Insurance Assignment is confusing and contradictory without clearly defining what is being assigned and to who. ............................... 24

(e)    The Disclosure Statement is inadequate because it does not state who will satisfy the conditions precedent pursuant to the LMI Policies. ................................................................................................ 26

(f)    The Disclosure Statement fails to explain in easy to digest terms how the Trust will treat Abuse Claimants.................................................. 28

(g)    The Disclosure Statement is inadequate because the Plan fails to include an "Exhibit A."............................................................................ 29

IV.    CONCLUSION...................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re 266 Washington Assoc.*, 141 B.R. 275 (Bankr. E.D.N.Y. 1992)..........................15

*Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24 (S.D.N.Y. 1995) ..........20

*In re Adelphia Commc'ns Corp.*, 352 B.R. 592 (Bankr. S.D.N.Y. 2006) ..............20, 25

*In re Am. Cap. Equip., Inc.*, 405 B.R. 415 (Bankr. W.D. Pa. 2009)..........................16

*In re Am. Capital Equip., LLC*, 688 F.3d 145 (3d Cir. 2012)................................. 15-16

*In re Avianca Holdings S.A.*, 618 B.R. 684 (Bankr. S.D.N.Y. 2020)..........................22

*Bd. of Trustees of Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp.
2d 662 (S.D.N.Y. 2011)..........................17

*In re Brass Corp.*, 194 B.R. 420 (Bankr. E.D. Tex. 1996) ..........................15

*In re Cardinal Congregate I*, 121 B.R. 760 (Bankr. S.D. Ohio 1990) ..........................15

*Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94 (3d Cir. 1988) ........20

*Conf. Assocs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 80 A.D.3d 552, 914
N.Y.S.2d 310 (2011)..........................16

*Consol. Edison Co. of New York v. Liberty Mut.*, 749 N.Y.S.2d 402 (Sup. Ct.
2002) ..........................23

*Const. Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F. Supp. 124 (S.D.N.Y.
1997) ..........................23

*In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279 (Bankr. S.D.N.Y. 1990) ............20

*In re Dakota Rail, Inc.*, 104 B.R. 138 (Bankr. D. Minn. 1989)..........................15

*In re Diocese of Camden, New Jersey*, 653 B.R. 309 (Bankr. D.N.J. 2023) ................19

*In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999) ..........................15

*Eagley v. State Farm Ins. Co.*, No. 13-CV-6653P, 2015 WL 5714402 (W.D.N.Y.
Sept. 29, 2015)..........................23

*In re El Comandante Mgmt. Co.*, 359 B.R. 410 (Bankr. D.P.R. 2006) ..........................15

*In re Felicity Assocs., Inc.*, 197 B.R. 12 (Bankr. D.R.I. 1996)..........................15

*In re Ferretti*, 128 B.R. 16 (Bankr. D.N.H. 1991) ..........................20

*In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993) ......................................................15

*In re Hawker Beechcraft, Inc.*, 486 B.R. 264 (Bankr. S.D.N.Y. 2013) ............................22

*Hochhauser v. Elec. Ins. Co.*, 46 A.D.3d 174, 844 N.Y.S.2d 374 (2007) .....................16

*In re Ionosphere Clubs, Inc.*, 85 F.3d 992 (2d Cir. 1996) ..............................................24

*In re Jastrzebski*, 948 N.Y.S.2d 689 (2012) ..................................................................17

*Jay Dee/Mole Joint Venture v. Mayor & City Council of Balt.*, 725 F. Supp. 2d
    513 (D. Md. 2010) .......................................................................................................22

*John Hancock Mutual Life Insurance Company v. Route 37 Business Park
    Associates*, 987 F. 2d 154 (3d Cir. 1993) ..................................................................15

*Kirk v. Texaco, Inc.*, 82 B.R. 678 (S.D.N.Y. 1988) ........................................................28

*In re Larsen,* No. 09-02630, 2011 WL 1671538 (Bankr. D. Idaho May 3, 2011).........15

*Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*,
    53 N.Y.2d 835, 422 N.E.2d 819 (1981)................................................................16, 23

*In re Mahoney Hawkes, LLP*, 289 B.R. 285 (Bankr. D. Mass. 2002) ...........................15

*In re Main St. AC, Inc.*, 234 B.R. 771 (Bankr. N.D. Cal. 1999) ....................................15

*Matthews v. Cont'l Cas. Co.*, 39 Misc. 3d 1216(A), 975 N.Y.S.2d 367 (Sup. Ct.
    2013) ...........................................................................................................................16

*MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344
    (S.D.N.Y. 2014)............................................................................................................8

*In re McLean Indus., Inc.*, 132 B.R. 271 (Bankr. S.D.N.Y. 1991) ................................25

*Milea v. Hugunin*, 890 N.Y.S.2d 369 (Sup. Ct. 2009).....................................................17

*In re Miller*, No. 96-81663, 2008 WL 191256 (Bankr. W.D. La. Jan. 22, 2008).........15

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg.
    Corp.)*, 25 F.3d 1132 (2d Cir. 1994) .........................................................................19

*In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987) .............................15, 20

*Nat'l Commc'ns Ass'n, Inc. v. Nat'l Telecommunications Ass'n, Inc.*, No. 93
    CIV.0926 SS KAR, 1995 WL 236731, at *18 (S.D.N.Y. Apr. 21, 1995)...............25

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988)...........19-20

*People ex rel. Spitzer v. ELRAC, Inc.*, 745 N.Y.S.2d 671 (Sup. Ct. 2002)...................22

*In re Pettit*, 18 B.R. 6 (Bankr. E.D. Ark. 1980)...................................................................20

*In re Phoenix Petroleum Co.*, 278 B.R. 385 (Bankr. E.D. Pa. 2001) ............................................15

*In re Quigley Co.*, 377 B.R. 110 (Bankr. S.D.N.Y. 2007)..........................................................19

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) ...............................................................................................................................20

*Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597 (N.D. Cal. 1994)...............................................................................................................8

*In re Silberkraus*, 253 B.R. 890 (Bankr. C.D. Cal. 2000).........................................................15

*Spector v. Cushman &Wakefield, Inc.*, No. 104607/07, 2012 WL 2353736 (N.Y. Sup. Ct. June 12, 2012).................................................................................................22

*Stradford v. Zurich Ins. Co.*, No. 02 CIV.3628, 2002 WL 31819215 (S.D.N.Y. Dec. 13, 2002)..............................................................................................................23

*In re Superior Toy & Manufacturing Co.*, 78 F.3d 1169 (7th Cir.1996) ....................................24

*In re Teligent, Inc.*, 268 B.R. 723 (Bankr. S.D.N.Y. 2001) ........................................................22

*Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440 (2004)...............................................18

*In re the Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345, Doc. No. 2828 (Bankr. S.D.N.Y. Jan. 18, 2024) .................................................................28

*The Roman Catholic Diocese of Syracuse, New York et al. v. Arrowpoint Capital, et al.*, Adversary Proceeding No. 21-50002-5-mcr....................................................................9

*The Roman Catholic Diocese of Syracuse, New York v. LG 35 Doe et al.*, Adv. No. 21-50005, Doc. No. 22-2 (Bankr. N.D.N.Y. February 16, 2021) ........................... *Passim*

*In re Unichem Corp.*, 72 B.R. 95 (Bankr. N.D. Ill. 1987) ..........................................................15

*In re Valrico Square Ltd. P'ship*, 113 B.R. 794 (Bankr. S.D. Fla. 1990).....................................15

*In re Wireless Data, Inc.*, 547 F.3d 484 (2d Cir. 2008) .............................................................22

*In re WorldCom, Inc.*, No. M-47 HB, 2003 WL 21498904 (S.D.N.Y. Jun. 30, 2003) ...................................................................................................................................20

**Statutes**

11 U.S.C. § 101(5) ........................................................................................................................11

11 U.S.C. § 365..............................................................................................................................24

11 U.S.C. § 365(a) .........................................................................................................................24

11 U.S.C. § 365(f)(2)(A)...................................................................................................24

11 U.S.C. § 365(f)(2)(B)...................................................................................................24

11 U.S.C. § 365(k) ...........................................................................................................24

11 U.S.C. § 541.............................................................................................................18-19

11 U.S.C. § 1125.........................................................................................................19, 28

11 U.S.C. § 1125(a)(1)......................................................................................................19

11 U.S.C. § 1129(a)(3)......................................................................................................18

28 U.S.C. § 1334(e) ...........................................................................................................18

1 New Appleman New York Insurance Law § 16.02(2023) ........................................16

Financial Services and Markets Act 2000, Part VII .......................................................1

**Other Authorities**

H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977) ....................................................19

H.R. REP. NO. 595 (1977) ................................................................................................28

23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2002) .............................22

