**Hearing Date & Time: February 6, 2024, at 12:00 PM (Eastern)**
**Objection Deadline: January 30, 2024, at 11:59 PM (Eastern)**
**Hearing Location: 100 South Clinton Street, Syracuse, NY 13261**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In Re:                                                    Case No.: 20-30663

The Roman Catholic Diocese of Syracuse, New York,        Chapter 11

                        Debtor.
-------------------------------------------------------------------X

## THE INTERSTATE INSURERS' OBJECTION TO
## APPROVAL OF THE DEBTOR'S
## <u>DISCLOSURE STATEMENT</u>

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

    A.    The Interstate Policies ................................................................................ 3

    B.    Events Leading to the Chapter 11 Case ................................................... 5

    C.    The Adversary Proceeding and Mediation ................................................ 7

    D.    Dissolution of the Mediation Stay ............................................................ 8

    E.    Disclosure Statement and Plan ................................................................. 9

OBJECTION ............................................................................................................................ 14

    I.    THE PLAN IS PATENTLY UNCONFIRMABLE ........................................... 14

    A.    The Insurance Claims Assignment Violates the Bankruptcy Code ........... 15

    B.    The Insurance Claims Assignment of the Participating Parties' Interests Lacks any
Legal Basis ........................................................................................................ 17

    C.    The Plan Proponents Seek an Improper Good Faith Finding for the TDP ................ 18

    D.    The Plan Impermissibly Impairs the Interstate Insurers' Rights ............................... 19

        1.    Prejudicial Provisions Throughout the Plan Target Coverage Defenses ....... 22

        2.    The Plan Abandons the SIRs ................................................................. 27

        3.    The Plan Rewrites the Insurer-Insured Relationship .............................. 27

    E.    The Plan Was Not Proposed in Good Faith .............................................................. 28

        1.    The TDP Yield Outcomes That Are Incompatible with the
Bankruptcy Code ................................................................................. 29

        2.    The Plan Establishes an Inherently Conflicted Trust ........................... 33

    II.    THE DISCLOSURE STATEMENT IS INADEQUATE ................................. 36

    A.    The Disclosure Statement Fails to Disclose Material Risks to Abuse Claimants'
Recovery Under the Plan ..................................................................................... 37

    B.    The Disclosure Statement Fails to Disclose the Trust Fiduciaries' Connections ....... 39

STANDING ............................................................................................................................. 40

RESERVATION OF RIGHTS ................................................................................................. 43

CONCLUSION ........................................................................................................................ 43

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*641 Assocs. v. Balcor Real Estate Fin. (In re 641 Assocs.)*,
  No. 91-11234S, 1993 Bankr. LEXIS 1191 (Bankr. E.D. Pa. Aug. 26, 1993) ..................20, 26

*In re ACandS, Inc.*,
  311 B.R. 36 (Bankr. D. Del. 2004) ......................................................................................33

*Allen v. Wright*,
  468 U.S. 737 (1984).............................................................................................................42

*In re Am. Cap. Equip., LLC*,
  688 F.3d 145 (3d Cir. 2012)......................................................................................... *passim*

*In re Am. Capital Equip., Inc.*,
  405 B.R. 415 (Bankr. W.D. Pa. 2009) ...........................................................................34, 35

*Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*,
  97 B.R. 220 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*, *Amatex Corp. v.
  Stonewall Ins. Co.*, 102 B.R. 411 (E.D. Pa. 1989)...............................................................20

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015).............................................................................................................42

*In re Badlands Energy, Inc.*,
  608 B.R. 854 (Bankr. D. Colo. 2019) ..................................................................................15

*Bond v. United States*,
  564 U.S. 211 (2011).............................................................................................................42

*In re Boy Scouts of America and Delaware BSA, LLC*,
  642 B.R. 504 (Bankr. D. Del. 2022) ....................................................................................19

*In re Cajun Elec. Power Co-Op, Inc.*,
  230 B.R. 715 (Bankr. M.D. La. 1999) .................................................................................20

*Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP)*,
  422 F. App'x 15 (2d Cir. 2011)......................................................................................40, 41

*Cissel v. Am. Home Assur. Co.*,
  521 F.2d 790 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074 (1976).........................................20

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
  769 F. Supp. 671 (D. Del. 1991)..........................................................................................20

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)...................................................................21, 22

*In re Comcoach Corp.*,
   698 F.2d 571 (2d Cir. 1983)...........................................................................40

*In re Congoleum Corp.*,
   426 F.3d 675, 685-687 (3d Cir. 2005) ......................................................42, 43

*Congoleum Corp. v. Ace Am. Ins. Co.*,
   NO. MID-L-8908-01, 2007 N.J. Super. Unpub. LEXIS 3000 (N.J. Sup. Ct.
   May 18, 2007)....................................................................................23, 24, 25

*In re Copy Crafters Quickprint, Inc.*,
   92 B.R. 973 (Bankr. N.D.N.Y. 1988) ...........................................................37

*In re Crippin*,
   877 F.2d 594 (7th Cir. 1989) .......................................................................20

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006).....................................................................................42

*DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home
Mortg. Holdings, Inc.)*,
   402 B.R. 87 (Bankr. D. Del. 2009) ......................................................15, 16, 17

*In re Denario*,
   267 B.R. 496 (Bankr. N.D.N.Y. 2001) ..........................................................20

*In re Diocese of Camden*,
   653 B.R. 309 (Bankr. D.N.J. 2023) .................................................... *passim*

*In re Divine Ripe, L.L.C.*,
   554 B.R. 395 (Bankr. S.D. Tex. 2016) ..........................................................37

*In re Downey Fin. Corp.*,
   428 B.R. 595 (Bankr. D. Del. 2010) ..............................................................21

*In re Flour City Bagels, LLC*,
   No. 16-20213-PRW, 2017 Bankr. LEXIS 288 (Bankr. W.D.N.Y. Feb. 2, 2017) ...................14

*In re Forty-Eight Insulations, Inc.*,
   133 B.R. 973 (Bankr. N.D. Ill. 1991) ...........................................................18

*In re Glob. Indus. Techs.*,
   645 F.3d 201 (3d Cir. 2011)............................................................... *passim*

*In re GSC, Inc.*,
    453 B.R. 132 (Bankr. S.D.N.Y. 2011) ................................................................................14

*In re Heating Oil Partners*,
    No. 3:08-CV-1976 (CSH), 2009 U.S. Dist. LEXIS 117871 (D. Conn. Dec. 17,
    2009) ...............................................................................................................................40, 41

*In re Imerys Talc. v. Cyprus Historical Excess Insurers*,
    38 F.4th 361 (3d Cir. 2022) ................................................................................................11

*In re Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997) ................................................................................29

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................................42

*In re Metrocraft Pub. Servs., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ..................................................................................37

*In re MF Glob. Holdings Ltd.*,
    469 B.R. 177 (Bankr. S.D.N.Y. 2012) ..........................................................................20, 26

*Mission Prod. Holdings., Inc. v. Tempnology, LLC*,
    139 S. Ct. 1652, 1663 (20 ..............................................................................................19, 20

*Moody v. Amoco Oil Co.*,
    734 F.2d 1200 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) ....................................20

*In re Moshe*,
    567 B.R. 438 (Bankr. E.D.N.Y. 2017) ...............................................................................36

*In re Nashville White Trucks, Inc.*,
    5 B.R. 112 (Bankr. M.D. Tenn. 1980) ................................................................................20

*Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*,
    692 F.3d 283 (3d Cir. 2012) ..........................................................................................29, 33

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*,
    430 B.R. 170 (B.A.P. 8th Cir. 2010) .............................................................................17, 18

*In re R & G Props.*,
    No. 08-10876, 2009 Bankr. LEXIS 2101 (Bankr. D. Vt. July 6, 2009) ..............................15

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    140 S. Ct. 2183 (2020) ........................................................................................................42

*Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*,
    No. 09-0886, 2010 U.S. Dist. LEXIS 45667 (W.D. Pa. Mar. 29, 2010) .............................34

*SOCIETE INTERNATIONALE POUR PARTICIPATIONS v. ROGERS*,
   357 U.S. 197 (1958) .......................................................................................23

*Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings, LLC)*,
   997 F.3d 497 (3d Cir. 2021) ..........................................................................15

*In re Stewart Foods, Inc.*,
   64 F.3d 141 (4th Cir. 1995) ...........................................................................15

*In re Superior Air Parts, Inc.*,
   486 B.R. 728 (Bankr. N.D. Tex. 2012) ..........................................................15

*In re T H Agric. & Nutrition, L.L.C.*,
   2009 Bankr. LEXIS 4673 (Bankr. S.D.N.Y. May 28, 2009) ..........................22

*In re The Diocese of Camden, New Jersey*,
   No. 20-21257 (Bankr. D.N.J. Dec. 15, 2023) .................................................39

*Travelers Cas. & Sur. Co. of Am. v. PG&E*,
   549 U.S. 443 (2007) .......................................................................................33

*Union Bank v. Wolas*,
   502 U.S. 151 (1991) .......................................................................................29

**Statutes**

11 U.S.C. § 363(b)(1) ...........................................................................................15, 18

11 U.S.C. § 365 ...............................................................................................15, 16, 18

11 U.S.C. § 502(b) ...............................................................................................30, 33

11 U.S.C. § 541 ....................................................................................................17, 18

11 U.S.C. § 1109(b) .............................................................................................40, 41

11 U.S.C. § 1125(b) ..........................................................................................1, 2, 36

11 U.S.C. § 1129(a)(1) ..............................................................................................17

11 U.S.C. § 1129(a)(3) ....................................................................................... *passim*

**Other Authorities**

*In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Dec. 15,
   2023) Transcript of Oral Ruling .....................................................................19

*In re HONX*, No. 22-90035 (Bankr. S.D. Tex. Jan. 14, 2023) Dkt. No. 619,
   Transcript of Hearing .....................................................................................31

Interstate Fire & Casualty Company ("Interstate"), Fireman's Fund Insurance Company, and National Surety Corporation (collectively, the "Interstate Insurers" with each individually being an "Interstate Insurer"),[1] by and through undersigned counsel, hereby object (this "Objection") to approval of the *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York* [Dkt. No. 1566] (the "Disclosure Statement") filed by the above-captioned debtor and debtor-in-possession (the "Debtor" or the "Diocese") on December 6, 2023, and the *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Joint Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Joint Amended Plan; and (VI) Granting Related Relief* [Dkt. No. 1626] filed on December 16, 2023, by the Debtor. In support hereof, the Interstate Insurers respectfully state as follows:

## PRELIMINARY STATEMENT

This Disclosure Statement is woefully inadequate, and the Plan (as defined below) it describes is even worse: the former lacks basic information that Section 1125(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") requires, while the latter is facially deficient under Section 1129. Neither should go out for solicitation in their current state. Until or unless the Debtor and the Official Committee of Unsecured Creditors (the "Committee"

---

[1] The Interstate Insurers are joined in their Objection by TIG Insurance Company and Hanover Insurance Company. Hanover Insurance Company issued separate policies to two different parishes and TIG Insurance Company issued policies to certain parishes, but they join in the legal arguments contained herein to the extent they apply to their respective policies.

and collectively with the Debtor, the "Plan Proponents") bring both documents into compliance with the Bankruptcy Code, approval of the Disclosure Statement can, and should, be denied for at least two reasons.

**First**, the *Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York* [Dkt. No. 1565] (the "Plan") that accompanies the Disclosure Statement is patently unconfirmable. The Plan is riddled with provisions that violate bedrock bankruptcy law, including, for example: an assignment mechanism that attempts to split the benefits of contracts (coverage under insurance policies) from their burdens (the concomitant obligations); requests for overbroad and unnecessary findings that serve no legitimate bankruptcy purpose (*e.g.*, a good faith finding for documents other than the Plan); and a claims payment protocol that provides for distributions to **known** invalid claims – while installing fiduciaries with close connections to the plaintiffs' bar to allow and pay them. Every one of these defects is fatal to confirmation, and they barely scratch the surface. Approval of the Disclosure Statement should be denied for this reason alone.

**Second**, and independently of the Plan's flaws, the Disclosure Statement is itself inadequate under Bankruptcy Code Section 1125(b). That section makes clear that the purpose of a disclosure statement is to **disclose** – to inform the average creditor how much he is receiving, when he should expect to receive it, and what risks there are to his recovery. This Disclosure Statement falls far short of that standard. It omits basic financial information, such as recovery estimates, for the largest group of creditors (the Abuse Claimants[2]) in the Chapter 11 Case. It likewise fails to adequately inform those creditors of the serious and substantial risks to their

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

potential recoveries, not least of which is the material possibility that professional fees from the litigation contemplated in the Plan will erode Trust funding and lower distributions as a result. And even when the Disclosure Statement supplies relevant information, it often is incomplete. Despite supplements identifying the two Trust fiduciaries charged with evaluating and paying Abuse Claims, the Disclosure Statement fails to divulge that ***both*** fiduciaries-elect have longstanding connections to various professionals in this case (not to mention the precise nature of the connections).  These details matter.  Without their full and fair disclosure, the Disclosure Statement is inadequate and should not be approved.

