O'MELVENY & MYERS LLP
Tancred Schiavoni, Esq.
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

CLYDE & CO US LLP
Marianne May, Esq.
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Telephone: (973) 210-6700

*Counsel for Westchester Fire Insurance Company
and Ace Property and Casualty Insurance*

**IN THE UNITED STATES BANKRUPTCY COURT
THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK,<br><br>        Debtor. | Case No. 20-30663-5-wak<br><br>Chapter 11 |
| The Roman Catholic Diocese Of Syracuse, New York, *et al.*,<br><br>        Plaintiffs,<br>v.<br><br>Arrowpoint Capital, *et al.*,<br><br>        Defendants. | Adv. Pro. No: 21-50002 |

**PARISH INSURERS' OBJECTION TO TREATMENT OF NON-DEBTOR PARISH
POLICIES IN THE DISCLOSURE STATEMENT IN SUPPORT OF THE JOINT
CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC
DIOCESE OF SYRACUSE, NEW YORK**

The insurers listed in the signature block below (the "Parish Insurers"), which are non-debtors in this action and did not provide insurance coverage to the Roman Catholic Diocese of Syracuse, New York (the "Diocese" or the "Debtor"), respectfully submit the following objections to the approval of the Debtor's *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* [Dkt. No. 1566] (the "Disclosure Statement").[1]

## PRELIMINARY STATEMENT

The Disclosure Statement describes a plan that is patently unconfirmable with respect to the treatment of the contract obligations owed by the Non-Debtor Parishes and the rights of the Parish Insurers under the contracts issued to Non-Debtor Parishes.

It provides for the transfer of the obligations of Non-Debtor Parishes to aid and assist in the investigation, defense and settlement of claims to a plaintiff-controlled trust even though the bankruptcy court lacks jurisdiction to approve such a transfer. And, the Plan seeks to modify the obligations of Non-Debtor Parishes under contracts of insurance issued by the Parish Insurers contrary to basic bankruptcy law. Unless and until the Disclosure Statement and Plan comply with the Bankruptcy Code, approval of the Disclosure Statement can, and should, be denied.

---

[1] Capitalized terms not defined herein have the meaning set forth in the Debtor's Disclosure Statement and/or Debtor's *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* [Dkt. No. 1565] (the "Plan"). Unless otherwise indicated, "Dkt." cites refer to the docket in *In re The Roman Catholic Diocese of Syracuse, New York*, No. 20-30663 (Bankr. N.D.N.Y.), "Adv. Pro. Dkt." cites refer to the above captioned adversary proceeding No. 21-50005, all emphasis is added, and all citations, quotations, and footnotes are omitted. Any reference to undefined capitalized terms have the same meanings ascribed to them in the Plan and Disclosure Statement, and such reference shall not constitute an admission or waiver in any way.

Moreover, the Disclosure Statement does not provide creditors with sufficient detail of the terms of the Plan with respect to how it will impact the Non-Debtor Parish policies and the risk that it will render these policies void.

Finally, the Disclosure Statement does not disclose how the discharges, injunction and releases parties' claims with respect to the funds held by the Cabrini Foundation—an entity to which billions of dollars were transferred on the eve of the passage of the CVA. The Disclosure Statement lacks adequate disclosure and cannot be approved on that basis.

## BACKGROUND

### A. The Plan and the Disclosure Statement

On December 6, 2023, the Debtor filed its *Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York* (the "Plan") and Disclosure Statement. Dkt. Nos. 1565, 1566. On January 4 and January 9, 2023, the Debtor filed its "Plan Supplements" [Dkt. Nos. 1604, 1613], which included among other things (i) a trust agreement pursuant to the Plan [Dkt. No. 1604-3], (ii) a list of alleged insurance policies of the Debtor and affiliated non-debtor Parishes [Dkt. No. 1604-4], and (iii) the Plan's "Survivor Claim Allocation Protocol" (i.e., trust distribution procedures or "TDP"). Dkt. No. 1604-1.

