UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 20-30663 |
| The Roman Catholic Diocese of Syracuse, New York, | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

### OMNIBUS REPLY OF THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK TO DISCLOSURE STATEMENT AND SOLICITATION OBJECTIONS OF: (I) THE OFFICE OF THE UNITED STATES TRUSTEE; (II) LONDON MARKET INSURERS; (III) TRAVELERS INSURANCE COMPANY LIMITED, TRAVELERS CASUALTY AND SURETY COMPANY, AND TRAVELER'S INDEMNITY COMPANY; (IV) THE INTERSTATE INSURERS; AND (V) THE PARISH INSURERS

The Roman Catholic Diocese of Syracuse, New York, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Diocese"), by and through its undersigned counsel, hereby files its omnibus reply (this "Reply") to objections filed in opposition to the approval of the *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* [Docket No. 1566] (together with all schedules and exhibits thereto, and as may be modified, amended, or supplemented from time to time, the "Disclosure Statement"), including:

    i.    the Objection to the Diocese's *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Joint Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Joint Plan; and (VI) Granting Related Relief* (the "Solicitation Procedures Motion") [Docket No. 1626] filed by the Office of the United States Trustee (the "UST") [Docket No. 1636] (the "UST Objection");

    ii.    the Objection to the Solicitation Procedures Motion filed by Certain Underwriters at Lloyd's, London, and London Market Companies (collectively, "LMI") [Docket No. 1637] (the "LMI Objection");

iii.    the Objection to the Approval of the Disclosure Statement, filed by Interstate Fire & Casualty Company, Fireman's Fund Insurance Company, and National Surety Corporation (collectively, "Interstate") [Docket No. 1639] (the "Interstate Objection");

iv.    the Objection to the Solicitation Procedures Motion and joinder to the LMI Objection and Interstate Objection filed by Travelers Insurance Company Limited, Travelers Casualty and Surety Company and Traveler's Indemnity Company (collectively, "Travelers") [Docket No. 1640] (the "Travelers Objection"); and

v.    the Objection to the treatment of non-debtor parish policies in the Disclosure Statement filed by Westchester Fire Insurance Company and Ace Property and Casualty Insurance (the "Parish Insurers," and together with LMI, Travelers, and Interstate, collectively, the "Objecting Insurers") [Docket No. 1641] (the "Parish Insurers Objection");

(collectively, the UST Objection, the LMI Objection, the Travelers Objection, the Interstate Objection, and the Parish Insurers Objection, are referred to herein as the "Objections") and respectfully submits as follows:

## PRELIMINARY STATEMENT

1.    On December 6, 2023, the Diocese, together with the Official Committee of Unsecured Creditors appointed in this Chapter 11 Case (the "Committee") filed: (i) the *Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York dated December 6, 2023* [Docket No. 1565] (together with all schedules and exhibits thereto, and as it may be modified, amended, or supplemented from time to time, the "Joint Plan"); (ii) the accompanying Disclosure Statement; and (iii) the *Child Protection Protocols for The Roman Catholic Diocese of Syracuse, New York* [Docket No. 1567] (the "Child Protection Protocols").

2.    On January 4, 2024, the Diocese filed the *Plan Supplement* [Docket No. 1604] (the "Plan Supplement"), which included the following: (i) Exhibit 1 – Allocation Protocol; (ii) Exhibit 2 – Abuse Claim Release Agreement; (iii) Exhibit 3 – Trust Agreement; (iv) Exhibit 4 – List of Insurance Policies; and (v) Exhibit 7 – Litigation Claimant Agreement.

3.     On January 9, 2024, the Diocese filed the *Second Plan Supplement* [Docket No. 1613] (the "Second Plan Supplement", and together with the Plan Supplement, collectively, the "Plan Supplements"), which include the following: (i) Exhibit 6 – List of Assumed Contracts and Leases; (ii) Exhibit B – Liquidation Analysis; and (iii) Exhibit C – Financial Projections.

4.     On January 16, 2024, the Diocese filed the Solicitation Procedures Motion[1] seeking the entry of an order  (i) approving the adequacy of the Disclosure Statement*;* (ii) approving solicitation packages and distribution procedures; (iii) approving the forms of ballots and establishing procedures for voting on the Joint Plan; (iv) approving the form, manner, and scope of confirmation notices; (v) establishing certain deadlines in connection with approval of the Disclosure Statement and confirmation of the Joint Plan; and (vi) granting related relief (the "Disclosure Statement Order").  In addition, the proposed Disclosure Statement Order[2] included: (a) the proposed form of ballot for holders of Claims in Class 1, Class 2, and Class 4; and (b) the proposed form of ballot for holders of Claims in Class 5 (collectively, the "Ballots") as Exhibits 2 and 3, respectively.

5.     As the Court is aware, as one of the major steps towards the successful resolution of this complex Chapter 11 Case, the Committee, the Diocese, and the Diocese's associated parishes and other Catholic entities (the "Related Entities," and together with the Diocese, the "Catholic Family") reached a settlement that provides for, among other things, $100 million in funding by the Catholic Family.  Similarly, the approval of the Disclosure Statement would be

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Disclosure Statement, the Joint Plan, or the Solicitation Procedures Motion, as applicable.

[2] The proposed Disclosure Statement Order was filed as Exhibit A to the Solicitation Procedures Motion [Docket No. 1626].

17214782.4 2/2/2024

another major step toward the successful resolution of this Chapter 11 Case through a Joint Plan that has overwhelming creditor support.

6.      The UST Objection focuses heavily on the third-party release provisions of the Joint Plan. Collectively, the Objections filed by the Objecting Insurers raise numerous objections to the assignment of certain insurance rights under the Joint Plan, which will be specifically addressed below. However, a majority of the concerns raised in the Objections appear to be misplaced confirmation objections preemptively asserted as Disclosure Statement objections.

7.      Specifically, the UST argues that the Joint Plan is unconfirmable because it contains "expansive, abusive, overly broad, and inappropriate nonconsensual releases" and fails, in the UST's view, to provide adequate information pertaining to the legal and factual justification for such non-consensual releases. The Objecting Insurers also argue that the Joint Plan is unconfirmable because, as they misleadingly allege, the Joint Plan purports to assign their respective insurance policies to the Trust.

8.      As further discussed below, any objections to the confirmability of the Joint Plan are premature, and without merit. The Diocese fully appreciates its burden to provide factual and legal support for confirmation of the Joint Plan—and will do so at the appropriate time in connection with the hearing to consider confirmation of the Joint Plan. However, as demonstrated herein, while the UST and the Objecting Insurers may be critical of certain aspects of the Joint Plan, none of them have identified any legal or factual flaw that renders the Joint Plan patently unconfirmable such that the Court should intervene by denying approval of the Disclosure Statement and preventing the Diocese from soliciting creditor votes on the Joint Plan. The Diocese briefly addresses many of the confirmation-related portions of the Objections below

but reserves its right to submit additional factual and legal support in response to the Objections including, but not limited to, confirmation-related Objections.

9.        Approval of the Disclosure Statement does not require that the Disclosure Statement provide every scintilla of information relevant to any individual member of a voting class. The Disclosure Statement contains adequate information to enable "a hypothetical investor typical of the holders of claims or interests in the case[s] . . . to make an informed judgment about the plan . . . ," consistent with and as required by section 1125(a)(1) of the Bankruptcy Code.

10.        Accordingly, the Diocese respectfully requests that this Court overrule the Objections and approve the Disclosure Statement as filed with the Court.

## REPLY

### I.    THE DISCLOSURE STATEMENT CONTAINS SUFFICIENT INFORMATION FOR A TYPICAL HOLDER OF CLAIMS TO MAKE AN INFORMED JUDGMENT ON THE JOINT PLAN

11.        Section 1125 of the Bankruptcy Code governs postpetition disclosure in connection with solicitation of acceptances of a chapter 11 plan. To comply with section 1125, a plan must provide "adequate information" such that a hypothetical investor typical of the holders of claims or interests in the case can make an informed judgment about the plan. 11 U.S.C. § 1125(a). A disclosure statement must provide information that is "reasonably practicable" to permit an "informed judgment" by creditors and interest holders about whether to vote to accept or reject a plan of reorganization. *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995). Courts have construed this requirement with flexibility, in light of the facts and circumstances underlying each bankruptcy case, and this determination is largely within the discretion of the

Court. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir.

1988) ("From the legislative history of § 1125 we discern that adequate information will be

determined by the facts and circumstances of each case.") (citations omitted); *In re Tex.*

*Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir.

1988) ("The determination of what is adequate information is subjective and made on a case-by-

case basis. This determination is largely within the discretion of the bankruptcy court."). *See also*

*Cadle Co. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y.

