UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 20-30663 |
| The Roman Catholic Diocese of Syracuse, New York, | Chapter 11 |
| Debtor. | Judge Wendy A. Kinsella |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT; (II) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES; (III) APPROVING THE FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING ON JOINT PLAN; (IV) APPROVING THE FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES; (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE JOINT AMENDED PLAN; AND (VI) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") respectfully submits the following reply (the "Reply") in support of the *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for voting on Joint Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Joint Amended Plan; and (VI) Granting Related Relief* (the "Motion") [Dkt. No. 1626][1] and to address the objections filed to the Motion by the United States Trustee (the "UST");[2] Certain Underwriters at Lloyd's, London and London Market Companies (collectively, "LMI");[3] Interstate Fire & Casualty Company, Fireman's Fund Insurance Company, and National Surety Corporation

---

[1] Terms undefined herein have the meanings given to them in the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York Dated December 6, 2023* (the "Joint Plan") [Dkt. No. 1565].
[2] The United States Trustee filed its objection to the Motion at Dkt. No. 1636 (the "UST Objection").
[3] LMI filed its objection to the Motion at Dkt. No. 1637 (the "LMI Objection").

(collectively, "Interstate");[4] Travelers Insurance Company Limited, Travelers Casualty and Surety Company and Traveler's Indemnity Company (collectively, "Travelers");[5] and Westchester Fire Insurance Company and Ace Property and Casualty Insurance ("Westchester") (LMI, Interstate, Travelers, and Westchester are, collectively, the "Insurers").[6] In support of the Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

The Court's approval of the Disclosure Statement[7] will constitute the first measurable progress for survivors in several years, be viewed as a tangible acknowledgement of their histories, and be understood and felt as a significant step toward their recoveries and justice. This not hyperbole. For more than three and a half years, survivors have been restrained by this bankruptcy, forced to navigate an unfamiliar process, waiting silently and painfully on the sidelines, powerless to remove or even influence the obstacles to their own closure. Upon approval of the Disclosure Statement, survivors—undoubtedly the most important voices in this case—will finally have the opportunity to speak, by voting for or against the Joint Plan and moving themselves a sizeable step closer to finality.

With this end finally in sight, multiple parties, all of whom are unaffected by the Joint Plan, seek to stand in the way of survivors' progress toward a long-awaited resolution. The objecting parties have lodged a barrage of dramatic objections to the Disclosure Statement, the bulk of which

---

[4] Interstate filed its objection to the Motion at Dkt. No. 1639 (the "Interstate Objection"). The Interstate Objection indicates that TIG Insurance Company and Hanover Insurance company, who insure certain individual parishes separately, join in the Interstate Objections. Interstate Objection at p. 1, fn. 1.

[5] Travelers filed its objection to the Motion, and joinder to the LMI Objection and the Interstate Objection, at Dkt. No. 1640 (the "Travelers Objection").

[6] Westchester filed its objection to the Motion at Dkt. No. 1641 (the "Westchester Objection"). Westchester refers to itself as the "Parish Insurers" in the Westchester Objection, but does not speak on behalf of all parish insurers in this case.

[7] As used herein, "Disclosure Statement" refers to the *Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York Dated December 6, 2023* [Dkt. No. 1566].

2

are actually objections to confirmation of the Joint Plan. The Insurers, in particular, have used the objection process cynically to create self-serving delay and litigation advantage by mischaracterizing and confusing Joint Plan provisions and importing confirmation arguments from other diocesan bankruptcy cases that have nothing to do with the Joint Plan's actual terms.

The Diocese of Syracuse case and the Joint Plan are unique. The Joint Plan was intentionally structured differently from reorganization plans proposed in other bankruptcy cases involving survivor claims. Most importantly, the Joint Plan provides for an assignment of insurance proceeds to the Trust unhindered by trust distribution determinations set forth in the Allocation Protocol. This is critical because, unlike the protocols proposed in other bankruptcies, the Allocation Protocol in this case does not impact the potential liability of the Insurers in any way. On the contrary, the Joint Plan was designed specifically to *preserve* the Insurers' rights and defenses under the policies issued to the Debtor and the Participating Parties. The Insurers, throughout their objections, either overlooked this crucial distinction or chose to ignore it intentionally.

While the Committee is open to modifying the Disclosure Statement to detail more explicitly any potential risks associated with the Joint Plan, the Committee strenuously disagrees with the Insurers' assertion that the Joint Plan is so deficient that it cannot be confirmed and that the Disclosure Statement should not be approved as a result. By this Reply, the Committee responds to the objections filed to the Motion, delineating between objections properly raised as to the Disclosure Statement, premature Joint Plan objections, and objections to the solicitation procedures proposed in the Motion. In so doing, the Committee has sought to address legitimate concerns and provide the Court a comprehensive roadmap for evaluating and approving the Disclosure Statement.

CORE/3520516.0002/187159774.1

## <u>ARGUMENT</u>

I.   **THE INSURERS DO NOT HAVE STANDING TO RAISE OBJECTIONS TO THE JOINT PLAN OR DISCLOSURE STATEMENT**

As an initial matter, the Insurers do not have standing to object to provisions of the Joint Plan that do not directly impact their legal interests. *See In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992) (section 1109(b) of the Bankruptcy Code means that "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains . . .."). The Joint Plan does not seek to diminish Insurer property, increase Insurer burdens, or impair Insurer rights. On the contrary, the Joint Plan carefully preserves the rights of the Insurers. The Joint Plan is "insurance neutral" and, thus, the Insurers do not have standing to object to the Joint Plan or, by extension, the Disclosure Statement. *See In re Kaiser Gypsum Co.*, 60 F.4th, 73, 87-88 (4th Cir. 2023) (holding that an insurer was "not a party in interest under § 1109(b) and therefore lack[ed] standing" to challenge an insurance neutral plan), *cert. granted*, *Truck Insurance Exchange v. Kaiser Gypsum Co. et al.*, 2023 WL 6780372 (Mem), (U.S., Oct. 13, 2023) (No. 22-1079); *In re Combustion Eng'g., Inc.*, 391 F.3d 190, 217 (3d. Cir. 2004) (insurers do not have standing to object to a plan provision unless it "diminishes their property, increases their burdens, or impairs their rights.") (internal citations and quotations omitted); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 212 (3d Cir. 2011) ("'Insurance neutrality' is a meaningful concept where . . . a plan does not materially alter the quantum of liability that the insurers would be called to absorb.").[8]

---

[8] It is important to note that, even if one or more provisions of the Joint Plan were deemed to impact Insurer rights or interests negatively, the Joint Plan could still be confirmed. *See BSA*, 642 B.R. 504, 657 (insurance neutrality is a tool that may be used and "offer significant benefits to a bankruptcy case . . . but is not required"); *see BSA*, 642 B.R. 504, 667 ("Neither [*Combustion Eng'g. or Global Indus.*] guarantee an insurance company an 'insurance neutral plan,' rather [they] recognize that if a plan is not 'insurance neutral,' insurance companies have standing . . . to be heard."); *see generally BSA* (confirming a plan while overruling insurer plan confirmation objections throughout). In such a circumstances, the Insurers would simply have an opportunity to object to Joint Plan provisions that actually impacted

Here, the Insurers are not creditors and they are not entitled to vote on the Joint Plan, but they nevertheless object to the Disclosure Statement on grounds that **creditors** have insufficient information to consider the Joint Plan. The Insurers do not have standing to assert objections based the rights of other parties. To the extent the Insurers assert objections to the Disclosure Statement based on Joint Plan provisions that do not impact them, such objections should be overruled.

