**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

In re:

|  |  |
|---|---|
| The Roman Catholic Diocese of Syracuse, New York, | Case No. 20-30663 (WAK) |
| | Chapter 11 Case |
| Debtor. | |

**DISCLOSURE STATEMENT IN SUPPORT OF THIRD AMENDED**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE**
**ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK**

**DATED APRIL 16, 2024**

**BOND, SCHOENECK & KING, PLLC**
Stephen A. Donato, Bar Roll No. 101522
Charles J. Sullivan, Bar Roll No. 507717
Grayson T. Walter, Bar Roll No. 518237
Sara C. Temes, Bar Roll No. 514148
Office and Post Office Address:
One Lincoln Center
Syracuse, New York 13202-1355
Telephone: (315) 218-8000
Facsimile: (315) 218-8100
Email: donatos@bsk.com
        sullivc@bsk.com
        walterg@bsk.com
        stemes@bsk.com

*Counsel to The Roman Catholic*
*Diocese of Syracuse, New York*

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[1]**

THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK, THE DEBTOR AND DEBTOR IN POSSESSION IN THE ABOVE-CAPTIONED CHAPTER 11 CASE (THE "DIOCESE") AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (TOGETHER WITH THE DIOCESE, THE "PLAN PROPONENTS") JOINTLY SEEK CONFIRMATION OF THE THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK (THE "PLAN"). A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT A**.

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT"), THE PLAN, THE PLAN SUPPLEMENT, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS ARE BEING FURNISHED BY THE PLAN PROPONENTS, PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE IN CONNECTION WITH THE SOLICITATION BY THE PLAN PROPONENTS OF VOTES TO ACCEPT THE PLAN AS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THE PLAN PROVIDES FOR THE REORGANIZATION OF THE DIOCESE'S FINANCIAL AFFAIRS AND FOR DISTRIBUTIONS TO CREDITORS HOLDING ALLOWED CLAIMS FROM THE DIOCESE'S ASSETS, THE ASSETS OF PARISHES, SCHOOLS, AND OTHER CATHOLIC ORGANIZATIONS, THE CONTRIBUTIONS OF SETTLING INSURERS, AND FOR THE CLAIMS AGAINST NON-SETTLING INSURERS TO BE ASSIGNED TO THE TRUST. THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST THE DIOCESE ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, INCLUDING UNDER "*RISK FACTORS TO BE CONSIDERED*" IN ARTICLE XVIII.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST THE DIOCESE (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS DESCRIBED IN THE PLAN.

NO PERSON MAY GIVE ANY INFORMATION ON BEHALF OF THE PLAN PROPONENTS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN, OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE

---

[1] Capitalized terms not otherwise defined in this Disclosure Statement have the meanings and definitions assigned to such terms in the Plan.

17289563.12

STATEMENT, EXCEPT FOR THE COMMITTEE CONSISTENT WITH ITS OBLIGATIONS ARISING UNDER 11 U.S.C. § 1103(c)(3). ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREIN, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF IMPAIRED CLAIMS AGAINST THE DIOCESE TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN FILED CONTEMPORANEOUSLY HEREWITH, OTHER EXHIBITS ANNEXED HERETO, AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE BANKRUPTCY COURT PRIOR TO THE END OF THE SOLICITATION PERIOD FOR THE PLAN. NO MATERIALS OTHER THAN THE ACCOMPANYING MATERIALS ATTACHED HERETO OR REFERENCED HEREIN HAVE BEEN APPROVED BY THE BANKRUPTCY COURT OR THE PLAN PROPONENTS FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (I) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN REMAIN MATERIALLY ACCURATE, AND (II) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT, EXCEPT AS EXPRESSLY INDICATED IN THIS DISCLOSURE STATEMENT OR IN ANY EXHIBIT. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE PLAN PROPONENTS FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE PLAN PROPONENTS' KNOWLEDGE, INFORMATION, AND BELIEF. THE PLAN PROPONENTS' RESPECTIVE PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND ARE NOT RESPONSIBLE FOR ANY INACCURACIES THAT MAY BE CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION IS CORRECT AT ANY TIME SUBSEQUENT TO THIS DATE, AND THE PLAN PROPONENTS UNDERTAKE NO DUTY TO UPDATE THE INFORMATION.

PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DIOCESE SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED, AND SHOULD BE AWARE THAT ACTUAL DISTRIBUTIONS MAY VARY FROM THE ESTIMATES CONTAINED HEREIN.

17289563.12

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING OR REJECTING THE PLAN. NO REPRESENTATIONS ARE AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DIOCESE, THE DIOCESE'S BUSINESS OPERATIONS, THE VALUE OF THE DIOCESE'S ASSETS, OR THE VALUES OF ANY BENEFITS OFFERED PURSUANT TO THE PLAN, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT OR ANY OTHER DISCLOSURE STATEMENT OR OTHER DOCUMENT APPROVED FOR DISTRIBUTION BY THE BANKRUPTCY COURT. HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN THE PLAN AND OTHER PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSES OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DIOCESE OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DIOCESE, ANY PROTECTED PARTY, OR HOLDERS OF CLAIMS.

THIS DISCLOSURE STATEMENT IS FORWARD-LOOKING. FORWARD-LOOKING STATEMENTS ARE STATEMENTS OF EXPECTATIONS, BELIEFS, PLANS, OBJECTIVES, ASSUMPTIONS, PROJECTIONS, AND FUTURE EVENTS OF PERFORMANCE. AMONG OTHER THINGS, THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITH RESPECT TO ANTICIPATED FUTURE PERFORMANCE OF THE DIOCESE AND A TRUST TO BE CREATED FOR THE BENEFIT OF HOLDERS OF ABUSE CLAIMS, AS WELL AS ANTICIPATED FUTURE DETERMINATIONS OF CLAIMS AND DISTRIBUTIONS ON CLAIMS. THESE STATEMENTS, ESTIMATES, AND PROJECTIONS MAY OR MAY NOT PROVE TO BE CORRECT. ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE REFLECTED IN THESE FORWARD-LOOKING UNCERTAINTIES AND TO A WIDE

iv

VARIETY OF SIGNIFICANT BUSINESS, LEGAL, AND ECONOMIC RISKS, INCLUDING, AMONG OTHERS, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS UNDERTAKE NO OBLIGATION TO UPDATE ANY FORWARD-LOOKING STATEMENT. NEW FACTORS EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL FACTORS, NOR CAN THE IMPACT OF ALL FACTORS BE ASSESSED.

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH HOLDER SHOULD CONSULT WITH THEIR OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

**[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION OF A KIND AND IN SUFFICIENT DETAIL TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT WITH RESPECT TO VOTING TO ACCEPT OR REJECT THE PLAN.]**  HOWEVER, THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION OR DETERMINATION BY THE BANKRUPTCY COURT AS TO THE MERITS OF THE PLAN. EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN (INCLUDING ALL EXHIBITS AND SCHEDULES TO THE PLAN AND DISCLOSURE STATEMENT) IN THEIR ENTIRETY BEFORE VOTING.

TABLE OF CONTENTS

Page

**ARTICLE I INTRODUCTION** ...................................................................................... 1

    **A.**      Summary of the Plan ............................................................................. 2
    **B.**      Summary of Voting Procedures ............................................................ 4
    **C.**      Overview of Chapter 11 ....................................................................... 5
    **D.**      Summary of Classification of Claims ................................................... 7
    **E.**      Disclosure Statement Enclosures ......................................................... 8

**ARTICLE II THE DIOCESE AND ITS OPERATIONS** ............................................ 9

    **A.**      Prepetition Operations ......................................................................... 9
    **B.**      Need for Reorganization ..................................................................... 11

**ARTICLE III THE CHAPTER 11 CASE** ................................................................... 13

    **A.**      The Chapter 11 Filing ........................................................................ 13
    **B.**      Administration of the Case ................................................................. 14
    **C.**      Appointment of the Committee ........................................................... 14
    **D.**      Retention of Professionals ................................................................. 15
    **E.**      Schedules and Statement of Financial Affairs .................................... 16
    **F.**      Post-Petition Operations and Select Financial Information.................. 16
    **G.**      Bar Date, Abuse Claims, and Boy Scouts of America Claims ............ 19
    **H.**      Insurance Coverage Adversary Proceeding ........................................ 22
    **I.**      Stay of Litigation Against Parishes, Schools, and Other Catholic
          Organizations .................................................................................... 24
    **J.**      Appointment of Second Mediator....................................................... 25

**ARTICLE IV SUMMARY OF THE PLAN**................................................................ 26

    **A.**      Classification of Claims Generally ..................................................... 26
    **B.**      Creditor Recovery Under the Plan ...................................................... 27
    **C.**      Classification of Claims and Treatments ............................................ 27

**ARTICLE V ABUSE CLAIMS** ................................................................................. 33

    **A.**      Trust Liability for Abuse Claims. ....................................................... 33
    **B.**      Assessment of Abuse Claims.............................................................. 34
    **C.**      Treatment of Abuse Claims. ............................................................... 34
    **D.**      Legal Effect of Estimation of Claims and Distributions Under the
          Allocation Protocol ............................................................................ 36
    **E.**      Release and Discharge of Abuse Claims. ............................................ 37
    **F.**      Distributions to Abuse Claimants. ...................................................... 37
    **G.**      Dismissal of Pending Litigation.......................................................... 40
    **H.**      Claim Withdrawal .............................................................................. 40

**I.** Medicare Procedures ........................................................................................... 40

## ARTICLE VI SETTLING INSURERS ..................................................................... 41

**A.** No Insurance Settlement Agreements to Date ................................................... 41
**B.** Insurance Settlement Agreements ..................................................................... 41
**C.** Sale Free and Clear of Interests of Settling Insurer Policies ............................ 41
**D.** Resolution of Claims Involving Settling Insurers ............................................ 42
**E.** The Settling Insurer's Payments ...................................................................... 42
**F.** Further Assurances; Non-Material Modifications ............................................. 42
**G.** Waiver/Consent ................................................................................................ 42
**H.** Rights Under Insurance Settlement Agreements .............................................. 43
**I.** Timing ............................................................................................................... 43

## ARTICLE VII MATTERS RELATING TO NON-SETTLING INSURERS ............ 43

**A.** Preservation of Rights and Obligations ........................................................... 43
**B.** Estimations/Assessments of Abuse Claims Are Not Binding ........................... 43
**C.** Post-Effective Date Insurance Obligations ...................................................... 44
**D.** Trust Powers With Respect to Abuse Claims and Non-Settling Insurers........... 44
**E.** Insurance Coverage Adversary Proceeding ..................................................... 45

## ARTICLE VIII MEANS FOR IMPLEMENTATION OF THE PLAN ................... 45

**A.** Plan Implementation ........................................................................................ 45
**B.** Corporate Action .............................................................................................. 45
**C.** Payments Effective Upon Tender ..................................................................... 45
**D.** Agreements, Instruments, and Documents ....................................................... 46
**E.** Continuation of Insurance Policies ................................................................... 46
**F.** Bar Date for Professional Fee Claims .............................................................. 46
**G.** Bar Date for Other Administrative Claims ....................................................... 46
**H.** Exit Financing .................................................................................................. 47

## ARTICLE IX THE TRUST ...................................................................................... 47

**A.** Establishment of the Trust ............................................................................... 47
**B.** Funding the Trust ............................................................................................. 47
**C.** Vesting of Trust Assets .................................................................................... 50
**D.** Child Protection Protocols. .............................................................................. 50
**E.** Appointment of the Trustee .............................................................................. 50
**F.** Rights and Responsibilities of the Trustee ....................................................... 51
**G.** Trust Pursuit of Insurance Claims .................................................................... 51
**H.** Investment Powers; Permitted Cash Expenditures. .......................................... 53
**I.** Tax Matters ...................................................................................................... 55
**J.** DOS Entities' Post-Effective Date Costs Procedures ....................................... 56
**K.** No Recourse Against Trustee ........................................................................... 58
**L.** Indemnification by Trust. ................................................................................. 58
**M.** Trust Liability .................................................................................................. 58

17289563.12

**N.**     Termination .................................................................................................... 59

## ARTICLE X GENERAL CLAIMS ADMINISTRATION .................................. 59

**A.**     Objections to Non-Abuse Claims ................................................................. 59
**B.**     Determination of Claims .............................................................................. 59
**C.**     No Distributions Pending Allowance ........................................................... 60
**D.**     Claim Estimation .......................................................................................... 60
**E.**     Treatment of Contingent Claims ................................................................... 60
**F.**     Controversy Concerning Impairment ........................................................... 60
**G.**     Treatment of Executory Contracts and Unexpired Leases ........................... 60

## ARTICLE XI PROVISIONS GOVERNING DISTRIBUTIONS ..................... 61

**A.**     Disbursing Agents ........................................................................................ 61
**B.**     Manner of Payment ...................................................................................... 61
**C.**     Distribution Only to Holders of Allowed Claims ........................................ 61
**D.**     Disputed Claim Reserve ............................................................................... 61
**E.**     Transmittal of Distributions ......................................................................... 62
**F.**     Timing of Distributions ................................................................................ 62
**G.**     Time Bar to Check Payments ....................................................................... 63
**H.**     No Professional Fees or Expenses ............................................................... 63
**I.**     No Interest on Claims ................................................................................... 63
**J.**     Saturday, Sunday or Holiday ........................................................................ 63
**K.**     Withholding Taxes ........................................................................................ 63
**L.**     Setoffs and Recoupment ............................................................................... 64
**M.**     No *De Minimis* Distributions ...................................................................... 64
**N.**     Prepayment ................................................................................................... 64

## ARTICLE XII EFFECTIVE DATE .................................................................. 64

**A.**     Conditions Precedent to Effective Date ....................................................... 64
**B.**     Waiver of Conditions Precedent to the Effective Date ................................ 66
**C.**     Notice of Effective Date ............................................................................... 66
**D.**     Effect of Non-Occurrence of Conditions ..................................................... 66

## ARTICLE XIII EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE ....... 67

**A.**     General Injunction and Discharge ................................................................ 67
**B.**     Injunction and Discharge of Abuse Claims and Inbound Contribution
          Claims ........................................................................................................... 68
**C.**     Channeling Injunction Preventing Prosecution of Channeled Claims
          Against Protected Parties .............................................................................. 71
**D.**     Supplemental Settling Insurer Injunction ................................................... 73
**E.**     Litigation/Settlement of Certain Claims. ..................................................... 73
**F.**     Injunction Against Interference with Plan .................................................... 76
**G.**     Release by Holders of Claims ...................................................................... 76
**H.**     Mutual Releases ........................................................................................... 77

17289563.12

| | | |
|---|---|---|
| **I.** | Exculpation; Limitation of Liability | 77 |
| **J.** | Injunctions in Full Force and Effect | 78 |
| **K.** | Injunctions and Releases Integral | 78 |
| **L.** | Timing | 78 |
| **M.** | Non-Settling Insurers | 78 |
| **N.** | Title to and Vesting of Assets | 79 |
| **O.** | Continued Corporate Existence; No Successor Liability | 79 |
| **P.** | Identity of Trustees and Officers. | 80 |
| **Q.** | Authority to Effectuate Plan | 80 |
| **R.** | Binding Effect | 80 |
| **S.** | Dissolution of Committee | 80 |

**ARTICLE XIV RETENTION OF JURISDICTION** ......... 81

| | | |
|---|---|---|
| **A.** | By the Bankruptcy Court | 81 |
| **B.** | By the District Court | 83 |
| **C.** | Actions to Enforce the Plan | 83 |
| **D.** | Case Closure | 83 |

**ARTICLE XV TAX CONSEQUENCES OF THE PLAN** ......... 83

| | | |
|---|---|---|
| **A.** | Federal Income Tax Consequences to Holders of Unsecured Claims | 84 |
| **B.** | Federal Income Tax Consequences to the Diocese | 85 |
| **C.** | Tax Consequences to the Trust | 85 |

**ARTICLE XVI ALTERNATIVES TO THE PLAN** ......... 85

| | | |
|---|---|---|
| **A.** | Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code | 85 |
| **B.** | Dismissal of the Chapter 11 Case | 86 |
| **C.** | Chapter 7 Liquidation Not a Viable Alternative | 86 |
| **D.** | Appointment of a Chapter 11 Trustee is Not a Viable Alternative | 86 |

**ARTICLE XVII ACCEPTANCE AND CONFIRMATION OF THE PLAN** ......... 86

| | | |
|---|---|---|
| **A.** | General Confirmation Requirements | 86 |
| **B.** | Confirmation Hearing | 88 |
| **C.** | Confirmation | 88 |
| **D.** | Acceptance of Plan | 88 |
| **E.** | Confirmation Without Acceptance of All Impaired Classes | 88 |
| **F.** | Best Interests Test | 89 |
| **G.** | Feasibility | 90 |
| **H.** | Compliance with the Applicable Provisions of the Bankruptcy Code | 91 |

**ARTICLE XVIII RISK FACTORS TO BE CONSIDERED** ......... 91

| | | |
|---|---|---|
| **A.** | Objection to Classifications of Claims | 91 |
| **B.** | Failure to Satisfy Voting Requirements | 91 |
| **C.** | The Plan May Not Be Accepted or Confirmed | 92 |

ix

**D.** The Plan Proponents' Assumptions and Estimates May Prove Incorrect............ 92
**E.** Non-Confirmation or Delay in Confirmation of the Plan.................................... 92
**F.** Non-Consensual Confirmation ...................................................................... 92
**G.** Authority to Grant Third-Party Releases ...................................................... 92
**H.** Risk of Non-Occurrence of the Effective Date.............................................. 93
**I.** Non-Settling Insurers May Raise Objections to Confirmation........................... 93
**J.** Post-Confirmation Litigation May Not Result in Additional Recovery .............. 93
**K.** Confirmation of the Plan may be delayed or denied by the District Court........... 94

**ARTICLE XIX MISCELLANEOUS PROVISIONS ...................................................... 94**

**A.** Amendment or Modification of the Plan ..................................................... 94
**B.** Headings ............................................................................................... 94
**C.** Severability of Plan Provisions ................................................................. 94
**D.** Validity and Enforceability....................................................................... 95
**E.** Revocation or Withdrawal of the Plan........................................................ 95
**F.** Controlling Documents............................................................................ 95
**G.** Filing of Additional Documents ............................................................... 95
**H.** Direction to a Party ................................................................................ 95
**I.** Certain Actions ...................................................................................... 96
**J.** Plan as Settlement Communication ........................................................... 96
**K.** Reports ................................................................................................. 96
**L.** Governing Law ...................................................................................... 96
**M.** No Admissions....................................................................................... 96

**ARTICLE XX BANKRUPTCY RULE 9019 REQUEST ........................................ 97**

**ARTICLE XXI RECOMMENDATION AND CONCLUSION................................... 97**

**EXHIBITS**

Exhibit A        Chapter 11 Plan of Reorganization
Exhibit B        Liquidation Analysis
Exhibit C        Financial Projections

# ARTICLE I

# INTRODUCTION

On June 19, 2020 (the "Petition Date"), the Diocese filed a voluntary chapter 11 petition with the United States Bankruptcy Court for the Northern District of New York (Syracuse Division) (the "Bankruptcy Court"). Since the Petition Date, the Diocese has remained in possession of its assets and has continued to own, operate, and manage its affairs pending the approval of a plan of reorganization in accordance with the provisions of Title 11 of the United States Code (as amended, the "Bankruptcy Code").

On July 9, 2020, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in the Diocese's Chapter 11 Case. The Committee is comprised of individuals who assert claims of sexual abuse against the Diocese. The Committee supports approval and confirmation of the Plan and is a Plan Proponent and a signatory to the Plan.[2]

The Plan sets forth, among other things, the proposed treatment of Claims and other interests in accordance with the Bankruptcy Code. This Disclosure Statement is intended to explain the Plan and provide such information to Creditors as may be deemed material, important, and necessary so that they may make reasonably informed decisions in exercising their right to vote for acceptance of the Plan. A copy of the plan is included with this Disclosure Statement. If the Plan and this Disclosure Statement are not consistent, the terms of the Plan control. Capitalized terms used in this Disclosure Statement but not otherwise defined shall have the meanings ascribed to them in the Plan.

The Plan provides for the financial restructuring of the Diocese and the settlement of all, or substantially all, Claims against the Diocese, including, without limitation, the settlement of all Abuse Claims against the Diocese and the Participating Parties.

As set forth in more detail below, the Plan (i) provides for payment in full of all Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, and U.S. Trustee Fee Claims, (ii) modifies the rights of holders of certain Allowed Secured Claims in accordance with section 1123(b)(5) of the Bankruptcy Code, (iii) leaves unimpaired any Pass-Through Claims, (iv) provides deferred payments equal to the full Allowed amount of any General Unsecured Claims, and (v) establishes the Abuse Claims Settlement Fund to be held by the Trust to compensate holders of Abuse Claims. Inbound Contribution Claims are disallowed and extinguished pursuant to the Plan.

The Plan's treatment of Abuse Claims represents the culmination of more than 3 years of negotiation between the Diocese and the Committee and has been approved by the Committee in consultation with attorneys representing Committee members who collectively represent

---

[2] The Committee is not a signatory to this Disclosure Statement and makes no representations or warranties with respect to information set forth herein regarding the Diocese's history and financial projections. The Committee has reviewed and approved the description of the Plan and the statements contained herein pertaining to the Committee, its activities in this Chapter 11 Case, and the Committee's evaluation and recommendations as a Plan Proponent with respect to the Plan and alternatives to the Plan.

approximately forty-five percent (45%) of all Abuse Claimants who have asserted Abuse Claims against the Diocese ("State Court Counsel").

The Plan provides that funding for the Trust and the Abuse Claims Settlement Fund will be provided from, among other potential sources of recovery, a monetary contribution by the Diocese and other Participating Parties in the aggregate amount of up to $100,000,000, which may include up to $15 million to be evidenced by the DOS Trust Note (the "Catholic Family Contribution"). The Diocese anticipates that it will fund approximately half of the Catholic Family Contribution, with the remaining portion to be funded by the other Participating Parties. The Plan also provides for the assignment of certain Insurance Claims to the Trust.

To the extent the Diocese and the Committee can reach agreement on an Insurance Settlement Agreement or other terms of settlement with respect to Insurance Claims against Non-Settling Insurers prior to confirmation of the Plan, the Plan provides that such Non-Settling Insurers may become Settling Insurers and for settlement proceeds resulting therefrom to be used to further supplement the Abuse Claims Settlement Fund. To the extent no settlement is achieved, the Plan provides for the assignment of all Insurance Claims held by the Diocese or other Participating Parties to the Trust, and establishes a framework for post-confirmation litigation of Insurance Claims and other Litigation Claims seeking recovery from Non-Settling Insurers. The Committee, in consultation with State Court Counsel representing approximately forty-five percent (45%) of all Abuse Claimants who have asserted Abuse Claims against the Diocese, has acknowledged and accepted the risk inherent in pursuing post-confirmation recovery from Non-Settling Insurers in the absence of a settlement. The Committee believes that assignment of the Insurance Claims represents an opportunity to maximize the potential recovery for Abuse Claimants.

## A.    Summary of the Plan

Survivors of Abuse are the focal point of the Plan. The tragedy of the Abuse that was inflicted in the past by certain priests or others purporting to do the missionary work of the Roman Catholic Church is impossible to overstate. Instead of fulfilling this mission, such perpetrators inflicted harm and suffering. The Abuse is inexcusable. It not only deeply impacted the survivors, but it also affected the faithful and the community that the Diocese serves.

Prior to the enactment of the New York Child Victims Act (A.2683/S.2440) (the "CVA") and the Adult Survivors Act (A.648/S.66) (the "ASA"), the Diocese took steps to provide support and compensation to survivors of Abuse, including providing counselling, therapy, agreed compensation and other support to those survivors.

Following the enactment of the CVA, individuals alleging Abuse Claims began to file lawsuits against the Diocese. The Diocese has limited insurance and other resources available to compensate Abuse Claimants. A filing for bankruptcy relief was the only viable means to preserve and fairly distribute the Diocese's limited resources among the numerous Abuse Claimants. In order to compensate the Abuse Claimants, the Diocese and certain primary stakeholders, including the Committee and the Committee Members who are represented by State Court Counsel that collectively represent over 45% of Abuse Claimants in this Chapter 11 Case have engaged in discussions that have resulted in the formulation of the Plan.

2

17289563.12

The Plan establishes a Trust funded by: (i) the Catholic Family Contribution; and (ii) the assignment to the Trust of certain Insurance Claims against Non-Settling Insurers (the foregoing are, collectively, the "Trust Assets").  The Trustee will liquidate the Trust Assets and distribute the proceeds to the Abuse Claimants, pursuant to the procedures contained in the Allocation Protocol.  Distributions to Abuse Claimants may be subject to fee agreements between an Abuse Claimant and their legal counsel. Abuse Claimants' legal counsel are obligated to comply with Rule 1.5 of the New York Rules of Professional Conduct and 22 CRR-NY 1015.15 in connection with any fees charged to Abuse Claimants.

The contribution by each of the foregoing was reached as the result of extensive negotiations regarding, among other things, the extent of liability faced by each entity, the ability of each entity to pay, and insurance coverage available for the types of Claims being satisfied by the trust.  In exchange for the contributions to the Trust, (a) the Diocese and Reorganized Diocese, (b) the Parishes, (c) the Schools, (d) Other Catholic Organizations, (e) the Settling Insurers, and (f) each of the foregoing Persons' respective Related Persons (collectively, the "Protected Parties"), shall receive certain releases, exculpation, and injunctions, all as more specifically set forth in this Disclosure Statement and the Plan.  Similarly, in exchange for their contributions to the Trust, Settling Insurers, will likewise be entitled to the benefit of certain releases, exculpation, and injunctions, which are summarized below, and set forth more specifically later in this Disclosure Statement and the Plan.

> **Exculpation.** The Plan provides certain exculpation provisions which are typical and customary in chapter 11 plans.  The provisions provide that the Diocese, the Reorganized Diocese, the Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and entities will be released from certain of their acts and omissions that occurred from the Petition Date though Effective Date, or in preparation of the Chapter 11 Case.  None of these parties will be exculpated from claims arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty.

> **Releases.** The Plan Provides that the Participating Parties will be granted releases and a channeling injunction regarding certain claims, including all Abuse Claims. If the Plan is confirmed, Abuse Claimants will not be able to recover directly from or pursue further litigation against the Participating Parties (except that some Litigation Claimants may be authorized to pursue Litigation Claims for limited purposes in accordance with the terms of the Plan), and Abuse Claimants' recoveries on account of their Abuse Claims will limited by the terms of the Plan.

> **Injunctions.** The Plan provides for certain injunctions, including a channeling injunction which will channel certain Claims, including all Abuse Claims against the Diocese or any of the Participating Parties, into the Trust.  This means that any holder

of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan.

The releases contained in the Plan are an integral part of the Diocese's overall restructuring efforts and were an essential element of the negotiations among the parties and in obtaining the Protected Parties' support for the Plan.

The Plan further provides that the holders of Allowed Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, Professional Fee Claims, Secured Claims, Pass-Through Claims, and General Unsecured Claims will be paid in full as set forth herein, that all Abuse Claims will be channeled to the Trust, that the Diocese will be able to restructure its financial affairs, and that the Reorganized Diocese will be able to continue the mission and ministry of the Church. The Reorganized Diocese will also continue its mission to serve the Central New York community, including through its work with the elderly, poor, incarcerated and vulnerable populations, and to address the spiritual needs of those who were harmed and the Catholic community as a whole.

In the opinion of the Plan Proponents, the treatment of Claims under the Plan provides an opportunity for greater recovery for Creditors than that which is likely to be achieved under other alternatives. **Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of, and provides the highest and most expeditious recoveries to, holders of all Claims against the Diocese. All Creditors entitled to vote, therefore, are urged to vote to accept the Plan.**

**B.     Summary of Voting Procedures**

1.     **Vote Solicitation and Deadline**.

To be counted, your Ballot must be received, pursuant to the following instructions, by Bankruptcy Management Solutions, Inc. d/b/a Stretto ("Stretto"), on or before **5:00 p.m. (Eastern Time) on _____, 2024** (the "Voting Deadline"):

**If by first class mail, overnight courier or hand delivery:**

The Roman Catholic Diocese of Syracuse, New York – Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, California 92602

**By electronic, online submission:**

Please visit **https://case.stretto.com/syracusediocese/docket**.
Click on the "***E-Ballot***" section of the Diocese's website and
follow the directions on your Ballot to submit your E-Ballot. If
you choose to submit your Ballot via Stretto's E-Ballot system,
you should not also return a hard (paper) copy of your Ballot.

**IMPORTANT NOTE: You will need a unique E-Ballot ID Number that will be provided with your Ballot.**

17289563.12

**IF YOU HOLD A CLAIM ENTITLED TO VOTE:**

Please (i) complete the information requested on the Ballot; (ii) sign, date, and indicate your vote to accept or reject the Plan; and (iii) return the completed Ballot in the enclosed pre-addressed, postage-paid envelope, or by one of the other methods described above, so that it is actually received by Stretto on or before the Voting Deadline.

**DO NOT RETURN ANY INVOICES, DEBT INSTRUMENTS, NOTES, OR CERTIFICATES THAT YOU MAY HAVE WITH YOUR BALLOT.**

**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED, NOR WILL ANY BALLOTS RECEIVED BY TELECOPY OR EMAIL BE ACCEPTED.**

**IF YOU HAVE QUESTIONS REGARDING THE BALLOT, DID NOT RECEIVE A RETURN ENVELOPE WITH YOUR BALLOT, DID NOT RECEIVE AN ELECTRONIC COPY OF THE DISCLOSURE STATEMENT AND THE PLAN, OR NEED PHYSICAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE DIOCESE'S SOLICITATION AND CLAIMS AGENT, STRETTO, BY EMAIL AT TEAMSYRACUSEDIOCESE@STRETTO.COM OR BY CALLING 855.347.3773 AND REQUESTING TO SPEAK WITH A MEMBER OF THE DIOCESE'S SOLICITATION TEAM.**

      2.    **Importance of Your Vote**.

Your vote is important. The Bankruptcy Court defines acceptance by a Class of Claims as acceptance of at least two-thirds in amount and a majority in number of Allowed Claims in the Class that vote. Only the Ballots of those Creditors who actually vote are counted for purposes of determining whether a Class voted to accept the Plan. Your failure to vote will leave to others the decision to accept or reject the Plan.

**C.**    **Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself and its creditors. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and interest holders with respect to any distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession". Upon filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce, through litigation or otherwise, claims against the debtor. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor.

17289563.12

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of Creditors in the case.  On July 9, 2020, the United States Trustee appointed the Committee in the Chapter 11 Case to represent the interests of the Diocese's unsecured Creditors, including Abuse Claimants. Each of the members of the Committee asserted a claim for sexual abuse against the Diocese and members of the Committee devoted a substantial part of their lives, on an unpaid basis for more than three years, to negotiate the terms set forth in the Plan.

The principal objective of a chapter 11 reorganization is the confirmation of a plan of reorganization.  The plan sets forth the means for satisfying the claims of creditors and other stakeholders.  The plan and a disclosure statement that contains information necessary to allow creditors, shareholders, and members to evaluate the plan are sent to creditors, shareholders and members whose claims or interests are impaired, who then vote to accept or reject the plan.

A class of claims is entitled to vote to accept or reject a plan if the class is "impaired" by the plan.  Section 1124 of the Bankruptcy Code provides generally that a claim is impaired if the legal, equitable, or contractual rights of the claim are altered.

