UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Case No. 20-30663-5-wak |
| The Roman Catholic Diocese of Syracuse, New York, | Chapter 11 |
| Debtor. | |

**LONDON MARKET INSURERS' OPPOSITION TO THE MOTION FOR ENTRY OF AN ORDER (I) APPROVING DISCLOSURE STATEMENT; (II) APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES; (III) APPROVING THE FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR VOTING ON FOURTH AMENDED JOINT PLAN AND CONSENTING TO THIRD PARTY RELEASES; (IV) APPROVING THE FORM, MANNER, AND SCOPE OF CONFIRMATION NOTICES; (V) ESTABLISHING CERTAIN DEADLINES IN CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND CONFIRMATION OF FOURTH AMENDED JOINT PLAN; AND (VI) GRANTING RELATED RELIEF**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ....................................................................................................... 1

II.     BACKGROUND ........................................................................................................ 4

        A.      The LMI Policies ......................................................................................... 4

        B.      The Adversary Proceeding ........................................................................... 8

        C.      Summary of the Plan .................................................................................... 9

                (a)     Allocation Protocol ......................................................................... 10

                (b)     Insurance Claims ............................................................................ 11

                (c)     Injunction ....................................................................................... 12

                (d)     Insurance Claims Assignment ......................................................... 12

                (e)     Reserve Fund .................................................................................. 13

                (f)     Pre-Determination and Allocation of Liability ............................... 14

III.    ARGUMENT ........................................................................................................... 14

        A.      Approval of the Disclosure Statement Should Be Denied Because the Plan
                is Patently Unconfirmable .......................................................................... 14

                (a)     The Plan is patently unconfirmable because it violates *Purdue
                        Pharma* ........................................................................................... 15

                (b)     The Plan is patently unconfirmable because the Court cannot
                        adjudicate or estimate personal injury tort claims pursuant to 28
                        U.S.C. § 157(b)(5) .......................................................................... 15

                (c)     The Plan is patently unconfirmable because it purports to rewrite the
                        Debtor's obligations under the LMI Policies .................................. 17

                (d)     The Plan is patently unconfirmable because it treats Consenting
                        Abuse Claimants and Non-Participating Abuse Claimants, whom
                        are similarly situated, differently, in violation of 11 U.S.C.
                        § 1123(a)(4) .................................................................................... 20

(e)     The Plan is patently unconfirmable because the Committee cannot unilaterally act as attorney in fact for Consenting Abuse Claimants........ 21

(f)     The Plan is patently unconfirmable because the Trustee owes a fiduciary duty to Abuse Claimants, but must also pay for the Debtor's and Participating Parties' defense of the abuse claims .............. 22

(g)     The Plan is patently unconfirmable because it requires the Court to approve the transfer of non-debtor property. ............................................. 23

(h)     The Plan is patently unconfirmable because it purports to assign the LMI Policies to the Trust without assuming them, and without providing adequate assurance of future performance ............................... 25

(i)     The Plan is patently unconfirmable because it improperly delegates allowance of the Abuse Claims.................................................................. 26

B.     The Disclosure Statement Provides Inadequate and Misleading Information ............................................................................................................... 26

(a)     The Insurance Claims Assignment is confusing and ambiguous.............. 27

(b)     The Disclosure Statement fails to disclose attendant risks to insurance recoveries................................................................................... 29

(c)     The Disclosure Statement fails to alert creditors that the Plan proposes to pay objectionable claims ........................................................ 30

(d)     The Disclosure Statement fails to alert creditors that the there is a risk that the Insurance Claims Assignment violates the LMI Policies, which would void coverage ..................................................................... 31

(e)     The Disclosure Statement fails to disclose that the LMI Policies are executory contracts that must be assumed, and that adequate assurance of future performance must be provided by any assignee before any interest thereunder could be assigned. .................................... 32

(f)     The Disclosure Statement is inadequate because it does not state who will satisfy the conditions precedent under the LMI Policies.......... 33

IV.     CONCLUSION....................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 266 Washington Assoc.*
141 B.R. 275 (Bankr. E.D.N.Y. 1992) .......................................................................14

*641 Assocs. v. Balcor Real Estate Fin. (In re 641 Assocs.)*
1993 Bankr. LEXIS 1191 (Bankr. E.D. Pa. Aug. 26, 1993) ....................................17

*In re 785 Partners LLC*
470 B.R. 126 (Bankr. S.D.N.Y. 2012) .....................................................................17

*In re Adelphia Commc'ns Corp.*
352 B.R. 592 (Bankr. S.D.N.Y. 2006) .....................................................................27

*In re Am. Cap. Equip., Inc.*
405 B.R. 415 (Bankr. W.D. Pa. 2009) .....................................................................15

*In re Am. Cap. Equip., LLC*
688 F.3d 145 (3d Cir. 2012) .....................................................................................15

*In re Asbestos Litigation*
986 F. Supp. 761 (S.D.N.Y. 1997) ..........................................................................16

*Bd. of Trustees of Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*
806 F. Supp. 2d 662 (S.D.N.Y. 2011) .....................................................................23

*In re Buchholz*
224 B.R. 13 (Bankr. D.N.J. 1998) ...........................................................................26

*In re Cajun Elec. Power Co-Op, Inc.*
230 B.R. 715 (Bankr. M.D. La. 1999) .....................................................................17

*Canal Corp. v. Finnman (In re Johnson)*
960 F.2d 396 (4th Cir. 1992) ...................................................................................26

*Matter of Celotex Corp.*
152 B.R. 661 (Bankr. M.D. Fla. 1993) ....................................................................18

*Century Indem. Co. v. Marine Grp., LLC*
131 F. Supp. 3d 1018 (D. Or. 2015) ........................................................................18

*In re Chateaugay Corp.*
111 B.R. 67 (Bankr. S.D.N.Y. 1990) .......................................................................15

*In re Crippin*
877 F.2d 594 (7th Cir. 1989) ...................................................................................17

*In re Crowthers McCall Pattern, Inc.*
120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...................................................................27

*Cruden v. Bank of N.Y.*
957 F.2d 961 (2d Cir.1992)...................................................................................17

*In re Denario*
267 B.R. 496 (Bankr. N.D.N.Y. 2001) ..................................................................17

*In re Diocese of Camden, New Jersey*
653 B.R. 309 (Bankr. D.N.J. 2023) .......................................................................24

*In re Dow Corning Corp.*
237 B.R. 380 (Bankr. E.D. Mich. 1999) ...............................................................14

*In re Ferretti*
128 B.R. 16 (Bankr. D.N.H. 1991) ........................................................................27

*In re Garden Ridge Corp.*
2005 WL 523129 (Bankr. D. Del. Mar. 2, 2005)...................................................21

*In re Gordon*
646 B.R. 903 (Bankr. D. Idaho 2022).....................................................................16

*In re H.K. Porter Co.*
156 B.R. 16 (W.D. Pa. 1993)..................................................................................14

*Harrington v. Purdue Pharma, L.P.*
144 S.Ct. 2071 (2024)...............................................................................2, 15, 29

*Hopeman Bros., Inc. v. Cont'l Cas. Co.*
307 F. Supp. 3d 433 (E.D. Va. 2018) ....................................................................18

*In re Ice Cream Liquidation, Inc.*
281 B.R. 154 (Bankr. D. Conn. 2002) ...................................................................16

*In re Jastrzebski*
948 N.Y.S.2d 689 (2012)........................................................................................23

*John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*
987 F. 2d 154 (3d Cir. 1993)..................................................................................14

*Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*
422 N.E.2d 819 (1981)........................................................................................1, 25

*In re Main St. AC, Inc.*
234 B.R. 771 (Bankr. N.D. Cal. 1999) ..................................................................15

*In re Mason*
514 B.R. 852 (Bankr. E.D. Ky. 2014) ...................................................................16

*MBIA Inc. v. Certain Underwriters at Lloyd's, London*
33 F. Supp. 3d 344 (S.D.N.Y. 2014)................................................................7, 18

*In re MF Glob. Holdings Ltd.*
469 B.R. 177 (Bankr. S.D.N.Y. 2012)...................................................................17

*Milea v. Hugunin*
890 N.Y.S.2d 369 (Sup. Ct. 2009).........................................................................23

*Mirant Americas Energy Mktg., L.P. v. Off. Comm. of Unsecured Creditors of Enron Corp.*
2003 WL 22327118 (S.D.N.Y. Oct. 10, 2003).......................................................22

*Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*
25 F.3d 1132 (2d Cir. 1994)...................................................................................27

*In re Monroe Well Service*
80 B.R. 324 (Bankr. E.D. Pa. 1987) ................................................................14, 27

*In re Nashville White Trucks, Inc.*
5 B.R. 112 (Bankr. M.D. Tenn. 1980) ...................................................................17

*Oneida Motor Freight, Inc. v. United Jersey Bank*
848 F.2d 414 (3d Cir. 1988)...................................................................................27

*In re Pettit*
18 B.R. 6 (Bankr. E.D. Ark. 1980) ........................................................................27

*In re Pierce*
237 B.R. 748 (Bankr. E.D. Cal. 1999)...................................................................21

*In re PRS Ins. Grp., Inc.*
335 B.R. 77 (Bankr. D. Del. 2005) ........................................................................26

*In re Quigly*
437 B.R. 102 (Bankr. S.D.N.Y. 2010)...................................................................20

*In re Quigley Co.*
377 B.R. 110 (Bankr. S.D.N.Y. 2007)...................................................................27

*In re Residential Cap., LLC*
480 B.R. 550 (Bankr. S.D.N.Y. 2012)...................................................................22

*In re Roman Cath. Archbishop of Portland in Or.*
339 B.R. 215 (Bankr. D. Or. 2006)........................................................................16

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*
   81 F.3d 355 (3d Cir. 1996)..................................................................27

*Save Mart Supermarkets v. Underwriters at Lloyd's London*
   843 F. Supp. 597 (N.D. Cal. 1994) ..................................................7, 18

*Stars Jewelry by A Jeweler Corp. v. Hanover Ins. Grp., Inc.*
   960 N.Y.S.2d 465 (2013)..................................................................19

*Stradford v. Zurich Ins. Co.*
   2002 WL 31819215 (S.D.N.Y. Dec. 13, 2002) ..................................25

*In re Teligent, Inc.*
   268 B.R. 723 (Bankr. S.D.N.Y. 2001)..............................................25

*Tennessee Student Assistance Corp. v. Hood*
   541 U.S. 440 (2004)..........................................................................24

*Truck Ins. Exch. v. Kaiser Gypsum Co.*
   144 S. Ct. 1414 (2024) ...............................................................29, 31

