**Hearing Date & Time**: November 7, 2024 at 10:00 AM (Eastern)
**Objection Deadline**: October 18, 2024 at 12:00 AM (Eastern)
**Hearing Location**: 100 South Clinton Street, Syracuse, NY 13261

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
| THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK, | : | Case No. 20-30663-WAK |
| Debtor. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**THE CERTAIN INSURERS' OPPOSITION TO DISCLOSURE STATEMENT IN
SUPPORT OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
<u>REORGANIZATION</u>**

# Table of Contents

Page

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     FACTUAL BACKGROUND ..................................................................... 3

   A. APPROVAL OF THE DISCLOSURE STATEMENT FOR THE THIRD AMENDED PLAN .................. 3

   B. THE SUPREME COURT'S *PURDUE PHARMA* DECISION AND ITS IMPACT ON THIS CASE .......... 3

   C. THE FOURTH AMENDED PLAN ........................................................... 5

III.    ARGUMENT AND CITATION TO LEGAL AUTHORITY .................................. 6

   A. APPLICABLE LEGAL STANDARD .......................................................... 7

   B. IN *PURDUE PHARMA*, THE SUPREME COURT REQUIRED SOME MANIFESTATION OF CONSENT
      TO APPROVE NON-DEBTOR RELEASES ................................................... 8

   C. THE PLAN CONTAINS NUMEROUS PROVISIONS THAT RELEASE THE CERTAIN INSURERS'
      CLAIMS AGAINST NON-DEBTORS WITHOUT THEIR CONSENT ................................. 11

      1.   The Inbound Contribution Injunction and the Channeling Injunction Improperly
           Release the Certain Insurers' Third-Party Claims Against Non-Debtors ................ 11

      2.   The Release Proposed in the Plan Improperly Releases the Certain Insurers' Claims
           Against Non-Debtors Without Their Consent ......................................... 18

      3.   Section 8.8.3 of the Plan Improperly Limits the Certain Insurers' Entitlement to
           Relief on Claims Asserted Against Non-Debtors .................................... 19

      4.   The Plan's Exculpation Violates Purdue Pharma and is Otherwise Problematic .... 20

IV.     CONCLUSION .............................................................................. 22

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Duratech Indus., Inc.*,
241 B.R. 291 (Bankr. E.D.N.Y. 1999), *aff'd* 241 B.R. 283 (E.D.N.Y. 1999) ..........................7

*Harrington v. Purdue Pharma L.P.*,
219 L. Ed. 2d 721 (2024) ............................................................................... *passim*

*Harrington v. Purdue Pharma, L.P.*,
No. 23-124 (June 27, 2024) ...........................................................................................3

*In re Ionosphere Clubs, Inc.*,
179 B.R. 24 (S.D.N.Y. 1995)...........................................................................................7

*In re MF Glob. Holdings Ltd.*,
469 B.R. 177 (Bankr. S.D.N.Y. 2012) .........................................................................21

*In re Purdue Pharma, L.P.*,
633 B.R. 53 (Bankr. S.D.N.Y. 2021), *vacated*, 635 B.R. 26 (S.D.N.Y. 2021),
*rev'd and remanded sub nom.*, 69 F.4th 45 (2d Cir. 2023), *rev'd and*
*remanded sub nom.*, 219 L. Ed. 2d 721 (2024)....................................................8, 9

*In re Tonawanda Coke Corp.*,
No. 18-12156 CLB, 2024 Bankr. LEXIS 2032 (Bankr. W.D.N.Y. Aug. 27,
2024) ...........................................................................................................................8

*In re Wash. Mut., Inc.*
442 B.R. 314 (Bankr. D. Del. 2011) ...........................................................................19

**Statutes**

11 U.S.C. § 105...................................................................................................................14

11 U.S.C. § 363...................................................................................................................14

11 U.S.C. § 502.............................................................................................................12, 13

11 U.S.C. § 524.........................................................................................................10, 11, 14

11 U.S.C. § 1103(c) .......................................................................................................21, 22

11 U.S.C. § 1123(b)(6) .................................................................................................9, 10, 11

11 U.S.C. § 1125.............................................................................................................7, 21

11 U.S.C. § 1141 ................................................................................................................................14

Interstate Fire & Casualty Company and Fireman's Fund Insurance Company (collectively, "Interstate" or the "Interstate Insurers"), Certain Underwriters at Lloyd's, London, and London Market Companies (and as further defined in n.1, Dkt. No. 1830, "LMI"), and Hartford Fire Insurance Company ("Hartford" and collectively with the Interstate Insurers and LMI, the "Certain Insurers"), by and through their undersigned counsel, hereby object (this "Objection") to approval of the *Disclosure Statement in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York Dated September 13, 2024* [Dkt. No. 2173] (the "Disclosure Statement") filed by Debtor The Roman Catholic Diocese of Syracuse, New York (the "Debtor" or the "Diocese") on September 13, 2024, and the *Motion for Entry of an Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Fourth Amended Joint Plan and Consenting to Third Party Releases; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of Fourth Amended Joint Plan; and (VI) Granting Related Relief* [Dkt. No. 2178] (the "Disclosure Statement Motion") filed by the Debtor on September 16, 2024.  In support hereof, the Certain Insurers respectfully state as follows:

## I.      PRELIMINARY STATEMENT

1.      The Debtor and the Official Committee of Unsecured Creditors (the "Committee" and collectively with the Debtor, the "Plan Proponents") requested and received nearly two months from the Court to rewrite their plan to purportedly account for the Supreme Court's recent decision in *Harrington v. Purdue Pharma L.P.*, 219 L. Ed. 2d 721 (2024) ("*Purdue Pharma*") with respect to various non-debtor releases previously contained within the *Third Amended Joint Chapter 11*

*Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York Dated April 16, 2024* [Dkt. 1848] (the "Third Amended Plan").

