UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

The Roman Catholic Diocese of Syracuse, NY.

Debtor.

_____

Case No. 20-30663

Chapter 11

**OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO DEBTOR'S MOTION
FOR ENTRY OF ORDER (I) APPROVING DISCLOSURE STATEMENT, (II)
APPROVING SOLICITATION PACKAGES AND DISTRIBUTION PROCEDURES, (III)
APPROVING THE FORMS OF BALLOTS AND ESTABLISHING PROCEDURES FOR
VOTING ON FOURTH AMENDED JOINT PLAN AND CONSENTING TO THIRD
PARTY RELEASES; (IV) APPROVING THE FORM, MANNER, AND SCOPE OF
CONFIRMATION NOTICES; (V) ESTABLISHING CERTAIN DEADLINES IN
CONNECTION WITH APPROVAL OF THE DISCLOSURE STATEMENT AND
CONFIRMATION OF THE FOURTH AMENDED JOINT PLAN;
AND (VI) GRANTING RELATED RELIEF**

TO: THE HONORABLE WENDY A. KINSELLA, UNITED STATES CHIEF BANKRUPTCY
    JUDGE:

William K. Harrington, the United States Trustee for Region 2 (the "United States

Trustee"), through counsel, respectfully submits this objection (the "Omnibus Objection") to the

Motion of the Roman Catholic Diocese of Syracuse, New York (the "Debor") for an *Order (I)*

*Approving Disclosure Statement, (II) Approving Solicitation Packages and Distribution*

*Procedures, (III) Approving the Forms of Ballots and Establishing Procedures for Voting on*

*Fourth Amended Joint Plan and Consenting to Third Party Releases, (IV) Approving the Form,*

*Manner, and Scope of Confirmation Notices, (V) Establishing Certain Deadlines in Connection*

*with Approval of the Disclosure Statement and Confirmation of the Plan, and (VI) Granting*

*Related Relief* (ECF Dkt. No. 2178) (the "Motion"). The Debtor's Motion seeks approval of the

Disclosure Statement (ECF Dkt. No. 2173) (the "Disclosure Statement") filed by the Debtor and

1

the Official Committee of Unsecured Creditors (the "Committee", collectively with the Debtor

referred to as the "Plan Proponents"), in support of the Fourth Amended Joint Plan of

Reorganization (ECF Dkt. No. 2172) (the "Plan") filed on September 13, 2024, by the Plan

Proponents.  In support thereof, the United States Trustee respectfully states as follows:

## I.    PRELIMINARY STATEMENT

A disclosure statement should not be approved if the plan it describes is unconfirmable on

its face, because approving the disclosure statement, soliciting votes on the plan, and proceeding to

a confirmation hearing would be a fruitless and wasteful exercise.  Here, the Debtor's proposed

Disclosure Statement should not be approved because it supports a Plan that is contrary to the

Bankruptcy Code, United States Supreme Court precedent, and applicable state law for the

following separate and independent reasons:

- The Plan provides non-consensual releases to non-debtor third parties of claims and
  causes of action held by claimants and other stakeholders, contrary to the United States
  Supreme Court precedent in *Harrington v. Purdue Pharma, L.P.*, 603 U.S. __, 144 S.
  Ct. 2071 (2024).

- The Plan inappropriately requires claimants to "opt out" or file an objection to the Plan
  to contest third-party releases.  (Opt-outs are not consent.)

- The Plan inappropriately coerces abuse claimants to "opt out" through a difficult and
  cumbersome process that punishes those who opt out of the releases by limiting
  distributions on such claimants' estate claims and curtailing claimants' litigation rights,
  if they choose to exercise their right to "opt out".

Accordingly, and for the additional reasons set forth herein, the United States Trustee

respectfully requests that the Court deny approval of the Disclosure Statement and deny

confirmation of the Plan.

## II.    BACKGROUND

### A.    General Facts

1.      On June 19, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief

under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for

the Northern District of New York (the "Court").  ECF Dkt. No. 1.  The Debtor is represented by

Bond, Schoeneck & King, PLLC.

2.      On July 9, 2020, pursuant to Section 1102 of the Bankruptcy Code, the United States

Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").

ECF Dkt. No. 38.  The Creditors' Committee employed as its counsel Stinson, LLP.

3.      The Debtor currently is operating its business and managing its affairs pursuant to

Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this

case.

### B.    The Plan and Disclosure Statement Process

4.      On December 6, 2023, the Debtor filed a Disclosure Statement in Support of Joint

Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York along

with a Joint Plan of Reorganization.  ECF Dkt. Nos. 1565, 1566.

5.      On January 16, 2024, the Debtor filed its Motion for entry of an Order (I) Approving

Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III)

Approving the Form of Ballot and Establishing Procedures for Voting on Plan; (IV) Approving the

Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in

Connection with Approval of the Disclosure Statement and Confirmation of the Plan; and (VI)

Granting Related Relief.  ECF Dkt. No. 1626.

6.      On February 8, 2024, the Court entered an Order Denying Approval of the Disclosure

Statement in Support of Joint Chapter 11 Plan of Reorganization.  ECF Dkt. No. 1664.

7.      On April 16, 2024, the Debtor filed a Third Amended Disclosure Statement in Support

of the Third Amended Joint Plan of Reorganization ("Third Amended Disclosure Statement") and a

Third Amended Joint Chapter 11 Plan of Reorganization.  ECF Dkt. Nos. 1818, 1817.

8.      The Court entered an Order approving the Third Amended Disclosure Statement on

May 2, 2024.

9.      On June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue*

*Pharma, L.P.*, 144 S.Ct. 2071 (2024).

10.     On September 13, 2024, the Debtor filed its Fourth Amended Joint Plan and Disclosure

Statement.  ECF Dkt. No. 2172, 2173.

## C.      Absence of Essential Documents

11.     The Disclosure Statement and Plan reference certain Exhibits and other documents that

have not been filed, including the List of "Participating Parties," referenced as "Exhibit A" to the

Plan.

## D.      Key Definitions and Provisions of Disclosure Statement and Plan

12.     The Plan defines "Released Parties" as follows:

> …(i) the Diocese and its Related Persons; (ii) the Reorganized Diocese and its Related
> Persons; (iii) the Participating Parties and their Related Persons; (iv) a Settling Insurer, but
> only to the extent that such Settling Insurer's liability arises out of liabilities covered by the
> Settling Insurer Policies; and (v) a Settling Insurer's Related Persons, but only to the extent
> such Person's liability arises out of liabilities covered by the Settling Insurer Policies;
> *provided, however*, that "*Released Parties*" shall not include: (i) any Person who
> perpetrated an act of Abuse; or (ii) any religious order, diocese, or archdiocese, unless such
> entity is identified as a Participating Party on Exhibit A.

Plan, § 1.1.164.

13.     The Plan defines "Related Person" as follows:

4

…with respect to any person or entity, such person's or entity's predecessors, successors, assigns, and present and former shareholders, members, affiliates, subsidiaries, employees, Agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such.

Plan, § 1.1.162

14.    The Plan defines "Protected Parties" as follows:

…the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, any Settling Insurer Covered Persons, and their respective Related Persons.

Plan, § 1.1.160

15.    The Plan defines "Channeled Claims," in relevant part, as follows:

… any Abuse Claim, Inbound Contribution Claim, Medicare Claim, Extra-Contractual Claim, or any other Claim against the Diocese or any Protected Party arising from or related in any way to an Abuse Claim or any of the Settling Insurer Policies, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy … .

Plan, § 1.1.27.

