UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 20-30663 |
| The Roman Catholic Diocese of Syracuse, New York, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAN PROPONENTS' JOINT OMNIBUS REPLY TO OBJECTIONS TO DISCLOSURE STATEMENT IN SUPPORT OF FOURTH AMENDED JOINT PLAN OF REORGANIZATION**

The Roman Catholic Diocese of Syracuse, New York, the ("Diocese"), by and through its undersigned counsel, hereby submits this memorandum of law in support of the Joint Omnibus Reply (the "Joint Omnibus Reply") of the Diocese and Official Committee of Unsecured Creditors of The Roman Catholic Diocese of Syracuse, New York (the "Committee" and together with the Diocese, the "Plan Proponents") to objections to the *Disclosure Statement in Support of Fourth Amended Joint Plan of Reorganization for the Roman Catholic Diocese of New York Dated September 13, 2024* [Docket No. 2173] (the "Disclosure Statement"). In further support of the Joint Omnibus Reply, the Plan Proponents respectfully submit as follows:

**The Supreme Court Decision in *Purdue* Does Not Prohibit the Non-Debtor Release Provisions in the Fourth Amended Plan**

1. The Disclosure Statement objection filed by the Office of the United States Trustee (the "US Trustee"), the LMI Objection[1], the Certain Insurers' Objection, the TNCRRG Objection and the Travelers' Objection all take the position that the Disclosure Statement cannot be approved because the Fourth Amended Plan is patently unconfirmable. Most, if not all, of the

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Joint Omnibus Reply.

objections to the Disclosure Statement are objections to the Fourth Amended Plan and are premature confirmation objections not properly considered at this time.

2. Disclosure hearings anticipate, but do not preempt, confirmation hearings. The appropriate standard for approval of a disclosure statement is "adequate information," and confirmation issues should be determined at a hearing to consider confirmation of a chapter 11 plan in accordance with the procedures attendant to such a hearing. *See* 11 U.S.C. § 1125(a)(1). Notably, to date, no Abuse Claimants have objected to the approval of the Disclosure Statement or raised any issues related to the Fourth Amended Plan's confirmability.

3. Any objection seeking to derail approval of a disclosure statement on account of confirmation concerns must clear a very high bar. Courts have recognized that solicitation should be delayed only when the proposed plan is "facially" or "patently" unconfirmable and where, as a matter of law, the plan "is so fatally flawed that confirmation is impossible." *See In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990). Moreover, "[s]uch action is discretionary and must be used carefully so as not to convert the disclosure statement hearing into a confirmation hearing, and to ensure that due process concerns are protected." *Id.* (citations omitted). Accordingly, a "disclosure statement should be disapproved at the threshold only where the plan it describes displays fatal facial deficiencies or the stark absence of good faith." *In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (*quoting In re Eastern Maine Elec. Coop., Inc.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991)).

4. Prior to the most recent Fourth Amended Plan, the Disclosure Statement was considered and modified to address concerns raised by the US Trustee, the Insurers and the Court over the course of five months and during four separate hearings held by the Court before the Court issued the Disclosure Statement Approval Order on May 2, 2024. The Disclosure

Statement, as written, has been examined in meticulous detail and contains information that is certainly adequate to allow claimants to assess their rights as proposed under the Fourth Amended Plan. The changes to the Fourth Amended Plan and Disclosure Statement, filed in redline form on the docket at Docket No. 2174, are minimal and are designed to address the consent requirement imposed by the Purdue Decision.

## I. **The UST Objection Relies on an Unwarranted Expansion of the *Purdue* Ruling**

5. The US Trustee argues that the Fourth Amended Plan is unconfirmable because it releases claims against non-Debtor entities, unless the claimant either (i) checks a box on the provided election form to express a desire to be treated as a Non-Participating Abuse Claimant or (ii) files an objection to the Fourth Amended Plan contesting the release of their claims against the third-party. UST Objection at p.17-34. The US Trustee further argues that the Fourth Amended Plan inappropriately coerces abuse claimants to consent to third-party releases through a difficult and cumbersome process that punishes those who opt out by limiting distributions for Non-Participating Abuse Claimants and curtailing such claimants' litigation rights if they choose to exercise their right to "opt out." UST Objection at p.34-36.[2]

6. The US Trustee's objections to the releases and channeling provisions contained in the Fourth Amended Plan are confirmation objections, not objections to the Disclosure Statement. Such objections are premature.[3] For this reason alone, the Plan Proponents respectfully submit that the UST Objection should be overruled and the Disclosure Statement approved.

