So Ordered.

Signed this 14 day of November, 2024.



_____

Wendy A. Kinsella

United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

The Roman Catholic Diocese of Syracuse,
New York,

         Debtor.

Case No. 20-30663

Chapter 11

**ORDER DENYING APPROVAL OF THE DISCLOSURE STATEMENT IN SUPPORT OF FOURTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK DATED SEPTEMBER 13, 2024**

On November 7, 2024 the Court held a hearing (the "Disclosure Statement Hearing") on Debtor's *Motion For Entry Of An Order (I) Approving Disclosure Statement; (II) Approving Solicitation Packages And Distribution Procedures; (III) Approving The Forms Of Ballots And Establishing Procedures For Voting On Fourth Amended Joint Plan And Consenting To Third Party Releases; (IV) Approving The Form, Manner, And Scope Of Confirmation Notices; (V) Establishing Certain Deadlines In Connection With Approval Of The Disclosure Statement And Confirmation Of Fourth Amended Joint Plan; And (VI) Granting Related Relief* (the "Motion" at

Doc. 2178) and *Disclosure Statement In Support Of Fourth Amended Joint Chapter 11 Plan Of Reorganization For The Roman Catholic Diocese Of Syracuse, New York* (the "Disclosure Statement" at Doc. 2173) to address the adequacy of the Disclosure Statement which relates to the *Fourth Amended Joint Chapter 11 Plan Of Reorganization For The Roman Catholic Diocese Of Syracuse, New York* (the "Plan" at Doc. 2172),[1] together with the Executive Summary (the "Executive Summary" at Doc. 2209), and the Plan Supplement (the "Plan Supplement" at Doc. 2207),[2] proposed jointly by The Roman Catholic Diocese of Syracuse, New York (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee," collectively with Debtor, the "Plan Proponents"). The Plan Supplement includes: (i) Exhibit 1, the proposed Allocation Protocol (the "Allocation Protocol"); (ii) Exhibit 2, the proposed Consenting Abuse Claim Release Agreement; (iii) Exhibit 3, the proposed Non-Participating Abuse Claim Release Agreement; (iv) Exhibit 4, the proposed Trust Agreement; (v) Exhibit 5, the proposed List of Insurance Policies; (vi) Exhibit 6, the proposed Child Protection Protocols; (vii) Exhibit 7, the proposed List of Assumed Contracts and Leases; (viii) Exhibit 8, the proposed Litigation Claimant Agreement; (ix) Exhibit 9, the proposed Non-Participating Litigation Claimant Agreement; (x) Exhibit 10, the proposed DOS Trust Note; and (xi) Exhibit 11, the proposed DOS Trust Security Agreement. The Motion also included a request for approval of: (i) the solicitation package (the "Solicitation Package"); (ii) distribution procedures (the "Distribution Procedures"); and (iii) the forms of ballots (the "Ballots") (collectively, the "Solicitation Procedures").

Objections were filed to the Motion and Disclosure Statement from the following parties: (i) The National Catholic Risk Retention Group, Inc. (the "TNCRRG Objection" at Doc. 2263);

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan.
[2] As the Court has previously noted, findings of good faith will be limited only to the Plan, not Plan Supplements or Ancillary Documents.

2

(ii) collectively, Interstate Fire & Casualty Company and Fireman's Fund Insurance Company, Certain Underwriters at Lloyd's, London, and London Market Companies, and Hartford Fire Insurance Company (the "Certain Insurers' Objection" at Doc. 2260); (iii) Travelers Insurance Company Limited, Travelers Casualty and Surety Company and Traveler's Indemnity Company (the "Travelers' Objection" at Doc. 2265); (iv) Certain Underwriters at Lloyd's, London, and London Market Companies (the "LMI Objection" at Doc. 2258); and (v) Catholic Mutual Relief Society of America (the "Catholic Mutual Objection" at Doc. 2289) (collectively, the "Insurers' Objections"). In addition to the Insurers' Objections, the United States Trustee (the "UST") filed an Omnibus Objection (the "UST Objection" at Doc. 2261). The Plan Proponents jointly filed an Omnibus Reply to these objections (the "Plan Proponents' Joint Omnibus Reply" at Doc. 2281).[3] The Parishes and certain other Catholic-affiliated Entities (the "Parishes") filed a joinder to the Plan Proponents' Joint Omnibus Reply (the "Parishes' Joinder" at Doc. 2293), and Child USA filed a statement in support of the Plan (the "Child USA Statement" at Doc. 2292).

