UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

IN RE:

|  |  |
|---|---|
| | Case No. 20-30663 |
| The Roman Catholic Diocese of Syracuse, New York, | Chapter 11 |
| | |
| Debtor. | |

_____

### UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR THE ROMAN CATHOLIC DIOCESE OF SYRACUSE, NEW YORK

TO: THE HONORABLE WENDY A. KINSELLA, UNITED STATES CHIEF BANKRUPTCY
    JUDGE:

William K. Harrington, the United States Trustee for Region 2 (the "United States Trustee"), through counsel, objects to confirmation of the *Fifth Amended Joint Chapter 11 Plan* [ECF Dkt. No. 2337] (the "Plan"), and in support of his objection respectfully states as follows:

### PRELIMINARY STATEMENT

The United States Trustee objects to confirmation of the Plan on the grounds that it improperly seeks to impose non-consensual third-party releases in violation of the Bankruptcy Code, established precedent, and governing principles of consent. The Plan purports to provide all creditors—including those who do not vote or otherwise participate in the case—the right to opt out of the third-party releases and injunctions to avoid being bound by them. However, the proposed opt-out procedure is procedurally flawed and, even if those procedural flaws are corrected, the proposed opt-out structure effectively presumes consent where none has been given, placing the burden on creditors to take affirmative action to protect their rights.

The procedural flaws have a significant impact on the rights of creditors. As to creditors who have no right to vote but are deemed to accept or reject the Plan, such as the Inbound

1

Contribution Claimants, they are not even given an opportunity to utilize the flawed opt-out approach, but instead, must file an objection to the Plan to avoid having the third-party releases imposed upon them.  Potentially more egregiously, the holders of certain unclassified claims, such as Medicare Claims and Extra-Contractual Claims, have their claims channeled to the Trust without any ability to vote or comment on the Plan as there is no procedure for these non-creditor claimants (as they hold third party claims) to object to the Plan.  However, holders of such claims are prohibited from pursuing remedies against third parties, except through the Trust.  In some cases, they may not be entitled to receive any payment from the Trust, as the Trust's protocols bar recoveries for distributions for these types of claims.

Finally, creditors who have and exercise their rights to the flawed opt out procedures—the Non-Participating Abuse Claimants—will retain certain rights to pursue their claims in other forums and to seek a distribution from the estate.  However, to do so, they must sign an agreement that significantly modifies their rights, including their entitlement to any estate distribution, access to insurance proceeds related to their claim, and the ability to pursue certain other claims.  Once a Non-Participating Abuse Claimant's claim is adjudicated, estate claims may be pursued only against a sub-trust funded solely by the Debtor's contribution.  This sub-trust does not include funds the Trust receives from Participating Parties or Settling Insurers, including any portion which might be part of an estate settlement against such parties.  Although the rights to sue Participating Parties and Settling Insurers is technically preserved, it is significantly limited by the Settling Insurer Injunction and the channeling of certain claims, such as the Extra-Contractual Claims.  As a result, any preserved rights are effectively eliminated.  This makes the opt-out mechanism flawed and coercive as it significantly restricts the rights of those who opt out including, among others, the rights to certain distribution on their

estate claims.  An opt-out cannot be construed as consent when it is coercive and where those who elect it are penalized for that choice.

If the flaws to the purported opt-out procedure can be resolved, the Plan's opt-out procedure still remains problematic as it fails to comply with state law. Although the Court, in its Order Denying Approval of the Fourth Amended Disclosure Statement, attempted to resolve the issue of what constitutes valid consent to such releases, an opt-out mechanism for third-party releases does not create affirmative consent under state law.  The Supreme Court's recent decision in *Harrington v. Purdue Pharma, L.P.* definitively establishes that bankruptcy courts lack the statutory authority to approve non-consensual third-party releases unless expressly authorized by Congress.  The Bankruptcy Code is silent on such authority, and no provision permits an opt-out regime as a substitute for actual, affirmative consent, and thus, state law applies.

Additionally, the Court's reliance on class action procedures under Fed. R. Civ. P. 23 to validate procedural mechanisms such as deemed consent or opt-out releases in bankruptcy conflates the procedural safeguards applicable in civil litigation with the unique requirements within the Bankruptcy Code.  Deemed consent and opt-out mechanisms are particularly problematic in this context because they lack the rigorous notice and fairness requirements of Rule 23.  Similarly, there is no legal basis for the Court's treatment of the Official Committee of Unsecured Creditors to function both as a fiduciary and as a class representative for the purpose of granting or negotiating third-party releases on behalf of all unsecured creditors.  The Committee is appointed to act as a fiduciary, representing the collective interests of all unsecured creditors in their claims against the Debtor, not third parties, and ensuring their rights are adequately protected during the bankruptcy proceedings.  However, serving simultaneously as a

class representative with the authority to negotiate third-party releases imposes conflicting responsibilities that are incompatible with the Committee's core duties.  Such a dual role contravenes the individual autonomy of creditors and risks conflicts of interest that undermine the integrity of the confirmation process.

Finally, even though the proposed Plan does not contain current settlements with any Settling Insurers, it contains, under the guise of 363(f) protections, non-consensual non-debtor third party releases and injunctions for the Settling Insurers (and as to which no creditor may opt out).  There currently are no Settling Insurers, so the proposed releases and injunctions are prospective releases and injunctions that may arise from future settlements between certain yet to be disclosed insurers and the Debtor or the Trust.  As these releases are being granted prospectively, no creditor will have a chance to evaluate and provide knowing and affirmative consent to the same as such settlements have not yet been achieved and the Settling Insurers have not yet been identified.  While section 363(f) provides limited protection for a purchaser with respect to the Debtor's interest in property that is sold in a bankruptcy case, it does not authorize broad prospective non-consensual non-debtor releases that insulate future purchasers of some of the Debtor's assets from any and all claims including direct claims against a future purchaser of the Debtor's assets.

Section 1129(a) of the Bankruptcy Code sets forth the criteria a plan must meet to be confirmed. The Plan fails to comply with section 1129(a)(1), which requires that the Plan adhere to the applicable provisions of the Code.  Because the third-party release provisions are not consensual, the Plan does not meet the requirements of section 1129 and cannot be confirmed.

Accordingly, the Court should deny confirmation of the Plan.

## **BACKGROUND**

1.        On June 19, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy

Court for the Northern District of New York (the "Court").  ECF Dkt. No. 1.  The Debtor is

represented by Bond, Schoeneck & King, PLLC.

2.        On July 9, 2020, pursuant to Section 1102 of the Bankruptcy Code, the United States

Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee").

ECF Dkt. No. 38.  The Creditors' Committee employed as its counsel Stinson, LLP.

3.        The Debtor currently is operating its business and managing its affairs pursuant to

Sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in

this case.

4.        On December 6, 2023, the Debtor filed a Disclosure Statement in Support of Joint

Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York

along with a Joint Plan of Reorganization.  ECF Dkt. Nos. 1565, 1566.

5.        On January 16, 2024, the Debtor filed its Motion for entry of an Order (I) Approving

Disclosure Statement; (II) Approving Solicitation Packages and Distribution Procedures; (III)

Approving the Form of Ballot and Establishing Procedures for Voting on Plan; (IV) Approving

the Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in

Connection with Approval of the Disclosure Statement and Confirmation of the Plan; and (VI)

Granting Related Relief.  ECF Dkt. No. 1626.

6.      On February 8, 2024, the Court entered an Order Denying Approval of the Disclosure Statement in Support of Joint Chapter 11 Plan of Reorganization.  ECF Dkt. No. 1664.

7.      On April 16, 2024, the Debtor filed a Third Amended Disclosure Statement in Support of the Third Amended Joint Plan of Reorganization ("Third Amended Disclosure Statement") and a Third Amended Joint Chapter 11 Plan of Reorganization.  ECF Dkt. Nos. 1818, 1817.