Certain Underwriters at Lloyd's, London, and London Market Companies (together "London Market Insurers" or "LMI")[1] hereby oppose the *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Joint Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Joint Amended Plan; and (VI) Granting Related Relief* filed by the Roman Catholic Diocese of Syracuse, New York ("Debtor" or "Diocese") and the Official Committee of Unsecured Creditors ("Committee" and together with the Debtor or Diocese, "Plan Proponents"), and respectfully state as follows:

## I.    <u>INTRODUCTION</u>

LMI believe that a global settlement among the Debtor, its related entities, its insurers, and

---

[1]    The "London Market Insurers" are the solvent Certain Underwriters at Lloyd's, London, subscribing Policy Nos. L73-05-17-01, SL3107/SLC 5115, SL3551/SLC 5577, SL4008/SLC 5995, and ISL3352/ICO5202; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd and/or London & Edinburgh Insurance Company Ltd as successor to London & Edinburgh General Insurance Company Ltd); RiverStone Insurance (UK) Limited (formerly known as Dai Tokyo Insurance Company (UK) Limited) of 161-163 Preston Road, Brighton, East Sussex, BN1 6AU with Company Number 01167327 (RIUK) on its own behalf and as successor in interest to Markel International Insurance Company Limited ("Markel") (formerly Terra Nova Insurance Company Limited) under the terms of a transfer under Part VII Financial Services and Markets Act 2000 with effect from 31 March 2017; Tenecom Limited as successor in interest to Sompo Japan Nipponkoa Insurance Company of Europe Ltd. (formerly known as The Yasuda Fire & Marine Insurance Company of Europe Ltd); Harper Insurance Limited f/k/a Turegum Insurance Company; Dominion Insurance Company Ltd.; Assicurazioni Generali S.p.A.; and River Thames Insurance Company Limited (as successor in interest to Unionamerica Insurance Company Limited (on its own behalf and in turn as successor in interest to certain business of St. Paul Travelers Insurance Company Limited (f/k/a St. Katherine Insurance Company Limited, St. Katherine Insurance Company Plc, and St. Paul International Insurance Company Limited))).

TIG Insurance Company issued separate policies to particular parishes, but joins in the legal arguments contained herein to the extent that they are relevant to those policies. Hanover Insurance Company issued separate policies to two different parishes, but joins in the legal arguments contained herein to the extent that they are relevant to those policies.

Abuse Claimants (defined below) is the best solution for all parties.  The *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse New York, Dated December 6, 2023* ("Plan"),[2] is not a global settlement.

The *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York dated December 6, 2023* ("Disclosure Statement")[3] describes a patently unconfirmable plan.  The Plan is unconfirmable because of the conflicting duties that it imposes on the Trustee.[4]  The conflict occurs because any assignment of rights to excess coverage in insurance policies of LMI ("LMI Policies"), described below, requires the assignee, *i.e.*, a trust ("Trust"),[5] to act as the primary self-insurer for abuse-related claims ("Abuse Claims").[6]  New York law requires such a primary self-insurer, which would include the Trustee, to defend vigorously any Abuse Claims implicating the LMI Policies.  However, New York law also specifies that the Trustee would be a fiduciary to the Abuse Claimants[7] with a duty

---

[2]    Doc. No. 1565.

[3]    Doc. No. 1566.

[4]    "Trustee" means the proposed trustee of the Trust, identified as DW Harrow & Assoc., LLC, and any successor trustee appointed pursuant to the terms of the Plan and/or Trust Agreement.  Plan, § 1.1.169.

[5]    "Trust means the trust to be established pursuant to the Plan and the Trust Agreement for the satisfaction of all Abuse Claims."  Plan, § 1.1.162.

[6]    "Abuse Claim means any Claim that has been asserted, or could be asserted, against the Diocese or any Participating Party, arising in whole or in part, directly or indirectly, from Abuse occurring in whole or in part prior to the Effective Date, and seeking monetary damages or any other relief, under any theory of liability, including vicarious liability, any negligence-based theory, contribution, indemnity, or any other theory based on any acts or failures to act by the Diocese or any Participating Party, or by any other Person for whose acts or failures to act the Diocese or any Participating Party is or was allegedly responsible, including, without limitation, all Adult Abuse Claims, Child Abuse Claims, Timely-Filed Abuse Claims, Late-Filed Abuse Claims, and Previously Unasserted Abuse Claims, against the Diocese or any Participating Party, whether or not such Claims arise under, or were revived pursuant to, the [New York Child Victim's Act] or the [New York Adult Survivors Act], and whether or not a proof of claim has been Filed or an Abuse Action has been commenced with respect to such Claim."  Plan, § 1.1.3.

[7]    Holders of Abuse Claims are Abuse Claimants.  Plan, § 1.1.6.

to maximize payments to them.  Hence, defending Abuse Claims vigorously would violate the Trustee's fiduciary duties to Abuse Claimants.  On the other hand, if the Trustee maximizes payments to Abuse Claimants, it would violate its duties as a primary self-insurer, impairing coverage under the LMI Policies.

The Plan is patently unconfirmable because it seeks the Court's approval to transfer certain non-debtor participating parties' ("Participating Parties")[8] property interests in the LMI Policies to the Trust.  The Court cannot approve this transfer because such property interests are not property of the Debtor's bankruptcy estate, and the Court lacks jurisdiction over the Participating Parties' interests in the LMI Policies.

The Disclosure Statement cannot be approved, because it provides inadequate and misleading information for the following reasons.  The Disclosure Statement fails to disclose:

(i)     that the Trustee has a disabling conflict;

(ii)    whether the Debtor or the Trust will vigorously defend the Abuse Claims;

(iii)   that the LMI Policies are executory contracts, which must be assumed, and that the Debtor must provide adequate assurance of the Trust's performance under the insurance contracts before the LMI Policies can be assigned to the Trust;

(iv)    whether the Plan assigns the LMI Policies or only the insurance proceeds under those policies;

(v)     who will satisfy the Debtor's conditions precedent pursuant to the LMI Policies and that any failure to satisfy these conditions will vitiate coverage;

(vi)    in plain English, how the Trust will treat Abuse Claimants; and

(vii)   a clear definition of Participating Parties, which references "Exhibit A" to the Plan but which the Plan does not attach.

---

[8]     "Participating Parties" means "all Parishes, all Schools, and those Other Catholic Organizations, and other Persons and entities listed on Exhibit A attached hereto who contribute Insurance Claims to the Trust and/or contribute funds to the DOS Entities' Cash Contribution. Neither the Reorganized Diocese nor any Settling Insurer shall be a Participating Party."  Plan, § 1.1.127.

Accordingly, LMI respectfully request that the Court deny approval of the Disclosure Statement.

## II.    BACKGROUND

### A.    The LMI Policies

The Debtor and certain Named Assureds[9] became self-insurers starting in 1973.  As a self-insurer, the Debtor has the right and responsibility to defend and administer claims, including Abuse Claims, while LMI and other insurers provide excess indemnity coverage to reimburse covered "Ultimate Net Loss" or ("UNL")[10] in excess of Self-Insured Retention ("SIR") amounts.

LMI subscribed Combined Property, Casualty and Crime Insurance Policies ("Package Policies"), on behalf of the Debtor, as the Named Assured.[11]  The Package Policies provided excess indemnity coverage above self-insurance administered by the Debtor.  The Debtor's Related Entities, including its parishes and schools, are also Assureds under the Package Policies.[12]

---

[9]    *See, e.g.*, *The Roman Catholic Diocese of Syracuse, New York v. LG 35 Doe et al.*, Adv. No. 21-50005, Adv. No. 21-50005, Doc. No. 22-2 at 1 (Bankr. N.D.N.Y. February 16, 2021) (LMI Policy No. SL3551 (Part 2)) ("Name of Assured: Most Reverend Francis J. Harrison, D.D., the Roman Catholic Diocese of Syracuse, New York and all Affiliated Parishes, Schools and Institutions and Catholic Charities"); *id.*, Doc. No. 22-3 at 1 (LMI Policy No. SL3551 (Part 3)) ("Name of Insured: It is agreed that Most Reverend Francis J. Harrison, D.D. et al. owns and/or operates Parishes, Schools, Cemeteries and Other Agencies under specific Names, and it is the intention of this Insurance to cover such Parishes, Schools, Cemeteries and Other Agencies or directly connected organizations as Named Assureds").

[10]    The term "Ultimate Net Loss" means "the total sum which the Assured becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and shall also include . . . expenses for doctors, lawyers, nurses, . . . and for litigation . . . *which are paid as a consequence of any occurrence covered hereunder…. Fees, charges and expenses for [the Service Organization] are specifically excluded*, and are to be paid by the Assured. *See, e.g.*, *id.*, Doc. Nos. 22-17 at 1, 22-4 at 4 (LMI Policy No. SL4008 (Part 4) and LMI Policy No. SL3551 (Part 4)) (emphasis added).

[11]    *See, e.g.*, *id*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)).

[12]    *See, e.g.*, *id.*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)).