Given the material defects in both the Disclosure Statement and Plan, neither should advance any further.  Otherwise, the Plan Proponents will squander limited estate resources distributing an inadequately informative Disclosure Statement and soliciting votes on a patently unconfirmable Plan – an outcome that is antithetical to core bankruptcy principles of conservation and efficiency.  For these reasons, and for those set forth in greater detail below, the Interstate Insurers respectfully submit that approval of the Disclosure Statement should be denied.

## FACTUAL BACKGROUND

### A.  The Interstate Policies

1.     Interstate contracted with the Diocese to provide excess liability coverage, on an indemnity-only basis, from July 1, 1979 through July 1, 1986 (the "Interstate Policies")[3], as summarized in the following chart:

---

[3] Interstate Policy documents in connection with policies in effect from July 1, 1979 to July 1, 1986 are attached as Exhibit A to the *Declaration of Siobhain P. Minarovich in Support of the Interstate Insurers' Objection to Approval of the Debtor's Disclosure Statement* ("Minarovich Declaration"), which is attached hereto as **Exhibit 1**.

| Policy Number | Policy Period | Limits |
|---|---|---|
| 83-152664 | 7/01/79–7/01/80 | $4.8 million excess of $200,000 |
| | 7/01/80–7/01/81 | $4.8 million excess of $200,000 |
| | 7/01/81–7/01/82 | $4.8 million excess of $200,000 |
| | 7/01/82–7/01/83 | $4.8 million excess of $200,000 |
| 83-0170070 | 7/01/83–7/01/84 | $4.8 million excess of $200,000 |
| | 7/01/84–7/01/85 | $4.8 million excess of $200,000 |
| 83-0172447[4] | 7/01/85–7/01/86 | $800,000 excess of $200,000 |

2.      In each policy period, the Interstate Policies provide second-level indemnity coverage, excess of both (i) the Diocese's self-insured retention ("SIR") and (ii) the limits of underlying insurance,[5] in that order.  As second-level coverage, the Interstate Policies typically "followed form" to – that is, incorporated most terms, conditions, and definitions of – the underlying policies.  The Interstate Policies do not include a duty to defend.[6]  Rather, they only provide for indemnification to the Diocese for "Loss" in excess of the Diocese's SIR and LMI's limits.  "Loss", as defined in the Interstate Policies, includes investigation, adjustment, defense, or appeal costs, and expenses.  Thus, the Interstate Policies provide reimbursement of defense costs

---

[4] This Interstate Policy is subject to a Sexual or Physical Abuse Exclusion Endorsement and an Errors & Omission Limitation Endorsement, barring coverage for claims arising out of sexual or physical abuse or molestation.

[5] The Interstate Policies are excess of the limits of the underlying policy(ies) from Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies (collectively, "LMI").

[6] The Interstate Policies do, however, provide that Interstate at its own option may – but is not required to – participate in the investigation, settlement, or defense of any claim or suit against an insured.

incurred by the Diocese in connection with "occurrences" covered under the policies, upon a proof of loss occurring during the coverage period and subject to the terms and conditions of the policies.

3.      Interstate also issued higher level excess coverage to the Diocese from July 1, 1991 to July 1, 1993.  Those policies are excess $40 million in underlying coverage, each occurrence, and are subject to exclusions barring coverage for sexual abuse and/or molestation claims, and thus are not at issue in this matter.

4.      Finally, in certain years in the early 1970s, Fireman's Fund Insurance Company and National Surety Corporation issued insurance policies to five parishes located within the Diocese.  However, only one of those parishes have claims asserted against it at a time when an Interstate Insurer issued coverage to it.

**B.  Events Leading to the Chapter 11 Case**

5.      The Debtor is a Catholic diocese that serves a seven-county region in central and south-central New York.[7]  Like many other Catholic dioceses in New York and elsewhere, it became the subject of intense scrutiny from state lawmakers in the wake of a bombshell report that documented serial abuse of children by Catholic clergy in Pennsylvania.[8]

6.      This state of affairs ultimately led to the enactment of legislation in New York – the Child Victims Act ("CVA") – that revived for a set interval previously time-barred claims arising out of childhood sexual abuse.[9]  The CVA reviver window opened on August 14, 2019 and, after an extension, closed two years later.[10]

---

[7] Disclosure Statement, § II.A. at Dkt. No. 1566, p. 20 of 103.
[8] *See* Ian Lovett, *Catholic Church Offers Cash to Settle Abuse Claims—With a Catch*, THE WALL STREET JOURNAL (JUL. 11, 2019, 10:20 a.m.), https://www.wsj.com/articles/catholic-church-offers-cash-to-settle-abuse-claimswith-a-catch-11562854848.
[9] *See* N.Y. C.P.L.R. § 214-g.
[10] *See id*.

7.       Once the CVA window opened, individuals began filing complaints for damages against the Debtor, alleging that the Debtor was (and is) liable for injuries purportedly sustained from past abuse (collectively, the "<u>Prepetition Claims</u>").[11]   "[M]ounting costs of litigation" soon followed.[12]

8.       Dogged by these costs, along with its "potential exposure to" the Prepetition Claims,[13] the Debtor on June 19, 2020 (the "<u>Petition Date</u>") initiated the Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[14]

9.       The Debtor sought bankruptcy protection primarily to resolve its liability for abuse, in its own words intending "to maximize its assets (including any available insurance assets)" so that it could "provide the greatest recovery for the greatest number of abuse victims."[15]   These words proved prescient.   As of the Petition Date, the Debtor anticipated that it would face approximately 150[16] proofs of claim alleging abuse in the Chapter 11 Case.[17]   By the time the Debtor submitted the Plan and Disclosure Statement, over 411 proofs of claim had been filed.[18]

---

[11] *Declaration of Stephen Breen Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* [Dkt. No. 6] (the "<u>Breen Decl.</u>") at ¶ 13.

[12] *Id.* at ¶ 14.

[13] *Id.*

[14] *See id.*

[15] *Id.* at ¶ 16.

[16] The Debtor on the Petition Date noted that approximately 100 Prepetition Claims (formal suits) had been filed against it, and that it had received some unidentified number of "demand letters and or [*sic*] notices . . . from other claimants who ha[d] not yet commenced lawsuits." *Id.* at ¶ 13. It is unclear whether the Debtor expected 150 proofs of claim in the aggregate or 150 proofs of claim in addition to those likely to be filed on account of the 100 Prepetition Claims (for a total of 250). *See id.*

[17] *See id.*

[18] Disclosure Statement, § III.G.1. at Dkt. No. 1566, p. 30 of 103.  According to the Debtor, at least 18 claims "are either duplicate claims or do not [properly] allege . . . Abuse"; 19 were not timely filed; and 29 assert claims against unaffiliated individuals or entities.

### C. The Adversary Proceeding and Mediation

10.     As part of its strategy to "maximize" insurance assets, the Debtor and over 100 non-debtor related entities (*e.g.*, parishes) (collectively with the Debtor, the "Plaintiffs") on the Petition Date filed a "Complaint" against approximately 56 of their alleged insurers, including the Interstate Insurers (collectively, the "Insurers").[19][20]  The Complaint and the Adversary Proceeding it initiated concern prepetition contracts for insurance – *viz*., policies allegedly issued by the Insurers – and whether (or to what extent) these policies cover the Plaintiffs' actual or potential liabilities for claims alleging sexual abuse ("Abuse Claims" held by "Abuse Claimants").[21]

11.     These issues remain unresolved.  Before the Insurers were due to answer the Complaint, the Court indefinitely suspended all deadlines in the Adversary Proceeding (the "Mediation Stay") and referred the parties to global mediation with the Committee.[22]

12.     Over the course of the next two years and as many mediators, the Interstate Insurers mediated in good faith with the Plaintiffs and the Committee.  Despite these efforts, the Interstate Insurers were unable to reach agreement with the Committee on the terms of a settlement.[23]  The other Insurers were similarly unsuccessful.[24]

---

[19] *See The Roman Catholic Diocese of Syracuse, New York.*, et al. *v. Arrowpoint Capital*, et al. (Adv. Pro. Case No. 21-50002-5) (the "Adversary Proceeding") [Dkt. No. 1].

[20] Plaintiffs voluntarily dismissed the Adversary Proceeding as to National Surety Corporation by a Notice of Voluntary Dismissal Without Prejudice filed on August 27, 2021 [Adv. Pro. Dkt. No. 111].

[21] *See generally id.*

[22] *Order Referring This Adversary Proceeding to Mediation* [Adv. Pro. Dkt. No. 59].

[23] *See The Interstate Insurers' Joinder to Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 163] at ¶¶ 9-11.

[24] Disclosure Statement, § III.J. at Dkt. No. 1566, p. 35 of 103.  As a result of the impasse, the Court on January 5 of this year terminated the judicial stay of the Adversary Proceeding and directed the Insurers to answer, move, or otherwise respond to the Complaint by no later than February 20, 2024.  *Order Approving Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Say* [Adv. Pro. Dkt. No. 170].

13.    But the same was not true for the Plaintiffs.  In mid-2023, the Plaintiffs "c[a]me to an agreement" with the Committee "concerning the contribution to be made" by the Plaintiffs to a trust for the benefit of Abuse Claimants.[25]  This agreement formed the basis for the Plan.[26]

### D.  Dissolution of the Mediation Stay

14.    As a result of the impasse among the remaining mediation parties, certain Insurers on October 20, 2023 moved to terminate the Mediation Stay.[27]  The moving Insurers generally sought a resumption of litigation to ensure that coverage issues would be decided in the Adversary Proceeding – and not as an adjunct to plan confirmation.[28]  Both the Debtor and the Committee strenuously opposed this request, insisting that the Insurers' "rights will not be impaired" by the (then-forthcoming) Plan[29] and assuring the Court that the Plan "entirely preserves the Insurers'

---

[25] Letter to the Faithful from Most Revd. Douglas J. Lucia, Bishop of Syracuse (July 27, 2023) [Adv. Pro. Dkt. No. 163-1] ("[T]he [Debtor] is pleased to report that it has reached a milestone settlement with the Committee . . .").

[26] Disclosure Statement, § I at Dkt. No. 1566, pp. 12-13 of 103.

[27] *See Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 141]; *Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies Joinder in Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 142]; *The Interstate Insurers' Joinder to Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 163].

[28] *See, e.g.*, [Adv. Pro. Dkt. No. 141] at ¶¶ 21-22; [Adv. Pro. Dkt. No. 142] at ¶ 3.

[29] *Omnibus Objection to (I) Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay, and (II) Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies Joinder in Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 150] at ¶ 11; *see also id*. at ¶ 12 ("Further, nothing in the Joint Plan will impair the rights of any of the non-settling insurers to litigate the merits of individual claims for which such Insurer may be responsible for providing coverage and all such rights will be fully preserved under the Joint Plan.").

rights with respect to the policies they issued, including their rights to assert coverage-related defenses."[30]

15.    Following a hearing on the matter, the Court on January 5, 2024, entered an order dissolving the Mediation Stay and directing the Insurers to answer or otherwise respond to the Complaint within 45 days.[31]

### E.  Disclosure Statement and Plan

16.    The Debtor filed the Plan and accompanying Disclosure Statement on December 6, 2023, followed by two supplements (which do not include the proposed confirmation order) in early January.[32]  The Plan is proposed by both the Debtor and the Committee and, according to the Debtor, represents "the culmination of more than 3 years of negotiation between" the two.[33]

17.    Broadly, the Plan contemplates the following:[34]

(a)    *Establishment & Funding of Trust*.  A Trust for the benefit of Abuse Claimants will be established on or after the Confirmation Date.  The Debtor and the Participating Parties (some or all of the other Plaintiffs) will fund the Trust with (i) an aggregate monetary

---

[30] *The Official Committee of Unsecured Creditors' Response to Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 151] at 3.

[31] *Order Approving Travelers Insurance Company Limited, Travelers Casualty and Surety Company, Traveler's Indemnity Company and Arrowood Indemnity's Motion to Terminate the Mediation Stay* [Adv. Pro. Dkt. No. 170].

[32] *See* Disclosure Statement, Plan; *see also Notice of Filing of Plan Supplement to Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York Dated December 6, 2023* [Dkt. No. 1604]; *Notice of Filing of Second Plan Supplement to Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York Dated December 6, 2023 and Disclosure Statement* [Dkt. No. 1613].

[33] Disclosure Statement, § I. at Dkt. No. 1566, p. 12 of 103.