The Plan Supplement indicates certain insurance policies of non-debtor Parishes that are allegedly issued or the responsibility of Parish Insurers. *See generally* Dkt. No. 1604-4.

## OBJECTION I

### THE COURT CANNOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT DESCRIBES A PATENTLY UNCONFIRMABLE PLAN

The Court should decline to approve the Disclosure Statement because the Plan to which it relates is patently unconfirmable. A disclosure statement that describes a plan that is unconfirmable should not be approved. *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154–55

2

(3d Cir. 2012) ("if it appears there is a defect that makes a plan inherently or patently unconfirmable, the Court may consider and resolve that issue at the disclosure stage . . . . The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable"); *see also In re Quigley Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007); *In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000); *In re Curtis Ctr. Ltd. P'ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996). A plan is "patently unconfirmable where (1) confirmation defects cannot be overcome by creditor voting results, and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Am Capital Equip.*, 688 F.3d at 154-55.

A. **The Plan Is Unconfirmable Because It Seeks to Modify the Contract Obligations that the Non-Debtor Parishes Owe to Non-Debtor Parish Insurers.**

The Plan Proponents ask that the Court issue an order transferring to the Trust the obligations that the Non-Debtor Parishes owe to the Parish Insurers associated with all "Insurance Claims."[2] Under Section 8.2.4a "Insurance Claims Assignment," the Plan states that "[o]n the Effective Date, and ***without further action by any party***, … each of the [Non-Debtor Parishes] will be deemed to have assigned to the Trust … the [Non-Debtor Parishes'] rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers . . . and shall not be construed[] . . . as an assignment of the insurance policies."[3] Further, the Plan calls for this Court to eliminate obligations that the Non-Debtor Parishes owe to the Parish Insurers and the Parish Insurers corresponding to rights and defenses as part of the compulsory

---

[2]   Plan, §§ 11.1.1b, 8.2.4a.

[3]   Plan, § 8.2.4a.

3

assignment of the policy rights from the Non-Debtor parishes with whom they contracted to a plaintiff controlled trust.[4]

The Plan's compulsory Insurance Claims Assignment of the obligations of the Non-Debtor Parishes and related provisions to a plaintiff-controlled trust renders it unconfirmable for several reasons. Each are addressed in turn below.

> 1. *The Plan Improperly Purports to Expand the Court's Jurisdiction Over Non-Debtor Parish Policies.*

Under Section 541 of the Bankruptcy Code, the Court's jurisdiction is limited to the property of the bankruptcy estate, which does not include non-debtor property. *See* 11 U.S.C. § 541(a)(1) (The estate comprising of "all legal or equitable interests of the debtor in property as of the commencement of the case."); *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004) ("[T]he court's jurisdiction is premised on the debtor and his estate"). Because the Plan seeks approval for assigning the contract obligations of the Non-Debtor Parishes to a plaintiff-controlled trust, the Plan improperly seeks to expand the Court's jurisdiction over non-debtor property.

In *In re Diocese of Camden, New Jersey* ("<u>Diocese of Camden</u>"), the bankruptcy court ruled on this exact issue, where the debtor sought confirmation and approval of an assignment of non-debtor entities' obligations to insurers to the trust. 653 B.R. 309, 351 (Bankr. D. N.J. 2023). In *Diocese of Camden*, Judge Poslusny found that the court "lacks jurisdiction to order or approve the transfer of the [other Catholic entities'] interest in the Policies, because the Court's jurisdiction is limited to property of the Debtor, or the estate." *Id.* at 352. The court further maintained that "while a further Modified Plan may reference the OCEs' separate agreement to assign their

---

[4] Plan § 8.7.1h (providing that the Non-Settling Insurers retain coverage defenses "***except any defense regarding or arising from the Insurance Claims Assignment.}***

4

interests in the policies, and that agreement may be binding under non-bankruptcy law, [the Court] cannot approve or require it." Adv. Pro. Dkt. 163-4, Tr. 14:21-24. Thus, the Plan's broad and unilateral transfer of the Non-Debtor Parishes obligations with respect to Insurance Claims to a plaintiff-controlled trust renders it patently unconfirmable.