2008) ("what constitutes 'adequate information' in any particular situation is determined on a

case-by-case basis . . . with the determination being largely within the discretion of the

bankruptcy court")

12.     Typically, courts will require disclosures regarding certain categories of material

information in assessing the adequacy of the disclosures. *See, e.g.*, *In re Phoenix Petroleum*, 278

B.R. 385, 393 n.6 (Bankr. E.D. Pa. 2001) (listing categories of information); *In re Scioto Valley*

*Mortg. Co.*, 88 B.R. 168, 170–71 (S.D. Ohio 1988) (same). Because "adequate information"

necessarily depends upon the facts and circumstances of each bankruptcy case, certain

disclosures may prove warranted in some cases but not others. *See, e.g.*, *In re Phoenix Petroleum*

*Co.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case

may be omitted in another; no one list of categories will apply in every case."); *In re U.S. Brass*

*Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996).

13.     The information contained in the Disclosure Statement is more than sufficient to

meet the requirements of section 1125 of the Bankruptcy Code. As demonstrated in the

Solicitation Procedures Motion, the Disclosure Statement contains a thorough description of

detailed information necessary for creditors to make an informed decision, including: (a) a

17214782.4 2/2/2024

description of the Diocese's not-for-profit religious organization, including revenue, assets and its need for reorganization; (b) key events leading to the commencement of the Chapter 11 Case, including a description of the Abuse Claims asserted against the Diocese; (c) significant events that occurred during the Chapter 11 Case; (d) a summary of the key provisions of the Joint Plan, including a description of the release, injunction, and exculpation provisions contained in the Joint Plan; (e) an overview of the Trust; (f) a liquidation analysis; (g) a summary of solicitation and voting procedures; (h) risk factors to be considered regarding confirmation of the Joint Plan; (i) a description of confirmation procedures, requirements for confirmation of the Joint Plan, and alternatives to confirmation and consummation of the Joint Plan; (j) projected financial performance of the Reorganized Diocese, assuming confirmation of the Joint Plan; and (k) tax consequences of the Joint Plan.

14.    Additional disclosures requested by the Objections are beyond the scope of the "adequate information" required by section 1125 of the Bankruptcy Code and the Diocese respectfully asserts that the Disclosure Statement contains sufficient information for creditors to make an informed decision concerning the Joint Plan.

15.    Here, the Disclosure Statement clearly lays out the sources of funding for the Trust, which will form the basis for recovery for Class 5 Abuse Claims to share pursuant to the point system set forth in the Allocation Protocol.  The Disclosure Statement is more than sufficient to allow creditors to understand (a) their treatment under the Joint Plan; (b) the release, injunction, and exculpation provisions contained in the Joint Plan; (c) the implementation and operation of the Trust; and (d) the recovery scenarios for each of the Diocese's creditor classes upon consummation of the Joint Plan.

17214782.4 2/2/2024

## II.   OBJECTIONS TO CONFIRMATION ARE PREMATURE

16.    Disclosure hearings anticipate, but do not preempt, confirmation hearings. The appropriate standard for approval of a disclosure statement is "adequate information," and confirmation issues should be determined at a hearing to consider confirmation of a chapter 11 plan in accordance with the procedures attendant to such a hearing. *See* 11 U.S.C. § 1125(a)(1); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 172 (Bankr. S.D. Ohio 1988) ("If the creditors oppose their treatment in the plan, but the Disclosure Statement contains adequate information, issues respecting the plan's confirmability will await the hearing on confirmation."); *In re Waterville Timeshare Grp.*, 67 B.R. 412, 413 (Bankr. D.N.H. 1986) ("[A]pproval of a disclosure statement is an interlocutory action in the progress of a Chapter 11 reorganization effort leading to a confirmation hearing at which all parties have ample opportunity to object to confirmation of the plan."). [3]

17.    Any objection seeking to derail approval of a disclosure statement on account of confirmation concerns must clear a very high bar.  Courts have recognized that solicitation should be delayed only when the proposed plan is "facially" or "patently" unconfirmable and where, as a matter of law, the plan "is so fatally flawed that confirmation is impossible." *See In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). Moreover, "[s]uch action is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to ensure that due process concerns are protected." *Id.* (citations omitted). Accordingly, a "disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal facial deficiencies or the stark absence of good faith."

---

[3] Quite notably in the present case, no creditors of the Diocese have objected to approval of the Disclosure Statement or have foreshadowed any confirmation objections.

17214782.4 2/2/2024

*In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (quoting *In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991)).

18.     Courts should not turn the disclosure statement hearing into a hearing on confirmation; "due process considerations are protected, and objections are restricted to those defects that could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure statement hearing." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); *accord In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

19.     As demonstrated below, the Objections to confirmation of the Joint Plan are premature, without merit, and assume certain material facts without any record support. The Diocese is entitled to have challenges to the Joint Plan determined on the basis of an appropriate evidentiary and legal record, including the facts and circumstances developed and further legal support presented up to and including the Confirmation Hearing.

## III.    THE OBJECTING INSURERS LACK STANDING TO OBJECT TO THE APPROVAL OF THE DISCLOSURE STATEMENT

### a.   Applicable Legal Standard Required for Standing

20.     Standing is a threshold jurisdictional requirement in every case, which cannot be waived.[4]  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.  This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise."[5]  In order for a party to have standing to be heard in a bankruptcy case they must meet three different

---

[4] *See Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[5] *Id.*

17214782.4 2/2/2024

standards: (i) the standing requirements under Article III of the United State Constitution; (ii) the prudential standing requirements applied in federal courts, and (iii) the "party in interest" requirements set forth under section 1109(b) of the Bankruptcy Code.[6]  "A theory of standing that 'relies on a highly attenuated chain of possibilities' does not satisfy constitutional requirements."[7]  The Objecting Insurers, as the parties seeking to invoke the Court's jurisdiction to be heard with respect to the Disclosure Statement and Solicitation Procedures Motion, bear the burden to demonstrate that they have standing.[8]

### b.  Party in Interest

21.    Statutory standing in a bankruptcy case is granted pursuant to section 1109 of the Bankruptcy Code. Section 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter."[9]  "Party in interest" is not defined in the Code, but for purposes of this section, the term is broadly construed, "but not infinitely expansive".[10]  "Although [section] 1109(b) broadly defines a 'party in interest,' the phrase invites interpretation and 'is generally understood to include all persons whose pecuniary interests are[ ] directly affected by the

---

[6] *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) ("To have standing in bankruptcy court, a party must meet three requirements: (1) Article III's constitutional requirements, (2) federal court prudential standing requirements, and (3) the "party in interest" requirements under Bankruptcy Code 1109(b)."); *In re Quigley Co.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008) ("A 'party in interest' 'must still satisfy the general requirements of the standing doctrine.'").

[7] *In re Sun Edison, Inc.*, No. 16-10992 (SMB), 2019 WL 2572250, at *5 (Bankr. S.D.N.Y. June 21, 2019) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

[8] *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

[9] 11 U.S.C. § 1109

[10] *Southern Blvd., Inc. v. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y.1997).

10

bankruptcy proceedings.'"[11] "The general theory behind [section 1109] is that anyone holding a direct financial stake in the outcome of the case should have an opportunity ... to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest."[12] Additionally, parties with a legal interest, as opposed to a financial interest, have been deemed parties in interest under certain limited circumstances.[13]

22.      In analyzing standing, the Seventh Circuit Court of Appeals held that a non-creditor excess insurer of the debtor did not have standing to object to the debtor's settlement with a different insurer, even where the objecting excess insurer might suffer collateral damage as a result of such settlement. In siding with the debtor and denying standing, the Court held:

> [T]o become a party to the bankruptcy proceeding Columbia had to show not merely standing but that 'a legislatively conferred cause of action encompasses' its claim. Specifically, it had to show that the Bankruptcy Code conferred the right that it sought—the right to butt into a settlement negotiation between other parties. Its desire to butt in is understandable. Agreements settling lawsuits often have third-party effects. A company might pay so much in settlement of a suit that it could no longer afford to honor its contract to buy some input from a third party; the third party would be harmed. The logic of Columbia's claim to be entitled to object to Hall's settlement with Integrity is that Hall received so little in the settlement that it is bound to come after Columbia for the difference. The claim is weak. Columbia's lawyer would have to agree that by this logic an employee whom the lawyer's client had laid off because it foresaw having to make a big payout to Hall could challenge the settlement. That way madness lies—settlements made impossible by crowds of objectors.

---

[11] *In re Alpex Comput. Corp.*, 71 F.3d 353, 356 (10th Cir. 1995) (quoting *Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 756 (4th Cir. 1993)).

[12] *See In re Ionosphere Clubs, Inc.*, 208 B.R. 812, 814 (S.D.N.Y. 1997) (quoting Collier on Bankruptcy).