## II.   THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION OR CAN BE UPDATED TO ASSURE ITS SUFFICIENCY

11 U.S.C. § 1125 requires that a disclosure statement contain "adequate information" enabling claim holders entitled to vote on a plan to "make an informed judgment about the plan." *See* 11 U.S.C. § 1125(a)(1). Stated differently, the information in a disclosure statement must be "reasonably practicable" to allow voting creditors to make this "informed judgment." See *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994). A disclosure statement "need not include such information about any other possible or proposed plan" and, in determining the adequacy of a disclosure statement, the "***court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.***" 11 U.S.C. § 1125(a)(1) (emphasis added).

### a.   Missing Documents Will Be Provided

Several objections to the Disclosure Statement assert that various documents it references have not been provided, but should be provided prior to solicitation. These objections, and the Committee's position with respect to each, is set forth below.

1. The UST Objection indicates that the Disclosure Statement, on p. iii, references "accompanying ballots," but notes that the ballots are not attached to the Disclosure Statement.[9]

---

them. *See In re Combustion Eng'g., Inc.* 391 F.3d at 217. And, of course, this Court could sustain or overrule any such objection within the context of the confirmation process.

[9] *See* UST Objection at ¶ 8(i).

5

The ballots for voting on the Joint Plan are attached to the Motion, not the Disclosure Statement. To correct the Disclosure Statement, the Committee proposes the following revision:

> THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE PLAN, THE PLAN SUPPLEMENT, THE ~~ACCOMPANYING~~ PLAN BALLOTS.

2.  The UST Objection and LMI Objection indicate that the list of Participating Parties, defined in the Joint Plan at § 1.1.127 as including parties listed on Exhibit A to the Joint Plan, has not been filed.[10]

The Committee agrees that the list of Participating Parties should be added to the Joint Plan as Exhibit A and appended Disclosure Statement prior to solicitation.

3.  The UST Objection notes that the Child Protection Protocols, Exhibit 5 to the Plan, are not finalized.[11]

The Committee agrees that the Child Protection Protocols must be finalized prior to solicitation, and continues to work with the Debtor to resolve remaining disputes.

4.  The UST Objection indicates that the DOS Trust Note and DOS Trust Security Agreement, Exhibits 8 and 9 to the Joint Plan, respectively, have not been provided.[12]

While the DOS Trust Note and the DOS Trust Security Agreement have not yet been provided in a plan supplement, the Disclosure Statement provides adequate information regarding the *possibility* that the Trust will be funded pursuant to the DOS Trust Note, at the Diocese's option, and the material terms that may be included in the DOS Trust Note Documents.[13] The Committee would not oppose the inclusion of reasonable, additional language in the Disclosure Statement to further clarify this issue.

### b.  Third-Party Releases

---

[10] *See id.* at ¶ 8(ii); LMI Objection at p. 3, 29.

[11] *See id.* at ¶ 8(iii).

[12] *See id.* at ¶¶ 8(iv) and (v).

[13] *See* Disclosure Statement at Art. IX.B.2.

CORE/3520516.0002/187159774.1

The UST, Travelers, and Westchester raise various concerns about the discussion of third-party releases in the Disclosure Statement. The UST objects on the basis that the Disclosure Statement doesn't provide a justification for the third-party releases contained in the Joint Plan,[14] doesn't contain adequate information regarding the Bankruptcy Court's subject matter jurisdiction to impose third-party releases,[15] and does not address the Court's authority and jurisdiction to impose a channeling injunction (allegedly functioning as a nonconsensual third-party release) against claimants who do not consent and sign a release.[16] The UST and Travelers object on the basis that the Disclosure Statement does not explain the contributions made by the Released Parties, or identify the Released Parties or Protected Parties, or their Related Persons.[17] And Westchester objects that the Disclosure Statement does not explain that the nonconsensual third-party releases contained in the Joint Plan could render it unconfirmable.[18]

The Committee does not oppose inclusion of language in the Disclosure Statement indicating that the Plan Proponents believe the third-party releases contained in the Joint Plan are authorized by *In re Purdue Pharma L.P.*, 69 F.4th 45, 77-79 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (U.S. Aug. 10, 2023) ("*Purdue*"), that the UST believes the Bankruptcy Court does not have subject matter jurisdiction to approve third-party releases, and that the third-party releases contained in the Joint Plan could ultimately render it unconfirmable.

The Disclosure Statement currently includes information regarding the contributions made by the Released Parties. For instance, it discloses that the DOS Entities will make a $100 million

---

[14] *See* UST Objection at p. 13-14.
[15] *See id.* at p. 18-19, fn. 5.
[16] *See id.* at p. 19.
[17] *See id.* at p. 15-17 and Travelers Objection at ¶ 2.
[18] *See* Westchester Objection at p. 14-15.

cash contribution to the Trust and will make the Insurance Claims Assignment which requires Participating Parties to transfer to the Trust their rights to Insurance Claims and recoveries against Non-Settling Insurers.[19] Further, the UST itself identifies the parties being released from claims, citing the definitions of Released Parties, Protected Parties, and Related Persons contained in the Joint Plan at §§ 1.1.145, 1.1.141, and 1.1.143, respectively.[20]

### c. Allocation Protocol and Trust Distributions

Interstate contends the Disclosure Statement does not explain the risks of the Allocation Protocol's evaluation factors which are unscaled, unbounded by an aggregate limit, and provide for preferential treatment for Committee members unrelated to the merits of their claims.[21] The Disclosure Statement indicates, in several locations, that distributions will be made according to the Allocation Protocol.[22] The Committee believes that parties interested in the mechanics of the Allocation Protocol are capable of locating and reviewing it for themselves, without the taint of opinions from an entity (Interstate) that is not impacted to any degree by how Trust distributions will be determined. Nonetheless, the Committee does not oppose the addition of language indicating that the survivors should review the Allocation Protocol and its evaluation factors to gain an understanding of how distributions to survivors will be determined.

### d. Distribution Amounts and Timing

Various non-survivor parties raise concerns that the Disclosure Statement does not disclose information indicating the amount survivors can expect to receive or when survivors can expect distributions to be made.[23] Relatedly, Interstate raises questions regarding disclosure of the costs

---

[19] Disclosure Statement at Art. IX.B.1 and Art. IX.B.4.
[20] *See* UST Objection at ¶¶ 15-17 and p. 16.
[21] *See* Interstate Objection at ¶¶17(e), 62.
[22] Disclosure Statement at p. 3, 5, 19.
[23] *See* UST Objection at p. 24, LMI Objection at p. 3, 28-29, Interstate Objection at p. 2, Travelers Objection at ¶ 2.

CORE/3520516.0002/187159774.1

the Trust will incur in connection with litigating post-confirmation against Non-Settling Insurers and how such costs will impact distribution amounts.[24]

As a general matter, the Committee believes it unwise and potentially harmful to survivors to make assumptions regarding the amount or timing of Trust distributions. Abuse Claims are unliquidated, and under the Allocation Protocol and considering the potential for future recoveries from Non-Settling Insurers, Trust distributions cannot be calculated or estimated at this time. While the timing of initial distributions may be capable of estimation, the Committee has concerns about inadvertently setting unrealistic expectations for survivors and putting pressure on the Survivor Claims Reviewer and Trustee to execute their obligations related to Trust distributions, which could have the effect of prioritizing speed over accuracy.