A plan may be confirmed under section 1129(a) of the Bankruptcy Code if each class of claims or interests is not impaired by the plan or if each class has noted to accept the plan.  Votes will be counted only with respect to claims: (a) that are listed on the debtor's schedules other than as disputed, contingent, or unliquidated; or (b) for which a proof of claim was filed on or before the claim filing deadline set by the Bankruptcy Court for the filing of proofs of claim.  However, any vote by a holder of a claim will not be counted if the claim has been disallowed or is the subject of an unresolved objection, absent an order from the Bankruptcy Court allowing the claim for voting purposes.  A class of claims has accepted a plan if creditors that hold at least two-thirds in amount and more than one-half in number of the allowed voting claims in the class have voted to accept the plan.  Pursuant to Bankruptcy Rule 3018(a), Class 5 Claims shall be estimated at $1.00 for voting purposes only.  The actual amount payable on account of Class 5 Claims will be determined pursuant to the Allocation Protocol.

A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily Allowed by the Diocese, or by an order of the Bankruptcy Court, in an estimated amount that it deems proper for the purpose of voting to accept or reject the Plan.  In other words, only holders of Allowed Claims that are in Class 1 (Secured Claim of KeyBank), Class 2 (Secured Claim of NBT), Class 4 (General Unsecured Claims) or Class 5 (Class 5 Claims) may vote to accept or reject the Plan.  A Claim to which an objection has been Filed by the Diocese or any other party in interest that is pending at the time of the Confirmation Hearing or a Claim (i) that is listed on the Diocese's Schedules as disputed, unliquidated, or contingent, and (ii) with respect to which a superseding proof of claim has not been Filed, is not an Allowed Claim for voting purposes, unless the Claim is settled by agreement or the Bankruptcy Court Allows the Claim (in whole or in part) by Final Order.  Upon request of a party in interest, the Bankruptcy Court may temporarily Allow or estimate a Disputed Claim for the purpose of voting on the Plan.  In addition, a vote may be disregarded if the Bankruptcy Court determines that the acceptance or rejection of the Plan by the Claimant is not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

6

If an impaired class votes to reject the plan, the proponent of the plan may seek to "cram down" the plan by confirming it under section 1129(b) of the Bankruptcy Code. A plan proponent may cram down a plan upon a rejecting class only if at least one impaired class has voted to accept the plan, the plan does not discriminate unfairly, and the plan is fair and equitable with respect to each impaired class that has not voted to accept the plan. **With the exception of Class 5 Claims, the Plan Proponents believe that the Plan will satisfy the foregoing requirements as to any rejecting Class of Claims, and can therefore be confirmed despite any such rejection by any Class.**

Voting on the plan by each holder of a claim in an impaired class is important. After carefully reviewing the Plan and Disclosure Statement, each holder of a claim should vote on the enclosed ballot either to accept or reject the Plan. Any ballot that does not appropriately indicate acceptance or rejection of the Plan will not be counted. A ballot that is not received by the deadline will not be counted. If a ballot is lost, damaged, or missing, a replacement ballot may be obtained by contacting the Diocese's solicitation and claims agent, Stretto, by email at TeamSyracuseDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**Class 1 Secured Claim of KeyBank, Class 2 Secured Claim of NBT Bank, Class 4 General Unsecured Claims and Class 5 Claims are Impaired under the Plan and are entitled to vote on the Plan.**

**Class 3 Pass-Through Claims (if any) are Unimpaired under the Plan and are deemed to accept the Plan. Class 6 Inbound Contribution Claims are Impaired under the Plan and are deemed to reject the Plan.**

Section 1129(a) of the Bankruptcy Code establishes several conditions for the confirmation of a plan. These conditions are too numerous to be fully explained here. Parties are encouraged to seek independent legal counsel to answer any questions concerning the chapter 11 process. Among the conditions for plan confirmation is that either each holder of a claim must accept the plan, or the plan must provide at least as much value as would be received upon liquidation of a debtor's estate under chapter 7 of the Bankruptcy Code. **The Plan Proponents believe that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code.**

The Bankruptcy Court has scheduled a Confirmation Hearing to consider approving the Plan commencing on _____, 2024 at _____ a.m./p.m. **(prevailing Eastern Time)** at the United States Bankruptcy Court for the Northern District of New York in Syracuse, New York. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date or upon the Diocese filing a notice of adjournment.

## D.     Summary of Classification of Claims

Detailed elsewhere in this Disclosure Statement are descriptions of the technical aspects of the classification of Claims, the relative allocations of assets to holders of such Claims, the methodology as to how such assets are to be distributed, the risks inherent in the proposed Plan, and the applicable bankruptcy and tax consequences of the Plan. However, the Plan Proponents

believe that a broad overview of what, in their opinion, the Creditors are likely to receive under the Plan, will be helpful for your consideration of whether you wish to accept or reject the Plan.

The following is a summary of the classification of all Claims under the Plan. This summary is qualified in its entirety by reference to the Plan:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does not Vote |
| 1 | Secured Claim of KeyBank | Yes | Entitled to Vote |
| 2 | Secured Claim of NBT | Yes | Entitled to Vote |
| 3 | Pass-Through Claims | No | Deemed to Accept |
| 4 | General Unsecured Claims | Yes | Entitled to Vote |
| 5 | Abuse Claims | Yes | Entitled to Vote |
| 6 | Inbound Contribution Claims | Yes | Deemed to Reject |

As discussed in the Liquidation Analysis attached hereto as **Exhibit B**, the Plan Proponents estimate that recoveries for holders of Abuse Claims in Class 5 under the Plan will be greater than in liquidation under chapter 7 of the Bankruptcy Code because the total amount of assets available for Distribution is greater under the Plan than in liquidation under chapter 7. The portion of the DOS Entities' Cash Contribution and assignment of Insurance Claims made by the Diocese and the Parishes, Schools, and Other Catholic Organizations that comprise the Participating Parties will not be available to the Estate under chapter 7. The Plan Proponents also believe that theoretical Distributions under a chapter 7 case would likely be delayed due to the time it will take a chapter 7 trustee to assess the Diocese's assets, review and analyze Claims, and evaluate and litigate claims against third parties. Holders of Allowed Claims entitled to vote to accept or reject the Plan should review the Liquidation Analysis (including all footnotes thereto and documents referenced therein) in assessing whether to vote to accept or reject the Plan.

E.    **Disclosure Statement Enclosures**

Accompanying this Disclosure Statement are the following enclosures:

1.    **Order Approving Disclosure Statement**.

A copy of the Order of the Bankruptcy Court dated _____, **2024**, approving this Disclosure Statement and, among other things, establishing procedures for voting on the Plan, scheduling the Confirmation Hearing, and setting the deadline for objecting to confirmation of the Plan (the "Order Approving Disclosure Statement").

2.    **Notice of Confirmation Hearing**.

17289563.12

A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing, and the deadline for filing objections to confirmation of the Plan (the "Notice of Confirmation Hearing").

3.  **Ballot**.

A Ballot (and return envelope) for voting to accept or reject the Plan.  *See* Article XVII below for an explanation of which Creditors are entitled to vote.

## ARTICLE II

## THE DIOCESE AND ITS OPERATIONS

### A.    Prepetition Operations

The Catholic Church is a worldwide community with over 1.2 billion members who hold a common creed.  The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate, and universal ordinary power in the Church.  The Pope exercises such power in concert with the College of Bishops of which he is the head.  The organizational structure is intended to serve the mission to teach, to sanctify, and to serve which is realized in a variety of instruments and organizations.  A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy.  As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds.  The bishop of a diocese is appointed by the Pope.  The Bishop of the Diocese is the Most Reverend Douglas J. Lucia (the "Bishop").  Bishop Lucia was installed as the Bishop of Syracuse on August 8, 2019.  A diocese is divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.  As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds.

Canon Law is a generic term applied to several sources of church law that together establish the internal organizational structure and procedures to be followed within the Catholic Church.  Canon Law also identifies property rights and agency relationships among the variety of structures with the community of the Catholic Church.  The Diocese is a Latin Catholic Diocese and subject to the *Code of Canon Law* promulgated by Pope John Paul II on January 25, 1983.[3]  As used herein, "Church" means the universal Catholic Church.  Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

Under New York Law, the Diocese is an incorporated legal entity, formed pursuant to a Special Legislative Act with its own corporate structure and governance, separate from the

---

[3]  1983 Code c.1-1752 (1983) (as amended, "1983 Code").  Within the Roman Catholic Church there are 24 *sui juris* churches.  The Latin Church is the largest, it is subject to *Codex Iuris Canonici auctoritate Ionnisa Paulii PP. II promulgatus* (Vatican City: Libreria Editrice Vaticana, 1983).  Hereinafter, the 1983 Code.  Throughout this Disclosure Statement, the English translation used will be *Code of Canon Law, Latin-English Edition,* CLSA 1998.

17289563.12

Parishes and Other Catholic Organizations within its territory.  The juridic person of the Diocese of Syracuse was canonically established on November 26, 1886.  Thereafter, on October 30, 1896, a corporation was formed to constitute the Diocese of Syracuse under New York law.  The Diocese as it exists today was reincorporated on March 21, 1968 by a special act of the New York State Legislature (Chapter 1062 of the Laws of 1968 (the "Special Act")).  The Special Act provides that the three trustees of the Diocese are the Bishop, the Vicar General and the Chancellor as required under Canon Law.

The Diocese serves a 7-county region in Central and South-Central New York and its territory is co-extensive with the counties of Broome, Chenango, Cortland, Madison, Oneida, Onondaga and Oswego.  Within the territory of a diocese are separately constituted parishes.  Like a diocese, a parish is usually defined territorially.  There are currently [119] separately incorporated Parishes and approximately [217,000] Catholic individuals in the territory of the Diocese.  These individuals are served by [89] Diocesan priests, [26] priests who are Religious that reside in the Diocese, [15] extern priests[4] and [96] permanent deacons.  Deacons are men ordained for the ministry of the word (catechetics and preaching), service to the poor, and liturgical assistance.  The Diocese also currently employs approximately [158] individuals, which includes both clergy and laity.  Numerous Parish corporations own, maintain, and operate cemeteries.  According to the Diocese, the Parish corporations located within the Diocese are not under the fiscal or operating control of the Diocese.  The Parish corporations have not sought bankruptcy relief and are not debtors in this bankruptcy proceeding.

Within the Diocese, eighteen (18) Parish corporations own and operate schools serving approximately 3,079 students.  There are also seven (7) non-Diocesan Catholic schools in the territory of the Diocese that are separately operated and governed by Religious or private not-for-profit organizations (the "Independent Schools").  The Independent Schools serve approximately 2,141 students.  Four of these Independent Schools (Bishop Grimes (Syracuse), Bishop Ludden (Syracuse), Notre Dame (Utica) and Seton Catholic (Binghamton)) were formerly affiliated with the Diocese.  Such schools separated from the Diocese and were incorporated (chartered) by the New York State Board of Regents.  According to the Diocese, the Parish-operated schools and Independent Schools located within the Diocese are not under the fiscal or operating control of the Diocese.

The Diocese, through its administrative offices (a) provides operational support to the Catholic parishes, schools and certain other Catholic entities that operate within the territory of the Diocese in support of their shared charitable, humanitarian and religious missions; (b) conducts school operations by managing tuition and scholarship payments, employee payroll, and other school related operating expenses for separately incorporated Diocesan schools, as well as providing parish schools with financial, operational and educational support; and (c) provides comprehensive risk management services to the Parishes and Schools through the Diocese's insurance program.

---

[4] An extern priest is priest incardinated in another diocese or institute of consecrated life who comes with the permission of the diocesan bishop to exercise ministry in the territory of the Diocese of Syracuse.  Incardination is the bond that exists between a cleric and a diocese or institute of consecrated life.

There are several Other Catholic Organizations that assist the Diocese and the Parishes in their ministry, which include: (i) Catholic Charities of the Roman Catholic Diocese of Syracuse, New York, Inc.; (ii) Catholic Cemeteries of the Roman Catholic Diocese of Syracuse, Inc.; and (iii) the Syracuse House of Retreats, Inc. d/b/a Christ the King Retreat House. According to the Diocese, these entities are not under the fiscal or operating control of the Diocese.

The Diocese is a not-for-profit Religious Corporation under New York law. Gross revenue for the fiscal years ending on June 30, 2020, June 30, 2021, June 30, 2022, and June 30, 2023, was $4,612,554, $4,538,674, $4,633,828, and $4,674,362 respectively. The primary sources of funding for the Diocese's programmatic services are contributions, grants and service fees collected by the Diocese, with the largest portion of such funding coming from grants made by The Foundation of the Roman Catholic Diocese of Syracuse, Inc. (the "Foundation") which raises money to support the Diocese as well as other Catholic entities and initiatives through its annual HOPE Appeal. The Diocese also applies for grants, receives gifts and bequests, conducts capital campaigns, and generates investment income to fund its operations. Finally, the Diocese receives various donations and bequests with specific designations on how those funds may be used and on how the amount of the underlying principal may be used.

Since the Petition Date, the programmatic services of the Diocese are revenue neutral and, with respect to its risk management and insurance operations, the Catholic schools, office, physical plant upkeep and maintenance activities, and central administrative service functions, the Diocese's net revenue is calculated on a cumulative basis at approximately $2.8 million, as of October 31, 2023. The Diocese has recognized positive investment returns during this period. The primary source of revenue used by the Diocese to support these operational functions comes from parish assessments. The Diocese assesses parishes an annual amount based primarily on historical parish offertory. Assessments are due on a monthly basis. Assessments are collected for general Diocesan purposes and also for dedicated purposes such as education and clergy retirement.

## B.    Need for Reorganization

Over the last several decades, certain clergy members and employees of the Church have violated the sacred trust placed in them by children and their families and the Church by committing acts of Abuse. This conduct runs contrary to the teaching and traditions of the Church.

In February 2018, the Diocese established its Independent Reconciliation and Compensation Program ("IRCP") to address the claims of victims of clergy sexual abuse of minors. The Diocese engaged Kenneth Feinberg and Camille Biros (the "Administrators") to design, implement and administer a program for the submission, evaluation and settlement of individual claims which had been previously brought to the attention of the Diocese. The IRCP was modeled after similar programs established by the Archdiocese of New York and the Dioceses of Brooklyn and Rockville Center, all of which were also administered by Mr. Feinberg and Ms. Biros. Participation by claimants in the IRCP was purely voluntary and all eligibility decisions and settlement amounts under the IRCP were left to the discretion of the Administrators. No aggregate cap was imposed upon the settlements proposed under the IRCP, and the Diocese agreed to pay the amount deemed appropriate by the Administrators in each case.

11

A total of 88 claims were submitted to the IRCP. At the conclusion of the program 80 of those cases were successfully resolved by settlement. With respect to the eight cases which were not resolved, three claimants were deemed ineligible by the Administrators, three claimants did not respond to the Administrator's proposed settlement terms, and two claimants declined to settle their claims. The Diocese expended approximately $12.7 million in connection with the IRCP, including just under $11 million paid in compensation to abuse victims, with the balance going to the program's administrative costs.

The Diocese has taken additional steps to address claims of Abuse prior to the date of this Disclosure Statement, including creating safe environment training and disclosure policies to protect children and young people.  In connection with these efforts, the Diocese has publicly disclosed proven or acknowledged perpetrators.  The Diocese makes referrals to law enforcement for all allegations of Abuse.

As part of the Plan, child protection protocols have been created through collaboration between the Diocese and the Committee to enhance measures already in place to protect young parishioners, students, and other vulnerable individuals within the Diocese. Bishop Lucia has engaged directly in extensive discussions with the Committee regarding enhanced child protection measures that will further strengthen the safe environment program in the Diocese.

Bishop Lucia made the following statement in support of the settlement with the Committee that formed the basis of the joint Plan:  "[a]s the present leader of the Church of Syracuse, I cannot apologize enough for the abuse which happened or for any neglect in dealing with it.  This is why the final settlement will include commitments meant to strengthen our safe environment protocols to further ensure the past does not repeat itself."

On January 28, 2019, the New York State Legislature passed the CVA.  New York's Governor signed the legislation on February 14, 2019.  The CVA modified New York's statute of limitations and created a one-year "window" during which victims of child sexual abuse whose claim may have been time-barred were permitted to commence a timely civil action.  In addition, the CVA extended the statute of limitations for claims that were not time-barred on its date of passage, permitting such child victims to commence timely civil actions until they reach 55 years of age.  The window for commencing previously time-barred actions under the CVA was subsequently extended to, and closed on, August 13, 2021.  Since the Petition Date, survivors of alleged clergy Abuse have filed 411 proofs of claims against the Diocese's Estate in the Chapter 11 Case.  In addition, the vast majority of such claims are the subject matter of separate Abuse Actions that have been commenced in other courts against a Participating Party that is alleged to be jointly and severally liable with the Diocese on account of such claims.

On May 24, 2022, New York's Governor signed into law the ASA.  The ASA created a one-year window during which survivors whose claims would otherwise have been subject to New York's statute of limitations may commence lawsuits based upon sexual offenses committed against them when they were eighteen (18) years of age or older at the time the Abuse occurred. The ASA window to sue on an Adult Abuse Claim opened on November 24, 2022.

As a result, the Diocese faced the prospect of addressing Abuse Claims asserted in amounts exceeding the Diocese's ability to pay, in which circumstance (a) survivors of Abuse could have

12

been left with no compensation or other support, and (b) those within the Diocese (including non-Catholics) who depend on the services of the Church delivered through the Diocese could have been left without the material, monetary, and spiritual support the Diocese provides.

And, while the Diocese carried insurance during many periods in which Abuse is alleged to have occurred, and while the Diocese believes such insurance provides coverage for the Abuse Claims as they were asserted or likely would be asserted against the Diocese, prior to filing its Chapter 11 Case, the Diocese had been largely unsuccessful in obtaining any coverage for Abuse Claims asserted against the Diocese.

The Diocese is a not-for-profit religious corporation with limited resources, including limited insurance coverage which may be applicable to claims of persons seeking remedies for Abuse Claims. The Diocese acknowledges its moral obligation to compensate all victims of Abuse by church personnel fairly and equitably. Consistent with this moral obligation, it cannot allow any single plaintiff to recover a disproportionate share of the limited funds available from the Diocese simply because that plaintiff's case goes to trial first. Similarly, the Diocese cannot ignore the valid claims of other Creditors who stand on equal footing with Abuse Claimants as general unsecured Creditors of the Diocese. The Diocese also has a fundamental and moral obligation to the Catholic faithful it serves, and to the donors who have entrusted the Diocese with the material fruits of their life's labor, to continue the ministries of the Church through the Reorganized Diocese. The Diocese's goals in seeking chapter 11 relief were two-fold: First, to protect and preserve its assets that are properly available for Distribution to satisfy the claims of the Diocese's unsecured Creditors, along with whatever additional assets can be marshaled, so that those assets are distributed equitably to all Creditors. Second, to continue the work of the Church in Central New York to the fullest extent possible, using the resources dedicated to that purpose.

## ARTICLE III

## THE CHAPTER 11 CASE

### A. The Chapter 11 Filing

The Diocese commenced the Chapter 11 Case on the Petition Date by filing a voluntary petition for chapter 11 relief under the Bankruptcy Code [Docket No. 1]. The Diocese's case is currently assigned to the Honorable Wendy Kinsella, Chief United States Bankruptcy Judge for the Northern District of New York.[5] The Diocese has continued in possession of its assets and the management of its business as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On June 19, 2020, the Bankruptcy Court held an initial hearing to consider certain "first day" matters and entered several orders in the Chapter 11 Case, each of which is available from the Clerk of the Bankruptcy Court or may be viewed, free of charge, at the case management website maintained by the Diocese's notice agent at https://case.stretto.com/syracusediocese. The Bankruptcy Court entered the following orders granting "first day" relief:

---

[5] Judge Margaret Cangilos-Ruiz was the judge assigned to the Chapter 11 Case from the Petition Date through the date of her retirement, June 7, 2021.

17289563.12

1.      **Employee Wages and Benefits**.

The Diocese Filed a motion seeking approval to pay certain prepetition employee wage and benefit obligations (the "<u>Wage Motion</u>"). An Interim Order granting the relief requested in the Wage Motion were entered on June 24, 2020 [Docket No. 26] and a Final Order was entered on August 10, 2020 [Docket No. 74].

2.      **Pre-petition Insurance Program**.

The Diocese Filed a motion seeking authority to continue its prepetition insurance program and health plan (the "<u>Insurance Motion</u>"). An Interim Order granting the relief requested in the Insurance Motion was entered on June 24, 2020 [Docket No. 28] and a Final Order was entered on September 18, 2020 [Docket No. 114].

3.      **Utilities**.

The Diocese Filed a motion seeking to prohibit utility companies from altering, refusing, or discontinuing service and determining adequate assurance of future performance (the "<u>Utilities Motion</u>"). An Interim Order granting the relief requested in the Utilities Motion was entered on June 24, 2020 [Docket No. 27] and a Final Order was entered on August 14, 2020 [Docket No. 85].

4.      **Maintain Bank Accounts and Forms**.

The Diocese Filed a motion seeking approval to maintain its existing investment and bank accounts and its existing business forms (the "<u>Cash Management Motion</u>"). An Interim Order approving the Cash Management Motion was entered on June 24, 2020 [Docket No. 31] and a Final Order was entered on September 18, 2020 [Docket No. 116].

5.      **File Chapter 11 Matrix and Schedules Under Seal**.

The Diocese Filed a motion seeking approval to File all documents containing the names of alleged child Abuse victims in a redacted form (the "<u>Motion to File Under Seal</u>"). An Interim Order approving the Motion to File Under Seal was entered on June 24, 2020 [Docket No. 24] and a Final Order was entered on August 10, 2020 [Docket No. 73].

**B.     Administration of the Case**

After the Petition Date, and in accordance with sections 1107(a) and 1108 of the Bankruptcy Code, the Diocese continued its operations and managed its assets as a debtor in possession. As of the date of this Disclosure Statement, no trustee or examiner has been appointed in the Chapter 11 Case, nor has any motion for a trustee or examiner been made.

**C.     Appointment of the Committee**

On July 9, 2020, the Office of the United States Trustee appointed the Committee pursuant to sections 1102(a) and 1102(b) of the Bankruptcy Code to serve in the Chapter 11 Case. The Committee is composed of individuals who hold Abuse Claims against the Diocese.

The Committee retained the law firm of Stinson, LLP ("Stinson") to represent it in the Chapter 11 Case. Since its appointment, the Committee has taken an active role in the Chapter 11 Case and has been involved in virtually every major event that transpired during the chapter 11 process, including participating in mediation and drafting the Plan.

The Committee also performed its investigatory function by reviewing financial and operating information supplied by the Diocese and third parties, and by conducting an investigation to determine whether any other assets could be made available to pay Abuse Claims.

## D.     Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court approved the retention and employment of the following professionals to assist in the administration of the Chapter 11 Case:

### 1.     **Bankruptcy Counsel to Diocese**.

On July 31, 2020, the Diocese Filed an application to retain Bond, Schoeneck & King, PLLC ("Bond") as its bankruptcy counsel. An Order approving the retention of Bond was entered on August 24, 2020 [Docket No. 95].

### 2.     **Claims and Noticing Agent**.

On June 19, 2020, the Diocese Filed applications (a) to retain Stretto as its claims and noticing agent and (b) as its administrative advisor. An Order approving the retention of Stretto was as claims and noticing agent was entered on June 24, 2020 [Docket No. 32] and an Order approving the retention of Stretto as administrative advisor was entered on September 18, 2020 [Docket No. 115].

### 3.     **Special Litigation Counsel to Diocese**.

On September 1, 2020, the Diocese Filed an application to retain Mackenzie Hughes, LLP ("Mackenzie") as its special counsel with respect to (i) the Abuse Claims; and (ii) a certain subpoena dated September 6, 2018 issued to the Diocese by the New York State Office of the Attorney General. An Order approving the retention of Mackenzie was entered on November 22, 2019 [Docket No. 273].

### 4.     **Special Insurance Counsel to Diocese**.

On August 21, 2020, the Diocese Filed an application to retain Blank Rome LLP ("Blank Rome") as its special counsel with respect to the Diocese's various insurance policies and insurance coverage litigation. An Order approving the retention of Blank Rome was entered on September 2, 2020 [Docket No. 102].

### 5.     **Special Counsel to the Diocese**.

On August 18, 2021, the Diocese Filed an application to retain Gellert, Scali, Busenkell & Brown, LLC ("Gellert") to act as special counsel to the Diocese and represent its interests in the chapter 11 case filed by the Boy Scouts of America in the United States Bankruptcy Court for the

15

District of Delaware (Case No. 20-10343). An Order approving the retention of Gellert was entered on October 29, 2021 [Docket No. 732].

6.     **Counsel Retained by the Committee**.

On July 30, 2020, the Committee Filed an application to retain Stinson as its legal advisor. An Order approving the retention of Stinson was entered on August 14, 2020 [Docket No. 86].

7.     **Financial Advisor Retained by the Committee**.

On January 12, 2022, the Committee Filed an application to retain Berkeley Research Group, LLC as its financial advisor. An Order approving the retention of Berkeley Research Group, LLC was entered on March 3, 2022 [Docket No. 850]

8.     **Special Insurance Counsel Retained by the Committee**.

On July 28, 2021, the Committee Filed an application to retain Burns Bowen Bair LLP as special insurance counsel to the Committee. An Order approving the retention of Burns Bowen Bair LLP was entered on September 7, 2021 [Docket No. 671]

9.     **Claim Valuation Expert Retained by the Committee**.

On May 17, 2022, the Committee Filed an application to retain The Claro Group, LLP as claim valuation expert to the Committee. An Order approving the retention of The Claro Group, LLP was entered on June 2, 2022 [Docket No. 926].

**E.**     **Schedules and Statement of Financial Affairs**

The Diocese Filed its Schedules of Assets and Liabilities (the "Schedules") and Statements of Financial Affairs Schedules on July 22, 2020 [Docket No. 48].

**F.**     **Post-Petition Operations and Select Financial Information**

Since the Petition Date, the Diocese has continued to operate its ecclesiastical business. During a typical month, the Diocese's expenses total approximately $2,000,000.

Set forth below is a summary of the Diocese's Assets as of June 30, 2023:

1.     **Operating Cash**.

As of June 30, 2023, the Diocese had approximately $26.7 million in cash and cash equivalents, approximately $4.6 million of which was not subject to donor restrictions.

2.     **Real Estate**.

The Diocese currently owns real property as follows:

a.     the Convent property and parking lot at 414-422 Montgomery Street, Syracuse, New York;

16

      b.     the School property and parking lots at 424-26 Montgomery Street, Syracuse, New York;

      c.     the Spanish Apostolate property and land at 170 Seymour Street, Syracuse, New York;

      d.     the SUNY Binghamton Newman Center at 400 Murray Hill Road, Vestal, New York; and

      e.     the Chancery properties, garage, parking lots and land located at 240, 245-51, 262 and 272 and East Onondaga Street, Syracuse, New York.

3.     **Personal Property**.

The Diocese currently owns personal property (accounts receivable, prepaid expenses including insurance, workers' compensation, furniture, and fixtures), with a scheduled value of $3,264,933 as of the Petition Date.

4.     **Investment Accounts**.

      a.     *Syracuse Diocesan Investment Fund, Inc. Accounts.* The Diocese maintains several accounts with the Syracuse Diocesan Investment Fund, Inc. ("SDIF"), a not-for-profit corporation formed in 2010 to enable the Diocese, along with parishes, cemeteries, and various other separately incorporated Catholic entities, to pool their investments to achieve collective benefits. SDIF is maintained in conformity with Canon Law and the New York State Prudent Management of Institutional Funds Act. SDIF's affairs are governed by its Certificate of Incorporation and By-laws. The Diocese maintains SDIF is a separate and distinct legal entity from the Diocese, and that the debts and liabilities of SDIF lie solely with SDIF and are not guaranteed or payable by the Roman Catholic Church, the Diocese or any other person or entity. Similarly, the Diocese maintains that the debts and liabilities of the Roman Catholic Church and the Diocese are solely their own and are not guaranteed or payable by SDIF. As of the Petition Date, SDIF had approximately $45.6 million in total assets under management, of which approximately $2,257,000 represent Diocesan funds. All of the Diocese's investments in SDIF are comprised of special purpose funds which are dedicated to supporting Catholic schools within the territory of the Diocese. The Diocese's investments in SDIF are held in eleven separate accounts, each of which is described below:

      (i)     Catholic School Office - Cabrini Scholarships (xx1223). Funds in this investment account originate from a restricted grant for from the Mother Cabrini Health Foundation and are used to fund tuition scholarships for students at Catholic schools within the Diocese;

      (ii)     Catholic School Office - Cabrini Team Health (xx0023). Funds in this investment account originate from a restricted grant by the Mother Cabrini Health Foundation to provide healthcare resources to students of various Catholic schools within the Diocese and their family members;

17

(iii)     Catholic School Office - Eastern Region (xx2733). Funds in this investment account originate from contributions by parishes within the Diocese's Eastern Region which have been designated to support Catholic schools within the Diocese;

(iv)     Catholic School Office - Western Region (xx2593). Funds in this investment account originate from contributions by parishes within the Diocese's Western Region which have been designated to support Catholic schools within the Diocese;

(v)     Catholic School Office - Gala Fund (xx2753). Funds in this investment account originate from the net proceeds of the annual gala held to support Catholic schools within the Diocese and are used to fund scholarship awards;

(vi)     Catholic School Office - Laptop Program (xx0003). Funds in this investment account originate from contributions from Catholic schools within the Diocese which have been designated for the purpose of furnishing students with laptops;

(vii)     Catholic School Office - Operating Mandated Services (xx0003). Funds in this investment account originate from New York State for mandated school services such as testing, attendance and regents exams;

(viii)    Catholic School Office - Student Accident Insurance (xx1073). Funds in this investment account originate from Catholic schools within the Diocese to pay premiums for boiler insurance and accident insurance;

(ix)     Catholic School Office - Technology (xx2273). Funds in this investment account originate from federal technology rebates awarded to Catholic schools within the Diocese and are used for technology expenses in Catholic schools;

(x)     Catholic School Office - Title Funds (xx2773). Funds in this investment account originate from federal educational funds made available under Titles I-VII of the Elementary and Secondary Education Act which have been distributed by New York State to support the Diocese's educational initiatives, including support to Catholic schools within the Diocese.

(xi)     Catholic School Office - Yeazel Education Fund (xx0013). Funds in this investment account originate from scholarship grants received from the Msgr. Yeazel Scholarship Fund.

b.      *Collateral Investment Accounts.* The Diocese maintains accounts at KeyBank and at NBT Bank for the purpose of collateralizing certain financial accommodations extended to the Diocese by these banks. With respect to KeyBank, the Diocese is indebted to KeyBank pursuant to a promissory note and loan agreement which made available to the Diocese a $7,300,000 revolving loan consisting of a $2,000,000 working capital line of credit (the "Line of Credit") and a $5,300,000 letter of credit (the "WCB LOC"). The Diocese is self-insured for workers compensation claims, and, like most self-insured organizations, the New York State Worker's Compensation Board (the "WCB") has required that the Diocese post security to cover potential workers compensation liabilities. The WCB LOC is issued by KeyBank to the WCB to secure the Diocese's obligations under its self-insured worker's compensation program. 104. The

Diocese's repayment obligations under the Line of Credit and WCB LOC are collateralized by two blocked investment accounts held at KeyBank, which, as of the Petition Date, had an aggregate value of approximately $7.6 million.  The Diocese has never drawn on the Line of Credit.  Accordingly, as of the Petition Date, KeyBank's collateral was valued at approximately $2.3 million more than the KeyBank Debt Amount, giving KeyBank an equity cushion of approximately 143%.  The Diocese also collateralizes approximately $6.5 million in term loans extended by NBT Bank (the "NBT Term Loans") with the following blocked investment account at NBT Bank, which as of the Petition Date had a value of approximately $9.8 million, giving NBT Bank an equity cushion of approximately 150%.

        c.    *Insurance Investment Fund.*  The Diocese also maintains reserves related to its insurance programs in the following investment accounts held and managed by Morgan Stanley which, as of the Petition Date, had an aggregate value of approximately $7.5 million.