*In re Valrico Square Ltd. P'ship*
   113 B.R. 794 (Bankr. S.D. Fla. 1990) ..............................................14

*In re W.R. Grace & Co.*
   729 F.3d 311 (3d Cir. 2013)..............................................................21

*In re Wireless Data, Inc.*
   547 F.3d 484 (2d Cir. 2008)..............................................................25

*In re WorldCom, Inc.*
   2003 WL 21498904 (S.D.N.Y. Jun. 30, 2003) ................................27

**Statutes**

11 U.S.C. § 365..........................................................3, 25-26, 32

11 U.S.C. § 365(a) ...............................................................32

11 U.S.C. § 541......................................................................24

11 U.S.C. § 1123(a)(4)......................................................3, 20-21

11 U.S.C. § 1125......................................................................27

11 U.S.C. § 1125(a)(1)...........................................................27

11 U.S.C. § 1129(a)(3)...........................................................17

28 U.S.C. § 157(b)(5) ......................................................2, 15-16

28 U.S.C. § 1334(e) ...................................................................................................................24

CPLR 1601 ................................................................................................................................14

Certain Underwriters at Lloyd's, London, and London Market Companies (together "London Market Insurers" or "LMI")[1] hereby oppose the *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Fourth Amended Joint Plan and Consenting to Third Party Releases; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (v) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of Fourth Amended Joint Plan; and (VI) Granting Related Relief* filed by the Roman Catholic Diocese of Syracuse, New York ("Debtor" or "Diocese") and the Official Committee of Unsecured Creditors ("Committee" and together with the Debtor or Diocese, "Plan Proponents"), and respectfully state as follows:

## I.     INTRODUCTION[2]

The Plan Proponents' *Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* ("Plan")[3] described by the Plan Proponents' *Disclosure Statement in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* ("Disclosure Statement")[4] describes a patently

---

[1]     The "London Market Insurers" are the solvent Certain Underwriters at Lloyd's, London, subscribing Policy Nos. L73-05-17-01, SL3107/SLC 5115, SL3551/SLC 5577, SL4008/SLC 5995, and ISL3352/ICO5202; Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd and/or London & Edinburgh Insurance Company Ltd as successor to London & Edinburgh General Insurance Company Ltd); RiverStone Insurance (UK) Limited (formerly known as Dai Tokyo Insurance Company (UK) Limited) of 161-163 Preston Road, Brighton, East Sussex, BN1 6AU with Company Number 01167327 (RIUK) on its own behalf and as successor in interest to Markel International Insurance Company Limited ("Markel") (formerly Terra Nova Insurance Company Limited) under the terms of a transfer under Part VII Financial Services and Markets Act 2000 with effect from 31 March 2017; Tenecom Limited as successor in interest to Sompo Japan Nipponkoa Insurance Company of Europe Ltd. (formerly known as The Yasuda Fire & Marine Insurance Company of Europe Ltd); Harper Insurance Limited f/k/a Turegum Insurance Company; Dominion Insurance Company Ltd.; Assicurazioni Generali S.p.A.; and River Thames Insurance Company Limited (as successor in interest to Unionamerica Insurance Company Limited (on its own behalf and in turn as successor in interest to certain business of St. Paul Travelers Insurance Company Limited (f/k/a St. Katherine Insurance Company Limited, St. Katherine Insurance Company Plc, and St. Paul International Insurance Company Limited))).

[2]     The term "Section" means sections of Title 11 of the United States Code, 11 U.S.C. §§101, *et. seq* ("Code") unless otherwise noted.

[3]     Doc. No. 2172.
[4]     Doc. No. 2173.

unconfirmable plan.

As with other diocesan bankruptcies, LMI believe that a properly mediated global settlement—rather than a contested plan—is the only solution that can lead to a confirmable plan. The Disclosure Statement describes a plan that falls far short of this goal. The Plan is patently unconfirmable because it violates *Harrington v. Purdue Pharma, L.P.*[5] ("*Purdue Pharma*") by granting sweeping non-consensual releases to non-debtors.

The Plan violates 28 U.S.C. § 157(b)(5) ("Section 157(b)(5)") by requiring Abuse Claims[6] who do opt out of the Plan ("Non-Participating Abuse Claimants"[7]) to consent to fixed culpability for their claims as between the Debtor and Participating Parties,[8] amongst others tortfeasors ("Allocation of Liability").[9] The Court lacks jurisdiction to approve the Allocation of Liability because Non-Participating Abuse Claims are considered "personal injury" tort claims pursuant to Section 157(b)(5). Hence, the Court may not adjudicate or estimate such claims even for the purposes of distribution in a Chapter 11 plan.

The Plan is patently unconfirmable because it purports to rewrite LMI's insurance policies ("LMI Policies"), as further defined below. For example, pre-petition, the Debtor and Participating Parties agreed to utilize a claims-handling organization. The claims handling organization oversaw and reported to LMI on the Debtor's and Participating Parties' handling and defense of

---

[5]    144 S.Ct. 2071 (2024).

[6]    Plan, § 1.1.3.

[7]    "Non-Participating Abuse Claimant means the holder of an Abuse Claim who affirmatively withholds their consent to the releases and injunctions provided for in the Plan with respect to Protected Parties other than the Diocese by (i) indicating as such on their Abuse Claim Ballot; or (ii) Filing an objection to the Plan indicating that they do not consent to the releases and injunctions provided for in the Plan with respect to Protected Parties other than the Diocese; and who has not, prior to entry of the Confirmation Order, agreed in writing to provide such consent, to grant such releases, and to be treated as a Consenting Abuse Claimant for all purposes. After the Effective Date, a Non-Participating Abuse Claimant may become a Consenting Abuse Claimant by means of the procedure set forth in Sections 4.4.6 and 4.5.1.c of the Plan." *Id.* § 1.1.132.

[8]    *Id.*, § 1.1.144.

[9]    *See id.*, § 4.4.4.

Abuse Claims—all of which were and are conditions precedent to coverage pursuant to the LMI Policies.  The Plan purports to eliminate these conditions precedent.

The Plan is patently unconfirmable because it treats consenting Abuse Claims ("Consenting Abuse Claimants")[10] and Non-Participating Abuse Claimants differently, even though such claimants are in the same class, in violation of Section 1123(a)(4).

The Plan also authorizes the Committee to represent the Consenting Abuse Claimants as their attorney in fact, making it patently unconfirmable.  The Committee must represent *all* unsecured creditors and cannot represent a specific class of claimants, such as the Consenting Abuse Claimants.

The Plan establishes a trust ("Trust") for the benefit of Abuse Claimants but must also pay costs in defending Abuse Claims.[11]  This is an inherent conflict that makes the Plan patently unconfirmable.

 Additionally, the Plan is patently unconfirmable because it purports to approve the transfer of the Participating Parties' interests under the LMI Policies, which the Court does not have jurisdiction to approve.

The Plan also attempts to assign the LMI Policies without assumption or adequate assurance of future performance as required by Section 365.  The Court cannot approve such assignment making the Plan patently unconfirmable.

The Plan appoints an individual to review and determine whether to allow Abuse Claims.  However, only the Court can make that determination.  The Plan cannot delegate claim allowance to another party, making it patently unconfirmable.

Additionally, the Court cannot approve the Disclosure Statement because it provides inadequate and misleading information.  The Disclosure Statement's description of the Plan's purported assignment of the LMI Policies is confusing since it is not clear what is being purportedly assigned and to whom.  The Disclosure Statement also fails to warn creditors of a

---

[10]    *Id.*, § 1.1.49.

[11]    *Id.*, § 1.1.162.

number of potential risks, which could diminish or eliminate recovery, including the:

- Plan being overturned on appeal,

- Plan's failure to satisfy conditions precedent to coverage pursuant to the LMI Policies, which would void coverage,

- Plan's proposal to pay objectionable claims,

- Plan's purported assignment of the LMI Policies, which would void coverage, and

- Plan's failure to assume the LMI Policies.

Accordingly, based on the foregoing, LMI respectfully request that the Court deny approval of the Disclosure Statement.

## II.   **BACKGROUND**

### A.   **The LMI Policies**

The Debtor and certain Named Assureds[12] became self-insurers starting in 1973. As a self-insurer, the Debtor has the right and responsibility to defend and administer claims, including Abuse Claims, while LMI and other insurers provide excess indemnity coverage that reimburses covered "Ultimate Net Loss" or ("UNL")[13] in excess of Self-Insured Retention ("SIR") amounts. LMI subscribed Combined Property, Casualty and Crime Insurance Policies ("Package Policies"), on behalf of the Debtor, as the Named Assured.[14] The Package Policies provided excess indemnity coverage, above self-insurance administered by the Debtor. The Debtor's Related Entities,

---

[12]    The Named Assureds are those specified in the LMI Policies. *See, e.g., The Roman Catholic Diocese of Syracuse, New York v. LG 35 Doe et al.*, Adv. No. 21-50005, Doc. No. 22-2 at 1 (Bankr. N.D.N.Y. February 16, 2021) (LMI Policy No. SL3551 (Part 2)).

[13]    The term "Ultimate Net Loss" means "the total sum which the Assured becomes obligated to pay by reason of personal injury or property damage claims, either through adjudication or compromise, after making proper deductions for all recoveries and salvages, and shall also include . . . expenses for doctors, lawyers, nurses, . . . and for litigation . . . which are paid as a consequence of any occurrence covered hereunder…. Fees, charges and expenses for [the Service Organization] are specifically excluded, and are to be paid by the Assured. *See, e.g., id.*, Doc. Nos. 22-17 at 1, 22-4 at 4 (LMI Policy No. SL4008 (Part 4) and LMI Policy No. SL3551 (Part 4)) (emphasis added).

[14]    *See, e.g., id.*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)).

including its parishes and schools, are also Assureds under the Package Policies.[15]

LMI subscribed the relevant Package Policies from April 16, 1973, to July 1, 1986.[16] The Package Policies provided property, casualty, crime and other types of coverage.[17] The Package Policies provide General Liability Coverage on an "occurrence" basis with Specific Excess Coverage limits of (a) 80% of $150,000 UNL each occurrence excess of a $50,000 UNL each occurrence SIR for the periods from 1973 to 1976;[18] (b) 80% or 90% of $135,000 UNL each occurrence excess of a $65,000 UNL each occurrence SIR for the periods from 1976 to 1985;[19] and (c) and 80% of $100,000 UNL each occurrence excess of a $100,000 UNL each occurrence SIR for the period from 1985 to 1986.[20]

LMI also subscribed Excess Umbrella and Excess Broadform Policies on behalf of the Debtor as the Named Assured, and the Debtor's Related Entities as Assureds, effective from April 16, 1973 to April 16, 1975, and from July 1, 1979 to July 1, 1985 ("High Layer Excess Policies", and collectively with the Package Policies, "LMI Policies").[21] The High Layer Excess Policies

---

[15]    *See, e.g.*, *id.*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)).