2.      Thus, while the Plan Proponents' stated reason for the newly filed *Fourth Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York Dated September 13, 2024* [Dkt. 2172] (the "Plan" or the "Fourth Amended Plan") was to bring the Plan's releases and injunctions into compliance with the Bankruptcy Code in light of the *Purdue Pharma* decision,[1] it appears that the Plan Proponents have only attempted to comply with *Purdue Pharma* with respect to holders of Abuse Claims, but not any potential claims held by the Certain Insurers against non-debtors.[2]

3.      While Abuse Claimants have the ability to "opt out" of the non-debtor releases, the Certain Insurers do not receive a vote for or against the Plan.  Thus, the Certain Insurers have no vote with respect to confirmation or the non-debtor releases, injunctions, exculpations, or other relevant provisions contained within the Plan that release claims against more than two hundred non-debtor "Participating Parties."

4.      Without the ability to manifest consent to the non-debtor releases within the Plan, the Certain Insurers' third-party claims cannot be released as a matter of law and, consequently, the Plan possesses the same problematic non-consensual non-debtor releases that were prohibited by the Supreme Court in *Purdue Pharma.*  Thus, because the Plan does not comply with *Purdue Pharma*, the Plan is patently unconfirmable and should not be solicited.

---

[1] The Certain Insurers take no position on the proprietary of any non-debtor releases or injunctions as they pertain to the Abuse Claimants, including whether the Abuse Claimants are given an opportunity to consent to any non-debtor releases by "opting out" of them under the Plan.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Third Amended Plan or the Fourth Amended Plan, as appropriate.

## II.    FACTUAL BACKGROUND[3]

### A.    Approval of the Disclosure Statement for the Third Amended Plan

5.    On June 19, 2020 (the "Petition Date"), the Debtor initiated this Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  [Dkt. 1.]

6.    On May 2, 2024, the Court entered its *Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III) Approving the Forms of Ballots and Establishing Procedures for Voting on Plan; (IV) Approving the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and Confirmation of the Plan; and (VI) Granting Related Relief* (the "Prior Disclosure Statement Order").  [Dkt. 1859.]  Pursuant to the Prior Disclosure Statement Order, the Court set a confirmation hearing for the Third Amended Plan for September 16, 2024.

### B.    The Supreme Court's *Purdue Pharma* Decision and Its Impact on this Case

7.    On June 27, 2024, the United States Supreme Court issued its decision in *Harrington v. Purdue Pharma, L.P.*, No. 23-124 (June 27, 2024) whereby the Court held that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  *Purdue Pharma L.P.*, 219 L. Ed. 2d 721, 739.

---

[3]  The Certain Insurers incorporate by reference herein the factual and legal arguments set forth in *The Interstate Insurers' Objection to Approval of the Debtor's Disclosure Statement* [Dkt. 1639]; *The Interstate Insurers' Objection to Approval of Amended Disclosure Statement* [Dkt. 1753]; *The Certain Insurers' Objection to (I) Approval of the Second Amended Disclosure Statement and (II) Entry of the Accompanying Form of Order* [Dkt. 1793]; and *The Certain Insurers' (I) Response to the Revised Insurance Neutrality Language and Related Provisions of the Third Amended Plan and (II) Continued Objection to the Solicitation Procedures Order* [Dkt. 1831].

8.       In a letter to the Court dated July 1, Interstate and LMI raised a variety of concerns regarding the Third Amended Plan's compliance with the Supreme Court's *Purdue Pharma* decision, including that, among other things, the Third Amended Plan provided for broad third-party releases against numerous non-debtor "Participating Parties," including a Channeling Injunction prohibiting the assertion of claims against those non-debtor Participating Parties.  (*See e.g.*, Third Amended Plan, §§ 12.2, 12.3, 12.7, 12.8, 12.9.)  Consequently, Interstate and LMI asserted that the Third Amended Plan was "inherently unconfirmable" and requested supplemental briefing with respect to *Purdue Pharma's* impact on the Third Amended Plan.  [Dkt. 2022, p. 2.]

9.       In response to Interstate and LMI's July 1 letter, the Debtor filed a letter on July 24, in which it stated its belief that it was "in the best interests of the process for the Diocese and Committee to amend their" Third Amended Plan and the disclosure statement in support of the Third Amended Plan "solely to address the treatment of non-debtor releases in light of the changes brought by the *Purdue* decision."  [Dkt. 2111, p. 1.]  The Debtor indicated that it would submit a revised plan and disclosure statement no later than August 19.  [*Id.*]

10.      In a letter to the Court on August 7 [Dkt. 2125] and at a status conference scheduled the following day, counsel for the Debtor indicated that additional time was needed "to address the *Purdue* guidance while limiting the impact on the Joint Plan Provisions" and thus the Debtor and the Committee would file their amended plan "during the week of September 9, 2024."  [Dkt. 2125, p. 1.]  *See also Transcript of Hearing of Doc. No. 1961 – Section 105(a) Conference Re: Official Committee of Unsecured Creditors' Discovery Dispute and Doc. No. 1967 – Section 105(a) Conference Re: Parishes Discovery Dispute Before Honorable Wendy A. Kinsella, United States Bankruptcy Court Judge*, attached to the Declaration of Siobhain P. Minarovich ("Minarovich Decl.") as Exhibit 1, pp. 7:11-11:18.  (*See* Minarovich Decl., ¶ 4.)