16.    Section 12 of the Plan sets forth the Plan's  injunction provisions (the "Injunction Provisions").  Section 12.1.1 of the Injunction Provisions describes the "General Injunction and Discharge" and provides for an injunction against bringing claims against the Diocese as follows (emphasis added):

***EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 BELOW***, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ***ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE,*** WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, ***THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT,***

5

***CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT,
OR OBLIGATION OF THE DIOCESE OR THE DIOCESE'S AGENTS,
BEFORE THE CONFIRMATION DATE***, OR THAT OTHERWISE AROSE
BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY,
ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST
ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE
CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED
UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY
LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i)
OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM
IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE
BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN;
OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ***ARE
PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE,
FROM*** (A) COMMENCING OR CONTINUING IN ANY MANNER ***ANY
ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY
SUCH CLAIM*** OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE
OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN
AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE
ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY
MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER
AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT
OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY
ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS
IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON
ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF
SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY
OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE
OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE
DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH
CLAIM.

17.     Section 12.2.1 of the Plan's Injunction Provisions describes the "Injunction and

Discharge of Abuse Claims and Inbound Contribution," which enjoins abuse claims and certain

contribution claims against the Diocese, the Reorganized Diocese, and any Participating Party, as

follows (emphasis added):

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 BELOW OR
IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ***ALL
PERSONS*** SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED
FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES
OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE
***AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY***

*PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS,* KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT: (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE; (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.

IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY.

18.    Section 12.2.2 provides for exceptions to the Injunction Provisions ("Injunction Exceptions"):

*Limited Exceptions to Injunctions.*

a. Non-Participating PP Abuse Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prevent a Non-Participating Abuse Claimant from pursuing or enforcing his or her Non-Participating PP Abuse Claim (if any) against a Participating Party.

b. Certain Inbound Contribution Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prohibit the pursuit or enforcement of an Inbound Contribution Claim against a Participating Party by any Person who affirmatively indicates, by Filing a timely written

objection to confirmation of the Plan, that they will not consent to having such
Inbound Contribution Claim (if any) enjoined as contemplated in the Plan. Any
Person who holds an Inbound Contribution Claim against a Participating Party,
whether or not Filed with the Bankruptcy Court or in any Abuse Action, and who
fails to File a timely written objection to confirmation of the Plan shall be
conclusively deemed to consent to the injunction set forth in Sections 12.2.1 and 12.3
and shall be bound thereby.

19.     Section 12.3 sets forth the Plan's provision concerning a channeling injunction for

Protected Parties that channels all Channeled Claims as defined above.  The Channeling Injunction

provides, among other things, that all Channeled Claims are channeled to a Trust and holders of

such claims are enjoined from taking any action, directly or indirectly (as further defined therein)

against the Protected Parties.

20.     Section 12.4 sets forth the Plan's provision concerning a Supplemental Settling

Insurer Injunction, which provides, among other things, that pursuant to insurance settlement

agreements, including certain settling insurers' purchase of applicable settling insurer policies

pursuant to section 363(g) of the Bankruptcy Code, Channeled Claims (including any claims of

Non-Participating Abuse Claimants as such claims for these purposes are not excluded from the

definition of Channeled Claims) are enjoined from taking any action, directly or indirectly, against

the Settling Insurers or Settling Insurer Polices.

21.     Section 12.7 of the Plan sets forth the Plan's provision concerning third-party

releases.  The release provision provides in relevant part as follows (emphasis added):

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE
CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY
APPLICABLE LAW, *ALL HOLDERS OF CHANNELED CLAIMS, INCLUDING
CONSENTING ABUSE CLAIMS (THE "RELEASING PARTIES")*, SHALL BE DEEMED TO
PROVIDE *A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE
PROPERTY FROM ANY AND ALL CLAIMS RELATING TO* THE DIOCESE, THE
PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE
PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION,
SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE
STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER
AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH

8

OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND
PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND
CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS
OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS
PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING
PARTIES AND ANY RELEASED PARTY, ***OR ANY OTHER ACT OR OMISSION,
TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE
BEFORE THE EFFECTIVE DATE.***

THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF
THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE
CLAIM THEY MAY HOLD, EACH CONSENTING ABUSE CLAIMANT WILL RELEASE
THE DIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE
ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.

FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE
APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS
SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT MAY NAME
THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO
ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS
LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT
THAT LITIGATION CLAIMANT'S RECOURSE IN SUCH CASE OR PROCEEDING SHALL
BE LIMITED TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND
ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST
ANY NON-SETTLING INSURERS.

NOTHING IN THIS SECTION 12.7 SHALL BE DEEMED TO RELEASE ANY NON-
PARTICIPATING PP ABUSE CLAIM A NON PARTICIPATING ABUSE CLAIMANT MAY
HAVE AGAINST A PARTICIPATING PARTY (IF ANY).

22.      Section 12.9 of the Plan sets forth the Plan's provision concerning exculpation (the

"Exculpation Provision").  The Exculpation Provision provides as follows:

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES
SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER
EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY
IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM THE
PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH THIS
CHAPTER 11 CASE OR (II) IN CONNECTION WITH THE PREPARATION AND FILING
OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR PURSUIT OF
CONFIRMATION OF A PLAN, THE CONSUMMATION OF THIS PLAN, AND THE
ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER
THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE GROSS NEGLIGENCE,
WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE FIDUCIARY DUTY OF
LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE SUBJECT TO
DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF COMPETENT

JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY SHALL BE
ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH
RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS PLAN.
WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE COMMITTEE,
THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR RESPECTIVE OFFICERS,
TRUSTEES, BOARDS, COMMITTEE MEMBERS, EMPLOYEES, ATTORNEYS, FINANCIAL
ADVISORS, EXPERTS, EXPERT WITNESSES, AND OTHER PROFESSIONALS SHALL BE
ENTITLED TO AND GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY
CODE AND THE CHANNELING INJUNCTION.

**E.     Claims Classification**

23.     The Disclosure Statement and Plan contain the following provisions with respect to

classification and specification of treatment of claims:

   i.   Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, and
        Professional Fee Claims are deemed to accept the Plan.

  ii.   Class 3 Pass-Through Claims are deemed to accept the Plan.

 iii.   Class 1 Secured Claims of KeyBank and NBT are entitled to vote.

  iv.   Class 4 (General Unsecured Claims) are entitled to vote.

   v.   Class 5 (Abuse Claims) are entitled to vote.

  vi.   Class 6 (Inbound Contribution Claims) are deemed to reject the Plan.

24.     Treatment of Class 5 Abuse Claims is bifurcated based on a claimant's status as either

(i) a Consenting Abuse Claimant, defined generally as a holder of an Abuse Claim who has not

affirmatively opted out of the consent to the releases and injunctions either on the Ballot or in an

objection to the Plan, or (ii) a Non-Participating Abuse Claimant, defined generally as a holder of

an Abuse Claim who has affirmatively withheld consent to the releases and injunctions either on

the Ballot or in an objection to the Plan.

25.      Section 4.3.1 of the Plan sets forth treatment of Consenting Abuse Claimants.  A

Consenting Abuse Claimant is required to elect in writing a treatment alternative either as a

Distribution Claimant or Litigation Claimant.

26.      As a Distribution Claimant, the Consenting Abuse Claimant would receive in full

satisfaction and discharge of its claim an amount determined by an Abuse Claim Reviewer and is

required to execute a Consenting Abuse Claim Release Agreement.

27.      As a Litigation Claimant, the Consenting Abuse Claimant would receive in full

satisfaction and discharge of its claim, rights to distributions from the Trust and, subject to relevant

provisions of the Plan, the right to litigate his or her Consenting Abuse Claim to determine the

amount of claim and the liability of a Protected Party for such claim.  A Litigation Claimant is

likewise required to execute a Consenting Abuse Claim Release Agreement and a Litigation

Claimant Agreement.

28.      If an Abuse Claimant fails to elect treatment either as a Distribution Claimant or

Litigation Claimant, the Plan provides that the Abuse Claimant will be treated as a Distribution

Claimant by default.