[2] The UST's objection on the grounds the Fourth Amended Plan is coercive is not tied to the adequacy of the Disclosure Statement, and at best is a confirmation issue and is premature to address at this phase of the case.

[3] Courts should not turn the disclosure statement hearing into a hearing on confirmation; "due process considerations are protected, and objections are restricted to those defects that could not be cured by voting and where the pertinent material facts are either not at issue or have been fully developed at the disclosure statement hearing." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); accord *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987).

### a. Disclosures Regarding Nonconsensual Third-Party Releases

7. The Plan Proponents previously advised this Court that they will demonstrate at confirmation that: (i) the release provisions of the Fourth Amended Plan are appropriate; and (ii) all releases and channeling injunction provisions comply with established case law and take into account the requirements set forth in the Supreme Court decision in *Purdue*.[4] After *Purdue*, bankruptcy courts may still authorize the release of claims against non-debtors, but simply cannot do so against the stated wishes of the claimants.[5] The US Trustee offers this Court a method to implement *Purdue* that is unworkable both as a general matter in any mass tort case and that is specifically impractical in cases involving survivors of childhood trauma and abuse. The US Trustee proposes an onerous and impractical procedure whereby bankruptcy courts must assume claimants' opposition and require the plan proponents assume claimants have rejected the third-party releases *en masse*. In such an instance, there is an overwhelming likelihood that inaction by even a small subset of claimants, and the untenable risk such outlier claimants would create, will prevent contribution by non-debtor third parties and create an insurmountable impasse in mass tort cases. Absent the ability to bring parties together during the confirmation process and formulate solutions to opt-out claimants prior to confirmation, global resolution of mass tort cases general will be unable to be achieved.[6] The Committee advises that this is especially true in cases where the tort claimants are Survivors of childhood sexual abuse who are

---

[4] *See Harrington v. Purdue Pharma, L.P*., 603 U.S. __, 144 S. Ct. 2071 (2024).

[5] *Id.* at 2088 ("Confining ourselves to the question presented, we hold only that the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

[6] Justice Sotomayor, during oral argument in *Purdue*, specifically noted the practical impossibility of successfully confirming mass tort cases if an opt-in procedure was required. Transcript at 15:6-14, *William K. Harrington, U.S. Trustee v. Purdue Pharma LP*, No. 23-124 (U.S. Dec. 4, 2023). Notably, after such matters were discussed, the majority decision expressly declined to state that an opt-in procedure was required for consent for non-debtor releases. *See Purdue*, 144 S.Ct. at 2087-88.

much more likely to experience medical and psychological barriers to providing their affirmative consent. The Fourth Amended Plan provides Survivors with the agency to opt-out, but respects the fact that affirmatively opting-in may be an insurmountable obstacle for many claimants. Without these processes—designed to respect Survivors not coerce or deceive them—there may be no opportunity for an orderly recovery on the Abuse Claims in this case or any other similar case involving Survivors.

8. To the extent the UST Objection relates to the adequacy of disclosure, such objections are misplaced.[7] The Disclosure Statement and the proposed ballots and election forms contain detailed, prominently placed, discussions of the releases and injunctions. The Disclosure Statement and ancillary documents also explain the justifications for the releases, the current legal standard that needs to be satisfied for the approval of such releases, and the claimants' ability to withhold consent for the releases and injunctions through an opt out process. *See* Article XVIII (G) of the Disclosure Statement. *See also In re DBSD N. Am. Inc.*, 419 B.R. 179, 219 (Bankr. S.D.N.Y. 2009) (finding a third-party release provision consensual where "both the Plan and Disclosure Statement have the third party release provision set off in bold font, and the ballots set forth in both capitalized and bold text the effect of consenting to the Plan or abstaining without the opting out of the release.") Furthermore, the disclosures relating to releases, channeling injunction and exculpation provisions contained in the Fourth Amended Plan are nearly identical to those approved by this Court as providing adequate information in the Disclosure Statement Approval Order.