The Court heard extensive arguments on the Objections at the Disclosure Statement Hearing and reconvened to issue an oral ruling to address several issues outlined more fully below.

I. **Opt-Out Ballot in Light of *Purdue Pharma***

Although many of the objections raised by the parties are more suited to confirmation, several of them assert the Plan is patently unconfirmable. If a plan is patently unconfirmable on its face, the motion to approve the disclosure statement must be denied, as solicitation of the vote would be futile. *See In re Quigley Co., Inc.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007). The UST and Certain Insurers have raised concerns over the proposed Class 5 Ballot form and the Plan,

---

[3] Note that Plan Proponents' Joint Omnibus Reply was filed before Catholic Mutual Objection was filed. However, Catholic Mutual Objection did not proffer new objections, and only adopted objections set forth in the LMI Objection, Certain Insurers' Objection, and Travelers' Objection.

3

arguing the "opt-out" mechanism proposed is barred by the Supreme Court's holding in *Purdue Pharma*, thereby making the Plan patently unconfirmable. All parties recognize the sole method by which third parties may be released in a post-*Purdue Pharma* landscape is through consent. Contention now lies in the method by which consent may be obtained, as the Supreme Court in *Purdue Pharma* specifically declined to define methods by which consent is achieved: "Nor do we have occasion today to express a view on what qualifies as a consensual release . . . ." *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2088, 219 L. Ed. 2d 721 (2024) ("*Purdue Pharma*").[4]

The Plan and Solicitation Procedures propose an opt-out mechanism, whereby failure to affirmatively opt-out of releasing third parties[5] is deemed consent by a claimant. The proposed Ballot contains an optional form allowing a survivor to check an opt-out box, and if a survivor either does not check the box or fails to return a ballot, then such failure is deemed consent to the third-party releases. In the UST Objection and at the Disclosure Statement Hearing, the UST argued that the third-party releases cannot be accomplished by that procedure. Instead, the process is governed by state contract law that requires affirmative consent, and therefore an "opt-in" procedure must be used. *See* UST Objection, at 19 and 21 (citing *In re Smallhold,* No. 24-10267 (CTG), 2024 WL 4296938 (Bankr. D. Del. Sept. 25, 2024)).

In the absence of Supreme Court guidance, this Court looks to Second Circuit case law to determine the method by which consent may be established and whether silence or inaction can be deemed consent. It should be noted that in the Second Circuit's opinion and concurrence in *Purdue Pharma*, the court suggested that opt-out releases are consensual. *See In re Purdue Pharma LP,* No 22-110 (2d Cir. May 30, 2023) ECF No. 978-1 at 78 ("The Trustee also questions whether such a release, without an ability to opt-out, can comply with due process because it effectively denies

---

[4] Notably, the ballot in *Purdue Pharma* did not provide an opt-in or opt-out option.
[5] In the Plan, the third parties being released are identified as the Protected Parties.

4

claimants their day in court"); *In re Purdue Pharma LP,* No 22-110 (2d Cir. May 30, 2023) ECF No. 979 at 87–88 ("Finally, the Release is non-consensual; it binds consenting and objecting parties, without providing an opt-out option to those who object."). However, it appears the Second Circuit has not specifically addressed this issue and there is a split in lower court cases within the Circuit. In addition, many of the cases cited by the parties—both in support of and against the opt-out procedure—come from outside of the Second Circuit. As a result, the Court must analyze the rationale of the differing positions and determine the more persuasive arguments for the facts of this case.

As an initial matter, the Court takes a very conservative approach when considering whether to allow an opt-out ballot for third-party releases. Concerns raised regarding opt-out releases should be addressed on a case-by-case basis given the particular circumstances, just like any other plan provision. As a matter for the Court's discretion, there is no hard and fast rule on when they would be appropriate, and adequate notice remains a critical component of the analysis.