8.      The Court entered an Order approving the Third Amended Disclosure Statement on May 2, 2024.  ECF Dkt. No. 1859.

9.      On June 27, 2024, the Supreme Court issued its decision in *Harrington v. Purdue Pharma, L.P.*, 144 S.Ct. 2071 (2024).

10.     On September 13, 2024, the Debtor filed its Fourth Amended Joint Plan and Disclosure Statement.  ECF Dkt. No. 2172, 2173.

11.     On November 14, 2024, the Court entered an Order Denying Approval of the Disclosure Statement in Support of Fourth Amended Joint Chapter 11 Plan of Reorganization ("Order Denying Approval of Fourth Amended Disclosure Statement").  ECF Dkt. No. 2308.

12.     The Order Denying Approval of Fourth Amended Disclosure Statement *inter alia* approved opt-out procedures, noting that there is "no hard and fast rule on when they would be appropriate," and that "opt out releases should be addressed on a case-by-case basis."  ECF Dkt. No. 2308, page 5.  However, the Order Denying Approval of the Fourth Amended Disclosure Statement preserved the rights of all parties to raise any and all *Purdue* related issues at the confirmation hearing.

13.     On November 27, 2024, the Debtor filed its Fifth Amended Disclosure Statement in

Support of the Fifth Amended Joint Plan of Reorganization ("Disclosure Statement") and a Fifth

Amended Joint Chapter 11 Plan of Reorganization ("Plan").  ECF Dkt. Nos. 2337, 2338.

14.     On, December 9, 2024, the United States Trustee filed a Supplemental Objection to

the Disclosure Statement and Plan and Reservation of Rights on the basis that the Disclosure

Statement and Plan continued to provide for nonconsensual third-party releases not authorized

under the Bankruptcy Code, and reserving all rights, claims, arguments, defenses, and remedies

with respect to confirmation of the Plan.  ECF Dkt. No. 2355.

15.     On December 23, 2024, the Court entered an Order Approving the Fifth Amended

Disclosure Statement; Approving Solicitation Packages and Distribution; Approving the Forms

of Ballots and Establishing Procedures for Voting on Fifth Amended Joint Plan and Consenting

to Third Party Releases; Approving the Form Manner, and Scope of Confirmation Notices;

Establishing Certain Deadlines in Connection with Approval of the Disclosure Statement and

Confirmation of Fifth Amended Joint Plan; and Granting related Relief ("Order Approving Fifth

Amended Disclosure Statement").  ECF Dkt. 2398.

**Key Definitions and Provisions of Disclosure Statement and Plan**

16.     The Plan defines "Released Parties" as follows:

…(i) the Diocese and its Related Persons; (ii) the Reorganized Diocese and its Related
Persons; (iii) the Participating Parties and their Related Persons; (iv) a Settling Insurer,
but only to the extent that such Settling Insurer's liability arises out of liabilities covered
by the Settling Insurer Policies; and (v) a Settling Insurer's Related Persons, but only to
the extent such Person's liability arises out of liabilities covered by the Settling Insurer
Policies; provided, however, that "Released Parties" shall not include: (i) any Person who
perpetrated an act of Abuse; or (ii) any religious order, diocese, or archdiocese, unless
such entity is identified as a Participating Party on Exhibit A.

Plan, § 1.1.164.

17.     The Plan defines "Related Person" as follows:

7

…with respect to any person or entity, such person's or entity's predecessors, successors, assigns, and present and former shareholders, members, affiliates, subsidiaries, employees, Agents, brokers, adjusters, managing agents, claims agents, underwriting agents, administrators, officers, directors, trustees, partners, attorneys, financial advisors, accountants, and consultants, each in their capacities solely as such.

Plan, § 1.1.162

18.     The Plan defines "Protected Parties" as follows:

…the Diocese, the Reorganized Diocese, the Participating Parties, the Settling Insurers, any Settling Insurer Covered Persons.

Plan, § 1.1.160

19.     The Plan defines "Channeled Claims," in relevant part, as follows:

… any Abuse Claim, Inbound Contribution Claim, Medicare Claim, Extra-Contractual Claim, or any other Claim against the Diocese or any Protected Party arising from or related in any way to an Abuse Claim or any of the Settling Insurer Policies, whenever and wherever arising or asserted, whether sounding in tort, contract, warranty, or any other theory of law, equity, or admiralty, including without limitation all Claims by way of direct action, subrogation, contribution, indemnity, alter ego, statutory or regulatory action, or otherwise, Claims for exemplary or punitive damages, for attorneys' fees and other expenses, or for any equitable remedy … .

Plan, § 1.1.30.

20.     Section 12 of the Plan sets forth the Plan's injunction provisions (the "Injunction Provisions").  Section 12.1.1 of the Injunction Provisions describes the "General Injunction and Discharge" and provides for an injunction against bringing claims against the Diocese as follows (emphasis added):

**EXCEPT WITH RESPECT TO ABUSE CLAIMS AND INBOUND CONTRIBUTION CLAIMS ADDRESSED IN SECTION 12.2 BELOW**, OR AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, **ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OF ANY KIND OR NATURE AGAINST THE DIOCESE,** WHETHER KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY,

***THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE OR THE DIOCESE'S AGENTS, BEFORE THE CONFIRMATION DATE***, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL INTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF NON-ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE, WHETHER OR NOT (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE, (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN, ***ARE PERMANENTLY ENJOINED, ON AND AFTER THE CONFIRMATION DATE, FROM*** (A) COMMENCING OR CONTINUING IN ANY MANNER ***ANY ACTION OR OTHER PROCEEDING OF ANY KIND WITH RESPECT TO ANY SUCH CLAIM*** OR TAKING ANY ACT TO RECOVER SUCH CLAIM OUTSIDE OF THE CLAIMS ALLOWANCE PROCEDURE PROVIDED FOR IN THE PLAN AND THE BANKRUPTCY CODE AND BANKRUPTCY RULES, (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION, OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM AND (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DIOCESE OR THE REORGANIZED DIOCESE OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DIOCESE OR THE REORGANIZED DIOCESE ON ACCOUNT OF ANY SUCH CLAIM.

21.     Section 12.2.1 of the Plan's Injunction Provisions describes the "Injunction and Discharge of Abuse Claims and Inbound Contribution," which enjoins abuse claims and certain contribution claims against the Diocese, the Reorganized Diocese, and any Participating Party, as follows (emphasis added):

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 12.2.2 BELOW OR IN THE CONFIRMATION ORDER, ON AND AFTER THE EFFECTIVE DATE ***ALL PERSONS*** SHALL BE PERMANENTLY STAYED, ENJOINED, AND RESTRAINED FROM TAKING ANY ACTION, DIRECTLY OR INDIRECTLY, FOR THE PURPOSES

9

OF ASSERTING, ENFORCING, OR ATTEMPTING TO ASSERT OR ENFORCE ***AGAINST THE DIOCESE, THE REORGANIZED DIOCESE, OR ANY PARTICIPATING PARTY, ANY ABUSE CLAIMS OR INBOUND CONTRIBUTION CLAIMS,*** KNOWN OR UNKNOWN, WHETHER OR NOT GIVING RISE TO A RIGHT TO PAYMENT OR AN EQUITABLE REMEDY, THAT AROSE, DIRECTLY OR INDIRECTLY, FROM ANY ACTION, INACTION, EVENT, CONDUCT, CIRCUMSTANCE, HAPPENING, OCCURRENCE, AGREEMENT, OR OBLIGATION OF THE DIOCESE, ANY PARTICIPATING PARTY, OR THE DIOCESE'S OR ANY PARTICIPATING PARTY'S AGENTS, BEFORE THE CONFIRMATION DATE, OR THAT OTHERWISE AROSE BEFORE THE CONFIRMATION DATE, INCLUDING ALL NTEREST, IF ANY, ON ANY SUCH CLAIMS AND DEBTS, WHETHER SUCH INTEREST ACCRUED BEFORE OR AFTER THE DATE OF COMMENCEMENT OF THE CHAPTER 11 CASE, AND INCLUDING ALL CLAIMS AND DEBTS BASED UPON OR ARISING OUT OF ABUSE CLAIMS AND FROM ANY LIABILITY OF THE KIND SPECIFIED IN SECTIONS 502(g), 502(h), AND 502(i) OF THE BANKRUPTCY CODE,WHETHER OR NOT: (I) A PROOF OF CLAIM IS FILED OR IS DEEMED FILED UNDER SECTION 501 OF THE BANKRUPTCY CODE; (II) SUCH CLAIM IS ALLOWED UNDER THE PLAN; OR (III) THE HOLDER OF SUCH CLAIM HAS ACCEPTED THE PLAN.