LMI subscribed the relevant Package Policies from April 16, 1973, to July 1, 1986.[13]  The

Package Policies provided property, casualty, crime and other types of coverage.[14]  The Package

Policies provide General Liability Coverage on an "occurrence" basis with Specific Excess

Coverage limits of: 80% of $150,000 Ultimate Net Loss ("UNL") each occurrence excess of a

$50,000 UNL each occurrence Self-Insured Retention ("SIR") for the periods from 1973, to

1976;[15] 80% or 90% of $135,000 UNL each occurrence excess of a $65,000 UNL each occurrence

SIR for the periods from 1976. to 1985;[16] and 80% of $100,000 UNL each occurrence excess of a

$100,000 UNL each occurrence SIR for the period from 1985 to 1986.[17]

LMI also subscribed Excess Umbrella and Excess Broadform Policies on behalf of the

Debtor as the Named Assured, and the Debtor's Related Entities as Assureds, effective from April

16, 1973, to April 16, 1975, and from July 1, 1979, to July 1, 1985 ("High Layer Excess Policies",

and collectively with the Package Policies, "LMI Policies").[18]  The High Layer Excess Policies

---

[13]      *See* Doc. No. 1604-4 at 2-3 (LMI Policies No. L(C)73051701 effective from April 16, 1973 to April 16, 1976; No. SL 3107/SLC 5115 effective from April 16, 1976 to April 16, 1979; No. SL3551/SLC5577 effective from July 1, 1979 to July 1, 1982; No. SL4008/SLC5995 effective from July 1, 1982 to July 1, 1985).  LMI also subscribed Package Policies on behalf of the Debtor for the periods from July 1, 1986, to July 1, 1989, which, however, only provided liability coverage on a claims made basis and/or were subject to Sexual Misconduct Exclusions.  *See, e.g.*, DOS_Insur00007168 (Sexual Misconduct Exclusion of LMI Policy No. ISL 3564 effective from July 1, 1986 to July 1, 1987).

[14]      *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-15 at 2 (LMI Policy No. SL4008 (Part 2)).

[15]      *See, e.g.*, *id*., Doc. Nos. 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)), 22-21 at 6 (LMI Policy No. L(C)73051701 (Part 2)), 22-22 at 1 (LMI Policy No. L(C)73051701 (Part 3)).

[16]      *See, e.g., id.*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-3 at 3 (LMI Policy No. SL3551 (Part 3)), 22-6 at 5 (LMI Policy No. SL3551 (Part 6)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-15 at 5 (LMI Policy No. SL4008 (Part 2)), 22-19 at 6 (LMI Policy No. SL4008 (Part 6)).

[17]      *See* DOS_Insur00004840 (summary of limits for Policy No. ISL3352/ICO5202 effective from July 1, 1985 to July 1, 1986).

[18]      *See* Doc. No. 1604-4 at 2-3 (LMI Policies No. L(C)73051701E effective from April 16, 1973 to April 16, 1976; No. SL3578/SLC5603 effective from July 1, 1979 to July 1, 1982; No. SL3579/SLC5604 effective from July 1, 1979 to July 1, 1980; SL3710/SLC5731 effective from

provided General Liability Coverage with limits excess of at least $5,000,000 each occurrence

underlying insurance.[19]

The Package Policies have several conditions precedent to coverage, including that the

Debtor must:

- Utilize a service organization;[20]

- Provide notice of an occurrence to LMI through its service organization;

- Provide LMI with the opportunity to be associated with the Assured in the defense
  of claims, and cooperate with LMI;[21]

---

July 1, 1980 to July 1, 1981; SL 3844/SLC 5855 effective from July 1, 1981 to July 1, 1982; SL
4010/SLC 5997 effective from July 1, 1982 to July 1, 1985; SL 4011/SLC5998 effective from July
1, 1982 to July 1, 1985).  The Diocese alleges that LMI subscribed to policies other than the ones
listed in this footnote and in footnote 12 above.  *See* Doc. No. 1604-4.  LMI's position is that there
is insufficient or no evidence to support that such policies provide coverage for the Abuse Claims.

[19]     *See, e.g.*, DOS_Insur00005516 (Limits of No. SL3578/SLC5603 effective from July 1,
1979 to July 1, 1982).

[20]     The <u>Service Organization requirement in the LMI Policies states</u>: "Insurance afforded
under this Insurance is issued to the Assured on the express condition that the Assured undertakes
to utilize at all times the services of Gallagher Bassett Insurance Service . . . This Service
Organization shall perform the following duties: (a) Strictly discharge the Assured's obligation to
the employees or members of the public; (b) Maintenance of accurate records of all details incident
to payments; (c) Furnish inspection and safety engineering service; (d) Furnish monthly claims
records on an approved form.  The acceptance of these services shall be a condition precedent to
any liability which may attach to the Underwriters in accordance with the terms and conditions of
this Insurance."  *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-3 at 3-4 (LMI Policy No.
SL3551 (Part 3)).

[21]     The LMI Policies require the Debtor to provide notice of each occurrence, as follows:
"<u>NOTICE OF OCCURRENCE:</u> Whenever the Assured has information from which the Assured
may reasonably conclude that an occurrence covered under Section II of this Insurance involves
injuries or damages, notice shall be given to Gallagher Bassett Insurance Service, The Tower, Golf
Road, Rolling Meadows, Illinois 60008 as soon as practicable. Claims shall not be prejudiced if
the Assured, through clerical oversight or error, fails to notify the above firm of any such
occurrence." *See, e.g., id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)). <u>The LMI Policies
also specify that LMI shall have the opportunity to associate in the defense of claims, as follows:</u>
"<u>CLAIMS</u>: The Assured shall immediately notify Underwriters through [the Service Organization]
of any occurrence, the cost of which is likely to result in payment by the Underwriters under this
Insurance. Underwriters shall have the opportunity to be associated with the Assured in defense of
any claims, suits, or proceedings relative to an occurrence wherein the opinion of the Underwriters,
their liability under this Insurance is likely to be involved, in which case the Assured and

- Maintain its status as a self-insurer;[22]

- Allow LMI to inspect books and records;[23]

- Obtain LMI's consent to assign any interest in the LMI Policies;[24] and

- Must not make false or fraudulent claims.[25]

In addition to such conditions precedent imposed on the Debtor, LMI's obligations are set

forth in (and no broader than) the General Liability Insuring Agreement and its applicable terms,

exclusions, and conditions.[26]    LMI have no duty to defend or settle claims, only to indemnify

---

Underwriters shall cooperate to the mutual advantage of both." *Id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[22]    The LMI Polcies require the Debtor to maintain its status as a self-insurer, as follow: "SELF-INSURERS STATUS:  The Assured agrees to duly qualify as a self-insurer by compliance with the provisions of the Worker's Compensation and/or Occupational Disease Law respecting Self-Insurance in the State of New York and shall continue to maintain said status throughout the period of this Insurance, provided, however, Underwriters shall not be relieved of their obligations hereunder because of a breach of this condition until (1) the Assured becomes insured with respect to his Worker's Compensation and/or Occupational Disease liability or (2) the expiration of a period of thirty days after date of the notice served upon the Assured by the Industrial Commission terminating his status as a self-insurer, whichever occurs first." *See, e.g.*, *id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[23]    The LMI Policies require the Debtor to allows claims and records inspections, as follows: "INSPECTIONS, AUDIT AND VERIFICATION OF VALUES:  The Underwriters or their duly authorized representatives shall be permitted at all reasonable times during continuance of this Insurance to inspect the premises used by the Assured and to examine the Assured's books or records so far as they relate to coverage afforded by this Insurance. *See, e.g.*, *id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)). "Records" are defined in the LMI Policies, as follows: "RECORDS: It is hereby understood and agreed that the records and books as kept by the Assured shall be acceptable to Underwriters in determining the amount of loss or damage covered hereunder." *See, e.g.*, *id.*

[24]    The LMI Policies require LMI's consent to assign *any interest* under the LMI Policies, as follows: "ASSIGNMENT: Assignment of interest, under this Insurance shall not bind the Underwriters until the Underwriters' consent is endorsed hereon. *See, e.g.*, *id.* at 4.

[25]    The LMI Policies become void if the Debtor makes any fraudulent claims, as follows: "FRAUDULENT CLAIMS: If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Insurance shall become void and all claim hereunder shall be forfeited. *See, e.g.*, *id.*

[26]    The General Liability Insuring Agreement states: Agreement C–General Liability: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the

covered UNL.[27]  The obligation to reimburse defense expenses or a loss payment arises only after
the underlying claim is resolved and coverage for that claim has been determined.  This is because
the Package Policies provide indemnity coverage for Ultimate Net Loss incurred for Personal
Injury claims arising from an Occurrence where there is legal liability, for damages and expenses,
which has been either "imposed upon the Assured by law" or "assumed by the Named Assured
under contract or agreement."[28]

The Package Policies also specify the timing of a "Loss Payment," as "*[w]hen it has been
determined that Underwriters are liable under this Insurance*, Underwriters shall thereafter
promptly reimburse the Assured for all payments made in excess of the amounts stated in…the
Limits Agreement."[29]

In sum, the Debtor, as a self-insured, and as required by conditions precedent in the
Package Policies, must: (i) defend and settle claims; (ii) notify LMI of claims; (iii) utilize at all
times a service organization; (iv) provide LMI with records; (v) cooperate with LMI; (vi) permit
LMI to associate in the defense of claims; (vii) not assign interests under the LMI Policies without
LMI's consent; (viii) make no changes to the agreements except by endorsement; and (ix) not
make false or fraudulent claims.