[34] This description is a general (non-exhaustive) summary and is qualified in all respects by the terms of the Plan.  It is not, and should not be deemed to be, an admission by the Interstate Insurers that the Plan is appropriate or otherwise confirmable, or that the Plan will or should take effect as portrayed.

contribution of $100 million cash[35] and (ii) an assignment of their rights and claims under the policies purportedly issued by the Insurers – including the claims at issue in the Adversary Proceeding – but ***not*** the policies themselves or the burdens (*i.e.*, obligations) associated with them.[36]  The Disclosure Statement does not divulge that the Court lacks jurisdiction over the Participating Parties' interests, or the potential consequences of this jurisdictional defect.

(b)  *Channeling of Abuse Claims & Release*.  In exchange for their contribution(s) to the Trust, the Participating Parties will be released (and the Debtor discharged) from any liability for Abuse Claims.  The Trust will assume this liability, and the Abuse Claims will be channeled exclusively to the Trust for resolution and payment.[37]

(c)  *Appointment of Trustee*.  The Trust will be administered by a compensated Trustee.  The Trustee's compensation, and that of any professionals the Trustee retains, will be paid out of the Trust's assets.  The proposed initial Trustee is DW Harrow & Assoc., LLC ("DW Harrow"),[38] an organization that has been appointed to similar posts in other diocesan bankruptcy trusts[39] and, once appointed, has retained the firm currently serving as special insurance counsel

---

[35] Plan, § 1.1.62.  Up to 15% ($15 million) of the total contribution may be funded via promissory note, rather than cash.  Plan, § 1.1.66.

[36] *See generally* Plan, § 8.2.

[37] *See generally*, Plan § 8.1.

[38] *See generally* Plan, § 8.1; *Roman Catholic Diocese of Syracuse, New York Settlement Trust Agreement* [Dkt. No. 1604-3] (the "Trust Agreement") at 1.

[39] Joint Disclosure Statement for Chapter 11 Plan of Reorganization Proposed by the Diocese of Duluth, *In re Diocese of Duluth*, No. 15-50792 (Bankr. D. Minn. Jul. 9, 2019) Dkt. No. 385, p. 34 ("DW Harrow & Assoc., LLC will be the Trustee."); Modified Chapter 11 Plan of Reorganization Second Amended Joint Plan, *In re Diocese of New Ulm*, No. 17-30601 (Bankr. D. Minn. Mar. 6, 2020) Dkt. No. 360-4, p. 2 of 21 ("DW Harrow & Assoc., LLC [will be] the Trustee") (cleaned up); Joint Disclosure Statement for Corrected Third Amended Joint Chapter 11 Plan Of Reorganization Proposed by the Diocese of Winona-Rochester and the Official Committee of Unsecured Creditors, *In re Diocese of Winona-Rochester*, No. 18-33707 (Bankr. D. Minn. July 13, 2021) Dkt. No. 317, p. 37 ("The Trustee under the Trust will be DW Harrow & Assoc., LLC."); First Amended Joint Plan of Reorganization, *In re Diocese of St. Cloud*, No.

to the Committee.[40]  Neither the Plan nor the Disclosure Statement furnish this or any other

information regarding DW Harrow's connections, nor do they attest to DW Harrow's

disinterestedness.[41]

> (d)  *Appointment of Survivor Claim Reviewer*.  The Trustee will make

distributions to Abuse Claimants based on each claimant's *pro rata* share of "points" awarded

pursuant to the "Survivor Claim Allocation Protocol" (herein, the "TDP")[42] – a document for

which the Plan Proponents seek a good faith finding under the Plan.  This TDP award process is

undertaken by a separate fiduciary, the "Survivor Claim Reviewer," and is the "sole and exclusive

method by which" an Abuse Claimant "may seek allowance and distribution" of his or her Abuse

Claim.[43]  The proposed Survivor Claim Reviewer is Roger L. Kramer of Kramer Law, LLC.  Less

than one month ago, Mr. Kramer was appointed as co-mediator in *The Roman Catholic Diocese*

*of Albany, New York* chapter 11 case to mediate, among other things, insurance coverage issues,

the terms of a consensual chapter 11 plan, and that debtor's potential liability for abuse claims.[44]

Neither the Plan nor the Disclosure Statement furnish this or any other information regarding Mr.

Kramer's connections, nor do they attest to Mr. Kramer's disinterestedness.

---

20-60337 (Bankr. D. Minn. Oct. 23, 2020) Dkt. No. 108, p. 73 of 96 ("DW Harrow & Assoc.,
LLC [will be] the Trustee") (cleaned up).

[40] Notice of Appearance on Behalf Of DW Harrow & Associates, LLC, as Trustee of the Diocese
of Winona-Rochester Settlement Trust, *DW Harrow & Assoc., LLC, as Trustee of the Diocese of*
*Winona-Rochester Settlement Trust, v. United States Fire Insurance Company, et al.*, No. 18-
03094 (Bankr. D. Minn. Dec. 9, 2021) Dkt. Nos. 90, 92, Timothy Burns and Jesse Bair.

[41] The Interstate Insurers submit that, as Trust fiduciaries, the guardian ad litem standard that the
Third Circuit adopted in *In re Imerys Talc. v. Cyprus Historical Excess Insurers*, 38 F.4th 361,
374-79 (3d Cir. 2022) should serve as a guidepost to address the conflicts likely to apply in this
case.

[42] TDP, § 3.5.

[43] TDP, § 2.3.

[44] Order Appointing Mediators at ¶¶ 2-3, *In re The Roman Catholic Diocese of Albany, New York*,
No. 23-10244 (Bankr. N.D.N.Y. Jan. 2, 2024), Dkt. No. 697.

(e)     *Liquidation of Abuse Claims*.  Mr. Kramer as the Survivor Claim Reviewer is tasked with assessing the Abuse Claims and is directed to allow every one that is "proved . . . by a preponderance of the evidence."[45]  He will then allot points to each Abuse Claim based on certain non-exhaustive "evaluation categories and factors" set forth in the TDP.[46]  These factors, which range from the circumstances of the alleged abuse to whether the claimant has headaches, are unscaled[47] and are also unbounded by any aggregate limit.[48]  The factors, moreover, provide for the preferential treatment of certain Abuse Claimants based on events that are unrelated to the merits of their respective claims and factors that are not contemplated under applicable state law. For example, Abuse Claimants who sat on the Committee or took any action "to secure" the Child Protection Protocols may be awarded additional points.  Such an enhancement, which has nothing to do with the merits of the Abuse Claim, benefits the Abuse Claimant and his counsel. The Disclosure Statement does not inform Abuse Claimants of the risks associated with: (i) an unscaled and uncapped points system, including the risk that points awarded (and thus, distributions received) may not necessarily correspond to the severity of injury; and/or (ii) distributions from a common fund, including the risk that distributions on invalid claims will dilute recoveries for holders of valid Abuse Claims.

(f)     *Litigation Claimants*.  Ultimately, every holder of an allowed Abuse Claim is guaranteed "a minimum monetary distribution in the dollar amount that is equal to 33% of the *pro rata* share of the total points assigned" to his or her Abuse Claim.[49]  Once an Abuse Claimant

---

[45] TDP, § 3.1. Notably, the TDP do not require an Abuse Claimant to plead and prove **negligence** by a preponderance of the evidence.

[46] *Id*. at § 4.1.

[47] *Compare id*. at § 4.1(a)(3), *with id*. at § 4.1(b)(2).  *See generally id*. at § 4.1.

[48] *See generally* TDP.

[49] *Id.* at § 5.1.

is notified of the amount of his award under the TDP, he has 30 days to elect to liquidate his Abuse

Claim in the tort system by suing the Debtor (or applicable Participating Party) in name only (as

such, a "Litigation Claimant").[50]    This election, however, is solely "for purposes of the Trust

seeking recovery from any Non-Settling Insurer,"[51] because the dollar value of any distribution to

a Litigation Claimant is still governed by the points he is awarded under the TDP.[52]    Plus, a

Litigation Claimant may rescind his election ***at any point*** "prior to entry of an order of dismissal

or a final judgment on [his] Litigation Claim in favor of a Protected Party" and at any time

thereafter with the consent of the Trustee.[53]    Irrespective of the outcome of the Litigation Claim,

the fees and costs of the applicable Litigation Claim defendant (*e.g.*, the Debtor or a Participating

Party) are chargeable to the Trust and payable from the Trust assets, as are the fees and costs of

the Trustee (and the Trustee's professionals) – including those fees and costs incurred pursuing an

Insurer for coverage as a result of any Litigation Claim.    The Disclosure Statement does not divulge

the likely nature or extent of these expenses, or that the expenses will erode the Trust corpus.

18.    *Insurance Neutrality*.    Finally, the Plan incorporates a purported "Insurance

Neutrality" clause.[54]    That provision states, among other things, that nothing in the Plan or any

other Plan Document "shall affect, impair, or prejudice the rights and defenses of any Non-Settling

Insurer" under any Non-Settling Insurer Policy – but as against "the Diocese or any other

Participating Party" only (the Trust is omitted).[55]    The very next sentence of the provision, by

---

[50] Plan, § 4.3.1.b.

[51] *Id.* at § 4.3.1.b.

[52] *See id.*; *see also* TDP, § 3.2.b.  A Litigation Claimant may, however, receive additional points "in light of additional efforts and contributions resulting from . . . pursuit of" the Litigation Claim. TDP, § 3.2.b.

[53] TDP, § 4.3.2.a.  Neither the Plan nor the TDP provide for the disallowance of a Litigation Claim that is dismissed or valued at zero.

[54] Plan, § 8.7.2.

[55] Plan, § 8.7.2.

contrast, preserves "the rights and defenses" of, among others, "*the Trust* . . . under [the] Non-Settling Insurer Policies . . . ."[56]  Beyond this asymmetry, there are a number of other provisions in the Plan – outside of the insurance neutrality clause – directed toward the Insurers, including, for example: (i) Section 8.7.1.h., which purports to (among other things) (a) strip the Insurers of "any defense regarding or arising from the Insurance Claims Assignment" and (b) prohibit the assertion of any coverage defense that may or could be triggered by the Debtor's negotiation of the Plan or the terms of the Plan;[57] and (ii) Section 8.2.4.a., which sets forth the Plan Proponents' agreement to seek a finding that the Insurance Claims Assignment "is valid and does not defeat or impair" coverage.[58]

## OBJECTION

## I.    THE PLAN IS PATENTLY UNCONFIRMABLE

19.    The Court should not approve the Disclosure Statement because the Plan it describes is unconfirmable as a matter of law.  Courts, including those within the Second Circuit, almost universally recognize that "[a]n unconfirmable plan is grounds for rejection of the disclosure statement."[59]  A disclosure statement, in other words, "should not be approved" if it describes a plan that is "unconfirmable on its face."[60]  This makes good sense.  Bankruptcy is by

---

[56] *Id.*
[57] *Id.* at § 8.7.1.h.
[58] *Id.* at § 8.2.4.a.
[59] *In re GSC, Inc.*, 453 B.R. 132, 157 n.27 (Bankr. S.D.N.Y. 2011) (internal citations omitted). *Accord, e.g.*, *In re Flour City Bagels, LLC*, No. 16-20213-PRW, 2017 Bankr. LEXIS 288, at *4-5 (Bankr. W.D.N.Y. Feb. 2, 2017) ("If the answer to any one of the confirmation objections could render either or both proposed plans facially unconfirmable, it is a better use of both judicial and Estate resources to deal with those issues now [at the disclosure statement stage]."); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012) ("[A] bankruptcy court can determine at the disclosure statement stage that a Chapter 11 plan is unconfirmable without first holding a confirmation hearing.").
[60] *GSC, Inc.*, 453 B.R. at 157 n.27 (internal citations omitted).

nature an exercise in the efficient allocation of limited funds, and solicitation is often an expensive

undertaking – to say nothing of confirmation.[61]  Thus, when a plan proponent seeks to solicit votes

on a fatally deficient plan, a court can and should refuse to approve the accompanying disclosure

statement to protect the estate from the expense of a "costly and futile solicitation process."[62]  That

rationale compels denial of this Disclosure Statement, as the Plan it accompanies is patently

unconfirmable for at least the following five reasons.