Relatedly, the Plan is unconfirmable because it envisions coercing non-debtors to act for the Debtor's benefit although it preserves their rights, claims and obligations. For instance, the Disclosure Statement states in relevant part that if Insurance Claims Assignment is not ordered by the Court, then any "Participating Party" (*i.e.*, including Parishes and other Catholic entities[5]) "will retain the Insurance Claims," but such a party is directed to "assert [its] Insurance Claims to the extent reasonably requested by the Trust against any Non-Settling Insurer," and "retain counsel acceptable to the Trustee to prosecute any Insurance Claims."[6] Here, by compelling such Participating Parties to take certain actions to augment the Debtor's estate, the Plan improperly purports to convert non-estate assets into estate assets. Because bankruptcy courts lack authority to direct non-debtors to take actions with respect to non-estate assets or to preserve such rights and obligations,[7] the Plan is unconfirmable.[8]

---

[5] Plan, § 1.1.127.

[6] Disclosure Statement, Art. IX.B.4b.

[7] *See Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*, 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) (finding that where non-debtors had right to be indemnified and defended by insurers under debtor's policies, "[t]he bankruptcy court did not have the jurisdiction or authority to impair or extinguish these independent contractual rights"). *See also In re Petters Company, Inc.*, 419 B.R. 369, 376 (Bankr. D. Minn. 2009) ("Case law recognizes that any individual insured has a contractually-distinct status that runs directly between itself and the insurer. This makes the right to receive payment on a covered claim the property of the insured itself."); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973 (N.D. Ill. 1991) (recognizing limitation on bankruptcy court's powers to impair a non-debtor, co-insured's contract rights under an insurance policy); *but see BSA*, 642 B.R. at 574 (distinguishing 133 B.R. 973 as a liquidating case).

[8] Even if the Court had jurisdiction over property non-debtor Parish policies, the Debtor has not and cannot provide a provision of the Bankruptcy Code that allows assignment of property of non-

5

2.  *The Plan Is Unconfirmable Because It Is Affirmatively "Insurance Prejudicial" Rather Than Insurance Neutral.*

Under section 1129 of the Bankruptcy Code, the Court may confirm a plan only if it "complies with the applicable provisions of [title 11]" and "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(1), (3). Section 1129(a)(3) incorporates state law.[9]

A bedrock principle of bankruptcy law is that a debtor is not entitled to rewrite prepetition contracts merely because of its status in bankruptcy. Absent express statutory authority providing otherwise, the Debtor may not use the chapter 11 process to renegotiate its bargained-for contractual rights and obligations.

The Plan impermissibly modifies, and is specifically designed to evade the terms of, the Non-debtor Parish insurance contracts. As made clear in the Disclosure Statement, the Plan affirmatively seeks to prejudice the Parish Insurers' rights with respect to the Non-Debtor Parish policies and it is thus the polar opposite of "insurance neutral" in violation of section 1129(a)(1)-(3) of the Bankruptcy Code. *See In re Cajun Elec. Power Co-op, Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999) (finding that plan violated section 1129(a)(3) and, therefore, was unconfirmable because it "call[ed] for an improper modification of the [power supply contracts] in that it seeks to bind the Members for 25 years to treatment which they do not want and for which they did not contract"); *cf. Coca-Cola Bottling Co. of Shreveport, Inc. v. The Coca-Cola Co.*, 769 F. Supp. 671,

---

debtors. *See, e.g.,* 11 U.S.C. §§ 363(b)(1), 1123(a) (5) (concerning "property of the estate"); *see also id.* § 365(a) (concerning "executory contract[s] . . . of the debtor").