[13] *In re Teligent, Inc.*, 640 F.3d 53, 60 (2d Cir. 2011)("Although parties in interest typically have a financial stake in the outcome of the litigation, under certain limited circumstances, courts have recognized that a party with a legal (as opposed to financial) interest may appear.").

17214782.4 2/2/2024

> The question we need to answer is whether the Bankruptcy Code, in providing that "a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case [arising] under" the Code, 11 U.S.C. § 1109(b), confers a right to be heard on a debtor's insurer. The list of "parties in interest" is not exhaustive, but does suggest that such a party is someone who has a legally recognized interest in the debtor's assets, namely the debtor (or the trustee in bankruptcy, if as in this case there is a trustee) and the creditors.

*In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014)(internal citations omitted).  Just like in that case, here the Objecting Insurers are attempting to "butt in" to disrupt the settlement between the Diocese and the Committee, embodied in the Joint Plan, in an attempt to avoid facing coverage claims under their policies following confirmation.  This is precisely the kind of interest that the Seventh Circuit found to be too attenuated to confer standing in *C.P. Hall*. Moreover, the Objecting Insurers do not have standing arising from any modification or impairment of their contractual rights because, as demonstrated herein and as will be shown at the confirmation hearing, the Joint Plan does not in fact modify or impair any such contractual arrangements.

23.     In determining whether a party has statutory standing a court should "employ the usual tools of statutory interpretation" and ask itself "whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury."[14]

### c.  Article III Standing

24.     Article III of the United States Constitution requires that (i) a party "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized,

---

[14] *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007)(emphasis in original).

and (b) actual or imminent, not conjectural or hypothetical";[15] (ii) there is a causal connection between the injury and the challenged conduct;[16] and (iii) that a favorable federal court decision is likely to redress the injury.[17]

25.     The injury in fact prong requires that the purported injury be particularized, meaning it "affect[s] the plaintiff in a personal and individual way," and that it be concrete, meaning it is "*de facto . . . it must actually exist.*"[18] Because a purported injury must be actual or imminent to establish standing, "'[a]llegations of possible future injury are not sufficient to satisfy' that standard."[19]  The causal connection prong requires "the existence of an immediate link between [the challenged party's conduct] and the injury."[20]  Finally, the redressability prong requires the movant to show a "non-speculative likelihood that the injury can be remedied by the requested relief."[21]

---

[15] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(internal citations and quotations omitted).

[16] *Allen v. Wright*, 468 U.S. 737, 751 (1984); *United States v. Hays*, 515 U.S. 737, 743 (1995).

[17] *Linda R.S. v. Richard D.*, 410 U.S. 614, 617–18 (1973); *Warth v. Seldin*, 422 U.S. 490, 505–06 (1975).

[18] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-340 (2016), as revised (May 24, 2016)(internal citations and quotations omitted).

[19] *In re W.R. Grace & Co.*, 532 F. App'x 264, 267 (3d Cir. 2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 150 (1990)); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021)(holding that except with respect to injunctive relief, "the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a separate concrete harm.").

[20]  *See Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008).

[21] *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008).

### d. Prudential Standing

26.     The prudential standing requirement prohibits parties from raising and relying on

the legal rights or interests of other parties.[22]   The prudential standing principles are "judicially

self-imposed limits on the exercise of federal jurisdiction,"[23] and "founded in concern about the

proper—and properly limited—role of the courts in a democratic society."[24]   "The prudential

concerns limiting third-party standing are particularly relevant in the bankruptcy context"[25]

where  "it is important that a bankruptcy court is not too facile in granting applications for

standing. Overly lenient standards may potentially over-burden the reorganization process by

allowing numerous parties to interject themselves into the case on every issue, thereby thwarting

the goal of a speedy and efficient reorganization."[26]

### e. The Objecting Insurers Have Failed to Establish that they have Sustained Their Burden of Proof with Respect to Standing

27.     "The party asserting standing has the burden of establishing its existence by a

preponderance of the evidence."[27]   To prove standing, "each element must be supported in the

same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the

manner and degree of evidence required at the successive stages of the litigation."[28]   Black's

---

[22] *In re Diocese of Camden, New Jersey*, No. 20-21257, 2022 WL 3369087, at *2 (Bankr. D.N.J. Aug. 12, 2022)("Prudential standing merely requires the party raise its own legal rights and cannot rest their claim on the legal rights or interests of third parties.") (citing *In re Quigley Co., Inc.*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008)).

[23] *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal quotation marks omitted).

[24]  *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975).

[25] *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 644 (2d Cir. 1988).

[26] *See In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850 (Bankr. S.D.N.Y. 1989) (discussing the party in interest standard while recognizing the court's discretion in limiting standing.).

[27] *In re Grason*, 486 B.R. 448, 457 (Bankr. C.D. Ill. 2013).

[28] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992).

Law Dictionary defines a preponderance of the evidence as "[e]vidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is evidence which as a whole shows that the fact sought to be provided is more probable than not."[29]

28.    It is clear from a review of the record before the Court that the Objecting Insurers have not met their evidentiary threshold to establish standing though a preponderance of the evidence. With the exception of Interstate, none of the Objecting Insurers filed any affidavits or other evidentiary support with the Objections, instead choosing to make their standing arguments by relying on conclusory allegations instead of actual factual evidence.

29.    While Interstate did include an attorney declaration, such declaration simply attached a copy of the historic insurance policy for Interstate and a transcript. No evidence was provided by any of the Objecting Insurers which shows, through a preponderance of evidence, that the Objecting Insurers can satisfy statutory standing pursuant to section 1109 of the Bankruptcy Code, Article III constitutional standing, or prudential standing, such that the Objecting Insurers should be granted standing to be heard on their objections to the Disclosure Statement and Solicitation Procedures Motion.  As a result of the Objecting Insurers' failure to establish, by the preponderance of evidence that they have standing to object to the approval of the Disclosure Statement, the Court should deny the Objecting Insurers standing with respect to the approval of the Disclosure Statement.

30.    The Objections filed by the Objecting Insurers all assert that the Joint Plan is patently unconformable based on their contention that the assignment of insurance coverage claims to the Trust is impermissible. The Diocese asserts that the Joint Plan, and in particular the assignment of coverage claims to the Trust is not prejudicial to the rights of the Objecting

---

[29] Preponderance Of The Evidence Definition, *Black's Law Dictionary* (9th ed. 2009).

Insurers and is, in fact, insurance neutral, as set forth in greater detail below. If the Objecting

Insurers are granted any standing at all, such standing should be strictly limited to matters that

directly impact the rights of the Objecting Insurers under their respective policies, and not, for

example, the treatment of Abuse Claims, releases of non-debtor entities or other issues set forth

in the Objections. *See In re Diocese of Camden, New Jersey*, 653 B.R. 309, 351 (Bankr. D. N.J.

2023).

IV.    **REPLY TO THE UST OBJECTION**

a. **Third-Party Releases**

31.    Most, if not all, of the objections raised by the UST to the Disclosure Statement

are really objections to the Joint Plan and are premature confirmation objections not properly

considered at this time. The UST primarily argues that the Joint Plan is unconfirmable as written

in light of the UST's policy preferences regarding certain provisions governing third-party

releases and exculpation. But the law concerning third-party releases in the Second Circuit is

clear and does not support the UST's position. In *Purdue Pharma*, the Second Circuit authorizes

non-consensual third-party releases in appropriate circumstances. *In re Purdue Pharma L.P.*, 69

F.4th 45, 77-79 (2d Cir. 2023), cert. granted sub nom. *Harrington v. Purdue Pharma L.P.*, No.

(23A87), 2023 WL 5116031 (U.S. Aug. 10, 2023). The pendency of the UST's appeal to the

Supreme Court of the United States in *Purdue* does not invalidate the Second Circuit's decision,

nor does it prevent this Court from approving the Disclosure Statement over the objection of the

UST, which is nothing other than a thinly veiled attempt to preserve its footing during the

pendency of its appeal in *Purdue Pharma*.

32.    In *Purdue Pharma*, the United States Court of Appeals for the Second Circuit set

forth seven factors that bankruptcy courts should review prior to imposing nonconsensual third-

17214782.4 2/2/2024

party releases.  Specifically, the Court held that nonconsensual releases may be justified where the following factors are present:  (1) "whether there is an identity of interests between the debtors and the released third parties . . ."; (2) "whether the claims against the debtor and non-debtor are factually and legally intertwined . . ."; (3) "whether the scope of the releases is appropriate . . ."; (4) whether the releases are essential to the reorganization . . ."; (5) whether the non-debtor contributed substantial assets to the reorganization . . . "; (6) "whether the impacted class of creditors 'overwhelmingly' voted in support of the plan with the releases . . ."; and (7) "whether the plan provides for the fair payment of enjoined claims." *Purdue Pharma*, 69 F.4th at 77-79. Each of the factors must be considered by the bankruptcy court, though the presence of some or all of the factors is not necessarily sufficient, absent specific detailed findings made by the court. *Id.* at 79.