The Committee is not opposed, however, to including reasonable, additional language in the Disclosure Statement clarifying for survivors that the Trust will incur costs in pursuing recoveries from the Non-Settling Insurers that will impact the amount initially distributable to survivors, but that the Committee believes that such costs will ultimately yield recoveries distributable to survivors far exceeding what the Joint Plan currently provides. The Committee is likewise not opposed to including language in the Disclosure Statement indicating the risk that some of the costs that the Trust will incur in connection with pursuing recoveries from Non-Settling Insurers may not yield a recovery.

### e.  Trust Fiduciary Independence

Interstate objects to the Disclosure Statement on the basis that it does not inform creditors that the Survivor Claims Reviewer or Trustee have connections to case professionals and that the Trustee has retained Committee professionals in post-confirmation insurance litigation in other

---

[24] *See* Interstate Objection at p. 2-3, ¶¶ 17(f), 43, and 62.

cases.[25] While the selection of the Trust fiduciaries has no impact on Interstate, the Committee does not oppose including reasonable, additional language in the Disclosure Statement describing the Survivor Claims Reviewer's or Trustee's involvement in other diocesan bankruptcy cases.

### f. Insurance Claims Assignment

Certain of the Insurers raise objections to the Disclosure Statement regarding the adequacy of information provided with respect to the Insurance Claims Assignment.

For instance, LMI argues, incorrectly assuming that the Non-Settling Insurer Policies are being assigned to the Trust, that the Disclosure Statement does not explain the Trustee's purported "irreconcilable conflict."[26] LMI likewise contends that the Disclosure Statement does not disclose whether the LMI policies or only the insurance proceeds under those policies are being transferred to the Trust.[27] LMI's repeated mischaracterization that the Insurance Claims Assignment is ambiguous or an assignment of the Non-Settling Insurer Policies to the Trust must be corrected. **The Insurance Claims Assignment transfers the Debtor's and Participating Parties' Insurance Claims against Non-Settling Insurers to the Trust; it does not assign the Non-Settling Insurer Policies to the Trust.**[28] As a result, the Trustee is not obligated to "defend Abuse Claims vigorously" or "cooperate with LMI," or satisfy conditions in LMI's policies, as LMI suggests.[29] Instead, the obligations under the Non-Settling Insurer Policies remain with the Debtor or Participating Party (as applicable). As a result, the Trustee does not have an "irreconcilable conflict." The Disclosure Statement provides adequate information on this point.[30]

---

[25] *See* Interstate Objection at p. 3, ¶¶ 17(c), 17(d), 63.
[26] *See* LMI Objection at p. 2-3; 16-18, 20-21.
[27] *See id.* at p. 3, 24-25.
[28] Joint Plan at § 8.2.4.a
[29] *See* LMI Objection at p. 17.
[30] *See* Disclosure Statement at Art. IX.B.4.a.

CORE/3520516.0002/187159774.1

LMI further asserts the Disclosure Statement is inadequate because it fails to disclose that the Debtor must satisfy various conditions precedent to coverage under LMI Policies, but it is unclear who is obligated to satisfy those obligations in connection with the Insurance Claims Assignment.[31] Travelers similarly argues the Disclosure Statement doesn't indicate that the Travelers policies are "OLT" policies and provide limited coverage.[32] The Committee does not oppose the addition of reasonable language in the Disclosure Statement stating LMI's insurance policies may require the Debtor or Participating Parties to take certain actions before LMI is obligated to provide coverage or, alternatively, that the Debtor's or Participating Parties' failure to take such actions may vitiate coverage under the LMI policies. Similarly, the Committee does not oppose the addition of reasonable language in the Disclosure Statement stating that Travelers, or any Non-Settling Insurer, may contend that their Non-Settling Insurer Policies do not provide coverage for Abuse Claims and that recoveries from Non-Settling Insurers are not guaranteed. The Committee does not, however, believe that detailed position statements recounting the mechanics of the Non-Settling Insurer Policies would aid Abuse Claimants in making an informed decision regarding the Joint Plan.

### g. Joint Plan's Impact on Insurance Coverage

Interstate and Westchester raise concerns that the Disclosure Statement does not adequately explain that confirmation of the Joint Plan, for various reasons, may vitiate their obligation to provide insurance coverage.[33] The Committee does not oppose adding reasonable language to the Disclosure Statement stating that, during post-confirmation litigation with Non-Settling Insurers,

---

[31] *See* LMI Objection at p. 3, 26-27.
[32] *See* Travelers Objection at ¶¶ 2, 20.
[33] *See* Interstate Objection at ¶ 60; Westchester Objection at p. 13-14.

CORE/3520516.0002/187159774.1

the Non-Settling Insurers may assert that they are no longer obligated to provide coverage for Abuse Claims because various Joint Plan provisions vitiate their coverage obligations.

**h.   Executory Nature of Insurance Policies**

LMI argues the Disclosure Statement is inadequate because it does not explain that LMI's insurance policies are executory contracts that must be assumed before they can be assigned.[34] However, as LMI is aware, LMI's argument that its policies are executory contracts that must be assumed has been previously rejected. *See In re Diocese of Camden, New Jersey*, 653 B.R. 309, 351 (Bankr. D.N.J. 2023) ("*Camden*") (citations omitted) ("the Policies in this case are not executory. The 'obligations' [of the duty to defend and to pay SIRs] discussed by the Insurers do not render the Policies executory."). The presence of self-insured retentions ("SIRs") and the duty to defend do not make the Insurance Policies executory contracts under 11 U.S.C § 365. *Id.* Further, even if LMI's policies are executory contracts—which they are not—there is adequate assurance of future performance because the Trust will be funded and is obligated to pay the Debtor or Participating Parties defense costs and SIRs, if any are required.[35] Importantly, though, New York courts have held that N.Y. Ins. Law § 3420(a)(1) supersedes the requirement that an insured pay its SIRs. *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 281 (E.D.N.Y. 2009) ("the failure of a bankrupt [insured] to fund a self-insured retention does not relieve the insurer of the obligation to pay claims under the policy"); *Rollo v. Servico New York, Inc.*, 914 N.Y.S.2d 811, 813–14 (N.Y.A.D. 4th 2010) (insurer must pay damages for injuries or losses covered under the policy exceeding defendants' SIR obligation). LMI, itself, has recognized this in pleadings filed

---

[34] *See* LMI Objection at p. 3, 21-24.
[35] Disclosure Statement at Art. IX.J.

in other diocesan bankruptcy cases, stating "[t]he LMI Policies include SIRs, but as discussed

*supra,* LMI cannot require an insolvent debtor to pay its SIRs."[36]

To address LMI's purported concern, however, the Committee is agreeable to inserting the

following language in the Disclosure Statement:

> LMI contend that the LMI Policies are executory, that the Debtor
> must assume the LMI Policies, and that the Trust must provide
> adequate assurance of future performance of the Debtor's
> obligations under the LMI Policies before any interest under the
> LMI Policies can be assigned to the Trust. Because the Plan does
> not provide for such assumption and assignment of the LMI
> Policies, LMI further contend that the Plan cannot be confirmed.
> The Plan Proponents disagree that the LMI Policies are executory
> contracts that must be assumed. The Plan Proponents disagree that
> the policies are being assumed and assigned to the Trust. To the
> extent the LMI Policies are executory and must be assumed, the Plan
> Proponents believe the Joint Plan provides adequate assurance of the
> Reorganized Debtor's and/or the Trust's future performance under
> the LMI Policies and that the Joint Plan can be confirmed.