## G.    **Bar Date, Abuse Claims, and Boy Scouts of America Claims**

    1.    **Bar Date**.

By an Order dated November 6, 2020 (the "Bar Date Order"), the Bankruptcy Court fixed April 15, 2021 (the "Bar Date") as the deadline for filing proofs of claim for all prepetition Claims, including Abuse Claims, against the Diocese.  The Bar Date Order also established April 15, 2021 as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to File proofs of claim in the Chapter 11 Case.  The Notice of Deadline for Filing Proofs of Claim (the "Bar Date Notice") approved by the Bankruptcy Court defines "Sexual Abuse Claim" as any claim arising from "any actual or alleged sexual conduct or misconduct, sexual abuse or molestation, indecent assault and/or battery, rape, pedophilia, ephebophilia, or sexually-related physical, sexually-related psychological, or sexually-related emotional harm, or contacts, or interactions of a sexual nature between a child and an adult, or a nonconsenting adult and another adult."

The Bar Date Notice was sent to all known Creditors of the Diocese.  In addition, the Bar Date Notice was published, as required in the Bar Date Order, in national and regional newspapers, on television and radio stations, on the Diocese's social media accounts, in the *The Catholic Sun*, *North Country Catholic* and *The Evangelist*, through postings at Parishes and at other Catholic agencies, and through postings at governmental agencies, including the State of New York Office of the Attorney General, and at the district attorney's office, sheriff's office, county government center, and public health and substance abuse agencies in Broome, Chenango, Cortland, Madison, Oneida, Onondaga and Oswego Counties.

Under the Bar Date Order and the Plan, unless otherwise ordered by the Bankruptcy Court or as provided in the Allocation Protocol, any Person who was required to File a timely proof of claim and failed to do so on or before the Bar Date will not be entitled, with respect to such Claim, to receive any payment or Distribution of property from the Diocese, its successors or assigns, and will be forever barred from asserting such Claim against the Diocese or its Estate.

The Diocese, its Professionals, and the Committee's Professionals have reviewed all the Claims Filed by Creditors.  More than 411 proofs of claim were Filed by Abuse Claimants in the

Chapter 11 Case. The Diocese believes that at least 18 of these proofs of claim are either duplicate claims or do not allege a claim arising from or related to Abuse. At least 19 Abuse Claims were filed after the Bar Date. Among the Abuse Claims Filed prior to the Bar Date, the Diocese believes at least 29 assert Claims based upon the actions or omissions of individuals or entities that are not affiliated with the Diocese and for which the Diocese believes neither it nor the Participating Parties have any legal liability. Notwithstanding the Diocese's position on liability, or whether Abuse Claims may be duplicative or filed after the Bar Date, the Abuse Claim Reviewer may determine that holders of such Abuse Claims may be entitled to a Distribution in accordance with the Allocation Protocol. Further, in the case of Litigation Claims, a court may find that the Diocese and/or Participating Parties are liable to Litigation Claimants even where the Diocese and/or Participating Parties believe they are not liable for such Claims. Nothing herein shall be deemed an admission regarding any Person's liability for Abuse Claims. In addition, various Parishes, Schools, and Other Catholic Organizations also Filed contingent claims for indemnification or contribution in the Chapter 11 Case, as they were sued in various Abuse Actions either as co-defendants along with the Diocese prior to the Petition Date or, following the Petition Date, in Abuse Actions relating to the same actions or occurrences of Abuse alleged in proofs of claim Filed in the Chapter 11 Case.

The Diocese also filed a motion seeking entry of an Order establishing a supplemental bar date for claims of persons who allege abuse while they were over the age of 18 filed pursuant to the ASA. An Order was entered on November 4, 2022 establishing January 17, 2023 as supplemental bar date for Abuse Claims filed under the ASA [Docket No. 1083].

2.    **Claims Involving the Boy Scouts of America**.[6]

On February 18, 2020, the Boy Scouts of America and Delaware BSA, LLC (collectively, "BSA") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") commencing a jointly administered chapter 11 bankruptcy case bearing the case number 20-10343 (the "BSA Bankruptcy Case"). The BSA Bankruptcy Case was filed primarily to address thousands of unique abuse-related claims asserted against the BSA (the "BSA Abuse Claims").[7] In addition to alleging direct liability against BSA for abuse, many BSA Abuse Claims also implicate certain other organizations (known as "Chartered Organizations")[8] that facilitate the scouting programs of the

---

[6] Capitalized terms that are used in this section but not defined in the Diocese's Plan or elsewhere in this Disclosure Statement shall have the meanings ascribed to them in the *Third Modified Fifth Amended Chapter 11 Plan of Reorganization (With Technical Modifications) for Boy Scouts of America and Delaware BSA, LLC* [BSA Docket No. 10296] (the "BSA Plan"). References to the BSA Bankruptcy Case docket will be cited in the following manner: "[BSA Docket No. ____]".

[7] The term "BSA Abuse Claim", as used in this section, has the meaning given to "Abuse Claim" in the BSA Plan.

[8] There are over 40,000 Chartered Organizations nationwide within the BSA organization, and they operate within one of the 253 non-debtor Local Councils that are responsible for administering the BSA's programs across the United States and its territories. Each Local Council covers a specific geographic area. The counties served by the Diocese are variously located within the Baden-Powell Council, the Longhouse Council, and the Leatherstocking Council.

BSA on a local level.  The Diocese and several of the Participating Parties may have been Chartered Organizations and are potentially implicated by certain BSA Abuse Claims.

There are 45 Abuse Claims asserted against the Diocese and other Participating Parties (either through proofs of claim filed in the Chapter 11 Case or Abuse Actions filed in state court) that reference the BSA and allege scouting-related Abuse (the "DOS-BSA Abuse Claims").  On or around June 22, 2021, the Roman Catholic Ad Hoc Committee (the "RCAHC")[9] was formed to represent the interests of all Roman Catholic entities ("Roman Catholic Entities") nationwide that are Chartered Organizations, or are otherwise implicated by, the BSA Case.  The Diocese is a member of the RCAHC.

On March 17, 2022, the RCHAC entered into a Settlement Agreement with BSA and its key constituents (the "RCAHC Settlement") which provides that all non-debtor Roman Catholic Entities would be treated as Participating Chartered Organizations under the BSA Plan.  Roman Catholic Entities, such as the Diocese, that are currently debtors in their own chapter 11 cases are required to obtain orders from their own bankruptcy courts authorizing them to participate in the RCAHC Settlement.  On October 28, 2022, the Bankruptcy Court entered an Order [Docket No. 1074] authorizing, but not directing, the Diocese to opt-in to treatment as a Participating Chartered Organization.

On September 8, 2022, the Delaware Court entered an order [BSA Docket No. 10316] (the "BSA Confirmation Order") confirming the BSA Plan.  On December 20, 2022, the Diocese gave BSA notice of its election to opt-in to treatment as a Participating Chartered Organization under the BSA Plan.

The legal effect of certain provisions contained within the BSA Plan and the BSA Confirmation Order is a matter of dispute among various parties in interest in the BSA Bankruptcy Case.  Further, the BSA Confirmation Order has been appealed by multiple parties.  While there is a possibility that the BSA Confirmation Order will be modified or vacated on appeal, in the event it is upheld the Diocese believes that, as a Participating Chartered Organization, it will receive the following treatment under the BSA Plan:[10]

a.    ***Protection from Direct BSA Abuse Claims***.  All BSA Abuse Claims that arose on or after January 1, 1976 ("Post-1975 BSA Abuse Claims"), as well as all BSA Abuse Claims that arose prior to January 1, 1976 ("Pre-1976 BSA Abuse Claims") for which there is insurance issued by a Settling Insurance Company (as defined in the BSA Plan, a "BSA Settling Insurance Company"), will be channeled into a Settlement Trust established under the BSA Plan (the "BSA Settlement Trust"), and the Abuse survivors will release the Participating Chartered Organizations from such BSA Abuse Claims.  Claims unrelated to scouting are not impacted by

---

[9] The RCAHC is composed of the following entities: Catholic Mutual Relief Society of America, Roman Catholic Diocese of Sioux City, Roman Catholic Diocese of Joliet, Roman Catholic Diocese of Omaha, Roman Catholic Diocese of Winona-Rochester, Roman Catholic Archdiocese of Washington, D.C, Roman Catholic Archdiocese of Atlanta, Roman Catholic Archdiocese of New York, Roman Catholic Archdiocese of Chicago, Roman Catholic Diocese of Syracuse, Roman Catholic Diocese of Buffalo, and the Diocese of Rochester.

[10] Notwithstanding the Diocese's description of its understanding of the legal effect of the BSA Plan, nothing herein shall bind the Abuse Claims Reviewer, the Trustee or the Trust in the application of the Allocation Protocol to Abuse Claims.

21

the BSA Plan. The BSA Plan also provides that all Participating Chartered Organizations will receive the protection of a twelve-month injunction from prosecution of BSA Abuse Claims beginning on the Effective Date of the BSA Plan (subject to further extension) to afford Participating Chartered Organizations an opportunity to negotiate an appropriate contribution with the Settlement Trust in order to become, and receive the enhanced treatment afforded to, Contributing Chartered Organizations under the BSA Plan. Contributing Chartered Organizations receive complete releases from all BSA Abuse Claims asserted against them, regardless of when the BSA Abuse Claim arose.

      b.    ***BSA and Local Council Insurance***. Participating Chartered Organizations will assign, to the BSA Settlement Trust, their rights as additional insureds under liability insurance policies covering BSA Abuse Claims issued to the BSA or Local Councils by BSA settling insurance companies (the "<u>Participating Chartered Organization Insurance Assignments</u>") and will voluntarily release their rights to any such insurance policies. All BSA Abuse Claims will be channeled into the BSA Settlement Trust. Participating Chartered Organizations must also assign to the BSA Settlement Trust, among other things, all causes of action against non-settling insurance companies related to Post-1975 BSA Abuse Claims; however, they will retain whatever rights they previously had (if any) in all pre-1976 insurance policies issued to the BSA and Local Councils.

      c.    ***Chartered Organization Insurance***. BSA Abuse Claims against Participating Chartered Organizations will be released and channeled to the BSA Settlement Trust if a BSA Settling Insurance Company issued a liability policy (other than an automobile policy or director's and officer's policy) that does not specifically exclude Abuse or molestation to a Participating Chartered Organization, and a claimant alleges Abuse during the period of that policy. Although the Participating Chartered Organization will release the BSA settling insurance company for these BSA Abuse Claims, the Participating Chartered Organization will retain all rights for Abuse claims unrelated to scouting under policies issued by BSA settling insurance companies. They will also retain all rights for any claims (both related and unrelated to scouting) under independent insurance policies issued by non-settling insurance companies.

      d.    ***Indirect Abuse Claims***. The Participating Chartered Organizations must voluntarily waive all claims against the BSA for contribution, indemnity, reimbursement, or subrogation, and any other claims which are derivative of abuse claims against BSA.

The Diocese believes that eighteen (18) of the 45 DOS-BSA Abuse Claims allege Post-1975 BSA Abuse Claims, and the remaining 27 allege Pre-1976 BSA Abuse Claims that are not covered under insurance policies issued by BSA Settling Insurance Companies.

Under the Plan, holders of DOS-BSA Abuse Claims may receive Distributions from the Trust without regard to treatment of such claims under the BSA Plan.

## H.   <u>Insurance Coverage Adversary Proceeding</u>

The Diocese determined that Insurance Policies issued by many of its Insurers may be implicated by the Abuse Claims. The Abuse Claims have also been Filed, in many cases, against Parishes, Schools, and Other Catholic Organizations, including non-debtor catholic entities.

The Insurers asserted various defenses to coverage of the Abuse Claims. In response, on January 15, 2021, the Diocese commenced Adversary Proceeding No. 21-50002 (the "Insurance Adversary Proceeding") by filing a complaint against Arrowpoint Capital, Certain Underwriters at Lloyd's, London, Certain London Market Companies (along with Certain Underwriters at Lloyd's, London, "LMI"), Markel International Insurance Company Limited, CX Reinsurance Company Limited, Tenecom Limited, English & American Insurance Company, London & Edinburgh Insurance Company Limited, Dominion Insurance Company Limited, Travelers Insurance Company Limited, Bermuda Fire and Marine Insurance Company Limited, Mutual Reinsurance Company Limited, Tokio Marine & Nichido Fire Insurance Company Limited, Old Mutual International (Guernsey) Limited, Mitsui Sumitomo Insurance Company (Europe), Limited, Allianz International Insurance Company, Heddington Insurance Company (U.K.) Limited, Assicurazioni Generali S.p.A., Winterthur Swiss Insurance Company, Harper Insurance Limited, Interstate Fire & Casualty Company, Colonial Penn Insurance Company, Catholic Mutual Group, National Catholic Risk Retention Group, Merchants Mutual Insurance Company, Westchester Fire Insurance Company ("Westchester Fire"), Travelers Casualty and Surety Company, U.S. Fidelity and Guaranty Company, Aviva, PLC, Continental Insurance Company, TIG Insurance Company, Great American Assurance Company, Fireman's Fund Insurance Company (along with Interstate Fire & Casualty Company, "Interstate"), Traveler's Indemnity Company, North River Insurance Company, Insurance Company of North America, Hartford Fire Insurance Company, U.S. Fire Insurance Company, Hanover Insurance Company, National Surety Corporation, Continental Casualty Company, Excelsior Insurance Company, Royal Globe Insurance Company, Utica Mutual Insurance Company, Providence Washington Insurance Company, Arrowood Indemnity Company, SPARTA Insurance Company, Ace Property and Casualty Insurance, Traveler's Indemnity Company (along with Travelers Insurance Company Limited and Travelers Casualty and Surety Company, "Travelers"), Lamorak Insurance Company, Nationwide Insurance Company of America, Zurich American Insurance Company, NGM Insurance Company, Unigard Insurance Company, Andover Companies, New York Central Mutual Fire Insurance Company, Michigan Millers Mutual Insurance Company, General Insurance Company of America, and National Fire Insurance Company of Hartford[11] (collectively, after dismissal of certain insurers the "Insurers") for breach of contract and declaratory judgment, seeking a declaration of the rights, duties, and liabilities of the parties pursuant to the terms of their respective insurance policies and damages. By commencing the Insurance Adversary Proceeding,

---

[11] CX Reinsurance, Swiss Re America Corporation as Administrator for 21st Century Centennial Insurance Company, Formerly Known as Colonial Penn Insurance Company, Ace Property and Casualty Insurance, Andover Companies, Continental Casualty Company, Continental Insurance Company, General Insurance Company of America, Great American Assurance Company, Heddington Insurance (U.K.) Limited, Insurance Company of North America, Lamorak Insurance Company, Michigan Millers Mutual Insurance Company, National Fire Insurance Company of Hartford, National Surety Corporation, New York Central Mutual Fire Insurance Company, NGM Insurance Company, North River Insurance Company, Providence Washington Insurance Company, Royal Globe Insurance Company, Tokio Marine & Nichido Fire Insurance Company Limited, Traveler's Indemnity Company, U.S. Fidelity and Guaranty Company, U.S. Fire Insurance Company, QBE Insurance Corporation as successor-in-interest to Unigard Insurance Company (successor-in-interest to Jamestown Mutual Insurance Company), Zurich American Insurance Company, SPARTA Insurance Company, Old Mutual International (Guernsey) Limited, English & American Insurance Company, Aviva, PLC, Bermuda Fire and Marine Insurance Company Limited, and Mutual Reinsurance Company Limited were dismissed from the Insurance Adversary Proceeding once it was determined that no Abuse Claims implicate the insurance policies in question.

23

the Diocese sought to determine the extent of coverage as to the Abuse claims asserted against the Diocese.

LMI and Interstate asserted dozens of defenses to providing coverage for Abuse Claims. LMI and Interstate contend that those defenses arise from the Diocese's alleged failures to satisfy conditions precedent to LMI's and Interstate's respective obligations under the LMI and Interstate Policies, including providing notice to LMI and Interstate, cooperating with LMI and Interstate, utilizing a service organization to handle Abuse Claims, and allowing LMI and Interstate access to books and records, as well as exclusions to coverage that LMI and Interstate contend are applicable to the Abuse Claims. *See The Roman Catholic Diocese of Syracuse New York et al. v. Arrowpoint Capital et al.*, No. 21-50002, Dkt. Nos. 195, 202 (Bankr. N.D.N.Y. filed Jan. 15, 2021). The Plan Proponents do not agree with LMI and Interstate's position and asserted defenses with respect to the Abuse Claims.

On February 4, 2021, the Diocese moved for an order referring the issues raised in the Insurance Adversary Proceeding to mediation and for the appointment of a mediator to mediate all issues among the Diocese, the Committee, and the Insurers. On April 12, 2021, the Court entered an Order Directing Mediation and Appointing Mediator (the "Mediation Order") [Docket No. 59] which (i) referred the claims asserted in the Insurance Adversary Proceeding to mediation; (ii) appointed the Honorable United States Bankruptcy Judge Judith K. Fitzgerald as mediator; and (iii) directed the Diocese, the Insurers, the Committee, the *ad hoc* committee of Parishes and other Protected Parties to participate in the mediation process.

On August 27, 2021, the Diocese and other Plaintiffs in the Insurance Adversary Proceeding voluntarily dismissed Ace Property and Casualty Insurance Company, and Insurance Company of North America, without prejudice. On February 28, 2024, the Diocese and other Plaintiffs in the Insurance Adversary Proceeding voluntarily dismissed Westchester Fire, without prejudice. Accordingly, Westchester Fire, Ace Property and Casualty Insurance Company, and Insurance Company of North America are excluded from the Plan definition of "Non-Settling Insurers," and no insurance rights under policies issued by Westchester Fire, Ace Property and Casualty Insurance Company, or Insurance Company of North America will be subject to the Insurance Claims Assignment.

**Under the Plan, the Trust will succeed to the Diocese as plaintiff under the Insurance Adversary Proceeding.**

## I.    Stay of Litigation Against Parishes, Schools, and Other Catholic Organizations

Until September 15, 2023, all litigation in Abuse Actions against Participating Parties was stayed pursuant to a *Stipulation and Order Pursuant to 11 U.S.C. § 105(a) Staying Continued Prosecution of Certain Lawsuits* [Docket No. 345] (the "Stay Stipulation and Order"). The Stay Stipulation and Order enjoined the prosecution of Abuse Claims against all Participating Parties, and was the result of negotiations between the Diocese and the Committee. The Stay Stipulation and Order was intended to enable the parties to concentrate their efforts on achieving a global resolution of all Abuse Claims against the Diocese *and* the Participating Parties through the Plan. The Stay Stipulation and Order was extended through consent of the Diocese and the Committee eleven times over the course of the Chapter 11 Case while the Diocese engaged in plan negotiations

24

through mediation with its Insurers and the Committee [Docket Nos. 445, 549, 689, 802, 875, 986, 1070, 1148, 1270, 1324 and 1349]. The Stay Stipulation and Order have been extended to December 15, 2023.[12]

On January 28, 2021, the Diocese commenced an adversary proceeding by filing a *Verified Complaint Seeking Declaratory and Injunctive Relief Pursuant to 11 U.S.C. §§105 and 362 or a Preliminary Injunction Pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure* (Adv. Pro. No. 21-50005) (the "Stay Adversary") and Filed a motion (the "Injunction Motion") seeking, among other things, entry of one or more orders (i) confirming that the automatic stay provided by section 362 of the Bankruptcy Code enjoins the prosecution of the Abuse Claims, to the extent they seek to recover against, collect, or to obtain possession or control of, any property of the Diocese's bankruptcy estate (including, without limitation, any rights to insurance coverage), and further (ii) enjoining the prosecution of the Abuse Claims against the Participating Parties pursuant to section 105(a) of the Bankruptcy Code, to the extent such prosecution is not already stayed by operation of the automatic stay.[13]

Various Abuse Claimants opposed the Injunction Motion. A Decision and Order Granting Preliminary Injunctive Relief was entered on March 5, 2021 [Docket No. 37]. Further Orders granting the Injunction Motion and extending the requested preliminary injunction have been entered [Docket Nos. 50, 63, 72, 95], most recently extending the preliminary injunction to the earlier of (i) June 30, 2024, or (ii) the Termination Date (as such term is used in the Stay Stipulation and Order).

## J.    Appointment of Second Mediator

On May 6, 2022, Judge Fitzgerald filed a Mediator's report detailing, among other things, that no consensual chapter 11 plan had been arrived at in this case, to date [Docket No. 889]. The Diocese, the Committee, and the Insurers thereafter requested that the Bankruptcy Court appoint Paul Van Osselaer to act as co-mediator with Judge Fitzgerald. On July 8, 2022, the Bankruptcy Court entered the *Order on Consent of the Mediation Parties Appointing Additional Mediator* Appointing Paul Van Osselaer as Additional Mediator [Insurance Adv. Docket No. 125] and the mediation sessions resumed under the guidance of Mr. Van Osselaer.

Since entry of the original Mediation Order, the Diocese, the Committee, and the Insurers have engaged in nearly three years of mediation with dozens of virtual and in-person mediation meetings, interspersed with ongoing negotiations and communications among the mediation parties. In spite of the substantial efforts of, and expense incurred in connection with, mediation, the Diocese, the Committee, and the Insurers have been unable to achieve agreement on a global settlement.

---

[12] Paragraph 7 of the Stay Stipulation and Order provides a forty-five (45) day period, following the occurrence of the Termination Date (as such term is used therein), before any answer, motion to dismiss, or other responsive pleading(s) must be filed by the Protected Parties in any of the CVA Cases.

[13] *See The Roman Catholic Diocese of Syracuse, New York v. LG 35 DOE, et al.,* Adv. No. 21-50005 [Stay Adv. Docket Nos. 1, 4] (January 28, 2021).

17289563.12

# ARTICLE IV

# SUMMARY OF THE PLAN

The Plan Proponents submit that the treatment of Creditors under the Plan is more favorable than the treatment Creditors would receive if the Chapter 11 Case were converted to a case under chapter 7 of the Bankruptcy Code.  Therefore, the Plan Proponents submit that the Plan is in the best interests of all Creditors and the Plan Proponents recommend acceptance of the Plan by holders of Class 1 Secured Claim of KeyBank, Class 2 Secured Claim of NBT Bank, Class 4 General Unsecured Claims and Class 5 Claims.

**The summary of significant elements of the Plan below is provided for the convenience of all parties.  The summary does not describe every element of the Plan and is not intended as a substitute for a thorough and complete review of the Plan.  This summary is subject to, and is qualified in its entirety by reference to, the full text of the Plan.  All Creditors are encouraged to review the Plan and this Disclosure Statement, including Exhibits, in their entirety for a more complete understanding of the Plan's provisions and impact upon Creditors.  To the extent any term or provision in this Disclosure Statement is inconsistent with a term or provision of the Plan, the term or provision of the Plan shall control.**

## A.    Classification of Claims Generally

Section 101(5) of the Bankruptcy Code defines a claim as: (a) a "right to payment, whether or not such right is reduced to judgement, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured"; or (b) a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall designate classes of claims against a debtor.  Section 1122 of the Bankruptcy Code further requires that each class of claims contain only claims that are "substantially similar" to each other.  The Diocese believes that it has classified all Claims in compliance with the requirements of Section 1122 and 1123.  However, it is possible that the holder of a Claim may challenge such classification and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Diocese would, to the extent permitted by the Bankruptcy Court, modify the classifications in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of Claims may necessitate a re-solicitation.

26

**B.**     **Creditor Recovery Under the Plan**

All classified Claims have been placed into one of six separate Classes.  The Plan affirmatively states whether each Class of Claims is Impaired or Unimpaired and whether such Class is entitled to vote.

**C.**     **Classification of Claims and Treatments**

As required by the Bankruptcy Code, all Claims are classified into several separate categories.  While the vast majority of Claims have been placed into one of the six separate Classes, some Claims are left unclassified.  The separate Classes are described in detail within this Disclosure Statement and in the Plan.

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| N/A | Administrative Claims | No | Deemed to Accept |
| N/A | Priority Tax Claims | No | Deemed to Accept |
| N/A | Non-Tax Priority Claims | No | Deemed to Accept |
| N/A | Professional Fee Claims | No | Deemed to Accept |
| N/A | U.S. Trustee Fee Claims | No | Does not Vote |
| 1 | Secured Claim of KeyBank | Yes | Entitled to Vote |
| 2 | Secured Claim of NBT Bank | Yes | Entitled to Vote |
| 3 | Pass-Through Claims | No | Deemed to Accept |
| 4 | General Unsecured Claims | Yes | Entitled to Vote |
| 5 | Abuse Claims | Yes | Entitled to Vote |
| 6 | Inbound Contribution Claims | Yes | Deemed to Reject |

**1.**     **Unclassified Claims**.

a.     *Administrative Claims*.  Administrative Claims are Claims for costs or expenses incurred in the administration of the Diocese's Chapter 11 Case, which are Allowed pursuant to section 503(b) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described in Section 2.1 of the Plan.  Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different and less favorable treatment than provided under the Plan, or by order of the Bankruptcy Court, a Person holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim as soon as practicable after the later of: (i) the Effective Date; or (ii) the date on which such Claim becomes an Allowed Administrative Claim.  Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

With respect to any trade Claims arising after the Petition Date representing obligations incurred by the Diocese in the ordinary course of its business consistent with past practice, such trade Claims shall be paid in the ordinary course of business.  As to other Allowed Administrative Claims, except as otherwise provided in the Plan, each holder of an Allowed Administrative Claim: (i) shall be paid by the Reorganized Diocese as soon as reasonably practicable after the Effective

27

Date or on the date the Order allowing such Administrative Claim becomes a Final Order; and (ii) shall receive, on account of and in full satisfaction of such Allowed Administrative Claim, Cash equal to the amount thereof, unless the holder agrees to less favorable treatment of such Allowed Administrative Claim.

Administrative Claims representing obligations incurred by the Diocese after the date and time of the entry of the Confirmation Order shall not be subject to application to the Bankruptcy Court and may be paid by the Reorganized Diocese in the ordinary course of business and without Bankruptcy Court approval.

b.     *Priority Tax Claims*.   Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Diocese or the Reorganized Diocese, as applicable, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due; provided, however, that the Diocese reserves the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.   The holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising from, or in connection with any Priority Tax Claim and any demand for such penalty will be deemed Disallowed by the confirmation of the Plan.

The Diocese does not anticipate that any Priority Tax Claims will exist as of the Effective Date.

c.     *Non-Tax Priority Claims*.   Unless the holder of an Allowed Non-Tax Priority Claim and the Diocese or the Reorganized Diocese (as applicable) agree to a different treatment, on, or as soon as reasonably practicable after, the later of (a) the Effective Date, or (b) the date on which such Non-Tax Priority Claim becomes an Allowed Claim, each holder of an such an Allowed Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for, such Allowed Claim, (i) Cash equal to the unpaid portion of such Allowed Claim or (ii) such other less favorable treatment as to which the Diocese or the Reorganized Diocese and the holder of such Allowed Claim shall have agreed upon in writing.   Notwithstanding anything in the Plan to the contrary, the holder of an Allowed Non-Tax Priority Claim may be paid on such other date and upon such other terms as may be agreed upon by the holder of an Allowed Administrative Claim and the Diocese or the Reorganized Diocese.

The Diocese does not anticipate that any unpaid Non-Tax Priority Claims will exist as of the Effective Date.

d.     *Professional Fee Claims*.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Professional Fee Claims have not been classified and are treated as described herein.   All Professionals or other Persons requesting an award by the Bankruptcy Court of Professional Fee Claims (a) shall File their respective final applications for allowance of

28

compensation for services rendered and reimbursement of expenses incurred by the date that is 60 days after the Effective Date, and (b) shall be paid in full, in Cash, by the Reorganized Diocese (i) as soon as practicable after the Effective Date or the date the order allowing such Administrative Claim becomes a Final Order; or (ii) upon such terms as may exist pursuant to order of the Bankruptcy Court or as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Diocese or the Reorganized Diocese, as applicable. The Diocese is authorized to pay its Professionals for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

Professional Fee Claims of Professionals employed by the Committee, which are incurred prior to the Effective Date of the Plan in connection with the implementation and consummation of the Plan, shall be paid by the Diocese or the Reorganized Diocese, after notice and a hearing, in accordance with Section 2.1.4 of the Plan, provided, however, the Diocese and/or Reorganized Diocese shall be responsible for paying no more than one-half of all Allowed Professional Fee Claims for Committee Professionals, up to a maximum of $25,000, for services provided or expenses incurred relating to each of (i) the Arrowood 2004 Motion, and (ii) the Stay Relief Motions, with the balance of any such Allowed Professional Fee Claims to be paid by the Trust. For the avoidance of doubt, Professional Fee Claims of Professionals employed by the Diocese of services rendered prior to the Effective Date shall not be paid by the Trust.

Neither the Diocese, the Reorganized Diocese, or the Trust shall have any obligation to pay any Professional Fee Claim for services provided or expenses incurred by any Professional for the Diocese or the Committee relating to or arising out of the Interstate POC Disclosure. All Allowed Professional Fee Claims arising from or relating to the Interstate POC Disclosure shall be borne and paid solely by Interstate in accordance with the Bankruptcy Court's order authorizing the Committee to issue subpoenas in furtherance of its investigation of the Interstate POC Disclosure which is Filed in the Chapter 11 Case at Docket No. 1485.

e.    *U.S. Trustee Fees*. U.S. Trustee Fees include all fees and charges assessed against the Diocese under 28 U.S.C. § 1930, together with interest, if any, under 31 U.S.C. § 3717. All U.S. Trustee Fees not paid prior to the Effective Date shall be paid by the Reorganized Diocese as soon as practicable after the Effective Date. In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of the Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930, nor shall any payment made by the Trust to any Person be considered a disbursement under 28 U.S.C. § 1930.

To date, the Diocese has paid U.S. Trustee Fees totaling approximately $_____ to the Office of the United States Trustee in connection with the Chapter 11 Case. The requirement to pay U.S. Trustee Fees is subject to any amendments to 28 U.S.C. § 1930(a)(6) that Congress makes retroactively applicable to confirmed chapter 11 cases. The Reorganized Diocese shall have the exclusive right to pursue any cause of action, right to reimbursement for overpayment, or similar interest of the Diocese in amounts paid pursuant to 28 U.S.C. § 1930.

2.    **Classified Claims**.

a.    ***Class 1 – Secured Claim of KeyBank***.

**Classification**:  Class 1 is composed of the Secured Claim held by KeyBank in connection with the Key Secured Debt Documents.