[16]    *See* Doc. No. 1604-4 at 2-3 (LMI Policies No. L(C)73051701 effective from April 16, 1973 to April 16, 1976; No. SL 3107/SLC 5115 effective from April 16, 1976 to April 16, 1979; No. SL3551/SLC5577 effective from July 1, 1979 to July 1, 1982; No. SL4008/SLC5995 effective from July 1, 1982 to July 1, 1985). LMI also subscribed Package Policies on behalf of the Debtor for the periods from July 1, 1986, to July 1, 1989, which, only provided liability coverage on a claims made basis and/or were subject to Sexual Misconduct Exclusions. *See, e.g.*, DOS_Insur00007168 (Sexual Misconduct Exclusion of LMI Policy No. ISL 3564 effective from July 1, 1986 to July 1, 1987). Note, the Plan purports to deprive LMI from asserting that the Assureds have no legal liability. *See* Plan, § 8.8.3.

[17]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-15 at 2 (LMI Policy No. SL4008 (Part 2)).

[18]    *See, e.g.*, *id.*, Doc. Nos. 22-20 at 2 (LMI Policy No. L(C)73051701 (Part 1)), 22-21 at 6 (LMI Policy No. L(C)73051701 (Part 2)), 22-22 at 1 (LMI Policy No. L(C)73051701 (Part 3)).

[19]    *See, e.g.*, *id.*, Doc. Nos. 22-2 at 1 (LMI Policy No. SL3551 (Part 2)), 22-3 at 3 (LMI Policy No. SL3551 (Part 3)), 22-6 at 5 (LMI Policy No. SL3551 (Part 6)), 22-14 at 5 (LMI Policy No. SL4008 (Part 1)), 22-15 at 5 (LMI Policy No. SL4008 (Part 2)), 22-19 at 6 (LMI Policy No. SL4008 (Part 6)).

[20]    *See* DOS_Insur00004840 (summary of limits for Policy No. ISL3352/ICO5202 effective from July 1, 1985 to July 1, 1986).

[21]    *See* Doc. No. 1604-4 at 2-3 (LMI Policies No. L(C)73051701E effective from April 16, 1973 to April 16, 1976; No. SL3578/SLC5603 effective from July 1, 1979 to July 1, 1982; No.

provided General Liability Coverage with limits excess of at least $5,000,000 each occurrence underlying insurance.[22]

The Package Policies have several conditions precedent to coverage the Debtor must satisfy, including that the Debtor must:

- Utilize a service organization;[23]

- Provide notice of an occurrence to LMI through its service organization; [24]

- Provide LMI with the opportunity to be associated with the Assured in the defense of claims, and cooperate with LMI; [25]

- Maintain its status as a self-insurer;[26]

- Allow LMI to inspect books and records, which must be kept in a form acceptable to LMI;[27]

---

SL3579/SLC5604 effective from July 1, 1979 to July 1, 1980; SL3710/SLC5731 effective from July 1, 1980 to July 1, 1981; SL 3844/SLC 5855 effective from July 1, 1981 to July 1, 1982; SL 4010/SLC 5997 effective from July 1, 1982 to July 1, 1985; SL 4011/SLC5998 effective from July 1, 1982 to July 1, 1985). The Diocese alleges that LMI subscribed policies other than the ones listed in this footnote and in footnote 12 above. *See* Doc. No. 1604-4. LMI's position is that there is insufficient or no evidence to support that such policies provide coverage for the Abuse Claims.

[22]    *See, e.g.*, DOS_Insur00005516 (Limits of No. SL3578/SLC5603 effective from July 1, 1979 to July 1, 1982).

[23]    The Service Organization requirement in the LMI Policies states: "Insurance afforded under this Insurance is issued to the Assured on the express condition that the Assured undertakes to utilize at all times the services of Gallagher Bassett Insurance Service . . . This Service Organization shall perform the following duties: (a) Strictly discharge the Assured's obligation to the employees or members of the public; (b) Maintenance of accurate records of all details incident to payments; (c) Furnish inspection and safety engineering service; (d) Furnish monthly claims records on an approved form. *The acceptance of these services shall be a condition precedent to any liability which may attach to the Underwriters in accordance with the terms and conditions of this Insurance.*" *See, e.g.*, Syracuse, Adv. No. 21-50005, Doc. No. 22-3 at 3-4 (LMI Policy No. SL3551 (Part 3)) (emphasis added).

[24]    The LMI Policies require the Debtor to provide notice of each occurrence, to Gallagher Bassett Insurance Service, as soon as practicable. *See, e.g., id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[25]    See *id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[26]    *See, e.g., id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[27]    The LMI Policies require the Debtor to allows claims and records inspections, and that the records be in a form acceptable to LMI in determining the amount of covered loss or damage. *See, e.g., id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

- Obtain LMI's consent to assign any interest in the LMI Policies;[28] and

- Must not make false or fraudulent claims.[29]

LMI's obligations upon the Debtor's satisfactions of these conditions precedent are set forth in the General Liability Insuring Agreement and subject to its applicable terms, exclusions, and conditions.[30]  LMI have no duty to defend or settle claims, only to indemnify covered UNL.[31] The obligation to reimburse defense expenses or a loss payment arises only after the underlying claim is resolved and claim coverage is determined.  This is because the Package Policies provide indemnity coverage for UNL incurred for damages and expenses incurred for personal injury claims arising from an occurrence where there is legal liability, which has been either "imposed upon the Assured by law" or "assumed by the Named Assured under contract or agreement."[32]

The Package Policies also specify the timing of a "Loss Payment," as "*[w]hen it has been determined that Underwriters are liable under this Insurance*, Underwriters shall thereafter promptly reimburse the Assured for all payments made in excess of the amounts stated in…the Limits Agreement."[33]

In sum, the Debtor, as a self-insured, and to satisfy conditions precedent in the Package

---

[28]    *See, e.g., id.*, at 4 (stating "ASSIGNMENT: Assignment of interest, under this Insurance shall not bind the Underwriters until the Underwriters' consent is endorsed hereon.")

[29]    *Id.*

[30]    The General Liability Insuring Agreement states:  "Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability imposed upon the Assured by law or assumed by the Named Assured under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term 'ultimate net loss,' on account of personal injuries . . . arising out of any occurrence happening during the period of Insurance." *See, e.g., id.*, Doc. No. 22-4 at 2 (LMI Policy No. SL3551 (Part 4)).

[31]    *See MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 355 (S.D.N.Y. 2014) ("[I]n the absence of a policy provision expressly imposing a duty to defend, New York courts will not find such a duty"); *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597, 603 (N.D. Cal. 1994) ("More importantly, the London Defendants' explicit option to join in the defense directly contradicts any possible duty to join in the defense.").

[32]    *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-4 at 2 (LMI Policy No. SL3551 (Part 4)).

[33]    *See, e.g., Syracuse*, Adv. No. 21-50005, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

Policies, must: (i) defend and settle claims;[34] (ii) notify LMI of claims;[35] (iii) utilize a service organization at all times;[36] (iv) provide LMI with acceptable records;[37] (v) cooperate with LMI;[38] (vi) permit LMI to associate in the defense of claims;[39] (vii) not assign interests under the LMI Policies without LMI's consent;[40] (viii) make no changes to the agreements except by endorsement;[41] and (ix) not make false or fraudulent claims.[42]

    **B.**    <u>**The Adversary Proceeding**</u>

On June 19, 2020, the Debtor filed a voluntary chapter 11 petition under title 11 of the United States Code ("Bankruptcy Code").[43]

On January 15, 2021, the Debtor and its related parishes (collectively, "Plaintiffs") commenced an adversary proceeding against various defendant insurers, including LMI (collectively, "Insurers," and together with Plaintiffs, "Parties"), in this Court.[44]

On April 12, 2021, the Court stayed the Adversary Proceeding to focus the Parties' efforts on mediation.[45]  Following years without resolution, on October 20, 2023, several Insurers filed a

---

[34]    *Id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[35]    *Id.*

[36]    *Id.*, Doc. No. 22-3 at 3-4 (LMI Policy No. SL3551 (Part 3)).

[37]    *Id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[38]    *Id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[39]    *Id.*

[40]    *Id.* at 4 (stating "ASSIGNMENT: Assignment of interest, under this Insurance shall not bind the Underwriters until the Underwriters' consent is endorsed hereon.")

[41]    *Id.*

[42]    *Id.*

[43]    Doc. No. 1.

[44]    *See The Roman Catholic Diocese of Syracuse, New York et al. v. Arrowpoint Capital, et al.*, Adversary Proceeding No. 21-50002-5-mcr ("Adversary Proceeding"), Doc. No. 1.

[45]    *Id.*, Doc. No. 59, ¶ 4.

motion to terminate the stay so the Adversary Proceeding could proceed.[46]  On January 5, 2024, the Court entered an order terminating the stay.[47]

On February 20, 2024, LMI filed a motion to withdraw the reference ("Motion to Withdraw") of the Adversary Proceeding to the United States District Court for the Northern District of New York ("District Court").[48]  On April 24, 2024, the Court stayed the Adversary Proceeding until the District Court ruled on the Motion to Withdraw.[49]  On August 22, 2024, the District Court denied the Motion to Withdraw "with leave to renew, if necessary, at a later stage of the proceedings."[50]  On September 26, 2024, the Court set a status conference for October 18, 2024, to discuss a scheduling order for the Adversary Proceeding.[51]

### C.    Summary of the Plan

On September 13, 2024, the Plan Proponents filed the Disclosure Statement and Plan.[52]  On October 2, 2024, the Plan Proponents filed plan supplements, which included, among other things, an "Allocation Protocol"[53] and a "Trust Agreement".[54]

The Plan proposes establishing two funds, held by a trust ("Trust"), to compensate Abuse Claims.[55]  The Plan establishes (i) an "Abuse Claims Settlement Fund"[56] to pay "Consenting Abuse

---

[46]    *Id.*, Doc. No. 141.

[47]    *Id.*, Doc. No. 170.

[48]    *Id.*, Doc. No. 198.

[49]    *Id.*, Doc. No. 290.

[50]    *Id.*, Doc. No. 293.

[51]    *Id.*, Doc. No. 297.

[52]    Doc. Nos. 2172, 2173.