C.    **The Fourth Amended Plan**

11.    On September 13, the Debtor filed its Fourth Amended Plan and the Disclosure Statement.

12.    The Plan contains, in relevant part, numerous injunctions, releases, and an exculpation, which are set forth generally in the Disclosure Statement:

**Exculpation**.  The Plan provides certain exculpation provisions which are typical and customary in chapter 11 plans.  The provisions provide that the Diocese, the Reorganized Diocese, the Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and entities will be released from certain of their acts and omissions that occurred from the Petition Date through the Effective Date, or in preparation of the Chapter 11 Case.  None of these parties will be exculpated from claims arising from the gross negligence, willful misconduct, fraud, or breach of the fiduciary duty of loyalty.

**Releases**.  The Plan Provides that the Participating Parties will be granted releases and a channeling injunction regarding certain claims, including all Abuse Claims.  If the Plan is confirmed, Abuse Claimants will not be able to recover directly from or pursue further litigation against the Participating Parties (except that some Litigation Claimants may be authorized to pursue Litigation Claims for limited purposes in accordance with the terms of the Plan), and Abuse Claimants' recoveries on account of their Abuse Claims will [be] limited by the terms of the Plan.

**Injunctions**.  The Plan provides for certain injunctions, including a channeling injunction which will channel certain Claims, including all Abuse Claims against the Diocese or any of the Participating Parties, into the Trust.  This means that any holder of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan.

(Disclosure Statement, § I(A) at pp. 3-4.)

13.    The aforementioned releases, injunctions, and exculpation adversely impact any potential claims held by the Certain Insurers against various non-debtors, including in section 12.2 (Injunction and Discharge of Abuse Claims and Inbound Contribution Claims, i.e., the "Inbound Contribution Injunction"), section 12.3 (Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties, i.e., the "Channeling Injunction"), section 12.7

(Release by Holders of Channeled Claims, i.e., the "Release"), and section 12.9 (Exculpation; Limitation of Liability, i.e., the "Exculpation").[4]  Additionally, section 8.8.3 contains additional limitations on the Certain Insurers' rights to assert their claims against non-debtors.

14.    On September 16, the Debtor filed its Disclosure Statement Motion, pursuant to which it sought a Court Order (i) approving the adequacy of the Disclosure Statement, (ii) approving solicitation packages and distribution procedures; (iii) approving the forms of ballots and establishing procedures for voting on the Plan; (iv) approving the form, manner, and scope of confirmation notices; (v) establishing certain deadlines in connection with approval of the Disclosure Statement and confirmation of the Joint Plan; and (vi) granting related relief.  (*See* Disclosure Statement Mot., pp. 1-2.)

15.    In a text order entered on September 18, following a status conference held the same day, the Court ordered the parties to file any objections to the Disclosure Statement Motion on or before October 18 and set a hearing on the Disclosure Statement Motion for November 7. [Dkt. 2184.]

16.    For the reasons set forth herein, the injunctions and releases contained within sections 12.2, 12.3, 12.7, and 12.9 of the Plan against non-debtors and the language limiting the Certain Insurers' rights with respect to claims against non-debtors in section 8.8.3 are impermissible under the Bankruptcy Code based upon the Supreme Court's decision in *Purdue Pharma*.  Consequently, the Court should deny the Disclosure Statement Motion and decline to approve the Disclosure Statement.

### III.    ARGUMENT AND CITATION TO LEGAL AUTHORITY

---

[4] The terms of the challenged injunctions, releases, and other plan provisions set forth in sections 8.8.3, 12.2, 12.3, 12.7, and 12.9 are set forth more fully herein.

## A.    **Applicable Legal Standard**

17.    The Bankruptcy Code sets forth that a disclosure statement must contain "adequate information" before the debtor may solicit acceptance of a plan of reorganization.  *See* 11 U.S.C. § 1125(b).  Adequate information is defined as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records. . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan, . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1).

18.    The bankruptcy court may require disclosure appropriate to the circumstances of each case.  *In re Ionosphere Clubs, Inc.*, 179 B.R. 24, 29 (S.D.N.Y. 1995).  The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan.  *In re Duratech Indus., Inc.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd* 241 B.R. 283 (E.D.N.Y. 1999).

19.    "An acceptance or rejection of a plan may not be solicited . . . from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).  "Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.  Consequently, the Court may decline to approve a disclosure statement that aims to solicit votes in favor of an unconfirmable plan."  *In re Tonawanda Coke Corp.*, No. 18-12156 CLB, 2024 Bankr. LEXIS 2032, at *3 (Bankr. W.D.N.Y. Aug. 27, 2024).

**B.**    **In *Purdue Pharma*, the Supreme Court Required Some Manifestation of Consent to Approve Non-Debtor Releases**

20.    In *Purdue Pharma*, the Supreme Court reversed the Second Circuit Court of Appeals and held that the Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Purdue Pharma*, 219 L. Ed. 2d at 739-40. This decision rejected the Chapter 11 plan of Purdue Pharma (together with several of its affiliates, the "Purdue Debtors"), which provided nonconsensual releases and injunctions for the benefit of the Purdue Debtors' non-debtor owners (the "Sacklers"). *See generally id.*

21.    Under control of the Sacklers, the Purdue Debtors in the mid-1990s began marketing OxyContin, an opioid medication, as a less addictive alternative to other opioids. *Id.* at 729.  But it later became apparent that OxyContin was highly addictive and prone to abuse.  *See id.*  Lawsuits against the Purdue Debtors (and, later, the Sacklers) followed.  *Id.*  As a result, the Purdue Debtors in 2019 sought bankruptcy relief to resolve their liability – and, ultimately, that of the Sacklers – for all present and future claims arising from the marketing and distribution of OxyContin.  *Id.* at 729-30.