29.      Section 4.4 of the Plan sets forth treatment of Non-Participating Abuse Claims.  In full

satisfaction of his or her Non-Participating DOS Abuse Claim (defined as "that portion of any Non-

Participating Abuse Claim for with the Diocese is, or is alleged to be, liable"), a Non-Participating

Abuse Claimant would receive a distribution of $1,000 and the opportunity to establish entitlement

to further distributions as set forth in the Plan and the Allocation Protocol as a "Default

Distribution."

30.      To pursue further liability, and seek an additional distribution, a Non-Participating

Abuse Claimant is required to execute a Non-Participating Litigation Claimant Agreement.  After

successfully litigating a Non-Participating DOS Abuse Claim, notwithstanding any judgment or

settlement obtained by a Non-Participating Abuse Claimant, any recovery against the Diocese or

the Reorganized Diocese is limited to distributions provided for under the Plan and the Allocation

Protocol.  Distributions to Non-Participating Abuse Claimants under these provisions would be

further limited based on the timing of the Trust's termination, in an amount less than the Default

Distribution described above, and limited to a pro-rata portion of the Diocese Abuse claims

Settlement Sub-Fund allocable to the Non-Participating DOS Abuse Claim.

31.    In addition, Non-Participating Abuse Claimants are bound to the liability allocations as

set forth in the Plan unless they file an objection to confirmation of the Plan and establish by a

preponderance of the evidence that the acts or omissions of the Diocese or Participating Parties are

of a nature that would prohibit the Diocese or Participating Parties from being eligible for state law

liability limitations.

**F.    Voting & Ballots**

32.    As noted above, the Disclosure Statement references holders of claims in Class 1, Class

2, Class 4, and Class 5 as receiving a Ballot along with receipt of the Disclosure Statement.

33.    The Disclosure Statement references Plan provisions under which certain classes of

creditors are not entitled to vote, deemed to accept, or deemed to reject the Plan.  Unclassified

claim holders, such as administrative claims, priority tax claims, non-tax priority claims, and

professional fee claims are deemed to accept the Plan.  Class 3, Pass-Through Claims, are likewise

deemed to have accepted the Plan and will not vote.  Inbound Contribution Claims in Class 6 are

deemed to have rejected the Plan and are not entitled to vote.

34.    Notwithstanding a Class's non-voting status, the Disclosure Statement and Plan

provisions provide that all holders of claims and interests (excluding holders of Abuse Claims who

12

opt out of the release and channeling injunction provisions in the Plan) are bound by the release

provisions therein.

**G.    Quarterly Fees Payable to the United States Trustee Pursuant to 28 U.S.C. § 1930(a)(6)**

35.    With respect to quarterly fees payable to the United States Trustee pursuant to 28

U.S.C. § 1930(a)(6), as well as interest thereon under 31 U.S.C. § 3717, the Plan provides, in part,

as follows: In no event shall the payments made to the Trust pursuant to Sections 2, 5, 7 or 8 of this

Plan by any Person other than the Diocese be considered "disbursements" under 28 U.S.C. § 1930,

nor shall any payment made by the Trust to any Person be considered a disbursement under 28

U.S.C. § 1930.

**H.    The Proposed Order**

36.    The Motion seeks entry of an order in the form attached as **Exhibit A** to the Motion

("Proposed Disclosure Statement Order").  Proposed Disclosure Statement Order includes

additional exhibits, including ballots and notices.

37.    Proposed Disclosure Statement Order *Exhibit 2* is a Ballot for distribution to Claims

in Class 1, Class 2, and Class 4 ("Ballot").

38.    Proposed Disclosure Statement Order *Exhibit 3* is a Ballot for distribution to Claims

in Class 5 ("Abuse Claims Ballot").

39.    The Abuse Claims Ballot includes an additional form titled "Optional Release and

Injunction Election Form."  The Optional Release and Injunction Election Form informs Abuse

Claimants that the submission of the form is optional, but that they will be treated as a Consenting

Abuse Claimant if they do not complete or return the form or otherwise file a timely objection to

confirmation of the Plan.  In other words, Abuse Claimants will need to "opt out" of the release and injunction provisions in order to avoid them being imposed upon them.

40.     The Optional Release and Injunction Election Form contains two options for Abuse Claimants:

---

**CHECK ONLY ONE BOX**

**I wish to be treated as a Consenting Abuse Claimant and to maximize my recovery under the Joint Plan:**

☐   I wish to receive the maximum amount of distributions available to me under the Joint Plan and consent to the release and injunction provisions in the Joint Plan.

**I wish to be treated as a Non-Participating Abuse Claimant and to receive a smaller distribution under the Joint Plan:**

☐   I understand that by selecting this option, I will not be eligible to receive any portion of the $50 million the Participating Parties are contributing to the Abuse Claims Settlement Fund, and my distributions under the Joint Plan will be less (possibly significantly less) than what I would otherwise receive as a Consenting Abuse Claimant.  I further understand that by selecting this option I may cause the Joint Plan to fail.  If the Plan fails, I may receive no distribution and other Abuse Claimants may receive no distribution as a result of this election.

---

41.     Exhibit 5 of the Proposed Order is the Notice of Non-Voting Status, which identifies "Non-Voting Classes" as holders of either (i) an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Professional Fee Claim, or U.S. Trustee Fee Claim, (ii) a pass-through claim, or (iii) an Inbound Contribution Claim.

42.     The Non-Voting Classes are not entitled to vote but are conclusively presumed to consent to certain releases, exculpations, and injunctive relief in the Plan.

43.     Parties receiving the Notice of Non-Voting Status will not receive the full solicitation package; instead, according to the Motion, the Non-Voting Classes will not be provided with a Ballot, copies of the Disclosure Statement, Plan, or the order approving the Disclosure Statement.

14

### III.    ARGUMENT

### A.    The Disclosure Statement Fails to Comply with Legal Standards

Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain

"adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also In re Quigley*

*Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  The Bankruptcy Code defines "adequate

information" as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in
> light of the nature and history of the debtor and the condition of the debtor's books
> and records, including a discussion of the potential material Federal tax consequences
> of the plan to the debtor, any successor to the debtor, and a hypothetical investor
> typical of the holders of claims or interests in the case, that would enable such a
> hypothetical investor of the relevant class to make an informed judgment about the
> plan, but adequate information need not include such information about any other
> possible or proposed plan and in determining whether a disclosure statement provides
> adequate information, the court shall consider the complexity of the case, the benefit
> of additional information to creditors and other parties in interest, and the cost of
> providing additional information.

11 U.S.C. § 1125(a)(1); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re*

*Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *In re Adelphia Commc'ns Corp.*, 352

B.R. 592, 596 (Bankr. S.D.N.Y. 2006); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y.

1999).

Section 1125(b) of the Bankruptcy Code requires the Bankruptcy Court to find that the

disclosure statement contains "adequate information" before a debtor is allowed to solicit its plan.

11 U.S.C. § 1125(b).  The disclosure statement requirement of section 1125 is "crucial to the

effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest

disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d

355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida*

*Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).  "Adequate information" under section 1125 is

15

"determined by the facts and circumstances of each case." *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)). The "adequate information" requirement is designed to help creditors in their negotiations with the Debtor over the plan. *See Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (3d Cir. 1988).