[7] This is especially true because the issue is not ripe and is raised in the hypothetical. It is entirely possible that every Abuse Claimant provides affirmative consent to the releases during the balloting process.

**b. The Consensual Third-Party Release Provisions in the Fourth Amended Plan are Not Prohibited by *Purdue***

9. The US Trustee contends that to comply with the decision in *Purdue*, the Plan Proponents must obtain creditor consent to third party releases consistent with state law contract principles, which the US Trustee alleges require an affirmative act (*i.e.,* opting-in) on behalf of the consenting party. In support of this contention, the US Trustee relies heavily on *In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024).

10. The Court should overrule the US Trustee's objections on at least three grounds. First, the US Trustee advances a theory of consent that has been rejected by dozens of courts. Second, the US Trustee's position would create a non-uniform patchwork of standards that would render third-party releases practically unachievable. Third, even adopting the US Trustee's impractical contract standard, state contract law permits acceptance through acquiescence and is compatible with the procedures proposed here.

11. To start, the US Trustee's position ignores decades of case law recognizing the validity of opt-out procedures in bankruptcy cases and other civil law contexts, and the Supreme Court in *Purdue* specifically decided to leave these precedents undisturbed. *See Infra* at Note 6.

12. In considering consensual releases during the *LATAM Airlines Group, S.A.* confirmation hearing, Judge Garrity performed a fact-specific inquiry regarding the type and adequacy of notice prior to issuing a ruling that opt out provisions constituted consent.[8] In

[8] *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *47 (Bankr. S.D.N.Y. June 18, 2022), corrected, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), and motion to certify appeal denied, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 756 (S.D.N.Y. 2022), *and aff'd sub nom. In re Latam Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re LATAM Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022), *cert. denied sub nom. TLA Claimholders Grp. v. LATAM Airlines Grp. S.A.*, 143 S. Ct. 2609, 216 L. Ed. 2d 1209 (2023).

support of this ruling, he provided a long list of cases within the Second Circuit confirming plans with opt out third party releases.[9]

13. Likewise, in the context of the confirmation hearing in *Extraction Oil & Gas, Inc.*, Judge Sontchi ruled that opt out releases are consensual releases, stating:

> I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release. ***I don't believe this is necessarily a contractual point… as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules***…

*Extraction Oil & Gas, Inc.*, Confirmation Hearing Tr. at 80-81 (Bankr. D. Del. Dec. 23, 2020) (Sontchi, J.) (cited by *In re Mallinckrodt PLC*, 639 B.R. 837, 879- 880 (Bankr. D. Del. 2022) (emphasis added).

14. The court in *In re Mallinckrodt PLC* outlined the precedent for implying consent provided the claimant was given proper notice and a chance to be heard:

> The notion that an individual or entity is in some instances deemed to consent to something by their failure to act is one that is utilized throughout the judicial system. When a party to a lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond, or a judgment is automatically entered against them. Within the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim. Additionally, if a claim objection is filed and the claimant fails to respond, the claim is

[9] *Id. (citing cases: "…In re China Fishery Grp. Ltd.*, Case No. 16-11895 (JLG), [ECF No. 2909] (Bankr. S.D.N.Y. Jan, 13, 2022) (confirming a plan with opt out third-party releases); *In re Philippine Airlines, Inc.*, Case No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) (same); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG), [ECF No. 2300] (Bankr. S.D.N.Y. Nov. 2, 2021) (same); *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC), [ECF No. 459] (Bankr. S.D.N.Y. Nov. 13, 2019) (same); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG), [ECF No. 1404] (Bankr. S.D.N.Y. Sept. 16, 2019) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), [ECF No. 1308] (Bankr. S.D.N.Y. Feb. 27, 2019) (same); *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), [ECF No. 765] (Bankr. S.D.N.Y. Nov. 9, 2018) (same); *In re Cenveo, Inc. et al.*, Case No. 18-22178 (RDD), [ECF No. 685] (Bankr. S.D.N.Y. Aug. 21, 2018) (same); *In re BCBG Max Azria Global Holdings, LLC et al.*, Case No. 17-10466 (SCC), [ECF No. 591] (Bankr. S.D.N.Y. July 26, 2017) (same); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC), [ECF No. 769] (Bankr. S.D.N.Y. May 10, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2018) (same).")