After reviewing the conflicting case law, the Court finds the reasoning provided in the *LATAM* and *Avianca* cases persuasive in allowing the opt-out procedure. *LATAM* recognized that "courts in this district routinely approve opt out release language in cases in which creditors and interest holders have been provided with a clear and prominent explanation of the opt out procedure." *See In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, No. 20-11254 (JLG), 2022 WL 2541298 (Bankr. S.D.N.Y. July 7, 2022), *and motion to certify appeal denied*, No. 20-11254 (JLG), 2022 WL 2962948 (Bankr. S.D.N.Y. July 26, 2022), *and aff'd sub nom. In re LATAM Airlines Grp., S.A.*, 643 B.R. 756 (S.D.N.Y. 2022), *and aff'd sub nom. In re LATAM Airlines Grp., S.A.*, 643 B.R. 741 (S.D.N.Y. 2022), *aff'd sub nom. In re LATAM Airlines Grp. S.A.*, 55 F.4th 377 (2d Cir. 2022), *cert.*

denied sub nom. TLA Claimholders Grp. v. LATAM Airlines Grp. S.A., 143 S. Ct. 2609, 216 L. Ed. 2d 1209 (2023) (quotation marks omitted).  Similarly, *Avianca* found that "[i]f a creditor with a right to vote is sent a ballot that clearly explains that the ballot must be returned and the opt-out box checked if the creditor elects not to approve the third-party release, the release is effective as to that creditor." *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021).  The *LATAM* court reasoned that inaction can be considered action under appropriate circumstances, and that "[w]hen someone is clearly and squarely told if you fail to act your rights will be affected, that person is then given information that puts them on notice that they need to do something or else.  That's not a trap." 2022 WL 2206829, at *46 (quoting *Avianca*, 632 B.R. at 137).[6]

The UST repeatedly cited to *In re Smallhold* in support of its position, in which Judge Goldblatt declined to approve opt-out third-party releases in a standard commercial case in Delaware.  However, the *Smallhold* decision does not foreclose the use of opt-out releases in a mass tort case like this one.  Pertinently, Judge Goldblatt wrote:

> The Court also seeks to emphasize a further issue that today's decision does not decide. In a recent article, two leading practitioners suggest that in the mass tort context, particularly in a case in which there is a factual basis for a court to make findings akin to those that a court makes when it certifies a Rule 23(b)(3) class

---

[6] Judge Garrity noted in one footnote in *LATAM* the history of courts in the Second Circuit to allow opt-out ballots. *In re LATAM Airlines Grp., S.A.*, 643 B.R. at *47, FN 91 ("*See, e.g., In re China Fishery Grp. Ltd.*, Case No. 16-11895 (JLG), [ECF No. 2909] (Bankr. S.D.N.Y. Jan, 13, 2022) (confirming a plan with opt out third-party releases); *In re Philippine Airlines, Inc.*, Case No. 21-11569 (SCC) (Bankr. S.D.N.Y. Dec. 17, 2021) (same); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG), [ECF No. 2300] (Bankr. S.D.N.Y. Nov. 2, 2021) (same); *In re Stearns Holdings, LLC*, Case No. 19-12226 (SCC), [ECF No. 459] (Bankr. S.D.N.Y. Nov. 13, 2019) (same); *In re Ditech Holding Corp.*, Case No. 19-10412 (JLG), [ECF No. 1404] (Bankr. S.D.N.Y. Sept. 16, 2019) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC), [ECF No. 1308] (Bankr. S.D.N.Y. Feb. 27, 2019) (same); *In re Tops Holding II Corp.*, Case No. 18-22279 (RDD), [ECF No. 765] (Bankr. S.D.N.Y. Nov. 9, 2018) (same); *In re Cenveo, Inc. et al.*, Case No. 18-22178 (RDD), [ECF No. 685] (Bankr. S.D.N.Y. Aug. 21, 2018) (same); *In re BCBG Max Azria Global Holdings, LLC et al.*, Case No. 17-10466 (SCC), [ECF No. 591] (Bankr. S.D.N.Y. July 26, 2017) (same); *In re Cumulus Media Inc.*, Case No. 17-13381 (SCC), [ECF No. 769] (Bankr. S.D.N.Y. May 10, 2018) (same); *In re 21st Century Oncology Holdings, Inc.*, Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. Jan. 11, 2018) (same).").