IN A SUCCESSFUL ACTION TO ENFORCE THE INJUNCTIVE PROVISIONS OF THIS SECTION IN RESPONSE TO A WILLFUL VIOLATION THEREOF, THE MOVING PARTY MAY SEEK AN AWARD OF COSTS (INCLUDING REASONABLE ATTORNEYS' FEES) AGAINST THE NON-MOVING PARTY, AND SUCH OTHER LEGAL OR EQUITABLE REMEDIES AS ARE JUST AND PROPER, AFTER NOTICE AND A HEARING.

THE DISCHARGE AND INJUNCTIONS CONTAINED IN THE PLAN AND THE RELEASES PROVIDED UNDER THE PLAN DO NOT RELEASE OR IMPAIR AN ABUSE CLAIMANT'S RIGHT TO RECOVER ON ANY ABUSE CLAIM AGAINST ANY PERPETRATOR OF ABUSE FOR ACTS OF ABUSE THAT ARE INDEPENDENT OF THE LIABILITY OF THE DIOCESE OR ANY PARTICIPATING PARTY.

22.     Section 12.2.2 provides for exceptions to the Injunction Provisions ("Injunction

Exceptions"):

***Limited Exceptions to Injunctions.***

a. Non-Participating PP Abuse Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prevent a Non-Participating Abuse Claimant from pursuing or enforcing his or her Non-Participating PP Abuse Claim (if any) against a Participating Party.

b. Certain Inbound Contribution Claims Excepted. The injunctions set forth in Section 12.2.1 above, and Section 12.3 below, shall not apply to prohibit

the pursuit or enforcement of an Inbound Contribution Claim against a Participating Party by any Person who affirmatively indicates, by Filing a timely written objection to confirmation of the Plan, that they will not consent to having such Inbound Contribution Claim (if any) enjoined as contemplated in the Plan. Any Person who holds an Inbound Contribution Claim against a Participating Party, whether or not Filed with the Bankruptcy Court or in any Abuse Action, and who fails to File a timely written objection to confirmation of the Plan shall be conclusively deemed to consent to the injunction set forth in Sections 12.2.1 and 12.3 and shall be bound thereby.

23.     Section 12.3 sets forth the Plan's provision concerning a channeling injunction for Protected Parties that channels all Channeled Claims as defined above.  The Channeling Injunction provides, among other things, that all Channeled Claims are channeled to a Trust and holders of such claims are enjoined from taking any action, directly or indirectly (as further defined therein) against the Protected Parties.

24.     Section 12.4 sets forth the Plan's provision concerning a Supplemental Settling Insurer Injunction, which provides, among other things, that pursuant to insurance settlement agreements, including certain settling insurers' purchase of applicable settling insurer policies pursuant to section 363(g) of the Bankruptcy Code, Channeled Claims (including any claims of Non-Participating Abuse Claimants as such claims for these purposes are not excluded from the definition of Channeled Claims) are enjoined from taking any action, directly or indirectly, against the Settling Insurers or Settling Insurer Polices.  The proposed Plan does not contain current settlements with any Settling Insurers

25.     Section 12.7 of the Plan sets forth the Plan's provision concerning third-party releases.  The release provision provides in relevant part as follows (emphasis added):

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PLAN OR THE CONFIRMATION ORDER, AND TO THE FULLEST EXTENT AUTHORIZED BY APPLICABLE LAW, ***ALL HOLDERS OF CHANNELED CLAIMS, INCLUDING CONSENTING ABUSE CLAIMS (THE "RELEASING PARTIES")***, SHALL BE DEEMED TO PROVIDE ***A FULL RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CLAIMS RELATING TO***

11

THE DIOCESE, THE PARTICIPATING PARTIES, THE ESTATE, THE CONDUCT OF THE DIOCESE'S AND THE PROTECTED PARTIES' BUSINESSES, THE FORMULATION, PREPARATION, SOLICITATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE DISCLOSURE STATEMENT OR PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH OR PURSUANT TO THE DISCLOSURE STATEMENT, THIS PLAN, THE FILING AND PROSECUTION OF THE CHAPTER 11 CASE, THE PURSUIT OF CONFIRMATION AND CONSUMMATION OF THIS PLAN, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THIS PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS AMONG THE RELEASING PARTIES AND ANY RELEASED PARTY, ***OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE BEFORE THE EFFECTIVE DATE.***

THE FOREGOING RELEASE SHALL BE EFFECTIVE UPON THE OCCURRENCE OF THE EFFECTIVE DATE, EXCEPT THAT, SOLELY WITH RESPECT TO ANY ABUSE CLAIM THEY MAY HOLD, EACH CONSENTING ABUSE CLAIMANT WILL RELEASE THE DIOCESE OR ANY PARTICIPATING PARTY UPON THE OCCURRENCE OF THE ABUSE CLAIM DISCHARGE DATE APPLICABLE TO SUCH ABUSE CLAIM.

FOR THE AVOIDANCE OF DOUBT, PRIOR TO THE OCCURRENCE OF THE APPLICABLE ABUSE CLAIM DISCHARGE DATE AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE PLAN, A DULY AUTHORIZED LITIGATION CLAIMANT MAY NAME THE DIOCESE OR ANY PARTICIPATING PARTY IN A CASE OR PROCEEDING TO ADJUDICATE WHETHER THE DIOCESE OR ANY PARTICIPATING PARTY HAS LIABILITY FOR AN ABUSE CLAIM AND THE AMOUNT OF ANY SUCH LIABILITY, BUT THAT LITIGATION CLAIMANT'S RECOURSE IN SUCH CASE OR PROCEEDING SHALL BE LIMITED TO THE PROCEEDS OF ANY NON-SETTLING INSURER POLICIES AND ALL OTHER COSTS AND/OR DAMAGES THAT MAY BE RECOVERABLE AGAINST ANY NON-SETTLING INSURERS.

NOTHING IN THIS SECTION 12.7 SHALL BE DEEMED TO RELEASE ANY NON-PARTICIPATING PP ABUSE CLAIM A NON PARTICIPATING ABUSE CLAIMANT MAY HAVE AGAINST A PARTICIPATING PARTY (IF ANY).