---

liability imposed upon the Assured by law or assumed by the Named Assured under contract or
agreement, for damages direct or consequential, and expenses, all as more fully defined by the
term "ultimate net loss," on account of personal injuries . . . arising out of any occurrence
happening during the period of Insurance.  *See, e.g.*, *id.*, Doc. No. 22-4 at 2 (LMI Policy No.
SL3551 (Part 4)).

[27]    *See MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 355
(S.D.N.Y. 2014) ("[I]n the absence of a policy provision expressly imposing a duty to defend, New
York courts will not find such a duty"); *Save Mart Supermarkets v. Underwriters at Lloyd's
London*, 843 F. Supp. 597, 603 (N.D. Cal. 1994) ("More importantly, the London Defendants'
explicit option to join in the defense directly contradicts any possible duty to join in the defense.").

[28]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-4 at 2 (LMI Policy No. SL3551 (Part
4)).

[29]    *See, e.g.*, *id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6) (emphasis added)).

### B.     The Adversary Proceeding

On June 19, 2020, the Debtor filed a voluntary petition for relief under chapter 11 of title

11 of the United States Code ("Bankruptcy Code").[30]

On January 15, 2021, the Debtor and its related parishes (collectively, "Plaintiffs")

commenced an adversary proceeding against various defendant insurers, including LMI

(collectively, "Insurers" and together with Plaintiffs, "Parties"), captioned *The Roman Catholic*

*Diocese of Syracuse, New York et al. v. Arrowpoint Capital, et al.*, Adversary Proceeding No. 21-

50002-5-mcr ("Adversary Proceeding"), in this Court.[31]

On February 4, 2021, Plaintiffs filed a motion to refer the Adversary Proceeding to

mediation.[32]  On March 5, 2021, the Parties stipulated to agreeing to stay the Adversary Proceeding

up through April 15, 2021 ("Stipulation").[33]   On March 12, 2021, the Court granted the

Stipulation.[34]

On April 12, 2021, the Court entered a mediation order ("Mediation Order"), which

provided that "all further proceedings in this Adversary Proceeding shall be suspended pending

further order of the Court, including, but not limited to, the obligation of the Insurers to answer the

Adversary Proceeding [c]omplaint."[35]

On October 20, 2023, several Insurers filed a *Motion to Terminate the Mediation Stay*

("Motion to Lift the Stay"), requesting that the Court lift the mediation stay and allow the Insurers

---

[30]    Doc. No. 1; unless otherwise defined, any reference to a section shall mean a statutory
section of the Bankruptcy Code.

[31]    Adversary Proceeding, Doc. No. 1.

[32]    *Id.*, Doc. No. 3.

[33]    *Id.*, Doc. No. 21.

[34]    *Id.*, Doc. No. 36.

[35]    *Id.*, Doc. No. 59, ¶ 4.

to litigate the Adversary Proceeding.[36]  On January 5, 2024, the Court entered an order approving

the Motion to Lift the Stay ("Lift-Stay Order").[37]  The Lift-Stay Order imposed a deadline for the

Insurers, including LMI, "to answer, move, or otherwise respond to the complaint" in the

Adversary Proceeding by February 20, 2024.

C.    **Summary of the Plan**

On December 6, 2023, the Plan Proponents filed the Disclosure Statement and Plan.[38]  On

January 4, 2024, the Plan Proponents filed a plan supplement, which included, among other things,

an allocation protocol ("Allocation Protocol")[39] and a trust agreement ("Trust Agreement").[40]

The Plan Proponents seek to establish a fund ("Abuse Claims Settlement Fund")[41] held by

the Trust to compensate Abuse Claims.  The Debtor and Participating Parties will contribute up to

$100 million to the Abuse Claims Settlement Fund.  The Trustee will make payments from the

Abuse Claims Settlement Fund to Abuse Claimants pursuant the terms of the Allocation Protocol,

the Trust Agreement, the Plan, and the Court's order confirming the Plan.[42]

The Plan Proponents designed the Allocation Protocol to provide guidance to a survivor

claims reviewer ("Survivor Claims Reviewer"),[43] who will assign points to each Abuse Claim

---

[36]    *Id.*, Doc. No. 141.

[37]    *Id.*, Doc. No. 170.

[38]    Doc. Nos. 1565, 1566.

[39]    "Allocation Protocol or Survivor Claim Allocation Protocol means the protocol for allocation of the Abuse Claims Settlement Fund developed by the Committee, attached to the Plan Supplement as Exhibit 1, and incorporated into the Trust Agreement."  Plan, § 1.1.15.

[40]    Doc. No. 1604.

[41]    "Abuse Claims Settlement Fund means a fund established by the Trust from which Distributions to Class 5 Claims will be made."  Plan, § 1.1.8.

[42]    Plan, § 8.2.

[43]    Roger L. Kramer, of Kramer Law, LLC, is the Survivor Claims Reviewer.  Doc. No. 1604-1, ¶ 2.5.

based on a set of factors involving the nature of abuse and circumstances, the impact of the abuse, and the Abuse Claimant's involvement in any legal proceeding related to an Abuse Claim.[44]  The Trustee will make payments to each Abuse Claimant based on the Abuse Claimant's pro rata share of the total points assigned.[45]

The Trust will also hold insurance claims ("Insurance Claims"), outbound contribution claims,[46] and "all other property transferred to the Trust" pursuant to the Plan,[47] including any amounts recovered by the Trust as insurance claim proceeds ("Insurance Claim Proceeds").[48] Insurance Claims means as follows, all:

    1.  Claims,[49] causes of action and enforceable rights of an Abuse Claimant, the Diocese

---

[44]    *Id.*, ¶ 4.1.

[45]    *Id.*, ¶ 3.3.

[46]    "Outbound Contribution Claims means any Claim or cause of action related to an Abuse Claim that may be asserted by the Diocese or any Participating Party against any Person that is not a Protected Party."  Plan, § 1.1.125.

[47]    Plan, § 1.1.164.

[48]    "Insurance Claim Proceeds means any amount recovered by the Trust in respect of any Insurance Claims assigned to the Trust pursuant to the terms of this Plan."  Plan, § 1.1.84; Plan, § 8.2.1.

[49]    "Claim means a claim, as that term is defined in section 101(5) of the Bankruptcy Code, including, without limitation, any claim, Action, assertion of right, complaint, cross-complaint, counterclaim, liabilities, obligations, rights, request, allegation, mediation, litigation, direct action, administrative proceeding, cause of action, Lien, encumbrances, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorney's fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, whether past, present or (to the extent it arises prior to the Effective Date) future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty, under the Bankruptcy Code, or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass,

and any Participating Party[50] against an Insurer whether sounding in contract, tort, or otherwise, including equity and bad faith, held by:

    i.    the Diocese for any reason related to any Abuse Claim including those for

        a.  indemnity and payment of any Abuse Claim,

        b.  any Insurer's failure or refusal to provide insurance coverage for any Abuse Claim under any Insurance Policy,

        c.  any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any Abuse Claims against the Diocese pursuant to any Insurance Policy,

        d.  to the extent not otherwise encompassed by section (c) above, any Insurer's failure or refusal to reasonably settle the Abuse Claims, and

        e.  the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing; and/or

    ii.    any of the Participating Parties or Settling Insurers[51] for any reason related to any Abuse Claim against the Participating Party or Settling Insurer, whether independently or jointly liable with the Diocese on such Abuse Claim, including for

        a.  indemnity and payment of any Abuse Claim,

        b.  any Insurer's failure or refusal to provide insurance coverage under any Insurance Policy for any Abuse Claim against the Diocese, a Participating Party or a Settling Insurer,

        c.  any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any Abuse Claims against the Diocese, a Participating Party, or a Settling Insurer pursuant to any Insurance Policy,

        d.  to the extent not otherwise encompassed by section (c) above, any Insurer's failure or refusal to reasonably settle the Abuse Claims, and

        e.  the interpretation or enforcement of the terms of any Insurance Policy

---

statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise." Plan, § 1.1.34.

[50]    The lack of an Oxford comma in this clause and the preceding clause creates ambiguity in the definition of Insurance Claims.