### A.  The Insurance Claims Assignment Violates the Bankruptcy Code

20.    *First*, the Insurance Claims Assignment – a key component of the Plan – violates

the Bankruptcy Code.  Although the Plan does not specify the precise section(s) of the Bankruptcy

Code on which it relies to effect the Insurance Claims Assignment, there are only two that could

apply: Section 365 (if the Interstate Policies are executory) or Section 363 (if they are not).[63]  In

either event, however, the transfer (or assignment) must be made *cum onere*.[64]  That principle

requires "the rights and obligations under [an] agreement[] to be transferred together, if at all."[65]

---

[61] *See, e.g.*, *In re R & G Props.*, No. 08-10876, 2009 Bankr. LEXIS 2101, at *8-9 (Bankr. D. Vt. July 6, 2009) (noting that the "solicitation process" was "costly" (internal citations omitted)).
[62] *Id.*
[63] *See DB Structured Prods. v. Am. Home Mortg. Holdings, Inc. (In re Am. Home Mortg. Holdings, Inc.)*, 402 B.R. 87, 93 (Bankr. D. Del. 2009) ("[I]f a contract is not executory, a debtor may assign, delegate, or transfer . . . under Section 363 of the Bankruptcy Code.  If a contract is executory, the debtor must . . . comply with Section 365 of the Bankruptcy Code . . ."); *see also Spyglass Media Grp., LLC v. Bruce Cohen Prods. (In re Weinstein Co. Holdings, LLC)*, 997 F.3d 497 (3d Cir. 2021); *see also In re Stewart Foods, Inc.*, 64 F.3d 141, 145 (4th Cir. 1995) (holding that a debtor "remains bound by the debtor's obligations under [non-executory] contracts after the bankruptcy filing."); *see In re Superior Air Parts, Inc.*, 486 B.R. 728, 738 (Bankr. N.D. Tex. 2012) ("[W]hen a contract is non-executory, the debtor remains bound to its obligations under that contract after the bankruptcy filing."); *see In re Badlands Energy, Inc.*, 608 B.R. 854, 875 (Bankr. D. Colo. 2019) (requiring Section 363 purchaser of contracts to comply with obligations).
[64] *Am. Home Mortg.*, 402 B.R. at 98 ("[T]he *cum onere* principle applies equally to the transfer of rights and obligations under a non-executory contract pursuant to Section 363 of the Bankruptcy Code as to the assumption and assignment of contracts and leases pursuant to Section 365.")
[65] *Id.*

Put simply, the benefits of a contract must travel with the burdens – and a debtor may not split one from the other.[66]

21.    But that is precisely what the Plan aims to achieve.  The plain wording of the Plan provides for the assignment of every possible ***right*** under the Interstate Policies – such that the Trust will "have full access to coverage under the [Interstate Policies]" in the same manner and "to the same extent as . . . the [Debtor] and any Participating Parties prior to"[67] confirmation – while explicitly disclaiming any transfer of the policies themselves.[68]  And in contrast to this detailed discussion of policy claims and rights, the Plan lacks any provision directing the Trust (as putative assignee-insured) to undertake the ***obligations*** attendant to coverage under the Interstate Policies:[69] *e.g.*, providing notice as soon as practicable and allowing Interstate to participate in the investigation, settlement, or defense of claims.[70]

22.    The upshot is that the Plan clearly endeavors to sever the benefits of the Interstate Policies (coverage) from their burdens (*e.g.*, payment of the SIRs and cooperation in the defense) – and through the Insurance Claims Assignment, to transfer the former without the latter.  This

---

[66] *See id.*

[67] Plan, § 8.7.1.h. (emphasis added).

[68] *See* Plan, § 1.1.82 (defining "Insurance Claims" to mean "all Claims, causes of action and enforceable rights of . . . the Diocese and any Participating Party against an Insurer . . . held by (i) the Diocese for any reason related to any Abuse Claim including those for (a) indemnity and payment of any Abuse Claim . . ."); *id.* at § 8.2.4.a. (providing that the Insurance Claims Assignment "shall not be construed as an assignment of the insurance policies." (cleaned up)).

[69] Although the Plan states that the Trust "shall assume responsibility for, and be bound by, only such obligations of the Diocese and Participating Parties under the Non-Settling Insurer Policies as are necessary to enforce the Insurance Claims and any recoveries" therefrom, *id.* at § 8.2.4.a., this toothless provision does not solve the issue.  To start, the Plan fails to identify which obligations are necessary, and to whom.  More important, it still violates the *cum onere* rule, which requires the transfer of *all* obligations accompanying a right – not merely the expedient ones.  *See Am. Home Mortg.*, 402 B.R. at 103.

[70] *See generally* Interstate Policies at Part V – Conditions, Paragraph 2., Notice of Loss; Participation in Defense by the Company, Minarovich Decl., Ex. A at DOC-IFC 004.

16

violates the most basic element of the *cum onere* rule.[71]  As a result, the Insurance Claims

Assignment does not comply with the Bankruptcy Code, and the Plan cannot be confirmed.[72]

### B.  The Insurance Claims Assignment of the Participating Parties' Interests Lacks any Legal Basis

23.      **Second**, the Insurance Claims Assignment of the non-debtor Participating Parties'

interests (if any) in and to the Interstate Policies lacks any jurisdictional or statutory predicate.  A

bankruptcy court may exercise jurisdiction over – and by extension, a plan may affect – only

property of a debtor's estate, which is defined by Section 541 of the Bankruptcy Code.  That

section, in relevant part, provides that a debtor's estate is comprised of "all legal or equitable

interests **of the debtor** in property as of the commencement of the case."[73]  Therefore, Section 541

on its face does not apply to the property of non-debtors.  Consequently, Courts have repeatedly

found that the policy interests of non-debtor additional insureds are not property of the estate.[74]

24.      The Bankruptcy Court for the District of New Jersey reached that exact conclusion

on almost identical facts in *In re Diocese of Camden* ("*Camden*").[75]  The debtor there – a Catholic

diocese much like the Debtor here – sought in its chapter 11 plan to transfer to a post-confirmation

trust the interests of various non-debtor related-parties (*e.g.*, parishes) in various prepetition

insurance policies.[76]  But the insurers who issued certain of the policies objected, asserting that the

court lacked the jurisdiction to order or approve the transfer of the non-debtors' interests.[77]  Judge

---

[71] *Cf. Am. Home Mortg.*, 402 B.R. at 103.

[72] *See* 11 U.S.C. § 1129(a)(1) (prohibiting confirmation of a plan that does not comply with the Bankruptcy Code).

[73] 11 U.S.C. § 541(a)(1) (emphasis added).

[74] *E.g., Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*, 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) (citing cases).

[75] 653 B.R. 309, 352 (Bankr. D.N.J. 2023)

[76] *Id*. at 328-29.

[77] *See id*. at 350-52.

Poslusny agreed, concluding squarely that "the [i]nsurers [we]re correct in their argument that th[e] Court lacks jurisdiction to order or approve the transfer" because "the Court's jurisdiction is limited to property of the [d]ebtor, or the estate."[78]

25.    The same is true here.  The Plan thus lacks the statutory[79] and jurisdictional hooks necessary to achieve the Insurance Claims Assignment of the non-debtor Participating Parties' interests (if any) in the Interstate Policies, and that portion of the Insurance Claims Assignment cannot be approved.

### C.  The Plan Proponents Seek an Improper Good Faith Finding for the TDP

26.    *Third*, the Plan inappropriately requires this Court to make a good faith finding for an external document.  Although good faith is a prerequisite to confirmation under Section 1129(a)(3), that section relates solely to a plan: it in relevant part provides that a court "shall confirm a plan only if . . . [t]he ***plan*** has been proposed in good faith . . . ."[80]  The only finding permitted or required under Section 1129(a)(3), in other words, is that the ***plan*** was proposed in good faith – not that an ancillary document was.

---

[78] *Id*. at 352 (citing 11 U.S.C. § 541).  *Accord, e.g.*, *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 978 (Bankr. N.D. Ill. 1991) ("Another party's interests [there a non-debtor's interests in an insurance policy] do not become property of the estate."); *Sportstuff, Inc.*, 430 B.R. at 178 n.15 ("[W]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a non-debtor, are not property of the estate.").  Although Judge Poslusny went on to determine the attempted transfer did not make the plan unconfirmable, he did so in the context of refusing to rule on the transfer due to the lack "of jurisdiction over [the non-debtors'] property, including [their] interest in the [insurance] [p]olicies."  *Id*.

[79] Even if the Court had jurisdiction over the non-debtor Participating Parties' interests in the Interstate Policies, there is no provision of the Bankruptcy Code that authorizes the assignment of property by non-debtors.  Section 363 contemplates only the disposal of "property of the estate," 11 U.S.C. § 363(b)(1); Section 365 is restricted to "executory contract[s] . . . of the debtor," *id*. § 365(a); and Section 1123 – which governs the transfer of property under a Chapter 11 plan – is limited to "property of the estate," *id*. §§ 1123(a)(5)(B), (D); *see also id*. § 1123(b)(4); *id*. § 1123(b)(2).

[80] 11 U.S.C. § 1129(a)(3) (emphasis added).

27.     At least two bankruptcy courts have reached this conclusion when confronted with requests to make good faith findings outside of a plan.  In *Camden*, Judge Poslusny twice "declined to make [a good faith] finding as to any documents other than the plan" and directed the plan proponents there "to limit the finding of good faith [in the proposed confirmation order] to the plan only."[81]  Judge Silverstein in *In re Boy Scouts of America and Delaware BSA, LLC* ("*Boy Scouts*") likewise refused to find that the trust distribution procedures in that case "were proposed in good faith and [we]re sufficient to satisfy the requirements of Section 1129(a)(3)," determining that Section "1129(a)(3) does not justify [that] finding."[82]

28.     Despite this wealth of recent – and indisputably relevant – caselaw on the topic, the Plan Proponents seek a finding that "the Allocation Protocol [TDP] as proposed by the Committee and attached as an exhibit to the Plan Supplement has been proposed in good faith and is fair and reasonable . . . ."[83]  This finding is no more appropriate here than similar findings were in *Boy Scouts* and *Camden*, and cannot be made for the same reasons.[84]

### D.  The Plan Impermissibly Impairs the Interstate Insurers' Rights

29.     ***Fourth***, and despite the Plan Proponents' repeated assurances to the contrary, the Plan is a naked attempt to rewrite the Interstate Policies via the confirmation process.  Nothing in the Bankruptcy Code permits this.  It is a bedrock principle of bankruptcy law that a "debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either";[85]

---

[81] Transcript of Decision of the Honorable Jerrold N. Poslusny, Jr. pp. 7:12-15, *In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Dec. 15, 2023) [Adv. Pro. Dkt. No. 163-4].
[82] 642 B.R. 504, 632-33 (Bankr. D. Del. 2022).
[83] Plan, § 11.1.1.a.
[84] *Cf. Boy Scouts*, 642 B.R. at 632-33; Transcript of Decision of the Honorable Jerrold N. Poslusny, Jr. pp. 7:12-15, *In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Dec. 15, 2023) [Adv. Pro. Dkt. No. 163-4].  *See also infra* § E.1.
[85] *Mission Prod. Holdings., Inc. v. Tempnology*, *LLC*, 139 S. Ct. 1652, 1663 (2019) (citations and internal quotations omitted).

"[w]hatever 'limitation[s] on the debtor's property [apply] outside of bankruptcy [] appl[y] inside

of bankruptcy as well."[86]  As such, a debtor may not use the bankruptcy process to renegotiate its

bargained-for contractual rights and obligations.[87]  Nor may a debtor rewrite contracts to include

terms to which the parties did not previously agree.[88]  Insurance policies are no different: "The

filing of a bankruptcy petition does not alter the scope or terms of a debtor's insurance policy"[89]

or permit a debtor-insured to "obtain greater rights to the proceeds" of the policy.[90]

     30.     Yet the Plan Proponents have proposed a Plan that impairs the Interstate Insurers'

rights so thoroughly that it effectively rewrites the Interstate Policies – in clear violation of

blackletter law.  This impairment is evident at the outset from the lack of any true insurance

---

[86] *Id.*

[87] *See In re Cajun Elec. Power Co-Op, Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (finding that the plan violated Section 1129(a)(3) of the Bankruptcy Code and was unconfirmable because it "call[ed] for an improper modification of the [debtor's contracts]"). *Cf. Coca-Cola Bottling Co. v. Coca-Cola Co.*, 769 F. Supp. 671, 707 (D. Del. 1991) ("Courts do not rewrite contracts to include terms not assented to by the parties."); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd sub nom.*, *Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411, 414 (E.D. Pa. 1989) (refusing to compel insurers to make lump-sum payments to the debtor "contrary to the terms of their policies"); *641 Assocs. v. Balcor Real Estate Fin. (In re 641 Assocs.)*, No. 91-11234S, 1993 Bankr. LEXIS 1191, *20–21 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights."); *Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074 (1976) (holding that a bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement among the policyholder, the claimant, and the insurance company, as required by the policy holder); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is not intended to expand debtor's rights against others more than they existed at the commencement of the case).