[9]  *See, e.g., In re Zenith Electronics Corp.*, 241 B.R. 92, 108 (Bankr. D. Del. 1999) ("[T]he Plan must not only comply with the provisions of the Code, but must meet the standards for approval of such a transaction under Delaware corporate law. We agree that section 1129(a)(3) does incorporate Delaware law (as well as any other applicable nonbankruptcy law").

6

707 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1992) ("Courts do not rewrite contracts to include terms not assented to by the parties."); *In re Exide Holdings, Inc.*, No. 20-11157, 2021 WL 3145612, at *6 (D. Del. July 26, 2021) (citing *Coca-Cola Bottling Co. of Shreveport*, 769 F. Supp. at 707, with approval).[10]

The assignment or transfer of all Insurance Claims to the Trust impairs the Parish Insurers' rights under the allegedly applicable policies with the Non-Debtor Parishes by shifting the burden of proof regarding the validity of such assignment of non-debtors' interests. Under the Plan, the "Insurance Claims Assignment" is defined as "the transfer or assignment of the Insurance Claims to the Trust,"[11] and non-debtor Parishes are "deemed to have assigned to the Trust" their rights to Insurance Claims "without further action by any party."[12] The Plan preserves for the Trust, "full access to coverage under the Non-Settling Insurer Policies to the greatest extent permitted by applicable non-bankruptcy law," just as the Non-Debtor Parishes had under the insurance

---

[10] That a debtor may not misuse bankruptcy to rewrite its prepetition contracts is not a novel concept – bankruptcy courts have long recognized that they cannot alter or enlarge insurers' contractual obligations even outside the context of plan neutrality. *See e.g., Cissel v. Am. Home Assur. Co.*, 521 F.2d 790, 792 (6th Cir. 1975), *cert. denied*, 423 U.S. 1074 (1976) (bankruptcy trustee could not obtain recovery from insurer for claims filed against the estate absent a judgment or a written settlement agreement between the policyholder, the claimant, and the insurance company, as required by the policy holder); *In re The Wallace & Gale Co.*, No. 85-40092 (Bankr. D. Md.), July 22, 1998 Hr'g Tr. at 119-21 (refusing to confirm a plan that violated insurer's contractual rights in asbestos bankruptcy); *Amatex Corp. v. Aetna Cas. & Sur. Co. (In re Amatex Corp.)*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989), *aff'd*, *Amatex Corp. v. Stonewall Ins. Co.*, 102 B.R. 411, 414 (E.D. Pa. 1989) (refusing to compel insurers to make lump-sum payments to debtor "contrary to the terms of their policies"); *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984), *cert. denied*, 469 U.S. 982 (1984) (holding that the Bankruptcy Code is not intended to expand debtor's rights against others more than they exist at the commencement of the case); *641 Assocs. v. Balcor Real Estate Fin. (In re 641 Assocs.)*, No. 91-11234S, 1993 Bankr. LEXIS 1191, *20-21 (Bankr. E.D. Pa. Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to disregard state-law contractual rights.").

[11] Plan, §§ 1.1.83, 8.2.4a.

[12] Plan, § 8.2.4a.

policies.[13] It then expressly carves out the Parish Insurers' rights and coverage defenses "regarding or arising from the Insurance Claims Assignment,"[14]—while purportedly maintaining their rights to the extent required under their respective insurance contracts and applicable law.[15] This means that the assignment to the Trust of obligations that the Non-Debtor Parishes owe to the Parish Insurers is presumptively valid, and Parish Insurers are forced to affirmatively challenge the validity of the assignment under the policies or state law.