33.    Accordingly, challenges to the Joint Plan's release provisions should be determined on the basis of an appropriate evidentiary and legal record.  The hearing on the approval of the Disclosure Statement should not be hijacked and converted into a preliminary hearing on plan confirmation. As such, the UST objections are premature, and the Diocese will demonstrate at confirmation that the releases and exculpation provisions of the Joint Plan are appropriate and consistent with Second Circuit authority.

### b.  Contributions from Other Catholic Entities

34.    The UST also argues that the Disclosure Statement should identify the proposed released parties and adequately explain their contributions and consideration they are making to the Joint Plan and the reorganization.

35.    As discussed in the Disclosure Statement, the Joint Plan establishes a Trust funded by (i) the Catholic Families' Cash Contribution in the aggregate amount of $100,000,000.

The Diocese anticipates that $50,000,000 of the Cash Contribution will be funded by the Diocese, while $50,000,000 will be funded by Parishes and other Related Entities. The Diocese recognizes that adherence to *Purdue Pharma* will require proof of such contribution at the confirmation hearing, but that is not a matter for which proof is required to approve the Disclosure Statement.

36.    The UST also seeks greater certainty on the disclosure of the timing of distribution to Abuse Claimants. While the Plan and Trust Agreement defer to the Trustee's discretion with respect to the timing of distributions to Abuse Claimants, the Diocese anticipates that a significant portion of the $100,000,000 contribution from the Catholic Family will be distributed within a matter of months, if not weeks, following the occurrence of the Effective Date and the Trustee's establishment of reserves for post-confirmation litigation against the Objecting Insurers and other Trust Expenses. By way of example only, if the Trustee were to retain $15 million as a Trust Reserve and distribute the balance of the Catholic Family's $100 million contribution, $85 million would be available for distribution shortly after the Joint Plan's Effective Date, which would result in an average (mean) recovery for Abuse Claimants of more than $200,000,[30] without taking into account the prospect of additional Trust recoveries from the Objecting Insurers.

37.    Because the Objecting Insurers have not agreed to settle their coverage obligations, the Joint Plan provides mechanisms for post-confirmation litigation which are designed to maximize, to the extent possible, the Diocese's insurance assets. The outcome of

---

[30] Actual recoveries for individual Abuse Claimants will vary and could be higher or lower based upon the points attributed to each Abuse Claim pursuant to the Allocation Protocol.

any litigation is inherently uncertain as to timing and amount, and these uncertainties are identified and discussed in the Disclosure Statement.

### c. The Disclosure Statement is Written in Plain English

38.      In the UST Objection, the UST asserts that the Disclosure Statement is not written in "plain English" and, thus, Survivors and other creditors will be unable to understand provisions of the Joint Plan. Specifically, the UST expresses concerns that Disclosure Statement does "not give creditors any idea of how much will be distributed to them, and when the distributions are to be made."  All of the Abuse Claimants hold contingent, disputed, and unliquidated claims, and until such claims are evaluated in accordance with the Allocation Protocol, the Diocese cannot provide Abuse Claimants with their exact compensation amount, which will be determined in accordance with the Allocation Protocol after the Effective Date of the Joint Plan.  Further, under the terms of the Joint Plan and the Trust Agreement, there will be post-confirmation insurance litigation that will likely result in significant additional contributions to the Trust, thereby increasing the overall amount being distributed to Survivors.

39.      Additionally, the UST makes the blanket and offensive assumption that Survivors are somehow unsophisticated and unable to understand the Disclosure Statement as written. Such an assumption is completely baseless and insulting to Survivors. A vast majority of Abuse Claimants are represented by counsel and will have the benefit of discussing the provisions of the Disclosure Statement and Joint Plan with their respective attorney. Moreover, the Disclosure Statement specifically advises claimants to consult with an attorney to evaluate the Joint Plan. Accordingly, the Diocese submits that there is little, if any, chance that a Survivor will be unable to adequately evaluate the Disclosure Statement and Joint Plan.

17214782.4 2/2/2024

40.    However, if the Court determines that the Disclosure Statement contains any provisions that are confusing "legalese," the Diocese will be glad to amend those specific provisions and revise any language that may be considered specialized language of the legal profession to more reasonably understandable language. The Diocese has thus far avoided the preparation of an executive summary of the Joint Plan because of the inherent risks in providing "boiled down" information, but will do so if requested by the Court, to address this concern.

### d.  All Essential Documents Have Been Filed

41.    The UST asserts that certain Joint Plan and Disclosure Statement exhibits have not been filed in connection with the Joint Plan and Disclosure Statement. However, several Plan Supplements have been filed containing the relevant exhibits (*see* paragraphs 2 and 3, above) and only Exhibit A to the Joint Plan remains to be filed at this time. Exhibit A, which will be filed before the hearing concerning approval of the Disclosure Statement, sets forth the "Participating Parties" under the Joint Plan and includes the Parishes and other Related Entities of the Diocese. Placeholders for Exhibits 8 (DOS Trust Note) and 9 (DOS Trust Note Security Agreement) contemplate documents that are not yet due to be filed and may not ever be filed unless the Diocese exercises the option in the Joint Plan to pay a portion of the DOS Entities' Cash Contribution over time.  It is common for plan proponents to file plan supplements containing agreements implementing transactions contemplated by the plan, at a later time in the plan confirmation process.

### e.  The Diocese will Comply with Post-Confirmation
### Statutory Fee Requirements and Reporting Obligations

42.    The UST also asserts that, by the creation of the Trust, the Diocese seeks to shirk its obligation to pay Chapter 11 Quarterly Fees and comply with reporting obligations in the post-confirmation period. The UST may collect quarterly fees for the Diocese's disbursement of

its contribution into the Trust, however the payments to creditors from the Trust should not be included as a disbursement for quarterly fee purposes, as such an outcome would be akin to "double dipping." When considering whether the UST could assess fees for a second time on distributions made from a trust where the initial funding of the trust by the debtor had already been taxed, Judge Sontchi ruled that "[t]he OUST has already collected its fee. It is not entitled to a second bite at the apple." *In re Paragon Offshore, PLC*, 629 B.R. 227, 228 (Bankr. D. Del 2021).

## V. REPLY TO OBJECTING INSURERS' GENERAL OBJECTIONS

### a. The Insurance Assignments are Consistent with State Law

43.     The Diocese's Disclosure Statement and Joint Plan calls for an assignment of the Catholic Family's Insurance Claims to the Trust. The Objecting Insurers oppose the assignment, asserting that it prejudices rights that they would otherwise possess.

44.     The assignment contemplated by the plan, however, is consistent with state law and does not alter the Objecting Insurer's rights. Importantly, the Insurance Claims being assigned pursuant to the Joint Plan are simple choses in action. The Catholic Family is not assigning (and is in fact retaining ownership of) the underlying insurance policies themselves. New York courts have long recognized that that policyholders may transfer rights to recover under an insurance policy to a third party, provided that the injury in question triggering coverage has already occurred. The reason such assignments are valid is because such transfers neither increase (or decrease) the exposure the insurer has contracted to cover. In other words, post-loss assignments are insurance neutral.

45.     Such post-loss assignments are valid, even if the insurance policy contains so-called anti-assignment provision that purports to restrict assignments. Unlike other types of

contracts, the "enforceability of a no-transfer clause in an insurance contract is limited."

*Arrowood Indem. Co. v. Atlantic Mut. Ins. Co.*, 948 N.Y.S.2d 581, 582 (1st Dep't 2012) (quoting

*Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (applying New

York law)). In this regard, New York follows the majority rule that anti-assignment provisions in

an insurance policy are only valid pre-loss and do not apply after an insured-against loss has

occurred. *See, e.g.*, *id.* (citations omitted); *Kittner v. E. Mut. Ins. Co.*, 915 N.Y.S.2d 666, 669 n.3

(3d Dep't 2011) (collecting cases); *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, 375 F.

Supp. 2d 238, 245-46 (S.D.N.Y. 2005).

46.     In determining when a loss has occurred, New York courts look to when "the

potential liabilities in question arose," or, in other words, when the insurance claim accrued.

*Arrowood*, 948 N.Y.S.2d at 695; *Globecon*, 434 F.3d at 171 (citations omitted); *see also In re*

*Viking Pump*, Inc. 148 A.3d 633, 651-52 (Del. 2016) (applying New York law) (finding that anti-

assignment provisions do not apply to "claims for pre-assignment occurrences").  An insurance

claim arises for this purpose when the injury at issue occurred. *See In re Viking Pump*, Inc. 148

A.3d at 652. The rationale for this rule is that, although "insurers have a legitimate interest in

protecting themselves against additional liabilities [that they] did not contract to cover, once the

insured against loss has occurred, there is no issue of an insurer having to insure against

additional risk and, in that circumstance, the only question is who will pay for the loss."