### i. Readability

The UST argues that the Disclosure Statement is not written in "plain English" and

references separate documents, making it difficult to understand.[37] LMI makes a similar argument,

indicating specifically that the Disclosure Statement should clarify the difference between a

Distribution Claimant and a Litigation Claimant and "how Abuse Claims will be determined."[38]

The Committee believes the Disclosure Statement is written in plain English, and can be

comprehended by survivors, the vast majority of whom are represented by competent legal

counsel. While the Committee recognizes the Disclosure Statement describes the resolution of a

complex case with intricate issues in detailed language, it believes that whittling sections of the

---

[36] *See* Reply in Support of LMI's Motion to Withdraw the Reference, *The Roman Catholic Diocese of Rockville Centre, New York v. Certain Underwriters at Lloyds, London & Certain London Market Companies,* Case No. 21-cv-00071 (S.D.N.Y.), Dkt. No. 32 at 4.
[37] *See* UST Objection at p. 27.
[38] *See* LMI Objection at p. 3, 28-29.

CORE/3520516.0002/187159774.1

Disclosure Statement down to bare bones summaries would be a disservice to survivors, may cause further confusion or promote grounds for non-interested parties to interfere, and would result in further delay. The Committee believes that parties objecting on this point are doing so out of their self-interest to delay confirmation, as opposed to a legitimate concern for survivors. To the extent a survivor deems it necessary, and as the Disclosure Statement already specifically advises,[39] they can consult with counsel to evaluate the Disclosure Statement and Joint Plan. Notwithstanding the Committee's position, to the extent *the Court* believes the Disclosure Statement should be revised to make specific provisions more digestible, the Committee would not oppose reasonable revisions that could be incorporated within an expeditious timeframe.

### j.  Mother Cabrini

Westchester claims the Disclosure Statement is deficient because it doesn't provide information regarding the impact of the Joint Plan on claimants' potential claims related to Mother Cabrini.[40] Westchester purports to advocate for creditors in asserting that information regarding the impact of the Joint Plan on creditors' rights with respect to Mother Cabrini must be included in the Disclosure Statement.[41] Westchester does not have standing to assert these arguments because they do not directly impact Westchester's rights and obligations, and Westchester has not explained otherwise.

Regardless, the Disclosure Statement discusses the transfer of Residual Assets to the Reorganized Debtor, which assets include certain claims and causes of action held by the Debtor.[42] The Disclosure Statement also discusses the effect on the discharge, injunction, and releases on

---

[39] Disclosure Statement at p. vi.
[40] *See* Westchester Objection at p. 15-16.
[41] *See id.*
[42] Disclosure Statement at Art. XII.A.1(e).

creditors for claims against the Debtor and other Protected Parties.[43] Finally, Mother Cabrini

Foundation is not a Protected Party receiving the benefit of a release or channeling injunction

under the Joint Plan, so there is no reason to detail the effect of the Joint Plan on creditor's potential

claim(s) against Mother Cabrini.

**k. Balloting Procedures and Related Notice**

The UST raises two concerns regarding the Disclosure Statement's inclusion of

information relating to solicitation, balloting, and notice thereof.

First, the UST argues the Disclosure Statement does not include a proposed ballot or

sufficient explanation of the balloting and voting procedures for voting classes and non-voting

classes, indicating that the Ballot and Notice of Non-Voting Status were attached as exhibits to the

Motion filed more than a month after the Disclosure Statement was filed.[44] The purpose of a

disclosure statement is to provide information so that creditors can make an informed decision

when voting on a plan of reorganization. *See* 11 U.S.C. § 1125(a)(1). 11 U.S.C. § 1125(a)(1) does

not require disclosure of the solicitation procedures. In any case, while the proposed solicitation

procedures are not included in the Joint Plan or the Disclosure Statement, those procedures are

detailed in the Motion. The Motion describes the solicitation procedures, includes relevant

attachments, and the Motion was provided to creditors timely. It is not necessary to provide a

reiteration of the solicitation procedures in the Disclosure Statement for creditors to make an

informed decision regarding the Joint Plan. *See* 11 U.S.C. § 1125(a)(1).

Second, the UST argues the Debtor did not provide sufficient notice of hearing to consider

approval of the Disclosure Statement because information contained in Exhibits to the Motion

(Ballots, Confirmation Hearing Notice, Publication Notice, Notice of Non-Voting Status, each as

---

[43] *Id.* at Art. XII.
[44] *See* UST Objection at ¶¶ 12-13.

CORE/3520516.0002/187159774.1

defined the Motion) was not also included in Disclosure Statement.[45] The UST does not, however, specify which information contained in the solicitation forms should have been included in the Disclosure Statement.[46] Further, contrary to the UST's assertion, the solicitation forms merely reiterate material terms already included in the Disclosure Statement or Joint Plan.

The Committee believes both of the foregoing objections should be overruled.

**l.    Success of Confirmation Objections**

Finally, Interstate and Travelers argue that the Disclosure Statement does not inform Abuse Claimants that successful confirmation objections lodged by the Insurers could have one or more of the following consequences:

- Insurers' contractual rights and coverage defenses may be preserved;

- Different Trust fiduciaries may be appointed;

- The distribution process could be altered such that Insurers could object to claims and take discovery;

- Survivors may be required to prove their claims are legally enforceable;

- Invalid claims may be forbidden from receiving a distribution; or

- The Court may not enter a good faith finding related to the liquidation or settlement of Abuse Claims under the Joint Plan or Allocation Protocol.[47]

While the Committee disputes the possibility that certain of these outcomes are legally required or could actually occur without Committee or survivor support, the Committee is not opposed to including language in the Disclosure Statement indicating plan objections from Non-

---

[45] *See* UST Objection at p. 25-26.
[46] *See id.*
[47] *See* Interstate Objection at ¶ 60; Travelers Objection at ¶ 2.

CORE/3520516.0002/187159774.1

Settling Insurers are anticipated and that the outcomes of such objections may necessitate changes to the Joint Plan.

### III.    THE JOINT PLAN IS NOT PATENTLY UNCONFIRMABLE

Many of the objections prematurely and improperly raise issues that should be addressed in connection with confirmation of the Joint Plan. These objections are made under the guise that the Joint Plan cannot be confirmed and that the Disclosure Statement cannot be approved as a result. However, "[a]t disclosure statement hearings, courts should refuse to hear issues that are confirmation rather than disclosure issues, such as classification of claims, feasibility, whether the plan has been proposed in good faith, or whether a plan is fair and equitable." 7 COLLIER ON BANKRUPTCY ¶ 1125.03 (16th ed. 2023). In limited circumstances, courts "may address the issue of plan confirmation where it is obvious at the disclosure statement stage that . . . the plan" is "patently unconfirmable," *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). "A plan is patently unconfirmable where (1) confirmation defects [cannot] be overcome by creditor voting results; and (2) those defects concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing." *Id* at 154-55 (internal citations and quotations omitted). Importantly, "care must be taken to ensure that the hearing on the disclosure statement does not turn into a confirmation hearing." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988).

None of the identified, anticipated objections to the Joint Plan deem the Joint Plan "patently unconfirmable." Below, the Committee identifies and briefly addresses each of the identified, anticipated objections to the Joint Plan. The Committee respectfully submits that evaluation of each of the following issues should be deferred until the confirmation stage.