**Treatment**:  The Diocese is current with respect to all obligations due under the Key Secured Debt Documents.  Upon the occurrence of the Effective Date, the Line of Credit shall be cancelled, and KeyBank shall have no obligation to honor any request from the Diocese or Reorganized Diocese to draw upon such credit facility. On or as soon as reasonably practicable after the Effective Date, the Diocese will liquidate certain of the KeyBank Blocked Collateral in an amount equal to $5,885,000, or such greater amount as shall represent 110% of the KeyBank Debt Amount as of the Effective Date, the proceeds of which will be converted into one or more cash certificate(s) of deposit (collectively, the "KeyBank Replacement CD").  The KeyBank Lien shall attach to the KeyBank Replacement CD, to the same extent, validity and priority as it attached to the assets of the Diocese prior to the Petition Date, and the Reorganized Diocese shall assume all obligations of the Diocese under the Key Secured Debt Documents, *except that*, notwithstanding anything to the contrary herein or in the Key Secured Debt Documents, except for the KeyBank Replacement CD which shall continue to be maintained in one of the KeyBank Blocked Accounts, the Reorganized Diocese shall have no obligation to maintain any of the remaining KeyBank Blocked Collateral in the KeyBank Blocked Accounts, and shall be free to withdraw, liquidate, and/or transfer the same in its sole discretion.  The Diocese shall also pay KeyBank any reasonable fees, costs, or charges subject to and in accordance with section 506(b) of the Bankruptcy Code.  The Diocese shall execute and deliver such documents and instruments and perform such other acts that are reasonably necessary in connection with the KeyBank Replacement CD and KeyBank's treatment under the Plan.

**Voting**:  The Class 1 Claim is Impaired, and therefore, the holder of the Class 1 Claim is entitled to vote to accept or reject the Plan.

b.    ***Class 2 – Secured Claim of NBT Bank.***

**Classification**:  Class 2 is composed of the Secured Claim held by NBT Bank, National Association, in connection with the NBT Secured Debt Documents.

**Treatment**:  The Diocese is current with respect to all obligations due under the NBT Secured Debt Documents.  On or after the Effective Date, the NBT Lien shall attach to the Residual Assets held by the Reorganized Diocese, to the same extent, validity and priority as it attached to the assets of the Diocese prior to the Petition Date, and the Reorganized Diocese shall assume all obligations of the Diocese under the NBT Secured Debt Documents, *except that*, notwithstanding anything to the contrary in the NBT Secured Debt Documents, the maximum amount of NBT Blocked Collateral that the Reorganized Diocese shall be required to maintain in the NBT Blocked Account shall not exceed one-hundred ten percent (110%) of the NBT Debt Amount.

**Voting**:  The Class 2 Claim is Impaired, and therefore, the holder of the Class 2 Claim is entitled to vote to accept or reject the Plan.

c.    ***Class 3 – Pass-Through Claims.***

**Classification:**  Class 3 includes all Pass-Through Claims.

17289563.12

**Treatment:** Upon the later to occur of the Effective Date and the date on which the Diocese designates a Claim as a Pass-Through Claim, the holder of such Pass-Through Claim shall be deemed to have granted relief from the automatic stay with respect to its Pass-Through Claim, such Pass-Through Claim shall not be subject to the Diocese Discharge, and the parties shall retain their respective rights, remedies, claims, and defenses as they existed on the Petition Date. The Diocese shall designate all Pass-Through Claims no later than sixty days after the Effective Date.

**Voting:** Class 3 Pass-Through Claims are Unimpaired, and therefore, holders of Class 2 Claims are deemed to have accepted the Plan and are not entitled to vote.

d.    ***Class 4 – General Unsecured Claims.***

**Classification:** Class 4 Claims include all General Unsecured Claims. The Diocese estimates that the Class 4 Claims total approximately $50,000.

**Treatment:** Except to the extent the holder of an Allowed General Unsecured Claim agrees in writing to accept less favorable treatment as proposed by the Diocese or Reorganized Diocese, the Reorganized Diocese shall pay each holder of an Allowed General Unsecured Claim, Cash in two installments each equal to 50% of the Allowed amount of such General Unsecured Claim with the first payment to occur on, or as soon as reasonably practicable after the later of (a) the Effective Date, and (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, and the second payment to occur on, or as soon as reasonably practicable after the date that is six months after the date of the first payment. The foregoing payments shall be in full satisfaction, settlement, and release of, and in exchange for, such Allowed General Unsecured Claim. Notwithstanding anything to the contrary set forth above, no payments shall be made to any Protected Party on account of any General Unsecured Claim and all Protected Parties shall be deemed to have withdrawn any General Unsecured Claim with prejudice as of the Effective Date in consideration of the Channeling Injunction and release provisions provided in Article 12 of the Plan.

**Voting:** Class 4 General Unsecured Claims are Impaired, and therefore, each holder of a Class 3 Claim is entitled to vote to accept or reject the Plan.

e.    ***Class 5 – Abuse Claims.***

**Classification:** Class 5 Claims include all Filed Abuse Claims. More than 411 Abuse Claims have been asserted against the Diocese and the Participating Parties through proofs of claim filed in the Chapter 11 Case and/or through the commencement of Abuse Actions in other courts.

**Treatment:**

i.    The Plan provides for the establishment of the Trust to fund Distributions to Class 5 Claimants. The Trust shall be funded as provided in Section 8 of the Plan. Distributions from the Trust shall be made to Class 5 Claimants on a fair and equitable basis, pursuant to and in accordance with Section 4.6 of the Plan, the Trust Agreement, and the Allocation Protocol, which shall represent the sole recovery available to Class 5 Claimants in respect to any

31

obligation owed by the Protected Parties. Distributions to Class 5 Claimants from the Trust do not impact in any way any Class 5 Claims to the extent such Class 5 Claims implicate any Non-Settling Insurer Policy.

ii. As of the Effective Date of the Plan, the liability of Protected Parties for all Class 5 Claims shall be fully assumed by the Trust, without any further order from the Bankruptcy Court or further action from any party, and pursuant to the Channeling Injunction set forth in Section 12.3 of the Plan. All Allowed Class 5 Claims shall be satisfied solely from the Trust as set forth in the Plan, the Trust Agreement, and the Allocation Protocol; *provided*, *however*, such assumption of Class 5 Claims shall not prevent Litigation Claimants from asserting Litigation Claims to the extent provided for herein.

iii. No Class 5 Claimant shall receive a Distribution from the Trust until such Class 5 Claimant has executed and delivered to the Trust the Abuse Claim Release Agreement attached to the Plan Supplement as **Exhibit 2**. Each Class 5 Claimant must release all Claims against the Protected Parties prior to receiving a Distribution, *provided, however,* to preserve coverage under Non-Settling Insurer Policies, and subject to the provisions of Section 12.2 of the Plan, Class 5 Claimants specifically reserve, and do not release, any and all Claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse is limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any proceeds from such judgments or awards will be Distributed in accordance with Section 4.6 of the Plan. The Trust must provide copies of all executed Abuse Claim Release Agreements to the (i) Protected Parties; and (ii) any Joint Tortfeasor, upon reasonable request and provision of an appropriate, executed non-disclosure or confidentiality agreement.

iv. Class 5 Claims will be released as against the Diocese and the Participating Parties upon the occurrence of the applicable Abuse Claim Discharge Date as provided in Sections 12.2.3 and 12.7 below. For the avoidance of doubt, nothing herein shall require a Class 5 Claimant to release any Person that is not a Protected Party.

v. The Non-Settling Insurers remain fully liable for their obligations related in any way to the Class 5 Claims, and their obligations are not reduced by the Diocese being in bankruptcy or by the Trust Distributions Class 5 Claimants receive, or are entitled to receive, based on the Plan, Trust Agreement, or Allocation Protocol. For the avoidance of doubt, (i) determinations by the Abuse Claims Reviewer and/or any distributions entitled to be received from the Trust shall not constitute a determination of the Diocese's or any Participating Party's liability or damages for Class 5 Claims; and (ii) under no circumstances shall the Abuse Claims Reviewer's review of a Class 5 Claim affect, or be construed to affect, the rights of a Non-Settling Insurer. The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Class 5 Claims. Any such recoveries by the Trust from Non-Settling Insurers will become Trust Assets to be distributed pursuant to Section 4.6 of the Plan and the Allocation Protocol.

vi.      Nothing in the Plan affects, diminishes or impairs any Class 5 Claimant's rights against any Joint Tortfeasor, including that Joint Tortfeasor's comparative fault or joint and several liability for Abuse, if any.  In any litigation against a Joint Tortfeasor, nothing in the Plan or the Plan Documents shall be deemed an adjudication of a Class 5 Claim for any purpose or a limitation on the recovery against such Joint Tortfeasor.

vii.      No Person, other than the Committee or, following the Effective Date, the Trustee, may: (i) object to any Class 5 Claim; or (ii) challenge the merit, validity, or amount of any Class 5 Claim, except that nothing in the Plan shall prevent the Diocese or any Participating Party, or with respect to an Abuse Claim implicating a Non-Settling Insurer Policy, a Non-Settling Insurer, from asserting any legal or factual defenses that the Diocese, Participating Party, and/or Non-Settling Insurer may have in response to any Litigation Claim.  Any objection or challenge to a Class 5 Claim pending as of the Effective Date is deemed withdrawn and shall not be refiled. With the exception of the Trustee's objections or challenges to a Class 5 Claim, or the adjudication or settlement of a Litigation Claim, Class 5 Claims shall be treated in accordance with the Allocation Protocol and shall not be subject to any other review or judicial consideration.  Nothing in the Plan or the Plan Documents shall constitute an admission by any Protected Party as to the validity or amount of any Class 5 Claim, nor shall anything herein or therein restrict the Diocese or the Participating Parties from complying with any Post-Effective Date Insurance Obligations or modify the terms of any Non-Settling Insurer Policy with respect to any failure of the Diocese or the Participating Parties to observe or perform any Post-Effective Date Insurance Obligations.

**Voting:**  Abuse Claims are Impaired, and each holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

f.      *Class 6 – Inbound Contribution Claims.*

**Classification:**  Class 6 Inbound Contribution Claims include any Claim asserted against the Diocese for indemnity, contribution, or reimbursement arising out of, or related to, the Claimant's liability to pay or defend any Abuse Claim.

**Treatment:**  Class 6 Claims shall be Disallowed and extinguished and there will be no Distributions to the holders of Class 6 Claims on account of such Class 6 Claims.

**Voting:**  Class 6 Inbound Contribution Claimants will not receive or retain any property under the Plan and therefore are deemed to have rejected the Plan.  Class 6 will not vote on the Plan.

# ARTICLE V

## ABUSE CLAIMS

A.      **Trust Liability for Abuse Claims.**

On the Effective Date, the Trust shall automatically and without further act or deed assume: (i) all liability, if any, of the Protected Parties and Settling Insurers in respect of Channeled Claims, subject to Section 12.3 of the Plan; (ii) the responsibility for preserving, managing and distributing Trust Assets pursuant to the Allocation Protocol and the Trust Agreement; and (iii) the right to

33

pursue Insurance Claims against Non-Settling Insurers. Except as otherwise provided herein, the Trust shall only assume the liabilities of the Protected Parties with respect to Abuse Claims upon the occurrence of the applicable Abuse Claim Discharge Date.

**B.**     **Assessment of Abuse Claims**

Abuse Claims will be assessed in accordance with the Allocation Protocol, which is designed to provide an expeditious, efficient, and inexpensive method for determining whether an Abuse Claimant is entitled to a Distribution from the Trust. The Allocation Protocol provides that all Abuse Claims will be reviewed by an Abuse Claims Reviewer. The Abuse Claims Reviewer is Roger L. Kramer, of Kramer Law, LLC. Roger Kramer has served as an abuse claims reviewer in connection with the bankruptcy cases filed by the Archdiocese of St. Paul and Minneapolis, the Crosiers Order, the Diocese of Duluth, the Diocese of New Ulm, the Diocese of St. Cloud, the Diocese of Winona-Rochester, the Archdiocese of Agaña, and the Diocese of Harrisburg. Stinson LLP, the Committee's bankruptcy counsel, served as bankruptcy counsel to the survivor committee in each of the foregoing cases and represented or represents each of the settlement trusts that were established in each case, except for the Archdiocese of Agaña settlement trust. Several State Court Counsel who represent Abuse Claimants also represented abuse claimants in those cases.

The Diocese, the Participating Parties, and the Reorganized Diocese shall reasonably cooperate with the Abuse Claims Reviewer and the Trustee in connection with any inquiries by either related to the administration of the Allocation Protocol, but shall not be required to act in any way that violates any duty or prevents the satisfaction of any condition precedent under any Non-Settling Insurer Policy, if any (including any duty to cooperate with a Non-Settling Insurer). Under no circumstances shall the Abuse Claims Reviewer's review of an Abuse Claim or a Distribution to an Abuse Claimant have any effect on the rights, defenses, or obligations of any Non-Settling Insurer.

**C.**     **Treatment of Abuse Claims.**

1.     ***Abuse Claimant Treatment Election.*** No later than thirty (30) days after an Abuse Claimant is notified of the amount of their award under the Allocation Protocol, the Abuse Claimant shall elect in writing one of the following treatment alternatives:

a.     *Treatment as a Distribution Claimant*. Any holder of an Abuse Claim who is not a Litigation Claimant pursuant to subsections b and c below, will receive, in full and final satisfaction and discharge of their Abuse Claim, Distributions from the Trust in the amount determined as a result of the Abuse Claims Reviewer's assessment of the Abuse Claimant's Abuse Claim pursuant to the Allocation Protocol. An Abuse Claimant who elects to receive a Trust Distribution for a Distribution Claim must execute and deliver to the Trustee an Abuse Claim Release Agreement.

b.     *Treatment as a Litigation Claimant*. Any holder of an Abuse Claim that elects treatment as a Litigation Claimant will receive, in full and final satisfaction and discharge of their Abuse Claim, (i) rights, to the extent set forth in the Plan and Allocation Protocol, to Distributions from the Trust and (ii) the right, prior to the occurrence of the applicable Abuse

34

Claim Discharge Date, and subject to the Trustee granting authorization to pursue a Litigation Claim in accordance with the provisions of the Plan, to liquidate his or her Abuse Claim for its full amount according to proof in order to determine the liability of any Protected Party for purposes of the Trust seeking recovery from any Non-Settling Insurer that is or may be liable on the Abuse Claim or any Insurance Claim arising therefrom, pursuant to Section 8.7 of the Plan. For the avoidance of doubt, the Settling Insurers shall not be obligated to defend or indemnify any Person in connection with a Litigation Claim and the Settling Insurers shall not have any other duties or obligations to any Person in connection with a Litigation Claim. Further, under no circumstances will an Abuse Claimant or any other Person be able to recover any amount from a Settling Insurer, or to obtain any recovery whatsoever against any asset of the Diocese, the Reorganized Diocese, or the Participating Parties (except for collecting proceeds from any Non-Insurer Policy or other amounts for which a Non-Settling Insurer is deemed to be liable), in connection with a Litigation Claim.

(i)     Prior to authorizing an Abuse Claimant to proceed as a Litigation Claimant, the Trustee shall (a) consult with counsel for the Litigation Claimant, and the Diocese and/or any Participating Party against whom such Abuse Claimant's Claim is asserted, to coordinate, among other things, a mutually acceptable litigation schedule; and (b) require the Abuse Claimant to execute and deliver an Abuse Claim Release Agreement and a Litigation Claimant Agreement.

(ii)    The Trustee shall provide a copy of each Abuse Claim Release Agreement and Litigation Claimant Agreement to the Reorganized Diocese upon execution thereof, and to any other Protected Parties upon request. For the avoidance of doubt, the Trustee shall have the sole discretion to (a) authorize a Litigation Claimant to pursue their Litigation Claim; (b) make a final decision as to whether a Litigation is pursued; and (c) make final decisions relating to the management and timing of litigation relating to Litigation Claims, *provided*, *however*, that the Trust Agreement shall direct that in making such determinations, the Trustee shall take into consideration, and shall use reasonable efforts to minimize the cumulative impact of post-Effective Date litigation on, the business operations and legal and personnel resources of the Diocese, the Reorganized Diocese, and the Participating Parties.

c.      *Default Election.* If an Abuse Claimant does not make one of the elections above, the Abuse Claimant will be treated as a Litigation Claimant prior to the occurrence of the applicable Abuse Claim Discharge Date and subject to the Trustee's authorization to proceed on such Litigation Claim as set forth in b, above.

2.      *Modification of the Treatment Election.*

a.      Upon written notice to the Trustee, subject to the Trustee's sole and absolute discretion, an Abuse Claimant may rescind the election to be treated as a Litigation Claimant in favor of being treated as a Distribution Claimant. Notwithstanding the foregoing, the Trustee shall consent to an Abuse Claimant's rescission if such written notice of rescission is given prior to entry of an order of dismissal or a final judgment on the Litigation Claim in favor of a Protected Party.

17289563.12

b.      No later than ten (10) days after an Abuse Claimant makes an election to be treated as a Distribution Claimant, an Abuse Claimant may rescind such election in favor of being treated as a Litigation Claimant, provided, however, that such Abuse Claimant must first obtain the Trustee's authorization before prosecuting his or her Litigation Claim, in accordance with the provisions of Section 4.3.1.b of the Plan.

3.      *Trustee's Rights with Respect to Abuse Claimant Treatment Election*. The Trust retains the right to pursue Non-Settling Insurers for the Diocese's and any other Protected Party's liability to Abuse Claimants.

4.      *Reporting of Abuse Claimant Treatment Election*.  The Trustee shall report to the Reorganized Diocese, on a quarterly basis, or upon reasonable request, (i) the date on which each Abuse Claimant is notified of their award under the Allocation Protocol, (ii) whether each Abuse Claimant has elected to be treated as a Distribution Claimant or Litigation Claimant, and (iii) any modification made by any Abuse Claimant to their treatment status pursuant to Section 2, above.

## D.      <u>Legal Effect of Estimation of Claims and Distributions Under the Allocation Protocol</u>

The Abuse Claims Reviewer's determinations are for estimation and Distribution purposes only and shall not constitute binding findings as to, or the fixing of, facts or liability concerning the Abuse Claims with any binding legal effect.  The determination of Abuse Claimants' qualifications, the estimation of Abuse Claims, and Trust Distributions to Abuse Claimants shall not be construed as an admission of liability by the Diocese, any Participating Party, or the Trust with respect to any Abuse Claim and shall have no *res judicata* or collateral estoppel effect on the Diocese, the Reorganized Diocese, any Participating Party, the Trust, or any Non-Settling Insurer.

The Trust's act of making a Distribution to an Abuse Claimant is immaterial to, and shall not be construed as, a determination or admission of the Diocese's, any Participating Party's, or any Non-Settling Insurers' liability for, or damages with respect to, any Abuse Claim, nor will the Trust present any Non-Settling Insurer with a demand for payment of said Distribution.  The determination of qualification, estimation of Abuse Claims, and the payment of Distributions is not a settlement, release, accord, or novation of any Abuse Claim and cannot be used by any Joint Tortfeasor as a defense to any alleged joint liability.  The determination of qualification, estimation of claims, and payment of partial Distributions does not impair a Litigation Claimant's right to obtain a judgment, including a judgment based on joint and several liability, against the Diocese and/or a Participating Party or any Non-Settling Insurer, for purposes of establishing the Diocese's and/or a Participating Party's liability with respect to their Litigation Claim, *provided, however*, that recourse on such judgment shall be limited to the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim or any Insurance Claim arising therefrom, and ay proceeds from such judgments or awards will be Distributed in accordance with Section 4.6 of the Plan.  Neither the Abuse Claims Reviewer's review of an Abuse Claim and determination of qualification, nor the Trust's estimation of an Abuse Claim or the payment of Distributions shall: (i) constitute a trial, an adjudication on the merits, or evidence of liability or damages in any

36

litigation with the Diocese or the Participating Parties, Non-Settling Insurers, or any other Person, or (ii) constitute, or be deemed, a determination of the reasonableness of the amount of any Litigation Claim, either individually or in the aggregate with other Litigation Claims, in any coverage litigation with any Non-Settling Insurers.  The Trust's estimation of Abuse Claims and payment of Trust Distributions does not create an admission of the fact of liability, or the extent of damages, on behalf of the Diocese and/or any Participating Parties.

### E.        Release and Discharge of Abuse Claims.

Notwithstanding anything to the contrary herein, each Abuse Claimant must, prior to receiving a Distribution from the Trust, execute and deliver to the Trustee an Abuse Claim Release Agreement in the form attached to the Plan Supplement as **Exhibit 2**, *provided, however,* to preserve coverage under Non-Settling Insurer Policies, Abuse Claimants specifically reserve, and do not release, subject to the occurrence of the applicable Abuse Claim Discharge Date, any and all Abuse Claims that they may have against the Protected Parties that implicate coverage under Non-Settling Insurer Policies, but recourse on such Abuse Claims prior to their release is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable by the Trust from any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim, and any such judgments or awards will be handled in accordance with the Plan.

Abuse Claims will be released or enjoined as against the Protected Parties for any Abuse that may be covered under Non-Settling Insurer Policies only upon the occurrence of the applicable Abuse Claim Discharge Date, as set forth in Sections 12.2.3 and 12.7 of the Plan.  Abuse Claimants will expressly reserve their rights against other Persons (other than Protected Parties), including joint tortfeasors, who will remain severally liable on any Abuse Claims.

Any Person (other than a Protected Party) that is, or was alleged to be a joint tortfeasor with any of the Protected Parties in connection with the Abuse that forms the basis of an Abuse Claim shall not be liable for any Protected Party's share of causal liability or fault.

For the avoidance of doubt, with respect to all Non-Abuse Claims, except as otherwise provided in the Plan, the Debtor's liability on account of such Claims shall be discharged pursuant to the provisions of 1141(d).

### F.        Distributions to Abuse Claimants.

1.        Distributions Generally.

a.        ***Tax Considerations.*** Any Distribution to an Abuse Claimant constitutes a payment for damages on account of a personal physical injury or sickness arising from an occurrence, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

b.      ***Distribution Limitations.*** The Abuse Claimants' recoveries on their Claims shall be limited to their Trust Distributions, if any, as set forth in this Section F, the Allocation Protocol, and the Trust Documents, and the Abuse Claimants shall not be entitled to collect personally, or otherwise, any additional amounts whatsoever on their Abuse Claims from the Diocese, the Reorganized Diocese, any Participating Party, or their respective assets, or from any Settling Insurers or Settling Insurers' assets, for any Abuse Claims that are Channeled Claims, even if they are denied a Trust Distribution.

c.      ***No Impact on Non-Settling Insurers***. Nothing in the Plan shall affect in any way the Non-Settling Insurers' rights to argue that any Abuse Claim (whether or not allowed by the Abuse Claims Reviewer for purposes of Distribution) is legally inviable, including by way of illustration and not limitation, the fact that (i) Abuse Claimants may receive Trust Distributions that are determined on the basis of when their claim was filed in relation to the CVA Deadline or the ASA Deadline; and (ii) holders of Disallowed Abuse Claims may be entitled to distribution pursuant to the Allocation Protocol.

For the avoidance of doubt, Trust Distributions made to Litigation Claimants shall have no impact on Litigation Claimants' rights to obtain a judgment, including a judgment based on joint and several liability, against the Diocese, any Participating Party, or any Non-Settling Insurer, but recourse is limited to any Trust Distributions as set forth in the Plan, the Trust Agreement, and the Allocation Protocol, and the proceeds of Non-Settling Insurer Policies and all other damages (including extra-contractual damages), awards, judgments in excess of policy limits, penalties, punitive damages and attorney's fees and costs that may be recoverable against any Non-Settling Insurers because of their conduct concerning insurance coverage for, or defense or settlement of, any Abuse Claim or any Insurance Claim arising therefrom, and any proceeds from such judgments or awards will be Distributed in accordance with Section 4.6 of the Plan.

Neither the Trust's Distributions to Abuse Claimants, nor the Abuse Claims Reviewer's review of Abuse Claims, shall: (1) constitute a trial, an adjudication on the merits, or evidence of liability or damages, either individually or in the aggregate, in any litigation whatsoever, or (2) constitute, or be deemed, a determination of the reasonableness or unreasonableness of the amount of any Abuse Claim or any Insurance Claim, either individually or in the aggregate with other Abuse Claims, in any coverage litigation with any Non-Settling Insurers.

Any Trust Distribution to a Litigation Claimant that has obtained a judgment or settlement does not affect, diminish or impair the Trust's right to collect the policy proceeds in respect of such Litigation Claimant's Claim from any Non-Settling Insurer, nor does it affect, diminish or impair the Trust's right to bring any Insurance Claims against the Non-Settling Insurer that have been assigned to the Trust or that belong to the Trust by operation of law.

2.      ***Distributions to Abuse Claimants***. An Abuse Claimant whom the Abuse Claims Reviewer determines to be entitled to a Distribution will receive a Distribution from the Trust in the amount(s) and at the time(s) provided for in Section 4.6 of the Plan.  Such Distributions may commence after the entry of a final decree in this Chapter 11 Case.

a.      ***Distributions to Holders of Filed Abuse Claims***. Distributions to Abuse Claimants who, on or prior to the Effective Date, Filed a Filed Abuse Claim, shall be made by the

38

Trustee, in his or her discretion, upon determining the allocable portion of the Abuse Claims Settlement Fund available for Distribution to such Claimants in accordance with the Abuse Claims Reviewer's evaluation of Filed Abuse Claims pursuant to the Allocation Protocol, the Trust Agreement, and the Plan.

      b.    ***Distributions to Holders of Previously Unasserted Abuse Claims.*** Distributions to Abuse Claimants who assert, at any time after the Effective Date, a Previously Unasserted Abuse Claim, shall be made from the Unasserted Abuse Claims Reserve as follows:

      (i)    Upon the assertion of a Previously Unasserted Abuse Claim by a Post-Effective Date Claimant, the Abuse Claims Reviewer shall evaluate and assign a score to such Previously Unasserted Abuse Claim pursuant to the Allocation Protocol and notify the Trustee of the same. The Trustee, then, but only after the Post-Effective Date Claimant executes and delivers an Abuse Claim Release Agreement shall make an immediate Trust Distribution to the Post-Effective Date Claimant from the Unasserted Abuse Claims Reserve in the amount of $20,000.

      (ii)    Except as provided in Subsection (iii) below, upon termination of the Trust, the Trustee shall, after accounting for any initial Distributions made to Post-Effective Date Claimants from the Unasserted Abuse Claims Reserve, make a final, pro-rata Distribution to Post-Effective Date Claimants from the remaining Unasserted Abuse Claims Reserve funds based on the score each Post-Effective Date Claimant's Previously Unasserted Abuse Claim was assigned by the Abuse Claims Reviewer pursuant to the Allocation Protocol, *provided, however*, that any subsequent Distributions to Post-Effective Date Claimants from the Unasserted Abuse Claims Reserve shall be made consistent with Section 5.1 of the Allocation Protocol.  If the Trustee determines that the funds held in the Unasserted Abuse Claims Reserve exceed the amount distributable to Post-Effective Date Claimants pursuant to the Plan and the Allocation Protocol, any such excess funds will revert to the Abuse Claims Settlement Fund and shall be Distributed by the Trustee in accordance with Subsection a above.

      (iii)    To the extent that a Post-Effective Date Claimant is a Litigation Claimant and is authorized by the Trustee to pursue a Litigation Claim in accordance with Section 4.3.1.b of the Plan, and as a result of the prosecution of such Litigation Claim the Abuse Claims Reviewer, in his or her sole discretion, assigns an increased score to such Post-Effective Date Claimant's Previously Unasserted Abuse Claim pursuant to Section 3.2.b of the Allocation Protocol, Section 4.6.2.b.ii of the Plan shall not apply for purposes of the Trustee making subsequent Trust Distributions to such Post-Effective Date Claimant.  Instead, to the extent that the Abuse Claims Reviewer, in his or her sole discretion, assigns an increased score to a Litigation Claim held by a Post-Effective Date Claimant pursuant to the Section 3.2.b of the Allocation Protocol, the Trustee shall make Distributions to such Post Effective Date Claimant from the Abuse Claims Settlement Fund pursuant to Section 2(a) above.

      To the extent that either a settlement is achieved with a Non-Settling Insurer as to any Target Policy or a Litigation Claimant obtains a judgment against a Protected Party and the Trust obtains a recovery from a Non-Settling Insurer as to such judgment, such recovery shall be added to the Abuse Claims Settlement Fund, *provided, however,* such recovery shall first go to reimburse the Trust or the Litigation Claimant, as the case may be, for all costs (including attorneys' fees)

17289563.12

incurred in connection with pursuing the recovery against the Non-Settling Insurer(s) relating to the Litigation Claim, so long as such amounts are reasonable and were agreed to in advance by the Trust. Any amount remaining shall be distributed in a manner consistent with this Section 2 and the Allocation Protocol.

**G.    Dismissal of Pending Litigation.**

Upon the occurrence of the applicable Abuse Claim Discharge Date, as defined Section 12.2.3 of the Plan, the subject Abuse Claim asserted in any lawsuit against any Protected Party pending in state or federal court shall be dismissed, with prejudice, and without fees and costs being recoverable against any Protected Party.

**H.    Claim Withdrawal**

An Abuse Claimant may withdraw his or her Abuse Claim at any time on written notice to the Trustee.  If withdrawn, the Abuse Claim will be withdrawn with prejudice and may not be reasserted, and such Abuse Claimant shall still be bound by the Diocese Discharge and all injunctive provisions of the Plan, including the Channeling Injunction.

**I.    Medicare Procedures**

With respect to all Abuse Claims, the Trust shall maintain sufficient funds to perform the following duties:

1.    It is the position of Diocese that none of the Protected Parties, Settling Insurers, or the Trust will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSPA or MMSEA.

2.    Prior to making any Distribution on behalf of an Abuse Claim (including any Distribution disbursed to an Abuse Claimant's counsel), the Trustee may obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSPA relating to such Channeled Claim.  If the Trust receives no such certification, the Trust shall (i) withhold funds sufficient to assure that all obligations owing or potentially owing for Medicate Claims are paid to CMS; and (ii) provide for the payment and/or resolution of any obligations owing or asserted under 42 U.S.C. § 1395y(b), or any related rules, regulations, or guidance, in connection with, or relating to, such Claimant's Abuse Claim.

3.    The Trust shall indemnify and hold harmless the Protected Parties from any Claims related to Medicare Claims or similar reporting and payment obligations, whether relating to past conditional payments made, future payments to be made, or otherwise arising out of, relating to, or in connection with Abuse Claims, including any obligations owing or potentially owing under MMSEA or MSPA, and any Claims related to the Trust's obligations under the Plan, the Trust Documents, and the Plan Documents. The Trustee shall also have the obligation to cooperate with the Protected Parties in the assertion of the Channeling Injunction with respect to any Medicare Claims asserted against the Protected Parties.  The Trustee shall not have personal liability for these obligations and the Trust shall not be required to create a reserve for these potential

40

obligations.  The Trust may seek recovery of any such payments from the applicable Abuse Claimant, including by withholding future Distributions due to such applicable Abuse Claimant from the Trust.

4.      The Trust Assets shall also be used for payment of indemnity and expenses relating to reimbursing the United States government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare Beneficiary who is an Abuse Claimant. The amount of such payment shall not exceed that Claimant's award under the Trust Documents.  The Protected Parties shall not be responsible for and will not pay indemnity or expenses relating to reimbursing the United States Government or its contractors for conditional payments made pursuant to the MSPA applicable to any Medicare Beneficiary who is an Abuse Claimant.

5.      The Trust shall have no further obligations under the Plan or the Trust upon the termination of the Trust as provided for in the Trust Agreement.

6.      Notwithstanding anything to the contrary herein, no party shall have any reporting obligation with respect to Abuse Claims that arise from or relate to alleged Abuse that occurred prior to December 5, 1980.

## ARTICLE VI

## SETTLING INSURERS

### A.      No Insurance Settlement Agreements to Date

As of the date of the filing of this Disclosure Statement, there are no Settling Insurers and no Insurance Settlement Agreements executed.  Any discussion of a Settling Insurer or Insurance Settlement Agreement herein refers to the identification of Settling Insurers under future Insurance Settlement Agreements.