[53]    Plan, § 1.1.14.

[54]    Doc. No. 2207.

[55]    Plan, § 8.1.

[56]    *Id.*, § 1.1.7.

Claims"[57] and (ii) a "sub-fund" entitled the "Diocese Abuse Claims Settlement Sub-Fund"[58] to pay "Non-Participating Abuse Claimant[s]".[59]  However, "no portion of any of (i) the Participating Parties' Cash Contribution, (ii) the Settling Insurers' Cash Contribution, (iii) any payment by a Settling Insurer pursuant to an Insurance Settlement Agreement, (iv) any Insurance Claim Proceeds, (v) proceeds of Litigation Awards, (vi) proceeds of Outbound Contribution Claims, (vii) proceeds of the DOS Trust Note (if any), or (viii) any other proceeds which the Trust may obtain pursuant to the terms of the Plan shall be included in the Diocese Abuse Claim Settlement Sub-Fund."[60]

Hence, the Non-Participating Abuse Claimants can only be paid from the Debtor's contribution, and recoveries from the Non-Settling Insurers (if any).[61]  The Trustee will pay the Consenting Abuse Claimants, from the Abuse Claims Settlement Fund.[62]  The Trustee will pay the Non-Participating Abuse Claimants only from the Diocese Abuse Claim Settlement Sub-Fund.[63]

     (a)     **Allocation Protocol**

Under the Allocation Protocol, Roger Kramer will review Abuse Claims as the "Abuse Claims Reviewer".[64]  After reviewing the Abuse Claims, Mr. Kramer will assign points to each Consenting Abuse Claim based on certain factors.[65]  The Trustee pays each Consenting Abuse

---

[57]     *Id.*, § 1.1.48.

[58]     *Id.*, § 1.1.57.

[59]     *Id.*, § 1.1.132.

[60]     *Id.*, § 1.1.57.

[61]     *Id.*, § 1.1.57.

[62]     *Id.*, § 8.2.

[63]     *Id.*

[64]     Roger L. Kramer, of Kramer Law, LLC, is the Abuse Claims Reviewer.  Doc. No. 2208-1, ¶ 2.5.

[65]     These factors include: (1) the nature of abuse and circumstances; (2) the impact of the abuse; (3) and the Consenting Abuse Claimant's involvement in any legal proceeding related to a Consenting Abuse Claim.  *Id.*, ¶ 4.1.

Claimant a *pro rata* share, based on the total points assigned.[66]

      **(b)**    **Insurance Claims**

      The Trust will hold "Insurance Claims"[67], "Outbound Contribution Claims"[68], and "other

property"[69], including any amounts recovered by the Trust as "Insurance Claim Proceeds".[70]

      The definition of Insurance Claims include contractual rights that have not been reduced

to claim.  The Trust will "assume responsibility for preserving, managing, and distributing Trust

Assets to Abuse Claimants".[71]  The Trustee will oversee the Trust as a fiduciary to Abuse

Claimants.[72]  The Trust will assume "the right to pursue Insurance Claims" against any "Non-

---

[66]    *Id.*, ¶ 3.3.

[67]    "Insurance Claims means all Claims, causes of action and enforceable rights against an Insurer that is not an Excluded Insurer, whether sounding in contract, tort, or otherwise, including equity and bad faith, held by: (i) the Diocese or an Abuse Claimant for any reason related to any Abuse Claim asserted or alleged against the Diocese, including those for (a) indemnity and payment of any such Abuse Claim, (b) any Insurer's failure or refusal to provide insurance coverage for any such Abuse Claim under any Insurance Policy, (c) any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any such Abuse Claims against the Diocese pursuant to any Insurance Policy, (d) to the extent not otherwise encompassed by section (c) above, any Insurer's failure or refusal to reasonably settle such Abuse Claims, and (e) the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing; and/or (ii) any of the Participating Parties, Settling Insurers, or any Consenting Abuse Claimant for any reason related to any Consenting Abuse Claim against the Participating Party or Settling Insurer, whether independently or jointly liable with the Diocese on such Consenting Abuse Claim, including for (a) indemnity and payment of any such Consenting Abuse Claim, (b) any Insurer's failure or refusal to provide insurance coverage under any Insurance Policy for any such Consenting Abuse Claim against the Diocese, a Participating Party or a Settling Insurer, (c) any Insurer's tortious or wrongful claims handling including the failure or refusal of any Insurer to timely compromise and settle any such Consenting Abuse Claims against a Participating Party or a Settling Insurer pursuant to any Insurance Policy, (d) to the extent not otherwise encompassed by section (c) above, any Insurer's failure or refusal to reasonably settle such Consenting Abuse Claims, and (e) the interpretation or enforcement of the terms of any Insurance Policy as it pertains to any of the foregoing."  Plan, § 1.1.91.

[68]    "Outbound Contribution Claims means any Claim or cause of action related to an Abuse Claim that may be asserted by the Diocese or any Participating Party against any Person that is not a Protected Party."  *Id.*, § 1.1.142.

[69]    *Id.*, § 1.1.182.

[70]    "Insurance Claim Proceeds means any amount recovered by the Trust in respect of any Insurance Claims assigned to the Trust pursuant to the terms of this Plan."  *Id.*, § 1.1.93.

[71]    Doc. No. 2207-4, § 1.2.

[72]    *Id.*, § 1.7.3 (emphasis added).

Settling Insurers".[73]  However, although the LMI Policies are executory contracts, the Plan does not propose for the Debtor or Trust to assume the Debtor's insurance policies.[74]

### (c)      Injunction

The Plan provides for the Court to enjoin all "Persons"[75] from asserting any Abuse Claims against the Debtor or Participating Parties ("Injunction").[76]  However, the Injunction does not "apply to prevent a Non-Participating Abuse Claimant from pursuing or enforcing his or her" claim against a Participating Party.[77]

### (d)      Insurance Claims Assignment

The Plan purports to assign all Insurance Claims against the Non-Settling Insurers to the Trust ("Insurance Claims Assignment")[78], but provides that the Insurance Claims Assignment "shall not be construed: (i) as an assignment of the insurance policies…"[79]  Following the Insurance Claims Assignment, the Trust may assert Insurance Claims on behalf of any Consenting Abuse Claimant and pursue Insurance Claims against Non-Settling Insurers that involve the Debtor's, Participating Parties' and Non Settling Insurers' liability for Abuse Claims.[80]  The Trust also purportedly retains coverage under any Non-Settling Insurance Policy.[81]  Moreover, the Trust succeeds the Debtor as plaintiff in the Adversary Proceeding.[82]

The Plan impermissibly delegates to the Trust the sole duty of satisfying the SIRs for any

---

[73]      Plan, § 4.1; *id.*, § 1.1.171; *id.*, § 1.1.98.

[74]      Plan, § 7.5.

[75]      *Id.*, § 1.1.150.

[76]      *Id.*, § 12.2.1.

[77]      *Id.*, §§ 12.2.1, 12.2.2., 1.1.135.

[78]      *Id.*, § 8.2.7.

[79]      *Id.*, § 8.2.7.a.

[80]      *Id.*, § 8.8.1.a-b.

[81]      *Id.*, § 8.8.1.h.

[82]      Disclosure Statement, Art. VII, ¶ E.

Consenting Abuse Claims under the LMI Policies.[83]  If the Debtor or any Participating Party fail to satisfy any policy conditions, a Non-Settling Insurer may only raise defenses against coverage.[84] For Abuse Claimants litigating against a Non-Settling Insurer, the Plan limits recovery "to the *proceeds* of Non-Settling Insurer Policies…."[85]

### (e)     Reserve Fund

The Plan creates a reserve fund ("Reserve Fund") to pay costs incurred by the Debtor or Participating Parties in (1) pursuing Insurance Claims against the Non-Settling Insurers; (2) defending against Abuse Claims; and (3) administering the Allocation Protocol.[86]  These costs include payment of the SIRs under the LMI Policies for Consenting Abuse Claims but, contrary to the requirements of the LMI Policies, expressly *exclude* defense costs related to Non-Participating Abuse Claims.[87]  The Plan will fund the Reserve Fund with a $3,000,000 initial contribution.[88]  The Trustee has "sole and exclusive discretion" to replenish the fund.[89]  If the Reserve Fund balance falls below $500,000, the Trustee may file an application for authority to not replenish the fund.[90]  If the Court agrees, then, again, contrary to the LMI Policies' requirements, the Debtor and Participating Parties are "irrevocably released" from any Plan obligations concerning Abuse Claims and Insurance Claims, including any Post-Effective Date Preconditions to Coverage.[91]

---

[83]     Plan, § 8.2.7.

[84]     Plan, § 8.8.3.

[85]     Disclosure Statement, Art. V, ¶ G (emphasis added).  The Plan also appears to assign the Insurance Claim Proceeds to the Trust.  Plan, § 8.2.1 (funding of the Settlement Abuse Trust includes "Insurance Claim Proceeds").

[86]     *See* Plan, § 8.11.1.

[87]     *Id*. § 1.1.69.

[88]     *Id*. § 8.11.1.

[89]     *Id*.

[90]     *Id.*

[91]     *Id.*, *see also id*. at § 1.1.156.

(f)    **Pre-Determination and Allocation of Liability**

The Plan proposes to allocate liability for Non-Participating Abuse Claimants without reference to applicable, and controlling, state law.[92]  Under the Plan, unless a Non-Participating Abuse Claimant "files a timely objection of the Plan" and establishes that they should receive a different allocation by a preponderance of the evidence, the Plan's "allocations of liability" are "conclusive and binding upon each Non-Participating Abuse Claimant for all purposes in any Abuse Action against a Participating Party."[93]

The Plan also provides that "any liability of the Diocese and Participating Parties shall be conclusively deemed to be subject to the limitations of liability" under New York Civil Practice Law and Rules ("CPLR")   1601.[94]  These liability limitations do not apply only if a Non-Participating Abuse Claimant timely objects to the Plan and "establishes by a preponderance of the evidence" that the Diocese or the Participating Parties are not eligible for the limitations under CPLR 1601.

## III.    ARGUMENT

### A.    Approval of the Disclosure Statement Should Be Denied Because the Plan is Patently Unconfirmable

A bankruptcy court should not approve a disclosure statement if it describes a patently unconfirmable plan.[95]  "If it appears there is a defect that makes a plan inherently or patently unconfirmable, the court may consider and resolve that issue at the disclosure stage before requiring the parties to proceed with solicitation of acceptances and rejections and a contested

---

[92]    Plan, § 4.4.4(a).

[93]    *Id.*

[94]    *Id.*, § 4.4.4(b).