22.    This eventually culminated in a Chapter 11 plan under which, among other things: (a) essentially all OxyContin-related claims against the (non-debtor) Sacklers would be released and enjoined (herein, the "Sackler Relief"); (b) the Sacklers would contribute $4.325 billion (later increased to roughly $6 billion) to fund a series of post-confirmation trusts for the benefit of the claimants; and (c) individual opioid victims' claims against the Purdue Debtors and the Sacklers would be channeled to the trusts, which would pay each claimholder anywhere from $3,500 "up to a ceiling of $48,000." *Id.* at 730.  The plan enjoyed substantial support among voting creditors – approximately 95% of the personal injury claimants that returned ballots voted to accept – and

8

the bankruptcy court ultimately confirmed it over the objections of the United States Trustee and others. *In re Purdue Pharma, L.P.*, 633 B.R. 53 (Bankr. S.D.N.Y. 2021), *vacated*, 635 B.R. 26, 71 (S.D.N.Y. 2021), *rev'd and remanded sub nom.*, 69 F.4th 45 (2d Cir. 2023), *rev'd and remanded sub nom.*, 219 L. Ed. 2d 721 (2024).

23.     But the district court later vacated the confirmation order, holding that the Bankruptcy Code "does not authorize a bankruptcy court to order the non-consensual release of third-party claims against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan." *Purdue Pharma*, 635 B.R. at 78. "After that setback," the Purdue Debtors, the Sacklers, and others appealed to the Second Circuit. *Purdue Pharma*, 219 L. Ed. 2d at 731. There, a divided panel reversed the district court and revived the confirmation order, concluding that §§ 105 (a) and 1123(b)(6) "provide[d] the statutory basis" for approval of the plan (including the Sackler Relief). *Purdue Pharma*, 69 F.4th at 73.

24.     The Supreme Court disagreed. It began with the text of section 1123(b)(6),[5] which provided that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of" Title 11. *Purdue Pharma*, 219 L. Ed. 2d at 733 (quoting 11 U.S.C. § 1123(b)(6)). Both the Purdue Debtors and the Second Circuit characterized this language as a permissive grant authorizing "*any* term not 'expressly forbid[den]'" by the Bankruptcy Code "as long as a bankruptcy judge deems it 'appropriate' and consistent with the broad 'purpose[s]' of bankruptcy" – a standard that they argued the Sackler Relief satisfied. *Id.* (quoting *Purdue*

---

[5] Although section 105(a) played a supporting role in the analysis below, all parties except the Sacklers conceded (and the Second Circuit itself recognized) that "§ 105(a) alone [could not] justify the imposition of nonconsensual third-party releases because it serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma*, 219 L. Ed. 2d at 733 n.2 (internal citations and quotations omitted). Thus, the Supreme Court's "focus train[ed] on § 1123(b)(6)." *Id.*

*Pharma*, 69 F.4th at 73-74 (emphasis and alterations in original)).  But their "understanding of the

statute face[d] an immediate obstacle": section 1123(b)(6) "is a catchall phrase tacked on at the

end of a long and detailed list of specific directions," and all of them "concern *the debtor*."  *Purdue*

*Pharma*, 219 L. Ed. 2d at 733-34 (emphasis in original).  Given this "obvious link" between

subparagraphs (1)-(5), the Supreme Court determined that "the catchall [11 U.S.C. § 1123(b)(6)]

cannot be fairly read to endow a bankruptcy court with the radically different power to discharge

the debts of a nondebtor without the consent of affected nondebtor claimants."  *Id.* at 734 (internal

citations and quotations omitted).

     25.    An analysis of "Chapter 11 more broadly" yielded the same conclusion, for two

main reasons.  *Id.* at 736.  First, reading section 1123(b)(6) to authorize the effective discharge of

a non-debtor "would defy" a number of limitations that apply to discharges in general.  *Id.*  For

example, the Bankruptcy Code provides only "the debtor – the entity that files for bankruptcy" –

with a release "from its debts" and an injunction against "future efforts to collect them" (i.e., a

discharge).  *Id.*  Further, the discharge awarded to a debtor is not "unbounded" in application or

scope: it "does not reach claims based on fraud or those alleging willful and malicious injury," and

the debtor must "come forward with virtually all its assets" to receive one.  *Id.*  The Sackler Relief

(and the expansive construction of section 1123(b)(6) that accompanied it) "transgress[ed] all these

limits."  *Id.*

     26.    Second, the Sacklers' expansive construction of section 1123(b)(6) ignored the

"notable exception to the code's general rules" on discharges, 11 U.S.C. § 524(g).  *Id.* at 736-37.

Applicable to "asbestos-related bankruptcies – and only [to] such bankruptcies" – section 524(g)

permits a court to "issue 'an injunction . . . bar[ring] any action directed against a third party' under

certain statutorily specified circumstances."  *Id.* (quoting 11 U.S.C. § 524(g) (second and third

alterations in original)).  Since that is the "*one* context" in which the Bankruptcy Code authorizes nonconsensual third-party plan injunctions, the Supreme Court reasoned that section 1123(b)(6) could not "afford courts [t]he same authority in *every* context."  *Id.* at 737.  From there, the Court easily concluded that "nothing in present law" permitted the Sackler Relief because the Bankruptcy Code "does not authorize a release and injunction that," as part of a Chapter 11 plan, "effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  *Id.* at 739-40.

27.     Based on the analysis set forth above, the Supreme Court reversed the Second Circuit's decision and remanded the case for further proceedings consistent with its opinion.  *Id.* at 740.