The "adequate information" requirement merely establishes a floor, and not a ceiling, for disclosure to voting creditors. *In re Adelphia*, 352 B.R. at 596 (citing *Century Glove,* 860 F.2d at 100). Once the "adequate disclosure" floor is satisfied, additional information can go into a disclosure statement as long as the additional information is accurate, and its inclusion is not misleading. *Adelphia*, 352 B.R. at 596. The purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan. *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y. 1999), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999). The disclosure statement must inform the average creditor what it will receive and when and what contingencies might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

Moreover, Section 1129(a)(2) conditions confirmation of a plan upon compliance with applicable Code provisions. The disclosure requirement of Section 1125 is one of those provisions. *See* 11 U.S.C. § 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000). Therefore, a disclosure statement should not be approved if the plan it describes is unconfirmable on its face, because approving the disclosure statement and proceeding to a confirmation hearing would be a fruitless exercise. *In re Dow Corning Corp.*, 237 B.R. 380 (Bankr. E.D. Mich. 1999); *In re 266 Washington Assoc.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re H.K. Porter Co.*, 156 B.R. 16 (W.D. Pa. 1993); *In re Monroe Well Service*, 80 B.R. 324 (Bankr. E.D. Pa. 1987); *In re Valrico Square Ltd. P'ship*, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990); *John Hancock Mutual*

16

*Life Insurance Company v. Route 37 Business Park Associates*, 987 F. 2d 154 (3d Cir. 1993).

Judge Bucki recently stressed this point in denying approval of the disclosure statement in *In re Tonawanda Coke Corp.*, No. 18-12156, Decision and Order (Bankr. W.D.N.Y. Aug. 27, 2024). "[T]he proponent of a plan may not solicit its acceptance unless there is transmitted to creditors 'the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information.'" *Id*. at 1 (citing Section 1125(b)). "Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed." *Id*.

The United States Trustee submits that the Disclosure Statement should not be approved because it "aims to solicit votes in favor of an unconfirmable plan." *Id*.

**B.      The Plan is Unconfirmable Because it Provides Nonconsensual Third-Party Releases**

1.      <u>The Bankruptcy Code Does Not Authorize Nonconsensual Third-Party Releases</u>

Nonconsensual third-party releases are not authorized under the United States Bankruptcy Code. *Harrington v. Purdue Pharma, L.P.*, 144 S.Ct. 2071, 2082-88 (2024) (referred herein as *"Purdue"* or *"Purdue Pharma"*).

The Plan contains nonconsensual third-party releases to which certain creditors and stakeholders have no ability whatsoever to consent to or even opt out of, contrary to applicable law.

The Channeling Injunction and the Plan's treatment of Channeled Claims is an explicit example of such impermissible releases. The Channeling Injunction protects the Participating Parties, and a host of others, from past and future liability, by barring non-debtor third parties from bringing claims against them, without affirmative consent of all affected creditors. Regardless of their consent, under Plan Section 12.7, all holders of Channeled Claims are subject to the release. This is a definitive nonconsensual, third-party release, and the Court has no authority to approve it.

17

Channeled Claims include, among others, any Inbound Contribution Claim, Medicare Claim, and Extra-Contractual Claim.  As a Class 6 Claim, Inbound Contribution Claims are not entitled to vote.  Unless a creditor holding an Inbound Contribution Claim files a written objection to the Plan, they are deemed to consent to the Plan and the release and injunction provisions.  But these creditors will not even receive a copy of the Plan or Disclosure Statement to understand its provisions.

A Medicare Claim is a claim by the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services relating to payments in respect of an Abuse Claim, which include claims for reimbursement of payments made to Abuse Claimants who receive distributions from the Trust.  *See* Plan § 1.1.120.   The Plan does not specifically address the class or voting status of the holder of a Medicare Claim.  However, based on the Plan's explanation of Medicare Procedures, regardless of whether or not the holder of a Medicare Claim approves, rejects, or objects to the Plan, Protected Parties, Settling Insurers, and the Trust are relieved of any Medicare reporting obligations of Medicare Claims, and Protected Parties are indemnified by the Trust from Medicare Claims.  *See* Plan 4.12.  Furthermore, Medicare Claims are forced into the channeling injunction process and subject to the control of the Trustee, and enjoined from pursuing any of their rights or remedies against various third parties including, among others, the Protected Parties and the Settling Insurers — without their consent.

Extra-Contractual claims are likewise bound by the Channeling Injunction and are simply released for all claimants irrespective how the creditors holding such claims vote with respect to the Plan or whether they opt out of the releases and injunctions contained in the Plan.

Notwithstanding their status, Inbound Contribution Claims, Medicare Claims, and Extra-Contractual Claims are bound by the terms of the Channeling Injunction and the holders

18

of such claims are enjoined from pursuing such claims against various third parties, without

their consent.

Accordingly, the Plan contains nonconsensual third-party release claims for which the

Bankruptcy Court has no authority to approve as held by the Supreme Court in *Purdue*.

2.    <u>The Plan Inappropriately Extracts Non-Consensual Releases from Abuse Claimants</u>

The Plan Proponents attempt to circumvent the *Purdue Pharma* decision by proposing the

Plan, which would have this Court treat inaction and silence (indeed, even inadvertence) as an

expression of consent.  The United States Trustee objects.  Consent requires an express

manifestation of agreement.  The Court should require the Plan Proponents to remove the non-

consensual release provisions or require the Plan Proponents to obtain actual consent to third-party

releases.

Contract principles govern whether a release is consensual. *See In re Smallhold, Inc.*, No.

14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024); *In re SunEdison, Inc.,* 576

B.R. 453, 458 (Bankr. S.D.N.Y. 2017).  That is because a third-party release is essentially a

settlement between a non-debtor claimant and another non-debtor.

Whether parties have reached an agreement—including an agreement not to sue—is

governed by state law.  The only exception is if there is federal law that preempts applicable state

contract law.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416

(2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of

decision or authorizes a federal court to supply one, 'state law must govern because there can be no

other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

To establish consent in this context requires review under state law.  *See In re Tonawanda

Coke Corp.,* 662 B.R. 220, No. 18-12156 CLB, 2024 WL 4024385 (Bankr. W.D.N.Y. Aug. 27,

2024).  With no authority provided for under the Bankruptcy Code, a proposal for a non-debtor release is governed by state law and becomes a contract upon acceptance and consent.  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 2024 WL 4024385 at *2.  Judge Bucki, citing to New York statutory authority, ruled succinctly that failure to opt out of the agreement will not suffice to bind a creditor.  *Id.*  "An agreement, promise or undertaking to change or modify, or to discharge in whole or in part, any ... obligation ... shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such ... obligation ... shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent."  *Id.* (citing N.Y. GEN. OBLIG. LAW § 5-1103 (McKinney 2022)).

In *In re Ebix*, the court likewise found that the release of a non-debtor's claims against another non-debtor is "more accurately construed as one of contract between those non-debtor parties."  *In re Ebix, Inc.*, No. 23-80004, Aug. 2, 2024 Hr'g Tr. 15  (Bankr. N.D. Tex. Aug. 2, 2024) (citing *In re Wool Growers Central Storage*, 371 B.R. 768; *In re SunEdison*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017)).  "Once consent is viewed from a contractual perspective … it is exceedingly difficult to construe the failure to opt out of a third-party release as valid consent."  *Id.*

No federal law applies to the question of whether the nondebtor Releasing Parties have agreed to release the non-debtor Released Parties.  The Bankruptcy Code does not apply to agreements between non-debtors.  And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not exist under state law.  Nor does 11 U.S.C. § 105(a) confer any power to override state law.   Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue Pharma, L.P.*, 144 S. Ct.

20

at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Code.

Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."). *See also Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) ("[T]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual. *See, e.g.*, *In re Smallhold, Inc.*, 2024 WL 4296938, at *11 (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *Patterson v. Mahwah Bergen Retail Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity

21

of the releases requires affirmative consent"); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr.

S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor

consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J.