*Id.* at *47 fn91.

> disallowed. There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization.

*In re Mallinckrodt PLC*, 639 B.R. at 879.

15. Furthermore, recent post-*Purdue* decisions have also allowed the use of opt out release provisions, especially where pre-*Purdue* precedent approved of the use of opt out provisions. *See, e.g., In re Bowflex, Inc.*, Bankr. D.N.J. No. 24-12364, Aug. 19, 2024 Hr'g Tr. at 67; *In re Invitae Corp.*, Bankr. D.N.J. No. 24-11362, July 23, 2024 Hr'g Tr. at 14 (US Trustee objections to opt out consent relying on *Purdue* were overruled); *In re Robertshaw US Holding Corp.*, Bankr. S.D. Tex. No. 24-90052 ("Consensual third-party releases in liquidating Chapter 11 bankruptcy plan were appropriate and afforded affected parties constitutional due process and meaningful opportunity to opt out, since parties-in-interest were provided detailed notice about plan, deadline to object to plan confirmation, and voting deadline, all ballots provided claimants opportunity to opt out, third-party release language was specific enough to put releasing parties on notice of types of claims released, third-party releases were narrowly tailored to case, and third-party release was integral part of plan and was condition of settlements.").

16. Prior to the Supreme Court ruling in *Purdue*, the Southern District of New York issued its decision in *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021) denying the allowance of non-consensual third-party releases. During that time, and before the appeal to the Second Circuit was decided, the United States Bankruptcy Court for the Southern District of New York issued a decision in the *In re LATAM Airlines Grp., S.A.* case, holding that "[t]he voluntary 'opt out' structure is routinely applied in chapter 11 cases in this and other districts.

The Court overrules [the ad hoc group and U.S. Trustee] objection that an opt in rather than Opt-Out Procedure must be followed for a consensual release to be effective."[10]

17. The court in *LATAM Airlines* went on to explicitly distinguish its facts (where notice and an opportunity to opt out of releases was provided with balloting) from *Purdue* (where no option to opt out of releases was offered):

> The Non-Debtor Releases are consensual and apply only to those creditors and equity interest holders who affirmatively decide not to opt out of the release. As such, the U.S. Trustee misplaces his reliance on *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021) as support for his objection. There, the reorganization plan incorporated a broad, involuntary release of claims (including those predicated on fraud and willful misconduct) against non-debtors facing extensive liability stemming from the opioid crisis. *Id.* at 36. In contrast to the creditors and equity interest holders herein, the claimants in Purdue Pharma were afforded no opportunity to opt out of the releases. *See id.* at 81 (noting the claims at issue were "being finally disposed of pursuant to the Plan ... without the claimants' consent and without any payment"). ***The holding of Purdue Pharma has no bearing on these Chapter 11 Cases.***

(emphasis supplied) *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *47 fn 92.

18. Moreover, although the US Trustee relies on the holding in *Smallhold* to support many of its assertions throughout the UST Objection, the US Trustee also conveniently disagrees with the portions of the holding in *Smallhold* that do not support its position. Specifically, the US Trustee asserts that "merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors." UST Objection at p. 31. However, the court in *Smallhold* held that creditors that vote on the plan but do not opt out have given sufficient consent to bind them to the release under the new standard established by *Purdue* and

[10] *In re LATAM Airlines Grp. S.A.*, 2022 WL 2206829, at *47.

under contract law. *See Smallhold*, at 14 ("[T]he vote is an affirmative step, and coupled with conspicuous notice of the opt-out mechanism, suffices as consent to the third-party releases under general contract principles … Creditors who returned their ballots and voted in favor of the plan after being informed that doing so, unless they checked the box to opt out, have not been silent. They have taken an affirmative step. And under ordinary contract principles, what they have done is sufficient to hold them to the terms of the release."). Recognizing that the holding in *Smallhold* would undercut the US Trustee's hyper-technical argument, the US Trustee only selectively embraces its holding and states that the court in *Smallhold* erred in its decision when it held that "the affirmative act of voting, coupled with clear and conspicuous disclosure and instructions about the consequences of the vote and a simple mechanism for opting out, is a sufficient expression of consent to bind the creditor to the release under ordinary contract principles." *Smallhold*, 2024 WL 4296938 at 3.