> action, a bankruptcy court can and should treat an estate fiduciary as a class representative, giving that representative the authority to bind absent class members, subject to those members receiving individual notice and being afforded the opportunity to opt out. There may well be merit to that point. There are also challenges. In some mass torts, for example, the reason that bankruptcy has become the last resort is that the plaintiffs lacked sufficient commonality to permit the defendant to obtain a global resolution through a Rule 23 class action. That question is not presented in this case. But nothing in the Court's rejection of the opt-out release in the circumstances presented here should be construed to foreclose reaching a different outcome in a circumstance such as the one presented in that article.

No. 24-10267 (CTG), 2024 WL 4296938 at *15 (citing Marshall S. Huebner and Kate Somers, *Opting Into Opting Out: Due Process and Opt Out Releases*, 43 AM. BANKR. INST. J. (Aug. 2024)).

To demonstrate commonality under Fed R. Civ. P. 23(a), a party must show that the class members have "suffered the same injury" and that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution." *Marcus v. AXA Advisors, LLC*, 307 F.R.D. 83, 96 (E.D.N.Y. 2015) (quoting *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 80 (2d Cir.2015)). The question asked to determine commonality is whether the evidence on the record demonstrates a likelihood that common answers will be determined via a class action approach or whether differences among proposed class members will necessarily generate individualized determinations as litigation moves forward. *See Aley v. Lightfire Partners, LLC*, Case No. 22-cv-00330, 2024 U.S. Dist. LEXIS 156946 (N.D.N.Y. Aug. 30, 2024).

Here, all Class 5 Claimants subject to the opt-out provisions are sexual abuse survivors who are represented by their fellow survivors sitting on the Committee. This is a vastly different situation from the standard commercial chapter 11 case where there are often several different types of committee members representing a myriad of creditors, ranging from landlords, vendors, utilities, credit card companies, and various other unsecured creditors. In contrast, the survivors here have all suffered the same injury of sexual abuse, and their claims depend upon a common contention of such a nature that it is capable of classwide resolution. Therefore, while not in a traditional mass tort class action context, the survivors share the commonality characteristics required by Fed. R. Civ. P. 23(a), and the Court finds the circumstances permitting an opt-out mechanism as discussed in the *Smallhold* decision to be present.

The Court also finds this situation warrants the treatment of the Committee as both an estate fiduciary as well as a class representative. The Committee, as a representative, has the authority to bind absent class members, subject to those members receiving individual notice and being afforded the opportunity to opt out. *In re Smallhold*, No. 24-10267 (CTG), 2024 WL 4296938 at *15. Under the Bankruptcy Code, the Committee's role includes participating in the formulation of a plan, advising those represented by such committee of such committee's determination as to any plan formulation, and performing such other services as are in the interest of those represented. *See* 11 U.S.C. § 1103. "It is well settled that statutory unsecured creditors' committees owe a fiduciary duty to the entire class of creditors represented by such committee . . . ." *In re Residential Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012); *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006). This fiduciary duty includes putting their individual interests ahead of their own for the benefit of all of the class members. *See, e.g., In re Haskell-Dawes, Inc.*, 188 B.R. 515, 522 (Bankr. E.D. Pa. 1995) ("[T]he creditors appointed to the creditors' committee have a fiduciary

8

obligation to act in the interests of the members whom they represent . . . . This duty prohibits members of the creditors' committee from using their position to advance their own individual interests."). In this case, the Committee is comprised of seven survivors who have been actively involved in every aspect of this case. The Committee as a whole is not just a supporter, but a negotiator and proponent of the Plan and the Solicitation Procedures that include the opt-out mechanism. If the Committee, as the *de facto* class representative, believes that process is in the best interests of the Class 5 Claimants and no individual Abuse Claimants have objected to it, the Court will allow it.