26.     Section 12.9 of the Plan sets forth the Plan's provision concerning exculpation (the

"Exculpation Provision").  The Exculpation Provision provides as follows:

FROM AND AFTER THE EFFECTIVE DATE, NONE OF THE EXCULPATED PARTIES SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM BY ANY OTHER EXCULPATED PARTY, BY ANY HOLDER OF A CLAIM, OR BY ANY OTHER PARTY IN INTEREST, FOR ANY ACT OR OMISSION (I) THAT OCCURRED FROM

12

THE PETITION DATE THROUGH THE EFFECTIVE DATE IN CONNECTION WITH
THIS CHAPTER 11 CASE OR (II) IN CONNECTION WITH THE PREPARATION AND
FILING OF THIS CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR
PURSUIT OF CONFIRMATION OF A PLAN, THE CONSUMMATION OF THIS PLAN,
AND THE ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE
DISTRIBUTED UNDER THIS PLAN, EXCEPT FOR CLAIMS ARISING FROM THE
GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, OR BREACH OF THE
FIDUCIARY DUTY OF LOYALTY OF ANY EXCULPATED PARTY, IN EACH CASE
SUBJECT TO DETERMINATION OF SUCH BY FINAL ORDER OF A COURT OF
COMPETENT JURISDICTION AND PROVIDED THAT ANY EXCULPATED PARTY
SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL
WITH RESPECT TO ITS DUTIES AND RESPONSIBILITIES (IF ANY) UNDER THIS
PLAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE
COMMITTEE, THE DIOCESE, THE REORGANIZED DIOCESE AND THEIR
RESPECTIVE OFFICERS, TRUSTEES, BOARDS, COMMITTEE MEMBERS,
EMPLOYEES, ATTORNEYS, FINANCIAL ADVISORS, EXPERTS, EXPERT
WITNESSES, AND OTHER PROFESSIONALS SHALL BE ENTITLED TO AND
GRANTED BENEFITS OF SECTION 1125(e) OF THE BANKRUPTCY CODE AND THE
CHANNELING INJUNCTION.

**Claims Classification**

27.     The Plan contains the following provisions with respect to classification and

specification of treatment of claims:

> i.    Administrative Claims, Priority Tax Claims, Non-Tax Priority Claims, and
>       Professional Fee Claims are deemed to accept the Plan.
>
> ii.   Class 3 Pass-Through Claims are deemed to accept the Plan.
>
> iii.  Class 1 Secured Claims of KeyBank and Class 2 Secured Claims of NBT
>       are entitled to vote.
>
> iv.   Class 4 (General Unsecured Claims) are entitled to vote.
>
> v.    Class 5 (Abuse Claims) are entitled to vote.
>
> vi.   Class 6 (Inbound Contribution Claims) are deemed to reject the Plan.

28.     Treatment of Class 5 Abuse Claims is bifurcated based on a claimant's status as

either (i) a Consenting Abuse Claimant, defined generally as a holder of an Abuse Claim who

has not opted out of the consent to the releases and injunctions either on the Ballot or in an

13

objection to the Plan, or (ii) a Non-Participating Abuse Claimant, defined generally as a holder

of an Abuse Claim who has opted out of the releases and injunctions either on the Ballot or in an

objection to the Plan.

## **BASIS FOR RELIEF**

The Supreme Court has definitively held that non-consensual third-party releases are not

authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.,* 603 U.S. 204, 144

S. Ct. 2071, 2082-88 (2024). While the Supreme Court in *Purdue* did not address whether

consensual non-debtor releases can be included in a chapter 11 plan and confirmation order, it

clarified that authority for the same did not exist in the Bankruptcy Code and thus, such authority

must arise from another source.

I.      **The Plan Cannot be Confirmed Because it Provides Nonconsensual Third-Party
        Releases Because it Deems a Creditor's Silence by Neglecting to Opt Out as
        "Consent"**

The Plan Proponents seek to bypass the *Purdue* decision by proposing a plan that treats

inaction and silence as a form of consent.

The Plan defines a "Consenting Abuse Claimant" in Section 1.1.52 as any holder of an

Abuse Claim who has not either (i) affirmatively indicated on their Abuse Claim Ballot that they

are withholding their consent to the releases and injunctions provided for in the Plan with respect

to the Protected Parties; or (ii) filed a timely objection to confirmation of the Plan indicating that

they are withholding their consent to the releases and injunctions provided for in the Plan. This

definition turns silence into consent and conflates a lack of opposition with affirmative approval.

### *A. Rule 23's Opt-Out Rule Is Legally Irrelevant Because Congress Has Not Included
    Anything Like that in the Code*

In the Order Denying Approval of the Fourth Amended Disclosure Statement, the Court

14

reasoned that a failure to opt out could constitute consent by analogizing to Federal Rule of Civil

Procedure 23, under which a court-approved class action settlement may bind class members

who do not opt out.  That analogy is misplaced.

The Supreme Court has unanimously admonished: "[C]ourts may not 'recognize a

common-law kind of class action' or 'create *de facto* class actions at will.'"  *United States v.

Sanchez-Gomez*, 584 U.S. 381, 389 (2018) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 901

(2008)) (cleaned up).  Yet, that is exactly what the Court would do by imposing a third-party

release on those who failed to opt out on the ground that opt-outs are acceptable in the context of

class action litigation.

Importantly, consent is not the reason why class members are bound by a court-approved

class-action settlement.  Rather, once a class has been certified its members "are considered

parties to the litigation in many important respects" and "may be bound by the *judgment*."  *Id.*- at

387 (cleaned up; emphasis added); *accord Sosna*, 419 U.S. at 399 n.8.  This is equally true for

both adverse judgments after trial and judgments entered on a court-approved class-action

settlement.[1]  *See, e.g.*, *Sosna*, 419 U.S. at 399 n.8; *Conceicao v. Nat'l Water Main Cleaning Co.*,

650 F. App'x 134, 135 (3d Cir. 2017) ("Judicially approved settlement agreements are

considered final judgments on the merits for the purposes of claim preclusion.").  As one court

explained: "people who fail to respond to class action notices are bound because that is the legal

consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of

an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr.

---

[1] *See also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376, 379 (1996) (holding class
members were bound by class-action settlement judgment, explaining "Delaware has
traditionally treated the impact of settlement judgments on subsequent litigation in state court as
a question of claim preclusion").

S.D.N.Y. 2015). In contrast, "[t]here is no rule that specifies an 'opt out' mechanism or a

'deemed consent' mechanism" in the context of non-debtor releases in chapter 11 plans. *Id.*

The Supreme Court has consistently rejected attempts to apply class-action rules to non-

class actions that allegedly were "sufficiently similar" to class actions. *See, e.g., Sanchez-*

*Gomez*, 584 U.S. at 387, 390; *Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013).

There is no such thing as a "functional class action" that can preclude claims "outside the formal

class action context." *Sanchez-Gomez*, 584 U.S. at 389-90.

Here, too, there has been no class action certified under Rule 23, so Rule 23(b)(3)'s class-

action opt-out procedure cannot be unilaterally transplanted to impose third-party releases in

violation of state law.  As the Supreme Court warned, courts may not "create *de facto* class

actions at will." *Sanchez-Gomez*, 584 U.S. at 389.  Thus, it would be error to hold that because

Rule 23(b)(3) class-action settlements can bind those who do not opt out, a chapter 11 plan can

impose third-party releases for which there is no consent under state law.

Indeed, as the court found in *Patterson*, "the comparison to class action litigation

highlights the impropriety of finding releases consensual based merely on a failure to opt out"

because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class

action complies with the unique requirements of Rule 23 of the Federal Rules of Civil

Procedure." [2]  636 B.R. at 686.

Federal class actions may proceed only after a court certifies that the class meets a series

of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-

---

[2] Further, "in the class action context there is a public policy that favors the consolidation of
similar cases and that justifies the imposition of a rule that binds class members who have not
affirmatively opted out." *Chassix Holdings, Inc.*, 533 B.R. at 78.  By contrast, in the context of
non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of
making third party releases applicable to as many creditors as possible."  *Id.*

wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality

("questions of law or fact common to the class"); (2) typicality (named parties' claims or

defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will

fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521

U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards

protect against the variability of equitable justice).