[51]    "Settling Insurer means any Insurer that is a party to an Insurance Settlement Agreement with the consent of the Committee and the Diocese." Plan, § 1.1.152.

as it pertains to any of the foregoing.[52]

The Trust will "assume responsibility for preserving, managing, and distributing Trust Assets to Abuse Claimants".[53]  The Plan Proponents seek to appoint the Trustee to oversee the Trust "*solely in a fiduciary capacity*" to preserve, manage, and distribute Trust Assets to Abuse Claimants.[54]  The Trust will also assume "the right to pursue Insurance Claims" against any "Non-Settling Insurers"[55]

The Plan provides for the issuance of an injunction to bar all persons ("Persons")[56] from asserting any Abuse Claims against the Debtor or Participating Parties ("Injunction") and discharges all Abuse Claims against the Debtor and the Participating Parties.[57]  The Plan Proponents also seek to channel the Abuse Claims, including unknown Abuse Claims, to the Trust,

---

[52]     Plan, § 1.1.82.  Insurance claim also "includes any Claims or causes of action nfor reimbursement of DOS Entities' Post-Effective Date Costs under any Insurance Policy, but only to the extent such DOS Entities' Post-Effective Date Costs are actually paid by the Trust." *Id.*

[53]     Doc. No. 1604-3, § 1.2.

[54]     Doc. No. 1604-3, § 1.7.3 (emphasis added).

[55]     Plan, § 4.1.  "Non-Settling Insurer means any Insurer that is not a Settling Insurer."  Plan, § 1.1.121.  "Settling Insurer means any Insurer that is a party to an Insurance Settling Agreement with the consent of the Committee and the Diocese."  *Id.*, § 1.1.152.  "Insurer means a Person that has, or is alleged to have, issued, subscribed, any interest in, assumed any liability for, or underwritten any risk in an Insurance Policy, whether or not a regulated insurance company, including all of such Person's reinsurers and retrocessionaires and all of its affiliates, successors, and assigns, and all Agents of the foregoing."  *Id.*, § 1.1.89.  "Insurance Settlement Agreement means a settlement agreement among the Diocese and the applicable Participating Parties, with the Committee's consent or, following the Effective Date, the consent of the Trust, and a Settling Insurer, consistent with the Terms of the Plan, to be included in the Plan Supplement or Filed with the Bankruptcy Court if entered into by the Trust after the Effective Date."  *Id.*, § 1.1.187.

[56]     Person' means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Diocese, the Reorganized Diocese, and the Participating Parties."  Plan, § 1.1.131.

[57]     Plan, §§ 12.2.1, 12.2.2.

pursuant to a proposed injunction to be issued by the Court, pursuant to section 105.[58]

The Plan assigns all Insurance Claims against the Non-Settling Insurers to the Trust ("Ambiguous Insurance Assignment")[59], but provides that the Ambiguous Insurance Assignment shall not be construed: (i) as an assignment of the insurance policies…"[60]  Following the Ambiguous Insurance Assignment, the Trust has the right to:

- "assert and/or assign to any Abuse Claimant or combination of Abuse Claimants, … any and all Insurance Claims that currently exist or may arise in the future against Non-Settling Insurers" ("Insurance Claims Provision"),[61]

- "pursue Claims against Non-Settling Insurers related to the Diocese's and/or the Participating Parties' liability for Abuse Claims or the Non-Settling Insurers' obligations in respect of such Claims, regardless of whether an Abuse Claimant holds a Claim against the Trust, a Litigation Claim,[62] or both" ("Claims Provision"),[63] or

- "***full access to coverage*** under the Non-Settling Insurer Policies to the greatest extent permitted by applicable non-bankruptcy law, in the same manner and to the same extent, as any Abuse Claimant, the Diocese and any Participating Parties prior to the confirmation of the Plan and the Insurance Claims Assignment" ("Insurance Policy Provision" and together with the Insurance Claims and Claims Provisions, "Insurance Provisions").[64]

The Trust will also succeed the Debtor as the named plaintiff in the Coverage Action.[65]

---

[58]    Plan, § 12.3.

[59]    Plan, § 8.2.4.

[60]    Disclosure Statement, Art. IX, ¶ B.4.a.

[61]    *Id.*, ¶ G.1.a.

[62]    "Litigation Claim means any Abuse Claim held by a Litigation Claimant, to the extent the Trustee has (i) determined in good faith that such Abuse Claim is covered, in whole or in part, by one or more Non-Settling Insurer Policies, and (ii) authorized such Litigation Claimant to liquidate their Abuse Claim in accordance with the Plan, Allocation Protocol, and the Trust Agreement." Plan, § 1.1.104.  "Litigation Claimant means any Abuse Claimant who elects to be treated as a Litigation Claimant pursuant to Section 4.3.1.b of the Plan or who is deemed to be a Litigation Claimant pursuant to the terms of Section 4.3.1.c of the Plan. *Id.*, § 1.1.105

[63]    Disclosure Statement, Art. IX, ¶ G.1.b.

[64]    *Id.*, ¶ G.1.h (emphasis added).

[65]    *Id.*, Art. VII, ¶ E.

Additionally, the Disclosure Statement states that the Plan limits recovery of an Abuse

Claimant, seeking litigation against a Non-Settling Insurer, "to the **proceeds** of Non-Settling

Insurer Policies…."[66]

## III.  ARGUMENT

### A.  Approval of the Disclosure Statement Should Be Denied Because the Plan is Patently Unconfirmable

A bankruptcy court should not approve a disclosure statement if it describes a patently

unconfirmable plan, because it would be a fruitless exercise.[67] "If it appears there is a defect that

makes a plan inherently or patently unconfirmable, the court may consider and resolve that issue

at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and

rejections and a contested confirmation hearing."[68]  In *American Capital*, the insurers, which were

the only objectors, objected because the disclosure statement described a facially unconfirmable

---

[66]    *Id.*, Art. V, ¶ D (emphasis added).  The Plan also appears to assign the Insurance Claim Proceeds to the Trust.  Plan, § 8.2.1 (funding of the Settlement Abuse Trust includes "Insurance Claim Proceeds").

[67]    *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (3d Cir. 1993).

[68]    *In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (quoting *In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011)); *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001); *In re Miller*, No. 96-81663, 2008 WL 191256, at *3 (Bankr. W.D. La. Jan. 22, 2008); *In re El Comandante Mgmt. Co.*, 359 B.R. 410, 415 (Bankr. D.P.R. 2006); *In re Mahoney Hawkes, LLP*, 289 B.R. 285, 294 (Bankr. D. Mass. 2002); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000); *In re Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990); *In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989); *In re Unichem Corp.*, 72 B.R. 95, 100 (Bankr. N.D. Ill. 1987).

plan.[69]  The bankruptcy court and district court upheld that objection. The Third Circuit affirmed

those decisions.[70]  It held that a "bankruptcy court may address the issue of plan confirmation

where it is obvious at the disclosure statement stage that a later confirmation hearing would be

futile because the plan described by the disclosure statement is patently unconfirmable."[71]

> **(a)**      **The Plan is patently unconfirmable because the Trustee has an irreconcilable conflict.**

The Plan is patently unconfirmable because the Trustee has an irreconcilable conflict.

The Plan specifies that the Trust will assume the right to pursue Insurance Claims against

Non-Settling Insurers.[72]  Pursuant to the LMI Policies, the Debtor must defend Abuse Claims to

judgment before seeking indemnity for covered UNL in excess of all SIR obligations.[73]  The LMI

Policies also require the Debtor to cooperate, including permitting LMI to inspect records, and to

associate in the defense of claims.[74]  These conditions precedent are enforceable under New York

law.[75]  If the LMI Policies are assigned to the Trust, the Trust must perform the Debtor's

---

[69]    *In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 418 (Bankr. W.D. Pa. 2009).

[70]    *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012).

[71]    *Id.* at 154.

[72]    Plan, § 4.1.

[73]    *Matthews v. Cont'l Cas. Co.*, 39 Misc. 3d 1216(A), 975 N.Y.S.2d 367 (Sup. Ct. 2013) (self-insured retention "is an amount that an insured retains and covers before insurance coverage begins to apply."); *see also* 1 New Appleman New York Insurance Law § 16.02(2023) ("A 'self-insured retention' represents that amount of loss absorbed by the insured before it can obtain the insurance coverage provided by an excess or umbrella liability insurance policy.").

[74]    *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)); *id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[75]    "Generally an insured has a duty to cooperate in an insurance investigation by its insurer. In fact, typically, an insurer may disclaim coverage where an insured deliberately fails to cooperate with its insurer as required by an insurance policy." *Hochhauser v. Elec. Ins. Co.*, 46 A.D.3d 174, 180, 844 N.Y.S.2d 374, 378 (2007) (citations omitted); *see also Conf. Assocs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 80 A.D.3d 552, 914 N.Y.S.2d 310 (2011) (insurer not obligated to reimburse insured because insured breached obligation to cooperate); *Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*, 53 N.Y.2d 835, 836, 422 N.E.2d 819, 820 (1981) (finding breach of cooperation clause).

obligations as a self-insurer under the LMI Policies and defend claims vigorously, pursuant to New York law.  This is diametrically opposed to the Trustee's duty not to act contrary to the interests and expectations of the beneficiaries. On the one hand, if the Trustee breaches the duty to defend claims vigorously or to cooperate, then the Trust would lose coverage under the LMI Policies, to the detriment of the Trust's beneficiaries. On the other hand, a vigorous defense of Abuse Claims and cooperation with LMI could result in the denial of coverage for, or payment of potential Trust beneficiaries.