[88] *See supra* note 87.  *See also, e.g.*, *In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("While bankruptcy courts have the power to allow debtors to *escape* burdensome contracts by rejecting them, bankruptcy courts do not have the power to rewrite contracts to allow debtors to continue to perform on more favorable terms."); *In re Nashville White Trucks, Inc.*, 5 B.R. 112, 117 (Bankr. M.D. Tenn. 1980) ("The [Bankruptcy] Code does not . . . grant the debtor in bankruptcy greater rights and powers under the contract than he had outside of bankruptcy.").

[89] *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 194 (Bankr. S.D.N.Y. 2012).

[90] *In re Denario*, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001) (quotation omitted).

neutrality language in the Plan.[91]  Insurance neutrality is "a meaningful concept where . . . a plan does not materially alter the quantum of liability that the [debtor's] insurers would be called to absorb."[92]  Procedurally, insurance neutrality grew out of standing disputes between Chapter 11 debtors and their insurers.[93]  But it is rooted in (the prevention of) impairment.[94]  More specifically, insurance neutrality requires that a plan "neither increase [an] insurer['s] pre-petition obligations nor impair [its] pre-petition contractual rights under the subject insurance polic[y]."[95]  This is analytically indistinguishable from the well-established prohibition against using the Bankruptcy Code to modify prepetition contracts; preventing a debtor from enlarging its rights under a contract and ensuring that a non-debtor counterparty's contractual rights do not shrink are two sides of the same coin.[96]  Thus, insurance neutrality as a concept is most accurately understood as shorthand for whether a Chapter 11 plan violates the proscription against altering prepetition contracts.

31.    This Plan clearly fails the above-referenced insurance neutrality test.  Under the Plan, any language ostensibly preserving the Interstate Insurers' rights is subject to an exception that swallows the rule.[97]  The gist of these exclusionary provisions is that the Interstate Insurers'

---

[91] Notably, the insurance neutrality provision in the Plan omits the Trust from the first operative clause.  *See* Plan, § 8.7.2 ("[N]othing in this Plan . . . shall affect, impair, or prejudice the rights and defenses of any Non-Settling Insurer against the Diocese or any other Participating Party under any Non-Settling Insurer Policies . . .").

[92] *In re Glob. Indus. Techs.*, 645 F.3d 201, 212 (3d Cir. 2011).

[93] *See id.* at 212 (vacating and remanding after determining that the plan's insurance neutrality language was insufficient to deny certain of the debtor's insurers standing to appear and contest plan confirmation); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 217 (3d Cir. 2004) (holding that certain insurers did not have appellate standing to challenge a plan because of the plan's insurance neutrality provision).

[94] *See Glob. Indus. Techs.*, 645 F.3d at 212.

[95] *Id.*

[96] *Compare id. with, e.g.*, *In re Downey Fin. Corp.*, 428 B.R. 595, 607 (Bankr. D. Del. 2010) ("[The Bankruptcy Code] is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case.").

[97] *See, e.g.*, Plan, § 6.1 ("Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Protected Party, ***except any***

contractual rights are preserved – except for the many situations where they are not.  This construction is patently deficient.  It stands in stark contrast to even the rudimentary insurance neutrality language in *Combustion Engineering*, which provided that "nothing in the [p]lan shall in anyway [*sic*] operate to, or have the effect of, impairing [the] insurers' legal, equitable or contractual rights, if any, in any respect."[98]  The more robust, and appropriate, language developed elsewhere (*e.g.*, *In re T H Agriculture & Nutrition, L.L.C.*)[99] underscores the incoherence of the formulation in the Plan.[100]

32.    More to the point, the Plan's selective incorporation of the rights that the Interstate Insurers are permitted to retain defeats the entire purpose of insurance neutrality – and highlights the resulting injury.  Either "***nothing*** [in the Plan] impairs [the Interstate Insurers'] rights"[101] or, as here, the Interstate Insurers' rights are impaired.[102]  It necessarily follows from there that the Plan modifies the Interstate Policies: it enlarges the Debtor's (or Trust's) rights under the Interstate Policies at the expense of the Interstate Insurers.  Indeed, the Plan endeavors to abrogate or eliminate the Interstate Insurers' rights in at least the following three respects.

1.    Prejudicial Provisions Throughout the Plan Target Coverage Defenses

33.    Most prominently, the Plan contains a number of highly prejudicial provisions that seek to strip the Interstate Insurers of coverage defenses to which they are entitled.  This proposed elimination begins with Section 8.7.1.h., which provides:

---

*defense arising from the Insurance Claims Assignment*." (emphasis added)); Plan, § 8.7.1.h.  *See also infra* § II.A.
[98] 391 F.3d at 217 (internal quotations omitted).
[99] No. 08-14692 (REG), 2009 Bankr. LEXIS 4673 (Bankr. S.D.N.Y. May 28, 2009).
[100] *Compare id.* at *84-86 *with* Plan at §§ 6.1, 8.7.1.h.
[101] *Combustion Eng'g, Inc.*, 391 F.3d at 216 (emphasis in original) (internal citations and quotations omitted).
[102] *See Glob. Indus. Techs.*, 645 F.3d at 212.

The Non-Settling Insurers shall retain any and all coverage defenses, *except any defense regarding or arising from the Insurance Claims Assignment*, but confirmation or effectuation of this Plan *shall not trigger any coverage defense, or give rise to any additional coverage defense*, that did not exist prior to the Diocese's filing for bankruptcy or Plan confirmation, *and no coverage defenses* are created by the Diocese's bankruptcy *or the negotiation*, solicitation, or confirmation *of the Plan, or the terms thereof*, including any treatment of, or protections afforded to, the Diocese, the Reorganized Diocese, any Participating Party or Settling Insurer under this Plan.[103]

34.     At first glance, this section is explicit in its intent.  It openly aims to eradicate any coverage defenses arising as a result of the Plan itself (specifically including the Insurance Claims Assignment)[104] and/or the Plan Proponents' actions throughout the Plan process[105] – which is itself inappropriate.[106]  Less immediately obvious, however, is the Plan Proponents' attempt through this section to extinguish any defense raised on account of the TDP's unreasonableness, like in *Congoleum Corp. v. Ace American Insurance Co.*[107]  The eponymous plaintiff in *Congoleum* brought a declaratory judgment action against certain of its insurers, seeking a declaration that (among other things) its insurers were "obligated to provide coverage" for asbestos claims that had

---

[103] Plan, § 8.7.1.h. (emphasis added).

[104] *See id.* ("[N]o coverage defenses are created by . . . the terms [of the Plan], including any treatment of, or protections afforded to, the Diocese, the Reorganized Diocese, any Participating Party . . . under this Plan."); *id.* at § 6.1 ("Non-Settling Insurers retain any defenses that they would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Protected Party, except any defense arising from the Insurance Claims Assignment.").

[105] *See* Plan, § 8.7.1.h. ("[C]onfirmation or effectuation of the Plan shall not trigger any coverage defense, or give rise to any additional coverage defense, that did not exist prior to the Diocese's filing for bankruptcy or Plan confirmation, and no coverage defenses are created by the Diocese's bankruptcy or the negotiation, solicitation, or confirmation of the Plan . . .").

[106] *Cf. SOCIETE INTERNATIONALE POUR PARTICIPATIONS v. ROGERS*, 357 U.S. 197, 209 (1958) ("[The Due Process Clause imposes] constitutional limitations upon the power of courts . . . to dismiss an action without affording a party the opportunity for a hearing on the merits of his cause.").

[107] NO. MID-L-8908-01, 2007 N.J. Super. Unpub. LEXIS 3000 (N.J. Sup. Ct. May 18, 2007).

been allowed and liquidated under a "Claimant Agreement" later folded into a prepackaged bankruptcy plan.[108]

35.     The Claimant Agreement – which had been negotiated among Congoleum and plaintiffs' lawyers for the asbestos claimants, without Congoleum's insurers[109] – "abandon[ed] viable defenses [from] the tort system,"[110] "allow[ed] time-barred claims,"[111] "contain[ed] no meaningful exposure requirement,"[112] and "contain[ed] no meaningful provisions to ferret out fraudulent claims."[113]  As a result, the insurers declined coverage on the basis that the Claimant Agreement was not entered in good faith and was unreasonable.[114]  After a thorough review of the many deficiencies of the Claimant Agreement, Judge Stroumtsos determined that the "Claimant Agreement [wa]s an unreasonable agreement, not made in good faith" and held that the insurers had "no obligation or coverage for the Claimant Agreement."[115]

36.     Like the Claimant Agreement in *Congoleum*, the TDP here "abandon[] viable defenses in the tort system,"[116] "allow[] time-barred claims,"[117] "contain[] no meaningful [liability] requirement,"[118] and "contain[] no meaningful provisions to ferret out fraudulent claims."[119]  And, like the Claimant Agreement in *Congoleum*, the TDP were negotiated among

---

[108] *Id.* at *1-13.

[109] *Id.* at *11-12, 16.

[110] *Id.* at *18.

[111] *Id.* at *19.

[112] *Id.*

[113] *Id.*

[114] *See id.* at *13.

[115] *Id.* at *23.

[116] *Id.* at *18; *cf. generally* TDP.

[117] *Congoleum*, 2007 N.J. Super. Unpub. LEXIS 3000 at *19; *cf., e.g.*, TDP at § 5.2 ("Holders of Late-Filed Abuse Claims shall receive a maximum monetary distribution in the dollar amount that is equal to 33% of the pro rata share of the total points assigned in respect of such Claim . . .").

[118] *Congoleum*, 2007 N.J. Super. Unpub. LEXIS 3000 at *19; *cf., e.g.*, TDP at §§ 3.1, 4.1.

[119] *Congoleum*, 2007 N.J. Super. Unpub. LEXIS 3000 at *19; *cf.* Disclosure Statement, §  III.G.1. at Dkt. No. 1566, p. 30 of 103 ("Notwithstanding the Diocese's position on liability . . . the Abuse

plaintiffs' lawyers without any input from the Interstate Insurers.[120]  Put simply, there is ample

evidence that the TDP are "unreasonable . . . [and] not made in good faith."[121]  Yet Section 8.7.1.h.

of the Plan endeavors to prevent in advance any outcome like that in *Congoleum* by insulating

every constituent element of the TDP: the negotiation of the Plan, the Insurance Claims

Assignment, the terms of the Plan more generally, and the confirmation or effectuation thereof.[122]

37.    Equally problematic are Sections 8.7.1.d., 8.2.4.a., and 6.1 of the Plan.  Section 6.1

provides that "each Non-Settling Insurer shall retain any and all legal and factual defenses that

may exist in respect to [a liquidated Abuse Claim] and, ***except as set forth in this Section***, all

coverage defenses."[123]  It goes on to state that "Non-Settling Insurers retain any defenses that they

would be able to raise if the Claim for coverage for an Abuse Claim were brought by any Protected

Party, ***except any defense arising from the Insurance Claims Assignment***."[124]  Section 8.2.4.a.

likewise aims to inoculate the Insurance Claims Assignment from any challenge, stating that the

parties "shall use reasonable efforts to seek the Bankruptcy Court's determination . . . that the

proposed Insurance Claims Assignment is valid and does not ***defeat or impair the Insurance***

***Coverage***."[125]  Section 8.7.1.d. then purports to prevent any "limitations on recovery from Non-

Settling Insurers . . . by virtue of the fact that the Diocese is in bankruptcy or by any Distribution

from the Trust to an Abuse Claimant."[126]

---

Claim Reviewer may determine that holders of such Abuse Claims may be entitled to a
Distribution . . .").
[120] *See* Plan, § 11.1.1.a. (". . . the [TDP] as proposed by the Committee . . .").
[121] *Congoleum*, 2007 N.J. Super. Unpub. LEXIS 3000 at *22.
[122] *See* Plan, § 8.7.1.h.
[123] *Id.* at § 6.1 (emphasis added).
[124] *Id*. (emphasis added).
[125] *Id*. at § 8.2.4.a. (emphasis added).
[126] *Id*. at § 8.7.1.d.

38.    These provisions, together with Section 8.7.1.h., purport to cripple the Interstate
Insurers' contractual rights and defenses against *future* coverage demands from the Trust
following the liquidation of Abuse Claims under the Plan and TDP.  Absent these provisions,
Interstate would have the ability to assert all applicable coverage defenses based on any failure of
the Trust (as the insured) to comply with the Interstate Policies' requirements, such as: the
Diocese's duty to defend itself; the duty to cooperate; the right of the Interstate Insurers to
participate in the investigation, settlement, and defense of claims; and the right of the Interstate
Insurers to challenge unreasonable settlements.  But by cordoning off the Insurance Claims
Assignment and "any distribution from the Trust to an Abuse Claimant,"[127] the Plan Proponents
plainly seek to strip the Interstate Insurers now of any defenses they may hold in the future with
respect to the TDP.