This type of insurance claims assignment—which purports to assign non-debtor policies—was recognized as improper in *Diocese of Camden*. There, Judge Poslusny declined to determine whether an assignment of insurance interests was enforceable under state law, and held that he would "allow another court in the future to determine on a case-by-case basis, whether the transfers were permissible under state law given the debtors remaining obligations under the contract." 653 B.R. at 351, 358 (citation omitted). Likewise, in *In re Boy Scouts of Am. & Delaware BSA, LLC* ("<u>BSA</u>"), the court noted that "obligations under the Non-Settling Insurance Companies' policies . . . cannot be decided in a vacuum" and that each policy "will need to be interpreted under applicable law in the context of a specific dispute." 642 B.R. 504, 669 (Bankr. D. Del. 2022), *aff'd*, 650 B.R. 87 (D. Del. 2023).

Further, the Insurance Claims Assignment of the Non-Debtors' obligations under Parish policies, without consent of the Parish Insurers, is contrary to the contract terms and improper under state law. Under New York law, the burden of proving the enforceability of any contract

---

[13] Plan, § 8.7.1h. Under the Plan, "Participating Parties" includes "all Parishes, all Schools, and those Other Catholic Organizations, and other Persons and entities listed on **Exhibit A** attached hereto." Plan, § 1.1.127. To date, the Debtor has not filed a Plan Supplement, listing other persons and entities.

[14] *Id.*

[15] Disclosure Statement, Art. IV.C.2.e5.

8

lies with the party seeking to enforce the contract, and in the insurance context, the party seeking coverage bears the initial burden of proving coverage.[16]

This burden extends to parties who are attempting to establish the validity of a contractual assignment. For example, in *Quantum Energy Solutions, LLC v. Mercury Solar Systems, Inc.*,[17] the parties were engaged in a contractual dispute. The parties filed cross-motions for summary judgment on whether the plaintiffs had been assigned the right to payment under a contract from a dissolved company. The defendants countered that the assignment never occurred. As part of its summary judgment analysis, the court ruled that the plaintiffs, who sought to establish the validity of the assignment, bore the burden of proof.[18]

### 3. *The Plan's "Preservation" of the Parish Insurers' Rights are Subsumed by Carve Outs in the Plan.*

In *Diocese of Camden,* the court held no proposed plan can be confirmed "unless the Insurers['] rights and defenses are preserved, including any defense related to the insured's failure to perform its obligations under the Policy." 653 B.R. at 351. In denying confirmation, that court noted the "significant problem" with the plan's "inconsistent and insufficient language" preserving the insurers' rights under the policies and ordered plan proponents to "provide more clarity" on

---

[16] *See generally Spandex House, Inc. v. Hartford Fire Ins. Co.*, 407 F. Supp. 3d 242, 250 (S.D.N.Y. 2019), *aff'd*, 816 F. App'x 611 (2d Cir. 2020) ("The policyholder bears the initial burden of showing that the insurance policy covers the claims at issue. . . . Once that burden is met, the burden shifts to the insurer to show that an exclusion to the policy applies") (citing *Morgan Stanley Grp. Inc. v. New England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000)); *see also Travelers Indem. Co. v. Northrop Grumman Corp.*, 4 F. Supp. 3d 599 (S.D.N.Y. 2014), *aff'd in part*, 677 F. App'x 701 (2d Cir. 2017) (holding under New York law that an insured's voluntary settlement of contamination claims without insurers' consent barred insured from seeking indemnification the policies' terms).

[17] No. 12-2820 (SRC), 2015 U.S. Dist. LEXIS 113708 (D.N.J. Aug. 27, 2015).

[18] *Quantum Energy Solutions*, 2015 U.S. Dist. LEXIS 113708 at *2. *See also Eustis Mfg. Co. v. Eustis*, 51 N.J. Eq. 565, 569 (N.J. Ch. 1893) ("The right of the company to an assignment . . . must rest on an agreement . . . to assign . . . . The burden of proof is on the complainants to establish the existence of such an agreement.").

9

the rights and defenses preserved or eliminated. *Id.* at 358; *see also BSA,* 642 B.R. at 669 (noting that "obligations under the Non-Settling Insurance Companies' policies . . . cannot be decided in a vacuum. Each contract will need to be interpreted under applicable law in the context of a specific dispute.").