*Arrowood*, 948 N.Y.S.2d at 582-83 (brackets in original) (internal quotations omitted) (quoting

*Viking Pump Ins. v. Century Indem. Co.*, 2 A.3d 76, 103 (Del. Ch. 2009) (applying New York

law)); *see also Globecon*, 434 F.3d at 170 ("The idea behind the majority rule is that, once the

insured-against loss has occurred, the policy-holder essentially is transferring a cause of action rather than a particular risk profile.").[31]

47.     Against this backdrop of established law, the Joint Plan would assign to the Trust the Catholic Family's rights to recover for claims for sexual abuse that allegedly happened decades ago. Accordingly, contrary to the Objecting Insurers' misleading contentions, the Joint Plan seeks to assign only post-loss causes of action under these policies, such that any anti-assignment provisions in the policies are inapplicable because the Objecting Insurers' risk profiles are not impacted by the alleged pre-assignment occurrences. *See, e.g.*, *Arrowood*, 948 N.Y.S.2d at 695; *Globecon*, 434 F.3d at 171 (citations omitted). Consistent with well-established New York law, the Trust will merely "stand[] in the shoes" of the Catholic Family, such that the Objecting Insurers will maintain all of their rights and obligations under their respective policies. *Intelligent Digital Sys., LLC v. Beazley Ins. Co., Inc.*, 207 F. Supp. 3d 242, 247 (E.D.N.Y. 2016); *see also Globecon*, 434 F.3d at 171 ("[R]egardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy." (citations omitted)); *Arrowood*, 948 N.Y.S.2d at 583 (recognizing that the third-party assignee "is only seeking a defense from [the insurer] to the extent of the risk that [the insurer] contracted to undertake—those claims that potentially implicate [the insured's] products").

48.     Interstate's appeal to *Diocese of Camden, New Jersey* is unavailing given the state law discussed above. (Interstate Obj. at 17 (citing *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 352 (Bankr. D.N.J. 2023)). There, the court explicitly found the assignment was proper

---

[31] One notable exception to this rule is in the context of "certain claims for business interruption insurance . . . where such lost income is uncertain at the time of the assignment." *Globecon*, 434 F.3d at 171. No such "unusual circumstances," *id.* at 171, exist here, however, where the policies at issue involve occurrence-based liability policies. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. AT&T Corp.*, 2021 WL 2003166, at *7 (N.Y. Sup. Ct. May 19, 2021) ("[T]ellingly, the Insurers point to no authority invalidating a post-loss assignment under an occurrence-basis liability policy, like those here.").

17214782.4 2/2/2024

under bankruptcy law, but held that state law governed "given the debtors['] remaining obligations" under the policies.  653 B.R. at 351. The court further held that the relevant provisions do not violate the Bankruptcy Code and therefore do not render the Joint Plan unconfirmable. *Id.* at 352. Because the assignment is proper under New York law, these provisions pose no impediment to the Joint Plan or Disclosure Statement.[32]

### b.  The Joint Plan is Insurance Neutral

49.    As set forth above, the assignment of the Insurance Claims does not amount to an assignment of the underlying Insurance Policies, nor does it impact the Objecting Insurers' rights and obligations.  Thus, the Joint Plan is insurance neutral.

50.    Despite their protestations, the Objecting Insurers will retain all their rights to contest coverage. Tellingly, the Objecting Insurers fail to cite any provisions of the Joint Plan that eliminates the insured's duty to cooperate or the Objecting Insurers' right to challenge unreasonableness of settlements or participate in the investigation, settlement, and defense of claims. As Interstate admits, the concept of insurance neutrality is to avoid expanding or contracting the coverage available. *See* Interstate Obj. at 19 ("It is a bedrock principle of bankruptcy law that a 'debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either'"). The Joint Plan simply limits the Objecting Insurers to the same coverage defenses they would have had if the Diocese were not in bankruptcy, without granting the Objecting Insurers added defenses by virtue of the mechanics of bankruptcy.

51.    The Objecting Insurers attempt to manufacture obstacles, asserting that the Joint Plan will effectively increase their liability by transferring or eliminating the Catholic Family's

---

[32] Any argument that the Joint Plan improperly shifts the burden to Insurers to disprove the assignment's validity is therefore similarly misplaced.  The assignment is valid as a matter of law, as explained above.

obligations under the policies. These contentions, whether inadvertent or made with deliberate intent to obfuscate the issue and delay the Diocese on the path to confirmation, fundamentally misconstrue the nature of the assignment. Simply put, the Joint Plan does not seek to assign the policies themselves, and therefore does not assign any duties thereunder. Section 6.3 of the Joint Plan specifically requires the Catholic Family to use reasonable efforts to comply with any such Post-Effective Date Insurance Obligations.  To the extent the Diocese or any member of the Catholic Family has a duty to cooperate with the Objecting Insurers, in the defense of Abuse Claims, the Catholic Family retains such duty, it is not assigned to the Trust and therefore cannot be the basis of a conflict of interest for the Trustee as LMI contends. (*Cf.* LMI Obj. at 16-17). Even if, hypothetically, the Trust could be said to have a duty to cooperate with the Objecting Insurers, the Objecting Insurers would still retain their rights to challenge the Trust's cooperation under the policies and any conflict of interest would only serve to provide the Objecting Insurers with additional coverage defenses. *See AT&T Corp.*, 2021 WL 2003166, at *7 (citations omitted) (recognizing that insurers may challenge an assignee's cooperation under the assigned policy).

52.     LMI and Interstate also contend that the Plan is not insurance neutral because it fails to explicitly preserve the Diocese's obligation to pay SIRs going forward. (*See* Interstate Obj. at 27). But the plan does not disturb the SIRs. The Objecting Insurers remain liable only for the portion of loss in excess of the SIRs (if any).  In the bankruptcy context, the actual payment of the SIRs is unnecessary, due to the Diocese's insolvency. The SIRs do not act as conditions precedent where, as here, the insured is in bankruptcy.  *See Admiral Ins. Co. v. Grace Indus.*, 409 B.R. 275, 280 (E.D.N.Y. July 29, 2009) (affirming bankruptcy court holding that insurer's "obligation exists whether or not [policyholder] actually pays a penny of its $50,000 SIR obligation"). In other words, a policyholder in bankruptcy does not actually have to pay the SIRs.

*See In re Diocese of Camden, New Jersey*, 653 B.R. 309, 351 (Bankr. D.N.J. 2023) ("there is caselaw finding that payment of the SIRs are not prerequisites to the Objecting Insurers obligation to pay, and instead merely set a floor on the claim amounts below which the Objecting Insurers have not agreed to make any payments"). Even assuming arguendo that the SIRs must be paid, the Trust will be sufficiently funded to pay the SIRs. In this context, the SIR amount would be paid to the trust for the portion of the loss within the SIR, thus there would be no net loss to the Trust. In short, the Joint Plan does not impact the Objecting Insurers' attachment point in excess of the SIRs (if any), and thus does not prejudice the Objecting Insurers' coverage obligations.

53.     The proposed Joint Plan bears no similarity to the circumstances in *Congoleum Corp. v. Ace American Insurance Co.*, NO. MID-L-8908-01, 2007 N.J. Super. Unpub. LEXIS 3000 (N.J. Sup. Ct. May 18, 2007), where, among other issues, the court found the proposed agreement affirmatively abandoned viable defenses (where the pre-bankruptcy analysis assumed at least 60% of claims would be entitled to no damages), the debtor's counsel had a conflict of interest, and the agreement included no monetary contribution from the debtor.  (*Cf.* Interstate Obj. at 23). The Joint Plan preserves the Objecting Insurers' ability to object to specific claims and the reasonableness of awards, and there is no serious dispute that the instant Joint Plan is the product of arms' length negotiations. Any purported violation of the insured's duties and insurers' rights is purely speculative and premature at this point and should therefore be rejected.

54.     Accordingly, because the Objecting Insurers will retain their contractual rights under their respective policies, the Joint Plan will be insurance neutral and Objecting Insurers' Objections fail.

## VI.    REPLY TO LMI OBJECTION

55.    LMI argues in its Objection that the Joint Plan is patently unconfirmable because (a) the Trustee as an irreconcilable conflict and (b) it requires the Court to approve the transfer of non-debtor property.