### a.    Third-Party Releases Are Permitted

The UST Objection argues that the Joint Plan cannot be confirmed because it contains non-consensual third-party releases, in the form of the Joint Plan's release provision, the Channeling Injunction, and the exculpation clause.[48] However, as it stands, nonconsensual third-party releases are permitted in the Second Circuit and the Court can approve the Joint Plan. *See Purdue*. Further, exculpation clauses similar to the one in the Joint Plan are regularly approved. *See In re Aegean Marine Petrol. Network Inc.*, 599 B.R. 717, 721 (Bankr. S.D.N.Y. 2019) (noting that "a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions"); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (exculpation provisions ensure "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation."); *see also In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *50 (Bankr. S.D.N.Y. June 18, 2022) (approving an exculpation provision including non-estate fiduciaries).[49]  The scope of these releases, the scope of the parties being released, and whether such releases can be approved without consent are all issues that should be considered at confirmation. The possibility of such issues being addressed at confirmation, however, does not deem the Joint Plan patently unconfirmable.

**b.  The Joint Plan is Proposed in Good Faith**

Various parties assert that the Joint Plan cannot be confirmed because it was not proposed in good faith, as is required by 11 U.S.C. § 1129(a)(3).

**1.  The Debtor Has Not Prioritized Non-Debtors Over Payment to Survivors**

---

[48] *See* UST Objection at p. 13-24.

[49] The Committee does not oppose revisions to the exculpation provision that make clear Exculpated Parties are only exculpated for conduct occurring from the Petition Date through the Effective Date.

The UST argues that the Debtor is prioritizing the protections of non-debtors over its obligation to pay survivors.[50] The UST does not detail, however, how this argument requires a conclusion that the Debtor has failed to act in good faith.[51] And, while the Committee genuinely appreciates the UST's focus on ensuring fair compensation for survivors, the Committee also believes the Debtor, and other Participating Parties under the Joint Plan, have acted in good faith in agreeing to fund the Trust in exchange for protections from Abuse Claims post-petition. The global resolution proposed by the Joint Plan was a primary goal of this case and took years to negotiate. The Committee could not (and would not) have reached a settlement with the Debtor without concluding that the Debtor and its affiliates were acting in good faith.

### 2.   The Plan Proponents' Request for a Good Faith Finding Does Not Prevent Confirmation of the Joint Plan

Interstate and Travelers argue the Joint Plan is patently unconfirmable because it seeks a finding that the Allocation Protocol was proposed in good faith.[52] While neither insurer has standing on this issue because they cannot demonstrate how the Allocation Protocol impacts them, the argument is supported by analogy to cases (*BSA* and *Camden*, as defined herein) where distribution procedure determinations *did* impact insurers in post-confirmation litigation.[53] Unlike plans proposed in similar bankruptcy cases where trust distribution procedures contained mechanisms binding non-settling insurers to claim reviewer valuation determinations, the Allocation Protocol here has no impact in post-confirmation litigation against the Non-Settling Insurers. Instead, it simply sets forth how the monetary value of Trust distributions will be determined by the Survivor Claims Reviewer and the Trustee. In any event, the requested finding

---

[50] *See* UST Objection at p. 24.
[51] *See id.*
[52] *See* Interstate Objection at p. 2, ¶¶ 17(d), 26-28; Travelers Objection at ¶¶ 2, 15.
[53] *See* Interstate Objection at ¶ 27.

that the Allocation Protocol was proposed in good faith does not prohibit confirmation of the Joint

Plan. Further, if the proposed finding actually presents an impediment to confirmation of the Joint

Plan, the Court has the option of simply declining to include the finding in its confirmation order.

### 3.   The Allocation Protocol is Proposed in Good Faith

Interstate and Travelers further argue that the Joint Plan was not proposed in good faith

because the Allocation Protocol is inconsistent with Bankruptcy Code provisions related to the

payment of claims.[54] Specifically, Interstate and Travelers argue, purportedly on behalf of

survivors, that the Allocation Protocol is improper because it (i) vests sole authority in the Survivor

Claims Reviewer to determine whether survivor claims are allowed for purposes of distribution;

(ii) allows for the payment of invalid claims, shielded from judicial review; (iii) contains

evaluation factors that do not properly address the merits of survivor claims; and (iv) skews

distribution amounts.

Interstate's and Travelers' arguments relating to the Allocation Protocol are misguided,

misinformed, and unsupported by relevant authority. The Allocation Protocol's mechanisms for

the allowance of claims and determining Trust distributions is substantially similar to mechanisms

approved in numerous Diocesan bankruptcy cases. *See*, *e.g.*, *In re Diocese of Winona-Rochester*,

Bankr. D. Minn. Case No. 18-33707, Dkt. No. 398 (the "Winona Plan") at Exhibit 2, § 3.1

(indicating that survivor claim shall be allowed by the survivor claims reviewer if the claim is

proved by the preponderance of the evidence), and § 3.4 (providing the survivor claims reviewer

final authority to score claims for purposes of calculating distributions to survivors); Article IV

(detailing evaluation factors); *see also* Dkt. No. 405 (order confirming Winona Plan).[55] Further,

---

[54] *See* Interstate Objection at ¶¶ 45-51; Travelers Objection at ¶¶ 3, 15.

[55] The plan confirmed in the Diocese of Winona-Rochester case is particularly relevant given that it was approved notwithstanding the fact that there were non-settling insurers. Notably, Interstate was a *settling insurer* in the Diocese of Winona-Rochester case and supported the plan confirmed in the case.

the proposed Survivor Claims Reviewer, Mr. Kramer, who would be responsible for assigning points to survivor claims pursuant to the Allocation Protocol, likely has more experience than any other individual in evaluating survivor claims. Mr. Kramer has reviewed over 2,200 survivor claims while serving in the role of survivor claims reviewer in eight prior diocesan bankruptcy cases. Mr. Kramer is more than qualified to evaluate the veracity of survivor claims in this case and weigh them relative to the proposed evaluation factors. Moreover, contrary to Interstate's and Traveler's assertions that holders of invalid claims will be entitled to Trust distributions, the Survivor Claims Reviewer is permitted to allow Abuse Claims for purposes of distribution only if he first determines the claim was proved by a preponderance of the evidence.[56] Finally, the evaluation factors included in the Allocation Protocol were specifically developed by the Committee—composed of a dedicated group of survivors of abuse advocating for other survivors—who engaged in a painstaking review of factors they thought worthy of the Survivor Claims Reviewer's consideration. Interstate's and Traveler's suggestion that their judgment should be substituted for the judgment of the Committee regarding the validity of such factors is offensive and nonsensical, particularly given that the Allocation Protocol's factors have no impact on the rights of Insurers whatsoever.

At best, in raising these objections, Interstate and Travelers are misguidedly importing arguments from other cases with respect to the relationship between distribution determinations and post-confirmation litigation against Non-Settling Insurers. At worst, Interstate and Travelers are intentionally conflating issues relevant in other cases to stoke confusion among survivors and artificially manufacture bases to undermine progress toward confirmation of the Joint Plan.

---

[56] *See* Allocation Protocol at 3.1. The Allocation Protocol is attached to the plan supplement filed at Dkt. No. 1604.

CORE/3520516.0002/187159774.1

Regardless of their motivations, these objections do not prohibit the Joint Plan from being confirmed or the Disclosure Statement from being approved.