### B.      Insurance Settlement Agreements

Each Insurance Settlement Agreement is effective and binding upon all Persons who have notice, and any of the foregoing Persons' successors and assigns, upon the entry of a Final Order approving the Insurance Settlement Agreement and satisfaction of all conditions precedent. Payments by each Settling Insurer to the Trust, and the releases by the Diocese and/or the Participating Parties of each Settling Insurer, pursuant to the Insurance Settlement Agreements shall occur and/or be effective according to the terms of each such agreement.  The Insurance Settlement Agreements shall survive the confirmation, effectiveness, and consummation of the Plan.  The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement and those provisions of the Final Order approving such Insurance Settlement Agreement, the Plan, and the Confirmation Order.

### C.      Sale Free and Clear of Interests of Settling Insurer Policies

Each Settling Insurer Policy shall be sold to the issuing Settling Insurer, pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, free and clear of all liens and Claims of all Persons, to the extent provided for in each applicable Insurance Settlement Agreement.

**D.**     **Resolution of Claims Involving Settling Insurers**

The Confirmation Order shall provide that within ten days after payment of each Settling Insurer's respective Insurance Settlement Amount, the Diocese or the Trust, as the case may be, and the Settling Insurer shall effect dismissal with prejudice of their Claims against each other in the Insurance Coverage Adversary Proceeding, with each side to bear its own fees and costs.

**E.**     **The Settling Insurer's Payments**

The Settling Insurers will pay to the Trust the sums set forth, on the terms set forth in their respective Insurance Settlement Agreements, to the extent applicable, but in no event later than forty-five (45) days after the Effective Date.

**F.**     **Further Assurances; Non-Material Modifications**

From and after the Effective Date, the Diocese and the Settling Insurers shall be authorized to enter into, execute, adopt, deliver, or implement all notes, contracts, security agreements, instruments, releases, and other agreements or documents necessary to effectuate or memorialize the Insurance Settlement Agreements without further order of the Bankruptcy Court.  The Diocese and the Settling Insurers, with the consent of the Committee, may make technical or immaterial alterations, amendments, modifications, waiver, or supplements to the terms of any Insurance Settlement Agreement and/or the Plan, subject to the requirements of the respective agreements. A Class of Claims that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or supplemented under Section 14.1 of the Plan, if the proposed alteration, amendment, modification, or supplement does not materially and adversely change the treatment of the Claims within such Class.  An order of the Bankruptcy Court approving any amendment or modification made pursuant to Section 14.1 of the Plan shall constitute an order in aid of consummation of the Plan and shall not require the re-solicitation of votes on the Plan.

**G.**     **Waiver/Consent**

In consideration of the releases and Channeling Injunction, the Supplemental Settling Insurer Injunction and other covenants set forth herein, subject to the occurrence of the Effective Date and the satisfaction of the other conditions precedent to the effectiveness of the Insurance Settlement Agreements, and upon receipt by the Trust of the Insurance Settlement Amounts, each of the Protected Parties: (a) irrevocably and unconditionally, without limitation, releases, acquits, forever discharges, and waives any Claims it has or might have now or in the future against the other Protected Parties with respect to any contribution, subrogation, indemnification, or other similar Claim arising from or relating to released Abuse Claims covered or alleged to be covered under the Settling Insurer Policies, and any Settling Insurer Policies; and (b) consents to the sale of the Diocese's and Participating Parties' Claims, if any, related to the Settling Insurer Policies in accordance with the Insurance Settlement Agreements and to the contribution of the proceeds from such sale and settlement to the Trust, as provided in the Plan.  Nothing in Section 12 of the Plan shall be construed to bar either (a) a Claim based on Abuse against a Person who is not a Protected Party, or (b) a Claim by such Person for insurance coverage in connection with a Claim described in the foregoing subsection (a) under an insurance policy other than a Settling Insurer Policy.

**H.**    **Rights Under Insurance Settlement Agreements**

The rights of the parties under any Insurance Settlement Agreement shall be determined exclusively under the applicable Insurance Settlement Agreement, the Final Order approving such Insurance Settlement Agreement, the Plan, and the Confirmation Order.

**I.**    **Timing**

The injunctions, releases, and discharges to which any Settling Insurer is entitled pursuant to such Insurance Settlement Agreement, the Plan, the Confirmation Order, the Final Order approving the Insurance Settlement Agreement, and the Bankruptcy Code shall become effective pursuant to the terms of such Insurance Settlement Agreement.

## ARTICLE VII

## MATTERS RELATING TO NON-SETTLING INSURERS

**A.**    **Preservation of Rights and Obligations**

If an Abuse Claim is liquidated through the Allocation Protocol or in any state or federal court as may be permitted by the Plan, the Allocation Protocol, or the Trust Agreement, then the Protected Parties, the Trust, and each Non-Settling Insurer shall retain the right to assert any and all rights and defenses of the Protected Parties with respect to such Abuse Claim and, except as set forth in this Section, all coverage defenses. The rights, duties, and obligations of each Non-Settling Insurer under the Non-Settling Insurer Policies with respect to Abuse Claims are not affected in any way by the Diocese Discharge.

The rights and obligations of the Protected Parties and every Non-Settling Insurer under the terms of the Non-Settling Insurer Policies and at law shall not be affected by the Allocation Protocol and shall be treated as if the determination by the Abuse Claims Reviewer had never occurred. Each Non-Settling Insurer shall be entitled to all rights and defenses as are provided under the terms of its Non-Settling Insurer Policies as if the determination by the Abuse Claims Reviewer had never occurred.

Nothing in the Plan, the Confirmation Order, or any Plan Document shall impose any obligation on any Non-Settling Insurer to provide a defense for, settle, or pay any judgment with respect to, any Abuse Claim, or grant to any Person any right to sue any Non-Settling Insurer directly, relating to an Abuse Claim. All such obligations with respect to Non-Settling Insurers shall be determined by and in accordance with the terms of the Non-Settling Insurer Policies and with applicable non-bankruptcy law.

**B.**    **Estimations/Assessments of Abuse Claims Are Not Binding**

Estimations of Abuse Claims for purposes of determination, qualification, assignment of points pursuant to the Allocation Protocol, and payment of Trust Distributions:

a.    shall not (i) constitute an admission of liability by any Person with respect to such Abuse Claims; (ii) have any *res judicata* or collateral estoppel effect

43

on any Person; (iii) constitute a settlement, release, accord, satisfaction, or novation of such Abuse Claims; (iv) be used by any third-party as a defense to any alleged joint liability; or (v) otherwise prejudice any rights of the Trust, the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, the Non-Settling Insurers, or the Abuse Claimants in all other contexts or forums;

       b.    shall be without prejudice to any and all rights of the Trust, the Non-Settling Insurers, and the Abuse Claimants in all other contexts and forums; and

       c.    shall not be deemed to be a determination of liability of the Diocese or any Participating Party or a determination of whether, or the extent to which, such Abuse Claim is covered under any Non-Settling Insurer Policy.

## C.    Post-Effective Date Insurance Obligations

Notwithstanding the Insurance Claims Assignment, the Diocese, the Reorganized Diocese, and the Participating Parties shall, for purposes of preserving and maintaining as much insurance coverage as possible for the sole and exclusive benefit of the Trust, and subject to the Trust's payment of any DOS Entities' Post-Effective Date Costs in accordance with Section 8.10 of the Plan, observe and perform all Post-Effective Date Insurance Obligations.

If the Trust believes the Diocese, the Reorganized Diocese, or a Participating Party has failed to comply with any Post-Effective Date Insurance Obligation, the Trust shall give the Diocese, the Reorganized Diocese, or the Participating Party (as applicable) written notice identifying with specificity the Post-Effective Date Insurance Obligation at issue and the action the Trust believes must be taken in order to come into compliance.  Subject to further order of the Court, the Diocese, the Reorganized Diocese, and the Participating Parties shall have at least 45 days following receipt of any such notice from the Trust to either (i) undertake the actions requested by the Trust or (ii) seek a determination from the Court as to the extent of their Post-Effective Date Insurance Obligations and whether the action requested by the Trust is required to comply therewith.  The Court will retain jurisdiction to adjudicate such dispute or claim. Except in the case of willful misconduct by the Reorganized Diocese and any Participating Party, the Trust's sole remedy for any failure to comply with any Post-Effective Date Insurance Obligations shall be specific performance as ordered by the Court.

Nothing in the Plan shall impair, and each Non-Settling Insurer expressly retains, all contractual defenses to coverage, if any, available under any Non-Settling Insurer Policy arising from or relating to any actual or alleged failure by the Diocese, the Reorganized Diocese or any Participating Party to comply with their respective Post-Effective Date Insurance Obligations, if any.

## D.    Trust Powers With Respect to Abuse Claims and Non-Settling Insurers

Solely as set forth in the Plan, the Allocation Protocol, or the Trust Agreement, the Trust may enter into a settlement of any Insurance Claim or any Abuse Claim, provided that nothing in this Section preempts or prevents a Non-Settling Insurer from raising any defense to such settlement or claim for coverage.  For the avoidance of doubt, the Trustee may use the Trust Assets to prosecute any Insurance Claim.  If the Trust successfully resolves an Insurance Claim or

otherwise receives a recovery of insurance proceeds relating to any Abuse Claim from a Non-Settling Insurer, such proceeds shall become Trust Assets available for Distribution pursuant to the Allocation Protocol.

### E.    Insurance Coverage Adversary Proceeding

As of the Effective Date, the Trust shall be substituted as the named plaintiff in the Insurance Coverage Adversary Proceeding and have all rights of the Diocese and the Participating Parties to pursue recoveries against any Non-Settling Insurers.

## ARTICLE VIII

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    Plan Implementation

All Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, General Unsecured Claims, and Pass-Through Claims will be paid by the Diocese or the Reorganized Diocese.  All Abuse Claims will be paid solely from the Trust to be established for the purpose of receiving, liquidating, and distributing Trust Assets in accordance with the Plan and the Allocation Protocol, and the Trust Agreement.  The Allocation Protocol is attached to the Plan Supplement as **Exhibit 1** and is incorporated into the Trust Agreement.  The proposed Trust Agreement is attached to the Plan Supplement as **Exhibit 3**.

### B.    Corporate Action

All matters provided under the Plan involving the corporate structure of the Diocese or corporate action to be taken by or required of the Diocese, or the Reorganized Diocese, shall be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement or further approval by the Bankruptcy Court or any other governmental entity.  For avoidance of doubt, to the extent any corporate action or other transaction contemplated under the Plan would otherwise require approval under section 511 or 511-a of the New York State Not-For-Profit Corporation Law, the entry of the Confirmation Order shall constitute such approval.

### C.    Payments Effective Upon Tender

Whenever the Plan requires payment to be made to a Creditor, such payment will be deemed made and effective upon tender thereof by the Trustee, the Diocese, or the Reorganized Diocese to the Creditor to whom payment is due.  If any Creditor refuses a tender, the amount tendered and refused will be held by the Trust, the Diocese, or the Reorganized Diocese for the benefit of that Creditor pending final adjudication of the dispute.  However, when and if the dispute is finally adjudicated and the Creditor receives the funds previously tendered and refused, the Creditor will be obliged to apply the funds in accordance with the Plan as of the date of the tender; and while the dispute is pending and after adjudication thereof, the Creditor will not have the right to claim interest or other charges or to exercise any other rights which would be enforceable by

the Creditor if the Trust, the Diocese, or the Reorganized Diocese failed to pay the tendered payment.

### D.      Agreements, Instruments, and Documents

All organizational agreements, charter documents, instruments, and documents required under the Plan to be executed or implemented, together with such others as may be necessary, useful or appropriate in order to effectuate the Plan, shall be executed on or before the Effective Date or as soon thereafter as is practicable.

### E.      Continuation of Insurance Policies

Except to the extent any Insurance Policies are bought back as set forth in and pursuant to Insurance Settlement Agreements or as otherwise provided by the terms of the Plan, all Insurance Policies (including, without limitation, any Insurance Policy not included in Insurance Settlement Agreements) shall, as applicable, either be deemed to be assumed by the Diocese pursuant to sections 365, 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code to the extent such Insurance Policy is or was an executory contract of the Diocese, or continued in accordance with its terms pursuant to section 1123(a)(5)(A) of the Bankruptcy Code, to the extent such Insurance Policy is not an executory contract of the Diocese, such that each of the parties' contractual, legal, and equitable rights under each such Insurance Policy shall remain unaltered.  A list of all known Insurance Policies is attached to the Plan Supplement as **Exhibit 4**. To the extent that any or all such Insurance Policies are considered to be executory contracts, then the Plan shall constitute a motion to assume such Insurance Policies in connection with the Plan. Subject to the occurrence of the Effective Date, the Confirmation Order shall approve such assumption pursuant to sections 365(a), 1123(a)(5)(A), and 1123(b)(2) of the Bankruptcy Code and include a finding by the Bankruptcy Court that each such assumption is in the best interest of the Diocese, the Estate, and all parties in interest in this Chapter 11 Case. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Diocese existing as of the Effective Date with respect to any Insurance Policy.  The Diocese reserves the right to seek rejection of any Insurance Policy or other available relief prior to the Effective Date.

### F.      Bar Date for Professional Fee Claims

Each Professional retained or requesting compensation in the Chapter 11 Case, pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code, must File with the Bankruptcy Court a final application requesting the allowance of a Professional Fee Claim no later than 60 days after the Effective Date.  All applications for the allowance of Professional Fee Claims that are not timely Filed shall be forever barred.  Objections to such applications may be Filed in accordance with the Bankruptcy Rules.  The Bankruptcy Court shall determine all such Professional Fee Claims.

### G.      Bar Date for Other Administrative Claims

Except as provided for herein or in an order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims must File and serve on the Diocese requests for the payment of such Administrative Claims not previously Allowed by a Final Order in accordance with the procedures specified in the Confirmation Order,

on or before the Administrative Claims Bar Date, or such Administrative Claims shall be automatically considered Disallowed Claims, forever barred from assertion, and unenforceable against the Diocese or the Reorganized Diocese, the Estate, or their property without the need for any objection by the Diocese or the Reorganized Diocese, or further notice to, or action, order, or approval of the Bankruptcy Court, and any such Administrative Claims shall be deemed fully satisfied, released, and discharged.

## H.    Exit Financing

The Diocese and/or the Reorganized Diocese may, in their respective discretion, obtain Exit Financing to assist in funding the DOS Entities' Cash Contribution and/or making payments in satisfaction of the DOS Trust Note (if any), which financing may be secured by a security interest or Lien on any assets of the Diocese and any Residual Assets held by the Reorganized Diocese, to the extent the granting of such security interest or Lien is not inconsistent with applicable non-bankruptcy law.  Any security interest or Lien in collateral granted to an Exit Financing Lender in connection with Exit Financing provided to the Diocese shall, on and after the Effective Date, be enforceable against any interest the Reorganized Diocese may have in such collateral, to the same extent it may have been enforceable against the Diocese prior to the Effective Date.

## ARTICLE IX

## THE TRUST

## A.    Establishment of the Trust

On the Confirmation Date, or as soon as practicable thereafter, the Trust shall be established in accordance with the Trust Documents for the exclusive benefit of the holders of Abuse Claims.  The Trust will assume all liability for and rights concerning all Channeled Claims, including the rights to settle the Channeled Claims.  The Trust will make Distributions from the Abuse Claims Settlement Funds to Abuse Claimants pursuant to the terms of the Allocation Protocol, the Trust Agreement, the Plan, and the Confirmation Order.  The Trustee shall establish and maintain a reserve for Trust Expenses, which shall be paid pursuant to the terms of the Trust Agreement.

## B.    Funding the Trust

1.     **DOS Entities' Cash Contribution**.

On or before the Effective Date, the Diocese and the Participating Parties shall cause the DOS Entities' Cash Contribution to be paid to the Trust to establish the Trust Reserve, with any balance to be included in the Abuse Claims Settlement Fund.  The Abuse Claims Settlement Fund may be supplemented from time to time from: (a) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement; (b) any Insurance Claim Proceeds; (c) proceeds of Litigation Awards; (d) proceeds of Outbound Contribution Claims; and (e) any other proceeds which the Trust may obtain pursuant to the terms of the Plan.

2.     **DOS Trust Note Documents**.

47

In the event the DOS Entities' Cash Contribution is less than $100,000,000, on or before the Effective Date, the Reorganized Diocese shall execute and deliver the DOS Trust Note Documents to the Trust. For the avoidance of doubt, if the DOS Entities' Cash Contribution is $100,000,000, none of the DOS Trust Note Documents shall be executed or delivered to the Trust.

3. **Settling Insurers' Cash Contribution**.

The Settling Insurers will pay to the Trust the Insurance Settlement Amounts set forth in their respective Insurance Settlement Agreements on or before the Effective Date.

4. **Insurance Claims Assignment**.

Insurance Claims against any Non-Settling Insurer shall be transferred to the Trust as follows:

      a. On the Effective Date, and without further action by any party, the Diocese will be deemed to have assigned to the Trust the Diocese's rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers. Additionally, on the Effective Date, and without further action by any party, each of the Participating Parties will assign to the Trust the Participating Parties' rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers. The foregoing transfer shall be effective to the maximum extent permissible under applicable law and shall not be construed: (i) as an assignment of the insurance policies; or (ii) to entitle any Person to Insurance Coverage other than those Persons entitled to coverage under the terms of the Non-Settling Insurer Policies. LMI and Interstate assert that these conditions precedent include providing adequate notice, cooperating with LMI and Interstate, utilizing a service organization to handle claims and report, provide LMI and Interstate access to books and records, provide LMI and Interstate the opportunity to associate in the defense of claims, and provide LMI and Interstate the opportunity to participate in the settlement of claims. Interstate further contends that the failure to fully satisfy each and every applicable condition precedent will vitiate coverage under the Interstate Policies. The Diocese does not concede that all or any of these are conditions precedent to coverage and asserts that, to the extent that any of these are conditions precedent, that the Non-Settling Insurers have waived one or more of them or are estopped from asserting one or more of them. For the avoidance of doubt, the Trust shall be solely responsible for satisfying, to the extent required under applicable law, any self-insured retention obligations on account of any Abuse Claim or arising out of any Non-Settling Insurer Policy. To the extent that the Trust pays any self-insured retention in connection with any Abuse Claim, such amount shall be paid by the Trust from the DOS Entities' Post-Effective Date Costs Reserve, and the Trust shall contemporaneously contribute funds to the DOS Entities' Post-Effective Date Costs Reserve in an amount equal to such self-insured retention paid. To the extent the Diocese pays any self-insured retention, the Trust shall reimburse from the DOS Entities' Post-Effective Date Costs Reserve the Diocese for any amounts actually paid by the Diocese prior to making any Trust Distribution for the Abuse Claim for

48

which the Diocese paid the self-insured retention, and the Trust shall contemporaneously contribute funds to the DOS Entities' Post-Effective Date Costs Reserve in an amount equal to such self-insured retention paid. Nothing herein shall obligate any Non-Settling Insurers to advance any self-insured retention, unless otherwise required by applicable law. Likewise, nothing herein shall obligate the Trust or the Diocese to pay any self-insured retention that is not otherwise required by applicable law.

b.      In the event that the Bankruptcy Court determines that the Insurance Claims Assignment is inconsistent with the Bankruptcy Code with respect to the Diocese and/or one or more Participating Parties, the Diocese and each such Participating Party will retain their respective Insurance Claims. In such case, the Diocese or a Participating Party will assert and pursue any retained Insurance Claims to the extent reasonably requested by the Trust against any Non-Settling Insurer. The Diocese or Participating Party will retain counsel acceptable to the Trustee to prosecute any retained Insurance Claims (subject to any defenses the Non-Settling Insurers may have under applicable state law) and the Trust shall pay all attorney's fees, expert fees, and other costs and expenses incurred by the Diocese or the Participating Party in prosecuting the Insurance Claims. For avoidance of doubt, any efforts by the Diocese or a Participating Party to prosecute the Insurance Claims shall be an accommodation to the Trust and any costs and expenses incurred in connection therewith shall be paid by the Trust in full and shall not be subject to the DOS Entities' Post-Effective Date Costs Procedures described below. The Trust shall have a common interest with the Diocese in prosecuting Insurance Claims, and may appear and be heard in connection with the prosecution of such claims, at its own expense, unconditionally, subject only to any limitations of law and equity. The Diocese and the Participating Parties shall not settle any retained Insurance Claims without the prior written consent of the Trustee, which consent shall not be unreasonably delayed or denied. All recoveries on account of retained Insurance Claims will be paid to the Trust, net of any unreimbursed attorney's fees, expert fees and other costs and expenses associated with prosecuting such retained Insurance Claims.

c.      For the avoidance of doubt, except as specifically set forth in the Plan with respect to compliance with Post-Effective Date Insurance Obligations, the Diocese, the Reorganized Diocese, and the Participating Parties make no representations or warranties, and shall have no duty or obligations whatsoever, to the Trust with respect to the Insurance Claims. The Trust shall assume all risks with respect to the litigation, liquidation and collection of the Insurance Claims.

5.      **Outbound Contribution Claims**.

Outbound Contribution Claims shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

6.      **Interstate POC Disclosure Claims.**

Any Claims held by the Diocese or the Participating Parties arising from or related to the Interstate POC Disclosure shall be automatically, and without further act or deed, assigned to the Trust on the Effective Date.

7.      **Excluded Insurer Claims.**

Excluded Insurer Claims are not included in the Insurance Claims Assignment, or otherwise treated under the Plan, and any Holders of Excluded Insurer Claims shall retain whatever rights against Excluded Insurer Policies that they have under applicable law (subject to any defenses the Excluded Insurers may have under applicable law).

## C.      Vesting of Trust Assets

On the Effective Date, all Trust Assets shall vest in the Trust, and the Protected Parties shall be deemed for all purposes to have transferred all of their respective right, title, and interest in the Trust Assets to the Trust. On the Effective Date, or as soon as practicable thereafter, the Protected Parties, as applicable, shall take all actions reasonably necessary to transfer any Trust Assets to the Trust. Upon the transfer of the Trust Assets in accordance with this paragraph, the Protected Parties shall have no further interest in or with respect to any Trust Assets other than the DOS Entities' Post-Effective Date Costs Reserve.

## D.      Child Protection Protocols.

In order to further promote healing and reconciliation, and in order to continue efforts to prevent Abuse from occurring in the future, the Reorganized Diocese agrees that, as of the Effective Date (unless a different date is provided in the Confirmation Order), it will use reasonable efforts to undertake and observe the Child Protection Protocols as agreed upon with the Committee and set forth as **Exhibit 5** in the Plan Supplement.

## E.      Appointment of the Trustee

The Trustee is DW Harrow & Associates, LLC. The Trustee shall commence serving as the Trustee on the Effective Date; *provided, however*, that the Trustee shall be permitted to act in accordance with the terms of the Trust Agreement from such earlier date, as authorized by the Bankruptcy Court, and shall be entitled to seek compensation in accordance with the terms of the Trust Agreement and the Plan.

DW Harrow & Associates, LLC has served as trustee of the survivor settlement trusts established in connection with the bankruptcy cases filed by the Diocese of Duluth, the Diocese of New Ulm, the Diocese of St. Cloud, the Diocese of Winona-Rochester, and the Diocese of Harrisburg. Stinson LLP, the Committee's bankruptcy counsel, served as bankruptcy counsel to

50

the survivor committee appointed in each of the foregoing cases and represented or represents each of the settlement trusts that were established in each case. Burns Bair, the Committee's special insurance counsel, represents the Diocese of Winona-Rochester survivor settlement trust in post-confirmation litigation against non-settling insurers involved in that case.

## F.    Rights and Responsibilities of the Trustee

The Trustee shall be deemed to be a fiduciary of the Trust under the terms of the Trust Agreement and shall have all rights, powers, authority, responsibilities, and benefits under New York law specified in the Plan and as reflected in the Trust Agreement, including commencing, prosecuting or settling causes of action, enforcing contracts, and asserting Claims, defenses, offsets and privileges. If there is any inconsistency or ambiguity between the Confirmation Order and the Trust Agreement with respect to Trustee's authority to act, the provisions of the Trust Agreement shall control. Among other things, the Trustee:  (1) shall liquidate and convert to Cash the Trust Assets, make timely Distributions and not unduly prolong the duration of the Trust; (2) may request an expedited determination of taxes of the Trust under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Trust for all taxable periods through the dissolution of the Trust; and (3) may retain professionals, including legal counsel, accountants, financial advisors, auditors, and other Agents on behalf of the Trust, and at the Trust's sole expense, as reasonably necessary and to carry out the obligations of the Trustee hereunder and under the Trust Agreement.

The Trust shall make Trust Distributions to the Abuse Claimants, commencing no earlier than the entry of a final decree in the Diocese's Chapter 11 Case. The Trust shall pursue Insurance Claims against any Non-Settling Insurers. The Trust shall fund DOS Entities' Post-Effective Date Costs pursuant to the DOS Entities' Post-Effective Date Costs Procedures and may seek reimbursement from any Non-Settling Insurer.

The Confirmation Order shall state that, absent permission of the Bankruptcy Court, no cause of action shall be commenced in any forum, other than the Bankruptcy Court, against the Trustee in its official capacity, with respect to its status, duties, powers, acts, or omissions as Trustee.

## G.    Trust Pursuit of Insurance Claims

### 1.    Trust's Rights to Pursue Insurance Claims.

If the assignment contemplated in Section 8.2.4.a of the Plan is approved, effective as of the Effective Date, the Insurance Claims shall be assigned and transferred to the Trust.

a.    The Trust shall be entitled to (i) all recoveries on account of Insurance Claims assigned to the Trust as set forth in the Plan and the Confirmation Order, including the proceeds of any Insurance Claims relating to or arising out of any Litigation Claim, and (ii) to assert and/or assign to any Abuse Claimant or combination of Abuse Claimants, to the extent permitted by the Non-Settling Insurer Policies and applicable non-bankruptcy law, any and all Insurance Claims that currently exist or may arise in the future against Non-Settling Insurers.

51

b.      The Trust shall also have the right to pursue Claims against Non-Settling Insurers related to the Diocese's and/or the Participating Parties' liability for Abuse Claims or the Non-Settling Insurers' obligations in respect of such Claims. The foregoing transfer shall not be construed to entitle any Person to insurance coverage other than those Persons entitled to such coverage from Non-Settling Insurers.

c.      The Trust may act in its own name, or in the name of any Abuse Claimant, the Diocese and/or a Participating Party to enforce any right, title, or interest of any such party in the Insurance Claims assigned to the Trust.

d.      No limitations on recovery from Non-Settling Insurers shall be imposed by virtue of the fact the Diocese is in bankruptcy or by any Distribution from the Trust to an Abuse Claimant.

e.      The Insurance Claims Assignment shall not affect any Non-Settling Insurer's duty to defend, but to the extent that the failure to defend or a separate agreement between the Diocese and/or a Participating Party and any Non-Settling Insurer gives rise to a monetary obligation to reimburse defense costs in lieu of a duty to defend, the Trust shall be entitled to the benefit of such monetary obligation or policy proceeds to the extent of any DOS Entities' Post-Effective Date Costs actually paid by the Trust.

f.      Any recovery by the Trust on Insurance Claims relating to the Diocese's and/or Participating Parties' liability for Abuse Claims shall become a Trust Asset and shall be distributed as provided in the Allocation Protocol.

g.      The Trust's pursuit of the Protected Parties shall be limited to enforcing specific performance of the Insurance Claims Assignment and any Insurance Settlement Agreements and any other rights or interests expressly granted to the Trust under the Plan.

h.      The Trust shall have full access to coverage under the Non-Settling Insurer Policies as permitted by applicable non-bankruptcy law, and the Non-Settling Insurers shall retain any and all rights and defenses to coverage under the Non-Settling Insurer Policies and applicable non-bankruptcy law.

i.      The Insurance Claims Assignment does not affect any right of the Diocese, the Reorganized Diocese, any Participating Party or any Non-Settling Insurer to contest any liability or the amount of damages in respect of any Abuse Claims.

j.      LMI and Interstate contend that New York law establishes that the Trustee is a fiduciary to the Abuse Claimants. LMI and Interstate further contend that if the Diocese assigns rights under the LMI and Interstate Policies to the Trust, the Trustee must defend the Abuse Claims vigorously which would violate the Trustee's fiduciary duties to the Abuse Claimants. If the Trustee does not defend the Abuse Claims vigorously, LMI and Interstate contend the Trustee would violate his respective duties to LMI and Interstate. LMI and Interstate further contend that this conflict is irreconcilable, making the Plan unconfirmable. The Diocese strenuously disagrees with LMI and Interstate's position stated above.

k.      LMI and Interstate contend that under the terms of the LMI and Interstate insurance policies, the Diocese is responsible for investigating and defending claims to judgment, and thereafter seeking indemnity (i) first from LMI, for any amounts paid to defend or indemnity the claim that exceed the self-insured retention, which LMI and Interstate contend apply to each and every claim in each and every policy period, and (ii) then from Interstate (as applicable), and in each case subject to all the terms and conditions of the respective Policies. LMI and Interstate also contend that this obligation continues after the self-insured retention exhausts and that failure to put up a vigorous defense violates the terms of the LMI and Interstate Policies and eliminates LMI's and Interstate's respective duties to pay such claims. The Diocese strenuously disagrees with LMI and Interstate's position with respect to these matters.

2.      **Insurance Neutrality**.