[95]    *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990); *John Hancock Mutual Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (3d Cir. 1993).

confirmation hearing."[96]  In *American Capital*, the insurers (the only objectors) objected because the disclosure statement described a facially unconfirmable plan.[97]  The bankruptcy court and district court upheld that objection. The Third Circuit affirmed those decisions.[98]  It held that a "bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement is patently unconfirmable."[99]

(a)      **The Plan is patently unconfirmable because it violates *Purdue Pharma***

The Plan is patently unconfirmable because it violates the *Harrington v. Purdue Pharma, L.P.* decision from the Supreme Court.[100]  LMI incorporate the arguments set forth in in the objection filed by Interstate Fire & Casualty Company, Fireman's Fund Insurance Company, and National Surety Corporation (collectively, "Interstate") as though fully set forth herein.

(b)      **The Plan is patently unconfirmable because the Court cannot adjudicate or estimate personal injury tort claims pursuant to 28 U.S.C. § 157(b)(5)**

The Plan is patently unconfirmable because the Court lacks jurisdiction to adjudicate or estimate personal injury tort claims pursuant to Section 157(b)(5).  Section 157(b)(5) requires that the district court hold trial for personal injury or wrongful death claims.[101]  Hence, bankruptcy courts cannot liquidate or estimate personal injury claims to determine distribution amounts for claims in a chapter 11 plan.[102]  Sexual abuse claims are considered "personal injury" torts under

---

[96]      *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012) (quoting *In re Larsen*, No. 09-02630, 2011 WL 1671538, at *2 n.7 (Bankr. D. Idaho May 3, 2011)); *see also In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed.").

[97]      *In re Am. Cap. Equip., Inc.*, 405 B.R. 415, 418 (Bankr. W.D. Pa. 2009).

[98]      *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 148 (3d Cir. 2012).

[99]      *Id*. at 154.

[100]      144 S.Ct. 2071.

[101]      28 U.S.C. § 157(b)(5).

[102]      *In re Chateaugay Corp.*, 111 B.R. 67, 72 (Bankr. S.D.N.Y. 1990).

Section 157(b)(5).[103]  Here, contrary to that controlling statutory authority, the Plan Proponents

propose to allocate liability amongst non-debtor parties for the Non-Participating Abuse

Claimants' "personal injury" claims.[104]  *These allocations are conclusive and binding* "for all

purposes in any Abuse Action against a Participating Party", which violates Section 157(b)(5).[105]

By determining who is liable for how much, there is an implicit determination that liability exists.

The Court does not have jurisdiction to make liability determinations of personal injury claims.

Indeed, the Bankruptcy Court in *In re Roman Cath. Archbishop of Portland in Oregon* held that it

lacked jurisdiction to estimate personal injury claims for distribution purposes.[106]  Thus, the Plan

is patently unconfirmable.

      The Allocation of Liability also infringes on the Non-Participating Abuse Claimants' jury

trial rights.  "[I]f estimation for plan confirmation purposes results in *de facto* estimation for

distribution purposes via the effects of the plan of reorganization and the discharge provisions of

§ 1141(d), a claimant's right to a jury trial for purposes of liquidating her claim becomes

hollow."[107]  Here, the Allocation of Liability makes the Non-Participating Abuse Claimants' jury

trial rights meaningless by pre-determining liability allocations that are binding upon each Non-

Participating Abuse Claimant.  A jury determines liability.[108]  Section 157(b)(5) bars the Court

from approving these allocations.

---

[103]    *See, e.g., In re Gordon*, 646 B.R. 903, 908 (Bankr. D. Idaho 2022) (considering claims of sexual assault and sexual battery as personal injury torts pursuant to Section 157(b)(5)); *In re Ice Cream Liquidation, Inc.*, 281 B.R. 154 (Bankr. D. Conn. 2002) (reasoning that sexual harassment claims were personal injury claims); *In re Mason*, 514 B.R. 852, 860 (Bankr. E.D. Ky. 2014) (holding that sexual harassment and gender discrimination claims under 42 U.S.C. § 1983 were considered personal injury torts pursuant to Section 157(b)(5)).

[104]    Liability is allocated amongst the Debtor, the Perpetrator, all Participating Parties, Joint Tortfeasors and other Persons liable to such Non-Participating Abuse Claimant.  *See* Plan, § 4.4.4.a.

[105]    *Id.*, § 4.4.4(a).

[106]    *In re Roman Cath. Archbishop of Portland in Oregon*, 339 B.R. 215, 221 (Bankr. D. Or. 2006).

[107]    *Archbishop of Portland.*, 339 B.R. at 221 (quoting *In re Dow Corning Corp.,* 211 B.R. 545 (Bankr.E.D.Mich.1997)) (original emphasis).

[108]    *In re Asbestos Litigation*, 986 F. Supp. 761, 773 (S.D.N.Y. 1997).

Hence, based on the foregoing, the Plan is patently unconfirmable because the Court lacks

authority to approve the allocation scheme in section 4.4.4 of the Plan.

**(c)     The Plan is patently unconfirmable because it purports to rewrite the**

**Debtor's obligations under the LMI Policies**

A debtor may not use the bankruptcy process to renegotiate its bargained-for contractual

rights and obligations.[109]   Nor may a debtor rewrite contracts to include terms the parties did not

previously agree to.[110]   Insurance policies are no different: "The filing of a bankruptcy petition

does not alter the scope or terms of a debtor's insurance policy"[111] or permit a debtor-insured to

"obtain greater rights to the proceeds"[112] of the policy.   A bankruptcy court may not disregard or

rewrite contracts out of a desire for a more equitable outcome.[113]

The Plan rewrites the LMI Policies by excluding defense costs for any Non-Participating

Abuse Claim "except to the extent necessary to satisfy the Diocese's applicable [SIR]

---

[109]     *See In re Cajun Elec. Power Co-Op, Inc.*, 230 B.R. 715, 737 (Bankr. M.D. La. 1999)
(finding that the plan violated Section 1129(a)(3) of the Bankruptcy Code and was unconfirmable
because it "call[ed] for an improper modification of the [debtor's contracts]"); *641 Assocs. v.
Balcor Real Estate Fin. (In re 641 Assocs.)*, 1993 Bankr. LEXIS 1191, *20–21 (Bankr. E.D. Pa.
Aug. 26, 1993) ("There is no provision in the Bankruptcy Code allowing a bankruptcy court to
disregard state-law contractual rights.").

[110]     *See, e.g., In re Crippin*, 877 F.2d 594, 598 (7th Cir. 1989) ("[B]ankruptcy courts do not
have the power to rewrite contracts to allow debtors to continue to perform on more favorable
terms."); *In re Nashville White Trucks, Inc.*, 5 B.R. 112, 117 (Bankr. M.D. Tenn. 1980) ("The
[Bankruptcy] Code does not . . . grant the debtor in bankruptcy greater rights and powers under
the contract than he had outside of bankruptcy.").

[111]     *In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 193 (Bankr. S.D.N.Y. 2012)

[112]     *In re Denario*, 267 B.R. 496, 499 (Bankr. N.D.N.Y. 2001) (quotation omitted).

[113]     *See MF Glob. Holdings*, 469 B.R. at 193 ("In this case, the … provisions cannot be excised
because doing so would rewrite the Specialty Policies and expand the Debtors' rights under them.
The Individual Insureds' rights are clearly delineated in the Specialty Policies, and the Court cannot
modify those rights pursuant to the Bankruptcy Code and New York Insurance Law…."); *In re
785 Partners LLC*, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012) ("Even where the default rate strikes
the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness
and equity."*); Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir.1992) ("A court may neither
rewrite, under the guise of interpretation, a term of the contract when the term is clear and
unambiguous ... nor redraft a contract to accord with its instinct for the dispensation of equity upon
the facts of a given case.") (citation omitted).

obligations."[114] Under the LMI Policies, the Debtor and Participating Parties must defend, resolve and pay all Abuse Claims, including the Non-Participating Abuse Claims. The LMI Policies are not policies that provide for a contemporaneous duty to pay defense expenses. In fact, the LMI Policies contain express language to the contrary. The LMI Policies are indemnity policies that indemnify *after* the claim is resolved and there is a determination that the "ultimate net loss" sought to be reimbursed is covered. Further, "ultimate net loss" under the LMI Policies does not include defense costs associated with unsuccessful suits that either fail at trial or that do not result in settlement.[115]

As a result, the LMI Policies require the Debtor and Participating Parties to seek reimbursement only *after* defending against and paying any settlement or judgment on an Abuse Claim.[116] Hence, the Plan violates the LMI Policies by excluding payment for liability and defense costs for Non-Participating Abuse Claims. Moreover, the Plan permits the Trustee to seek the Court's approval to not replenish the Reserve Fund, which would "irrevocably" release the Debtor and Participating Parties from complying with their obligations under the LMI Policies.[117] This

---

[114]    Plan, § 1.1.69.

[115]    *See Hopeman Bros., Inc. v. Cont'l Cas. Co.*, 307 F. Supp. 3d 433, 463 (E.D. Va. 2018) ("excludes those defense costs associated with unsuccessful suits that either fail at trial or that do not result in settlement."); *see also Century Indem. Co. v. Marine Grp*., *LLC*, 131 F. Supp. 3d 1018, 1039 (D. Or. 2015) (holding the policies "clearly provide" that the Insurer "ha[d] no responsibility to pay the Insured the ultimate net loss, which includes both damages and claims expenses, until the [the relevant] Action ha[d] been fully resolved by judgment or settlement."); *Matter of Celotex Corp.*, 152 B.R. 661, 666 (Bankr. M.D. Fla. 1993) (holding excess insurers had no duty to advance defense costs because "[a]bsent a covered loss, the excess insurers have no duty to indemnify whatsoever"); *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597, 603 (N.D. Cal. 1994) (finding no obligation to pay defense costs as incurred, rather the "the London Defendants have an obligation to pay defense costs as a portion of ultimate net loss only if and when there is a determination that the underlying action is covered under the Policy"); *MBIA Inc. v. Certain Underwriters at Lloyd's, London*, 33 F. Supp. 3d 344, 356 (S.D.N.Y. 2014) (holding that because "[t]he Policies state that 'Underwriters shall reimburse Loss only upon the final disposition of any Claim'. . .Underwriters are not required to pay any defense costs until final disposition").

[116]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[117]    Plan, § 8.11.1.

irrevocable release of the Debtor and the Participating Parties' obligations would rewrite the LMI Policies without LMI's consent.