**C.    The Plan Contains Numerous Provisions that Release the Certain Insurers' Claims Against Non-Debtors Without Their Consent**

28.     Contrary to the Supreme Court's directives in *Purdue Pharma* and notwithstanding the professed reason for filing a Fourth Amended Plan, the Plan Proponents are seeking to confirm a Plan that releases, enjoins, and/or otherwise impairs claims held by the Certain Insurers without their consent.

**1.     The Inbound Contribution Injunction and the Channeling Injunction Improperly Release the Certain Insurers' Third-Party Claims Against Non-Debtors**

    a.     The Inbound Contribution Injunction Releases Claims Against Non-Debtors

29.     First, the Plan is unconfirmable because it contains at least two injunctions that prevent the assertion of claims against non-debtors.

30.     The first injunction prohibited by *Purdue Pharma* is the Inbound Contribution Injunction in section 12.2 of the Plan.  The Inbound Contribution Injunction provides:

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 BELOW OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ALL PERSONS SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS, KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETER OR NOT: (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKUPRTCY CODE; (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.**

(Plan, § 12.2.1)

31.    In relevant part, the Inbound Contribution Injunction enjoins "all Persons . . . from taking any action . . . for the purposes of asserting . . . or attempting to assert or enforce against the Diocese, the Reorganized Diocese, *or any Participating Party*, any Abuse Claim *or Inbound Contribution Claims* . . . that arise . . . from any action . . . of the Diocese, *any Participating Party*, or the Diocese's *or any Participating Party's Agents*." (*Id.* (emphasis added).)

32.    "Participating Parties" are non-debtors. The Plan defines "Participating Parties" as "all Parishes, all Schools, and those Other Catholic Organizations, and other Persons and entities listed on <u>Exhibit A</u> attached [to the Plan] who contribute Insurance Claims to the Trust and/or

contribute funds to the DOS Entities' Cash Contribution." (*Id.* at § 1.1.145.)  Although there is no "Exhibit A" attached to the Fourth Amended Plan, the Exhibit A attached to the Third Amended Plan includes 173 Parishes, 15 schools, and 33 Other Catholic Entities, none of whom have filed for bankruptcy.

33.     "Inbound Contribution Claims," which are precluded under the Inbound Contribution Injunction, are defined as "any Claim against the Diocese ***or any Participating Party*** asserting rights of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, allocation, reallocation, reimbursement, or any other direct, indirect or derivative recovery, arising from or related to any Abuse Claim." (*Id.* at § 1.1.90 (emphasis added).)  "Insurer Contribution Claims," which are presumably a subset of Inbound Contribution Claims (although this is not explicit within the Plan), are defined under the Plan as "any Claim held by an Insurer by which such Insurer may contend that it has paid more than its equitable or proportionate share of a Consenting Abuse Claim, whether expressed in terms of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, allocation, reallocation, reimbursement, or any other direct, indirect, or derivative recovery." (*Id.* at § 1.1.99.)

34.     Thus, the Inbound Contribution Injunction enjoins Inbound Contribution Claims, including Insurer Contribution Claims, that are held or may be held by the Certain Insurers against the 221 non-debtor Participating Parties identified in Exhibit A to the Plan.

35.     Further, the Plan effectively terminates such Inbound Contribution Claims because, as Channeled Claims, they are subject to the Release under the Plan.  (*See id.* at § 12.7; *see also infra* § III(C)(2).)  Moreover, the channeling of Inbound Contribution Claims or Insurer Contribution Claims "does not entitle the holder of such . . . Claim to a Trust Distribution." (Plan, § 12.5.1; *see also id.* at § 8.8.2(e); *infra* § III(C)(1)(b).)  Consequently, as Class 6 Claims they are

"Disallowed and extinguished and there will be no Distributions to [their] holders . . . on account of such . . . Claims." (*Id.* at p. 32 [presumptively meant to be § 2.3.6]; *see also id.* at § 1.1.42 (defining a "Class 6 Claim" as an Inbound Contribution Claim).

        b.     The Channeling Injunction Releases Claims Against Non-Debtors

36.    Similarly, the Channeling Injunction set forth in Section 12.3 of the Plan provides in relevant part:

> **IN CONSIDERATION OF THE UNDERTAKINGS OF THE PROTECTED PARTIES HEREIN, THEIR CONTRIBUTIONS TO THE TRUST, AND OTHER CONSIDERATION GIVEN, AND, WHERE APPLICABLE, PURSUANT TO THEIR RESPECTIVE SETTLEMENTS WITH THE DIOCESE AND TO FURTHER PRESERVE AND PROMOTE THE AGREEMENTS BETWEEN AND AMONG THE PROTECTED PARTIES, AND TO SUPPLEMENT WHERE NECESSARY THE INJUNCTIVE EFFECT OF THE DISCHARGE AS PROVIDED IN SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE, AND PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE:**
>
> > **(1)  ANY AND ALL CHANNELED CLAIMS ARE CHANNELED INTO THE TRUST AND SHALL BE TREATED, ADMINISTERED, DETERMINED, AND RESOLVED UNDER THE PROCEDURES AND PROTOCOLS AND IN THE AMOUNTS ESTABLISHED UNDER THIS PLAN, THE ALLOCATION PROTOCOL, AND THE TRUST AGREEMENT AS THE SOLE AND EXCLUSIVE REMEDY FOR ALL HOLDERS OF CHANNELED CLAIMS.**
> >
> > **(2)  ALL PERSONS WHO HAVE HELD OR ASSERTED, HOLD OR ASSERT, OR MAY IN THE FUTURE HOLD OR ASSERT, ANY CHANNELED CLAIMS, ARE HEREBY PERMANENTLY STAYED, ENJOINED, BARRED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES OF ASSERTING, ENFORCING OR ATTEMPTING TO ASSERT OR ENFORCE ANY CHANNELED CLAIMS AGAINST THE PROTECTED PARTIES, INCLUDING:**
> >
> > > **(I)  COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY CHANNELED CLAIM AGAINST ANY OF THE PROTECTED PARTIES OR AGAINST THE PROPERTY OF ANY OF THE PROTECTED PARTIES; . . .**