1997) (holding that a third-party release "is no different from any other settlement or contract"); *id*.

at 507 (holding that "the validity of the release . . . hinge[s] upon principles of straight contract law

or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal

quotation marks omitted) (alterations in original).  As one court recently held, because "nothing in

the bankruptcy code contemplates (much less authorizes it)' . . . . any proposal for a non-debtor

release is an ancillary offer that becomes a contract upon acceptance and consent."  *In re*

*Tonawanda Coke Corp*., 662 B.R. 220, 2024 WL 4024385, at *2 (quoting *Purdue*, 144 S. Ct. at

2086).  Accordingly, "any such consensual agreement would be governed by state law."  *Id.*

      Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties

will expressly consent to release their property rights nor to having that release memorialized in the

Plan.

      The "general rule of contracts is that silence cannot manifest consent."  *Patterson v.*

*Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 686 (E.D. Va. 2022). "Acceptance by silence is

exceptional.  Ordinarily an offeror does not have power to cause the silence of the offeree to

operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

      "[T]he exceptional cases where silence is acceptance fall into two main classes: those where

the offeree silently takes offered benefits, and those where one party relies on the other party's

manifestation of intention that silence may operate as acceptance.  Even in those cases the contract

may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69

cmt. a (1981).

Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *See also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out). Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981). *See also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted).

Applicable state contract law cannot be disregarded on a default theory, applied by some courts, that creditors who remain silent forfeit their rights against nondebtors because they received notice of the nondebtor release, just as they would forfeit their right to object to a plan if they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at *8-*11.

As the Court in *Smallhold* explained, the Supreme Court's *Purdue* decision undermined the fundamental premise of such a theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against nondebtors, so they had best pay attention lest they risk losing those rights. *Smallhold, Inc.*, 2024 WL 4296938, at *1-2; *see also id*. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). Under the default theory, because pre-*Purdue* a chapter 11 plan under certain circumstances under

23

certain circuit-level decisions could permissibly include nonconsensual, non-debtor releases, non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights.  *Id*. at *10.  A failure to opt out under the default theory is not truly consent, but rather "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection."  *Id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

But entering relief against a party who defaulted by not responding is, "[u]nder established principles" permissible "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation."  *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.  [After *Purdue*], that is no longer the case in the context of a third-party release.").  It is now clear in all circuits that imposition of a non-debtor release is not available relief through a debtor's chapter 11 plan.  *Id*. at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."); *see also id*. at *10.  Thus, *Smallhold* held that "it is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id*. at *10.

The *Smallhold* court provided an illustration that makes obvious why notice-plus-failure-to-opt out is not consent:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor.  Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never

24

returned a ballot could properly be subject to a legally enforceable obligation to make the
$100 contribution.

*Id*. at *2 (footnote omitted).

Cases that impose a non-debtor release based merely on the failure to opt out do not
"provide[] any limiting principle that would distinguish the third-party release from the college
education fund plan. And after *Purdue Pharma*, there is none." *Id*.  Thus, "ordinary contract
principles" apply to determine whether there is consent to a non-debtor release.  *Id*. at *3.

Just like it is legal error to define consent in a manner inconsistent with state law, it is error
to presume it exists.  As discussed above, consent arises when two sets of parties affirmatively
assent to something. *See* 1 Voss on Delaware Contract Law § 2.05 (citing *Loveman v. The
NuSmile, Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at *7 (Del. Super. Ct. Mar. 31, 2009) (Brady,
J.)). A party seeking to include non-debtor releases in a bankruptcy plan must show that they are
consensual.  To do so, state law requires that mutually agreeing third parties must come forward,
state their consent affirmatively, and ask the court to memorialize their consent in a plan.  Nothing
in the Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the
bounds of state law.

Here, as proposed by the Plan Proponents, an Abuse Claimant can "opt out" of the proposed
releases and injunctions only by completing and submitting the Optional Release and Injunction
Election Form.  If an Abuse Claimant fails to return the Optional Release and Injunction Election
Form indicating his or her election to opt out of the releases and injunctions, the Abuse Claimant is
compelled to release a claim, whether or not the claimant voted for the Plan.

In this case, there are many reasons an Abuse Claimant would not return the optional form
without intending to agree to the non-debtor release.  For one, the form contains language that is
unclear and ambiguous.  It is described as "optional" which makes it seem like something the

25

claimant need not even read.  In addition, the Optional Release and Injunction Election Form is

separate from the Ballot, making it less likely for claimants to return once they have completed

their Ballot selection.  But, as discussed further below, it is the language itself that may most

discourage Abuse Claimants from opting out:  that by electing to be treated as a Non-Participating

Abuse Claimant, the claimant "may cause the Joint Plan to fail" and if the Plan fails, the claimant

"may receive no distribution and other Abuse Claimants may receive no distribution" as a result of

their election.  Consent cannot be imputed from the failure of a creditor to make an opt-out

election, particularly when the Bankruptcy Code and other applicable law do not require creditors

to take action to avoid releasing a non-debtor.

An affirmative agreement—something more than the failure to opt out—is required to

support a consensual third-party release.  *See Smallhold,* 2024 WL 4296938, at *3 ("[A] creditor

cannot be deemed to consent to a third-party release without some affirmative expression of the

creditor's consent."); *see also id*. at *8; *In re Tonawanda Coke Corp.,* 662 B.R. 220; *Patterson*, 636

B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the

exceptions to the rule that silence is not consent applies, such as conduct by the offeree that

manifests an intention that silence means acceptance or taking the offered benefits.  For example,

the *Patterson* court, in applying black letter contract principles to opt-out releases in a chapter 11

plan, found that contract law does not support consent by failure to opt out.  *Patterson*, 636 B.R. at

686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not,

because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.  Because the

Plan forces third-party releases on these parties without their affirmative consent, the releases are

non-consensual and cannot be approved under *Purdue.*

The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement.  *Norcia*, 845 F.3d at 1282.  Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number."  *Id*.  It also stated that opting out would not affect the warranty coverage.  *Id*.  The customer did not take any steps to opt out.  *Id*.  When the customer later sued Samsung, Samsung argued that the arbitration provision applied.  *Id*. at 1282-83.

As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer.  Samsung is not a signatory."  845 F.3d at 1290.  That is even more true in the context of a chapter 11 plan.  Not only are the nondebtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors.  As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors.... [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators."  *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

27

The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not

constitute consent to arbitrate.  Unsurprisingly—because there was no applicable federal law—the

court applied the "general rule," applicable under California law, that "silence or inaction does not

constitute acceptance of an offer."  845 F.3d at 1284 (quotation marks omitted); *accord Southern*

*Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969).  The customer did not agree

to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his

intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement."

*Norcia*, 845 F.3d at 1285 (quotation marks omitted).  This was true, even though the customer *did*

take action to accept the offered contract from Verizon Wireless.  "Samsung's offer to arbitrate all

disputes with [the customer] cannot be turned into an agreement because the person to whom it is

made or sent makes no reply, even though the offer states that silence will be taken as consent,

unless an exception to this general rule applies."  845 F.3d at 1286 (quotation marks and citation

omitted).

The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to

respond or when the offeree retains the offered benefits but held neither exception applied.  *Norcia*,

845 F.3d at 1284-85.  There was no state law imposing a duty on the customer to act in response to

the offer, the parties did not have a prior course of dealing that might impose such a duty, and the

customer did not retain any benefits by failing to act given that the warranty applied whether or not

he opted out of the arbitration provision.  *Id*. at 1286.

Here, too, the Debtor's creditors have not signed an agreement to release the non-debtor

releasees.  Nor may consent be inferred from their silence because they have no duty to respond to

the offer of a non-debtor release and they have not retained any benefits offered in exchange for it.

Here, the Plan imposes non-debtor releases on those Abuse Claimants, who vote to accept the plan or vote to reject the Plan, unless they complete the Optional Release and Injunction Election Form.

First, merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). While voting on a plan may be an affirmative act, it is not an act that manifests consent to release non-debtors, and thus not a "*manifestation of intention* that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). Creditors have no affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). And as in *Norcia*, creditors have no state law duty to respond to an offer to release nondebtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released nondebtors that would impose such a duty. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

Nor are those who vote for the plan but fail to opt out "silently tak[ing] offered benefits" from the released non-debtors, *id.*, such that consent may be inferred. The only benefits received are through distributions from the debtor's chapter 11 plan—there are no benefits provided from the released non-debtor to the releasing claimant. And because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of

29

those distributions.  *See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied regardless of failure to opt out).  Further, acceptance of a "benefit"—distributions under the plan—that the offeror had no right to refuse the offeree does not manifest acceptance of the offer.  *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co*., 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

Similarly, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that the failure to opt out of a third-party release does not constitute the requisite affirmative consent to bind the releasing party under contract law. *Patterson*, 636 B.R. at 686.  "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent."  *Id*. at 688.

Second, for the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out.  It is inconceivable that a party would be consenting to a release of a third party if it votes to reject the Plan but merely through silence by failing to complete the "opt out" box on the Optional Release and Injunction Election Form they will be deemed to consent to the nondebtor release.  *See Chassix*, 533 B.R. at 79.  Not only is there no "mutual agreement" as to the Plan, much less the third-party release, the creditor has actually expressly stated its rejection of the Plan.  As the court in Chassix said, " a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***" *Id.* at 79 (emphasis added).

30

The United States Trustee recognizes that the court in *Smallhold* found that the act of voting on a plan combined with a failure to opt out can constitute consent to a non-debtor release.  *See Smallhold*, 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent.  In *Smallhold*, the court reasoned that consent existed because the act of voting is an "affirmative step" taken after being told that failing to opt out would bind the voter to the nondebtor release.  *Smallhold,* 2024 WL 4296938, at *14.  But while voting is an "affirmative step" with respect to the debtor's plan, merely voting on a plan does not manifest consent to the non-debtor release for the reasons discussed above.  Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the nondebtor release.[1]  As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form.  Restatement (Second) of Contracts § 69 cmt. a (1981).  Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the nondebtor release.  Just like the hypothetical creditors in *Smallhold*

---

[1] Notably, the Ninth and Second Circuit cases *Smallhold* cited do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent.  *Smallhold,* 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  Those cases emphasize the importance of notice as a prerequisite to consent and explain the requirements for when someone can be deemed on "inquiry notice" of terms they did not read.  *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75.  But whether there is sufficient notice is a distinct question from whether there has been a manifestation of an intent to accept an offer.  *See, e.g., Meyer*, 868 F.3d at 74 ("[A]n offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.") (internal quotation marks omitted; emphasis added).  While notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient.  There must also be a manifestation of consent.

could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.

The *Smallhold* court thus erred by failing to consider whether any of the exceptions to the state-law rule that silence is not consent apply in this context. For the reasons discussed above, they do not. State law affords no basis to conclude that consent to release *third-party* claims can properly be inferred from nothing more than a mere failure to check an opt-out box on a ballot expressing the party's views about the proposed treatment of its claims against the *debtor*.

Further, whether or not a creditor votes to accept or reject the plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

For the reasons discussed above, no consent can be inferred from this silence. Further, such creditors: (a) may never have received the solicitation package, or received it late, due to mail errors or delays; or (b) received the solicitation package timely, completed same and returned it to the balloting agent but, through no fault of their own, the ballot never reached the balloting agent, or the ballot was received late.

There also is no basis to infer consent by those who do not vote on the plan. Conspicuous warnings in the disclosure statement, on the plan ballots, or on an opt-out form that silence or

inaction will constitute consent to a release are not sufficient to convert their silence into consent to the non-debtor release. *See SunEdison*, 576 B.R. at 458-61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan. And creditors who do not intend to, or have no right to, vote in the first place are unlikely to do so. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 88. As the court explained in *Smallhold*: "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." 2024 WL 4296938, at *12.

As the court noted in *Emerge*, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt out simply do not qualify" as consent through a party's silence or inaction. *In re Emerge Energy Servs., LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.).

Indeed, recipients of mailings regarding the Debtor's bankruptcy case have no reason to expect that an offer to contract with nondebtors will be included in the plan solicitation or notices. As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017). *See also Norcia*, 845 F.3d at

33

1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

Likewise, the court in *SunEdison* observed that parties who are solicited, but do not vote, may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. The *SunEdison* debtors argued that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the nonvoting creditors' failure to object to the plan or to reject the plan should be deemed their consent to the release. *Id*. at 460. The *SunEdison* court rejected this argument because the debtors failed to show that the nonvoting creditors' silence was misleading or that the nonvoting creditors' silence signified their intention to consent to the release (finding that silence could easily be attributable to other causes). *Id*.

      3.   <u>The Plan Inappropriately Extracts Non-Consensual Releases from Abuse Claimants</u>

Even beyond the flawed opt-out procedure discussed above, the Disclosure Statement describes a Plan that inappropriately coerces Abuse Claimants to not opt out and instead, to sign away their rights against non-debtors. The Plan Proponents claim they are providing an opportunity for Abuse Claimants to opt out of the non-debtor releases, but the mechanism they propose for doing so does not provide consent under applicable state law. As discussed above, silence, such as a failure to opt out, is not consent. But even if a failure to opt out could constitute consent, it does not where, as here, the opt out process is confusing and difficult. The Plan also contains provisions governing the applicability of certain state law standards impacting the future ability of Abuse Claimants who opt out to litigate their claims against non-debtors, altering certain standards related to the pursuit of joint tortfeasors. The Plan also punishes those who opt out of the release by severely limiting distributions on the Non-Participating Abuse Claimants' claims against

34

the estate, if they choose to exercise their rights.  Such a mechanism is a coercive tactic by the Plan

Proponents to guarantee consent.  Not only is this not affirmative consent, it is coercive and unfair.

Specifically, the Plan creates an unclear, multi-step process for those electing to "opt out" of

the third-party releases.  Claimants electing this option need to properly follow certain procedures

and must also execute a Non-Participating Litigation Claimant Agreement.  *See* Sections 4.4.2 &

4.4.5 of the Plan.  Further, the Plan attempts to alter the rights of those who opt out (designated as

Non-Participating Abuse Claimants).  Unless claimants litigate these issues at the confirmation

hearing stage before the Bankruptcy Court, the rights of Non-Participating Abuse Claimants for

contribution and pursuing claims against joint tortfeasors in state court will be altered.  *See* Sections

4.4.4 of the Plan. Additionally, Non-Participating Abuse Claimants' distributions on their estate

claims will be significantly curtailed and delayed if they elect to exercise their rights to be a Non-

Participating Abuse Claimant.  *See* Section 4.4.3 of the Plan.  Despite being enjoined from pursuing

claims against Settling Insurers, Non-Participating Abuse Claimants will not share in estate

distributions of funds or proceeds recovered by Debtor or the Trust from the Settling Insurers.  *See*

Sections 4.4.3 & 12.4 of the Plan.

Coercing a creditor to provide a third-party release creates undue and inappropriate pressure

on the creditor.  As discussed above, contract principles govern whether a release is consensual.  *In

re SunEdison, Inc.,* 576 B.R. 453, 458 (S.D.N.Y. Bankr. 2017).  Under New York law, "[a] contract

is voidable on the ground of duress when it is established that the party making the claim was

forced to agree to it by means of a wrongful threat precluding the exercise of his free will."  *Austin

Instrument, Inc. v. Loral Corp*., 29 N.Y.2d 124, 130 (1971).  "[D]uress may take the form of

unlawful restraint of property or use of wrongful economic compulsion to force a party to yield to

demands that would otherwise be rejected."  *First Nat'l Bank of Cincinnati v. Pepper*, 454 F.2d

35

626, 632 (2d Cir. 1972) (emphasis added); see also Restatement (Second) of Contracts § 175(1), at

475 (1981) (a contract is voidable by the victim "if the party's manifestation of assent is induced by

an improper threat by the other party that leaves the victim no reasonable alternative").