19. Here, the solicitation procedures provide, and the Fourth Amended Plan expressly allows for, the ability of claimants to object to and/or opt out of the Third-Party Releases. Like the balloting and notice provisions in the *LATAM Airlines* case, which "conspicuously disclosed the Non-Debtor Releases in boldface type in the Ballots and Notice of Non-Voting Status, together with instructions on how to opt out of the Non-Debtor Releases and expressly advised of the consequences of not doing so"[11] the Optional Release and Injunction Election Form included with the Ballot contains clear and conspicuous language informing each claimant that failure to complete and return such form will be treated as consenting to the third-party releases. Therefore, the Diocese respectfully submits that the Third-Party Releases provided for in the

[11] *Id.* at *47-48.

Fourth Amended Plan are consensual, comply with the *Purdue* decision, and are permissible under applicable law.

20. Next, the US Trustee's favored "contract approach" is unworkable and flawed. Consent to the terms of a bankruptcy plan, and any third party releases it contains, through the statutory solicitation process, falls soundly outside the technical requirements of offer, acceptance, consideration, and the other requirements of state contract formation law. While it is common to refer to a bankruptcy plan as a new contract between a debtor and its creditors, a debtor does not literally negotiate back and forth with every individual creditor on the terms of the plan.[12] Thus reference to contract formation is simply a metaphor for, not a literal description of, the plan confirmation process. Instead, plan voting and plan confirmation requirements and procedures are inherently federal law issues governed under the Bankruptcy Code and Rules, which provide the Bankruptcy Court the ultimate authority to confirm a plan and its provisions.[13] *Purdue* did nothing to change that.[14]

21. In addition, the contract approach improperly abandons the uniformity requirements of the bankruptcy processes in favor of a state-by-state, and perhaps a claimant by claimant, standard.[15] For example, despite the fact that the US Trustee refers continuously to

---

[12] *See In re Quigley*, 391 B.R. 294, 306 (Bankr. N.D.W. Va. 2008), *aff'd*, No. CIV.A. 5:08CV126, 2009 WL 2761296 (N.D.W. Va. Aug. 27, 2009), *rev'd and remanded on other grounds*, 673 F.3d 269 (4th Cir. 2012) (stating that in the context of a chapter 13 plan "[w]hile explaining that a confirmed plan is akin to a 'new contract' is a useful analogy in relating a complex legal event to a layperson, a confirmation order is in no way a new contract between a debtor and the debtor's creditors").

[13] *E.g.*, 11 U.S.C. §§ 1125,1126,1129.

[14] *Harrington v. Purdue Pharma L. P*., 144 S. Ct. 2071, 2081 (2024) (stating that "[u]nder Chapter 11, the debtor can work with its creditors to develop a reorganization plan governing the distribution of the estate's assets, it must then present the plan to the bankruptcy court and win its approval").

[15] *Cf. Ry. Lab. Executives' Ass'n v. Gibbons*, 455 U.S. 457, 465–66 (1982) ("As James Madison observed, '[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce, and will prevent so many frauds where the parties or their property may lie or be removed into different States, that the expediency of it seems not likely to be drawn into question.'") (citing The Federalist No. 42, p. 285 (N.Y. Heritage Press 1945); *Sturges v. Crowninshield*, 4 Wheat. 122, 195, 17 U.S. 122, 195, 4 L.Ed. 529 (1819) (Marshall, C. J.) ("The bankrupt law is said to grow out of the exigencies of commerce")).

state law contract principles throughout the UST Objection,[16] with the exception of the *Tonawanda Coke Corp*. decision[17] in the Western District of New York, the cases cited by the US Trustee apply state contract law of Texas, Virginia, Delaware and California, which have no applicability here. It cannot be that the US Trustee is advocating for the application of contract law from Texas, Virginia, or California as the standard applicable here. Moreover, the US Trustee fails to offer or analyze what state's law applies to determine the rules for the formation of the supposed claimant-release contracts.[18] Is it the state where each claimant lives? Or the state in which this Bankruptcy Court sits? Perhaps the state where a debtor is incorporated or where its principle offices or located? Taken literally, as the US Trustee advocates, the strict contract approach requires an analysis of hundreds of separate scenarios for determining consent to the formation of a contract and creates an impractical barrier to implementing the release-by-consent scheme that *Purdue* expressly preserved.