There are additional considerations unique to this case that support allowing an opt-out ballot. While a layperson claimant may not understand the need to opt out to avoid being bound by the third-party releases, the vast majority of survivors are represented by counsel that have actively participated in this case who can explain the process and legal implications to them. The Court has been informed that of the 433 survivor claimants, only 24 of them are not represented by counsel. *See* Disclosure Statement Hearing Transcript, at 02:11:40 (Nov. 7, 2024), ECF No. 2305. With 94% of the survivors represented by sophisticated counsel, concerns that the legalese of an opt-out ballot may confuse a claimant who inadvertently agrees to the releases are minimized. The active participation of claimants' counsel is another factor that favors the use of the opt-out mechanism here.

The adequacy of consideration paid in exchange for the third-party releases and resulting recovery provided to survivors are factors that also weigh in favor the opt-out process. The Plan requires Debtor to pay $50M into a trust with the Participating Parties contributing an additional $50M in exchange for the releases. At the time of that settlement, it was the second largest settlement between a Diocese and the survivors in any bankruptcy case. While the facts of specific

9

abuse and the Allocation Protocol will determine a survivor's ultimate payment, the recoveries are not expected to be illusory or meager, but are anticipated to be meaningful. The Committee fully supports the $100M settlement and expected distributions to survivors.

Lastly, requiring an opt-in ballot with affirmative consent to third-party releases ignores the realities of this case. For voting on the Third Amended Plan, the record showed approximately 100 out of approximately 400 claimants did not return a ballot, and of the 305 claimants that responded, all except for two supported the plan. *See id.* at 01:31:30; *Letter filed by Stephen A. Donato Dated July 10, 2024* (Doc. 2047). Counsel has represented to the Court the failure of individual survivors to vote is not because they are opposed to the Plan and releases, but for many survivors, the emotionally difficult nature of the case means that they simply do not wish to engage with the case, and prefer to rely on their lawyers.[7] *See* Disclosure Statement Hearing Transcript, at 1:31:30 (Nov. 7, 2024), ECF No. 2305. With that in mind, assuming the voting outcome on the Fourth Amended Plan is similar to the prior results, approximately 25% of survivors will not vote. Even if all voting claimants elected to opt in, the Participating Parties would still be left with exposure for 25% of all Abuse Claims. While Debtor and the Participating Parties were not able to specify at the Disclosure Statement Hearing what percentage or value of opted out claims would prompt the Participating Parties to withdraw their $50M contribution, maintaining exposure for 25% of all claims may necessitate that withdrawal. Thus, those survivors whose trauma prevents them from completing an opt-in ballot may inadvertently and unknowingly cut the proposed Plan distributions by half, or worst case scenario, prompt Debtor to withdraw the Plan in its entirety.

---

[7] The apathetic creditor that is often emblematic of a chapter 11 case is not found here. *See, e.g.,* Sather, Stephen W. & Barron, Barbara M., *Voting and the Apathetic Creditor,* 39 AM. BANKR. INST. J. 12, FN. 11 (Dec. 2020) (positing methods by which apathetic creditors, a phenomenon that is prevalent enough to warrant such an article, may affect a plan, and collecting cases).

In light of the above circumstances, the Court finds that the opt-out mechanism proposed in this case (as modified below) does not run afoul of *Purdue Pharma* and make the Plan patently unconfirmable. The Court notes that the burden remains with the Plan Proponents to demonstrate notice and due process requirements are satisfied at confirmation in accordance with the Federal Rules of Bankruptcy Procedure. *See In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 28072, at *5 (Bankr. S.D.N.Y. Jan. 2, 2021) ("[N]otice requirements are designed to provide procedurally adequate notice to creditors . . . . To satisfy due process there must be notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.") (quotation marks omitted); *see also In re Franklin Indus. Complex, Inc.*, 386 B.R. 5, 10 (Bankr. N.D.N.Y. 2008) (stating with respect to disclosure statements, bankruptcy courts must "insure that due process concerns are protected").