Once those threshold showings are made, Rule 23(b) then requires that one of three

further predicates must be satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment

where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2)

authorizes class actions where "the relief sought must perforce affect the entire class at once."

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes

class treatment only where a court finds both that "the questions of law or fact common to class

members predominate over any questions affecting only individual members" and "that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).  Opt-out procedures are only available in class actions

under Rule 23(b)(3), not those under Rule 23(b)(1) and 23(b)(2).  *See Wal-Mart Stores*, 564 U.S.

at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").

Class action procedures also entail additional procedural safeguards.  A class must be

specifically defined to identify the class members and the class claims.  Fed. R. Civ. P.

23(c)(1)(B).

In the Order Denying Approval of the Fourth Amended Disclosure Statement, the Court

further reasoned that "while not in a traditional mass tort class context, the survivors share the

commonality characteristics required by Fed. R. Civ. P. 23(a)."  But even if class-action rules

17

could be applied in this context, the Court's conclusion mischaracterizes the nature of the claims

asserted by the Abuse Claimants in this case.  While the Abuse Claimants share the unthinkable

experience of having survived sexual abuse, the acts giving rise to their individual claims are

deeply personal and factually distinct. These claims vary widely depending on the identity of the

perpetrator, the location of the abuse, and the institutional context in which the abuse occurred—

be it a church, parish, school, or another Diocesan entity. Each claimant's experience is unique

and cannot be equated to a common factual nucleus required for typical Rule 23(a) class actions.

This is markedly different from a traditional mass tort or class action where a single

negligent act by a common defendant causes the same or substantially similar injuries across the

class. In such cases, the identity of the negligent party and the nature of the harm are uniform

across claimants. By contrast, in this case, the identity of the alleged negligent party varies from

claimant to claimant, and so too does the nature and context of the alleged abuse.

Therefore, the assertion that the Abuse Claimants satisfy the commonality requirement

under Rule 23(a) is not supported by the individualized and fact-intensive nature of their claims.

As such, reliance on a Rule 23 analysis to justify procedural mechanisms like deemed consent or

opt-out releases is both factually inaccurate and legally inapposite.

Moreover, the court must appoint class counsel that can best "represent the interests of

the class."  Fed. R. Civ. P. 23(g).  And for classes certified under Rule 23(b)(3), class members

must receive "the best notice practicable" that must "clearly and concisely state in plain, easily

understood language," including the nature of the action, who the class is, what their claims or

defenses are; their right to appear in the action through an attorney; their right to exclude

themselves from the action; how and when to exclude themselves; and the binding nature of the

judgment if they do not.  *Id.*  In other words, the Federal Rules of Civil Procedure set objective

procedural protections before a class can be certified and potential members bound.

Further, "any class [action] settlement that would bind absent class members requires court approval." *Patterson v. Mahwah Bergan Retail Group*, 636 B.R. 641, at 686 (E.D.Va 2022) (citing Fed. R. Civ. P. 23(e)). And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Id.* at 687 (quoting Fed. R. Civ. P. 23(e)(2)). "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

"None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686. "[N]o party litigates on behalf of the absent releasing party." *Id.*; *see also In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938, at *12 (Bankr. D. Del. Sept. 25, 2024) ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others."). And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party." *Patterson*, 636 B.R. at 686. "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead." *Id.*

Although the official committee of unsecured creditors owes a fiduciary duty to the unsecured creditor body, it does not owe a duty to any individual creditor or any specific group

of creditors, and the diverse body of unsecured creditors to whom it owes duties often has

conflicting interests.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 717, 722 (Bankr.

S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the

class as a whole, not to its individual members").  Further, the committee's duties relate only to

claims against the debtor, not claims against non-debtors.  Indeed, the Committee is prohibited

from representing claims against third parties, having a limited duty to represent claims against

the estate only.

   Because this matter lies outside of that class-action context, ordinary contract principles

apply, and a person cannot force a contract on someone else by deeming silence, such as a failure

to "opt out," to be consent, except in narrow circumstances inapplicable here, as discussed

below.

### B.  State Contract Law Applies, Not Federal Law

   A consensual third-party release is a separate agreement between non-debtors governed

by nonbankruptcy law.  As the Supreme Court recognized in *Purdue*, a release is a type of

settlement agreement.  *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was

not "a traditional release" because "settlements are, by definition, consensual").  A bankruptcy

court can acknowledge the parties' agreement to a third-party release, but the authority for a

consensual release is the agreement itself, not the Bankruptcy Code.

   The foundation of a consensual release is an agreement between the parties.  Whether

non-debtor parties have reached an agreement—including an agreement to release one's claims

against another (*i.e.*, not to sue)—is governed by state law.[3]  The only exception is if there is

---

[3] Recently, the issue of the applicability of controlling law in determining whether third-party
releases are consensual was discussed, but not decided, in *In re Spirit Airlines, LLC.*, 2025 WL
737068, at *21. Although Judge Lane found that consent existed as to certain creditors under the

federal law that preempts applicable state contract law in some specific context.  *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

No such exception applies here.  The Bankruptcy Code does not define a "consensual release."  It contains no provision that addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.  And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where such consent would not otherwise be found to exist as a matter of state law.  Nor does 11 U.S.C. § 105(a) itself confer any power to override state law.  Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code."  *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted).  Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity."  *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted).  Accordingly, any authority to include third-party releases in a plan must derive from some other source of law.

Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law.  *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of

---

facts in that case (which are distinguishable from this case), he expressly left open the broader legal issue, stating that he was "leaving for another day the question of whether state law governs the question of consent." *Id.* at *22.

settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").  That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48, (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law."). When not provided for in the Code, property rights are assessed under state law.  Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.

As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual.  *See, e.g.*, *Patterson*, 636 B.R. 641, 684-85 (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *Smallhold, Inc.*, 2024 WL 4296938, at *11 (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506, 507 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other

settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of

straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation

order") (internal quotation marks omitted) (alterations in original).  As one court recently held,

because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . . any

proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance

and consent."  *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024)

(quoting *Purdue*, 144 S. Ct. at 2086).  Accordingly, "any such consensual agreement would be

governed by state law."  *Id.*

Here, the Debtor fails to meet its burden of establishing that the releasing parties have

affirmatively and knowingly agreed to relinquish their property rights, as required under

applicable state law. Consent, especially as it pertains to the waiver of substantive legal rights,

must be clear, voluntary, and informed.  The Plan's reliance on an opt-out mechanism falls far

short of this standard. It does not demonstrate that affected parties were fully apprised of the

nature and scope of the releases, nor does it show that their silence or inaction can reasonably be

construed as affirmative consent to those releases under state law principles governing contract

formation and waiver.

### C.  Under State Law, Silence Is Not Acceptance

The "general rule of contracts is that silence cannot manifest consent."  *Patterson*, 636

B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002)

(recognizing "general rule" that "silence in response to an offer . . . does not constitute

acceptance of the offer").  Moreover, "[o]rdinarily[,] an offeror does not have power to cause the

silence of the offeree to operate as acceptance."  RESTATEMENT (SECOND) OF CONTRACTS § 69

cmt. a (1981); *accord* 1 Corbin on Contracts § 3.19 (2018); 4 Williston on Contracts § 6:67 (4th

ed.); *Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance.").  Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement.  *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").  Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist.  *See, e.g.*, *id*.; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

There are only very limited exceptions to that principle.  "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance.  Even in those cases the contract may be unenforceable under the Statute of Frauds."  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Neither exception applies here.