However, the Plan obligates the Trustee to act as a "fiduciary" to Abuse Claimants by prosecuting or settling Insurance Claims, including the assertion of any "defenses, offsets, and privileges."[76]  New York law requires a trustee to "administer the trust fairly for all of them and may not favor himself or herself over the other beneficiaries."[77]  Hence, as their fiduciary, the Trustee would have a duty of loyalty to the Abuse Claimants, and cannot act contrary their interests.[78]

If the Trustee were to defend the Abuse Claims vigorously, to satisfy the LMI Policies' conditions precedent to coverage, then the Trustee would violate the fiduciary duty to the Abuse Claimants not to act contrary to the interests and expectations of the Trust beneficiaries.  However, the duty of loyalty owed to the Trust beneficiaries prohibits a vigorous defense and cooperation with LMI in defending Abuse Claims.  If the Trustee acts in accordance with his fiduciary duties to the Abuse Claimants, and fails to defend the Abuse Claims vigorously, or does not cooperate

---

[76]     Plan, § 8.6.

[77]     *Milea v. Hugunin*, 890 N.Y.S.2d 369 (Sup. Ct. 2009) (citations omitted).

[78]     *Bd. of Trustees of Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662 (S.D.N.Y. 2011).  The most fundamental duty owed by the trustee is "a duty of undivided and undiluted loyalty to the beneficiaries whose interests the fiduciary is appointed to protect." *In re Jastrzebski*, 948 N.Y.S.2d 689, 691 (2012).

with LMI, in order to maximize payments to the Abuse Claimants, then such omission would fail to satisfy the conditions precedent to coverage set forth in the LMI Policies.

This conflict is fundamental and unavoidable under the Plan, preventing confirmation.[79] (Moreover, at no point does the Disclosure Statement warn of this disabling conflict to Abuse Claimants.  Do they wish to have their Trustee obligated by contract to oppose their very own Claims?)

> **(b)    The Plan is patently unconfirmable because it requires the Court to approve the transfer of non-debtor property.**

The Plan is patently unconfirmable because it seeks the Court's approval of the Participating Parties' property interests under the LMI Policies.  The Court cannot approve such assignment because it lacks jurisdiction over the Participating Parties' interests in the LMI Policies.

Bankruptcy Courts have exclusive jurisdiction over a debtor's property and over the estate.[80]  Section 541 governs which property becomes property of a debtor's estate.[81]  By its terms, Section 541 does not apply to the property of non-debtors.  The Participating Parties are non-debtors.  Hence, the Participating Parties' property does not become part of the Debtor's estate and the Court does not have jurisdiction to approve an assignment by the Participating Parties of their property.

In the Diocese of Camden, New Jersey bankruptcy case, the bankruptcy court recently ruled on the exact same issue. In that case, the debtor sought the bankruptcy court's approval of

---

[79]    *See* 11 U.S.C. § 1129(a)(3).

[80]    *See* 28 U.S.C. § 1334(e); *see also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).

[81]    "(a) The commencement of a case … creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) … all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541.

an assignment of its related non-debtor entities' insurance rights to a trust. Judge Poslusny held

that "the Court finds that the [i]nsurers are correct in their argument that this Court lacks

jurisdiction to order or approve the transfer of the OCE's interest in the Policies, because the

Court's jurisdiction is limited to property of the Debtor, or the estate. 11 U.S.C. § 541"[82]

Here, the Debtor also seeks the Court's approval of an assignment of the non-debtor

Participating Parties' rights, in the LMI Policies, to the Trust.[83]   The Court does not have

jurisdiction to approve that assignment

Therefore, because the Plan seeks relief from the Court that is beyond the Court's

jurisdiction, it is patently unconfirmable.

### B.    The Disclosure Statement Provides Inadequate and Misleading Information

The Disclosure Statement does not merit approval because it contains inadequate and

misleading information.

To merit approval, a disclosure statement must contain "adequate information"[84] that

describes a confirmable plan.[85]   "Adequate information" is "determined by the facts and

circumstances of each case."[86]   It is "crucial to the effective functioning of the federal bankruptcy

---

[82]    *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 352 (Bankr. D.N.J. 2023).

[83]    "On the Effective Date, and without further action by any party, the Diocese and each of the Participating Parties will be deemed to have assigned to the Trust the Diocese's and the Participating Parties' rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers."  Plan, § 8.2.4a.

[84]    11 U.S.C. § 1125(a)(1) (stating "Adequate Information" means: "information of a kind, and in sufficient detail. . .  that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, . . . in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information…"); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).

[85]    11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

[86]    *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

system[;] . . . the importance of full and honest disclosure cannot be overstated."[87]  The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene.[88]  This determination falls within the broad discretion of the Court.[89]

Bankruptcy Courts may not approve disclosure statements that include inadequate or misleading information.[90]  The Debtor's obligation to provide adequate and accurate information cannot be overemphasized.[91]  Thus, vague and ambiguous statements in a disclosure statement must be excised or clarified before approval.[92]

> **(a)     The Disclosure Statement fails to disclose the Trustee's disabling conflict.**

If, the Court ultimately were to approve a plan that requires the Trust to satisfy the conditions precedent to coverage[93] set forth in the LMI Policies, then, as discussed above, the Trustee would be subject to an irreconcilable conflict.  The Disclosure Statement fails to disclose that conflict.

To address this issue, the Plan Proponents should add the following statement to Art. IX, Sect. B.4 of the Disclosure Statement:

> LMI contend that if rights under the LMI Policies are assigned to the Trust, the

---

[87]     *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida*, 848 F.2d 414); *see also In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596–97 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988)).

[88]     *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[89]     *See In re WorldCom, Inc.*, No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. Jun. 30, 2003) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.") (quoting *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995)).

[90]     *See, e.g.*, *In re Monroe Well,* 80 B.R. at 330.

[91]     *Oneida,* 848 F.2d at 417.

[92]     *See, e.g.*, *In re Pettit*, 18 B.R. 6, 8 (Bankr. E.D. Ark. 1980).

[93]     This point, which is one of the many questions that the Disclosure Statement fails to clarify, is discussed further below.

Trustee would be required to both (i) vigorously defend the Abuse Claims; and (ii) act as the fiduciary of the Abuse Claimants, such that the performance of either duty would violate the other duty.

Absent the addition of the foregoing language, the Court should deny approval of the Disclosure Statement.

>    **(b)    The Disclosure Statement fails to alert creditors that the failure to satisfy the conditions precedent to coverage, set forth in the LMI Policies, would void coverage.**

If the Court approves a Plan that assigns the right to seek coverage under the LMI Policies to the Trust, then the Trustee would be obligated to satisfy the conditions precedent to coverage in the LMI Policies, including, without limitation, vigorously defending Abuse Claims.  The conflict described above, however, would bar the Trustee from performing such vigorous defense.  Any failure by the Trustee to satisfy the applicable conditions precedent to coverage, would void the coverage.

The Disclosure Statement fails to disclose that if this occurs, recovery from the LMI Policies for the Abuse Claimants would not occur.  To address this failure to disclose, the Debtor should add the following statement to Art. IX, Sect. G1 of the Disclosure Statement:

>    LMI contend that if the Trustee were not to vigorously defend the Abuse Claims, LMI would be excused from indemnifying the Trust, and for the Abuse Claims, which would reduce or completely eliminate any insurance recoveries for Abuse Claimants, thereby reducing the amounts of money they would receive from the Trust.

Absent this language, the Court should deny approval of the Disclosure Statement.

>    **(c)    The Disclosure Statement fails to disclose that the LMI Policies are executory contracts that must be assumed, and that adequate assurance of future performance must be provided by any assignee before any interest thereunder could be assigned.**

>    **(1)    New York law determines whether there are material unperformed obligations on both sides of the LMI Polices.**

"[An executory contract is] 'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete

21

performance would constitute a material breach excusing performance of the other.'"[94]  "The

materiality of the breach…is a factual question resolved through the application of state law."[95]

"[W]here the contract itself is clear in making a certain event a material breach of that contract, a

court must ordinarily respect that contractual provision."[96]  There is no dispute that New York law

governs the interpretation of the LMI Policies.  Hence, New York law determines whether there

are material unperformed obligations on both sides of the LMI Policies.