39.    All of this is patently prejudicial to the Interstate Insurers.  As important, it is
prohibited.[128]  "There is no provision in the Bankruptcy Code allowing a bankruptcy court to
disregard state-law contractual rights."[129]  Nor can the Interstate Insurers' coverage defenses
simply be "excised [from the Interstate Policies] because doing so would rewrite the . . . Policies
and expand the Debtor['s] rights under them."[130]

---

[127] *Id.*

[128] *See, e.g.*, *Diocese of Camden*, 653 B.R. at 356 ("[T]his Court has already ruled that it will not
confirm a plan which is so biased as to strip the Insurers of rights necessary to ensure the Plan is
equitable.").  Judge Poslusny in *Camden* also held that the plan there had to "be streamlined, rather
than requiring readers to review different sections . . . to understand what impact the [p]lan will
have on [coverage] defenses," *id.* at 358 – a problem that this Plan shares.

[129] *641 Assocs. v. Balcor Real Estate Fin.*, No. 91-11234S, 1993 Bankr. LEXIS 1191, *20–21
(Bankr. E.D. Pa. Aug. 26, 1993).

[130] *MF Glob. Holdings*, 469 B.R. at 193.

### 2.    The Plan Abandons the SIRs

40.    In addition to attempting to strip the Interstate Insurers of their coverage defenses, the Plan appears to abandon the SIRs entirely.  SIRs, however, occupy a principal place in the Interstate Policies' incentive structure and cannot simply be removed.  Among other things, SIRs encourage the insured to investigate and discover invalid claims to avoid making unnecessary out-of-pocket payments.  They also permit the insured to obtain coverage at a lower premium, in part because Interstate's obligations arise only upon the insured's exhaustion of the SIRs (and only then, if all other terms and conditions of the Interstate Policies are satisfied).

41.    Yet the Plan ignores the SIRs entirely.  There is no provision of the Plan that addresses the obligation to pay an SIR before coverage attaches, no explanation of how the Insurance Claims Assignment purports to affect the SIRs, and no indication that the Trust will satisfy them.  In short, there is no mention of the SIRs *at all*.  The only reasonable inference is that the Plan seeks to jettison the SIRs while retaining coverage under the Interstate Policies.  This attempted unilateral revision of the Interstate Policies denies Interstate the benefit of its bargain, to its clear prejudice.  It increases its ultimate liability, denies it a key protection against frivolous or *de minimis* claims, and upends the incentive structure on which the Interstate Policies were based.  It is just as clearly forbidden under the Bankruptcy Code.[131]

### 3.    The Plan Rewrites the Insurer-Insured Relationship

42.    Last, the Plan undermines Interstate's most basic contractual rights under the Interstate Policies by realigning their structure.  The Interstate Policies were underwritten, priced, and provided based on certain key assumptions – including, among other things, the identity and risk profile of the insured and an alignment of interests between Interstate and the Debtor (or other

---

[131] *See supra* § I.A.

insured, as applicable).  To reinforce each assumption, the Interstate Policies, and/or the LMI policies to which they follow form, contain provisions that: (a) require the Debtor to satisfy the SIR as a prerequisite to coverage; (b) provide to Interstate the right to participate in the investigation, settlement, and defense of any claim; (c) require the Debtor's cooperation; and (d) prohibit any non-consensual assignment.

43.    Yet the Plan and TDP together eviscerate these protections.  First, the Plan eliminates any chance of a vigorous defense – and with it, the right to participate in one – by effectively excising the SIRs from the Interstate Policies (and capping the Debtor's liability in any event).  Then, the Insurance Claims Assignment perverts the original insurer-insured relationship by (i) functionally substituting the Trust for the original insured(s) and (ii) ensuring that the Trust is the principal beneficiary of any judgment or settlement.  Finally, the Plan turns the tort system into a no-stakes lottery by shielding Abuse Claimants from any possibility of loss: a Litigation Claimant at any time may rescind the election to litigate his Abuse Claim, *and nothing in the Plan or TDP provides for the disallowance of an Abuse (Litigation) Claim that results in a defense verdict or $0 judgment*.

44.    This fundamental realignment of the typical incentive structure paves the way for massive claim valuations, while the glaring omission of insurance neutrality purports to thwart in advance any coverage defenses the Interstate Insurers might raise because of it.  Combined, the Plan's framework systematically destroys the Interstate Insurers' bargained-for contractual rights under the Interstate Policies and is substantially likely to subject the Interstate Insurers to an increased "quantum of liability."  The Bankruptcy Code permits neither.

**E.  The Plan Was Not Proposed in Good Faith**

45.    *Finally*, the Plan was not proposed in good faith under Section 1129(a)(3).  In this context, "good faith" means that a plan must "be proposed with honesty [and] good intentions"

and with "a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code."[132]  But results alone are insufficient to show good faith.[133]  A plan must also "*fairly* achieve a result consistent with the objectives and purposes of the Bankruptcy Code."[134]  The good faith inquiry thus requires an evaluation of the "totality of the circumstances surrounding the establishment of a chapter 11 plan" to determine if the plan fosters a result "consistent with the objectives and purposes of the [Bankruptcy] Code" and whether there was "a fundamental fairness in dealing with creditors."[135]  The "totality of the circumstances surrounding"[136] this Plan show that it fails that test by any measure.

### 1.  The TDP Yield Outcomes That Are Incompatible with the Bankruptcy Code

46.     As a gating issue, the TDP feature an Abuse Claims allowance and valuation mechanism that delivers results contrary to the "objectives and purposes" of the Bankruptcy Code.[137]  The primary purpose of the Bankruptcy Code is to ensure "equality of distribution among creditors of the debtor."[138]  In service to this goal, courts have repeatedly – since before the Bankruptcy Code – held that "a creditor cannot collect more, in total, than the amount it is owed" from the debtor.[139]  Logic therefore dictates that all claims for payment must (eventually) be

---

[132] *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997) (internal citations and quotations omitted).

[133] *See Am. Capital Equip.*, 688 F.3d at 158.

[134] *Id.* (emphasis in original) (internal citations and quotations omitted); *see also Leslie Fay Cos.*, 207 B.R. at 764 (a plan proponent must have exhibited "a fundamental fairness in dealing with creditors . . ." (internal citations and quotations omitted)).

[135] *See Am. Capital Equip.*, 688 F.3d at 158 (internal citations and quotations omitted).

[136] *Id.* (internal citations and quotations omitted).

[137] *Id.*

[138] *Union Bank v. Wolas*, 502 U.S. 151, 161 (1991).

[139] *Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012).

reduced to an absolute dollar amount, a concept the Bankruptcy Code supports.[140]  Likewise, the

claim itself should be cognizable and enforceable against the debtor to receive a distribution.[141]

47.    The TDP adhere to none of these concepts and instead permit an inappropriate

windfall to holders of Abuse Claims.  This begins with an indiscriminate allowance process.  The

Survivor Claim Reviewer is solely responsible under the TDP for determining whether an Abuse

Claim should be allowed.[142]  Yet the Survivor Claim Reviewer's discretion to do so is almost

entirely unchecked: the TDP places no limitation on the Survivor Claim Reviewer's ability to

allow Abuse Claims;[143] none of the Plan, Trust Agreement, or TDP require even satisfaction of

Section 502 as an antecedent to allowance;[144] and no outside authority – *including this Court* –

may countermand the Survivor Claim Reviewer's decision.[145]  The TDP, moreover, do not require

any showing of negligence as a predicate to claim allowance and, according to the Debtor, permit

distributions to known invalid claims.[146]  There is no legitimate bankruptcy purpose that could

possibly be served by greenlighting distributions to invalid claims and purporting to shield them

from judicial review.[147]

---

[140] *See* 11 U.S.C. § 502(b) ("[T]he court . . . shall determine the amount of such claim in lawful currency of the United States . . .").

[141] *See id*. at § 502(b)(1) (providing for the disallowance of claims "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.").  *Cf. id*. at § 704(a)(5) ("The trustee shall . . . examine proofs of claim and object to the allowance of any claim that is improper.").

[142] TDP, § 3.1.

[143] *See id.*; *see* Plan § 4.6.2.

[144] *See* TDP, § 3.1; *see* Plan, § 4.3.1.a; *see* Trust Agreement, §§ 3.2.h-i.

[145] *See* TDP, § 3.4.

[146] *See* Disclosure Statement, § 3.G.1. ("Notwithstanding the Diocese's position on liability, or whether Abuse Claims may be duplicative or filed after the Bar Date, the Abuse Claim Reviewer may determine that holders of such Abuse Claims may be entitled to a Distribution in accordance with the Allocation Protocol.")

[147] *See Diocese of Camden*, 653 B.R. at 360 ("[T]he Plan appears to allow compensation for claims which are facially invalid or fraudulent. [. . .] For this additional reason, the Plan cannot be confirmed. [. . .] The fact that the claims review is being handled by the Trust does not mean that

48.     The valuation process for Abuse Claims is equally problematic.  Under the TDP, the Survivor Claim Reviewer determines the value of an Abuse Claim by awarding "points" pursuant to certain "Evaluation Factors."[148]  The Evaluation Factors consist of the following three, broad categories: "Nature of Abuse & Circumstances,"[149] "Impact of the Abuse,"[150] and "Claimant Involvement."[151]  After the Survivor Claim Reviewer finalizes the points awards, the Trustee notifies each Abuse Claimant of the dollar value of his or her distribution based on his or her *pro rata* share of points.[152]  Although at first blush the system seems relatively innocent and orderly, a closer inspection reveals that the process is significantly less legitimate than it first appears.

49.     To start, the Evaluation Factors – which are not even exclusive to begin with[153] – sweep so broadly as to render them meaningless.  Considerations for the "Nature of Abuse & Circumstances" Evaluation Factor, for example, include whether the claimant had an "opportunity to experience sports or activities"[154] and whether the claimant "held [the] perpetrator in high regard."[155]  The "Impact of the Abuse" considerations are similarly overinclusive, describing almost every conceivable malady affecting the human condition, such as: "fear,"[156] "headaches,

---

this Court does not have jurisdiction over these claims, nor that it can allow facially invalid or fraudulent claims to be paid out without any form of review.").  *See also* Transcript of Hearing, *In re HONX*, No. 22-90035 (Bankr. S.D. Tex. Jan. 14, 2023) Dkt. No. 619 (holding that a committee's role includes investigating and determining which claims are valid and which are not).

[148] TDP, § 4.1.

[149] *Id.* at § 4.1.(a).

[150] *Id.* at § 4.1.(b).

[151] *Id.* at § 4.1.(c).

[152] *Id.* at § 3.2(a)

[153] *See id.* at 4.1.(a) ("Considerations should include, but are not limited to, the following factors."); *see id.* at § 4.1.(b) ("Some of these considerations may include the below factors, but the below list is not intended to be exhaustive."); *see id.* at § 4.1.(c) ("The Survivor Claims Reviewer should consider factors including but not limited to…").

[154] *Id.* at § 4.1(a)(3)(i). And even if either this or the opportunity to participate in sports were probative – and they are not – neither is realistically verifiable by independent means.

[155] *Id.* at § 4.1(a)(3)(iv).

[156] *Id.* at § 4.1(b)(1).

high blood pressure,"[157] and both poverty and wealth.[158]  Many if not most of the "Claimant Involvement" Evaluation Factors are also entirely unrelated to the merits of a claim.[159]  On top of these defects, the TDP fail to impose any limit on the number of points awarded, both in the aggregate and based on the (nonexclusive) considerations listed under each categorical Evaluation Factor.  As a result, the Survivor Claim Reviewer is free to award practically any number of points for any Abuse Claim.

50.     The distribution model has a similarly inflationary skew.  Under the distribution model, each holder of an Abuse Claim receives a *pro rata* distribution from the Trust corresponding to the (i) claimant's points award, (ii) total number of points awarded, and (iii) distributable assets in the Trust.[160]  This is true even for Litigation Claims.  As such, the value of any given Abuse Claim is **_entirely_** relative: there is no absolute dollar value assigned to any Abuse Claim (even one with a jury verdict).[161]  The dollar value of each Abuse Claim instead effectively equals the distributable assets available for such Abuse Claim.

51.     This allowance and valuation mechanism is wholly inconsistent with the letter and spirit of the Bankruptcy Code.  Rather than promoting the orderly liquidation of claims within the

---

[157] *Id.* at § 4.1(b)(2).

[158] *Id.* at § 4.1(b)(5).

[159] *See id.* at § 4.1(c) ("The Survivor Claim Reviewer should consider . . . whether the Abuse Claimant has participated on the [C]ommittee" and whether the Abuse Claimant "directly confronted the institutions or individuals that harmed them . . . provided that such confrontations appear to have been reasonably connected to . . . securing the Diocese's adoption of more stringent child protection practices.").