Here, by carving out the Parish Insurers' rights and the Non-Debtor Parishes' obligations and defenses arising from the assignment of Insurance Claims, the Plan contemplated by the Disclosure Statement does not "preserve" Parish Insurers' rights under their respective insurance policies, and instead directly interferes with them. In addition, the Plan states that "[t]he rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by: (i) the Diocese Discharge; (ii) any Trust Distribution; or (iii) the Insurance Claims Assignment."[19] The additional carve-outs here prohibit the Parish Insurers from disclaiming or denying coverage because of any distribution made by the Trust for Abuse Claims applies, regardless of whether the insured has performed its obligations under the relevant non-debtor Parish policies.[20] Taken to its logical conclusion, the Parish Insurers would have to provide coverage if the Trust Administrator were to make excessive distributions or payments that are not covered under the non-debtor Parish policies, which certainly impact

---

[19]   Plan, § 6.1.

[20]   For example, Parish Insurers' applicable insurance policies include *inter alia* provision governing the insured party's cooperation in with respect to a coverage claim. And failure by the insured to those obligations would allow an insurer reject coverage if the contact is breached. *See, e.g., Conf. Assocs., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 80 A.D.3d 552 (2nd Dep't 2011) (holding insurer not obligated to reimburse insured for insured's breach of policy's obligation to cooperate); *Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*, 53 N.Y.2d 835, 836 (1981) (finding breach of cooperation clause); *see also Hochhauser v. Elec. Ins. Co.*, 46 A.D.3d 174, 180 (2d Dep't 2007) ("[T]ypically, an insurer may disclaim coverage where an insured deliberately fails to cooperate with its insurer as required by an insurance policy.").

10

Parish Insurers' rights under the policies. Thus, the Plan contemplated by the Disclosure Statement is unconfirmable.

## OBJECTION II

## THE COURT SHOULD NOT APPROVE THE DISCLOSURE STATEMENT BECAUSE IT FAILS TO PROVIDE "ADEQUATE INFORMATION"

Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information," which the Code defines as "information of a kind, and in sufficient detail . . . that would enable . . . a hypothetical investor of the relevant class to make an ***informed judgment*** about the plan." *See* 11 U.S.C. § 1125(a). Before a debtor may transmit a disclosure statement to holders of claims or interests, the court must determine that it contains "adequate information." 11 U.S.C. § 1125(b); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). This inclusion of adequate information in a disclosure statement is a key requirement of the Bankruptcy Code. *See Ryan Ops. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("the importance of full and honest disclosure cannot be overstated."); *Krystal Cadillac-Oldsmobile*, 337 F.3d at 321. ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"). "The disclosure statement was intended by Congress to be the primary source of information upon which creditors and shareholders could rely in making an informed judgment about a plan of reorganization." *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

Plan proponents bear the burden of establishing that the disclosure statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code. *See, e.g.*, *In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("The debtor has the burden of proving that a disclosure statement is adequate."). To meet the standard of "adequate information," "a proper disclosure statement must clearly and succinctly inform the average unsecured creditor

11

what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). A debtor's obligation to file a disclosure statement containing "candid disclosure" is a "pivotal" and "critical step" in a Chapter 11 reorganization:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

*In re Oneida Motor Freight, Inc.*, 848 F.2d at 417. Bankruptcy Courts may not approve disclosure statements that include inadequate or misleading information. *See, e.g.*, *In re Monroe Well Services, Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987). Thus, vague and ambiguous statements in a disclosure statement must be excised or clarified before approval. *See, e.g.*, *In re Pettit*, 18 B.R. 6, 8 (Bankr. E.D. Ark. 1980).

Here, the Disclosure Statement fails to satisfy the section 1125 standard for multiple reasons and therefore cannot be approved.