56.    The Diocese respectfully submits that the conflict discussed by LMI is a result of LMI's intentional misreading of the assignment provisions of the Joint Plan. The Catholic Family, as insureds, retain the insurance policies and any obligations to cooperate with the Objecting Insurers to defend claims. The Trust, on the other hand, will be assigned only the Catholic Family's Insurance Claims under the policies, as discussed above and as explicitly permitted under New York law. The Trustee therefore does not have a conflict because the Trustee will have no obligations to the Objecting Insurers. The Diocese is not assigning any insurance policies, it is only assigning the right to an economic recovery under those policies.

57.    Despite LMI's assertion, the Joint Plan does not require the Court to approve the transfer of non-debtor property, referring to the contribution of Participating Parties' interest in the LMI Policies to the Trust (LMI Objection at p.18). As set forth above, New York law permits the assignment of claims under a policy, and such an assignment by Participating Parties would be permissible outside of a chapter 11 process and without any requirement of Court approval.

58.    LMI also argues that the Disclosure Statement contains inadequate and misleading information for failure to disclose the Trustee's alleged conflict (addressed above). As no such conflict exists, no disclosure is necessary.

59.    Additionally, LMI seeks to block the approval of the Disclosure Statement for a failure to disclose that the Diocese must satisfy conditions precedent to coverage, as set forth in the LMI Policies, or coverage could allegedly be voided. Again, the Joint Plan contemplates that

any obligations the Catholic Family may have to the Objecting Insurers will remain with, and be satisfied by, the Catholic Family.  Accordingly, there is no reason to anticipate that any conditions precedent to coverage will go unsatisfied, nor any need for additional disclosure.

60.    LMI also argues that the LMI policies are executory contracts that must be assumed then assigned to the Trust, and that adequate assurance is required before the assignment can occur. This is styled as an objection to the adequacy of information contained in the Disclosure Statement but is really an objection to confirmation of the Joint Plan, which is premature at this time.  As an initial, preliminary response to this confirmation objection, the Diocese respectfully submits that insurance policies with policy periods that have expired are not executory. *See In re Ames Dept. Stores, Inc.*, Case No. 93 CIV 4014 (KMW), 1995 WL 311764, at *3 (S.D.N.Y. May 18, 1995) ("insurance policies in which the policy periods have expired and the initial premiums have been paid … are not executory contracts despite continuing obligations on the part of the insured.").  However, even if the Court were to determine otherwise, the executory nature of the policies is irrelevant. The Catholic Family is not assigning the policies themselves, only the Insurance Claims it has already asserted under the policies, which is explicitly permitted under NY law, as set forth herein.

61.    LMI also asserts that the Disclosure Statement does not clearly set forth who will satisfy conditions precedent to the LMI Policies. To the extent that a duty to cooperate with defense as a condition precedent exists under the LMI Policies, it remains with the initial insured – the Catholic Family. If LMI or any of the other Objecting Insurers believe that any insured is not complying with its cooperation obligations under a policy, that Objecting Insurer has the right to assert such failure to cooperate as an additional defense to coverage.

17214782.4 2/2/2024

62.    LMI further alleges that the Disclosure Statement's discussion of the Joint Plan's insurance assignment provisions is confusing and contradictory. The Diocese respectfully submits that the Insurance Claim assignment is clearly explained in the Disclosure Statement, however the Diocese would not oppose any amendments to the Disclosure Statement the Court determines to be necessary, to provide further clarity.

### VII.    REPLY TO INTERSTATE OBJECTION

63.    The Interstate Objection focuses on the Joint Plan's alleged unconfirmability rather than deficiencies in the Disclosure Statement and alleges that the Insurance Claim assignment set forth in the Joint Plan violates the Bankruptcy Code.

64.    The Joint Plan does not impermissibly impair Interstate's rights, nor does it violate insurance neutrality.  As set forth above in paragraphs 44 through 54 above, the Joint Plan is not prejudicial to Interstate because the assignment of Insurance Claims provided therein is explicitly permitted under New York law and will not .prejudice the Objecting Insurers' rights under the policies.  Accordingly, the Joint Plan is insurance neutral, and Interstate lacks standing to challenge its terms.

65.    Finally, Interstate asserts that the Joint Plan was not proposed in good faith.  Such assertion is completely meritless and is a gross misrepresentation of the facts and circumstances surrounding the filing of the Joint Plan.  The Diocese and the Committee reached a settlement in principle only after years of contentious mediation followed by approximately six additional months of good faith negotiation over specific plan terms. All negotiations between the Diocese and the Committee were conducted at arm's length.  Nevertheless, even if this Court were inclined to consider Interstate's baseless assertion of bad faith, such consideration should be reserved for the confirmation hearing upon a full evidentiary record.

66.     Interstate also briefly addresses the issue of adequate information contained in the Disclosure Statement. The Diocese respectfully submits that the Disclosure Statement adequately addresses both risks to Abuse Claimant recovery and the Trustee's role in connection with the insurance assignment. Furthermore, the issues raised by Interstate in connection with the adequacy of information contained in the Disclosure Statement are not issues to which any of the Objecting Insurers should be entitled to standing.

## VIII.   REPLY TO TRAVELERS OBJECTION

67.     Travelers is responsible for a series of policies that Aetna Casualty and Surety Company sold to the Diocese ("Travelers Policies"). The Travelers Policies provide extend from 1941 to 1970. Travelers faults the Disclosure Statement on the grounds that it fails to disclose that the Travelers Policies do not provide coverage for abuse claims because they are "Owner Landlord, Tenant" ("OLT") policies. According to Travelers, OLT policies provide coverage for injury that takes place on an insured premises, but not injury that takes place away from the insured premises.

68.     Travelers' objection should be rejected because (1) not all the Travelers' policies are OLT policies and (2) OLT coverage is not restricted to on-premises injuries.

### a.   Travelers may not Join the Other Objecting Insurers' Objections because Travelers has Denied Coverage

69.     Travelers statement that the Travelers Policies "do not provide coverage for Abuse Claims" is shows that it has denied coverage. Travelers Objection at 4, 9.  Under New York law, a denial of coverage has significant legal ramifications. It releases the policyholder from its obligations to cooperate with the insurer under the policies. *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 151 A.D.3d 632, 633 (N.Y. 2017) (". . .defendants' repudiation of liability for plaintiffs' claims also excuses plaintiffs from performance of that obligation [(i.e., duty to

17214782.4 2/2/2024

cooperate. . . .")]).   Many of the objections by other insurers are premised on the duty to cooperate. By repudiating its coverage obligations, however, Travelers effectively has waived such objections. Thus, Travelers may not join other insurers' objections that center of the duty to cooperate.

### b.  Sufficient Evidence of the Travelers Policies Exist

70.     Travelers asserts "it has found no evidence of any of the Alleged Policies in its record" and expresses doubt that the Travelers Policies even exist. Travelers Objection at 5, 8. However, the Diocese has found substantial evidence of the Travelers Policies, including policy excerpts and correspondence, which leave no doubt that the policies exist.

71.     In the absence of an original insurance policy, New York law permits proof of the existence and terms of a policy through secondary evidence where it made a diligent search and inquiry. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002); *see also Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*, 828 F. Supp.2d 481, 491 (N.D.N.Y. 2011) (given the lack of dispute about a diligent search, the court "thus assumed that such a search was completed, and the secondary evidence will therefore be considered").[33]

72.     The Diocese has located substantial evidence of the policies, which contains details about the operative terms of the policies including the insurer, policy period, type of coverage, and the limits of liability. Together with specimen policies, such evidence is more than enough to create an issue of fact as to Aetna's coverage from 1941 through 1958. *See Travelers*

---

[33] While New York courts are split with respect to the standard of proof, *see Burt Rigid Box*, 302 F.3d at 91 (declining to decide appropriate standard), a preponderance of the evidence standard likely applies. *See, e.g., Emerson Enterprises, LLC v. Kenneth Crosby - New York, Inc.*, No. 03-CV-6530 CJS, 2007 WL 700846, at *8 (W.D.N.Y. Feb. 27, 2007) (insurer acknowledged preponderance of the evidence was the appropriate standard); *see also Gold Fields Am. Corp. v. Aetna Cas. & Sur. Co.*, 173 Misc.2d 901, 661 N.Y.S.2d 948, 949-51 (N.Y. Sup. Ct. 1997) (a clear and convincing standard "would only serve to encourage carriers to destroy policies as soon as possible in the hope that those who had paid for insurance would be unable to produce the policies after the lapse of a substantial period").

*Indem. Co. v. Rogers Cartage Co.*, 98 N.E.3d 524, 530 (Ill. App. Ct. 2017) (insured proved terms and conditions through bookend policies and specimen policies); *see also Schozer v. William Penn Life Ins. Co. of New York*, 84 N.Y.2d 639, 645 (1994) ("all competent secondary is generally admissible to prove" the contents of a missing document).