### 4.    The Trust Fiduciaries Were Proposed in Good Faith

Interstate further contends that the Joint Plan was not proposed in good faith because the Committee's selection of the Survivor Claims Reviewer and the Trustee may result in unwarranted valuations for survivor claims.[57] Interstate's argument that the Trustee and the Survivor Claims Reviewer are "inherently conflicted" because they have served in similar roles in other diocesan bankruptcy cases, or because they have a connection to professionals in this case, is illogical. The Trustee's and the Survivor Claims Reviewer's previous experience as survivor trust fiduciaries is precisely what qualifies them to perform the same functions in this case.

Interstate argues that the Trustee and the Survivor Claims Reviewer are conflicted because they have the "means, motive, and opportunity to pursue overgenerous or otherwise unwarranted valuations of Abuse Claims."[58] Neither the Trustee nor the Survivor Claims Reviewer "values" claims under the Joint Plan or Allocation Protocol. The Survivor Claims Reviewer assigns a point score to survivor claims pursuant to the Allocation Protocol and the Trustee calculates the distribution amount each survivor is entitled to receive, based on the point value allocated to his or her claim, from the Trust assets available for distribution. Neither professional is financially incentivized by the distribution amounts determined, which, as previously noted, are ***not*** binding on the Insurers.

Further, the irony of a Non-Settling Insurer asserting it should have a say in the selection of the Trustee charged with pursuing recoveries against Non-Settling Insurers should not be lost on the Court. Interstate's objection on this point is reckless, speculative, and mischaracterizes the

---

[57] *See* Interstate Objection at p. ¶¶ 52-56.
[58] *See id.* at p. ¶ 56.

CORE/3520516.0002/187159774.1

roles that the Survivor Claims Reviewer and Trustee will perform if the Joint Plan is confirmed.
This objection should be overruled.

### c. The Insurance Claims Assignment Does Not Prohibit Confirmation of the Joint Plan

The Insurers each argue that issues stemming from the Insurance Claims Assignment render the plan patently unconfirmable. These objections either misread the Joint Plan, misstate applicable authority, or both. Each such objection, and the Committee's response, is detailed below.

### 1. The Insurance Claims Assignment is Not Ambiguous and Can Be Approved

Interstate and Travelers argue that the Insurance Claims Assignment is improper pursuant to section 363 or Section 365 of the Bankruptcy Code because it splits the benefits of the insurance policy contracts from their burdens.[59] Interstate and Travelers appear to suffer from the same misunderstanding as LMI that the Insurance Claims Assignment effectuates an assignment of the insurance policies themselves from the Debtor or Participating Parties to the Trust.[60] It thus bears repeating: **the Insurance Claims Assignment transfers the Debtor's and Participating Parties' Insurance Claims against Non-Settling Insurers to the Trust; it does not assign the Non-Settling Insurer Policies to the Trust.**[61]

An assignment of proceeds under insurances policies like the one included in the Insurance Claims Assignment is permissible under the Bankruptcy Code. *See In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 668 (Bankr. D. Del. 2022), supplemented, No. 20-10343 (LSS), 2022 WL 20541782 (Bankr. D. Del. Sept. 8, 2022), aff'd, 650 B.R. 87 (D. Del. 2023)

---

[59] *See* Interstate Objection at p. 2, ¶¶ 20-22; Travelers Objection at ¶ 15.
[60] As described above, LMI likewise confuses the operation of the Insurance Claims Assignment. *See, e.g.,* LMI Objection p. 24-25.
[61] Joint Plan at § 8.2.4.a.

CORE/3520516.0002/187159774.1

("*BSA*") ("Under the Bankruptcy Code, if a contract is not executory, a debtor may assign, delegate, or transfer rights *and/*or obligations under section 363 of the Bankruptcy Code, provided that the criteria of that section are satisfied . . . [Under Section 363], Debtors can transfer their property rights consistent with applicable state law."); *see also In re Boy Scouts of Am. & Delaware BSA, LLC* 650 B.R. 87, 144 (D. Del. 2023) (reasoning that "Debtors routinely assign their insurance policy interests to a settlement trust" and collecting relevant cases).  Separately, under New York law, courts routinely uphold transfers of insurance rights, although not the policies themselves, when the covered loss occurred prior to the assignment, as is the case here for holders of Abuse Claims. *See*, *e.g.*, *Globecon Grp., LLC v Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006) (citations omitted) ("[a]s a general matter, New York follows the majority rule that a [no-transfer provision in an insurance contract] is valid with respect to transfers that were made prior to, but not after, the insured-against loss has occurred"); *SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props.*, LLC, 375 F. Supp. 2d 238, 245-46 (S.D.N.Y. 2005) ("Under [no-transfer] provisions, any unauthorized assignment of a property insurance policy before a loss occurs is invalid. After a loss occurs, however, a party to an insurance contract may assign its right to accrued insurance proceeds to another party, even in the face of express policy language prohibiting assignments.").[62]

---

[62] *See also Kittner v. E. Mut. Ins. Co.,* 80 A.D.3d 843, 846 n.3 (2011) ("Contrary to defendant's argument, while the insurance policy contains a provision that the '[a]ssignment of this policy is not valid without [defendant's] written consent,' this anti-assignment provision applies only to assignments before loss.") (internal citations omitted) *Arrowood Indem. Co. v. Atl. Mut. Ins. Co.,* 96 A.D.3d 693, 694 (2012) ("New York generally follows the majority rule that a no-transfer provision in an insurance contract is 'valid with respect to transfers that were made prior to, but not after, the insured-against loss' . . . . this principle is based on a judgment that while 'insurers have a legitimate interest in protecting themselves against additional liabilities [that they] did not contract to cover, once the insured-against loss has occurred, there is no issue of an insurer having to insure against additional risk and, 'in that circumstance, the only question is who the insurer will pay for the loss[.]'") (internal citation omitted); *Viking Pump, Inc. v. Century Indem.* Co., 2 A.3d 76, 103 (Del. Ch. 2009) (applying New York law) ("New York law generally does not permit anti-assignment clauses to be erected as a barrier to the transfer of 'post-loss claims,' that is to say claims for losses that have already happened.") (internal citations omitted).

Here, the occurrences giving rise to the Abuse Claims indisputably occurred prior to the requested Insurance Claims Assignment under the Joint Plan. Thus, the accrual of the Insurance Claims with respect to Abuse Claims has already occurred, and has effectively "extinguishe[d] the insurer's interest in the risk profile of the insured, thereby converting the claim into, in effect, a chose in action." *Globecon*, 434 F.3d at 171. Thus, under settled New York law, the anti-assignment provisions in the Insurance Policies do not bar the Insurance Claims Assignment.

Interstate and Travelers do not cite any authority to the contrary. As such, this objection should be overruled.

### 2. The Insurers Are Permitted to Assert Defenses to Coverage Under Their Policies Post-Petition

Certain of the Insurers raise objections that the Joint Plan strips them of their right to assert certain coverage defenses.[63] They argue that, because the Joint Plan prohibits them from asserting coverage defenses arising from the Insurance Claims Assignment or otherwise arising during the bankruptcy case, the plan is not insurance neutral.[64] The Insurers also argue the Plan Proponents' agreement to seek a finding regarding the validity of the Insurance Claims Assignment is improper and will impair their ability to assert coverage defenses under their policies in the future.[65]

As a threshold matter, the Insurers' objections misconstrue the nature of their rights under the insurance policies. As discussed above, under both bankruptcy and New York law, the Insurance Claims Assignment is valid and it does not compromise any contractual rights of the insurers. The Insurers also take issue with the language in § 8.7.1.h of the Joint Plan that would insulate the conduct of the debtor during the bankruptcy proceedings from collateral attacks by the

---

[63] *See* Interstate Objection at ¶¶ 18, 30-39, 42-44; Travelers Objection at ¶ 2; Westchester Objection at p. 6-10.
[64] *See id.*
[65] *See* Interstate Objection at ¶ 18; Travelers Objection at ¶ 2; Westchester Objection at p. 8.