Nothing in the Plan, the Allocation Protocol, the Trust Documents, the Plan Documents, any Confirmation Order (including any provision in the Confirmation Order), or any judgment, order, finding of fact, conclusion of law, determination or statement (written or verbal, on or off the record) made by the Bankruptcy Court, the District Court, or entered by any other court exercising jurisdiction over the Bankruptcy Case, including in any judgment, order, writ or opinion entered on appeal from any of the foregoing, shall in any Action against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding:

a.      constitute an adjudication, judgment, trial, determination on the merits, finding, or conclusion of law establishing:

(i)      or liquidating the liability (in the aggregate or otherwise) of (a) the Diocese, the Participating Parties, or the Trust, with respect to any Abuse Claims; or (b) any Non-Settling Insurer with respect to any Insurance Claim;

(ii)      the liability or obligation of the Diocese, Participating Parties, or Trust with respect to any Abuse Claim;

(iii)      that the aggregate value of the Abuse Claims is equal to the amount to be paid by the Diocese and/or the Participating Parties into the Trust;

(iv)      that it is reasonable, in good faith, or consistent with the terms and conditions of any Non-Settling Insurer Policy for any of the Diocese, the Participating Parties, or the Trust, to settle, allow, assign any value to, liquidate, and/or pay (or present to any Non-Settling Insurer for payment) any Abuse Claim on any terms or conditions contemplated by the Plan, the Allocation Protocol (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder), any other Plan Documents, or any other document or agreement;

(v)      that the Plan, any other Plan Document, or any other document or agreement (including any procedures, matrices or criteria used or considered in valuing, estimating or allowing Abuse Claims thereunder) are reasonable or consistent with any procedures that were used to evaluate, settle, or pay Abuse Claims against the Diocese and the Participating Parties before the Petition Date or under the terms and conditions of any Non-Settling Insurer Policy or applicable nonbankruptcy law;

17289563.12

(vi)     that the conduct of the Protected Parties, the Committee, or the Abuse Claimants, in connection with the negotiation, development, settlement and/or implementation of the Plan (including the aggregate value or amount of the DOS Entities' Cash Contributions), the other Plan Documents, or any related documents or agreements was, is, or will be consistent with the terms and conditions of any Non-Settling Insurer Policy or applicable nonbankruptcy law;

(vii)    that any Non-Settling Insurer was invited to participate in or participated in, consulted on, negotiated, and/or consented to the Allocation Protocol, the Trust Documents and other Plan Documents; and

b.      have any res judicata, collateral estoppel or other preclusive effect with respect to any matter set forth in Section 8.7.2(a) of the Plan, or shall otherwise prejudice, diminish, impair, or affect (under principles of waiver, estoppel, or otherwise) any defense, Claim or right any Non-Settling Insurer may have under any Non-Settling Insurer Policy or applicable non-bankruptcy law with respect thereto. Without limiting the foregoing, but subject to Sections 8.7.3 and 8.7.4 of the Plan, it is expressly agreed by all Neutrality Parties that the Neutrality Parties are not litigating any issue set forth in Section 8.7.2(a) of the Plan or any other Non-Settling Insurer coverage defenses, rights, obligations, or other coverage issue of any kind in this Chapter 11 Case.

c.      constitute a decision on any matter at issue or which may be raised as an issue in any Action against a Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding. Thus, any judgment, order, finding of fact, conclusion of law, determination or other statement of the Bankruptcy Court or issued or affirmed by the District Court in this Bankruptcy Case, or entered by any other court exercising jurisdiction over the bankruptcy case, including any Confirmation Order or the Allocation Protocol and/or other Plan Documents and any finding, conclusion or determination entered in connection therewith, is not intended – and shall not be construed – to constitute a finding, conclusion or determination regarding any matter set forth in Section 8.7.2(a) of the Plan or any other issue for any insurance coverage purpose whatsoever, and the Neutrality Parties shall not contend otherwise in any Action against a Non-Settling Insurer;

d.      subject to Sections 8.7.3 and 8.7.4 of the Plan, impair any Non-Settling Insurer's legal, equitable, or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims, or any policyholder's legal, equitable or contractual rights under any Non-Settling Insurer Policy or with respect to Insurance Claims. The Neutrality Parties shall retain, and be permitted to assert, in any Action against any Non-Settling Insurer, all Claims and/or defenses, including any coverage defenses related to the Abuse Claims, the Insurance Claims and/or the Non-Settling Insurer Policies, notwithstanding any provision of the Plan, Allocation Protocol, the Trust Documents, the other Plan Documents, the Confirmation Order, any findings of fact and/or conclusions of law with respect to the confirmation of the Plan, or any Final Order or opinion entered on appeal from the Confirmation Order; or

e.      subject to Sections 8.7.3 and 8.7.4 of the Plan, impair any Non-Settling Insurer's Insurer Contribution Claims, which may be asserted as a defense or counterclaim against the Diocese, the Participating Parties or the Trust (as applicable) in any Action against any Non-Settling Insurer, including the Insurance Coverage Adversary Proceeding. To the extent the Insurer Contribution Claims of a Non-Settling Insurer are determined to be valid, the liability (if any) of

54

such Non-Settling Insurer to the Trust shall be reduced by the amount of such Insurer Contribution Claims.  For avoidance of doubt, and notwithstanding anything to the contrary in Section 8.7.2 of the Plan, all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.5.1 of the Plan and no Insurer Contribution Claim shall be the basis for any affirmative recovery against the Diocese, the Reorganized Diocese, or any Participating Party.

On and after entry of the Confirmation Order, no Neutrality Party shall assert anything to the contrary of Section 8.7.2 of the Plan in any Action against a Non-Settling Insuer. Each Neutrality Party shall be entitled to enforce Section 8.7.2 of the Plan.

3.    ***Denial of Coverage as Sole Remedy.***  Notwithstanding anything to the contrary in Section 8.7.2 of the Plan, the sole remedy of any Non-Settling Insurer for any failure by the Diocese, the Reorganized Diocese, or any Participating Party to observe and perform any Post-Effective Date Insurance Obligations (if any) or any other duties or obligations that may exist under a Non-Settling Insurer Policy shall be limited to asserting any defenses to providing insurance coverage under the applicable Non-Settling Insurer Policy and nothing in this Plan shall serve as a basis for any Non-Settling Insurer to seek or be granted any affirmative relief against the Diocese, the Reorganized Diocese, or any Participating Party.

4.    ***Preservation of Plan Provisions Among Persons Other Than Non-Settling Insurers.***  For the avoidance of doubt, nothing set forth in Section 8.7.2 of the Plan shall impair any provision of the Plan, including, without limitation, the Diocese Discharge, the Channeling Injunction, or any other release or injunctive provisions set forth in the Plan, as between and among (i) any Neutrality Parties who are not Non-Settling Insurers or (ii) any Person who is not a Neutrality Party and each of the Neutrality Parties.

**H.    Investment Powers; Permitted Cash Expenditures.**

All funds held by the Trust shall be held in Cash or invested in short-term highly-liquid investments that are readily convertible to known amounts of Cash as more particularly described in the Trust Agreement.  The Trustee may expend such Cash in a manner consistent with the terms of the Trust Agreement.

**I.    Tax Matters**

The Trust is intended to qualify as a "Designated" or "Qualified Settlement Fund" pursuant to Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder.   The Diocese is the "transferor" within the meaning of Treasury Regulation Section 1.468B-1(d)(1). The Trustee shall be classified as the "administrator" within the meaning of Treasury Regulation Section 1.468B-2(k)(3). The Trust Documents, including the Trust Agreement, are incorporated herein by reference.  The Trust shall not be deemed to be the same legal entity as the Diocese or the Reorganized Diocese, but only the assignee of certain assets of the Diocese and a representative of the Estate for delineated purposes within the meaning of section 1123(b)(3) of the Bankruptcy Code.  The Trust is expected to be tax exempt.  The Trustee shall File such income tax and other returns and documents as are required to comply with the applicable provisions of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et seq.*, as may be amended, and the regulations promulgated thereunder, 31 C.F.R. §§ 900 *et seq.*, and New York law and the

regulations promulgated thereunder, and shall pay from the Trust all taxes, assessments, and levies upon the Trust, if any.  The Trustee, may in its discretion, establish a disputed claims reserve for the Trust, which shall be administered in accordance with applicable law.

**J.**      **DOS Entities' Post-Effective Date Costs Procedures**

1.      **DOS Entities' Post-Effective Date Costs Reserve**.

The Trust shall establish the DOS Entities' Post-Effective Date Costs Reserve, which shall be funded in an initial amount of not less than $3,000,000 from the DOS Entities' Cash Contribution.  The Trustee shall provide the Reorganized Diocese and all Participating Parties with a written statement as to the balance of the DOS Entities' Post-Effective Date Costs Reserve (a) on a quarterly basis, and (b) upon the reasonable request of the Reorganized Debtor or any Participating Party.

The Trustee may increase the amount of, or replenish, the DOS Entities' Post-Effective Date Costs Reserve, in his or her sole and exclusive discretion.  If the Trustee does not replenish the DOS Entities' Post-Effective Date Costs Reserve such that that the DOS Entities' Post-Effective Date Costs Reserve falls below $750,000, the Trustee shall immediately report the same to the Reorganized Diocese and all Participating Parties, and such parties shall meet and confer regarding (i) the Trustee's expectations with respect to the continued prosecution of Litigation Claims, (ii) the balance of any DOS Entities' Post-Effective Date Costs that are incurred but outstanding, and (iii) the parties' collective expectations as to any additional DOS Entities' Post-Effective Date Costs that are likely to be incurred in order to comply with any remaining Post-Effective Date Insurance Obligations.

If at any time the Trustee determines, in his or her discretion, not to replenish the DOS Entities' Post-Effective Date Costs Reserve before the balance of the DOS Entities' Post-Effective Date Costs Reserve falls below $500,000 (a "Non-Replenishment Determination"), the Trustee shall immediately (a) report the same to the Reorganized Diocese, and (b) file an application with the Bankruptcy Court on an expedited basis (i) setting forth the basis for the Non-Replenishment Determination and (ii) requesting authority to implement the Non-Replenishment Determination. If the Bankruptcy Court denies the Trustee's request to implement the Non-Replenishment Determination, the Trustee shall, subject to available funds, replenish the DOS Entities' Post-Effective Date Costs Reserve to at least $750,000.  If the Court approves the Trustee's request to implement the Non-Replenishment Determination, or if the Trustee lacks sufficient funds to maintain the balance of the DOS Entities' Post-Effective Date Costs Reserve above $500,000, the Diocese, the Reorganized Diocese, and the Participating Parties shall be irrevocably released from any further obligations they would otherwise have under the Plan with respect to any Insurance Claims and/or Abuse Claims, including, without limitation, any obligations to comply with any Post-Effective Date Insurance Obligations or to assist in the administration of the Allocation Protocol.  For the avoidance of doubt, the Trust shall remain responsible for the payment of all DOS Entities' Post-Effective Date Costs incurred within one year following the date of such notice which are submitted in accordance with these procedures to the extent any funds remain in the DOS Entities' Post-Effective Date Costs Reserve. For further avoidance of doubt, all Non-Settling Insurers shall retain any defenses to coverage they may have as a result of any failure of the

56

Diocese, the Reorganized Diocese or Participating Party to observe and perform any Post-Effective Date Insurance Obligation.

LMI contends that if the DOS Entities' Post-Effective Date Costs Reserve falls below $500,000, and Trustee decides not to replenish the DOS Entities' Post-Effective Date Costs Reserve, that any subsequent failure of the Reorganized Diocese or Participating Parties to comply with their Post-Effective Date Insurance Obligations could give rise to a defense by LMI with respect to the Insurance Claims asserted by the Trust and Abuse Claims asserted by Litigation Claimants. The Plan Proponents disagree with LMI's contentions.

Nothing herein shall be construed to address the rights of any Non-Settling Insurer or the Trust, as assignee of Insurance Claims, upon any withdrawal of cooperation in defense of Claims by the Diocese and/or any Participating Party.

2.     **DOS Entities' Post-Effective Date Costs.**

Professionals representing the Diocese, the Reorganized Diocese, or any Participating Party in connection with the observance and performance of their respective Post-Effective Date Insurance Obligations, including, without limitation, their participation in any post-Effective Date discovery or litigation regarding Insurance Claims or Abuse Claims, shall charge rates and expenses that are no higher than their usual and customary rates for similar work performed by such Professionals for clients generally at the time such services are provided, and such rates may be adjusted from time to time in accordance with the general practices of such Professionals.

Except to the extent that the Diocese, the Reorganized Diocese, and the Participating Parties are reimbursed directly by any Non-Settling Insurer for any DOS Entities' Post-Effective Date Costs contemporaneously as such DOS Entities' Post-Effective Date Costs are incurred, such DOS Entities' Post-Effective Date Costs shall be paid by the Trust from the DOS Entities' Post-Effective Date Costs Reserve.   The Trust's advancement or reimbursement of the Diocese, the Reorganized Diocese, or any Participating Party for such DOS Entities' Post-Effective Date Costs, and any distributions made by the Trust to the Class 5 Claimants, will not affect, diminish or impair the Trust's right to bring any claims against any Non-Settling Insurers for refusing to defend and/or indemnify the Diocese, the Reorganized Diocese, or any Participating Party, including but not limited to claims for payment of policy proceeds, bad faith, wrongful failure to settle, and extra-contractual damages authorized by law.

3.     **DOS Entities' Post-Effective Date Costs Payment and Dispute Resolution**.

All invoices for DOS Entities' Post-Effective Date Costs shall be submitted to the Trustee via email within 60 days following the end of the month in which DOS Entities' Post-Effective Date Costs are incurred (such submission, a "Fee Notice"). All Fee Notices provided to the Trustee may be redacted to prevent the disclosure of privileged information or trial strategy. The Trustee shall keep all Fee Notices confidential and shall not share any information contained in them (other than the amount of the fees) with any Litigation Claimant, or their respective individual counsel, or any professional whose firm previously represented the Committee in the Chapter 11 Case or represents the Trust in connection with the litigation or assertion of any Insurance Claim.

17289563.12

The Trustee shall inform the Reorganized Diocese, the Participating Party, and any professional submitting a Fee Notice of any disputes regarding the requested fees and expenses within thirty days of submission of a Fee Notice or shall pay the requested fees within such time. If any such dispute cannot be resolved within thirty days or such other amount of time agreed upon by the parties, either may submit such dispute to the Bankruptcy Court, or, if the Chapter 11 Case has been closed, to any other court of competent jurisdiction located in Onondaga County, New York for adjudication upon at least fifteen days' notice, unless the parties mutually otherwise agree to resolve such dispute through mediation, arbitration, or other alternative dispute resolution procedures.

## K.   No Recourse Against Trustee

No recourse shall ever be had, directly or indirectly, against the Trustee personally, or against any Agent retained in accordance with the terms of the Trust Agreement or the Plan by the Trustee, by legal or equitable proceedings or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant or agreement whatsoever executed by the Trustee in implementation of the Trust Agreement or the Plan, or by reason of the creation of any indebtedness by the Trustee under the Plan for any purpose authorized by the Trust Agreement or the Plan, it being expressly understood and agreed that all such liabilities, covenants, and Trust Agreements of the Trust whether in writing or otherwise, shall be enforceable only against and be satisfied only out of the Trust Assets or such part thereof as shall under the term of any such Trust Agreement be liable therefore or shall be evidence only of a right of payment out of the Trust Assets.  Notwithstanding the foregoing, the Trustee may be held liable for its recklessness, gross negligence, willful misconduct, knowing and material violation of law, breach of the fiduciary duty of loyalty, or fraud, and if liability on such grounds is established, recourse may be had directly against the Trustee.  The Trust shall not be covered by a bond.

None of the Diocese, the Reorganized Diocese, or any Participating Party shall be liable for any acts or omissions by the Trust, the Trustee, or their respective Agents or Related Persons.

## L.   Indemnification by Trust

The Trust shall defend, indemnify, and hold harmless the Trustee and its Agents to the fullest extent permitted under the laws of New York in the performance of their duties under the Plan and the Trust Agreement.  For the avoidance of doubt, the Diocese, Reorganized Diocese, Participating Parties, and their respective Agents shall not be deemed to be Agents of the Trust unless specifically authorized as such in writing by the Trustee.

## M.   Trust Liability

Upon the occurrence of the Effective Date, the Trust shall automatically and without further act or deed assume all responsibility for preserving, managing, and distributing Trust Assets.

Subject to and upon the occurrence of each applicable Abuse Claim Discharge Date, the Trust shall automatically and without further act or deed assume all liability, if any, of the Participating Parties and Settling Insurers in respect of the Abuse Claims, which shall become Channeled Claims in accordance with the terms of the Plan.

17289563.12

## N.  Termination

The Trust shall terminate after its liquidation, administration, and Distribution of the Trust Assets in accordance with the Plan and its full performance of all other duties and functions set forth in the Trust Agreement.

## ARTICLE X

## GENERAL CLAIMS ADMINISTRATION

## A.  Objections to Non-Abuse Claims

Prior to the Effective Date, the Diocese shall have the authority to pursue any objection to the allowance of any Non-Abuse Claim.  From and after the Effective Date, the Reorganized Diocese will retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving and making any Distributions with respect to Non-Abuse Claims (including those Non-Abuse Claims that are subject to objection by the Diocese as of the Effective Date); provided, however, that nothing in this Section shall affect the right of any party in interest (including the Reorganized Diocese and the Trustee) to object to any Non-Abuse Claim to the extent such objection is otherwise permitted by the Bankruptcy Code, the Bankruptcy Rules, and the Plan.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court, objections to Non-Abuse Claims will be Filed and served not later than 90 days after the later of: (i) the Effective Date, or (ii) the date such Claim is Filed (the "Claims Objection Deadline").  Such deadline or any Bankruptcy Court-approved extension thereof, may be extended upon request by the Reorganized Diocese by filing a motion without any requirement to provide notice to any Person, based upon a reasonable exercise of the Reorganized Diocese's business judgment.  A motion seeking to extend the deadline to object to any Claim shall not be deemed an amendment to the Plan.

## B.  Determination of Claims

From and after the Effective Date, any Non-Abuse Claim as to which a proof of claim or motion or request for payment was timely Filed in this Chapter 11 Case, or deemed timely Filed by order of the Bankruptcy Court, may be determined and (so long as such determination has not been stayed, reversed, or amended, as to which determination (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired, (and as to which no appeal or petition for review or rehearing was Filed or, if Filed, remains pending)), liquidated pursuant to:  (i) an order of the Bankruptcy Court; (ii) applicable bankruptcy law; (iii) agreement of the parties without the need for Bankruptcy Court approval; (iv) applicable non-bankruptcy law; or (v) the lack of (a) an objection to such Claim, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim, Filed by the Diocese, the Reorganized Diocese, or any other party in interest on or prior to any applicable deadline for filing such objection or application with respect to such Claim.  Any such Claim so determined and liquidated shall be deemed to be an Allowed Claim for such liquidated amount and shall be satisfied in accordance with the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Claims, rights, or causes of action that the Diocese or the

Reorganized Diocese may have against any Person in connection with or arising out of any Claim or Claims, including any rights under 28 U.S.C. § 157.

## C.   No Distributions Pending Allowance

Except in the case of Abuse Claims paid pursuant to the Allocation Protocol, no Distribution will be made with respect to a Disputed Claim, or any portion thereof, unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim.

## D.   Claim Estimation

To effectuate Distributions pursuant to the Plan and avoid undue delay in the administration of the Chapter 11 Case, with respect to Disputed Claims (except Abuse Claims), the Diocese or the Reorganized Diocese, after notice and a hearing (which notice may be limited to the holder of such Disputed Claim), shall have the right to seek an order of the Bankruptcy Court or the District Court, pursuant to section 502(c) of the Bankruptcy Code, estimating or limiting the amount of: (i) property that must be withheld from or reserved for Distribution purposes on account of such Disputed Claim(s), (ii) such Claim for allowance or disallowance purposes, or (iii) such Claim for any other purpose permitted under the Bankruptcy Code; provided, however, that the Bankruptcy Court or the District Court, as applicable, shall determine: (y) whether such Claims are subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (z) the timing and procedures for such estimation proceedings.

## E.   Treatment of Contingent Claims

Except with respect to Abuse Claims, until such time as a contingent Claim or a contingent portion of an Allowed Claim becomes fixed or absolute or is Disallowed, such Claim will be treated as a Disputed Claim for all purposes related to Distributions under the Plan.

## F.   Controversy Concerning Impairment

If a controversy arises as to whether any Claim or any Class of Claims is Impaired under the Plan, the Bankruptcy Court, after notice and a hearing, shall determine such controversy before confirming the Plan.

## G.   Treatment of Executory Contracts and Unexpired Leases

Subject to the requirements of section 365 of the Bankruptcy Code, all executory contracts and unexpired leases of the Diocese except (i) Insurance Policies that have not been assumed and retained by the Diocese pursuant to Section 7.5 of the Plan, or (ii) executory contracts and unexpired leases that have been rejected by order of the Bankruptcy Court or are the subject of a motion to reject pending on the Confirmation Date, will be deemed to be assumed and assigned to the Reorganized Diocese on the Effective Date. If any party to an executory contract or unexpired lease that is being assumed and assigned to the Reorganized Diocese objects to such assumption and assignment, the Bankruptcy Court may conduct a hearing on such objection on any date that is either mutually agreeable to the parties or fixed by the Bankruptcy Court. All payments to cure defaults that may be required under section 365(b)(1) of the Bankruptcy Code will be made by the

60

Reorganized Diocese, except that the Trust shall pay any cure costs under any Insurance Policy assumed and retained by the Diocese pursuant to Section 7.5 of the Plan. In the event of a dispute regarding the amount of any cure payments, or the ability of the Diocese or the Reorganized Diocese (as applicable) to provide adequate assurance of future performance with respect to any executory contracts to be assumed by the Diocese, or assumed and assigned to the Reorganized Diocese, the Trust or the Reorganized Diocese (as applicable) will make any payments required by section 365(b)(1) of the Bankruptcy Code after the entry of a Final Order resolving such dispute. The contracts and leases which will be assumed and assigned to the Reorganized Diocese, and their respective cure costs, are identified in **Exhibit 6** attached to the Plan Supplement.

## ARTICLE XI

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Disbursing Agents

The Reorganized Diocese shall be the disbursing agent for all aspects of the Plan except for Distributions made from the Trust. With respect to the Trust, the Trustee shall be the disbursing agent and be responsible for all Distributions made under the Trust.

### B.    Manner of Payment

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, all Distributions of Cash under the Plan may be made either by check via first class mail, postage prepaid, or by wire transfer from a domestic bank, at the option of the respective disbursing agent.

### C.    Distribution Only to Holders of Allowed Claims

Except as otherwise provided in the Plan for Abuse Claims, Distributions under the Plan and the Plan Documents will be made only to the holders of Allowed Claims. Until a Disputed Non-Abuse Claim becomes an Allowed Claim, the holder of that Disputed Non-Abuse Claim will not receive any Distribution otherwise provided to Non-Abuse Claimants under the Plan or the Plan Documents. If necessary, in determining the amount of a *pro rata* Distribution due to the holders of Allowed Claims in any Class, the Reorganized Diocese will make the *pro rata* calculation as if all Disputed Non-Abuse Claims were Allowed Claims in the full amount claimed or in the estimated amount. When a Disputed Non-Abuse Claim in any Class becomes an Allowed Claim, the Reorganized Diocese will make a full or partial Distribution, as applicable, with respect to such Allowed Claim, net of any setoff contemplated by the order, if any, allowing such Claim and any required withholding of applicable federal and state taxes.

### D.    Disputed Claim Reserve

Except with respect to Trust Distributions made to Abuse Claimants pursuant to the Allocation Protocol, to the extent that a disbursing agent makes a Distribution hereunder to a Class prior to the resolution of all Disputed Claims of such Class, the respective disbursing agent shall reserve an amount for any Disputed Claims in such Class equal to the amount that such holders of

Disputed Claims in such Class would be entitled to receive under the Plan if such Disputed Claims were Allowed in the asserted amount of the Claim.

## E.    Transmittal of Distributions

Except as otherwise provided in the Plan, in the Plan Documents, or in an order of the Bankruptcy Court, Distributions to be made under the Plan, Confirmation Order, or Trust Documents to Class 5 Claimants will be made by the Trust, and Distributions to all other Claimants will be made by the Diocese or the Reorganized Diocese. Distributions to Class 5 Claimants will be made (a) to the client trust account for the Claimant's attorney of record; or (b) if the Class 5 Claimant does not have an attorney of record, to the latest mailing address set forth in a proof of claim Filed with the claims agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Trustee, as applicable, by such Claimant in writing; or (c) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese or Trustee, as applicable, to the mailing address set forth in the Schedules Filed by the Diocese in this Chapter 11 Case. Distributions to Claimants holding Non-Abuse Claims will be made by wire transfer or by check via first class United States mail, postage prepaid, (a) to the latest mailing address set forth in a proof of claim Filed with the claims agent or the Bankruptcy Court by or on behalf of such Claimant, or to such other address as may be provided to the Reorganized Diocese, as applicable, by such Claimant in writing, or (b) if no such proof of claim has been Filed and no written notice setting forth a mailing address is provided by or on behalf of such Claimant to the Reorganized Diocese, to the mailing address set forth in the Schedules Filed by the Diocese in the Chapter 11 Case. If a Claimant's Distribution is not mailed or is returned to the Reorganized Diocese or to the Trustee because of the absence of a proper mailing address, the Reorganized Diocese or the Trustee, as the case may be, shall make a reasonable effort to locate or ascertain the correct mailing address for such Claimant from information generally available to the public and from such party's own records, but shall not be liable to such Claimant for having failed to find a correct mailing address. The Trustee shall have no liability to a Class 5 Claimant on account of Distributions made to the client trust account of a Class 5 Claimant's attorney.

## F.    Timing of Distributions

Unless otherwise agreed by the Reorganized Diocese or the Trustee, as applicable, and the recipient of a Distribution under the Plan or the Plan Documents, whenever any payment to be made is due on a day other than a Business Day, such payment will instead be made on the next Business Day. Any Claimant that is otherwise entitled to an undeliverable Distribution and that does not, within thirty days after a Distribution is returned to the Reorganized Diocese or to the Trustee, as applicable, as undeliverable or is deemed to be an undeliverable Distribution, provide the Reorganized Diocese or the Trustee, as applicable, with a written notice asserting its Claim to that undeliverable Distribution and setting forth a current, deliverable address will be deemed to waive any Claim to such undeliverable Distribution and will be forever barred from receiving such undeliverable Distribution or asserting any Claim against the Reorganized Diocese, the Trust, the Trustee, or its property. Any undeliverable Distributions to be made by the Trust that are not claimed under this Section will become available for the Trust to distribute to other Abuse Claimants. Any other undeliverable Distributions shall be retained by the Reorganized Diocese in

accordance with the Plan. Nothing in the Plan requires the Reorganized Diocese, the Trust, or the Trustee to attempt to locate any Claimant whose Distribution is undeliverable.

## G. Time Bar to Check Payments

If an instrument delivered as a Distribution to a Claimant by the Reorganized Diocese or the Trust is not negotiated within 90 days after such instrument is sent to the Claimant, then the instrument shall be null and void, the Claimant shall be deemed to have waived such Distribution, and all Claims in respect of such voided check shall be discharged and forever barred. Any request for re-issuance of a check must be made on or before 90 days after issuance of a non-negotiated check. Except as otherwise provided herein, any Distribution under the Plan which is not negotiated after 90 days following issuance shall be forfeited, and such Distribution, together with any interest earned thereon, and shall return to and revest in the Reorganized Diocese or to the Trust, as applicable.

## H. No Professional Fees or Expenses

No professional fees or expenses incurred by a Claimant will be paid by the Diocese, the Reorganized Diocese, or the Trust with respect to any Claim except as specified in the Plan or the Trust Documents.

## I. No Interest on Claims

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Diocese and the holder of a Claim approved by an Order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim. In addition, and without limiting the foregoing or any other provision of the Plan, the Confirmation Order, or the Trust Agreement, interest shall not accrue on or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes an Allowed Claim.

## J. Saturday, Sunday or Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the following Business Day, but shall be deemed to have been completed as of the required date.

## K. Withholding Taxes

The Reorganized Diocese shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. As a condition to making any Distribution under the Plan, the Reorganized Diocese may require that the holder of an Allowed Claim provide such holder's taxpayer identification number and such other information and certification as may be deemed necessary to comply with applicable tax reporting and withholding laws.

17289563.12

## L. **Setoffs and Recoupment**

Subject to the terms of the Plan and pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, the Diocese or Reorganized Diocese, as appropriate, may but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims of any nature whatsoever the Diocese may have against the holder of such Claim.

## M. **No *De Minimis* Distributions**

Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash (rounded to the nearest whole cent when and as necessary) will be issued to Claimants entitled to receive Distributions of Cash. Any Distribution of less than $25.00 will be considered *de minimis*, and holders of Allowed Claims that are entitled to Distributions of less than $25.00 will not receive any Distribution. Such funds will remain with, and revest in, the Reorganized Diocese. For avoidance of doubt, this Section XI.M shall not apply to any Distributions to be made by the Trust, which shall be governed solely by the Trust Documents.

## N. **Prepayment**

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Diocese shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## ARTICLE XII

## EFFECTIVE DATE

## A. **Conditions Precedent to Effective Date**

The Effective Date shall not occur, and the Plan shall not be consummated, unless each of the following conditions are satisfied or waived as set forth in Section 11 of the Plan:

1.    ***Confirmation Order.*** The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents and the Settling Insurers. Without limiting the generality of the foregoing, the Confirmation Order shall, at a minimum, contain findings by the Bankruptcy Court that:

a.    the assignment of Insurance Claims, or alternatively, the retention and prosecution of such claims following confirmation by the Diocese and other Participating Parties as contemplated in the Plan is authorized by, and does not conflict with, any provision of the Bankruptcy Code, and is therefore approved;

b.    all of the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code have been met and that the Plan should be confirmed;

c.    the Reorganized Diocese has been duly formed and is in good standing under New York law;

d.      the Bankruptcy Court has jurisdiction to approve, and does approve, the transfer of the Residual Assets to, and vesting of title in, the Reorganized Diocese in accordance with the provisions of section 511 or 511-a of the New York State Not-For-Profit Corporation Law, and that no further approval by the New York Attorney General or the New York Supreme Court is required;

e.      that, except as otherwise provided in the Plan, the Reorganized Diocese shall not be liable for any Claims against or liabilities of the Diocese or any of the Participating Parties, including under any theory of successor liability; and

f.      the Confirmation Order contains appropriate provisions for the examination fees to be paid by Abuse Claimants to their legal counsel under New York Law.

2.      ***Channeling and Insurer Injunctions.***  The Confirmation Order shall approve and implement the Channeling Injunction and the Supplemental Settling Insurer Injunction set forth in Section 12 of the Plan.

3.      ***Plan Documents.***  The Plan Documents shall be in form and substance acceptable to the Plan Proponents and the Settling Insurers.

4.      ***Trust Formation.***  The Trust shall have been formed, the Bankruptcy Court shall have entered an order appointing the Trustee, and the Trustee and the Diocese shall have executed the Trust Agreement.

5.      ***The DOS Entities' Cash Contribution.***  The DOS Entities' Cash Contribution shall have been made to the Trust.

6.      ***Participating Parties Assignment***.  Each Participating Party shall assign its respective Insurance Claims, to the extent such Claims exist, by executing and delivering such agreements and instruments of assignment as the Trustee may reasonably request.

7.      ***The DOS Trust Note Documents.***  In the event the DOS Entities' Cash Contribution is less than $100,000,000, the Trust shall have received the DOS Trust Note Documents, duly executed by the Reorganized Diocese.  For the avoidance of doubt, if the DOS Entities' Cash Contribution is $100,000,000, none of the DOS Trust Note Documents shall be executed or delivered to the Trust.

8.      ***Exit Financing.***  Each Exit Financing Lender shall have received their respective Exit Financing Documents, duly executed by the Diocese or Reorganized Diocese, as applicable, and shall have fully funded, or irrevocably committed to fully funding, the Exit Financing contemplated therein.

9.      ***Insurance Settlement Agreements.***  Each Insurance Settlement Agreement agreed to prior to the Confirmation Date shall have been duly executed by all parties thereto and approved by the Bankruptcy Court, in each case in form and substance satisfactory to the Plan Proponents and applicable Settling Insurers.

17289563.12

10. ***The Settling Insurers' Contribution.*** Each of the Settling Insurers shall have paid to the Trust the Insurance Settlement Amounts due under their respective Insurance Settlement Agreements, except to the extent the terms of such Insurance Settlement Agreements expressly provide that such payment will be made at a later date.

11. ***Permits and Approvals.*** The Reorganized Diocese shall have obtained any necessary governmental permits or approvals required to take title to the Residual Assets, and to conduct business as a tax-exempt entity pursuant to 26 U.S.C. § 501(c)(3), on and after the Effective Date in substantially the same manner as the Diocese has historically conducted its business.

12. ***Final Orders.*** The Confirmation Order, the order appointing the Trustee, and all orders approving Insurance Settlement Agreements shall be Final Orders and no stay of any such orders shall then be in effect.

13. ***No Material Amendments.*** The Plan shall not have been materially amended, altered, or modified as confirmed by the Confirmation Order, unless such material amendment, alternation, or modification has been made with consent of the Plan Proponents and any affected Settling Insurers.