The Plan also limits LMI's remedies. Section 8.8.3 of the Plan states that LMI's "*sole remedy*" for the Debtor's or Participating Parties' failure to satisfy any condition precedent of the LMI Policies is limited to denying coverage.[118] Hence, approval of the Plan purportedly would bar LMI from seeking declaratory relief or any other relief against the Debtor or Participating Parties.

Furthermore, the Allocation Protocol amends the bargained for procedures under the LMI Policies. The Allocation Protocol does not require the Debtor or Participating Parties to utilize a service organization.[119] The Service Organization requirement in the LMI Policies states: "The acceptance of these services shall be a condition precedent to any liability which may attach to the Underwriters in accordance with the terms and conditions of this Insurance."[120] Further, the LMI Policies explicitly state that "[f]ees, charges and expenses for [the Service Organization] are specifically excluded, and are to be paid by the Assured."[121] The Allocation Protocol also does

---

[118]    *Id.*, § 8.8.3 (emphasis added).

[119]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-3.

[120]    *See, e.g.*, Syracuse, Adv. No. 21-50005, Doc. No. 22-3 at 3-4 (LMI Policy No. SL3551 (Part 3)). Under New York law, "[a] contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself." *Stars Jewelry by A Jeweler Corp. v. Hanover Ins. Grp., Inc.*, 960 N.Y.S.2d 465, 466 (2013) (quoting *MHR Capital Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645, 884 N.Y.S.2d 211, 912 N.E.2d 43). Accordingly, "'when parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms.'" *Id.* (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876). "A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in [an] agreement arises.'" *Id.* (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690, 636 N.Y.S.2d 734, 660 N.E.2d 415). "Express conditions are those agreed to and imposed by the parties themselves," and they "must be literally performed." *Id.* (quoting Oppenheimer & Co., 86 N.Y.2d 685 at 690).

[121]    *See, e.g., id.*, Doc. Nos. 22-17 at 1, 22-4 at 4 (LMI Policy No. SL4008 (Part 4) and LMI Policy No. SL3551 (Part 4)).

not require the Debtor or Participating Parties to defend against Abuse Claims as self-insurers,[122] cooperate with LMI,[123] permit LMI to associate in the defense against Abuse Claims,[124] or require them to seek reimbursement from LMI only after they pay the judgment and defense costs associated with Abuse Claims.[125]

The Plan Proponents cannot rewrite the LMI Policies without LMI's consent. This is especially true for the non-debtor Participating Parties—whose rights under the LMI Policies are not estate property[126]—since they since they not within the Court's *in rem* jurisdiction, and cannot be released from their obligations under the LMI Policies without LMI's consent.

The Plan is thereby patently unconfirmable, because it purports to rewrite the LMI Policies without LMI's consent.

        **(d)**        **The Plan is patently unconfirmable because it treats Consenting Abuse Claimants and Non-Participating Abuse Claimants, whom are similarly situated, differently, in violation of 11 U.S.C. § 1123(a)(4)**

The Plan is patently unconfirmable because it violates Section 1123(a)(4) by treating Consenting Abuse Claimants and Non-Participating Abuse Claimants differently. Section 1123(a)(4) requires a plan to "provide the same treatment of any class of claims or interests that is impaired under the plan."[127] "Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution."[128] "[C]ourts have interpreted the 'same treatment' requirement to mean that

---

[122]    *Id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[123]    *See, e.g., id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[124]    *See, e.g., id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[125]    *Compare Syracuse*, Adv. No. 21-50005, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)) *with* Doc. No. 2207-1.

[126]    *See also* section III.A.(g) of this memorandum.

[127]    11 U.S.C. § 1123(a)(4).

[128]    *In re Quigly*, 437 B.R. 102, 146 (Bankr. S.D.N.Y. 2010).

all claimants in a class must have 'the same opportunity' for recovery."[129]  The Plan does not do that even though it classifies all Abuse Claims, both Consenting Abuse Claimants and Non-Participating Abuse Claimants, as Class 5 Claims.[130]   Moreover, the Plan provides different treatment for Consenting Abuse Claimants than Non-Participating Abuse Claimants.

This disparate treatment violates section 1123(a)(4) by treating these similarly classified claimants differently.  The Plan carves out assets that Non-Participating Claimants cannot receive. Under the Plan, Non-Participating Abuse Claimants cannot receive distributions from Trust Assets that include cash contributions from Participating Parties, Settling Insurers, and settlement payments from Setting Insurers.[131]  They also cannot receive proceeds from Litigation Awards, Outbound Contribution Claims, the DOS Trust Note or any other proceeds the Trust obtains.[132] However, the Consenting Abuse Claims can be compensated from all such assets.[133]  By limiting available assets, Non-Participating Abuse Claimants do not have the same opportunity for recovery.  Thus, by treating Non-Participating Claimants differently, the Plan violates section 1123(a)(4).

> **(e)   The Plan is patently unconfirmable because the Committee cannot unilaterally act as attorney in fact for Consenting Abuse Claimants**

The Committee cannot act as attorney in fact for Consenting Abuse Claimants.

The Committee owes an undivided duty of loyalty to all unsecured creditors in bankruptcy.[134]  The duty requires the Committee to "guide its actions so as to safeguard as much

---

[129]   *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013).

[130]   Plan, § 2.3.5.

[131]   *Id.*, § 4.4.3(b)(i).

[132]   *Id.*

[133]   *Id.*, § 4.9.2(a).

[134]   *In re Garden Ridge Corp.*, 2005 WL 523129, at *4 (Bankr. D. Del. Mar. 2, 2005) ("[…] the chief purpose of the Official Committee is to represent all general unsecured creditors. […]The Official Committee is simply not intended to represent individual creditor interests."); *In re Pierce*, 237 B.R. 748, 758 (Bankr. E.D. Cal. 1999) ("Among the duties assumed by Committee members are 'fiduciary dut[ies] of undivided loyalty and impartial service to all creditors.'") (citation omitted).

as possible the rights of minority as well as majority creditors."[135]  Indeed, the Committee cannot advocate on behalf of individual constituents for practical reasons.  "Neither the committee nor its lawyers could function if each constituent was a client."[136]  The principal purpose of a creditors' committee is not to "advocate any particular creditor class's agenda, but rather to 'strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'"[137]

The Plan directs the Committee to breach its duty of loyalty.  The Plan specifies that the Committee will represent Consenting Abuse Claimants as their "attorney in fact".[138]  The Committee may "negotiate and agree to modifications of the treatment accorded to Class 5 Claims, and the Plan generally on their behalf…."  Thus, the Committee will represent Consenting Abuse Claimants while representing the Non-Participating Abuse Claimants (and the rest of the unsecured creditor class).  The Consenting and Non-Participating Abuse Claimants have diverging interests concerning the Plan.  The Plan limits the Trust Assets Non-Participating Claimants may receive.[139]  There are no such limits for the Consenting Abuse Claimants.[140]  The Committee cannot represent Consenting and Non-Participating Claimants.  This is a clear conflict.  Hence, the Plan is patently unconfirmable.

> **(f)** **The Plan is patently unconfirmable because the Trustee owes a fiduciary duty to Abuse Claimants, but must also pay for the Debtor's and Participating Parties' defense of the abuse claims**

The Plan is patently unconfirmable because it creates an irreconcilable conflict for the

---

[135]     *In re Residential Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012).

[136]     *Id*. (citing *In re The Circle K Corp.*, 199 B.R. 92, 99–100 (Bankr. S.D.N.Y.1996)).

[137]     *Mirant Americas Energy Mktg., L.P. v. Off. Comm. of Unsecured Creditors of Enron Corp.*, 2003 WL 22327118, at *6 (S.D.N.Y. Oct. 10, 2003) (quoting *In re Hills Stores Co.*, 137 B.R. 4, 7 (Bankr. S.D.N.Y. 1992)).

[138]     Plan, § 2.3.5.h.

[139]     *Id.*, §§ 4.4.1, 4.4.3.

[140]     *Id.*, § 4.9.2.a.

Trustee.  The Trustee owes a duty of loyalty to Abuse Claimants.  However, the Trustee must pay for the Debtor's defense against Abuse Clams by those same claimants.[141]  This is an inherent conflict.

The Plan obligates the Trustee to act as a "fiduciary" to Abuse Claimants by prosecuting or settling Insurance Claims.[142]  New York law requires a trustee to "administer the trust fairly for all of them and may not favor himself or herself over the other beneficiaries."[143]  Hence, as the Abuse Claimants' fiduciary, the Trustee owes a duty of loyalty to the Abuse Claimants and cannot act contrary to their interests.[144]

The Plan requires the Trust to pay for the Debtor's defense.  Under the Plan, "the Trust shall be solely responsible for satisfying…any [SIR] obligations on account of any Abuse Claim or arising out of any Non-Settling Insurer Policy."[145]  As noted earlier, the LMI Policies require defense of any Abuse Claims.   This requirement to defend cannot be reconciled with the Trustee's duty of loyalty to Abuse Claimants.  The Trustee cannot satisfy his fiduciary duty to Abuse Claimants if he funds the Debtor's defense against Abuse Claims.  Because of this conflict, the Plan is patently unconfirmable.

> (g)     **The Plan is patently unconfirmable because it requires the Court to approve the transfer of non-debtor property.**

The Plan is patently unconfirmable because the Court cannot approve an assignment of the

---

[141]     *Id.*, § 8.2.4.a.

[142]     *Id.*, § 8.6.

[143]     *Milea v. Hugunin*, 890 N.Y.S.2d 369 (Sup. Ct. 2009) (citations omitted).

[144]     *Bd. of Trustees of Aftra Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662 (S.D.N.Y. 2011).  The most fundamental duty owed by the trustee is "a duty of undivided and undiluted loyalty to the beneficiaries whose interests the fiduciary is appointed to protect." *In re Jastrzebski*, 948 N.Y.S.2d 689, 691 (2012).

[145]     *Id.*, § 8.2.7.

Participating Parties' property interests under the LMI Policies.  The Court lacks jurisdiction to approve an assignment of the Participating Parties' interests.

Bankruptcy Courts have exclusive jurisdiction over a debtor's property and over the estate.[146]  Section 541 governs which property becomes property of a debtor's estate—it does not govern property of non-debtors.[147]  The Participating Parties are non-debtors.  Hence, their property is not estate property and the Court does not have jurisdiction to approve an assignment of it.  Here, the Debtor seeks the Court's approval to assign the Participating Parties' rights in the LMI Policies to the Trust.[148]  The Court does not have jurisdiction to approve that assignment.  Similarly, in the *Diocese of Camden, New Jersey* bankruptcy case, the bankruptcy court ruled it did not have jurisdiction to approve transfers of non-debtor property.[149]

Therefore, because the Plan seeks relief from the Court beyond the Court's jurisdiction, it is patently unconfirmable.