**(IV)   ASSERTING, IMPLEMENTING, OR EFFECTUATING ANY CHANNELED CLAIM OF ANY KIND AGAINST: (A) ANY OBLIGATION DUE ANY OF THE PROTECTED PARTIES; (B) ANY OF THE PROTECTED PARTIES; OR (C) THE PROPERTY OF ANY OF THE PROTECTED PARTIES; . . . [AND]**

**(VI)   ASSERTING OR ACCOMPLISHING ANY SETOFF, RIGHT OF INDEMNITY, SUBROGATION, CONTRIBUTION, OR RECOUPMENT OF ANY KIND AGAINST AN OBLIGATION DUE TO ANY OF THE PROTECTED PARTIES, OR THE PROPERTY OF ANY OF THE PROTECTED PARTIES.**

(*Id.* at § 12.3; *see also id.* at § 11.1.2 (stating as condition precedent to Plan confirmation that "[t]he Confirmation Order shall approve and implement the Channeling Injunction . . . set forth in Section 12 of the Plan.")

37.    Stated more succinctly, under the Channeling Injunction "any and all ***Channeled Claims*** are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under [the] Plan, the Allocation Protocol, and the Trust Agreement ***as the sole and exclusive remedy for all holders of channeled claims***."  (*Id.* at § 12.3 (emphasis added).)   Further, all holders of Channeled Claims are "permanently stayed, enjoined, barred, and restrained from taking any action . . . for the purposes of asserting, enforcing, or attempting to assert or enforce any ***Channeled Claims*** against the ***Protected Parties***."  (*Id.* (emphasis added).)

38.    The Plan defines "Channeled Claims," in relevant part, to mean "any . . . Inbound Contribution Claim . . . or any other Claim against the Diocese ***or any Protected Party*** arising from or related in any way to an Abuse Claim . . . ."  (*Id.* at § 1.1.27 (emphasis added).)   Moreover, "Protected Parties" are defined under the Plan as "the Diocese, the Reorganized Diocese, ***the Participating Parties***, the Settling Insurers, any Settling Insurer Covered Persons, and their respective Related Persons."  (*Id.* at § 1.1.160 (emphasis added).)   Thus, under the Channeling

Injunction any and all Claims against the Protected Parties are to be channeled into the Trust subject to "the sole and exclusive remedy" of being "treated, administered, determined, and resolved" pursuant to the Plan, the Allocation Protocol, and the Trust Agreement. (*Id.* at § 12.3.) And the Certain Insurers would be "permanently stayed, enjoined, barred, and restrained from taking any action . . . for the purposes of asserting, enforcing, or attempting to assert or enforce" their Claims against, among others, the Participating Parties. (*Id.*) Thus, as the Plan Proponents candidly admit, "any holder of a Claim that is channeled will no longer be permitted to pursue their Claim except as set forth in the Plan." (Disclosure Statement, § I(A) at pp. 2-3.)

39.     The Plan goes one step further to explicitly state that "the Channeling Injunction shall channel all Inbound Contribution Claims and all Insurer Contribution Claims, to the Trust," but "the channeling of an Inbound Contribution Claim or Insurance [sic] Contribution Claim does not entitle the holder of such Channeled Claim to a Trust Distribution." (Plan, § 12.5.1; *see also id.* at § 8.8.2(e) ("all Insurer Contribution Claims shall be channeled to the Trust in accordance with Section 12.5.1 of the Plan and no Insurer Contribution Claim shall be the basis for any affirmative recovery against the Diocese, the Reorganized Diocese, ***or any Participating Party***" (emphasis added).)

c.     The Inbound Contribution Injunction and the Channeling Injunction Are Non-Consensual and Their Various Carveouts are Invalid

40.     Both the Inbound Contribution Injunction and the Channeling Injunction have limited carveouts under section 12.2.2. (*See id.* at § 12.2.1 (Inbound Contribution Injunction applies "except as otherwise expressly provided in Section 12.2.2 below or in the Confirmation Order"); and *id.* at § 1.1.27 (Channeled Claims do not include "a Claim exempted from the injunctions set forth in Sections 12.2.1 and 12.3 of the Plan pursuant to Sections 12.2.2.a and 12.2.2.b of the Plan.")

41.    The first exception is irrelevant to the Certain Insurers because it only applies to Abuse Claimants, providing that the Channeling Injunction and the Inbound Contribution Injunction "shall not apply to prevent a Non-Participating Abuse Claimant [i.e., an Abuse Claimant who does not consent to non-debtor releases] from pursuing or enforcing his or her Non-Participating PP Abuse Claim (if any) against a Participating Party." (*Id.* at § 12.2.2.a.)

42.    The second exception applies to "Inbound Contribution Claims against a Participating Party by any Person who affirmatively indicates, by Filing a timely written objection to confirmation of the Plan, that they will not consent to having such Inbound Contribution Claim (if any) enjoined as contemplated in the Plan." (*Id.* at § 12.2.2.b.) Conversely, "[a]ny person who holds an Inbound Contribution Claim against a Participating Party . . . and who fails to File a timely written objection to confirmation of the Plan shall be conclusively deemed to consent" to the injunction set forth in Sections 12.2.1 [the Inbound Contribution Injunction] and 12.3 [the Channeling Injunction] and shall be bound thereby." (*Id.*) Holders of Class 6 Claims (i.e., Inbound Contribution Claims) are "deemed to consent to the injunctions and releases set forth in the Plan unless they File a timely objection to confirmation of the Plan in accordance with Section 12.2.2(b)." (*Id.* at § 3.3; *see also* Disclosure Statement, § IV(C)(2)(f) at p. 35.)