Furthermore, "[a] consent is not a voluntary one if it is the product of duress or coercion, actual or

implicit." *United States v. Como*, 340 F.2d 891, 893 (2d Cir. 1965); *see also In re Comm'r of Soc.

Servs.,* 141 A.D. 2d 821, 822 (2d Dep't 1988) (finding that evidence of any fraud, duress or

coercion would vitiate consent).  If an offeree is penalized unless an "offer" is accepted, that

"preclude[s] an inference of assent."  *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir.

2022).  Regardless of whether the court would hold that an opt out could constitute consent in some

circumstances, "consent" under duress is not true consent and therefore, including such coercive

provisions in the Plan would violate the Supreme Court's ruling in *Purdue* that nonconsensual non-

debtor releases cannot be imposed through a chapter 11 plan.

C.      **The Debtor Has Failed to Provide Adequate Information Concerning the Proposed
        Releases, Injunctions, and Exculpation Provisions**

        The Disclosure Statements fails to fully address material terms of the Plan in a manner

that allows creditors to make an informed choice.  The proposed releases, injunctions, and

exculpations should be sufficiently explained so that interested creditors can determine exactly

what releases will be imposed upon them and the releases' impact on their claim.  The

Disclosure Statement should also sufficiently explain the corollary and inform creditors of the

impact of opting out of the releases, injunctions, and exculpations.

        1.      <u>The Terms of the Releases and Injunctions are Unclear and Insufficiently
                Described</u>

The Disclosure Statement states that "[t]he Plan's injunctive provisions and releases are an

integral part of the Plan and are essential to its implementation."  *See* Disclosure Statement, pg. 91.

36

The simple, self-serving statement does not explain why the Plan's implementation hinges on the release of each of the many undisclosed "Released Parties."

Other than the Debtor's own conclusory assertions that the Plan terms are reasonable and fair, the Disclosure Statement fails to explain in a clear and succinct manner what releases are being imposed on creditors and the relevant legal authority to support such releases.

The releases in this case are all-encompassing. Claimants who vote to reject the Plan but don't otherwise object or return the Optional Release and Injunction Election Form are still bound by the releases and injunctions. This is also true for creditors not entitled to vote. As noted in the *Chassix* decision discussed above, an additional "opt out" requirement can be a trap for the inattentive creditor. *Id.* Such traps, including those in the proposed Plan, should not be condoned by the Court, but in any event, must be fully explained in terms a creditor can understand in the Disclosure Statement.

Moreover, both "Released Parties" and "Protected Parties" include "Related Persons," which, according to Section 1.1.162, "means, with respect to any person or entity, such person's or entity's predecessors, successors, assigns, and present and former shareholders, members, affiliates, subsidiaries, employees, Agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such." These "Related Persons" are otherwise unidentified. Given the breadth of the parties being released, the Disclosure Statement should make clear the consequences of failing to opt out.

Assuming arguendo that the release and injunction provisions *could* be considered consensual (and they cannot for the reasons discussed above), the language in the Disclosure Statement and Plan that describes the treatment of Abuse Claimant is anything but clear. Instead,

37

the description is misleading, mired in legalese and cross-refences to other provisions and definitions. The Executive Summary to the Plan attempts to clarify the treatment of Abuse Claimants, which includes an illustrative chart for hypothetical *Consenting* Abuse Claimants. There is no similar illustration for Non-Participating Abuse Claimants. To the contrary, Non-Participating Abuse Claimants' treatment is obscured.

Moreover, the statement in the Optional Release and Injunction Election Form, that Non-Participating Abuse Claimants "may cause the Plan to fail," is not otherwise explained anywhere in the Disclosure Statement or Plan. The Plan Proponents conceal the consequence of a claimant opting out of the releases to the Plan – and specifically, whether the Participating Parties will make their contribution absent 100% "consent" by claimants. The Plan Proponents should disclose the impact of an Abuse Claimant's election to proceed as a Non-Participating Abuse Claimant on the Plan's likelihood of success and feasibility as a result of that election.

To penalize Abuse Claimants for opting out of the release and injunction provisions, the Plan contemplates a separate analysis under which Non-Participating DOS Abuse Claimants would receive a minimal distribution from a "Diocese Abuse Claims Settlement Sub-Fund," and the Non-Participating DOS Abuse Claimants would not be permitted to receive distributions from other trust assets funded by the Debtor. However, the Disclosure Statement and Plan are silent as to whether the respective contributions of Participating Parties change depending on whether claimants elect to opt out of the release and injunction provisions, or on the number of or percentage of claimants who chose to do so.

The Disclosure Statement should also address the Court's authority to confirm the Plan to the extent the Plan proposes different treatment within the same class of creditors, in violation of 11 U.S.C. § 1129(a)(4). Or, if the Plan Proponents submit that the treatment is *not* different, that

38

explanation should likewise be included.

2.    The Exculpation Must Be Narrowed

Similarly, to the extent that applicable law authorizes exculpation beyond 11 U.S.C.

§ 1125(e), the Plan contains an exculpation provision that is overly broad and inconsistent with

applicable caselaw.  Courts have held that trustees, the debtor's officers and directors, official

committees and their members, and counsel to estate fiduciaries may not be exculpated for conduct

that is not court-supervised conduct that carries out estate fiduciary duties during the chapter 11

case, that is, conduct that occurs after the petition has been filed and before the plan's effective

date, provided that no party may be exculpated for fraud, willful misconduct or gross negligence.

*See, e.g., Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022) ("any exculpation

in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its

members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within

the scope of their duties . . . ."  ); *In re Pac. Lumber Co.*, 584 F.3d 229, 252 (5th Cir. 2009) (same);

*In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (court considered whether an official

committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies

both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors'

committee); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 700-01 (E.D. Va. 2022)

("Exculpation is appropriate when it is solely limited to fiduciaries who have served a debtor

through a chapter 11 proceeding.") (citing *In re Health Diagnostic Lab. Inc.*, 551 B.R. 218, 232-33

(Bankr. E.D. Va. 2016)); *In re Washington Mutual, Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del.

2011) ("[An] exculpation clause must be limited to the fiduciaries who have served during the

chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors'

directors and officers."); *In re PTL Holdings LLC*, 2011 WL 5509031 at *38 (Bankr. D. Del. Nov.

39

10, 2011) ("the exculpation clause here must be reeled into include only those parties who have

acted as estate fiduciaries and their professionals").

The Plan's exculpation provision is impermissibly broad under this caselaw for two reasons.

First, a proper exculpation operates to shield court-supervised fiduciaries from liability. *In re*

*Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (S.D.N.Y. 2019). "The exculpation clause

must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate

professionals, the Committees and their members, and the Debtor's directors and officers." *In re*

*Washington Mut., Inc.*, 442 B.R. 314, 350-51 (Bankr. D. Del. 2011).

The exculpation clause here, defined as "…the Diocese, the Reorganized Diocese, the

Diocese's Professionals, the Committee, the Committee's Professionals, the Mediators, the

Participating Parties, the Settling Insurers, and Related Persons of the foregoing Persons and

entities" (Plan § 1.1.80) sweeps well beyond the court-supervised conduct of estate fiduciaries in

the chapter 11 case. The Exculpated Parties include not only the Debtor, the Debtor's Professionals,

the Committee, the Committee's Professionals, and the Mediators, but also the Reorganized

Diocese, Participating Parties, Settling Insurers, and "Related Persons of the Persons and Entities."