22. Finally, even if contract law were to apply in the consent analysis, that would not preclude a court from permitting notice of a proposed release with an established opt out procedure under the facts of this case. Established contract law in New York provides for

[16] *See* UST Objection at p. 19, 20, 21, 22, 23, 25, 28, 29 and 32.

[17] *In re Tonawanda Coke Corp*., 662 B.R. 220, 2024 WL 4024385 at *2 (Bankr. W.D.N.Y. Aug. 18, 2024). The facts of Tonawanda Coke are also clearly distinguishable from the instant case. There, no financial contribution was being made by parties seeking releases, the plan projected a minimal distribution to unsecured creditors and there was no reason to expect that a creditor would consent to a release under the circumstances.

[18] *Swift & Co. v. Bankers Tr. Co.*, 280 N.Y. 135, 140–41 (1939) ("Where the parties have not in terms provided with law should be applied, the courts have attempted to formulate general rules defining the separate fields governed by the law of the place where a contract is made or by the law of the place where the contract is to be performed. *In Union Nat. Bank v. Chapman*, 169 N.Y. 538, 543, 62 N.E. 672, 673, 57 L.R.A. 513, 88 Am.St.Rep. 614, this court stated 'some general principles which appear to be settled beyond controversy, * * * (1) All matters bearing upon the execution, the interpretation and the validity of contracts, including the capacity of the parties to contract thereto, are determined by the law of the place where the contract is made; (2) all matters connected with its performance, including presentation, notice, demand, etc., are regulated by the law of the place where the contract, by its terms, is to be performed.' More recently we have said that 'as a general rule, the validity of a contract is determined by the law of the jurisdiction where made, and if legal there is generally enforceable anywhere.' That law governs, we have also said, 'in matters bearing upon the capacity of the parties to contract and upon the execution, the interpretation and the validity thereof.'") (internal citation omitted).

specific instances where silence would be deemed acquiescence. *See Russell v. Raynes Assocs. Ltd. P'Ship*, 166 A.D.2d 6, 15, 569 N.Y.S.2d 409, 414 (1991) ("Although, generally, intent to accept an offer may not be inferred from silence, a party's silence will be deemed an acquiescence where he or she is under such duty to speak that his or her 'conduct, accompanied by silence, would be deceptive and beguiling' and failure to speak therefore misleads the other party. Such duty may be created by a course of conduct, or … ***by an explicit statement by the offeree which gives the offeror reason to understand that silence will constitute acceptance***.") (internal citations omitted) (emphasis supplied).[19]

23. However, it is not clear that it is even necessary to reach a state law contract analysis. Nothing in the *Purdue* decision supports, much less requires, disregarding the longstanding practice by courts within this and other circuits under which consent to third-party releases can be obtained through an opt out mechanism that clearly and conspicuously discloses to all creditors their obligation and ability to opt out of such third-party releases.

### c. The Plan does not Impermissibly Presume the Consent of Parties Who are Presumed to Accept or Reject the Plan

24. The U.S. Trustee misreads the Plan when it suggests that parties in classes who are deemed to accept or reject the Fourth Amended Plan "are not entitled to vote but are conclusively presumed to consent to certain releases, exculpations and injunctive relief in the Plan." U.S. Trustee Objection at ¶ 42.

25. To the extent that creditors hold claims that are conclusively presumed to accept the Plan and therefore do not vote pursuant to Bankruptcy Code section 1126(f), such claims are *unimpaired* and will be paid in full. Moreover, the Plan Proponents note that the general

[19] *See also In re Stein Mart, Inc.*, 629 B.R. 516, 523 (Bankr. M.D. Fla. 2021) (finding that "the releases contained in the Proposed Plan are consensual because the Opt-Out Form meets the elements of acceptance under Florida law. The decision to return or not return the Opt-Out Form is an absolute and unconditional acceptance or rejection of the offered releases.").

injunction and discharge under Section 12.1.1 of the Plan, which applies to all claims other than Abuse Claims and Inbound Contribution Claims, releases and enjoins only claims against the Diocese. It does not release or enjoin claims against non-debtor third parties. Accordingly, the Plan Proponents submit that consent is not necessary.