## II.     Form of Ballots, Treatment, and Deficiencies

In finding the opt-out mechanism generally appropriate in this case, the Court nevertheless declines to approve the current form of the Solicitation Procedures and Ballots. In particular, the Class 5 Ballot must be revised to provide the "opt-out" box in the body of the Ballot, not as a separate Optional Release and Injunction Election Form which may be overlooked by voting claimants. The need to ensure sufficient, clear notice of the opportunity to "opt-out" is critical if that process is going to bind claimholders to the releases and injunctions. In addition, the Plan Proponents must remove the "doomsday" language in the Ballot and Executive Summary directed to those survivors who may be considering treatment as a Non-Participating Abuse Claimant. While Non-Participating Abuse Claimants may receive a reduced distribution under the Plan, their rights against the Protected Parties are preserved and they should not be coerced or guilted into

11

consenting to the third-party releases and injunctions. The Court directs the Plan Proponents to the ballot identified as Exhibit B Form of Claim Holder Ballot Class 3 (Asbestos Claims), *In re Paddock Enterprises, LLC*, No. 20-10028-LSS (Bankr. D. Del.), ECF No. 1216-2 as an example of non-inflammatory language that informs a claim holder of the impact of the failure to opt out.[8] While there may be additional information provided about the consequences of many opt-out ballots and the impact on Plan feasibility, the language should not be intimidating.

The Court also finds additional information on the survivors' treatment must be provided before the requirements of 11 U.S.C. § 1125 are satisfied. Many of this Court's concerns were shared by the Honorable Martin Glenn when he held: "As a guiding principle, the Disclosure Statement should provide in easy-to-digest terms what rights an Abuse Claimant possesses under the Plan as well as what an Abuse Claimant can expect in terms of recovery and distribution. The Court believes that such information would allow Abuse Claimants to make an informed assessment how they may fare if they pursued their claims outside of the bankruptcy system and, therefore, whether they would vote in favor of or against the Plan." *In re The Roman Catholic Diocese of Rockville Center*, *New York* Case No. 20-12345 (Bankr. S.D.N.Y. Jan. 18, 2024), ECF No. 2828, at 3. In addition, "Abuse Claimants should be not expected to navigate multiple documents and cobble together bits and pieces of information in an effort to ascertain what rights they may or may not possess." *Id*. at 4–5. While the Executive Summary resolved many of those

---

[8] The following is an example of non-inflammatory language that would be acceptable to the Court: IMPORTANT NOTICE REGARDING RELEASES: IF YOU DECLINE TO VOTE ON THE PLAN OR VOTE TO REJECT THE PLAN AND WISH TO OPT OUT OF GIVING THE RELEASE PROVIDED IN SECTION 10.6 OF THE PLAN, YOU MUST MAKE THE OPT OUT SELECTION ON THIS BALLOT. UNLESS YOU VOTE TO REJECT THE PLAN OR DECLINE TO VOTE ON THE PLAN AND ELECT TO OPT OUT OF THE RELEASE CONTAINED IN SECTION 10.6 OF THE PLAN BY CHECKING THE OPT-OUT BOX, IF THE PLAN BECOMES EFFECTIVE, YOU WILL BE DEEMED TO PROVIDE THE RELEASE CONTAINED IN SECTION 10.6 OF THE PLAN, REGARDLESS OF WHETHER YOU VOTE TO ACCEPT, REJECT, OR DECLINE TO VOTE ON THE PLAN. *See* Exhibit B Form of Claim Holder Ballot Class 3 (Asbestos Claims). *In re Paddock Enterprises, LLC*, No. 20-10028-LSS (Bankr. D. Del.), ECF No. 1216-2.

concerns, the Court believes this issue remains relevant, especially in light of the different treatment options presented to a survivor to be either a Participating Abuse Claimant or a Non-Participating Abuse Claimant.

Accordingly, the Court directs Debtor to revise the Executive Summary to add (i) a plain English description of the treatment of Non-Participating Abuse Claims; (ii) the impact that an Abuse Claimant's election to proceed as a Non-Participating Abuse Claimant may have on the Plan's likelihood of success; and (iii) a statement that the Participating Parties' contributions may be reduced or eliminated, or the Plan may be withdrawn depending on whether a certain number of Abuse Claimants elect to opt out of the release and injunction provisions.