But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.*  And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting."  *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

Absent limited exceptions not triggered here, silence and inaction are not assent to an offer under New York law. *See also Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440, 84 N.E.2d 625, 626 (1949) ("where the recipient of an offer is under no duty to speak,

24

silence–when not misleading, may not be translated into acceptance merely because the offer

purports to attached that effect to it."); s*ee Matter of Tanenbaum Textile Co. v. Schlanger*, 287

N.Y. 400, 404, 40 N.E.2d 225, 226 (1942); *Poel v. Brunswick-Balke-Collender Co.*, 216 N.Y.

310, 318 *et seq.*, 110 N.E. 619, 621 (1915); *More v. New York Bowery Fire Ins. Co.*, 130 N.Y.

537, 545, 547, 29 N.E. 757, 758, 759 (1892); *see also* 1 WILLISTON ON CONTRACTS [Rev.Ed.], §

91, pp. 279, 280; RESTATEMENT (SECOND) OF CONTRACTS, § 72(1).

Although the United States Trustee disagrees with the Court's decision in *Spirit Airlines*,

and the facts of that case are distinguishable from the facts of this case, the Court in that matter

recognized that there are only very limited exceptions in which silence and inaction may operate

as acceptance. *See In re Spirit Airlines, LLC*,  2025 WL 737068 at *23 (n. 32) (Bankr. S.D.N.Y

March 7, 2025) (citing to *Russell v. Raynes Assocs. Ltd. P'ship*, 166 A.D.2d 6, 15, 569 N.Y.S.2d

409 (1991) (citing to Restatement (Second) of Contracts, noting that "[a]lthough, generally,

intent to accept an offer may not be inferred from silence, party's silence will be deemed an

acquiescence where he or she is under such duty to speak that his or her conduct, accompanied

by silence, would be deceptive and beguiling ... and failure to speak therefore misleads the other

party. Such a duty may be created by a course of conduct ..., or, as here, *by an explicit statement*

*by the offeree which gives the offeror reason to understand that silence will constitute*

*acceptance*.") (emphasis added) (citations and quotations omitted); *Friedman v. Schwartz*, 2010

WL 3937304, at *3 (E.D.N.Y. Sept. 30, 2010) (noting that Section 69(1) of the Restatement

(Second) of Contracts reflects the law of New York); *Karlin v. Avis*, 457 F.2d 57, 62 (2d Cir.

1972) ("New York law on silence as acceptance is firmly supported by the Restatement of

Contracts."); *Andre v. Dollar Tree Stores, Inc.*, 2019 WL 2617253, at *9 (D. Del. June 26, 2019)

(noting that "Delaware law, following the Restatement (Second) of Contracts, [ ] states there are

three scenarios under which an offeree's silence and inaction operate to manifest consent or acceptance to a contract's terms" and citing the Restatement's delineated exceptions); *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, 2005 WL 170690, at *5 (Del. Super. Ct. Jan. 14, 2005) (noting that "[s]ilence also manifests consent in some contracts cases" and citing to exceptions).

In addition, Judge Lane, while not basing his holding upon same, discussed the limited exceptions when silence and inaction could be considered assent to an offer. "[S]ilence and inaction will constitute acceptance of an offer when 'the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent inactive to accept the offer.'" *In re Spirit Airlines, LLC*, 2025 WL 737068 at *20, (citing Restatement (Second) of Contracts § 69(1)); *Manigault v. Macy's E, LLC*, 318 F. App'x 6, 8 (2d Cir. 2009) ("a contract may be formed by words or by conduct that demonstrate the parties' mutual assent"). In *Spirit Airlines*, the facts are distinguishable from the facts of this case as virtually all of the creditors eligible to vote signed a Restructuring Support Agreement (negotiated prior to the debtor's case filing, and which allowed priority claims and general unsecured claims against the debtor to be paid in full) and voted on the plan and did not opt out of the releases. *See Spirit Airlines*, 2025 WL 737068, at *21. Judge Lane considered these facts in applying the third exception, noting "where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept." *Id.* at *22. (citing Restatement (Second) of Contracts § 1(c); *Russell*, 166 A.D.2d at 15, 569 N.Y.S.2d 409 (silence will be deemed acquiescence where under duty to speak through course of conduct). These can include "[e]xplicit statement by the offeree, usage of trade, or a course of dealing between the parties" that "may give the offeror reason to understand that silence will constitute

acceptance." Restatement (Second) of Contracts § 69, cmt. d. "Under Subsection (1)(c) the

offeree's silence is acceptance, regardless of his actual intent, unless both parties understand that

no acceptance is intended." *Id.* The exception will generally apply where there is an ongoing

course of conduct. *See Albrecht Chem. Co. v. Anderson Trading Corp.*, 298 N.Y. 437, 440–41,

84 N.E.2d 625 (1949) (silence can operate as acceptance where "the parties may have been

advised and warned by a previous course of dealings that inaction would be taken as assent.").

There is no similar ongoing course of conduct here.   The claimants here did not have the

opportunity to expressly or implicitly negotiate the terms of an agreement or contract, as the

supporting noteholders did in the *Spirit Airlines* case when entering into a restructuring support

agreement.   Therefore, there were no prior dealings, negotiations, or continuous course of

conduct that would trigger a state law exception, binding the claimants by their silence.

### D.  *Failing to Opt Out Does Not Provide the Required Affirmative Consent*

Consistent with the principles set forth above,  an affirmative agreement—something

more than a mere failure to opt out—is required for a non-debtor release to be consensual.  *See

In re Tonawanda Coke Corp.*, 662 B.R. 220, 222-23 (Bankr. W.D.N.Y. 2024); *Patterson*, 636

B.R. at 686.  Failing to "opt out" of an offer is not a manifestation of consent unless one of the

exceptions to the rule that silence is not consent applies, such as conduct by the offeree that

manifests an intention that silence means acceptance or taking offered benefits.  RESTATEMENT

(SECOND) OF CONTRACTS § 69 cmt. a (1981).  For example, the *Patterson* court, in applying

black letter contract principles to opt-out releases in a chapter 11 plan, found that contract law

does not support consent by failure to opt-out.  *Patterson*, 636 B.R. at 686.  "Whether the Court

labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case

there is a lack of sufficient affirmation of consent."  *Id.* at 688.

With respect to those creditors that are entitled to vote, third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 2024 WL 4296938, at *2; *SunEdison*, 576 B.R. at 458-61; *Chassix Holdings*, 533 B.R. at 81-82; *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011).

Certain creditors, either deemed to accept or reject the Plan, or which hold unclassified claims, are not permitted to vote and are therefore not granted the ability to opt out the release and injunction provisions. Those who abstain from voting cannot be said to be consenting to anything—they are taking no action with respect to the plan. Creditors who do not vote on a plan do not manifest consent to a non-debtor release by failing to return an opt out form.

Even where there are conspicuous warnings in the ballots or an opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence as consent to the release. *SunEdison*, 576 B.R. at 458-61. Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan.[4] And creditors who have no intention of voting in the first place are unlikely to do so.

Moreover, parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *Id.* at 461. Thus, the court in *SunEdison* rejected the debtors' argument that the warning in the disclosure statement and on the ballots regarding the potential effect of silence gave rise to a duty to speak, and the non-voting creditors' failure to object to or reject the plan should be deemed their consent to the release. *Id.* at 460-61. The court found that the nonvoting creditors' silence was not misleading and did not signify their intention to consent to the release (finding that silence could easily be attributable to other

---

[4] Here, the Plan and associated materials, including the Disclosure Statement, run to hundreds of pages.

28

causes). *Id*. at 460-61.