**(2)    The Debtor and LMI have material unperformed obligations
pursuant to the LMI Policies.**

The Debtor has numerous material obligations under the LMI Policies.  Among them is the

duty to defend and contribute to defense costs under the self-insured retention.  "*A self-insured*

*retention* represents a dollar amount of loss that is 'retained' by the insured and not covered by

insurance…Where a self-insured retention exists, the insured must exhaust the amount retained,

before the insurer will respond to the loss, thereby rendering the insured liable for all costs,

*including defense* and indemnity, *up to the applicable amount*."[97]    There is no separate rule

regarding the scope of this defense obligation; the duty to defend and to contribute defense costs

is the same for self-insurers as an insurance company.[98]  Furthermore, "[s]elf-insurance . . . has

been defined as a representation by the self-insured entity that it has the financial means to pay

---

[94]    *In re Wireless Data, Inc.*, 547 F.3d 484, 488, n.1 (2d Cir. 2008) (citations omitted).

[95]    *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001) (citations omitted).

[96]    *In re Avianca Holdings S.A.*, 618 B.R. 684, 696 (Bankr. S.D.N.Y. 2020) (citing *Jay Dee/Mole Joint Venture v. Mayor & City Council of Balt.*, 725 F. Supp. 2d 513, 526 (D. Md. 2010)); *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 278 (Bankr. S.D.N.Y. 2013) (citing 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2002)).

[97]    *Spector v. Cushman &Wakefield, Inc.*, No. 104607/07, 2012 WL 2353736 (N.Y. Sup. Ct. June 12, 2012) (citations omitted) (emphasis in the original)

[98]    *See People ex rel. Spitzer v. ELRAC, Inc.*, 745 N.Y.S.2d 671, 674-675 (Sup. Ct. 2002) (citing 1 Couch on Insurance 3d § 10:7 (1995)).

22

any judgments against it."[99]

Here, the Debtor elected to administer a self-insurance program from 1973 to 1986, where it agreed to administer and defend claims; utilize at all times a service organization; provide LMI with notice of claims, records, cooperation; and provide LMI the opportunity to associate in the defense.  The failure of the Debtor to perform any of these obligations with respect to an Abuse Claim would excuse LMI from indemnifying such claim.[100]  Further, the LMI Policies specifically state that maintaining a service organization is a condition precedent, which is patently an obligation that, if unperformed, would excuse LMI's performance.[101]  LMI may owe performance pursuant to the LMI Policies, including indemnification, ***only if*** the Debtor satisfies its conditions precedent above.  Thus, because both parties owe future performance under the LMI Policies that are material, the LMI Policies are executory contracts.

### (3)    The Debtor must assume the LMI Policies and the Trust must provide adequate assurance of future performance.

The Debtor must assume the LMI Policies and the Trust must provide adequate assurance of future performance.

---

[99]    *Consol. Edison Co. of New York v. Liberty Mut.*, 749 N.Y.S.2d 402, 403–04 (Sup. Ct. 2002).

[100]    *Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*, 422 N.E.2d 819, 820 (1981) (an insured's failure to submit for loss and sit for examination relieves the insurer of liability); *Stradford v. Zurich Ins. Co.*, No. 02 CIV.3628, 2002 WL 31819215, at *7 (S.D.N.Y. Dec. 13, 2002) (insured's willful breach of the cooperation clause under New York law precluded recover of the insurance proceeds); *Const. Reinsurance Corp. v. Stonewall Ins. Co.*, 980 F. Supp. 124, 131 (S.D.N.Y. 1997) (violating a prompt notice condition in agreement operates as a "complete bar" against recovering under the reinsurance policy); *Eagley v. State Farm Ins. Co.*, No. 13-CV-6653P, 2015 WL 5714402, at *6 (W.D.N.Y. Sept. 29, 2015) ("Under New York law, 'it is well settled that the insured's cooperation is a condition precedent to coverage under an insurance policy and that summary judgment is appropriate where it is determined that an insured's conduct constitutes a breach of the policy's cooperation clause.'") (citation omitted).

[101]    *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-3 at 3-4 (LMI Policy No. SL3551 (Part 3)).

Section 365 of the Bankruptcy Code specifies that, subject to court approval, a debtor may

assume or reject any executory contract of the debtor.[102]  Further,

> Before an executory contract may be assigned, the trustee first must assume the
> contract and "adequate assurance of future performance" of the contract must be
> provided. 11 U.S.C. §§ 365(f)(2)(A), (B). This requirement provides needed
> protection to the non-debtor party because the assignment relieves the trustee and
> the bankruptcy estate from liability for breaches arising after the assignment.[103]

Thus, in order for the Debtor to assign its interests in the LMI Policies to the Trust, it must

assume the LMI Policies and the Trust must provide adequate assurance of future performance.

> **(4)     The Disclosure Statement must disclose that LMI contend that
> the LMI Policies are executory contracts that must be assumed,
> with adequate assurance of future performance provided by an
> assignee, before the Ambiguous Insurance Assignment may
> occur.**

To address this, the Plan Proponents should add the following statement to Art. IX, Sect.

B.4 of the Disclosure Statement:

> LMI contend that the LMI Policies are executory, that the Debtor must assume the
> LMI Policies, and that the Trust must provide adequate assurance of future
> performance of the Debtor's obligations under the LMI Policies before any interest
> under the LMI Policies can be assigned to the Trust.  Because the Plan does not
> provide for such assumption and assignment of the LMI Policies, LMI further
> contend that the Plan cannot be confirmed.

Absent the additional language, the Court should deny approval of the Disclosure

Statement.

> **(d)     The Disclosure Statement is inadequate because the Ambiguous
> Insurance Assignment is confusing and contradictory without clearly**

---

[102]     11 U.S.C. § 365(a).

[103]     11 U.S.C. § 365(k). *See also In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996)
("Congress's intent in imposing these conditions on the ability of the debtor to assume the contract
was 'to insure that the contracting parties receive the full benefit of their bargain if they are forced
to continue performance.'") (citing *In re Superior Toy & Manufacturing Co.*, 78 F.3d 1169, 1174
(7th Cir.1996) ("'If the trustee is to assume a contract of lease, the court will have to insure that
the trustee's performance under the contract or lease gives the other contracting party the full
benefit of his bargain'") (citations omitted).

**defining what is being assigned and to who.**

The Disclosure Statement's description of the Ambiguous Insurance Assignment is confounding.[104]  The Disclosure Statement states that the Ambiguous Insurance Assignment is not an assignment of the "insurance policies,"[105] which includes the LMI Policies.[106]  The Disclosure Statement also states that the Plan limits recovery of an Abuse Claimant, seeking litigation against a Non-Settling Insurer, "to the **proceeds** of Non-Settling Insurer Policies…"[107]  However, following the Ambiguous Insurance Assignment, the Trust has substantive rights in the Insurance Provisions, including the Insurance Claims Provision, the Claims Provision, and the Insurance Policy Provision.[108]  The Insurance Provisions extend far beyond an assignment that purportedly limits recovery to insurance proceeds.[109]  Even more confusing is that Insurance Claims include **all** Claims against Non-Settling Insurers, making the Claims Provision redundant.

The Ambiguous Insurance Assignment is inconsistent and contradicts what exactly the Plan purportedly attempts to assigns.  The Plan Proponents must define **clearly** what is being assigned and to whom.  LMI cannot provide curative wording here because the Disclosure

---

[104]    *See Adelphia*, 352 B.R. at 596–97 (additional information in the disclosure statement must not be misleading).

[105]    Disclosure Statement, Art. IX, ¶ B.4.a (emphasis added).

[106]    Doc. No. 1604-4 (list of insurance policies).

[107]    Disclosure Statement, Art. V, ¶ D (emphasis added).  The Plan also appears to assign the Insurance Claim Proceeds to the Trust.  Plan, § 8.2.1 (funding of the Settlement Abuse Trust includes "Insurance Claim Proceeds").  Insurance proceeds only exist after a claim fully resolves. *See In re McLean Indus., Inc.*, 132 B.R. 271, 284 (Bankr. S.D.N.Y. 1991) (defining insurance proceeds as "insurance payable by reason of loss of damage to the collateral ..."); *Nat'l Commc'ns Ass'n, Inc. v. Nat'l Telecommunications Ass'n, Inc.*, No. 93 CIV.0926 SS KAR, 1995 WL 236731, at *18 (S.D.N.Y. Apr. 21, 1995) ("A security interest or lien in the proceeds of a pending lawsuit generally does not become choate until a settlement or judgment is obtained because the property to which the lien is attached is not 'in existence' until that time.") (citations omitted).

[108]    *Id.*, Art. IX, ¶¶ G.a, b, & h (emphasis added).

[109]    *Id.*, Art. V, ¶ D (emphasis added).

Statement is extraordinarily vague and nonsensical.

> **(e)**   **The Disclosure Statement is inadequate because it does not state who will satisfy the conditions precedent pursuant to the LMI Policies.**

The Disclosure Statement does not state who will satisfy the Debtor's conditions precedent pursuant to the LMI Policies.