[160] Stated differently, Distributions on account of Abuse Claims are calculated as follows:

$$\left(\frac{points\ awarded\ to\ specific\ Abuse\ Claim}{total\ points\ awarded}\right) \times distributable\ Trust\ Assets$$

[161] *See* TDP, § 3.2; *see* TDP, § 2.3 ("The Evaluation Factors set forth below shall be the sole and exclusive method by which he holder of an Abuse Claim may seek allowance and distribution of such Claim.").

four corners of the Bankruptcy Code (and applicable non-bankruptcy law), the TDP reward holders

of invalid or otherwise improper Abuse Claims with a seat at the table and a share of the spoils.

As problematic, the TDP pad the take for each Abuse Claim by prorating distributions based on a

fictive points award instead of an absolute dollar value.   Altogether, this scheme violates

foundational principles of bankruptcy law underlying the allowance, denomination, and payment

of claims.[162]   The Plan therefore fails on its face to "achieve a result consistent with the objectives

and purposes of the Bankruptcy Code."[163]

### 2. The Plan Establishes an Inherently Conflicted Trust

52. The Trust, which is inescapably conflicted, raises similar concerns.   As courts have

found repeatedly, conflicts of interest preclude a finding of good faith under Section 1129(a)(3).[164]

In *American Capital Equipment*, for example, the Third Circuit affirmed an order finding that a

plan was unconfirmable for lack of good faith because the plan "establishe[d] an inherent conflict

of interest."[165]   *American Capital Equipment* involved the attempted reorganization of American

Capital Equipment, Inc. ("ACE") and Skinner Engine Company ("Skinner"), the latter of which

manufactured ship engines and parts that allegedly contained asbestos.   ACE and Skinner filed for

chapter 11 after ACE purchased Skinner in a highly leveraged acquisition and Skinner performed

---

[162] *See* 11 U.S.C. § 502(b) ("[T]he court . . . shall determine the amount of such claim in lawful currency of the United States . . ."); *Travelers Cas. & Sur. Co. of Am. v. PG&E*, 549 U.S. 443, 450 (2007) ("[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code") (internal citations and quotations omitted) (formatting in original); *Nuveen Mun. Tr. v. Withumsmith Brown, P.C.*, 692 F.3d 283, 295 (3d Cir. 2012) ("[A] creditor cannot collect more, in total, than the amount it is owed.").
[163] *Am. Capital Equip.*, 688 F.3d at 158.
[164] *See, e.g.*, *Am. Capital Equip.*, 688 F.3d at 158; *Coram Healthcare*, 271 B.R. 228, 234 (Bankr. D. Del. 2001).   *See also In re ACandS, Inc.*, 311 B.R. 36, 43 (Bankr. D. Del. 2004).
[165] 688 F.3d at 158.

far worse than anticipated, failing to generate sufficient revenue to service its debt and maintain operations.

53.     In addition to these performance woes, more than 29,000 asbestos claims were pending against Skinner as of its petition date.  Skinner and ACE[166] sought to resolve these and other claims via Skinner's fifth amended plan (the "Skinner Plan").  As part of this proposed resolution, the Skinner Plan permitted the asbestos claimants to opt-in to certain "Court Approved Distribution Procedures" (the "CADP"), under which a trustee would evaluate the asbestos claims.[167]  In exchange for an evaluation under the CADP, the asbestos claimants agreed to remit to Skinner 20% of any payout received from Skinner's insurers (on their asbestos claims).[168]

54.     Following a contested hearing on the disclosure statement accompanying the Skinner Plan, Judge McCullough denied approval of the disclosure statement on the grounds that the Skinner Plan was "facially unconfirmable."[169]  Judge McCullough found that the Skinner Plan was unconfirmable because, among other reasons, the proposed treatment of asbestos claims was collusive and demonstrated "bad faith on the part of [Skinner], the [Skinner Plan proponents], and the [a]sbestos [c]laimants."[170]  Skinner thereafter appealed to the District Court, which emphatically affirmed.[171]

55.     On a further appeal, the Third Circuit affirmed again, determining that the "[Skinner] Plan w[ould] not fairly achieve the Bankruptcy Code's objectives because it

---

[166] Hereinafter, "Skinner" refers to both Skinner and ACE, collectively, unless otherwise noted.

[167] *In re Am. Capital Equip., Inc.*, 405 B.R. 415, 422 (Bankr. W.D. Pa. 2009) (hereinafter, "*Am. Capital I*").

[168] *Am. Capital Equip.*, 688 F.3d at 151.

[169] *Am. Capital I*, 405 B.R. at 418.

[170] *Id.* at 423.

[171] *Skinner Engine Co. v. Allianz Glob. Risk U.S. Ins. Co.*, No. 09-0886, 2010 U.S. Dist. LEXIS 45667, at *6 (W.D. Pa. Mar. 29, 2010) ("Under no standard of review would this court reverse the bankruptcy court's disposition of this case.").

establish[ed] an inherent conflict of interest under circumstances that are especially concerning."[172] These "especially concerning" circumstances included the fundamental misalignment of interests intrinsic in the proposed system where Skinner (as insured) would be "financially incentivized to sabotage its own defense" so that asbestos claimants could access coverage – in return for which Skinner would reap a 20% surcharge.[173] This issue and others were more than adequate for the Third Circuit to conclude that "the lack of good faith pursuant to [Section] 1129(a)(3) makes the [Skinner] Plan patently unconfirmable."[174]

56.    This Plan suffers from the same deficiencies. Like the Skinner Plan, this Plan (together with the TDP) establishes a system tainted by inescapable conflicts of interest that upset the delicate – and bargained-for – balance between insurer and insured.[175] The structural mismatch that follows is then made worse by the circumstances surrounding the selection of the two Trust fiduciaries-elect. Both DW Harrow and Mr. Kramer were handpicked by the Committee,[176] with whom both fiduciaries-elect appear to have substantial professional connections: DW Harrow and Mr. Kramer served in similar capacities (as trustee and claims reviewer, respectively) in four

---

[172] *Am. Capital Equip.*, 688 F.3d at 158.

[173] *Id.*

[174] *Id.* at 161.

[175] *See supra* § I.D.3.

[176] In the months prior to filing the Plan, the Committee reported numerous time entries dedicated to selecting the Trustee as well as interviewing candidates for and ultimately selecting the Abuse Claims Reviewer. *See* Monthly Fee Statement of Stinson LLP for Compensation of Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Official Committee of Unsecured Creditors for the Month of October 2023 [Dkt. No. 1551, pp. 15, 32, 35]; *see* Monthly Fee Statement of Stinson LLP for Compensation of Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Official Committee of Unsecured Creditors for the Month of November 2023 [Dkt. No. 1598, pp. 9, 10, 13, 31]; *see* Monthly Fee Statement of Stinson LLP for Compensation of Services Rendered and Reimbursement of Expenses Incurred as Counsel to the Official Committee of Unsecured Creditors for the Month of December 2023 [Dkt. No. 1615, p. 18]. The Debtor's fee application for October contains no discussion of time spent on either the Trustee or Abuse Claims Reviewer. Nor has the Debtor filed any further fee applications.

separate diocesan abuse bankruptcies where Mr. Kugler and Mr. Caldie (as committee counsel) and Jeff Anderson & Associates P.A. (as counsel for various committee members there and here) also served.[177]   The upshot is two Trust fiduciaries with the means, motive, and opportunity to pursue overgenerous or otherwise unwarranted valuations for Abuse Claims – and unavoidable conflicts of interest as a result.

*       *       *

57.   In sum, the Plan is categorically defective.   It was not proposed in good faith, it does not comply with the Bankruptcy Code, and much of it is demonstrably inappropriate.   Under these circumstances, "it is incumbent upon the court to decline approval of the disclosure statement to prevent diminution of the estate."[178]   That is the proper outcome here.

## II.  THE DISCLOSURE STATEMENT IS INADEQUATE

58.   As set forth above, the patent unconfirmability of the Plan is reason enough to deny approval of the Disclosure Statement.   But to the extent the Court determines the Plan satisfies that threshold, it should nonetheless decline to approve the Disclosure Statement under Section 1125(b).   Section 1125(b) provides that a disclosure statement may not be approved unless it contains "adequate information," which in pertinent part is defined as "information of a kind, and in sufficient detail, . . . [to] enable a hypothetical reasonable investor" of the relevant class "to make an informed judgment about the plan."[179]   Courts generally interpret this requirement to

---

[177] *See generally In re Diocese of Duluth*, No. 15-50792 (Bankr. D. Minn.); *see generally In re Diocese of New Ulm*, No. 17-30601 (Bankr. D. Minn.); *see generally In re Diocese of Winona-Rochester*, No. 18-33707 (Bankr. D. Minn.); *see generally In re Diocese of St. Cloud*, No. 20-60337 (Bankr. D. Minn).

[178] *In re Moshe*, 567 B.R. 438, 444 (Bankr. E.D.N.Y. 2017) (internal citations and quotations omitted).

[179] 11 U.S.C. § 1125(b).

mean that a disclosure statement must "contain simple and clear language delineating the consequences of the proposed plan on [an average general unsecured creditor's] claims and the possible [Bankruptcy] Code alternatives so that they can intelligently accept or reject the [p]lan."[180]  Thus, a critical disclosure in almost every case is "information relevant to the risks posed to creditors under the plan."[181]  This Disclosure Statement lacks at least two categories of "information relevant to the risks posed to creditors" under the Plan.[182]

### A. The Disclosure Statement Fails to Disclose Material Risks to Abuse Claimants' Recovery Under the Plan[183]

59.    At the outset, the Disclosure Statement fails to disclose all of the risks that are likely to prevent holders of Abuse Claims from realizing the recoveries intimated in it.  Although the Disclosure Statement does not provide an estimated recovery for Abuse Claimants, it nonetheless appears to be predicated on the assumption that the TDP will be implemented as written and that insurance will be available for most, if not all, of the inflated claims liquidated under the Plan and TDP.  But the Disclosure Statement offers no real basis for that assumption.  It simply states in a summary fashion that the Insurers may object to confirmation, are likely to raise defenses in coverage litigation, and that there is no guarantee the Trust will prevail on its coverage claims.[184]  That is insufficient in at least two respects.

---

[180] *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988)

[181] *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984).  *Accord, e.g.*, *In re Divine Ripe, L.L.C.*, 554 B.R. 395, 405 (Bankr. S.D. Tex. 2016) ("[T]he need for a creditor to know more about [a key party's] financial information is paramount to make an informed decision about the [plan] . . .").

[182] *Metrocraft Pub. Servs., Inc.*, 39 B.R. at 568.

[183] As a threshold matter, the Disclosure Statement fails to provide even a projected recovery for Abuse Claimants.  That is by definition "relevant to the [Abuse Claimants'] decision to accept or reject," *Metrocraft Pub. Servs.*, 39 B.R. at 568, the Plan.

[184] Disclosure Statement, § 18.H.

60.    *First*, it does not adequately inform Abuse Claimants of the consequences of successful confirmation objections (not to mention the nature of those objections).[185]  Rather than summarily dismissing potential objections, the Disclosure Statement should inform Abuse Claimants that – if the Interstate Insurers are successful – the Court may condition confirmation on material amendments to the Plan that could affect the holders of Abuse Claims, including, for example, provisions: (a) fully preserving the Interstate Insurers' contractual rights and coverage defenses; (b) requiring the appointment of truly neutral Trust fiduciaries to oversee a process in which parties in interest, including the Interstate Insurers, may object to claims and take discovery; (c) obligating Abuse Claimants to prove that their claims are legally enforceable against the Debtor under applicable non-bankruptcy law, and forbidding the allowance or payment of invalid claims; and (d) clarifying that by confirming the Plan, the Court is not approving – or making any determination at all regarding – the reasonableness or good faith of any liquidation or settlement of any Abuse Claim under the Plan and TDP.

61.    *Second*, the current disclosures fail to explain to Abuse Claimants that the Plan may operate to vitiate any available insurance coverage under the Interstate Policies for the Abuse Claims.  The Disclosure Statement should explain that the Interstate Insurers may assert in coverage litigation that the resolution of Abuse Claims under the TDP breaches the Interstate Policies and thus relieves the Interstate Insurers of any obligation to indemnify.  It should likewise inform Abuse Claimants that the Bankruptcy Court lacks jurisdiction to approve the Insurance Claims Assignment of the non-debtor Participating Parties' interests in and to the Interstate Policies (if any), and that the purported assignment may abrogate coverage under the Interstate

---

[185] The Disclosure Statement merely, and inaccurately, states that "the Bankruptcy Court might find that the Plan is not feasible."  Disclosure Statement, § XVIII.H. at Dkt. No. 1566, p. 99 of 103.

Policies.  Each of these outcomes may have a material and severely adverse effect on Abuse Claimants' recoveries.  The Plan Proponents have an obligation to disclose that risk.