   **A.** **The Disclosure Statement Fails to Adequately Disclose the Risks with Regard to the Parish Policies.**

The Disclosure Statement lacks "adequate information" to enable holders of Abuse Claims to make an informed judgment about the material risks presented by the Plan and how the provisions of the contracts of insurance issued to the Non-Debtors implicate these distributions. 11 U.S.C. § 1125(a)(1); *see Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir. 1988). The importance of providing "adequate information" is particularly relevant with respect to material, known risks that may affect the debtor's reorganization or ability to satisfy claims. *See In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) ("[A] proper disclosure statement must clearly and succinctly inform the average unsecured

12

creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.").

The disclosure statement is meant to provide creditors with "all pertinent information bearing on the success or failure of the proposals in the plan of reorganization," and it "should contain [] all material information relating to the risks posed to creditors and equity interest holders under the proposed plan of reorganization." *In re Budd Co.*, 550 B.R. 407, 412 (Bankr. N.D. Ill. 2016), (quoting *In re Cardinal Congregate I*, 121 B.R. 760, 765-66 (Bankr. S.D. Ohio 1990)).

The Court should decline to approve the Disclosure Statement because it fails to provide adequate information for parties in interest to appropriately evaluate the Plan specifically with regard to insurance policies issued by the Parish Insurers to the Non-Debtors Parishes.

There is no discussion of the risks associated with the proposed assignment of all the insurance rights of the Non-Debtor Parishes and other non-debtor entities (which are legally distinct from the Diocese), including the risks related to the enforcement of anti-assignment clauses and the violation of provisions vesting Parish Insurers with the right to control the settlement of claims in many of those policies. The Plan's assignment violates the anti-assignment clauses in the Parish Policies, which eliminate the Trust's ability to obtain coverage under those insurance policies. The Debtor cannot argue that such clauses apply to non-debtors or are preempted, as it is unclear that federal preemption of anti-assignment provisions in a debtor's insurance contracts applies outside the context of Bankruptcy Code section 524, which only covers asbestos claims. *Cf. In re Thorpe Insulation Co.*, 677 F.3d 869, 883 (9th Cir. 2012) (holding that "the anti-assignment provisions contained in the contracts . . . stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law").

13

But even if federal preemption applies to debtor contracts outside the section 524(g) context, preemption does not apply equally to non-debtors such as those entities who allege that they received insurance coverage from the Parish Insurers. *See, e.g., In re Combustion Engineering, Inc.*, 391 F.3d 190, 219 (3d Cir. 2004) ("To the extent the subject insurance policies are jointly held by [the debtor] and a non-debtor, … the § 541 preemption of anti-assignment provisions applies only to [the debtor's] interest in the shared policies."). The Disclosure Statement must explain these risks so that creditors may consider the coverage risks and the likelihood of a reduction in available coverage when evaluating the Plan. *See In re Am. Capital Equipment, LLC*, 688 F.3d 145, 156 (3d Cir. 2012) ("A plan will not be feasible if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely.").

The Plan is unacceptable because it does not allow for the meaningful assessment of the risks associated with the insurance policies allegedly issued by Parish Insurers.

B. **The Disclosure Statement Fails to Adequately Disclose the Necessity and Support for the Releases Granted to Non-Debtors and the Risks Associated With Them**

The third-party releases described in the Disclosure Statement are also improper because the Disclosure Statement should disclose that such releases with respect to the Non-Debtor Parishes may be the subject of litigation as to whether they render the Plan unconfirmable.

The Debtor fails to acknowledge that the release's inclusion of myriad non-debtor entities—including the entities that claim they received insurance coverage from Parish Insurers and entities that do not even exist yet, such as Reorganized Debtor—likely will draw a challenge. *See In re Bennett Paper Corp.*, 68 B.R. 518, 520 (Bankr. E.D. Mo.1986) (disapproving disclosure statement for failure to inform creditors that non-debtor release provision is impermissible); *In re Continental Airlines*, 203 F.3d at 211–218 (collecting cases); *see also In re Washington Mut., Inc.*,

14

442 B.R. 314, 348 (Bankr. D. Del. 2011) (explaining that post-confirmation entities "have done nothing yet for which they need a release" and will not come into existence until after confirmation).