### c. The 1967-1970 Travelers Policy Provides Comprehensive General Liability Coverage

73.     Although some Travelers policies purport to be limited to OLT coverage, Travelers is mistaken that the 1967-1970 policy is one of them. The 1967-1970 policy contains a coverage form with language that is characteristic of comprehensive general liability ("CGL") coverage. Unlike OLT policies, CGL coverage is not associated with specific location.[34] Nonetheless, Travelers asserts that the 1967-1970 policy is actually an OLT policy. Travelers' contentions are mere speculation and cannot overcome the plain language of the policy, which unambiguously shows the coverage is CGL, not OLT.

74.     The 1967-1970 Travelers Policy consists of a pre-printed policy form separated into parts corresponding to different types of liability coverage. One of the sections is "Comprehensive General Liability Insurance" and is designated as the "CGL Part." This section begins with a coverage grant that provides CGL coverage:

**I.      Comprehensive Injury Liability Coverage
Property Damage Liability Coverage**

The company will pay on behalf of the insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the

---

[34]"The commercial general liability (CGL) policy is a standard insurance policy issued to business organizations to protect them against liability claims for bodily injury (BI) and property damage (PD) arising out of premises, operations, products, and completed operations; and advertising and personal injury (PI) liability." *See* https://www.irmi.com/term/insurance-definitions/commercial-general-liability-policy.

insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

75.     The foregoing language features none of the indicia of OLT coverage, which, as Travelers notes, typically refers in some way to insured premises. No reference to insured premises appears in the above coverage grant. By its plain terms, the 1967-1970 policy clearly provides CGL coverage. *Lavanant v. Gen. Acc. Ins. Co. of Am.*, 79 N.Y.2d 623, 629 (N.Y. 1992) ("Unambiguous provisions of a policy are given their plain and ordinary meaning*."); see also Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) ("An unambiguous provision of the contract should be given its 'plain and ordinary meaning' and the contract should be construed without reference to extrinsic evidence.").

76.     Unlike OLT policies, the 1967-1970 Travelers Policy affirmatively states that coverage applies throughout the U.S. and in Canada. The "Policy Period; Territory Provision" specifies that the insurance applies to bodily injury or property damage that occurs within the policy territory, which is defined by the Definitions in the Policy Jacket as "the United States of America, its territories or possessions, or Canada."  Thus, the coverage is not limited to a specified insured premises.

77.     Other evidence exists that the 1967-1970 Travelers Policy is CGL, not OLT. Whereas prior Travelers Policies provide OLT coverage, the 1967-1970 policy includes a notice to the insured announcing that it contains a new kind of coverage. The "Notice of Revised Form" states: "Please note that the form and text of the insurance afforded by this policy has been substantially revised from that provided under the policy previously issued to you by this Company."  Further evidencing the intent to provide CGL coverage, a statement at the top of the

33

declarations reads: "Comprehensive Liability Policy for Roman Catholic Diocese of Syracuse," whereas the declarations in previous OLT policies refer to "Owners,' Landlords' and Tenants' Liability Policy."

78.     Significantly, "Comprehensive Liability" is a term of art dating back many years in the insurance industry that refers to a policy that provides broad coverage unless excluded as opposed to a policy that cover specific hazards. *See, e.g.*, Jeffrey W. Stempel & Erik S. Knutsen, Stempel and Knutsen on Insurance Coverage [1], Why the Original CGL Policy was Developed (4th Ed., 2022-1 Supp. 2015). Had Travelers intended to continue the OLT coverage, it could have simply replicated the OLT forms from the prior policies, and it certainly would not have included alerts and other indicia announcing a change in coverage.

### d.  The Travelers OLT Policies Prior To 1967 Cover Off-Premises Injury

79.     The Travelers Policies in place prior to 1967-1970 policy provide OLT coverage. Travelers asserts that OLT coverage is strictly limited to injury that occurs at a specified insured premises.  Neither the policy language nor controlling New York law support Travelers' unduly narrow interpretation of OLT coverage.

80.     Although OLT policies cover on-injury premises, they also cover injury away from the premises, provided that it arises out of the operations at the insured premises.  Thus, OLT policies in some instances do cover off-premises injury. For example, the 1964-1963 policy's coverage grant states:

> The Aetna Casualty and Surety Company . . . agrees with the Insured . . .
>
> Coverage A—Bodily Injury Liability
>
> To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, sickness, or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and ***arising out of the hazards hereinafter defined***.

34

The "Definition of Hazards" section lists one of the insured hazards as "Division 1— Premises—Operations," which is defined as: "The ownership, maintenance or use of the premises, and *all operations necessary or incidental thereto*."

81.     The OLT language encompasses injury "arising out" of the ownership, maintenance, or use of the premises, as well as injury arising out of "all operations necessary or incidental" to the premises. The phrase "arising out of" means "originating from, incident to, or having connection with." *Regal Constr. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 215 N.Y.3d 34, 38 (2010). Thus, when injury-causing conduct is causally related to the purposes for which the premises are used, then the injury is deemed to arise from the premises.

82.     New York courts have construed OLT wording to encompass off-premises injury. *See, e.g.*, *S.P. v. Dongbu Ins. Co.*, 25 N.Y.S.3d 171, 173 (2d Dep't. 2016) (finding that premises limitation endorsement did not preclude coverage where negligent acts were incidental to the use of the insured premises); *see also DeForte v. Allstate Inc. Co.,* 442 N.Y.S.2d 307, 310 (4th Dep't. 1981) (finding coverage for dog bite injuries sustained by police officer during insured's errand aware from the insured premises were necessary or incidental to the insured's business). New York law aligns with numerous other courts that have found that OLT coverage extends to off-premises injury. *See, e.g.*, *Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 857 F. Supp. 822, 836 (D.N.M. 1994) ("Coverage may exist under an OL&T policy for an off- premises accident. . . . [T]he key is not whether the injury occurs on or off-premises; rather, it is whether there exists a sufficient connection between the injury and the insured's premises, including necessary or incidental operations on the premises.").[35]

---

[35] *See, e.g., Hartford Fire Ins. Co. v. Annapolis Bay Charters, Inc.*, 69 F. Supp. 2d 756, 760 (D. Md. 1999) (concluding that "use" in the phrase "ownership, maintenance or use" in the context of a liability policy with a

(continued...)

83.     In fact, one New York case has found that OLT coverage applies to off-premises injury in the context of the physical abuse of a child. *City of New York v. Granite State Insurance*, 25 N.Y.S.3d 171 (1st Dep't. 2016), involved a lawsuit against the City of New York and a foster care agency alleging liability arising out of the abuse and death of a child as a result of their negligent supervision of the care of a child in her home.  The City sought coverage as an additional insured under the agency's insurance policy. The insurer, however, denied coverage based on a Limitation of Coverage to Designated Premises or Project endorsement ("Premises Limitation Endorsement"), which limited coverage to injuries arising from the "'ownership, maintenance, or use of the [designated] premises and operations necessary or incidental to those premises.'"  The trial court granted summary judgment to the insurer and denied summary judgment to the City.

84.     On appeal, the City contended that the Premises Endorsement did not preclude coverage because the alleged negligent supervision of the child's care emanated from the insured premises, the foster care agency's main office, where it performed its administrative and operational tasks. *See* Brief for Appellant, *City of New York v. Granite State Ins. Co.*, 2015 WL 13776140, at *28 (1st Dep't). The New York Appellate Division agreed with the City, holding that the Premises Endorsement "does not provide a basis for defendant to decline coverage."

---

designated premises endorsement – which as a whole created "something less than a general liability policy" – "extends [coverage] to any injuries 'arising from' the customary use of [the insured premises] as offices and hardware-retail space" and that some, but not all, business activities would be covered.); *Cycle Chem, Inc.*, 365 N.J. Super. at 68-69 (reversing summary judgment for insurer where policy limited coverage to occurrences arising out of the ownership, maintenance or use of the insured premises and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises, explaining that Cycle Chem should be given an opportunity at trial to demonstrate that a sufficient factual nexus exists between its necessary and incidental operations at or from the insured premises and the occurrences out of which liability arose); *C. Brewer & Co. v. Marine Indem. Ins. Co. of Am.*, 135 Haw. 190 (2015) (holding that designated premises endorsement provides coverage for injury and damage that occurs on premises not listed in the Schedule if the injury or damage arises out of the ownership, maintenance, or use of a designated premises); *Newman v. United Fire & Cas. Co.*, 995 F. Supp. 2d 1125, 1132–33 (D. Mont. 2014), *aff'd*, 668 F. App'x 816 (9th Cir. 2016) ("United's contention that the policy clearly limited coverage and the duty to defend to incidents that occurred directly on the St. George, Utah premises is meritless").