CORE/3520516.0002/187159774.1

Insurers in subsequent coverage disputes.[66] But the test of insurance neutrality is whether or not the Insurers maintain their pre-petition rights and obligations. *See, e.g., In re Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 420-21 (Bankr. D. Md. 2007). It is entirely appropriate for the Joint Plan to seek an order insulating the debtor's conduct during bankruptcy from collateral attack by insurers in subsequent coverage actions because the Insurers have failed to identify any contractual rights obligating debtor-policyholders to effectuate a bankruptcy process comporting with the Insurers' preferences. The Insurers have failed to do so because there is no such language in the policies at issue. *See, e.g., In re Kaiser Gypsum Co., Inc.*, 60 F.4th at 84-86 (4th Cir. 2023) ("Truck hasn't cited a single decision by *any* court holding that [a general liability insurance] policy's cooperation provision encompassed an insured's conduct in proposing a reorganization plan in a bankruptcy proceeding.") (emphasis in original); *see also Admiral Ins. Co. v. Grace Inds., Inc.*, 409 B.R. 275, 283-84 (E.D.N.Y. 2009).

This result is entirely consistent with both bankruptcy and New York law, which both preclude the Insurers from receiving a windfall upon the discharge of their policyholder's liability in the context of a bankruptcy. Under N.Y. Ins. Law §§ 3420(a)(1) and 3103(a), every policy or contract insuring against liability for injury to persons must contain (or is effectively read to contain):

> A provision that the insolvency or bankruptcy of the person insured, or the insolvency of the insured's estate, shall not release the insurer from the payment of damages for injury sustained or loss occasioned during the life of and within the coverage of such policy or contract.

Similarly, the Bankruptcy Code makes clear that the debtor's discharge with respect to a tort claim does not affect the liability of its insurers with respect to those tort claims. *See* 11 U.S.C.

---

[66] *See* Interstate Objection at ¶¶ 18, 30-39, 42-44; Travelers Objection at ¶ 2; Westchester Objection at p. 6-10.

§ 524(e). As a result, the coverage defenses actually held by the Insurers under the Policies are wholly preserved under the plain language of the Joint Plan.

Separately, a finding that a Joint Plan provision may not be insurance neutral does not render the Joint Plan unconfirmable at all, let alone patently unconfirmable (as would be required to deny approval of the Disclosure Statement). *See, e.g., In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B.R. 87, 189-90 (D. Del. 2023) ("There is no confirmation requirement that a chapter 11 plan be 'insurance neutral.'"). Disputes regarding the impact of the Insurance Claims Assignment on post-confirmation litigation and the related findings the Court may make should be reserved for confirmation, but have been approved in the past. *See* Winona Plan at Art. 8.1.a. Irrespective of these issues, the Insurers have not demonstrated how the mere existence of these provisions in the Joint Plan renders the Joint Plan patently unconfirmable such that the Disclosure Statement cannot be approved.

### 3. The Insurance Neutrality Clause Is Accurate.

Interstate and Travelers suggest the insurance neutrality clause is inconsistent because it does not preserve Non-Settling Insurers' rights and defenses with respect to the Trust, but the Trust's rights and defenses with respect to the Non-Settling Insurers are preserved.[67] These concerns are misplaced. The Non-Settling Insurers do not have any rights or defenses under the Non-Settling Insurer Policies against the Trust because the insurance policies are not being transferred to the Trust. To the extent the Trust asserts Insurance Claims against the Non-Settling Insurers, the Non-Settling Insurers remain free to assert the rights and defenses they have under their Non-Settling Insurer Policies with the Diocese or Participating Parties (as applicable) in such litigation. This objection should be overruled.

---

[67] *See* Interstate Objection at ¶ 18; Travelers Objection at ¶ 4, referencing Joint Plan § 8.7.2.

CORE/3520516.0002/187159774.1

### 4. The Transfer of Non-Debtor Property Does Not Violate the Bankruptcy Code

Each of the Insurers argues that the Bankruptcy Court does not have jurisdiction to transfer the non-Debtor Participating Parties' interests in the Non-Settling Insurance Policies (*i.e.* their Insurance Claims against the Non-Settling Insurers) to the Trust, and thus the Joint Plan is patently unconfirmable.[68] These arguments have been rejected in recent cases. *Camden,* 653 B.R. at 352 (Bankr. D.N.J. 2023) (though agreeing that the court lacked jurisdiction to order or approve the transfer of non-debtor entities' interests in the relevant insurance policies, the court ultimately concluded that the that plan provisions transferring non-debtor property "do not violate the Bankruptcy Code, and therefore do not make the Plan unconfirmable[.]"); *see also BSA*, 642 B.R. at 670 (the legality of a transfer of non-debtor property is a matter of state law, which "the parties are free to raise . . . before a state court at the appropriate juncture.") Put simply, the transfer of Participating Parties' Insurance Claims does not violate the Bankruptcy Code, preclude confirmation of the Joint Plan, or prevent the Disclosure Statement from being approved.

### 5. The Debtor and Participating Parties Remain Obligated Under the Non-Settling Insurance Policies

The Insurers further object by raising questions regarding who will perform the insureds' obligations under the Non-Settling Insurer policies. Interstate questions who will pay self-insured retentions under the Interstate policies.[69] LMI questions who will comply with the LMI policies' purported requirement to use a service organization.[70] Questions are also raised about who will perform other conditions precedent to coverage under the Non-Settling Insurer Policies.[71] The

---

[68] *See* LMI Objection at p. 3, 18-19, Interstate Objection at ¶ 23-25, Travelers Objection at ¶¶ 2, 15, Westchester Objection at p. 4-5.
[69] *See* Interstate Objection at ¶ 42.
[70] *See* LMI Objection at p. 6-7, 15, 17, 26-27.
[71] *See id.*

CORE/3520516.0002/187159774.1

answer to all of these questions is simple and made explicit in the Joint Plan—the Debtor or the Participating Parties, who are reimbursed by the Trust. Again: **the Insurance Claims Transfer does not require the Trust to assume the Debtor or Participating Parties' obligations under the Non-Settling Insurance Policies because the Non-Settling Insurer Polices are not being assigned to the Trust.**[72]

To the extent further clarity is needed regarding who is obligated to fund SIRs under Non-Settling Insurer Policies, if any such payments are actually necessary, the Joint Plan specifically provides that the Trust will be responsible for the DOS Entities' Post Effective Date Costs, which would include the DOS Entities' responsibility to pay self-insured retentions, if any.[73] In addition, as noted earlier in this Reply, New York courts hold that N.Y. Ins. Law § 3420(a)(1) supersedes the requirement that an insured pay its SIRs. *Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 281 (E.D.N.Y. 2009) ("the failure of a bankrupt [insured] to fund a self-insured retention does not relieve the insurer of the obligation to pay claims under the policy"); *Rollo v. Servico New York, Inc.*, 914 N.Y.S.2d 811, 813–14 (N.Y.A.D. 4th 2010) (insurer must pay damages for injuries or losses covered under the policy exceeding defendants' SIR obligation).