## B.  Waiver of Conditions Precedent to the Effective Date

Any condition to the occurrence of the Effective Date set forth in Section 11.1 of the Plan may be waived by the mutual written consent of the Diocese, the Committee, the Settling Insurers with respect to any conditions affecting such Settling Insurer's rights or obligations and the Participating Parties with respect to any conditions affecting such Participating Party's obligations.

## C.  Notice of Effective Date

The Diocese shall File a notice of Effective Date with the Bankruptcy Court, and serve it on all Creditors and parties in interest, within five Business Days after the occurrence of the Effective Date.  Such notice shall include all relevant deadlines put into effect by the occurrence of the Effective Date.

## D.  Effect of Non-Occurrence of Conditions

If substantial consummation of the Plan does not occur, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will: (i) constitute a waiver or release of any Claims by or against the Protected Parties or the Settling Insurers; (ii) prejudice in any manner the rights of the Protected Parties, the Trust, or the Settling Insurers; (iii) constitute an admission, acknowledgment, offer, or undertaking by the Protected Parties or the Settling Insurers in any respect, including but not limited to, in any proceeding or case against the Diocese or any Participating Party; or (iv) be admissible in any action, proceeding or case against the Protected Parties or Settling Insurers in any court or other forum.

## ARTICLE XIII

## EFFECTS OF PLAN CONFIRMATION AND EFFECTIVE DATE

### A.    General Injunction and Discharge

1.    *General Injunction*.  **EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 OF THE PLAN, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE, WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.**

2.    *General Discharge*.  Except as otherwise expressly provided in the Plan or in the Confirmation Order, on the Effective Date, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese, the Estate, and the Reorganized Diocese will be discharged from all liability for any and all Non-Abuse Claims.

**B.**     **Injunction and Discharge of Abuse Claims and Inbound Contribution Claims**

1.     *Injunction of Abuse Claims and Inbound Contribution Claims.*  **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 OF THE PLAN OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (A) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (B) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (C) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.**

**IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.**

**THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY.**

2.     *Limited Exception to Injunction.*  To facilitate the pursuit of Insurance Claims against Non-Settling Insurers, the injunctions set forth in the Plan shall not prevent the prosecution of Abuse Actions against the Diocese or any Participating Party (a) by one or more Litigation Claimants authorized by the Trustee to pursue their Litigation Claims, at such Litigation Claimants' expense, in any court of competent jurisdiction solely for the purpose of determining any liability that the Diocese and/or any Participating Party may have with respect to such Litigation Claimant's Litigation Claim, and the amount of that liability; (b) as the Trustee may deem necessary in order to prosecute the Insurance Claims; or (c) as the Trustee may deem

68

necessary in order to effectuate settlement of any Abuse Claims, *provided*, *however*, that all collection efforts against the Diocese and/or any Protected Party shall be enjoined and any Litigation Award obtained as a result of litigating such Abuse Actions shall be enforceable solely against Non-Settling Insurers and not against any Protected Party.

To preserve coverage under any Non-Settling Insurer Policy, Abuse Claims will not be released or discharged as against the Diocese or any other Participating Party until the occurrence of the applicable Abuse Claim Discharge Date. For the avoidance of doubt, prior to the occurrence of the applicable Abuse Claim Discharge Date and subject to the limitations set forth in the Plan, a duly authorized Litigation Claimant or the Trust may name the Diocese or any Participating Party in a proceeding to adjudicate whether the Diocese or any Participating Party has liability for an Abuse Claim and the amount of any such liability, but recourse shall be limited to the proceeds of any Non-Settling Insurer Policies and all other damages that may be recoverable against any Non-Settling Insurers.

Notwithstanding anything to the contrary herein or in the Plan, the Reorganized Diocese shall have no liability whatsoever for any Abuse Claims or Inbound Contribution Claims and any act by any Person to collect or enforce any Abuse Claim or Inbound Contribution Claim against the Reorganized Diocese shall be permanently enjoined.

3.    ***Discharge of Abuse Claims and Inbound Contribution Claims***. Except as otherwise expressly provided in the Confirmation Order, pursuant to section 1141(d) of the Bankruptcy Code, the Diocese and its Estate will be discharged (a) from all liability for any and all Inbound Contribution Claims on the Confirmation Date, and (b) from all liability for any and all Abuse Claims upon the occurrence of the applicable Abuse Claim Discharge Date.

The Abuse Claim Discharge Date with respect to each Abuse Claim shall be determined as follows:

a.    with respect to any Filed Abuse Claim held by an Abuse Claimant that elects treatment as a Distribution Plan Claimant, the Abuse Claim Discharge Date shall be the date following the last date on which such Abuse Claimant could modify his or her election to become a Litigation Claimant pursuant to Section 4.3.2.b of the Plan.

b.    with respect to any Filed Abuse Claim held by an Abuse Claimant who elects treatment as a Litigation Claimant and is authorized by the Trustee to liquidate his or her Litigation Claim on or before the first anniversary of the Effective Date, the Abuse Claim Discharge Date shall be the earlier of the date on which (a) all Litigation Claims asserted by such Litigation Claimant against the Diocese and/or any Participating Party have been fully adjudicated, settled or dismissed on a final and non-appealable basis and any Non-Settling Insurers' resulting liability with respect to such Litigation Claim, as determined by settlement or Final Order, has been fully satisfied by payment in accordance with the terms of such settlement or Final Order; (b) the Abuse Claimant withdraws his or her election to be a Litigation Claimant in accordance with Section 4.3.2.a of the Plan; or (c) the Trust enters into a settlement with respect to all Non-Settling Insurer Policies that are Target Policies of such Litigation Claim.

69

c.      With respect to any Filed Abuse Claim held by an Abuse Claimant who elects treatment as a Litigation Claimant but who is not authorized by the Trustee to liquidate his or her Litigation Claim on or before the first anniversary of the Effective Date, the Abuse Claim Discharge Date shall be the earlier of the date on which the Abuse Claimant withdraws his or her election to be a Litigation Claimant in accordance with Section 4.3.2.a of the Plan and the first anniversary of the Effective Date.

d.      With respect to any Previously Unasserted Abuse Claim held by an Abuse Claimant who elects treatment as a Distribution Claimant, the Abuse Claim Discharge Date shall be the date following the last date on which such Abuse Claimant could modify his or her election to become a Litigation Claimant pursuant to Section 4.3.2.b of the Plan.

e.      With respect to any Previously Unasserted Abuse Claim held by an Abuse Claimant who elects treatment as a Litigation Claimant and is authorized by the Trustee to liquidate his or her Litigation Claim within 90 days after such Abuse Claimant is notified of the amount of their award under the Allocation Protocol, the Abuse Claim Discharge Date shall be the earlier of the date on which (a) all Litigation Claims asserted by such Litigation Claimant against the Diocese and/or any Participating Party have been fully adjudicated, settled or dismissed on a final and non-appealable basis and any Non-Settling Insurers' resulting liability with respect to such Litigation Claim has been fully satisfied by payment to the Trustee by all Non-Settling Insurers implicated by such Litigation Claimant's Litigation Claim; (b) the Abuse Claimant withdraws his or her election to be a Litigation Claimant in accordance with Section 4.3.2.a of the Plan; or (c) the Trust enters into a settlement with respect to all Non-Settling Insurer Policies that are Target Policies of such Litigation Claim.

f.      With respect to any Previously Unasserted Abuse Claim held by a Abuse Claimant who elects treatment as a Litigation Claimant but who is not authorized by the Trustee to liquidate his or her Litigation Claim within 90 days after such Abuse Claimant is notified of the amount of their award under the Allocation Protocol, the Abuse Claim Discharge Date shall be the date which is 90 days after such Abuse Claimant is notified of the amount of their award under the Allocation Protocol.

g.      For the avoidance of doubt, (i) the Abuse Claim Discharge Date for any Abuse Claim shall be deemed to occur no later than the first day following the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against any Non-Settling Insurers who issued Non-Settling Insurer Policies that are Target Policies of any Litigation Claimants' potential Litigation Claims, and (ii) the Abuse Claim Discharge Date for all Abuse Claims shall be deemed to occur no later than the first day following the date on which the Trust has fully adjudicated, settled or dismissed on a final and non-appealable basis all Insurance Claims against all Non-Settling Insurers.

4.      ***Preservation of Insurance Claims.***  The Non-Settling Insurers remain fully liable for their obligations related in any way to the Abuse Claims, and their obligations are not reduced by the fact that the Diocese is in bankruptcy or by the amount of any Distributions Abuse Claimants receive, or may be entitled to receive, based on the Allocation Protocol.  The Trust may continue efforts to obtain recoveries from Non-Settling Insurers related to the Abuse Claims.  Any such recoveries by the Trust from Non-Settling Insurers will be added to the Abuse Claims Settlement

70

Fund to be distributed pursuant to the terms of the Plan, the Allocation Protocol and the Trust Documents. Nothing in the Plan shall be deemed to modify or abridge any rights of the Non-Settling Insurers under their respective Non-Settling Insurer Policies.

**C.      Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties**

1.      **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION GIVEN, AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**

a.      **ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THE PLAN AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**

b.      **ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:**

(i)      **COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(ii)      **ENFORCING, ATTACHING, COLLECTING, OR RECOVERING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, BY ANY MANNER OR MEANS, ANY JUDGMENT, AWARD, DECREE, OR ORDER WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES;**

(iii)      **CREATING, PERFECTING, OR ENFORCING, OR SEEKING TO ACCOMPLISH ANY OF THE PRECEDING, ANY LIEN OF ANY KIND RELATING TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF THE PROTECTED PARTIES;**

(iv)      **ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST:**

71

(a)    ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES;

(b)    ANY OF THE PROTECTED PARTIES; OR

(c)    THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

(v)    TAKING ANY ACT, IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO, OR COMPLY WITH, THE PROVISIONS OF THE PLAN; AND

(vi)    ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS SECTION 12 OR OTHERWISE IN THE PLAN, LITIGATION CLAIMANTS AND THE TRUST SHALL BE PERMITTED TO NAME THE DIOCESE AND ANY OTHER PROTECTED PARTY IN ANY PROCEEDING TO RESOLVE WHETHER THE DIOCESE OR SUCH OTHER PROTECTED PARTY HAS LIABILITY FOR A LITIGATION CLAIM, AND THE AMOUNT OF ANY SUCH LIABILITY, FOR THE PURPOSE OF OBTAINING INSURANCE COVERAGE FROM NON-SETTLING INSURERS UNDER THE NON-SETTLING INSURER POLICIES, AND FOR THE PURPOSE OF PURSUING ANY AND ALL INSURANCE CLAIMS AGAINST THE NON-SETTLING INSURERS. ANY SUCH JUDGMENTS OR AWARDS WILL BE TURNED OVER TO THE TRUST FOR DISTRIBUTION IN ACCORDANCE WITH SECTION 4.6 OF THE PLAN. FOR THE AVOIDANCE OF DOUBT, RECOURSE WITH RESPECT TO ANY AND ALL LITIGATION CLAIMS IS EXPRESSLY LIMITED TO THE PROCEEDS OF NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS, AS AND TO THE EXTENT PERMITTED BY THE PLAN.

2.    THE CHANNELING INJUNCTION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO THE PLAN'S CONSUMMATION AND IMPLEMENTATION.    IT IS INTENDED THAT THE CHANNELING OF THE CHANNELED CLAIMS AS PROVIDED IN SECTION 12.3 OF THE PLAN SHALL INURE TO THE BENEFIT OF THE PROTECTED PARTIES.    IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

**D.      Supplemental Settling Insurer Injunction**

PURSUANT TO SECTIONS 105(a), 363, AND 1129 OF THE BANKRUPTCY CODE, AND IN CONSIDERATION OF THE UNDERTAKINGS OF THE SETTLING INSURERS PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS, INCLUDING CERTAIN SETTLING INSURERS' PURCHASE OF THE APPLICABLE SETTLING INSURER POLICIES FREE AND CLEAR OF ALL CLAIMS PURSUANT TO SECTION 363(f) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ANY AND ALL PERSONS WHO HAVE HELD, NOW HOLD, OR WHO MAY IN THE FUTURE HOLD ANY CLAIMS (INCLUDING ALL DEBT HOLDERS, ALL EQUITY HOLDERS, GOVERNMENTAL, TAX AND REGULATORY AUTHORITIES, LENDERS, TRADE AND OTHER CREDITORS, ABUSE CLAIMANTS, PERPETRATORS, NON-SETTLING INSURERS, AND ALL OTHERS HOLDING INTERESTS OF ANY KIND OR NATURE WHATSOEVER, INCLUDING THOSE CLAIMS RELEASED OR TO BE RELEASED PURSUANT TO THE INSURANCE SETTLEMENT AGREEMENTS) AGAINST ANY OF THE SETTLING INSURERS, INCLUDING (A) INSURANCE CLAIMS RELATING TO THE SETTLING INSURER POLICIES, INCLUDING ABUSE CLAIMS, INBOUND CONTRIBUTION CLAIMS, AND RELEASED INSURANCE CLAIMS, (B) THE PAYMENT OF ANY OF THE CLAIMS IDENTIFIED IN (A), INCLUDING MEDICARE CLAIMS, AND (C) EXTRA-CONTRACTUAL CLAIMS ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, TO ASSERT, ENFORCE OR ATTEMPT TO ASSERT OR ENFORCE ANY SUCH CLAIM OR INTEREST AGAINST THE SETTLING INSURERS OR SETTLING INSURER POLICIES.

THE SUPPLEMENTAL SETTLING INSURER INJUNCTION WILL BE EFFECTIVE WITH RESPECT TO A SETTLING INSURER ONLY AS OF THE DATE THAT THE TRUST RECEIVES THE INSURANCE SETTLEMENT AMOUNT FROM THAT SETTLING INSURER PURSUANT TO THE TERMS OF THE APPLICABLE INSURANCE SETTLEMENT AGREEMENT. THE SUPPLEMENTAL SETTLING INSURER INJUNCTION BARS THE ABOVE-REFERENCED ACTIONS AGAINST THE SETTLING INSURERS AND THE SETTLING INSURER POLICIES, BUT AGAINST NO OTHER PERSON OR THING; PROVIDED, HOWEVER, NOTHING IN THIS SUPPLEMENTAL SETTLING INSURER INJUNCTION SHALL LIMIT, OR BE DEEMED OR OTHERWISE INTERPRETED TO LIMIT, THE SCOPE OF THE DISCHARGE OR CHANNELING INJUNCTION IN FAVOR OF THE PROTECTED PARTIES. THE FOREGOING INJUNCTIVE PROVISIONS ARE AN INTEGRAL PART OF THE PLAN AND ARE ESSENTIAL TO ITS IMPLEMENTATION.

**E.      Litigation/Settlement of Certain Claims.**

The Channeling Injunction shall channel all Inbound Contribution Claims and all Insurer Contribution Claims to the Trust. For the avoidance of doubt, unless otherwise provided in the Plan, the Allocation Protocol, or Trust Documents, the channeling of an Inbound Contribution Claim or Insurance Contribution Claim does not entitle the holder of such Channeled Claim to a Trust Distribution.

If, for any reason any court does not recognize the channeling of the Insurer Contribution Claims of any Insurers to the Trust, or such Insurer Contribution Claims are not channeled for any reason, then the following shall apply:

1.      Settling Insurers shall retain their Insurer Contribution Claims; provided, however, that:

a.      Settling Insurers shall not pursue any Insurer Contribution Claim against any Non-Settling Insurer, (A) that asserts an Insurer Contribution Claim solely against the Trust; (B) whose Insurer Contribution Claim is satisfied and extinguished entirely by the application of Section 12.5 of the Plan, or (C) that does not assert an Insurer Contribution Claim against them;

b.      If a Non-Settling Insurer asserts its Insurer Contribution Claim only against the Trust, then Settling Insurers shall assign any Insurer Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Insurer Contribution Claims against such Non-Settling Insurer;

(i)      If a Non-Settling Insurer releases its Insurer Contribution Claims, if any such exist, that it may have against Settling Insurers, then such released Settling Insurers shall release their Insurer Contribution Claims against such releasing Non-Settling Insurer.

2.      In any Action, including the Insurance Coverage Adversary Proceeding, involving the Diocese, a Participating Party, or the Trust (collectively, the "Alleged Insured") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Insurer Contribution Claim against any Settling Insurers, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such Settling Insurer is liable to pay such Non-Settling Insurer as a result of its Insurer Contribution Claim (the "Reduction Amount"), so that the Non-Settling Insurer's Insurer Contribution Claim is thereby satisfied and extinguished entirely. In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where such a Settling Insurer is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, establishing the Reduction Amount before obtaining an entry of judgment against such Non-Settling Insurer. Settling Insurers shall be required to cooperate in good faith with the Diocese and/or the Trust to take reasonable steps to defend against any Insurer Contribution Claim. In the absence of such good faith cooperation by any given Settling Insurer with respect to any given Insurer Contribution Claim, the Reduction Amount shall be zero. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Insurer Contribution Claim, then such Non-Settling Insurer shall fully reimburse the Settling Insurers their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the court.

3.      If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Abuse Claims, such agreement shall include a provision whereby such Non-Settling Insurer releases Insurer Contribution Claims against Settling Insurers so long as Settling Insurers release their Insurer Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer

has asserted, asserts, or could assert an Insurer Contribution Claim against Settling Insurers, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount. In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Insurer Contribution Claim by any Non-Settling Insurer against any Settling Insurer shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Insurer Contribution Claim is Filed. Settling Insurers shall be required to cooperate in good faith with the Diocese and/or the Trust to take reasonable steps to defend against any Insurer Contribution Claim by a Non-Settling Insurer. In the absence of such good faith cooperation by any given Settling Insurer with respect to any given Insurer Contribution Claim, the Reduction Amount shall be zero. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Insurer Contribution Claim, then such Non-Settling Insurer shall fully reimburse the Settling Insurers their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the court.

4.    If a Non-Settling Insurer Asserts an Insurer Contribution Claim against any Settling Insurer, and

a.    the Trust fully indemnifies the Settling Insurer, then the Selling Insurer shall assign its Insurer Contribution Claim to the Trust; or

b.    the Trust partially, but not fully, indemnifies the Settling Insurer for such Claim, then the Settling Insurer shall retain its Insurer Contribution Claims and may assert those Claims against the Non-Settling Insurer asserting the Insurer Contribution Claim against the Settling Insurer. Any recovery by the Settling Insurer in excess of the amount necessary to satisfy the Trust's full indemnity obligation plus the Settling Insurer's litigation costs shall be turned over to the Trust.

5.    The above procedures shall bind, and inure to the benefit of all Settling Insurers.

6.    To ensure that the reduction contemplated in Section 12.5.2 of the Plan is accomplished, the Settling Insurers shall be entitled to: (i) notice, within a reasonable time, of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer in which an Insurer Contribution Claim is asserted against any Settling Insurers, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations, but only to the extent necessary to accomplish the reduction contemplated in Section 12.5.2 of the Plan; (iii) the reasonable cooperation of the applicable Alleged Insured, at the sole cost and expense of Settling Insurers, so that the Settling Insurers can assert Section 12.5.2 of the Plan as a defense in any Action against any of them for any Insurer Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect the Settling Insurers from any Insurer Contribution Claim. The notice required above shall be given by (A) the Alleged Insured that is a party to such Action or settlement negotiations; or (B) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (C) if no Alleged Insured or Non-

75

Settling Insurer is a party to such Action or settlement negotiations, the Abuse Claimant bound by the Plan.

7.      The Trust shall use reasonable efforts to obtain, from all Settling Insurers, agreements with terms similar to those contained in Section 12.5 of the Plan.

## F.      Injunction Against Interference with Plan

Upon entry of the Confirmation Order, all holders of Claims shall be precluded and enjoined from taking any actions to interfere with the implementation and consummation of the Plan.

## G.      Release by Holders of Claims

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, ALL HOLDERS OF CLAIMS, INCLUDING ABUSE CLAIMS (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THE PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THE PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.**

**THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH ABUSE CLAIMANT WILL RELEASE THE DIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.**

**FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT OR THE TRUST MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE**

76

**OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT THAT LITIGATION CLAIMANT'S RECOURSE IN SUCH CASE OR PROCEEDING SHALL BE LIMITED TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS.**

H.    <u>Mutual Releases</u>

**EXCEPT FOR OBLIGATIONS ARISING UNDER ANY EXECUTORY CONTRACT ASSUMED AND ASSIGNED TO THE REORGANIZED DIOCESE, OBLIGATIONS ARISING UNDER THE PLAN AND ABUSE CLAIMS SUBJECT TO DELAYED RELEASE IN ACCORDANCE WITH SECTION 12.7 OF THE PLAN, ON THE EFFECTIVE DATE, EACH OF THE PROTECTED PARTIES, THE COMMITTEE, THE TRUST, AND EACH ABUSE CLAIMANT, SHALL BE DEEMED TO WAIVE, RELEASE, AND DISCHARGE ANY AND ALL CLAIMS AND CAUSES OF ACTION OF EVERY KIND AND NATURE THAT THEY MAY HAVE AGAINST EACH OTHER, AND THEIR RESPECTIVE RELATED PERSONS.  FOR THE AVOIDANCE OF DOUBT, ABUSE CLAIMANTS SHALL NOT WAIVE THEIR RIGHTS TO DISTRIBUTIONS UNDER THE TRUST IN ACCORDANCE WITH THE TRUST AGREEMENT AND THE ALLOCATION PROTOCOL AND SHALL BE DEEMED TO RELEASE THEIR ABUSE CLAIMS AS OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE; PROVIDED, HOWEVER, THAT ALL OTHER CLAIMS AND CAUSES OF ACTION ANY ABUSE CLAIMANT MAY HOLD AGAINST ANY OF THE PROTECTED PARTIES SHALL BE RELEASED ON THE EFFECTIVE DATE, AND PROVIDED, FURTHER, THAT PRIOR TO THEIR RELEASE ANY ABUSE CLAIMS SHALL ONLY BE ENFORCEABLE AND COMPENSABLE PURSUANT TO THE TERMS OF THE PLAN AND PLAN DOCUMENTS.**

I.    <u>Exculpation; Limitation of Liability</u>

**FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR, AND EACH EXCULPATED PARTY SHALL BE RELEASED FROM, ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (A) THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THIS CHAPTER 11 CASE OR (B) IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THE PLAN, AND THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL**

77

**WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THE PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.**

**J.      Injunctions in Full Force and Effect**

All injunctions and/or stays provided for in the Plan, the injunctive provisions of sections 524 and 1141 of the Bankruptcy Code, and all injunctions or stays protecting any Settling Insurer that has purchased Settling Insurer Policies, free and clear of all Claims pursuant to sections 105, 363, and 1123 of the Bankruptcy Code, are permanent and will remain in full force and effect following the Effective Date of the Plan and are not subject to being vacated or modified.

**K.      Injunctions and Releases Integral**

The Plan's injunctive provisions and releases are an integral part of the Plan and are essential to its implementation. The currently pending Abuse Actions commenced by Abuse Claimants, the continuation of which would violate Sections 12.1, 12.2, or 12.3 of the Plan, the releases provided for under the Plan, or the Insurance Settlement Agreements shall be dismissed with prejudice following the Trustee's receipt of an Abuse Claim Release Agreement executed by the applicable Abuse Claimant, except for Litigation Claims (or Abuse Claims that may become Litigation Claims), which will be released upon the applicable Abuse Claim Discharge Date in accordance with Sections 12.2.3 and 12.7 of the Plan.

**L.      Timing**

The injunctions, releases, and discharges (including the Channeling Injunction and the Supplemental Settling Insurer Injunction) to which any Settling Insurer is entitled pursuant to such Settling Insurer's Insurance Settlement Agreement, the Plan, the Confirmation Order, the Final Orders approving the Insurance Settlement Agreements, and the Bankruptcy Code shall only become effective when the Trust receives payment in full of the Insurance Settlement Amount from the corresponding Settling Insurer pursuant to the terms of the Settling Insurer's Insurance Settlement Agreement, and all other conditions to the effectiveness of the Insurance Settlement Agreement are fully met.

**M.      Non-Settling Insurers**

Notwithstanding anything to the contrary herein, the following shall apply to Non-Settling Insurers: (a) no Claim by an Abuse Claimant against a Non-Settling Insurer shall be a Channeled Claim, *provided*, *however*, any Claims which assert liability against a Non-Settling Insurer in conjunction with a Protected Party shall be Channeled Claims to the extent they assert liability against such Protected Party; (b) No Claim by an Abuse Claimant against a Non-Settling Insurer shall be released by operation of the Plan; (c) The injunctions provided in Section 12.1 and 12.2 of the Plan shall not apply to Claims by an Abuse Claimant against a Non-Settling Insurer; and (d)

78

All Claims by an Abuse Claimant against a Non-Settling Insurer are preserved and are not affected by the terms of the Plan.

**N.      Title to and Vesting of Assets**

All property of the Diocese and the Estate is dealt with by the Plan.  Therefore, on the Effective Date, to the fullest extent allowed by sections 1123(a)(5), 1123(b)(2), 1123(b)(3), 1141(b) and 1141(c) of the Bankruptcy Code, all property of the Diocese and the Estate, and any property acquired by the Diocese pursuant to the Plan, shall vest in the Reorganized Diocese and such property shall be free and clear of all Liens, Claims, charges or other encumbrances whatsoever, except that any charitable assets subject to Donor Restrictions shall pass to the Reorganized Diocese subject to such Donor Restrictions.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Diocese may operate and manage its affairs and may use, acquire, or dispose of such property without notice to any Person, and without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan or the Confirmation Order.  The Diocese and the Reorganized Diocese may pay any charges incurred on or after the Effective Date for Professional Fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

**O.      Continued Corporate Existence; No Successor Liability.**

1.      The Diocese will continue to exist after the Effective Date as a separate entity in accordance with New York law having tax-exempt status under 26 U.S.C. § 501(c)(3) and applicable New York law, without prejudice to any right to alter or terminate such existence, or to change its corporate name, except as such rights may be limited and conditioned by the Plan and the documents and instruments executed and delivered in connection therewith.

2.      On and after the Effective Date, the Reorganized Diocese may conduct business in the name of "The Roman Catholic Diocese of Syracuse, New York" or any derivation thereof that may be approved by the Bishop of Syracuse.  At the request of the Reorganized Diocese, the Diocese shall take such steps as may be required to change its corporate name to remove any references to "The Roman Catholic Diocese of Syracuse, New York."

3.      Notwithstanding anything to the contrary in the Plan or otherwise, except to the extent necessary to honor any Donor Restrictions or to the extent it may expressly assume such obligations in writing on or after the Effective Date, the Reorganized Diocese shall not be liable for any Claims against, or other liabilities or obligations of the Diocese.  The Reorganized Diocese shall not, and shall not be deemed under any state or federal law, or doctrine or theory of successor liability to: (a) be the successor of, or successor to, the Diocese; (b) have, de facto or otherwise, merged with or into the Diocese; (c) be a mere continuation or substantial continuation of the Diocese or the operations or business enterprises of the Diocese; or (d) be liable for any acts taken, or omitted to be taken, by the Diocese prior to the Effective Date.  All Persons and entities holding Liens, Claims and encumbrances, and other interests of any kind or nature whatsoever, including rights or Claims based on any successor or transferee liability, against or in the Diocese or the Residual Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with,

79

or in any way relating to the Diocese, the Residual Assets, or the operation of the Residual Assets prior to the Effective Date shall be forever barred, estopped, and permanently enjoined from asserting against the Reorganized Diocese such Liens, Claims, encumbrances, and other interests, including rights or claims based on any theory of successor or transferee liability, provided, however, nothing herein shall prohibit any Person with standing to do so from taking any action to enforce Donor Restrictions.

## P.    Identity of Trustees and Officers.

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the Persons proposed to serve as the trustees and officers of the Diocese and the Reorganized Diocese on and after the Effective Date shall be (i) The Most Reverend Douglas J. Lucia, Bishop of Syracuse, President, (ii) Reverend John Kurgan, Vicar General, Vice President, (iii) Danielle Cummings, Chancellor, Secretary/Treasurer and (iv) Stephen Breen, Chief Financial Officer, all of whom have served in such capacities for the Diocese prior to and during this Chapter 11 Case and each of whom is affiliated with the Universal Roman Catholic Church.

## Q.    Authority to Effectuate Plan

Upon the Effective Date, all matters provided under the Plan shall be deemed to be authorized and approved without the requirement of further approval from the Bankruptcy Court or the Diocese. The Diocese and the Reorganized Diocese shall be authorized, without further application to or order of the Bankruptcy Court, to take whatever action necessary to achieve consummation and carry out the Plan and to effectuate the transactions provided for thereunder.

## R.    Binding Effect

Except as otherwise expressly provided in the Plan, on and after the Effective Date, the Plan shall bind all holders of Claims. Subject to the terms of the Plan, upon the Effective Date, every holder of a Claim shall be precluded and permanently enjoined from asserting against the Diocese or the Reorganized Diocese any Claim based on any document, instrument, judgment, award, order, act, omission, transaction or other activity of any kind or nature that occurred before the Petition Date.

## S.    Dissolution of Committee

On the Effective Date, the Committee shall dissolve automatically, whereupon their members, Professionals, and Agents shall be released from any further duties and responsibilities in this Chapter 11 Case and under the Bankruptcy Code, except that such parties shall continue to be bound by any obligations arising under confidentiality agreements, joint defense/common interest agreements (whether formal or informal), and protective orders entered during this Chapter 11 Case, including any orders regarding confidentiality issued by the Bankruptcy Court or mediators, which shall remain in full force and effect according to their terms, provided that such parties shall continue to have a right to be heard with respect to any and all applications for Professional Fee Claims.

17289563.12

## ARTICLE XIV

## RETENTION OF JURISDICTION

**A.**      **By the Bankruptcy Court**

Pursuant to sections 105, 1123(a)(5) and 1142(b) of the Bankruptcy Code and 28 U.S.C. §§ 157 and 1334, on and after the Effective Date, the Bankruptcy Court shall retain (a) original and exclusive jurisdiction over the Chapter 11 Case, (b) original, but not exclusive jurisdiction to hear and determine all core proceedings arising under the Bankruptcy Code or arising in the Chapter 11 Case; and (c) original, but not exclusive, jurisdiction to hear and make proposed findings of fact and conclusions of law in any non-core proceedings related to the Chapter 11 Case and the Plan, including matters concerning the interpretation, implementation, consummation, execution or administration of the Plan.  Subject to, but without limiting the generality of the foregoing, the Bankruptcy Court's post-Effective Date jurisdiction shall include jurisdiction:

1.      over disputes concerning the ownership of Claims.

2.      over disputes concerning the distribution or retention of assets under the Plan.

3.      subject to the Plan Documents, over objections to Claims, motions to allow late-filed Claims and motions to estimate Claims.

4.      over proceedings to determine the extent, validity, or priority of any Lien asserted against property of the Diocese, the Estate, or the Trust, or property abandoned or transferred by the Diocese, the Estate or the Trust.

5.      over motions to approve Insurance Settlement Agreements entered into after the Effective Date by the Trustee.

6.      over matters related to the assets of the Estate or of the Trust, including the terms of the Trust, or the recovery, liquidation, or abandonment of Trust Assets.

7.      over matters related to the removal of the Trustee and the appointment of a successor Trustee.

8.      over matters relating to the subordination of Claims.

9.      to enter and implement such orders as may be necessary or appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated.

10.      to consider and approve modifications of or amendments to the Plan, to cure any defects or omissions or to reconcile any inconsistencies in any order of the Bankruptcy Court, including the Confirmation Order.

11.      to issue orders in aid of execution, implementation, or consummation of the Plan, including the issuance of orders enforcing any and all releases and injunctions issued under or pursuant to the Plan and any Insurance Settlement Agreement.