---

[146]    *See* 28 U.S.C. § 1334(e); *see also Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004).

[147]    "(a) The commencement of a case … creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held: (1) … all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541.

[148]    "On the Effective Date, and without further action by any party, (i) the Diocese and the Consenting Abuse Claimants will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers; and (ii) each of the Participating Parties will assign to the Trust the Participating Parties' rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers."  Plan, § 8.2.7a.

[149]    *In re Diocese of Camden, New Jersey*, 653 B.R. 309, 352 (Bankr. D.N.J. 2023) (ruling that the "[i]nsurers are correct in their argument that this Court lacks jurisdiction to order or approve the transfer of the OCE's interest in the Policies, because the Court's jurisdiction is limited to property of the Debtor, or the estate").

      **(h)**     **The Plan is patently unconfirmable because it purports to assign the LMI Policies to the Trust without assuming them, and without providing adequate assurance of future performance**

The Court cannot confirm the Plan because it assigns the LMI Policies to the Trust without assuming them and providing adequate assurance as Section 365 requires.  The LMI Policies are executory contracts.  "[An executory contract is] 'a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'"[150] "The materiality of the breach…is a factual question resolved through the application of state law."[151]  The Debtor and LMI have material unperformed obligations under the LMI Policies.

The Debtor has numerous material obligations under the LMI Policies.  These obligations include, though are not limited to, utilizing a service organization,[152] cooperating with LMI,[153] and permitting LMI to associate in the defense against Abuse Claims.[154]  The Debtor's failure to satisfy these obligations excuses LMI from indemnification.[155]  LMI may owe performance under the LMI Policies, including indemnification, *only if* the Debtor satisfies its conditions precedent above.

---

[150]    *In re Wireless Data, Inc.*, 547 F.3d 484, 488, n.1 (2d Cir. 2008) (citations omitted).  "The materiality of the breach…is a factual question resolved through the application of state law." *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001) (citations omitted).  There is no dispute that New York law governs the LMI Policies.

[151]    *In re Teligent, Inc.*, 268 B.R. 723, 730 (Bankr. S.D.N.Y. 2001) (citations omitted).

[152]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-3 (As a condition precedent to coverage, the LMI Policies require the Debtor to utilize a "service organization" to provide notice to excess insurers, administer claims, maintain records of claim details and payments, and furnish monthly claim reports.). Neither the Disclosure Statement nor Plan provide for the utilization of a service organization by the Trust.

[153]    *Id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[154]    *Id.*

[155]    *Lentini Bros. Moving & Storage Co. v. New York Prop. Ins. Underwriting Ass'n*, 422 N.E.2d 819, 820 (1981) (an insured's failure to submit for loss and sit for examination relieves the insurer of liability); *Stradford v. Zurich Ins. Co.*, No. 02 CIV.3628, 2002 WL 31819215, at *7 (S.D.N.Y. Dec. 13, 2002) (insured's willful breach of the cooperation clause under New York law precluded recover of the insurance proceeds).

Thus, because both parties owe material obligations, the LMI Policies are executory contracts.

Section 365 authorizes a debtor to assume an executory contract if there is "adequate assurance of future performance."  Because the Debtor is attempting to assign the LMI Policies (which are executory contracts), the Debtor must assume the LMI Policies.  There must also be adequate assurance of future performance.  The Plan provides for neither assumption nor adequate assurance.  Hence, the Plan is patently unconfirmable because it fails to comply with section 365.

**(i)     The Plan is patently unconfirmable because it improperly delegates allowance of the Abuse Claims**

The Plan is patently unconfirmable because it improperly delegates allowance of the Abuse Claims to the Abuse Claims Reviewer.  The Allocation Protocol improperly authorizes the Abuse Claims Reviewer to "review" each Abuse Claim.[156]  However, only a bankruptcy court may allow claims.[157]  "[A]llowance of that claim…is the *exclusive province of the bankruptcy court.*"[158]  This defect makes the Plan unconfirmable.

**B.     The Disclosure Statement Provides Inadequate and Misleading Information**

The Disclosure Statement does not merit approval because it contains inadequate and misleading information.

---

[156]     Allocation Protocol, § 2.5 at Doc. No. 2207-1 ("The Abuse Claims Reviewer shall conduct a review of each of the Abuse Claims and, according to the guidelines set forth…shall make determinations upon which individual monetary distributions will be made subject to the Plan and the Trust Agreement"); *Id*. at § 3.1 ("An Abuse Claim shall be allowed if the Abuse Claims Reviewer determines the Abuse Claim is not duplicative or fraudulent, and such Abuse Claimant proved his or her claim by a preponderance of the evidence.")

[157]     *In re PRS Ins. Grp., Inc.*, 335 B.R. 77, 81 (Bankr. D. Del. 2005) (emphasis added); *see also In re Buchholz*, 224 B.R. 13, 20 (Bankr. D.N.J. 1998) ("The duty to examine and pass on proofs of claim is that of the bankruptcy court alone, and cannot be delegated.")

[158]     *PRS Ins. Grp.*, 335 B.R. at 81 (emphasis added); *see, e.g.*, *Canal Corp. v. Finnman (In re Johnson)*, 960 F.2d 396, 404 (4th Cir. 1992); 4 Collier on Bankruptcy ¶ 502.030[1][a] (Alan N. Resnick & Henry J. Sommer eds. 15th ed. rev. 2005) ("[T]he bankruptcy court always retains the … sole right to determine the 'allowability' of the claim under the applicable standards set forth in section 502.")

To merit approval, a disclosure statement must contain "adequate information"[159] that describes a confirmable plan.[160] "Adequate information" is "determined by the facts and circumstances of each case."[161] It is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated."[162] The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene.[163] This determination falls within the Court's broad discretion.[164]

Bankruptcy Courts may not approve disclosure statements that include inadequate or misleading information.[165] The Debtor's obligation to provide adequate and accurate information cannot be overemphasized.[166] Thus, vague and ambiguous statements in a disclosure statement must be excised or clarified before approval.[167]

**(a)    The Insurance Claims Assignment is confusing and ambiguous**

The Insurance Claims Assignment is confusing and ambiguous.

---

[159]    11 U.S.C. § 1125(a)(1) (stating "Adequate Information" means: "information of a kind, and in sufficient detail. . .  that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, . . . in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information…."); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994).

[160]    11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).

[161]    *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

[162]    *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida*, 848 F.2d 414); *see also In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990); *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596–97 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 100 (3d Cir. 1988)).

[163]    *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

[164]    *See In re WorldCom, Inc.*, No. M-47 HB, 2003 WL 21498904, at *10 (S.D.N.Y. Jun. 30, 2003) ("The determination of what is adequate information is subjective and made on a case by case basis.  This determination is largely within the discretion of the bankruptcy court.") (quoting *Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 179 B.R. 24, 29 (S.D.N.Y. 1995)).

[165]    *See, e.g.*, *In re Monroe Well*, 80 B.R. at 330.

[166]    *Oneida*, 848 F.2d at 417.

[167]    *See, e.g.*, *In re Pettit*, 18 B.R. 6, 8 (Bankr. E.D. Ark. 1980).

The Plan defines Insurance Claims broadly to include claims asserted pursuant to the LMI Policies, such as indemnity and payments for any Abuse Claim.[168]   The Plan also states as follows:

> On the Effective Date, and without further action by any party, (i) the Diocese and the Consenting Abuse Claimants will be deemed to have assigned to the Trust their respective rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers; and (ii) each of the Participating Parties will assign to the Trust the Participating Parties' rights, if any, to all Insurance Claims and recoveries on account of such Insurance Claims against the Non-Settling Insurers.[169]

This paragraph makes no sense.   The definitions of Insurance Claims include recoveries under the LMI Policies.[170]   Yet, the Plan Proponents refer to "Insurance Claims and recoveries" in the prior paragraph.[171]   This implies that the recoveries are not included in the definition of Insurance Claims, but something in addition.   Moreover, the phrase "all Insurance Claims …on account of such Insurance Claims" is cryptic and nonsensical.   Thus, the Insurance Claims Assignment is ambiguous and confusing.

To alleviate this discrepancy, the Plan Proponents must delete "and recoveries," which appears twice in the cited paragraph above, and the words "on account of such Insurance Claims". Absent these deletions, the Court should not approve the Disclosure Statement.

---

[168]     Plan, § 1.1.136.

[169]     *Id.*, § 8.2.7.a.

[170]     *Id.*, § 1.1.136 ("Non-Participating Insurance Claims means all Claims... of …the Diocese … against an Insurer … whether sounding in contract, tort, or otherwise, including equity and bad faith, held by: (i) the Diocese or an Abuse Claimant for any reason related to any Abuse Claim asserted or alleged against the Diocese, including those for (a) indemnity and payment of any such Abuse Claim…") (emphasis added).

[171]     *Id.*, § 8.2.7.a.

      **(b)**     **The Disclosure Statement fails to disclose attendant risks to insurance recoveries**

            **(1)**     **The Disclosure Statement fails to alert creditors that there is a risk that the Plan will be overturned on appeal because it is patently unconfirmable**

There are serious concerns that the Disclosure Statement describes a patently unconfirmable plan. Nowhere in the Disclosure Statement does the Debtor warn creditors there is a risk the Plan will be overturned on appeal because it is patently unconfirmable. The Debtor's bankruptcy is replete with evidence that demonstrates that this failure to warn justifies denial of the Disclosure Statement.[172]

If the Court approves a plan that fails to conform to the law and the LMI Policies, there is a real danger that it will be subject to an appeal that may result in the Plan being overturned.[173]

The Disclosure Statement fails to disclose that if this occurs, recovery from the LMI Policies for the Abuse Claimants would not occur. More importantly, any potential recovery by Abuse Claimants from the LMI Policies that occurs post-confirmation but prior to the Plan being overturned may be subject to repayment or disgorgement.

To address this failure to disclose, the Debtor should add the following statement to Art. XVIII of the Disclosure Statement:

> LMI contend that if the Court approves a plan that fails to conform to applicable law and the LMI Policies, there is a risk that the plan will be subject to an appeal that may ultimately overturn the plan, thereby eliminating the amounts of money the Abuse Claimants would receive from the terms of the plan.

Absent this language, the Court should deny approval of the Disclosure Statement.

---

[172]    *See* Doc. Nos. 1565, 1718, 1787, 1817, 1848, 2172 (filing of numerous amended plans and separate disclosure statements in an attempt to address concerns raised by the Court and parties).