43.    Sections 12.2.2.b and 3.3 of the Plan are problematic because they violate *Purdue Pharma*. Even assuming that Insurer Contribution Claims are "Inbound Contribution Claims" and the Certain Insurers may avail themselves of section 12.2.2.b under the Plan, such provision is not a valid basis for imposing a non-debtor injunction and/or release in the plan context.

44.    For all the reasons set forth above, the Plan cannot be confirmed in its current form because both the Inbound Contribution Injunction and the Channeling Injunction operate as non-consensual third-party releases effectuated pursuant to a Chapter 11 plan.

**2.      The Release Proposed in the Plan Improperly Releases the Certain Insurers'
Claims Against Non-Debtors Without Their Consent**

45.      The Plan is also unconfirmable as a matter of law because it requires the Certain
Insurers to release third-party claims without their affirmative consent, even though such non-
consensual plan releases are explicitly prohibited under *Purdue Pharma*.

46.      The Plan releases all Channeled Claims that are subject to the Channeling
Injunction.

> **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS
> PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST
> EXTENT AUTHORIZED BY APPLICABLE LAW, ALL HOLDERS OF
> CHANNELED CLAIMS, INCLUDING CONSENTING ABUSE CLAIMS
> (THE "RELEASING PARTIES"), SHALL BE DEEMED TO PROVIDE A
> FULL RELEASE TO THE RELEASED PARTIES AND THEIR
> RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING
> TO THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE,
> THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES'
> BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION,
> DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE
> STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT,
> RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR
> ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE
> DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND
> PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF
> CONFIRMATION AND CONSUMMATION OF THIS PLAN, THE
> SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING
> RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS
> PLAN, THE BUSINESS OR CONTRACUTAL ARRANGEMENTS AMONG
> THE RELEASING PARTIES AND ANY RELEASED PARTY, OR ANY
> OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT,
> OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE
> DATE.**

(Plan, § 12.7.)

47.      The Release applies to "all holders of Channeled Claims," which include "any . . .
Claim against . . . any Protected Party," including the Participating Parties, "arising from or related
in any way to an Abuse Claim or any of the Settling Insurer Policies." (*Id.* at § 1.1.27 (defining

"Channeled Claims"); *id.* at § 1.1.160 (defining "Protected Parties").)  The holders of Channeled Claims are "Releasing Parties" who provide releases to all "Released Parties" including, among others, "the Participating Parties and their Related Persons."  (*Id.* at § 1.1.164.)  The Release applies to, among other things, "any and all claims relating to . . . the Participating Parties, . . . the conduct of . . . the Protected Parties' Businesses, . . . the business or contractual arrangements among the Releasing Parties and any Released Party, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Effective Date."  (*Id.* at § 12.7.)  Thus, the Release applies directly to non-debtors.

48.    The Release is problematic because the Certain Insurers, as holders of Insurer Contribution Claims and other Inbound Contribution Claims, have done nothing to manifest their consent to release (via the Plan) claims they hold or might hold against any non-debtor Released Parties.

49.    Finally, to the extent the Release extends to "the Reorganized Diocese and its Related Persons," it is improper because it releases entities that do not yet exist.  Thus, it is unclear what is being released or enjoined and why such release or injunction is necessary to the Plan.  *See In re Wash. Mut.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011) (post-confirmation entities "have not done anything yet for which they need a release" because they "will not even come into existence until the Plan is confirmed.").

50.    For each of the reasons set forth above, the Release is not authorized under the Bankruptcy Code, making the Plan inherently unconfirmable.

**3.      Section 8.8.3 of the Plan Improperly Limits the Certain Insurers' Entitlement to Relief on Claims Asserted Against Non-Debtors**

51.    The Plan is also problematic under *Purdue Pharma* because section 8.8.3 functions as a non-consensual third party release.

52.     Section 8.8.3 of the Plan states:

Notwithstanding anything to the contrary in Section 8.8.2, the sole remedy of any
Non-Settling Insurer for any failure by the Diocese, the Reorganized Diocese, or
any Participating Party to satisfy any Post-Effective Date Preconditions to
Coverage (if any) shall be limited to asserting any defenses to providing insurance
coverage under the applicable Non-Settling Insurer Policy and nothing in this Plan,
nor any acts or omissions by any of the Plan Proponents or their Related Persons as
part of the Chapter 11 Case, shall serve as a basis for any Non-Settling Insurer to
seek or be granted any affirmative relief against the Diocese, the Reorganized
Diocese, or any Participating Party.

(Plan, § 8.8.3; *see also* Disclosure Statement, § IX(H)(3) at p. 62.)

53.     Thus, under the Plan the Certain Insurers' "sole remedy" for the failure by "any

Participating Party" to satisfy "any Post-Effective Date Preconditions to Coverage" is limited to

"asserting any defenses to providing insurance coverage" and nothing within the Plan "shall serve

as a basis . . . to seek or be granted any affirmative relief against . . . any Participating Party." (*Id.*)

54.     This provision is a *de facto* release of claims against Participating Parties based on

their failure to satisfy Post-Effective Date Preconditions to Coverage.  By depriving the Certain

Insurers of the ability to seek affirmative relief, the Plan impermissibly modifies their claims

against the non-debtor Participating Parties without their consent in direct violation of *Purdue

Pharma*.  *See also In re MF Glob. Holdings Ltd.*, 469 B.R. 177, 193 (Bankr. S.D.N.Y. 2012)

(policy provisions "cannot be excised because doing so would rewrite the" consented-to policies).