Plan, § 1.1.80. In fact, the range of Exculpated Parties is so broad that it likely includes parties who

performed no duties essential, necessary, or at all, related to the case or the Plan. Neither the

Disclosure Statement nor the Plan provide any basis for including non-fiduciaries as Exculpated

Parties. *See Wash. Mut.*, 442 B.R. at 350-351 (limiting exculpation clause to estate fiduciaries).

The Settling Insurers, for example, are indisputably not fiduciaries to the estate. But exculpation

provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled

to qualified immunity for their actions." *Id*. There is no legal basis to provide the protection of an

exculpation provision to the Settling Insurers or the other non-fiduciaries listed in the Plan's definition of Exculpated Parties.

Second, the Exculpation Provision inappropriately extends to post-effective date activity that cannot be exculpated. But exculpation "only extends to conduct that occurs between the Petition Date and the Effective date". *In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bankr. D. Del. 2004). The exculpation clause applies to "any act or omission in connection with, relating to, or arising out of, the administration of these Bankruptcy Cases, the pursuit of confirmation of the Plan, the Disclosure Statement, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan." The temporal scope has no end date and therefore could be interpreted to provide prospective exculpation past the Effective Date, especially because it covers entities that will not exist until after the Effective Date, such as the Reorganized Diocese. All post-effective date entities should be stricken from the list of Released Parties and should not be covered by the Plan's Exculpation Provision.

Neither the Disclosure Statement nor the Plan provides any basis for an exculpation provision of the breadth and scope of proposed in the Plan. Accordingly, the Plan violates section 1129(a)(1) & (3) and the Disclosure Statement cannot be approved.

The United States Trustee objects to the extent the Exculpation Provision shields Exculpated Parties who rely upon the advice of counsel  Although reliance could be raised as an affirmative defense, it should not be an absolute bar against liability. The Exculpated Parties should have a claim against their legal advisors for any improper or mistaken advice, and the Exculpation should not protect such advice.

**D.    The Statutory Obligation to Pay Fees Due Pursuant to 28 U.S.C. § 1930(a)(6) and Post-Confirmation Reporting**

The Reorganized Debtor has an obligation to pay quarterly fees under 28 U.S.C. §

41

1930(a)(6) ("Chapter 11 Quarterly Fees") based on all monies distributed or paid pursuant to the

Plan.   The Plan's provision for the payment of Chapter 11 Quarterly Fees does not comply with the

statute's requirements.  *See* Plan, § 2.1.5.  The Plan provides that that the Chapter 11 Quarterly Fees

due and not paid as of the Effective Date will be paid "as soon as practicable after the Effective

Date." *Id.*  This provision violates 11 U.S.C. § 1129(a)(12), which specifically requires payment of

Chapter 11 Quarterly Fees "on the effective date of the plan."  The Plan provides further that

payments made (1) to the Trust under Sections 2, 5, 7 or 8 of the Plan by anyone other than the

Diocese, and (2) by the Trust to anyone are not to be considered "disbursements" under 28 U.S.C. §

1930(a)(6).   *Id.*

In addition, the Plan does not comply with 28 U.S.C. § 1930(a)(6) because it does not

require payment of Chapter 11 Quarterly Fees on all qualifying disbursements.  Chapter 11

Quarterly Fees are properly assessed on the following categories of disbursements: disbursements

of cash made by the Debtor, pursuant to the Plan and to the Trust, as well as disbursements directly

by the Debtor to non- abuse creditors and other payments obligated by the Plan; disbursements by

the Trust of monies generated from the liquidation of real estate transferred to the Trust by the

Debtor, including both disbursements to creditors and for fees and expenses associate with Trust

administration; *and* disbursements by the Trust of monies that did not originate with the Debtor and

were contributed to the Trust by non-debtor third parties.  The term "disbursements," while

undefined by statute, must include all post confirmation distributions from the bankruptcy estate to

creditors.  *In re Health Diagnostic Laboratory, Inc.*, No. 15-32919-KRH, 2023 WL 105586 (Bankr.

E.D.Va. Jan. 4, 2023) (citing *In re A.H. Robins Co.*, 219 B.R. 145 (Bankr. E.D.Va. 1998).

"Otherwise, … quarterly fees could be virtually eliminated by the simple expedient of transferring

assets from the bankruptcy estate to a post confirmation entity for subsequent payment."  *Id.*   The

majority of courts agree. *Id*. (citing *In re Atna Res., Inc.*, 576 B.R. at 219; *In re Postconfirmation Fees*, 224 B.R. 793, 799 (E.D. Wash. 1998) (rejecting the argument that a reorganized debtor's post-confirmation disbursements are not included in calculating quarterly frees); *In re CSC Indus., Inc.*, 226 B.R. 402, 404, 406 (Bankr. N.D. Ohio 1998) (holding that a liquidating trustee was responsible for paying post-confirmation quarterly fees out of the liquidation trust when the plan provided it was the successor and interest to the debtor's estate); *cf. In re Betwell Oil & Gas Co.*, 204 B.R. 817, 819 (Bankr. S.D. Fla. 1997) ("It makes no sense to hold that the post-confirmation payments made from the liquidation of the remaining assets are *not* disbursements just because the remaining assets were vested in a reorganized debtor or liquidating trust at confirmation.").

Courts have adopted a broad interpretation of 28 U.S.C. § 1930(a)(6). *See In re Richards*, No. 09-40337, 2017 WL 2743238, at *2 (Bankr. S.D.W.Va. June 23, 2017); *In re Quality Truck & Diesel Injunction Serv., Inc.*, 251 B.R. 682, (S.D. W.Va. 2000) ("Absent Congressional expression of contrary intent, it must be assumed Congress desired the same broad interpretation to apply to reorganized debtors.").

The Plan is the Debtor's mechanism to pay its creditors their rightful share, along with paying the costs of administration of the chapter 11 case.  The choice to utilize a plan-created entity (the Trust) to effectuate the payments to certain creditors does not alter the Debtor's statutory obligation to pay Chapter 11 Quarterly Fees that accrue and are imposed as a result of the monies that must be paid under the Plan.  The reorganized Debtor has an obligation to pay Chapter 11 Quarterly Fees based on *all* post-Effective Date disbursements made pursuant to the Plan, regardless of how the disbursements are accomplished.

Finally, the definition of Administrative Claim at Section 1.1.9 of the Plan inappropriately includes, "all fees and charges assessed against the Estate under chapter 123 of title 28 of the

43

United States Code." Chapter 11 Quarterly Fees are included among such "fees and charges."

*See* 28 U.S.C. 1930(a)(6). This definition should be revised to remove any reference to Chapter

11 Quarterly Fees as they are statutory, rather than administrative claims, and are not subject to

the same obligations of administrative creditors.

### IV.    CONCLUSION

WHEREFORE, for all of the foregoing reasons, the United States Trustee respectfully

requests that the Court (i) sustain this Omnibus Objection, (ii) deny the Motion, (iii) disapprove the

Disclosure Statement, and (iv) grant such other relief as is just and appropriate.

Additionally, the United States Trustee reserves his rights to supplement this Objection and

object at the hearing on the Disclosure Statement and Motion to other deficient and/or

amendments, including supplemental disclosures and documents. The United States Trustee

further reserves his rights to object to confirmation of the Plan, or any future amendments or

supplements thereto.

Dated:  October 18, 2024
        Utica, New York

Respectfully submitted,

WILLIAM K. HARRINGTON UNITED
STATES TRUSTEE, Region 2

By: /s/ Erin P. Champion, Esq.
Erin P. Champion
Assistant United States Trustee
Office of the United States
Trustee
10 Broad Street, Ste. 105
Utica, New York 13501
erin.champion@usdoj.gov