26. Only Inbound Contribution Claims in Class 6 are conclusively deemed to reject the Plan without a vote. The vast majority of Inbound Contribution Claims consist of cross-claims between the Diocese and one or more Participating Parties as alleged joint tortfeasors, accordingly the Plan Proponents anticipate that the holders of such claims will support the Plan's release and injunction provisions. Nevertheless, any party-in-interest that can establish an enforceable Inbound Contribution Claim can indicate its lack of consent to the Plan's releases and injunctions by filing an objection to confirmation in accordance with Sections 3.3 and 12.2.2.b of the Plan.[20] Therefore there is nothing in the plan that impermissibly and conclusively presumes the consent of any party where consent is so required.

**d. Returning a Ballot is Sufficient to Manifest Consent**

27. Additionally, although the Plan Proponents again submit that the UST Objection is more focused on plan confirmation issues, the Plan Proponents take issue with the US Trustee's position that the releases contained in the Fourth Amended Plan are non-consensual because the Diocese proposes to solicit consent through the election to be treated as a Non-Participating Abuse Claimant provided with the solicitation materials. Specifically, under the proposed solicitation procedures, in order to elect to be treated as a Non-Participating Abuse Claimant, claimants are required to either (i) check a prominently featured and clearly labeled box set forth on the Ballot; or (ii) file a timely objection to confirmation of the Fourth Amended

[20] To the extent certain Insurers have argued that they may have Inbound Contribution Claims, the Plan Proponents respectfully submit that such claims are either without merit or will be paid in full pursuant to the Plan's judgment reduction provisions.

Plan indicating that they are withholding their consent to the applicable release and injunction provisions.

28. Consistent with the holding in *Smallhold*, should a claimant return a Ballot but fail to check the opt out box, such claimant will be considered to have consented to the non-debtor third-party release provisions contained in the Fourth Amended Plan. Further, under *Smallhold*, the same would be true for a claimant who voted to reject the Fourth Amended Plan. *Id.* ("The same rationale applies to those creditors in class 2 who voted against the plan and elected not to opt out. They were provided clear instruction that a vote against the Plan would suffice to manifest agreement to a third-party release if they did not affirmatively opt out by marking the box on the ballot. A vote against the plan serves as evidence that the creditor was on notice and actively engaged, and thus has taken an affirmative step such that consent can be established to bind the party to the terms of the release"). The Plan Proponents submit that such an approach comports with the requirements of *Purdue* because prominent notice of the third-party releases and the opportunity to opt out will render the proposed releases consensual and the decision in *Purdue* only addressed non-consensual third-party releases:

> As important as the question we decide today are ones we do not. Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. ***Nor do we have occasion today to express a view on what qualifies as a consensual release*** or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.

*Purdue*, 144 S. Ct. 2087–88 (internal citations omitted) (emphasis supplied). The Supreme Court explicitly declined to issue a decision on what constitutes consent. In this case, we must look to prior precedent addressing consent in bankruptcy and other applicable law. The Plan Proponents

respectfully submit that the US Trustee should not be permitted to expand its reading of *Purdue* in a way that clearly violates the Supreme Court's holding.

## II. To the Extent the Insurers Have Claims Against Third Parties Released Under the Fourth Amended Plan, Such Claims are Paid in Full

29. The Certain Insurers assert that the Fourth Amended Plan is patently unconfirmable because it does not comply with the decision in *Purdue* and provides for non-consensual non-debtor third-party releases, which allegedly would release the Certain Insurers' claims against non-debtor entities without the Certain Insurers' consent to such releases. Certain Insurers Objection at ¶¶ 28-59.

30. As set forth in greater detail in the Omnibus Reply, the Certain Insurers argument is without merit. First, the Fourth Amended Plan already accounts for such rare but possible third-party claims by applying the Judgment Reduction Provision outlined in Section 12.5.2, so that the Non-Settling Insurer's Insurer Contribution Claim is thereby satisfied and extinguished entirely. Second, because the Judgment Reduction Provision will satisfy in full any amount that may be due to the Non-Settling Insurer on account of an Inbound Contribution Claims, including Insurer Contribution Claims, such Non-Settling Insurer, which currently includes the Certain Insurers, will be paid in full, which would obviate the need for consent to any release of claims under the *Purdue* decision.