In addition, the Exculpation and Release Provisions are too broad and cannot extend to "related persons of the Persons and Entities," nor should these exculpation and release provisions cover post-effective date activity. The Exculpation Provision should be limited to estate fiduciaries and their professionals, the Committee and its members, the mediators, and Debtor's officers and directors who participated in the Chapter 11 process from the Petition Date to the Effective Date. If there are other specific persons or entities that should be covered, they should be identified and an explanation of their involvement in the case should be provided.

Additional deficiencies that must be addressed: (1) the Court will not approve the limitations on liability under New York C.P.L.R. and General Obligations Law in Section 4.4.4 of the Plan, as those statutory limits will be decided in the appropriate forum; (2) to date, the Plan Proponents have not yet filed their list of Participating Parties for the current Plan and are directed to do so; (3) the Disclosure Statement must make it clear, if it is the Plan Proponents' intention, that the Plan does not extinguish or reduce the Non-Settling Insurers' Contribution Claims (as a subset of Inbound Contribution Claims) and to the extent any such claims exist, the Channeling

Injunction regarding Participating Parties does not apply to them in violation of *Purdue Pharma* (*see* Plan Proponents' Joint Omnibus Reply at ¶ 40); (4) the Plan Proponents may not limit the Non-Settling Insurers' remedies under Section 8.8.3 of the Plan, nor are the Non-Settling Insurers entitled to enhanced rights as a result of the Chapter 11 Case.  The applicable law and insurance policies establishing any recovery or defenses will be determined in the Insurance Coverage Litigation or claim specific litigation at the appropriate time; (5) to the extent the Plan Proponents intend to include payment of liability and defense costs for Non-Participating Abuse Claims from the Post Effective Date Costs Reserve to maintain insurance coverage, they should add that information; (6) in light of the inclusion of the opt-out mechanism and Plan Proponents' request to bind non-voting Class 5 Claimants to the releases and injunctions, the Solicitation Provisions should be amended to provide for a Publication Notice reflecting that opt-out process and the consequences of not opting out or failing to return a ballot to be published once in either *The New York Times* or *USA Today* and in each of *The Post Standard*, *The Rochester Democrat & Chronicle*, *The Observer-Dispatch*, *The Press & Sun Bulletin*, *The Albany Times Union*, *The Catholic Sun, North Country Catholic*, and *The Evangelist*, not more than twenty-eight (28) days after the entry of any order approving the Disclosure Statement and Solicitation Procedures; (7) the UST's concerns regarding classification of the Chapter 11 Quarterly Fees as administrative expenses should be addressed.  The Court will consider the issue regarding what constitutes a disbursement—whether it is only Debtor's $50M contribution or the $100M contribution by Debtor and Participating Parties—at the confirmation stage; (8) the Disclosure Statement should be revised to clearly disclose that if some amount of holders of Abuse Claims are not deemed to be Consenting Abuse Claims, the Plan Proponents maintain the option to withdraw the Plan.

While recognizing many of these issues are more appropriately heard at confirmation,[9] the Court denies approval of the Disclosure Statement and Solicitation Procedures in their current form. Debtor is directed file a redlined Disclosure Statement, Class 5 Ballot and corresponding documents that need to be amended in accordance with this Order by November 26, 2024 at 12:00 p.m. Any Supplemental Objections addressing only the redlined changes are due by December 2, 2024, at 12:00 p.m. The Disclosure Statement Hearing is adjourned to December 4, 2024 at 1:00 p.m. and will be held **ONLY TELEPHONICALLY**, and can be accessed by dialing (315) 691-0477 and entering Conference ID: 932081324#.[10]

###

---

[9] All objections to Plan confirmation are preserved, including but not limited to those objections regarding the breadth and scope of the release, injunction and exculpation provisions after *Purdue Pharma*.

[10] In the event Debtor requires additional time to make the revisions, Debtor may file a letter on the docket and the Court will hold a status conference on December 4, 2024 at 1:00 p.m.