Simply put, "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third-party release." *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix Holdings*, 533 B.R. at 81–82. An "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *Wash. Mut., Inc.*, 442 B.R. at 355. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix Holdings*, 533 B.R. at 81. "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold, Inc.*, 2024 WL 4296938, at *12; *see also id.* at *10 (discussing *Chassix*). As the court in *Emerge Energy Services, LP*, similarly explained, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as implied consent through a party's silence or inaction. No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

### E.  *Voting Does Not Equal Consent to a Release*

Voting to accept a plan without checking an opt-out box does not constitute the

29

affirmative consent necessary to reflect acceptance of an offer to enter a contract to release

claims against non-debtors.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

Voting to approve a plan plus a failure to opt out of a third-party release is nothing more than

silence with respect to the offer to release claims against non-debtors.  The act of voting on a

chapter 11 plan without opting out is not conduct that "manifest[s] [an] intention that silence

may operate as acceptance" of a proposal that the creditor release claims against non-debtors.

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Impaired creditors have a federal right

under the Bankruptcy Code to vote on a chapter 11 plan.  11 U.S.C. § 1126(a).  Merely

exercising that right does not manifest consent to release claims against non-debtors.

### F.  *Releases Cannot be Imposed on Creditors Who Reject the Plan Without Opting Out*

Similarly, releases cannot be imposed on those who vote to reject the plan but do not opt out.

It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt

out of the third-party release is evidencing consent to the third-party release.  Not only is there no

"mutual agreement" as to the plan, much less the third-party release, the creditor has expressly

stated its rejection of the plan.  As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A]

creditor who votes to reject a plan should also be presumed to have rejected the proposed third-

party releases that are set forth in the plan.  *The additional 'opt out' requirement, in the context

of this case, would have been little more than a Court-endorsed trap for the careless or

inattentive creditor.*"  533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

Creditors have no state law duty to respond to an offer to release non-debtors such that

their silence can be understood as consent, nor have they any prior course of dealing with the

released non-debtors that would impose such a duty.  *See Norcia*, 845 F.3d 1279, 1285-86 (9th

Cir.  Nor do creditors have any affirmative obligation to act on a plan, either to vote, to opt out or

30

to file an objection to the Plan.  *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may"

vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to

speak regarding a plan that would allow a court to infer consent to third-party releases from

silence).

Failure to return an opt-out form is not consent because—whether they are asked to vote

or not—claimants have no reason to expect that an offer to contract with non-debtors will be

included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption

that someone has agreed to contractual provisions of which they are "on notice," unless "there is

a reasonable basis to conclude that consumers will have understood the document contained a

bilateral agreement."  *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir.

2017).  *See also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not

appear to be a contract and the terms are not called to the attention of the recipient.") (quotation

marks omitted).

### G.  The Opt-Out Mechanism Under the Plan is Coercive

Additionally, the Plan contains a flawed process for those electing to "opt out" of the

third-party releases.  The Plan Proponents claim that the process provides an opportunity for

Abuse Claimants to opt out of the non-debtor releases, but the mechanism they propose

significantly restricts claimants' rights including, among others, the rights to certain distribution

on their estate claims if they make this election.  To make such election, Claimants must follow

certain, specific procedures to litigate their claims against the estate, including execution of a

Non-Participating Litigation Claimant Agreement that limits their potential recovery to the

distributions provided for under the Plan and Allocation Protocol so long as the Truste has not

already been terminated.   *See* Sections 4.4.2 & 4.4.5 of the Plan.  Even if such silence could be

interpreted as consent under some circumstances, it cannot be so interpreted here, where the opt-out process is coercive because it punishes those creditors who elect the right to opt out of the releases.

Non-Participating Abuse Claimants who exercise their right to opt out may pursue their claims in another forum to seek estate distribution- but only after signing the Non-Participating Litigation Claimant Agreement.  This agreement significantly limits their rights to estate distributions, access to insurance proceeds, and the ability to pursue certain claims.  Once adjudicated, recovery is limited to a sub-trust funded solely by the Debtor's contribution.  This sub-trust excludes funds contributed by the Participating Parties (including any portion which might be part of an estate settlement against such parties) and the Settling Insurers (which includes any portion related the estate settlement with the Settling Insurers and the estate sale of the policies to the Settling Insurers).  A claimant's right to sue the Participating Parties and the Settling Insurers are preserved according to the Plan, but limited by the Settling Insurer Injunction and the fact that certain claims, the Extra-Contractual Claims, are channeled.  Thus, while the right to pursue the Settling Insurer is nominally preserved, it is effectively eliminated by the Settling Insurer Injunction and the channeling of Extra-Contractual Claims.  As a result, the opt-out mechanism proposed by the Plan Proponents is both flawed and coercive, as it substantially limits the rights of those who opt out, including their ability to receive certain estate distributions.  An opt-out cannot be considered genuine consent when it is coercive and penalizes claimants for exercising that choice.

Accordingly, despite being enjoined from pursuing claims against Settling Insurers, Non-Participating Abuse Claimants will not share in estate distributions of funds or proceeds recovered by Debtor or the Trust from the Settling Insurers. *See* Sections 4.4.3, 4.4.4, and 12.4 of

32

the Plan.

Because Abuse Claimants who opt out of the releases are limited in the distributions they receive on account of their claims, their lack of an "opt out" cannot be characterized as voluntary consent. Rather, it reflects a punitive approach designed to suppress dissent and compel acquiescence through economic pressure. If an offeree is penalized unless an "offer" is accepted, that circumstance "preclud[es] an inference of assent." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).

Accordingly, the mechanism that the Debtor proposes for adjudication of Non-Participating Abuse Claimants' claims against the estate is unduly coercive and doesn't satisfy the legal standard for consent under applicable state law.

### H.  *The Opt-Out Procedures Contained in the Plan Are Confusing and Inconsistent*

The Court's Order Approving the Fifth Amended Disclosure Statement provides authority that any Class 5 Claimant who does not (i) indicate on their ballot a wish to be treated as a Non-Participating Abuse Claimant, or (ii) fails to submit a timely Ballot, shall be deemed to consent to the Third-Party Releases unless they file a timely objection to confirmation indicating that they withhold such consent. This process imposes multiple conditions, any of which may confuse the average creditor and discourage informed participation. The lack of a clear, singular directive undermines the ability of claimants to make deliberate choices.

 Additionally, as noted above, for certain unclassified claims (certain claims altered under the Plan, which  are not claims against the Debtors), these claims, such as Medicare Claims and Extra-Contractual Claims, are simply channeled to the Trust and holders of these claims are enjoined from pursuing any remedies for such claims or only pursuing remedies against the Trust for such claims.  For Extra-Contractual Claims, this right is further limited because the Trust distribution procedures do not provide for any distributions on account of any

33

Extra-Contractual Claims. See Plan §§ 1.1.84. With respect to Medicare Claims, HHS is limited

to seeking any recovery from the Trust on the Medicare Claims and due to the channeling

injunction is barred from pursuing any rights it has against any other party including the Abuse

Claimants or the Settling Insurers. See Plan §§ 1.1.120 and 4.12.

The inconsistency across documents, and the multiple layers of procedural requirements,

create a substantial risk that a claimant will take no action—not out of informed consent, but out

of confusion. This is analogous to the concerns raised by the court in *In re Chassix Holdings,*

*Inc.*, where the use of multiple forms led to confusion about the scope and effect of third-party

releases. The court in *In re Spirit Airlines, LLC*., 2025 WL 737068, at *21 n.25, cited that

concern in its own assessment of opt-out release procedures.

### I. *Non-Voting Creditors Are Given No Opportunity to Opt Out and Forced to Object Through Counsel with Inadequate Notice*

The flaws in the opt out process are exacerbated for claimants in Non-Voting Classes and

holders of Administrative Claims. The Court has approved a process whereby these creditors

receive no Ballot and are presumed to accept the Plan. Nevertheless, they are bound by the

releases, exculpations, and injunctions included in the Plan. These creditors are not given an

opportunity to opt out. Simply put, the solicitation procedures offer no mechanism for the Debtor

to obtain even the flawed "consent" the Debtor otherwise proposes from these claimholders.