As mentioned, following the Ambiguous Insurance Assignment, the Trust may assert "all Insurance Claims and recoveries…against the Non-Settling Insurers"[110] and have "full access to coverage under the Non-Settling Insurer Policies."[111]  However, the Trust shall assume "only such obligations of the Diocese and Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Insurance Claims and any recoveries on account of Insurance Claims against the Non-Settling Insurer Policies."[112]  Notwithstanding, the Debtor and Participating Parties "shall use reasonable efforts to comply with any Post-Effective Date Insurance Obligations."[113]  Yet, confusingly, the Ambiguous Insurance Assignment further qualifies this statement by requiring the Debtor and Participating Parties to comply with the Trust's "reasonable request."[114]

The Disclosure Statement does not state who will perform the Debtor's conditions precedent pursuant to the LMI Policies, including defense against Abuse Claims as a self-

---

[110]    *Id.*, Art. IX, ¶ B.4.a.

[111]    *Id.*, ¶ G.1.h (emphasis added).

[112]    *Id.*, ¶ B.4.a.

[113]    *Id.*, Art. VII, ¶ C.

[114]    *Id.*, Art. IX, ¶ B.4.a ("At the Trust's reasonable request, the Diocese, the Reorganized Diocese, and the Participating Parties shall use reasonable efforts to comply with any Post-Effective Date Insurance Obligations to preserve coverage under the non-Settling Insurer Policies.").

insurer,[115] utilization of a service organization,[116] notice,[117] cooperation,[118] access to books and records,[119] and LMI's association in the defense of claims.[120]  The worst of these failures is the fundamental question of who will defend claims in the tort system.  Therefore, the Disclosure Statement is ambiguous as to what will happen to these conditions precedent to obtain coverage. Various entities will purportedly perform "necessary" conditions precedent under the LMI Policies, including the Debtor, Participating Parties, and Trustee, but the Disclosure Statement is not clear who will assume what and when, and any determination whatsoever for what makes a condition precedent "necessary."

Thus, to address these issues, the Debtor should add the following statement to Art. IX Sect. G1 of the Disclosure Statement:

> LMI contend that the Debtor must satisfy material conditions precedent to coverage, including defense against Abuse Claims as a self-insurer, utilization of a service organization, notice, cooperation, access to book and records, and association in the defense of claims.  If such conditions are not satisfied, then the Trust may not have coverage under the LMI Policies.

Absent the additional language, the Court should deny approval of the Disclosure Statement.

---

[115]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[116]    *See, e.g.*, *id.*, Doc. No. 22-3 (As a condition precedent to coverage, the LMI Policies require the Debtor to utilize a "service organization" to provide notice to excess insurers, administer claims, maintain records of claim details and payments, and furnish monthly claim reports.). Neither the Disclosure Statement nor Plan provide for the utilization of a service organization by the Trust.

[117]    *See, e.g.*, *id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[118]    *See, e.g.*, *id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[119]    *See, e.g.*, *id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[120]    *See, e.g.*, *id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

(f)     **The Disclosure Statement fails to explain in easy to digest terms how the Trust will treat Abuse Claimants.**

The Plan lacks a plan English explanation that would enable an Abuse Claimant to sufficient understand how the Plan treats his or her claim.[121]  As a guiding principle, the Disclosure Statement should provide in easy-to-digest terms what rights an Abuse Claimant possesses under the Plan as well as what an Abuse Claimant can expect in terms of recovery and distribution.[122] Such information is critical to allow Abuse Claimants to make an informed assessment how they may fare if they pursued their claims outside of the bankruptcy system and, therefore, whether they should vote in favor of or against the Plan.[123]

At minimum, the Disclosure Statement should make clear:

i.      what it means to be a Settling Abuse Claimant or a Litigating Abuse Claimant and any attendant consequences;

ii.     how Abuse Claims will be determined;

iii.    the available funds for each class of Abuse Claims; and

iv.     the estimated amount and timing of distributions.[124]

---

[121]    *See In re the Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345, Doc. No. 2828 at 3 (Bankr. S.D.N.Y. Jan. 18, 2024) ("The crux of the Court's decision to decline approval of the Disclosure Statement in its current form centers on its finding that the Disclosure Statement lacks a plain English explanation that would enable a holder of an Abuse Claim (an 'Abuse Claimant') to sufficiently understand how his or her claim would be treated under the Plan.").

[122]    *Id.*

[123]    *See* 11 U.S.C. § 1125 (providing that a disclosure statement may be approved as "containing adequate information" where there is sufficient information for a "hypothetical investor typical of the holders of claims or interests in the case . . . to make an informed judgment about the plan"); *see also Kirk v. Texaco, Inc.*, 82 B.R. 678, 682 (S.D.N.Y. 1988) (indicating that the legislative history to section 1125(a) makes clear that "what constitutes adequate information in any particular instance will develop on a case-by-case basis") (quoting H.R. REP. NO. 595, at 408–09 (1977)).

[124]    *Rockville*, No. 20-12345, Doc. No. 2828.  The *Rockville* court also included a fifth factor that is omitted here because it is not relevant to the Plan, *i.e.*, "the risks for holders of Abuse Claims to receive disparate treatment depending on whether they fall in Class 4 or Class 5, among other things."

Here, regarding factor (i), the Disclosure Statement fails to explain in plain English the attendant consequences for an Abuse Claimant in electing treatment as either a distribution or litigation claimant.[125]  An Abuse Claimant must review and understand how an assessment by an Abuse Claim's review, pursuant to the separately filed Allocation Protocol, will affect an Abuse Claim.[126]  Regarding factor (ii), neither the Disclosure Statement nor the Allocation Protocol discusses any process for determining Abuse Claims.  Regarding factor (iii), the Disclosure Statement does not clearly state the amount of available funds for Abuse Claims in the Abuse Claims Settlement Fund.[127]  Regarding factor (iv), the Disclosure Statement fails to provide any information for the expected timing of distributions.[128]  Therefore, the Court should deny approval of the Disclosure Statement.

> **(g)    The Disclosure Statement is inadequate because the Plan fails to include an "Exhibit A."**

The Disclosure Statement incorporates the definitions of the Plan, including the term Participating Parties.[129]  Participating Parties includes, among others, "Persons and entities listed on Exhibit A ***attached hereto***…"[130]  Yet, neither the Plan nor its supplements attach an "Exhibit A."[131]  Therefore, the Court should deny approval of the Disclosure Statement.

---

[125]    *See* Disclosure Statement, Art V, ¶¶ C.1.a-b.

[126]    *Compare id.*, Art. V, ¶ C.1.a *with Rockville*, No. 20-12345, Doc. No. 2828 ("Abuse Claimants should not be expected to navigate multiple documents and cobble together bits and pieces of information in an effort to ascertain what rights they may or may not possess.").

[127]    Disclosure Statement, Art. IX, ¶ B.1.

[128]    *Id.*, Art. V, ¶¶ F.2.a – b; *see also* Plan, § 4.6.2.

[129] *See* Disclosure Statement, n. 1 ("Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.").

[130] Plan, § 1.1.127.

[131] *See generally* Plan & Doc. Nos. 1604, 1613.

IV.    **CONCLUSION**

For the reasons sated above, the Court should deny approval of the Disclosure Statement.


Dated:  January 30, 2024                               Respectfully submitted,

By: */s/ Russell W. Roten*
    Russell W. Roten (*pro hac vice*)
    Jeff D. Kahane (*pro hac vice*)
    Andrew Mina (*pro hac vice*)
    Nathan Reinhardt (*pro hac vice*)
    Duane Morris LLP
    865 S. Figueroa Street, Suite 3100
    Los Angeles, CA  90017-5450
    Telephone: (213) 689-7400
    Facsimile:  (213) 689-7401
    Email: RWRoten@duanemorris.com

By: */s/ Catalina J. Sugayan*
    Catalina J. Sugayan (*pro hac vice*)
    Yongli Yang (*pro hac vice*)
    Clyde & Co
    30 S. Wacker Drive, Suite 2600
    Chicago, IL 60606
    Telephone: (312) 635-7000
    Facsimile: (312) 635-6950
    Email: catalina.sugayan@clydeco.us

*Attorneys for London Market Insurers*

KENNEDYS CMK LLP
    Jillian G. Dennehy
    120 Mountain View Boulevard
    Basking Ridge, NJ 07920
    (908) 605-2974 (telephone)
    Jillian.dennehy@kennedyslaw.com

IFRAH LAW
    George R. Calhoun (*pro hac vice*)
    1717 Pennsylvania Avenue NW,
    Suite 650
    Washington, DC  20006
    (202) 524-4147 (telephone)
    george@ifrahlaw.com

*Attorneys for TIG Insurance Company*

RIVKIN RADLER LLP

*/s/ Stuart I. Gordon*
Stuart I. Gordon
926 RXR Plaza
Uniondale, New York  11556-0926
(516) 357-3000

*Attorneys for Hanover Insurance Company*