62.    Beyond these coverage-related risks, the Disclosure Statement lacks any discussion of the possibility that the Plan and/or TDP may themselves reduce Abuse Claimants' recoveries. More specifically, the Disclosure Statement does not appropriately inform Abuse Claimants that the Trustee's (and his professionals') fees and costs may consume a potentially significant amount of distributable cash, thus reducing recoveries, if the Trustee spends substantial resources litigating coverage cases in which the Trust does not prevail.[186]  The Disclosure Statement likewise fails to warn Abuse Claimants that the uncapped and unscaled points award system under the TDP may result in awards that do not correspond to the severity of injury, including because it contemplates preferential treatment – extra points – for a minority of the claimant pool (*e.g.*, Abuse Claimants who sat on the Committee).[187]  These adverse outcomes should similarly be disclosed.

**B.  The Disclosure Statement Fails to Disclose the Trust Fiduciaries' Connections**

63.    Finally, the Disclosure Statement fails to disclose the Trust fiduciaries-elect's connections to attorneys in this case.  As set forth above, both DW Harrow and Mr. Kramer have substantial connections to Jeff Anderson & Associates P.A., a firm that represents a number of

---

[186] The *Diocese of Camden* provides a cautionary example of the risks attendant to a bankruptcy case in which the plan proponents overreach and, instead, consume substantial resources of the bankruptcy estate through litigation.  The *Camden* confirmation proceedings have been ongoing for almost 20 months since the Diocese of Camden filed its Eighth Amended Plan Of Reorganization on June 1, 2022.  *See* Eighth Amended Plan Of Reorganization, *In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Jun. 1, 2022) Dkt. No. 1725.  Confirmation has since been twice denied by the bankruptcy court.  *See Diocese of Camden*, 653 B.R. 309 (Bankr. D.N.J. 2023) *and* Transcript of Decision of the Honorable Jerrold N. Poslusny, Jr., *In re The Diocese of Camden, New Jersey*, No. 20-21257 (Bankr. D.N.J. Dec. 15, 2023) [Adv. Pro. Dkt. No. 163-4].

[187] The Disclosure Statement also fails to advise Abuse Claimants that the Trustee may make distributions to invalid or untimely claims, which will dilute recoveries for those Abuse Claimants who acted timely and have legitimate claims.

Abuse Claimants, and certain professionals for the Committee.[188]  Given the nearly unfettered

discretion that the Trust fiduciaries-elect have over the allowance and valuation of Abuse Claims

– and particularly in light of the TDP's inbuilt points bonus for Committee members – Mr.

Kramer's and DW Harrow's connections should be fully and fairly disclosed.

## STANDING

64.     To the extent the Plan Proponents claim the Interstate Insurers lack standing to

object to the Disclosure Statement, their argument should be rejected as meritless.  Section 1109(b)

of the Bankruptcy Code provides that a "party in interest. . . may raise and may appear and be

heard on any issue in a case" under chapter 11.[189]  The Second Circuit has previously held that

whether a party qualifies as a party in interest is determined on a case-by-case basis, "taking into

consideration whether that party has a 'sufficient stake' in the outcome of th[e] proceeding, which

can include having a pecuniary interest directly affected by the bankruptcy proceeding."[190]

65.     A liability insurer, for instance, has a sufficient stake to participate in the

bankruptcy proceeding where it is responsible to pay claims brought against a debtor enabling a

liability that it insures.[191]  Therefore, a liability insurer has a substantive legal right to enforce,

which confers it standing under the analysis used by the Second Circuit Court of Appeals.[192]

---

[188] *See supra* § I.E.2.  Mr. Kramer also was recently appointed as co-mediator in *The Roman Catholic Diocese of Albany, New York* chapter 11 case. Order Appointing Mediators at ¶¶ 2-3, *In re The Roman Catholic Diocese of Albany, New York*, No. 23-10244 (Bankr. N.D.N.Y. Jan. 2, 2024), Dkt. No. 697.

[189] 11 U.S.C. § 1109(b).

[190] *Church Mut. Ins. Co. v. Am. Home Assurance Co. (In re Heating Oil Partners, LP)*, 422 F. App'x 15, 17 (2d Cir. 2011) (internal citations and quotations omitted).

[191] *In re Heating Oil Partners*, No. 3:08-CV-1976 (CSH), 2009 U.S. Dist. LEXIS 117871, at *14 (D. Conn. Dec. 17, 2009) ("[B]ankruptcy courts have recognized that a liability insurer is a 'party in interest' where the debtor's insurer is responsible to pay claims brought against the debtor.").

[192] *Cf. In re Comcoach Corp.*, 698 F.2d 571, 573 (2d Cir. 1983) (under section 362(d), a party in interest is the one who has a substantive legal right sought to be enforced).

66.    The Second Circuit Court of Appeals previously affirmed a district court decision

holding that insurers had a sufficient stake in a bankruptcy proceeding to establish standing to

bring a motion to declare a default judgment void where the debtor's insurance was a central asset

in the case.[193]   The decision in *Heating Oil Partners* should be extended in this case to include

objections to disclosure statements where the Interstate Insurers' pecuniary interest is directly

affected by the Disclosure Statement.  When the Interstate Insurers were previously impacted by

certain claimants' motions for relief from the automatic stay to issue demand letters,[194] the Court

stated: "the Court certainly finds that the insurance companies have standing under 1109 as parties

in interest.  It is their pockets, it's their money, and as much as they're the Diocese insurance

policies, they have a vested interest as the demand letters would be sent directly to them in

responding to that."[195]   As with the motions for relief from the automatic stay, the Interstate

Insurers are similarly exposed to pecuniary harm by the Disclosure Statement.

67.    The Third Circuit has similarly found that insurers have standing when (i) they can

demonstrate the constitutional standing requirement of "injury in fact" and (ii) the insurer is a

"party in interest" under 11 U.S.C. § 1109(b), which means "anyone who has a legally protected

interest that could be affected by a bankruptcy proceeding."[196]   "When a federal court gives its

approval to a plan that allows a party to put its hands into other people's pockets, the ones with the

---

[193] *See Heating Oil Partners*, 2009 U.S. Dist. LEXIS 117871, at *14, *aff'd Church Mut. Ins. Co. v. Am. Home Assur. Co. (In re Heating Oil Partners, LP)*, 422 F. App'x 15 (2d Cir. 2011).
[194] *Motion for Relief From Stay Filed by Certain Personal Injury Creditors* [Dkt. No. Docket 1393]; *Motion for Relief From Stay Filed by Merson Law Abuse Claimants* [Dkt. No. 1395]; *Motion for Relief From Stay Filed by PVCA Law Survivor Claimants* [Dkt. No. 1400].
[195] Transcript of Hearing (Sept. 28, 2023) pp. 49:25-50:5, an official copy of which is attached as Exhibit B to the Minarovich Declaration.
[196] *Glob. Indus. Techs.*, 645 F.3d at 209-210 (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)).

pockets are entitled to be fully heard and to have their legitimate objections addressed.  In short, they at least have bankruptcy standing."[197]

68.     Further, whether the pecuniary harm arising from the Plan and Disclosure Statement is real or speculative is of no consequence to the question of whether the Interstate Insurers have Article III standing to voice objections.  "In essence the question of [Article III] standing is whether the litigant is entitled to have the court decide the merits" of its claim.[198]  "The party invoking federal jurisdiction [of an Article III court, i.e., the Debtor] bears the burden of establishing" its own Article III standing to bring that suit.[199]  Conversely, "Article III does not restrict [an] opposing party's ability to object to relief."[200]  Therefore, the Interstate Insurers have **no burden** to establish Article III standing whatsoever.[201]  Nonetheless, even if the Interstate Insurers had a burden to prove Article III standing, the existence of standing "in no way depends on the merits' of the claim."[202]  Determining whether the Interstate Insurers have standing to object to the Disclosure Statement based upon the probability of resulting harm "confuse[s] weakness on the merits with absence of Article III standing."[203]

---

[197] *Glob. Indus. Techs.*, 645 F.3d at 204.  *See also In re Congoleum Corp.*, 426 F.3d 675, 685-687 (3d Cir. 2005) (granting insurers standing to challenge retention of debtor's insurance counsel because it was "an issue based on procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole").

[198] *Allen v. Wright*, 468 U.S. 737, 750-751 (1984) (emphasis added) (citation omitted).

[199] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  *See also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).

[200] *Bond v. United States*, 564 U.S. 211, 217 (2011); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2195 (2020).

[201] *See Brief for the United States as Amicus Curiae Supporting Petitioner* at 29-32, *Truck Insurance Exchange, Petitioner v. Kaiser Gypsum Company, Inc., et al.*, (No. 22-1079) (S. Ct. Dec. 14, 2023) ("It is a non sequitur to suggest that petitioner had to establish Article III standing to oppose that exercise of the district court's jurisdiction.  While a statutory provision could arguably limit such participation in ongoing bankruptcy proceedings, Article III does not.").

[202] *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (citation omitted).

[203] *Ariz. Indep. Redistricting Comm'n*, 576 U.S. at 800 (brackets and citation omitted).

69.     Finally, finding that the Interstate Insurers have standing is both necessary and appropriate because "no one [else] has an incentive to pursue" a challenge to the Disclosure Statement "other than the insurers slated to provide coverage."[204]  Because the Committee and the Abuse Claimants are unlikely to challenge a Plan and Disclosure Statement that were written with their support, and in all likelihood their guidance, it falls to the Interstate Insurers to challenge both the Plan and Disclosure Statement and to ensure that they comply with the relevant provisions of the Bankruptcy Code.  Consequently, the Court should find that the Interstate Insurers have standing to assert their objections to the Disclosure Statement.

## RESERVATION OF RIGHTS

70.     The Interstate Insurers reserve all rights to object to confirmation of the Plan, including by raising other and further objections not set forth herein.  The Interstate Insurers further reserve the right to join in any argument or objection made by any other party relating to the adequacy of the Disclosure Statement and confirmability of the Plan.  Nothing herein shall be deemed an admission by the Interstate Insurers as to the existence of, or coverage under, any insurance policies alleged to have been issued by the Interstate Insurers.

## CONCLUSION

WHEREFORE, the Interstate Insurers respectfully request entry of an order (i) denying approval of the Disclosure Statement and (ii) granting to the Interstate Insurers such other and further relief as the Court deems just and proper.

---

[204] *Glob. Indus. Techs.*, 645 F.3d at 214; *see also Congoleum*, 426 F.3d at 687 (insurer standing appropriate where "as a practical matter . . . it is highly unlikely that any of the parties other than the insurers or their attorneys" would bring challenge).

Respectfully submitted this 30th day of January, 2024,

WHITE AND WILLIAMS LLP

By: */s/ Siobhain P. Minarovich*
Siobhain P. Minarovich (704462)
7 Times Square, Suite 2900
New York, NY 10036-6524
Telephone: (212) 244-9500
Facsimile: (212) 631-1248
minarovichs@whiteandwilliams.com

*- and -*

PARKER, HUDSON, RAINER & DOBBS LLP
Harris B. Winsberg (admitted *pro hac vice*)
Matthew M. Weiss (admitted *pro hac vice*)
Matthew G. Roberts (admitted *pro hac vice*)
303 Peachtree Street, Suite 3600
Atlanta, GA 30308
Telephone: (404) 523-5300
Facsimile: (404) 522-8409
hwinsberg@phrd.com
mweiss@phrd.com
mroberts@phrd.com

*- and -*

PARKER, HUDSON, RAINER & DOBBS LLP
Todd C. Jacobs (admitted *pro hac vice*)
John E. Bucheit (admitted *pro hac vice*)
Two N. Riverside Plaza, Suite 1850
Chicago, Illinois 60606
Telephone: (312) 417-3306
Facsimile: (404) 522-8409
tjacobs@phrd.com
jbucheit@phrd.com

*Counsel to Interstate Fire & Casualty Company,
Fireman's Fund Insurance Company, and National
Surety Corporation*

KENNEDYS CMK LLP

By: */s/ Jillian G. Dennehy*
Jillian G. Dennehy
120 Mountain View Boulevard
Basking Ridge, NY 07920
Telephone: (908) 605-2974
Jillian.dennehy@kennedyslaw.com

- *and* -

IFRAH LAW
George R. Calhoun (admitted *pro hac vice*)
1717 Pennsylvania Avenue NW, Suite 650
Washington, DC 20006
Telephone: (202) 524-4147
george@ifrahlaw.com

*Counsel to TIG Insurance Company*

RIVKIN RADLER

By: */s/ Stuart I Gordon*
Stuart I. Gordon
926 RXR Plaza
Uniondale, NY 11556-0926
Telephone: (516) 357-3000
Stuart.Gordon@rivkin.com

*Counsel to Hanover Insurance Company*