The Debtor must disclose that this feature is likely to subject the Plan to challenge and may ultimately render it unconfirmable. The Plan cannot be confirmed in its current firm because it fails to include this disclosure.

### C. The Disclosure Statement Fails to Adequately Disclose Whether and the Extent to which Claims Against the Funds Transferred to the Cabrini Foundation on the Eve of the Passage of the CVA are Discharged, Enjoined or Released

In the Diocese of Albany bankruptcy, creditors have been allowed to seek discovery to show that the Debtor and other Dioceses held a beneficial interest in NYSCHP (now held in the Cabrini Foundation) for the purpose of carrying out their missions and discharging their responsibilities. The amounts at issue are large and would have significant impact on creditors in this case. Yet, there is no disclosure of how the discharges, injunction and release would impact creditors' claims with respect to the funds held by the Cabrini Foundation.

Some background information regarding the Cabrini Foundation is informative. In 1993, the Brooklyn Diocese founded a not-for-profit health insurance business called Fidelis Care. Four years later, the other seven dioceses in New York were brought in, each agreeing to invest in the business. Fidelis became a member organization, where the members included the bishops from across the state and the cardinal.

As we understand the transaction, the Dioceses invested the money to create Fidelis Care but the bishops were the sole "member." Taking advantage of federal and state investment in health care over the last two decades, Fidelis Care grew significantly, becoming the largest insurance provider in New York with more than 1.3 million policies.

15

On a parallel track, lawmakers began pushing for the Child Victims Act in 2006. That legislation exposed the church to liability. In September 2017, after the passage of the CVA in the Assembly but before it became law, the bishops voted to sell Fidelis to a large St. Louis health care corporation. The sale generated $3.3 billion, plus a substantial amount of assets held by Fidelis that were not included in the deal.

The bishops took $3.3 billion from the sale, plus another roughly $900 million more in Fidelis assets that were not included in the deal, and created the Mother Cabrini Health Foundation without any allocation to the Debtor which, at the time, is alleged to have been facing liability. It, like Fidelis, was a "member organization," where the sole members were the bishops, who retained control.

The transaction effectively moved more than $4 billion, with the bishops of the eight dioceses maintaining control over the funds, but keeping them in a separate corporate entity from the Debtor or any of the other dioceses.

The eight New York Bishops were and are the members of NYSCHP and, following the sale, became the members of Cabrini, while control over the assets (Fidelis - which was converted through the sale to money) has not changed. Pursuant to Canon Law, a bishop is the administrator of assets belonging to the diocese. *See* New Commentary of the Code of Canon Law (John P. Beal et al. eds., 2000) at p. 1477.

The Debtor must disclose how the discharges, injunction and release would impact creditors' claims with respect to the funds held by the Cabrini Foundation. The Plan cannot be confirmed in its current form because it fails to include this disclosure.

16

## RESERVATION OF RIGHTS

Parish Insurers reserve all of their rights to object to confirmation of the Plan, whether or not the bases for such objection are expressly referred to herein. Further, the Parish Insurers reserve the right to join in any argument or objection made by any other parties relating to the adequacy of the Disclosure Statement and confirmability of the Plan. Moreover, nothing contained herein shall be deemed an admission by the Parish Insurers as to the existence of coverage under any insurance policy alleged to have been issued by the Parish Insurers.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Parish Insurers respectfully request that the Court (i) deny approval of the Disclosure Statement and (ii) grant such other and further relief as the Court deems just and proper.

Dated: January 30, 2024                                  Respectfully submitted,


By: /s/ Tancred Schiavoni
**O'MELVENY & MYERS LLP**
Tancred Schiavoni, Esq.
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000

*Counsel for Westchester Fire Insurance Company and Ace Property and Casualty Insurance*