*Granite State*, 25 N.Y.S.3d at 173. It reasoned that "[t]he acts of negligence alleged in the underlying complaint here are 'incidental to' the 'use' of the premises designated in the Premises Limitation." *Id.* Accordingly, the Appellate Division reversed the trial court and rendered summary judgment in favor of the City. As *Granite State* demonstrates, OLT coverage is not strictly limited to on-premises abuse.

85.     This matter is directly analogous to *Granite State*. As Travelers' objection acknowledges, the premises insured by the OLT polices includes the Diocese's Chancery (and other Diocese offices). By definition, the Chancery is the main office of a Catholic diocese from which it conducts its business.  *See* https://www.merriam-webster.com/dictionary/chancery. The Diocese's alleged negligence necessarily emanated from the Chancery.  Just as in *Granite State*, where the acts of negligence arose out of and were incidental and necessary to the use of the foster care agency's main office, the Diocese's alleged acts of negligence arose out of and are necessary and incidental to the chancery. Thus, the OLT policies provide coverage for abuse that is alleged to have happened away from the Diocese's premises.

86.     Travelers' position that OLT coverage does not cover abuse away from insured premises conflicts with its own policy wording and controlling New York case law. Because the Diocese's alleged negligence arise out of the Diocese's operations at and use of the insured premises, namely, the chancery, the Aetna OLT policies extend coverage to off-premises injury. Accordingly, Travelers' objection should be rejected.

## IX.     REPLY TO PARISH INSURERS OBJECTION

87.     The Parish Insurers assert that the Joint Plan is unconfirmable because it improperly purports to expand the Court's jurisdiction over Non-Debtor Parish Policies by providing for the assignment of the contract obligations of the Non-Debtor Parishes to the Trust,

thereby expanding the Court's jurisdiction over non-debtor property. In support of this assertion, the Parish Insurers rely on the ruling in *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 351 (Bankr. D. N.J. 2023), where the court found that it "lacks jurisdiction to order or approve the transfer of the [other Catholic entities'] interest in the Policies, because the Court's jurisdiction is limited to property of the Debtor, or the estate."

88.     However, the Court in *Diocese of Camden* also found that because it lacked jurisdiction, it did not need to rule on the transfer of the [other Catholic entities'] interest in the Policies. Judge Poslusny went on further to find that the parties were free to raise such matters before a state court at the appropriate juncture, but clearly ruled that the plan provisions did not violate the Bankruptcy Code, and therefore did not render the *Diocese of Camden* plan unconfirmable. Thus, the Parish Insurers' assertion that the Joint Plan is unconfirmable because this Court lacks jurisdiction to authorize the assignment of the contract obligations of the Non-Debtor Parishes to the Trust is without any merit.

89.     The Parish Insurers further assert that the Joint Plan is unconfirmable because it is not "insurance neutral." The Parish Insurers argue that the assignment or transfer of all Insurance Claims to the Trust somehow impairs the Parish Insurers' rights under the allegedly applicable policies with the Non-Debtor Parishes by shifting the burden of proof regarding the validity of such assignment of non-debtors' interests. However, as discussed herein, under New York insurance law, the Non-Debtor Parishes are permitted to assign insurance recovery claims without the consent of the Parish Insurers and such assignment is not prejudicial to the Parish Insurers because all of the Parish Insurers' rights to defend such assigned insurance recovery claims are unaffected under the terms of the Joint Plan. As the court in *Diocese of Camden* held, if the Parish Insurers believe that such assignment is not permissible under New York State law,

they are free to argue such position, on a case-by-case basis, in the appropriate state court, at the

appropriate time, but regardless, such assignment does not impact the confirmability of the Joint

Plan.

90.    Moreover, the Parish Insurers contend that the Joint Plan does not preserve their

rights and that they will be prohibited from disclaiming or denying coverage because, regardless

of whether the insured has performed its obligations under the relevant non-debtor Parish

policies, the Trust can make distributions to Abuse Claims.  Although such contention is clearly

an objection to confirmation of the Joint Plan and should be determined at a hearing to consider

confirmation of Joint Plan upon a proper record, nevertheless, the Joint Plan, specifically

provides that:

> nothing in this Plan, the Trust Agreement, the Confirmation Order, any
> Plan Document, any order approving a settlement, or any other order,
> judgment, conclusion of law, finding of fact, determination or statement
> (written or oral) of the Bankruptcy Court (or any other Court exercising
> jurisdiction over the Chapter 11 Case) to the contrary (including any other
> provision that purports to be preemptory or supervening or grants a
> release): (i) shall affect, impair, or prejudice the rights and defenses of any
> Non-Settling Insurer against the Diocese or any other Participating Party
> under any Non-Settling Insurer Policies, including any factual or legal
> defenses to any claim for insurance; (ii) shall affect, impair or prejudice
> the rights and defenses of any Protected Party, the Trust, or any other
> insureds under Non-Settling Insurer Policies in any manner, including any
> factual or legal defenses to any claim for insurance; (iii) shall constitute a
> settlement or resolution of the Diocese's and/or any Participating Party's
> liability to an Abuse Claimant; (iv) shall in any way operate to, or have the
> effect of, impairing or having any res judicata, collateral estoppel, or other
> preclusive effect on, any party's legal, equitable, or contractual rights or
> obligations under any Non-Settling Insurer Policy; or (v) shall otherwise
> determine the applicability or non-applicability of any provision of any
> Non-Settling Insurer Policy and any such rights and obligations shall be
> determined under the Non-Settling Insurer Policy and applicable law.

91.    Accordingly, any distribution made by the Trust to an Abuse Claimant will in no

way prohibit, impair, or limit the defense rights of the Parish Insurers. Thus, the Parish Insurers'

17214782.4 2/2/2024

contention is without merit and should not impact this Court's determination with respect to the approval of the Disclosure Statement.

92.    As stated above, the Diocese submits that the Disclosure Statement meets the requirements of section 1125 of the Bankruptcy Code and provides "adequate information."  The Parish Insurers, however, assert that the Disclosure Statement should disclose the risks associated with the proposed assignment of all the insurance rights of the Non-Debtor Parishes and other non-debtor entities (which are legally distinct from the Diocese), including the risks related to the enforcement of anti-assignment clauses and the asserted violation of provisions vesting Parish Insurers with the right to control the settlement of claims in many of those policies. As discussed above, the Joint Plan's assignment of Insurance Claims, not policies, does not violate the anti-assignment clauses in the Parish Policies.  Even if it were a violation, however, the result would simply be to create a new defense for the Parish Insurers that could be asserted to frustrate the Trust's ability to obtain coverage.

93.    The Parish Insurers argue that the Disclosure Statement should disclose that the third-party releases with respect to the Non-Debtor Parishes contained in the Joint Plan may be the subject of litigation as to whether they render the Joint Plan unconfirmable. Again, this is merely a confirmation objection phrased as a request for additional disclosure and is beyond the scope of the "adequate information" required by section 1125 of the Bankruptcy Code.

94.    Finally, the Parish Insurers also argue that the Diocese should have included information in the Disclosure Statement regarding funds transferred to the Cabrini Foundation (Parish Insurer Objection at p.15-16). The Diocese respectfully submits that there is no duty to include in a Disclosure Statement every potential avenue of recovery considered, or investigation undertaken, within the course of a chapter 11 proceeding. The Diocese evaluated the transfers to

the Cabrini Foundation and determined that there were no meritorious claims likely to result in

recovery to the benefit of the chapter 11 estate. Furthermore, the time period for pursuing any

such action against the Cabrini Foundation lapsed two years after the Petition Date, pursuant to

section 546(a) of the Bankruptcy Code.

WHEREFORE, for the reasons set forth above, the Diocese respectfully requests that

the Court overrule the Objections in their entirety and enter an order in substantially the form

attached to the Solicitation Procedures Motion as *Exhibit A* approving the Disclosure Statement,

and providing for such other and further relief as the Court may deem just and proper.

Dated:  February 2, 2024                                    BOND, SCHOENECK & KING, PLLC


                                                           By: */s/ Stephen A. Donato*
                                                           Stephen A. Donato, Esq. (Bar Roll #101522)
                                                           Charles J. Sullivan, Esq. (Bar Roll #507717)
                                                           Grayson T. Walter, Esq. (Bar Roll #518237)
                                                           Sara C. Temes, Esq. (Bar Roll #514148)
                                                           Justin S. Krell, Esq. (Bar Roll #704364)
                                                           One Lincoln Center
                                                           Syracuse, NY 13202-1355
                                                           Telephone: (315) 218-8000
                                                           Email:  sdonato@bsk.com
                                                                   csullivan@bsk.com
                                                                   gwalter@bsk.com
                                                                   stemes@bsk.com
                                                                   jkrell@bsk.com

                                                           *Attorneys for The Roman Catholic Diocese*
                                                           *of Syracuse, New York*