If the Insurers believe they are not obligated to provide coverage because their contractual rights were violated, the Insurers will have every opportunity to assert those arguments during post-confirmation litigation. The fact that there are obligations under the Non-Settling Insurer Policies, however, does not prohibit approval of the Joint Plan or Disclosure Statement.

### 6. The Savings Clause Can Be Approved

Westchester argues the Bankruptcy Court cannot force the Participating Parties to assert Insurance Claims against Non-Settling Insurers in the event the Insurance Claims Assignment is

---

[72] Joint Plan at § 8.2.4.
[73] *Id.* at § 8.10.

CORE/3520516.0002/187159774.1

not approved because doing so would have the effect of improperly converting non-estate assets into estate assets.[74] Westchester is describing the Joint Plan's "savings clause," which provides for the Trust to recover from the Non-Settling Insurers via the Debtor or Participating Parties directly litigating coverage issues against Non-Settling Insurers in the event the Insurance Claims Assignment is not approved. Importantly, however, the Participating Parties are Plan Proponents. The cases cited by Westchester are thus easily distinguishable because they all involve the attempted *non-consensual* impairment of non-debtor rights under debtor insurance policies—a completely different scenario than the present case. And, as Westchester knows,[75] savings clauses have been approved in similar cases.[76] *See BSA*, 642 B.R. at 670 ("I see no issue with the 'savings clause . . . The savings clause merely reflects the agreement struck with the non-debtor parties who have agreed to contribute their insurance rights to the Settlement Trust either through an outright assignment (if possible) or through the cooperation mechanism in the savings clause."); *see also* Winona Plan at Art. 6.7 (b). Westchester does not explain how the savings clause has "the effect of improperly converting non-estate assets into estate assets" or otherwise identify a Bankruptcy Code provision that it contends is violated by this plan provision.[77] Westchester's objection on this point should be overruled.

### d. The Joint Plan Provides for the Payment of Chapter 11 Fees

The UST asserts that the Joint Plan cannot be confirmed because it does not properly provide for the payment of Chapter 11 Fees.[78] Among other things, the UST indicates that such fees must be paid by the Effective Date and the Debtor must pay fees related to disbursements to

---

[74] Westchester Objection at p. 5.
[75] Counsel for Westchester, Mr. Schiavoni, was significantly involved in the Boy Scouts of America bankruptcy case, representing Century Indemnity Company (a Chubb subsidiary), a plan proponent that agreed to resolve their liability to Boy Scouts survivors for $800 million.
[76] Joint Plan at § 8.2.4.b.
[77] Westchester Objection at p. 5.
[78] *See* UST Objection at p. 27-28.

the Trust. Relatedly, the UST argues that such fees should not be included in the Joint Plan's

definition of the term "Administrative Claim."

The Joint Plan provides for the payment of Chapter 11 fees at section 2.1.5. To the extent

this provision, or the administrative claim definition, render the plan in violation of 11 U.S.C. §

1129(a)(12), the Committee supports appropriate revisions. The necessity of potential fine-tuning

of the Joint Plan to conform with the Bankruptcy Code does not, however, warrant a determination

that the Joint Plan is patently unconfirmable such that the Disclosure Statement should not be

approved.

## IV.    THE SOLICITATION PROCEDURES ARE PROPER

The UST raises three objections to the solicitation procedures proposed in the Motion. The

Committee's position with respect to each is stated below.

First, the UST argues the Debtor should have to provide the entirety of the Solicitation

Packages (as defined in the Motion) to all Abuse Claimants.[79] The Committee understands and

supports the Debtor's proposal to provide the entirety of the Solicitation Package only once to

attorneys representing more than one Abuse Claimant, provided that a ballot is sent for each Abuse

Claimant. The proposal saves estate resources and promotes efficiency in the distribution of the

Solicitation Packages. The Debtor's proposal preserves estate resources and promotes efficiency

in the distribution of the Solicitation Packages. Based on experiences in prior cases, the Committee

is confident that attorneys representing more than one Abuse Claimant will be capable of

distributing the Solicitation Package materials amongst their clients as necessary. Further, the

Committee notes that the Debtor, via its claims administrator Stretto, has set up an e-balloting

---

[79] Motion at ¶ 33.

system, obviating the need for paper ballots, and has committed to provide paper ballots upon request.

Second, the UST points out that creditors in Non-Voting Classes will not receive a complete copy of the Solicitation Package, despite the fact that such creditors are impaired because they do not receive notice of integral provisions that should have been disclosed with the Disclosure Statement.[80] The Committee does not object to the Debtor's proposal to refrain from providing a complete copy of the Solicitation Package to creditors in Non-Voting Classes, given that such creditors are unimpaired under the Joint Plan. These creditors will receive the Confirmation Notice and the Notice of Non-Voting Status, and will have the opportunity to review confirmation-related filings to the extent they so choose. It is unclear what Joint Plan provisions the UST believes these creditors will not receive sufficient notice of, as they are not identified in the UST Objection. To the extent they relate to the UST's third-party release objections, the Committee submits that the Disclosure Statement contains adequate notice regarding the Joint Plan's release provisions, and that creditors in Non-Voting Classes were provided sufficient notice of the Disclosure Statement.[81]

Third, the UST argues that the ballots should contain reference to the no recourse and indemnification provisions in favor of the Trustee (in his personal capacity) for future conduct.[82] While the Committee believes the Disclosure Statement provides adequate notice regarding these provisions,[83] it does not oppose the addition of reference to these provisions in the ballots.

## CONCLUSION

---

[80] *Id.* at ¶¶ 24, 32, 44-47.
[81] *See id.* at ¶ 19, which lists the parties the Debtor served notice of the Disclosure Statement Hearing Order (as defined in the Motion) on the Notice Parties (as defined in the Motion), which includes "all persons or entities listed in the Diocese's schedules of assets and liabilities as holding liquidated, non-contingent, and undisputed Claims or who filed proofs of claim asserting Non-Abuse Claims[.]"
[82] *See* UST Objection at p. 23.
[83] *See* Disclosure Statement Art. IX.K and IX.L

CORE/3520516.0002/187159774.1

The Committee—perhaps more acutely than any other party—recognizes the importance of providing creditors with a Disclosure Statement that provides the information necessary to make an informed decision regarding the Joint Plan. The Committee likewise acknowledges the complexity associated with formalizing its resolution with parties who have, in good faith, settled with the Committee and the resulting, unavoidable intricacies of the Disclosure Statement and Joint Plan. While the Committee believes the Disclosure Statement can be approved as it stands, it thus supports the Court's careful, expeditious review of the Disclosure Statement and will not oppose appropriate revisions where needed. The Committee respectfully requests the Court adopt the proposed revisions to the Disclosure Statement identified herein, overrule all other objections, and approve the Disclosure Statement.

Respectfully submitted,

Date: February 2, 2024

/s/ Robert T. Kugler
Robert T. Kugler (MN # 194116)
Edwin H. Caldie (MN # 388930)
**Stinson LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Main: 612-335-1500
Facsimile: 612-335-1657
Email:     robert.kugler@stinson.com
            ed.caldie@stinson.com

*Counsel for the Official Committee of*
*Unsecured Creditors*

CORE/3520516.0002/187159774.1