17289563.12

12.    over disputes arising from or relating to the Plan, the Confirmation Order, or any agreements, documents, or instruments executed in connection therewith.

13.    over requests for allowance of payment of Claims entitled to priority under sections 507(a)(2) and 503(b) of the Bankruptcy Code and any objections thereto.

14.    over all applications for compensation under sections 327, 328, 329, and 330 of the Bankruptcy Code.

15.    over matters concerning state, local, or federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

16.    over conflicts and disputes among the Trust, the Diocese, the Reorganized Diocese, and holders of Claims.

17.    over disputes concerning the existence, nature, or scope of the Diocese Discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date.

18.    to issue injunctions, provide declaratory relief, or grant such other legal or equitable relief as may be necessary or appropriate to restrain interference with the Plan, the Diocese or its property, the Reorganized Diocese or its property, the Estate or its property, the Trust or its property, the Trustee, the Professionals, or the Confirmation Order.

19.    to enter a final decree closing the Chapter 11 Case.

20.    to enforce all orders previously entered by the Bankruptcy Court.

21.    over any and all other suits, adversary proceedings, motions, applications, and contested matters that may be commenced or maintained pursuant to the Chapter 11 Case or the Plan.

Notwithstanding anything in the Plan to the contrary, nothing contained herein concerning the retention of jurisdiction by the Bankruptcy Court shall be deemed to be a finding or conclusion that (1) the Bankruptcy Court in fact has jurisdiction with respect to any and all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding, (2) any such jurisdiction is exclusive with respect to all Claims and causes of action presently asserted in, or that could be asserted in, the Insurance Coverage Adversary Proceeding, or (3) abstention or dismissal of the Insurance Coverage Adversary Proceeding pending in the Bankruptcy Court or the District Court as an adversary proceeding is or is not advisable or warranted, so that another court can hear and determine such Insurance Coverage Adversary Proceeding. Any Court other than the Bankruptcy Court that has jurisdiction over the Insurance Coverage Adversary Proceeding shall have the right to exercise such jurisdiction.

## B.    By the District Court

Pursuant to sections 105, 1123(a)(5), and 1142(b) of the Bankruptcy Code, and 28 U.S.C. § 1134, on and after the Effective Date, the District Court shall retain original, but not exclusive, jurisdiction to hear and determine all matters arising under the Bankruptcy Code or arising in or related to the Chapter 11 Case.

## C.    Actions to Enforce the Plan

The Diocese, the Reorganized Diocese, and the Trust may, but are not required to, commence an Action to enforce the terms of the Plan or to collect amounts owed pursuant to the Plan and any settlements set forth in the Plan or later approved by the Bankruptcy Court, which are not paid in accordance with the terms of the Plan or such settlement.  Any such Action may be commenced by filing a motion with the Bankruptcy Court.  On and after the Effective Date, the Trust shall have the sole and exclusive right to enforce the terms of the Plan against the Diocese, the Reorganized Diocese and/or any Participating Party (except that the Diocese, the Reorganized Diocese, or any Participating Party may enforce the terms of the plan as against each other and the Trust) and may seek any appropriate remedy in law or equity from the Bankruptcy Court which shall retain exclusive jurisdiction over any such Action.

## D.    Case Closure

The existence and continued operation of the Trust shall not prevent the Bankruptcy Court from closing the Chapter 11 Case upon a motion by the Diocese, the Reorganized Diocese, or any other Person.  The Trustee shall not take any actions to unreasonably keep the Chapter 11 Case open.  The Trustee, in his sole discretion, may seek to reopen the Chapter 11 Case to administer assets of the Trust.  If the Chapter 11 Case is reopened upon request of the Trustee, the Trust, the Diocese, and the Reorganized Diocese shall cooperate to assure that no disbursements are made from the Estate during the period when the Chapter 11 Case is reopened, and the case shall be closed at the earliest possibility.

## ARTICLE XV

## TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims.  This summary is based on the Internal Revenue Code (the "Tax Code"), Treasury Regulations promulgated thereunder (the "Treasury Regulations"), and administrative and judicial interpretations and practice, all as in effect on the date of the Disclosure Statement and all of which are subject to change, with possible retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Diocese does not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below.  There can be no assurance that the Internal Revenue Service will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims that are not U.S. Persons (as such term is defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local or foreign tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## A.    Federal Income Tax Consequences to Holders of Unsecured Claims

In accordance with the Plan, all holders of General Unsecured Claims and Abuse Claims will receive Distributions on their Allowed Claims. Holders of General Unsecured Claims and Abuse Claims will realize a loss, if any, in an amount equal to that Claim, minus any recovery, on an adjusted tax basis.

The tax consequences to holders of General Unsecured Claims and Abuse Claims will differ and will depend on factors specific to the holder, including but not limited to: (i) whether the Claim, or a portion of the Claim, constitutes a Claim for interest or principal, (ii) the origin of the Claim, (iii) the type of consideration received in exchange for the Claim, (iv) whether the holder is a United States person or a foreign person for tax purposes, (v) whether the holder reports income on the accrual or cash basis method, and (vi) whether the holder has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

The Plan Proponents anticipate that Distributions to Abuse Claimants will, in all instances, constitute damages, other than punitive damages, on account of personal physical injuries and physical sickness, within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended. The Plan Proponents have not, however, fully analyzed such tax issues and cannot (and do not hereby) make any assurances or representations regarding the anticipated tax treatment of Abuse Claims.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCE TO EACH HOLDER OF A GENERAL UNSECURED CLAIM OR AN ABUSE CLAIM. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX, AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH HOLDER OF A GENERAL UNSECURED CLAIM AND ABUSE CLAIM OBTAIN

84

HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX
CONSEQUENCES TO THE HOLDER OF A GENERAL UNSECURED CLAIM OR ABUSE
CLAIM AS A RESULT OF THE PLAN.

**B.**     **Federal Income Tax Consequences to the Diocese**

The Diocese is a not-for-profit religious corporation having tax-exempt status under 26
U.S.C. § 501(c)(3). Due to the Diocese's status as a not-for-profit corporation, the Plan Proponents
anticipate that the confirmation of the Plan will have no material federal income tax consequences
on a cash basis for the Diocese or the Reorganized Diocese.

**C.**     **Tax Consequences to the Trust**

The Trust may satisfy the requirements of a designated settlement fund under Section 468B
of the Tax Code or a qualified settlement fund under Regulation 1.468B-1 of the Treasury
Regulations. There are certain tax consequences associated with the characterization of the Trust
as a designated settlement fund or a qualified settlement fund.

THE PLAN PROPONENTS EXPRESS NO OPINION REGARDING WHETHER THE
TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED SETTLEMENT
FUND. THE PLAN PROPONENTS HAVE NOT REQUESTED A RULING FROM THE
INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL REGARDING
WHETHER THE TRUST IS A DESIGNATED SETTLEMENT FUND OR A QUALIFIED
SETTLEMENT FUND. ACCORDINGLY, EACH CREDITOR IS URGED TO CONSULT
THEIR OWN TAX ADVISOR REGARDING THE CHARACTERIZATION OF THE TRUST
AND THE TAX CONSEQUENCES OF SUCH CHARACTERIZATION.

## ARTICLE XVI

## ALTERNATIVES TO THE PLAN

The Plan Proponents believe the Plan is in the best interests of the Creditors and should
accordingly be accepted and confirmed. If the Plan as proposed, however, is not confirmed, the
following two alternatives may be available: (a) an alternative plan of reorganization may be
proposed and confirmed, or (b) the Chapter 11 Case may be dismissed. As discussed below, two
other options, liquidation under chapter 7 and the appointment of a chapter 11 trustee, are not
viable alternatives in this Chapter 11 Case.

**A.**     **Alternative Plan Pursuant to Chapter 11 of the Bankruptcy Code**

If the Plan is not confirmed, the Diocese or another party in interest may propose a different
plan, which might involve an alternative means for reorganizing the Diocese. The Plan as
proposed has the support of, among other entities, the Committee and the Protected Parties.
Accordingly, the Plan Proponents believe that the terms of the Plan provide for the most favorable
outcome for Creditors. The negotiation and drafting required for additional plans would likely add
substantially greater administrative expenses with no guarantee of a better result for Creditors. For
these reasons, the Plan Proponents do not believe that an alternative plan of reorganization is a
preferable alternative to the Plan.

85

**B.**     **Dismissal of the Chapter 11 Case**

If the Plan is not confirmed, the Diocese or another party in interest may seek to dismiss the Chapter 11 Case.  After appropriate notice and a hearing, the Bankruptcy Court may grant the request and dismiss the Chapter 11 Case.  Dismissal of the Chapter 11 Case would have the effect of restoring, or attempting to restore, all parties to the position they were in immediately prior to the Petition Date.

Upon dismissal of the Chapter 11 Case, the protection of the Bankruptcy Code would be lost, resulting in the expensive and time-consuming process of negotiation and protracted litigation between the Diocese and individual Abuse Claimants and between the Diocese and its Insurers. In addition to the expense and delay, the Plan Proponents believe that these actions would lead to an inequitable recovery for Abuse Claimants, with the first Abuse Claimants to obtain and enforce judgments against the Diocese depleting the Diocese's assets and resulting in insufficient assets to satisfy later judgments.  Therefore, the Plan Proponents believe that dismissal of the Diocese's Chapter 11 Case is not a preferable alternative to confirming the Plan.

**C.**     **Chapter 7 Liquidation Not a Viable Alternative**

Pursuant to 11 U.S.C. § 1112(c), if a debtor is "not a moneyed corporation", a debtor's chapter 11 case cannot be converted to a chapter 7 case without the debtor's consent.  The Diocese, as a non-profit entity, is not a moneyed corporation, and may not be forced to convert its Chapter 11 Case to a chapter 7 case.  Thus, conversion to chapter 7 is not a viable alternative to the Plan.

**D.**     **Appointment of a Chapter 11 Trustee is Not a Viable Alternative**

It is the position of the Diocese that, as a result of limitations imposed by the First Amendment to the United States Constitution and the Religious Freedom and Restoration Act, a chapter 11 trustee cannot be appointed to replace the Bishop's administration of the Diocese.

**ARTICLE XVII**

**ACCEPTANCE AND CONFIRMATION OF THE PLAN**

**A.**     **General Confirmation Requirements**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Plan Proponents, including that (i) the Plan classifies Claims in a permissible manner; (ii) the Plan complies with applicable provisions of the Bankruptcy Code; (iii) the Plan Proponents have complied with applicable provisions of the Bankruptcy Code; (iv) the Plan Proponents propose the Plan in good faith and not by any means forbidden by law; (v) the disclosures required by section 1125 of the Bankruptcy Code have been made; (vi) the Plan has been accepted by the requisite votes of Creditors (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Diocese; (viii) the Plan is in the "best interests" of all holders of Claims in an Impaired Class by providing to such holders on account of their Claims property of a value, as

86

of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim in such Class has accepted the Plan; and (ix) all U.S. Trustee Fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date.

1. **Parties in Interest Entitled to Vote**.

Pursuant to the Bankruptcy Code, only Classes of Claims that are "Impaired" (as defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the legal, equitable or contractual rights to which the Claims of that Class entitled the holders of such Claims are modified, other than by curing defaults and reinstating the debt. Classes of Claims that are not Impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims that receive no Distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan.

2. **Classes Impaired Under the Plan**.

Class 1 Secured Claim of KeyBank, Class 2 Secured Claim of NBT Bank, Class 4 General Unsecured Claims and Class 5 Claims are the only Classes that are Impaired and entitled to vote under the Plan.

Acceptances of the Plan are being solicited only from those holders of Claims in Impaired Classes that will or may receive a Distribution under the Plan. Accordingly, the Diocese is soliciting acceptances only from holders of Class 1 Secured Claim of KeyBank, Class 2 Secured Claim of NBT Bank, Class 4 General Unsecured Claims and Class 5 Claims.

3. **Voting Procedures and Requirements**.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. YOU SHOULD COMPLETE, SIGN, AND RETURN THE BALLOT YOU RECEIVE IN ACCORDANCE WITH THE PROVISIONS SET FORTH IN ARTICLE I(B) ABOVE.**

4. **Ballots**.

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. If you are a holder of Class 1 Secured Claim of KeyBank, Class 2 Secured Claim of NBT Bank, a Class 4 General Unsecured Claim or Class 5 Claim and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact the Diocese's counsel, Bond, Schoeneck & King, PLLC, One Lincoln Center, Syracuse, New York 13202, Attention: Stephen A. Donato, or Stretto, the Diocese's Solicitation and Claims Agent, by email at TeamSyracuseDiocese@stretto.com or by calling 855.347.3773 and requesting to speak with a member of the solicitation team.

**PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY, COMPLETE AND SIGN THE BALLOT AND RETURN IT TO**

17289563.12

**THE DIOCESE'S SOLICITATION AND CLAIMS AGENT.  TO BE COUNTED, SIGNED
BALLOTS MUST BE RECEIVED ON OR BEFORE _____, 2024, AT 5:00 P.M.,
PREVAILING EASTERN TIME.**

### B.  Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing
regarding whether the Diocese and the Plan have fulfilled the confirmation requirements of section
1129 of the Bankruptcy Code.  The Confirmation Hearing has been scheduled for _____,
**2024 at ____ __.m. (prevailing Eastern Time)**, before the Honorable Wendy Kinsella, United
States Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of New
York, United States Courthouse, 100 South Clinton Street, Syracuse, New York.    The
Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without
further notice except for an announcement in open court at the Confirmation Hearing of the date
to which the Confirmation Hearing has been adjourned.

### C.  Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if the
requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for
confirmation are that the Plan (i) be accepted by the requisite holders of Claims or, if not so
accepted, that it be "fair and equitable" and "not discriminate unfairly" as to each non-accepting
Class of Claims, (ii) be in the "best interests" of each holder of a Claim that does not vote to accept
the Plan in each Impaired Class under the Plan, (iii) be feasible, and (iv) comply with the applicable
provisions of the Bankruptcy Code.

### D.  Acceptance of Plan

As a condition to confirmation, the Bankruptcy Code requires that each class of impaired
claims votes to accept the plan, except under certain circumstances.  A plan is accepted by an
impaired class of claims if holders of at least two-thirds in dollar amount and more than one-half
in number of claims of that class vote to accept the plan.  Only those holders of claims who actually
vote count in these tabulations.  Holders of claims who fail to vote, or whose votes are designated
pursuant to section 1126(e) of the Bankruptcy Code, are not counted as either accepting or rejecting
a plan.

In addition to this voting requirement, section 1129 of the Bankruptcy Code requires that
a plan be accepted by each holder of a claim or interest in an impaired class or that the plan
otherwise be found by the bankruptcy court to be in the best interests of each holder of a claim or
interest in such class.  In addition, each impaired class must accept the plan for the plan to be
confirmed without application of the "fair and equitable" and "unfair discrimination" tests in
section 1129(b) of the Bankruptcy Code discussed below.

### E.  Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirming a plan even if the plan is not
accepted by all impaired classes, as long as at least one impaired class of claims has accepted the

plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying other requirements of section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

In general, the "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims before any junior class receives any distribution. More specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed under that section if: (a) with respect to a secured class (i) the holders of such claims retain the liens securing such claims to the extent of the allowed amount of such claims and that each holder of a claim of such class receive deferred cash payments equaling the allowed amount of such claim as of the plan's effective date, or (ii) such holders realize the indubitable equivalent of such claims; (b) with respect to an unsecured claim, either (i) the impaired unsecured creditor must receive property of a value equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan on account of such junior claim or interest; and (c) with respect to a class of interests, either (i) each holder of an interest of such class must receive or retain on account of such interest property of a value, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to the interest of such class may not receive or retain any property on account of such junior interest.

The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class must be treated substantially equally with respect to other classes of equal priority.

**IF A CLASS OF CLAIMS VOTING ON THE PLAN VOTES TO REJECT THE PLAN, THE PLAN PROPONENTS RESERVE THE RIGHT TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASS.**

## F.    Best Interests Test

In order to confirm a plan, the Bankruptcy Court must independently determine that the plan is in the best interests of each holder of a claim in any impaired class who has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept the plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of the class member's claim that has a value, as of the effective date of the plan, at least equal to the value of the distribution that each such member would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Diocese were liquidated under a hypothetical chapter 7 case under the Bankruptcy Code, the Bankruptcy Court must first determine

the dollar amount that would be realized from such liquidation (the "Liquidation Fund").  The Liquidation Fund would consist of the net proceeds from the disposition of the Diocese's assets (after satisfaction of all valid liens) and the recoveries on causes of action, if any, held by the Estate.  The Liquidation Fund would not include (i) the portion of the DOS Entities' Cash Contribution coming from Entities other than the Diocese, (ii) the assignment of Insurance Claims, (iii) any contributions by Setting Insurers, or (iv) restricted funds, which would be subject to a *cy pres* action involving the New York Attorney General.  The Liquidation Fund would be reduced by the cost of the liquidation.  The costs of a hypothetical liquidation under chapter 7 would include the fees and expenses of the chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the chapter 7 trustee, selling expenses and wind-down costs, any unpaid expenses incurred by the Diocese during its Chapter 11 Case (such as fees for attorneys, financial advisors and accountants) which would be Allowed in the chapter 7 proceedings, interest expense on secured debt and claims incurred by the Diocese during the pendency of the cases.  These Claims would be paid in full out of the Liquidation Fund before the balance of the Liquidation Fund, if any, would be made available to holders of General Unsecured Claims and Abuse Claims. In addition, other Claims that would arise upon conversion to a chapter 7 case would dilute the balance of the Liquidation Fund available to holders of Claims.  Moreover, additional Claims against the Estate would arise as a result of the establishment of a new Bar Date for the filing of Claims in the chapter 7 case.  The present value of the Distributions from the Liquidation Fund (after deducting the amounts described above) must then be compared with the present value of the property offered to each of the Classes of Claims under the Plan, to determine if the Plan is in the best interests of Claim holders.

The Diocese believes that a chapter 7 liquidation of its remaining Assets would result in a diminution of the value realized by holders of Claims.  That belief is based upon, among other factors: (a) the reduced value of Diocese's remaining Assets in a chapter 7 case; (b) the additional administrative expenses involved in the appointment of a chapter 7 trustee, attorneys, accountants, and other chapter 7 professionals; (c) the substantial time that would elapse before Creditors would receive any Distribution in respect of their Claims, due to a chapter 7 trustee's need to become familiar with the Diocese's books and records and the chapter 7 trustee's administration of the case; and (d) the additional Claims that may be asserted against the Diocese.

## G.    Feasibility

In connection with confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the need for liquidation or further financial reorganization of the Diocese, except as proposed in the Plan.

In this case, the Diocese has prepared cash flow projections demonstrating that the Diocese, together with the Participating Parties, will be able to fund the DOS Entities' Cash Contribution, that the Diocese and the Reorganized Diocese will be able to meet their other respective obligations under the Plan, and that the Reorganized Diocese will have sufficient resources to support ongoing ministries and operations.  A copy of the financial projections is attached hereto as **Exhibit C**.  The cash flow projections demonstrate that the Diocese will be able to fund the Plan on the Effective Date and that the Reorganized Diocese will be able to make all payments required pursuant to the

Plan so that no further financial restructuring will be necessary. Accordingly, the Diocese believes that the Plan satisfies the feasibility test.

## H. Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Plan Proponents have considered each of these provisions in the development of the Plan and believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

### ARTICLE XVIII

### RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DIOCESE SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.**

## A. Objection to Classifications of Claims

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class, only if such claim is substantially similar to the other claims in such class. The Plan Proponents believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion. To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed and the reclassification adversely affects the treatment of the Claim of any Creditor, the Plan Proponents could be required to re-solicit votes for or against the Plan.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy the equal treatment requirement, the Court could deny confirmation of the Plan.

Issues or disputes relating to classification or treatment could result in a delay of the confirmation or consummation of the Plan and could increase the risk that the Plan will not be consummated.

## B. Failure to Satisfy Voting Requirements

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan. In the event that sufficient votes are not received, the

91

Plan Proponents may be forced to pursue an alternative plan of reorganization or the Diocese may dismiss the Chapter 11 Case.

## C.     The Plan May Not Be Accepted or Confirmed

The Plan may not be confirmed without the affirmative acceptance of at least one Impaired Class.  Even if all voting Classes accept the Plan, the Plan may not be confirmed if the Bankruptcy Court determines that the Plan does not meet the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.  The Plan Proponents believe that the Plan satisfies all of the relevant section 1129 requirements.  There can be no assurance, however, that the requisite Creditor consent will be obtained or that the Bankruptcy Court will also conclude that all such requirements have been satisfied.

## D.     The Plan Proponents' Assumptions and Estimates May Prove Incorrect

The Plan Proponents have made certain assumptions regarding, and have attempted to estimate in good faith and to the best of their ability, the aggregate number and amount of Claims in each Class, the projected expenses incurred to date or to be incurred in connection with the confirmation and administration of the Plan, and the assets which may be available for liquidation and Distribution under the Plan.  There can be no guarantee, however, that the Plan Proponents' assumptions and estimates regarding these amounts will prove to be accurate.  In the event the Plan Proponents' assumptions and estimates prove incorrect, Creditor recoveries under the Plan may be materially less than projected.

## E.     Non-Confirmation or Delay in Confirmation of the Plan

In the event a party objects to the Plan, it is possible that the Bankruptcy Court may not approve confirmation of the Plan.

## F.     Non-Consensual Confirmation

In the event the Impaired Class of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Plan Proponents' request if the cramdown requirements described above are satisfied.  The Plan Proponents believe that the Plan satisfies these requirements.

## G.     Authority to Grant Third-Party Releases

The Second Circuit recently held that bankruptcy courts have statutory authority to enter non-consensual third-party releases pursuant to sections 105(a) and 1123(b)(6) of the Bankruptcy Code.  *See In re Purdue Pharma L.P.*, 69 F.4th 45, 72-75 (2d Cir. 2023), *cert. granted sub nom. Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023).  The Second Circuit's decision was timely appealed, and the Supreme Court granted certiorari to determine "[w]hether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimants' consent." *Harrington v. Purdue Pharma L.P.*, No. (23A87), 2023 WL 5116031 (Aug. 10, 2023).  Because the Supreme Court granted certiorari, it is possible that the nonconsensual third-party releases provided for in the Plan will

92

not remain available after the Supreme Court's ruling in *Purdue*. The Plan Proponents note, however, that the Supreme Court recently declined to grant an application to stay the BSA Plan which contains non-consensual third-party releases similar to those under consideration in the *Purdue* appeal. *See Lujan Claimants, et al. v. Boy Scouts of America, et al.*, 23A741 (601 U.S. ___ February 22, 2024).

The Second Circuit's opinion in Purdue remains binding precedent on the Bankruptcy Court unless and until such time that it is reversed, overruled, vacated, or otherwise modified by the Supreme Court.

## H. Risk of Non-Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will in fact occur.

## I. Non-Settling Insurers May Raise Objections to Confirmation

Certain Non-Settling Insurers may object to confirmation of the Plan by asserting that the Plan impermissibly alters their contractual rights, duties and obligations under their Insurance Policies. For example, certain insurers raise concerns regarding, among other things, the Plan's treatment of applicable self-insured retentions required under any Non-Settling Insurer Policy. Also, Travelers contends that the Diocese has not established the existence of any Travelers' Insurance Policy that provides coverage for commercial general liability claims that may cover Abuse Claims. Travelers also contends that if such Travelers' policies exist, based on the available documentation the policies Travelers issued or is alleged to have issued provided designated premises/owners, landlords and tenants coverage, and would not provide coverage for Abuse Claims. Travelers also contends that none of the Claimants allege they were abused at any of the premises identified in alleged Travelers' Insurance Policies.

Although the Plan Proponents do not believe there is any merit to such objections or assertions, if the Non-Settling Insurers were to prevail on such contentions, the Bankruptcy Court might find that the Plan is not feasible or otherwise not confirmable.

## J. Post-Confirmation Litigation May Not Result in Additional Recovery

The Plan provides for the assignment to the Trust of Insurance Claims against Non-Settling Insurers. The Non-Settling Insurers are likely to assert factual and legal defenses to both their coverage obligations and to the underlying liability of the Diocese and other Participating Parties for Abuse Claims. Litigation of the Insurance Claims against Non-Settling Insurers could be protracted and expensive. There is no guarantee that the Trust will prevail in its prosecution of the Insurance Claims against Non-Settling Insurers.

In the event the Non-Settling Insurers successfully defend against the Insurance Claims, the DOS Entities' Cash Contribution and the settlement payments from Settling Insurers would be the sole source of recovery for Abuse Claims.

17289563.12

**K.**    **Confirmation of the Plan may be delayed or denied by the District Court**

The Plan Proponents' position is that the Bankruptcy Court has constitutional authority to confirm the Plan.  The United States Trustee has asserted, however, that the Bankruptcy Court does not have jurisdiction to approve certain of the releases, exculpation, and injunctions contemplated in the Plan.  If it is determined that the Bankruptcy Court lacks the authority to approve such provisions, the Plan Proponents anticipate that the Bankruptcy Court will issue proposed findings of fact and conclusions of law with respect to the confirmation of the Plan.  The Bankruptcy Courts findings and conclusions would then be subject to de novo review by the District Court for the Northern District of New York before the Plan can be confirmed, which may result in a delay in the occurrence of the Effective Date.  It is difficult to estimate how long the District Court would take to render a decision with respect to confirmation of the Plan, however, in the recent BSA Bankruptcy Case which included similar plan concepts, the District Court for the District of Delaware took approximately six months to review and affirm the bankruptcy court's findings and conclusions and to issue a confirmation order.

## ARTICLE XIX

## MISCELLANEOUS PROVISIONS

**A.**    **Amendment or Modification of the Plan**

The Plan Proponents may modify the Plan at any time prior to the Confirmation Hearing, in accordance with section 1127(a) of the Bankruptcy Code.  After the Confirmation Date and prior to substantial consummation, the Plan Proponents may modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, by filing a motion on notice as required under the applicable Bankruptcy Rules, and the solicitation of all Creditors and other parties in interest shall not be required unless directed by the Bankruptcy Court.  Notwithstanding the foregoing, those provisions of the Plan that implement and supplement the Insurance Settlement Agreements may not be severed, waived, amended, deleted or otherwise modified without the prior written approval of all of the Settling Insurers affected by such severance, waiver, amendment, deletion or modification.

**B.**    **Headings**

The headings used in the Plan and in this Disclosure Statement are inserted for convenience only and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**C.**    **Severability of Plan Provisions**

If, prior to confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and

94

effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.

**D.**     **Validity and Enforceability**

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the Confirmation Order, is valid and enforceable pursuant to its terms.  Should any provision in the Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of the Plan.

**E.**     **Revocation or Withdrawal of the Plan**

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order.  If the Plan Proponents revoke or withdraw the Plan before the Confirmation Date, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Diocese or the Committee or to prejudice in any manner the rights of the Diocese or the Committee in any further proceedings.

**F.**     **Controlling Documents**

In the event and to the extent that any provision of the Plan or the Trust Documents is inconsistent with any provision of the Disclosure Statement, the provisions of the Plan or the Trust Documents, as applicable, shall control and take precedence.  In the event and to the extent that any provision of the Trust Documents is inconsistent with any provision of the Plan, the Plan shall control and take precedence.  In the event and to the extent that any provision of the Confirmation Order is inconsistent with any provision of the Plan or the Trust Documents, the provisions of the Confirmation Order shall control and take precedence.

**G.**     **Filing of Additional Documents**

At any time before substantial consummation of the Plan, the Diocese, the Trust, or the Reorganized Diocese, as appropriate, may File with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, or otherwise to comply with applicable law.

**H.**     **Direction to a Party**

On or after the Effective Date, the Trustee, the Diocese, or the Reorganized Diocese, as applicable, may apply to the Bankruptcy Court for entry of an Order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect the transfer of properties dealt with by the Plan, and to perform any other act (including satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

**I.**     **Certain Actions**

By reason of entry of the Confirmation Order prior to, on, or after the Effective Date (as appropriate), all matters provided for under the Plan that would otherwise require approval of the officers or trustees of the Diocese under the Plan, including (a) the adoption, execution, delivery, and implementation of all contracts, leases, instruments, releases, and other agreements or documents related to the Plan, and (b) the adoption, execution and implementation of other matters provided for under the Plan involving the Diocese or the organizational structure of the Diocese shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate), pursuant to applicable non-bankruptcy law, without any requirement of further action by the officers or trustees of the Diocese.

**J.**     **Plan as Settlement Communication**

The Plan furnishes or offers or promises to furnish (or accepts or offers or promises to accept) valuable consideration in compromising or attempting to compromise Claims and/or causes of action that are disputed as to validity or amount (including Abuse Claims and the Insurance Coverage Adversary Proceeding), except as otherwise provided above. Accordingly, the Plan, the Disclosure Statement, and any communications regarding the Plan or the Disclosure Statement are subject in all respects to Rule 408 of the Federal Rule of Evidence and any comparable provision(s) of applicable state law precluding their use as evidence of liability for, or the validity, or invalidity of, any Disputed Claim or cause of action.

**K.**     **Reports**

Until a final decree closing the Chapter 11 Case is entered, the Diocese shall File all post-confirmation quarterly reports as required by the United States Trustee Operating Guidelines (with a copy served on the Office of the United States Trustee). The first report shall be Filed within thirty days after the end of the quarter in which the Effective Date occurs.

**L.**     **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of the Plan transactions consummated or to be consummated in connection therewith.

**M.**     **No Admissions.**

Notwithstanding anything herein or in the Plan to the contrary, nothing contained in the Plan shall be deemed as an admission by the Diocese, the Reorganized Diocese, any Participating Party, the Committee, or any Settling Insurer with respect to any matter set forth herein.

## ARTICLE XX

## BANKRUPTCY RULE 9019 REQUEST

Pursuant to Bankruptcy Rule 9019 and through the Plan, the Plan Proponents jointly request approval of all compromises and settlements included in the Plan or contemplated.

## ARTICLE XXI

## RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the Plan is in the best interests of all Creditors. The Plan as structured allows Creditors to participate in Distributions believed to be in excess of those which would otherwise be available were the Chapter 11 Case dismissed and provides an opportunity to maximize insurance recoveries through settlements with the Settling Insurers and post-confirmation litigation of Insurance Claims against Non-Settling Insurers.

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN PROPONENTS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE PLAN PROPONENTS STRONGLY RECOMMEND THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY THE DIOCESE'S SOLICITATION AND CLAIMS AGENT NO LATER THAN 5:00 P.M. PREVAILING EASTERN TIME ON _____, 20__.

*[Signature Page Follows]*

17289563.12

Dated:  April 16, 2024
         Syracuse, New York

Respectfully submitted,

**THE DIOCESE OF SYRACUSE**


By:          */s/ Stephen A. Breen*
             Stephen A. Breen
             Chief Financial Officer

**BOND, SCHOENECK & KING, PLLC**


By:          */s/ Stephen A. Donato*
             Stephen A. Donato, Bar Roll No. 101522
             Charles J. Sullivan, Bar Roll No. 507717
             Grayson T. Walter, Bar Roll No. 518237
             Sara C. Temes, Bar Roll No. 514148
             Office and Post Office Address:
             One Lincoln Center
             Syracuse, New York 13202-1355
             Telephone: (315) 218-8000
             Facsimile: (315) 218-8100
             Email:  donatos@bsk.com
                      sullivc@bsk.com
                      walterg@bsk.com
                      stemes@bsk.com

             *Counsel to The Roman Catholic*
             *Diocese of Syracuse, New York*

17289563.12