[173]    *See* Doc. No. 2022 (explaining the Supreme Court's reversal of a Chapter 11 plan in *Harrington v. Purdue Pharma, L.P.*, 144 S.Ct. 2071, 2081 (2024)); Doc. No. 2070 (explaining the effect the Supreme Court's reversal and remand in *Truck Ins. Exch. v. Kaiser Gypsum Co.*, 144 S. Ct. 1414 (2024)).

**(2)     The Disclosure Statement fails to alert creditors that the failure to satisfy the conditions precedent to coverage, set forth in the LMI Policies, would void coverage.**

The Disclosure Statement fails to warn creditors that failure to satisfy the conditions precedent under the LMI Policies would void coverage.  If the Court approves the Plan and its assignment of the LMI Policies to the Trust, then the Trustee must satisfy the conditions precedent to coverage.  Defending against Abuse Claims is a critical obligation under the LMI Policies. The conflict described above, however, would bar the Trustee from defending.  The Trustee's failure to satisfy the conditions precedent would void coverage under the LMI Policies.  Additionally, as mentioned above, the Plan excludes payment for liability and defense costs by the Participating Parties on any Non-Participating Abuse Claims.  Failure to defend against the Non-Participating Abuse Claims will also void coverage under the LMI Policies.

The Disclosure Statement fails to disclose that if there is no defense, there will be no recovery from the LMI Policies for Abuse Claimants.  To address this disclosure failure, the Debtor should add the following statement to Art. XVIII of the Disclosure Statement:

> LMI contend that if the Trustee were to not vigorously defend the Abuse Claims or if the Participating Parties do not vigorously defend Non-Participating Abuse Claims, LMI would be excused from indemnifying the Trust, Participating Parties, and Abuse Claims, which would reduce or completely eliminate any insurance recoveries for Abuse Claimants or Non-Participating Abuse Claimants, thereby reducing the amounts of money they would receive from the Trust.

Absent this language, the Court should deny approval of the Disclosure Statement.

**(c)     The Disclosure Statement fails to alert creditors that the Plan proposes to pay objectionable claims**

The Disclosure Statement should include a warning that the Plan proposes to pay objectionable claims.  On August 1, 2023, LMI sent a letter to the Debtor requesting that the Debtor object to seventy-eight objectionable abuse claims ("Objectionable Abuse Claims").[174]  The letter

---

[174]     Doc. No. 1811, Ex. A.

explains that the Debtor should object to the Objectionable Abuse Claims on multiple grounds.[175]

Despite LMI's request, the Debtor has not objected to the Objectionable Abuse Claims.[176]  Hence,

the Plan may ultimately pay the Objectionable Abuse Claims, reducing the overall recovery for

creditors that hold valid claims.  To address this issue, the Disclosure Statement should include

the following language in Art. XVIII, Sect. D to warn creditors:

> LMI contend that there are seventy-eight objectionable abuse claims ("Objectionable
> Abuse Claims") that the Debtor has failed to object to.  LMI assert that the Plan proposes
> to pay these Objectionable Abuse Claims and that payment of the Objectionable Abuse
> Claims may reduce the amount of money Abuse Claimants may recover from the Trust.

Unless the above language is included in the Disclosure Statement, the Court should deny

approval of the Disclosure Statement.

> **(d)    The Disclosure Statement fails to alert creditors that the there is a risk
> that the Insurance Claims Assignment violates the LMI Policies, which
> would void coverage**

The Disclosure State fails to alert creditors that there is a risk that the Insurance Claims

Assignment violates the LMI Policies, voiding coverage.  Under the Insurance Claims Assignment,

the Plan assigns all Insurance Claims against the Non-Settling Insurers to the Trust[177], but provides

that the Insurance Claims Assignment shall not be construed: (i) as an assignment of the insurance

policies…."[178]   The Insurance Claims Assignment is problematic.   Under the LMI Policies,

---

[175]    *Id*.  LMI's letter explains that the Debtor should object to the Objectionable Claims on the
following grounds: (1) failure to allege that the alleged perpetrator had the propensity to engage in
sexual abuse; (2) failure to allege that the Diocese had control over the alleged perpetrator or
religious institution at issue; (3) the proof of claim alleged abuse relating to Boy Scout activities;
(4) the proof of claim was untimely filed; and (5) the proof of claim failed to alleged sexual abuse.
*Id*.

[176]    On October 12, 2023, LMI filed a motion for an order to establish claim and disclosure
procedures to streamline LMI's objections to the Objectionable Abuse Claims. *See* Doc. No. 1489.
The Court denied this motion.  *See* Doc. No. 1572 at 59:20-23, 62:4.  On March 29, 2024, LMI
renewed their Procedures Motion, which the Court denied.  *See* Doc. 1774, Doc. No. 1887 at 84:7-
10.  On June 27, 2024, LMI filed a motion to seal and/or redact certain information contained in
objections to abuse proofs of claim.  *See* Doc. No. 2011.  The Court has not yet ruled on the motion
to seal.

[177]    *Id.*, § 8.2.7.

[178]    Disclosure Statement, Art. IX, ¶ B.7.a.

assignment of the LMI Policies requires LMI's consent.[179]  Currently, LMI do not consent to an

assignment of any interest under the LMI Policies.  Because LMI do not consent to the Insurance

Claims Assignment, the Plan violates the LMI Policies.  If confirmed, the Plan's breach would

void coverage under the LMI Policies. And if coverage is voided, the Trust's assets will be

diminished, reducing creditors' total recovery.  The Disclosure Statement should warn creditors of

this potential risk.  Hence, the Debtor should amend the Disclosure Statement in Art. XVIII to

include the following language:

> LMI contend that the Plan's assignment of insurance claims to the Trust would violate the
> LMI Policies.  According to LMI, the LMI Policies require LMI's consent to any
> assignment of any interest under the LMI Policies.  LMI assert that the Plan is proposing
> an assignment of interests without LMI's consent and such an assignment may void LMI's
> coverage obligations.  If LMI's coverage obligations are voided, then the insurance
> recoveries the Abuse Claimants may recover from the Trust may be reduced or completely
> eliminated.

Should the Debtor fail to include the above language, the Court should deny approval of the

Disclosure Statement.

> **(e)    The Disclosure Statement fails to disclose that the LMI Policies are
> executory contracts that must be assumed, and that adequate assurance
> of future performance must be provided by any assignee before any
> interest thereunder could be assigned.**

As stated in section III.A.(h) above, the LMI Policies are executory contracts.  The Debtor

must assume the LMI Policies, and the Trust must provide adequate assurance of future

performance before any assignment occurs under section 365.[180]  The Plan does not satisfy section

365.

To address this, the Plan Proponents should add the following statement to Art. IX, Sect.

B.4 of the Disclosure Statement:

> LMI contend that the LMI Policies are executory, that the Debtor must assume the LMI
> Policies, and that the Trust must provide adequate assurance of future performance of the

---

[179]    The LMI Policies require LMI's consent to assign any interest under the LMI Policies, as
follows: "ASSIGNMENT: Assignment of interest, under this Insurance shall not bind the
Underwriters until the Underwriters' consent is endorsed hereon."  *See* Doc. No. 22-5 at 4.

[180]    11 U.S.C. § 365(a).

Debtor's obligations under the LMI Policies before any interest under the LMI Policies can be assigned to the Trust.  Because the Plan does not provide for such assumption and assignment of the LMI Policies, LMI further contend that the Plan cannot be confirmed.

Absent the additional language, the Court should deny approval of the Disclosure Statement.

> **(f)    The Disclosure Statement is inadequate because it does not state who will satisfy the conditions precedent under the LMI Policies.**

The Disclosure Statement does not state who will perform the Debtor's and Participating Parties' conditions precedent under the LMI Policies.  These obligations include defense against Abuse Claims as a self-insurer,[181] utilization of a service organization,[182] notice,[183] cooperation,[184] access to books and records,[185] and LMI's association in the defense of claims.[186]  The Disclosure Statement does not explain the coverage consequences if these obligations are unsatisfied.  It also fails to explain the assumption of the LMI Policies.  Thus, to address these issues, the Debtor should add the following statement to Art. XVIII of the Disclosure Statement:

> LMI contend that the Debtor must satisfy material conditions precedent to coverage, including defense against Abuse Claims as a self-insurer, utilization of a service organization, notice, cooperation, access to book and records, and association in the defense of claims.  If such conditions are not satisfied, then the Trust may not have coverage under the LMI Policies.

Absent the above language, the Court should deny approval of the Disclosure Statement.

---

[181]    *See, e.g.*, *Syracuse*, Adv. No. 21-50005, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[182]    *Id.*, Doc. No. 22-3 (As a condition precedent to coverage, the LMI Policies require the Debtor to utilize a "service organization" to provide notice to excess insurers, administer claims, maintain records of claim details and payments, and furnish monthly claim reports.). Neither the Disclosure Statement nor Plan provide for the utilization of a service organization by the Trust.

[183]    *Id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[184]    *Id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

[185]    *Id.*, Doc. No. 22-5 at 1 (LMI Policy No. SL3551 (Part 5)).

[186]    *Id.*, Doc. No. 22-6 at 3 (LMI Policy No. SL3551 (Part 6)).

IV.    <u>**CONCLUSION**</u>

For the reasons sated above, the Court should deny approval of the Disclosure Statement.


Dated:  October 18, 2024                     Respectfully submitted,

                                             By: _/s/ Russell W. Roten_____
                                                 Russell W. Roten (*pro hac vice*)
                                                 Jeff D. Kahane (*pro hac vice*)
                                                 Andrew Mina (*pro hac vice*)
                                                 Nathan Reinhardt (*pro hac vice*)
                                                 Timothy W. Evanston (*pro hac vice*)
                                                 Duane Morris LLP
                                                 865 S. Figueroa Street, Suite 3100
                                                 Los Angeles, CA  90017-5450
                                                 Telephone: (213) 689-7400
                                                 Facsimile:  (213) 689-7401
                                                 Email: RWRoten@duanemorris.com

                                             By: _/s/ Catalina J. Sugayan_____
                                                 Catalina J. Sugayan (*pro hac vice*)
                                                 James Moffit (*pro hac vice*)
                                                 Brian Micic (*pro hac vice*)
                                                 Clyde & Co
                                                 30 S. Wacker Drive, Suite 2600
                                                 Chicago, IL 60606
                                                 Telephone: (312) 635-7000
                                                 Facsimile: (312) 635-6950
                                                 Email: catalina.sugayan@clydeco.us

                                             *Attorneys for London Market Insurers*