**4.      The Plan's Exculpation Violates *Purdue Pharma* and is Otherwise Problematic**

55.     Finally, the Exculpation is inconsistent with the Supreme Court's holding in *Purdue

Pharma* because it entails nonconsensual non-debtor releases that apply to persons other than

estate fiduciaries, for whom exculpation is authorized pursuant to 11 U.S.C. §§ 1103(c) and

1125(e).

56.     Under the Exculpation:

20

**FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THIS CHAPTER 11 CASE OR (II) IN CONNECTION WITH THE PREPARATION AND FILING OF THIS CHAPTER 11 CASE, THE CONSUMMATION OF THIS PLAN, AND THE ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE CHANNELING INJUNCTION.**

(Plan, § 12.9.)

57.    The "Exculpated Parties" under the Plan include "the Diocese, the Reorganized Diocese, the Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and entities." (*Id.* at § 1.1.80.) Thus, the non-debtor Participating Parties and their Related Persons are all exculpated under the Plan and "will be released from certain of their acts and omissions that occurred from the Petition Date through the Effective Date, or in preparation of the Chapter 11 Case." (Disclosure Statement, § I(A) at p. 3.)

58.    The Exculpation is impermissibly broad because the definition of "Exculpated Parties" includes the Participating Parties and their Related Persons, entities who are not estate

fiduciaries and therefore are not entitled to exculpation under either section 1103(c) or 1125(e) of the Bankruptcy Code.

59.     Because the Plan includes various injunctions, releases, exculpations, and other provisions that "effectively seek[] to discharge claims against a nondebtor without the consent of affected claimants," it is entirely inconsistent with the Supreme Court's recent holding in *Purdue Pharma* and is unconfirmable as a matter of law.  *See Purdue Pharma*, 219 L. Ed. 2d at 739-40.

## IV.    **CONCLUSION**

WHEREFORE, the Certain Insurers respectfully request entry of an order (i) denying the Disclosure Statement Motion; (ii) denying approval of the Disclosure Statement; and (iii) granting to the Certain Insurers such other and further relief as the Court deems just and proper.

Dated: October 18, 2024

PARKER, HUDSON, RAINER & DOBBS LLP

By:    /s/ *Harris B. Winsberg*
       Harris B. Winsberg (admitted *pro hac vice*)
       Matthew M. Weiss (admitted *pro hac vice*)
       Matthew G. Roberts (admitted *pro hac vice*)
       303 Peachtree Street, Suite 3600
       Atlanta, GA 30308
       Telephone: (404) 523-5300
       Facsimile: (404) 522-8409
       hwinsberg@phrd.com
       mweiss@phrd.com
       mroberts@phrd.com

*-and-*

       PARKER, HUDSON, RAINER & DOBBS LLP
       Todd C. Jacobs (admitted *pro hac vice*)
       John E. Bucheit (admitted *pro hac vice*)
       Two N. Riverside Plaza, Suite 1850
       Chicago, Illinois 60606
       Telephone: (312) 417-3306
       Facsimile: (404) 522-8409
       tjacobs@phrd.com

jbucheit@phrd.com

*-and-*

WHITE AND WILLIAMS LLP
Siobhain P. Minarovich (704462)
810 Seventh Avenue, Suite 500
New York, NY 10019
Telephone: (212) 244-9500
Facsimile: (212) 631-1248
minarovichs@whiteandwilliams.com

*Attorneys for Interstate Fire and Casualty
Company and Fireman's Fund Insurance
Company*

DUANE MORRIS LLP

By: /s/ *Jeff D. Kahane*
Russell W. Roten (admitted *pro hac vice*)
Jeff D. Kahane (admitted *pro hac vice*)
Andrew Mina (admitted *pro hac vice*)
Nathan Reinhardt (admitted *pro hac vice*)
865 S. Figueroa Street, Suite 3100
Los Angeles, CA  90017-5450
Telephone: (213) 689-7400
Facsimile: (213) 689-7401
RWRoten@duanemorris.com
jkahane@duanemorris.com
amina@duanemorris.com
nreinhardt@duanemorris.com

*-and-*

CLYDE & CO US LLP
Catalina J. Sugayan (admitted *pro hac vice*)
Yongli Yang (admitted *pro hac vice*)
Brian Micic (admitted *pro hac vice)*
30 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Telephone: (312) 635-7000
Facsimile: (312) 635-6950
catalina.sugayan@clydeco.us
yongli.yang@clydeco.com
brian.micic@clydeco.us

*-and-*

CLYDE & CO US LLP
Peter C. Netburn (admitted *pro hac vice*)
265 Franklin Street, Suite 802
Boston, MA 02110
Telephone: (617) 728-0050
Peter.netburn@clydeco.us

*Attorneys for London Market Insurers*

By: */s/ Joshua D. Weinberg*
    Joshua D. Weinberg (Bar No. 704445)
    Annette P. Rolain (Bar No. 704493)
    RUGGERI PARKS WEINBERG LLP
    1875 K St NW, Ste. 600
    Washington, DC 20006
    Telephone: (202) 984-1400
    Facsimile: (202) 984-1401
    jweinberg@ruggerilaw.com
    arolain@ruggerilaw.com

*-and-*

    SUGARMAN LAW FIRM, LLP
    Michael Boisvert (Bar No. 700029)
    211 West Jefferson Street
    Syracuse, NY 13202
    Telephone: (315) 474-2943
    mboisvert@sugarmanlaw.com

*Attorneys for Hartford Fire Insurance Company*