31. Despite the Certain Insurers reliance on *Purdue*, the Supreme Court specifically limited its decision to the question before it, stating "[n]or do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor." *Purdue,* S. Ct. at 2088.[21]

[21] Medicare Claims, which the US Trustee contends are being released in violation of *Purdue*, are similarly being paid in full under the Fourth Amended Plan. *See Fourth Amended Plan* at Section 4.12.2 and 4.12.3 (requiring the

### III. The Certain Insurers Lack Standing to Object to the Fourth Amended Plan's Non-Debtor Release Provisions

32. Because the Fourth Amended Plan contemplates full payment of Inbound Contribution Claims, including Insurer Contribution Claims, through the application of the Judgment Reduction Provision, the Certain Insurers do not have standing to object to the Fourth Amended Plan on the basis of Purdue Pharma and alleged nonconsensual third-party releases. The Diocese respectfully submits that this Court should only entertain plan confirmation objections from the Certain Insurers to the extent it finds that the Certain Insurers (i) have a financial stake that may be directly and adversely affected by confirmation sufficient to qualify them as parties in interest under section 1109(b) and (ii) can establish constitutional and prudential standing for each objection they seek to assert.

33. Additionally, it appears that the Certain Insurers do not even address in their objections the provisions in the Fourth Amended Plan concerning the Judgment Reduction Provision, which the Diocese submits resolves any concerns the Certain Insurers may have with respect to non-debtor third-party contribution claims. Unlike the dispute in the case of *In re Boy Scouts of Am. and Delaware BSA LLC,* which utilized estimates and speculation to determine when and if victims will be paid in full, here, the Diocese is not relying on estimates or speculation to determine what, if any, amount may be owed to Non-Settling Insurers.

34. Pursuant to the terms of the Fourth Amended Plan, Non-Settling Insurers are entitled to an equivalent reduction against any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer, which includes the Certain Insurers. Accordingly, the Certain Insurers cannot demonstrate that they will suffer any concrete

claimant or Trust, as applicable, to reimburse all monetary obligations arising from Medicare Claims and the Trust to indemnify to indemnify the Protected Parties for the same).

and particularized injury in fact that is actual and imminent, not speculative, as a result of confirmation of the Fourth Amended Plan.

35. In light of the foregoing, the Diocese submits that the Insurers do not have standing to object to the Disclosure Statement on the basis that the Fourth Amended Plan is unconfirmable because it is alleged to provide nonconsensual third-party releases of their claims. Therefore, any attempt by the Insurers to rely on *Purdue* to argue that the Fourth Amended Plan should be deemed unconfirmable is clearly relying on the hypothetical interest of other parties. The Plan Proponents respectfully submit that the Insurers do not have standing to, nor do they need to, represent the interests of the Abuse Claimants, whose interests are ably represented by the Committee. Any attempts by the Insurers to invoke *Purdue* as an objection to the Disclosure Statement or to confirmation of the Fourth Amended Plan should be denied in their entirety.

Dated: October 25, 2024
Syracuse, New York

BOND, SCHOENECK & KING, PLLC

By: *_______/s/ Stephen A. Donato_______*

Stephen A. Donato, Esq. (Bar Roll #101522)
Charles J. Sullivan, Esq. (Bar Roll #507717)
Sara C. Temes, Esq. (Bar Roll #514148)
Grayson T. Walter (Bar Roll #518237)
Justin S. Krell, Esq. (Bar Roll #704364)
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Email: sdonato@bsk.com
csullivan@bsk.com
stemes@bsk.com
gwalter@bsk.com
jkrell@bsk.com

*Attorneys for The Roman Catholic Diocese of Syracuse, New York*

STINSON LLP

By: */s/ Robert T. Kugler*

Robert T. Kugler (MN #0194116)
Edwin H. Caldie (MN #0388930)
Andrew J. Glasnovich (MN #398366)
50 S 6th Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 335- 1500
Robert.Kugler@stinson.com
Ed.Caldie@stinson.com
Drew.Glasnovich@stinson.com

*Counsel to the Official Committee of Unsecured Creditors*