They are instead required to retain counsel and file a formal objection simply to preserve their

claims against non-debtors—an impractical and inequitable burden. Nor are they informed in a

manner reasonably calculated to ensure that they understand the implications of their non-

participation.

For instance, the defined term Channeled Claims includes Inbound Contribution Claims.

Holders of Inbound Contribution Claims, categorized under Class 6, are not entitled to vote, are

34

subject to the various injunctions contained in the Plan and have no ability under the proposed

Plan to "opt-out" of the proposed third-party releases. Unless such creditors file written

objections, they are deemed to consent to the Plan and to be bound by the release and injunction

provisions contained in the Plan.  This is true despite the fact that such interested parties were not

even served with a copy of the Plan.

The only purported warning to these non-voting creditors appears in the Confirmation

Hearing Notice (Exhibit 4 to the Disclosure Statement), which is itself an exhibit to the Court's

Order Approving the Fifth Amended Disclosure Statement. This notice states that non-voting

creditors will receive a "Notice of Non-Voting Status" and must file a motion under Rule

3018(a) if they dispute their classification. The referenced Notice of Non-Voting Status (Exhibit

5) is not incorporated into the Disclosure Statement itself, nor is it listed in the "Disclosure

Statement Enclosures" on page 9 of the Disclosure Statement.

The defined term Channeled Claims also includes Medicare Claims, and Extra-

Contractual Claims. With respect to the Medicare Claims and Extra-contractual Claims, these

claims are unclassified.  The holders of these claims are not entitled to vote and there are no

separate procedures established to allow these claimants to opt out of the releases and injunctions

by filing an objection.  These claims are simply channeled to the Trust and any recovery for such

claims, if any, is limited to their treatment under the Trust as once channeled these claims cannot

be pursued against third parties. Moreover, pursuant to the Trust terms and protocols, holders of

Extra-Contractual Claims are prohibited from receiving any distributions from the Trust on

account of such claims so they are extinguished.

Such a disjointed roadmap fails to provide sufficient notice or opportunity for even the

flawed consent the Debtor proposes otherwise. It creates a process that is procedurally defective

35

and legally inadequate to support the imposition of third-party releases on parties who neither

voted nor could have even opted out. The Plan's reliance on such mechanisms violates

fundamental principles of due process and cannot be approved under governing law. There is no

acceptance of an offer when there is insufficient notice of the alleged contractual terms. *See*

*Norcia*, 845 F.3d at 1285 ("[A]n offeree, regardless of apparent manifestation of his consent, is

not bound by inconspicuous contractual provisions of which he was unaware, contained in a

document whose contractual nature is not obvious.") (quotation marks omitted).

## II.    The Plan Improperly Enjoins Claims Outside the Scope of Section 363(f)

The United States Trustee objects to the Plan to the extent that it seeks to enjoin claims

outside the scope of 11 U.S.C. § 363(f).  Although the Plan currently includes no settlements

with any of the Debtor's insurers, it nonetheless provides third-party releases for both known and

yet-to-be-disclosed insurers under the pretense of section 363(f) protection.  These releases

would apply to insurers that may reach settlements with the Debtor or the Trust in the future.

But creditors would not have the opportunity to assess or give informed consent at the time these

insurers are eventually identified.  Moreover, section 363(f) mandates that the court make

specific, fact-based findings relative to certain statutory requirements before authorizing a sale-

including, among other things, that proper and sufficient notice of the sale was given and that

key terms of the sale such as the identify of counterparties and the purchase price, were

adequately disclosed.  In light of the provisions under the Plan that are designed to protect future

settling insurers, the Court is unable to make those determinations in advance, as doing so would

be speculative and inconsistent with the statutory framework of section 363(f).

Even prior to the issuance of *Purdue*, courts recognized the limits of Section 363(f) and

declined to interpret Section 363(f) to permit non-consensual non-debtor injunctions and releases

under the guise of sales of insurance policies free and clear of non-debtors' "interests in" the

policies. *See In re Adelphia Communications Corp.*, 364 B.R. 518, 528 (Bankr. S.D.N.Y. 2007)

(permitting the debtor to sell its rights under insurance policies to the insurers but refusing to

"authorize invocation of section 363(f)" or limit the rights of certain objecting parties to bring

claims against the purchasing insurers and refusing to issue the "channeling injunction" barring

claims against the purchasing insurers); *In re Fraser's Boiler Service, Inc.*, 2019 WL 1099713 at

*8 (W.D. Wash. March 8, 2019) (reversing decision that approved the sale of insurance policies

free and clear of claims between insurance companies because claims by non-settling insurance

companies against the settling insurance companies were not an "interest" in the debtor's

property and the bankruptcy court had no authority to release those third-party claims);

*Overton's, Inc. v. Interstate Fire & Cas. Ins. Co. (In re Sportstuff, Inc.)*, 430 B.R. 170, 178

(B.A.P. 8th Cir. 2010) (overturning a bankruptcy court's approval of an insurance settlement

because it did not have "jurisdiction or authority to impair or extinguish independent contractual

rights" belonging to third parties, including the right to defense and reimbursement of defense

costs); *In re SoyNut Butter Co.*, 2018 WL 3689549 at *4 (Bankr. N.D. Ill. August 1, 2018)

(holding that a Section 363(f) sale of an insurance policy that released the claims of additional

insureds against the issuing insurance company could not be approved because the debtor could

not sell the additional insureds' rights in the policy or their legal claims since those rights and

claims were not part of the estate); *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 980 (Bankr.

N.D. Ill. 1991), aff'd, 149 B.R. 860 (N.D. Ill 1992)) (holding that Section 363(f) sale of a

debtor's rights in an insurance policy could not support a release and injunction against the

debtor's parent corporation that was an additional insured and had its own rights under the

policy).

Thus, while section 363(f) offers limited protections for purchasers of a debtor's assets in bankruptcy, it does not permit sweeping non-debtor releases that shield a purchaser from all claims, including direct claims against the purchaser.

Here, Settling Insurers–which do not presently exist—get non-consensual releases via the Supplemental Insurer Injunction that are not subject to the opt out process.  Under Section 12.4 of the Plan, the Supplemental Settling Insurer Injunction provides that pursuant to insurance settlement agreements, including certain settling insurers' purchase of applicable settling insurer policies pursuant to section 363(f) of the Bankruptcy Code, Channeled Claims (including any claims of Non-Participating Abuse Claimants as such claims for these purposes are not excluded from the definition of Channeled Claims) are enjoined from taking any action, directly or indirectly, against the Settling Insurers or Settling Insurer Polices.

Section 363(f) provides limited authority for a debtor or a trustee to sell property of the estate free and clear of interests in that property, but that subsection does not permit a court to release or enjoin claims between third parties that are not property of the debtor and that are not directed against the estate property being sold. Neither Section 105 nor Rule 9019 can extend the Court's limited authority under Section 363(f), and Section 363(f) cannot be used as an end run around *Purdue's* holding that nonconsensual releases are not permitted by the Code. Here, the Plan provides for relief beyond that authorized under Section 363(f) by enjoining or releasing claims outside the bounds of that section.

Accordingly, because the requested relief violates the Bankruptcy Code and *Purdue,* it cannot be approved.

### III.     The Court Should Not Waive the Rule 3020 Stay

The U.S. Trustee objects to any request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).

Respectfully submitted,

WILLIAM  K. HARRINGTON
UNITED STATES TRUSTEE, Region 2

By: /s/ Erin P. Champion, Esq.
Erin P. Champion
Assistant United States Trustee
Office of the United States Trustee
10 Broad Street, Ste. 105
Utica, New York 13501
(315) 793-8127
erin.champion@usdoj.gov