UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re:

The Roman Catholic Diocese of Syracuse, New
York,

          Debtor.

Case No.  20-30663 (WAK)

Chapter 11

---

The Roman Catholic Diocese of Syracuse, New
York, *et al.*,[1]

          Plaintiff,

v.

Arrowpoint Capital, *et al.*,

          Defendants.

Adv. Proc. No. 21-50002 (WAK)

## MOTION FOR ENTRY OF ORDERS PURSUANT TO
## SECTIONS 363 AND 105(A) OF THE BANKRUPTCY CODE AND BANKRUPTCY
## RULE 9019 APPROVING SETTLEMENT AGREEMENTS AND POLICY BUY-BACKS
## WITH CERTAIN INSURERS AND GRANTING RELATED RELIEF

The Roman Catholic Diocese of Syracuse, New York, (the "Diocese"), by and through its

undersigned counsel, hereby moves this Court (this "Motion") for entry of orders, pursuant to

sections 105 and 363 of title 11 of the United States Code (11 U.S.C. § 101, *et seq.*, as amended,

the "Bankruptcy Code") and Rules 2002(a)(2)-(a)(3), 6004, 9007, 9008, and 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") approving settlements and

policy buy-backs with: (i) Interstate Fire & Casualty Company, National Surety Corporation, and

Fireman's Fund Insurance Company (collectively, the "Interstate Insurers"); (ii) London Market

Insurers ("LMI"); (iii) The National Catholic Risk Retention Group, Inc. ("National Catholic");

(iv) Excelsior Insurance Company ("Excelsior"); (v) Catholic Mutual Relief Society of America

---

[1] The caption of the adversary proceeding has been abbreviated pursuant to Federal Rule of Civil Procedure 10 and
Federal Rule of Bankruptcy Procedure 7010.  The full caption of this adversary proceeding is set forth in the
Adversary Complaint found at Adv. Dkt. No. 1.

("Catholic Mutual"); (vi) TIG Insurance Company, North River Insurance Company, and U.S. Fire Insurance Company (collectively, the "TIG Insurers"); (vii) Utica Mutual Insurance Company ("Utica"); (viii) Hanover Insurance Company ("Hanover"); (ix) Hartford Fire Insurance Company ("Hartford"); and (x) Nationwide Mutual Fire Insurance Company ("Nationwide", and together with the Interstate Insurers, LMI, National Catholic, Excelsior, Catholic Mutual, the TIG Insurers, Utica, Hanover, and Hartford, collectively, the "Settling Insurers"), which proposed settlements will provide proceeds of $61,140,000. In support of this Motion, the Diocese respectfully represents as follows:

## PRELIMINARY STATEMENT

1.       As the Court is aware, the Diocese, together with its parishes and related Catholic entities (collectively, the "DOS Entities"), the Committee, and multiple insurers have engaged in extensive negotiations through mediation over the five-year history of this Chapter 11 Case.  As result of those efforts, the DOS Entities and the Committee, have reached agreement, subject to approval by the Court, to resolve all disputes with the Settling Insurers regarding the availability and extent to which any policies of insurance issued by the Settling Insurers (the "Subject Policies") provide coverage for sexual abuse claims asserted against the DOS Entities.   In exchange for settlement of the DOS Entities' coverage clams, and to buy back the Subject Policies,[2] the Settling Insurers have agreed to pay an aggregate of $61,140,000 to a trust (the "Trust") to be established pursuant to the *Fifth Amended Joint Chapter 11 Plan of Reorganization for The Roman Catholic Diocese of Syracuse, New York* [Docket No. 2337] (as it

---

[2] Catholic Mutual and National Catholic provide modern-day ongoing liability coverage to the DOS Entities. Accordingly, Catholic Mutual and National Catholic will only repurchase those portions of their respective Subject Policies that provide, or allegedly provide, coverage for Abuse Claims.   Preserved Coverage (as defined in the Catholic Mutual and National Catholic Settlement Agreements) with respect to liabilities not related to Abuse Claims will continue in effect notwithstanding the partial buy-back of the Catholic Mutual and National Catholic Subject Policies.

2

may be further amended or modified, the "<u>Plan</u>").[3]

2.    In addition to the $61,140,000 in settlement proceeds to be paid by the Settling Insurers, the Plan provides for the DOS Entities to make an aggregate contribution of $100 million to the Trust, thereby providing a minimum of $161,140,000 in Plan funding.

3.    Although the Diocese and the Committee were prepared to move forward with a contested confirmation hearing seeking confirmation of the Plan, which provides for, among other things, the assignment of Insurance Claims against Non-Settling Insurers to the Trust for post-confirmation litigation, the Insurer Settlements pave the way for a largely consensual confirmation process and provide what the Committee deems to be fair value for the claims to be released against the Settling Insurers.    Ultimately, the Diocese, in consultation with the Committee, determined that the settlement payments offered by the Settling Insurers, and the certainty of recovery provided thereby, outweighed the cost, delay, and litigation uncertainty of continued prosecution of the above-captioned adversary proceeding (the "<u>Coverage Action</u>") against the Settling Insurers.

4.    The Settling Insurers have agreed to provide an aggregate of $61,140,000 (collectively, the "<u>Settlement Proceeds</u>") in funding for the Trust as follows:

| Insurer | Settlement Amount |
|---|---|
| Interstate | $35,000,000 |
| LMI | $22,500,000 |
| National Catholic | $1,000,000 |
| Excelsior | $1,000,000 |
| Catholic Mutual | $750,000 |
| TIG Insurers | $500,000 |
| Utica | $175,000 |
| Hanover | $100,000 |
| Hartford | $90,000 |
| Nationwide | $25,000 |
| **TOTAL** | **$61,140,000** |

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

5.      Through this Motion, the Diocese is seeking authorization to enter into separate definitive agreements (each, a Settlement Agreement") with each of the Settling Insurers documenting the details of each settlement and setting forth the terms upon which the DOS Entities will settle their claims for insurance coverage and sell back to the Settling Insurers their respective interests in the Subject Policies, in exchange for the Settling Insurer's payment of the Settlement Proceeds. The proposed forms of the Settlement Agreements with Interstate and LMI are attached to this Motion as *Exhibits A* and *B* respectively.  The Diocese intends to file the Settlement Agreements for the remaining Settling Insurers as supplemental exhibits to this Motion as promptly as practicable once definitive documentation has been agreed upon by all necessary parties.

6.      The Settlement Proceeds represent a significant step toward funding the Trust and making a meaningful distribution to Abuse Claimants.  Accordingly, the Diocese requests that the Court approve the proposed Settlement Agreements in their entirety.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and rule-based predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2)-(a)(3), 6004, 9007, 9008, and 9019(a).

## BACKGROUND

10.      On June 19, 2020, the Diocese filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of

New York (the "Court"), commencing the Diocese's chapter 11 case (this "Chapter 11 Case"). The Diocese continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a trustee or examiner has been made in this Chapter 11 Case.

11.    On July 9, 2020, the Office of the United States Trustee filed notice of the appointment of an official committee of unsecured creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 38].  As of the date of the filing of this Motion, no other official committees have been appointed or designated.

12.    Information regarding the Diocese's history, business operations and structure, and the events leading up to this Chapter 11 Case is set forth in the *Declaration of Rev. Msgr. Timothy S. Elmer, J.C.L. Regarding Structure and Pre-Filing History of The Diocese and in Support of the Chapter 11 Petition and First Day Pleadings* [Docket No. 7] and the *Declaration of Stephen Breen Regarding the Diocese's Assets and Operations and in Support of the Chapter 11 Petition and First Day Pleadings* [Docket No. 6], each of which was filed on the Petition Date and is incorporated herein by reference.

13.    A continued hearing to consider the confirmation of the Plan is currently scheduled to resume on July 2, 2025.

## THE INSURANCE POLICIES

14.    At various times from at least 1941 to the present, in consideration of premiums paid by the Diocese, or by other DOS Entities, various insurance companies sold primary general liability insurance policies, as well as certain umbrella and/or excess liability policies (collectively, the "Insurance Policies"), providing coverage for the DOS Entities.

15.     In general, the Insurance Policies are liability or indemnity policies that provide coverage, subject to their terms, conditions, and limitations, for liability claims based on bodily injury, as long as any part of the injury took place, and with regard to certain Insurance Policies a claim was made, during the policy period.

## THE DIOCESAN POLICIES

### The LMI Policies

16.     LMI subscribed to certain first-layer excess indemnity policies that cover claims that allege abuse between April 16, 1973 to July 1, 1986.  Subject to their terms, conditions, and limitations, the LMI policies indemnify the insured for all sums which the insured shall be obligated to pay by reason of liability for damages and expenses on account of personal injury.

17.     The first layer excess policies provide coverage of $200,000 per occurrence in excess of a self-insured retention ("SIR"), which operates similar to a deductible.  LMI's percentage of the first-layer excess policies varied over time and ranged from approximately $153,000 to $160,000 per occurrence.  The SIR also varied, ranging from $50,000 in 1973 to 1976 to $100,000 in 1985 to 1986.

18.     LMI also sold higher-level excess policies in certain years.  From April 16, 1973 to April 16, 1976, LMI sold an excess policy providing $5 million excess of $5 million per occurrence.  From July 1, 1979 to July 1, 1985, LMI sold excess policies providing combined limits of liability of $15 million excess $5 million per occurrence.

### The Interstate Insurers Policies

19.     Interstate sold insurance policies providing excess indemnity coverage to the Diocese for policy periods running from July 1, 1979 to July 1, 1986.  Subject to their terms, conditions, and limitations, the Interstate policies indemnify the insured for the amount of loss

6

which is in excess of the applicable limits of liability of an underlying insurance policy (which is an LMI policy).  The limits of the Interstate excess policies are approximately $4.7 million per occurrence until the 1985-1986 period, when the Interstate policy limits decreased to $800,000 per occurrence.

**The National Catholic Policies**

20.    The Diocese purchased annual claims-made sexual misconduct coverage from National Catholic for the relevant time period, including July 1, 2019 to July 1, 2024.  These policies contain a retroactive date of coverage starting July 1, 1988.  The limit of liability for sexual misconduct in each policy was $750,000 per claim and in the aggregate, excess a $250,000 each loss SIR.

**The Catholic Mutual Policies**

21.    The Diocese purchased annual claims-made sexual misconduct excess coverage from Catholic Mutual for the relevant time period, including July 1, 2019 to July 1, 2024.  These policies contain a retroactive date of coverage starting July 1, 1998.  The limit of liability for sexual misconduct in each policy was $4 million per claim and in the aggregate.

## THE PARISH POLICIES

22.    In addition to the Diocese policies, certain Parishes purchased primary liability insurance policies.  These Parish policies provide coverage to the individual parishes that purchased them, and some include the Diocese as an additional insured.

23.    While the Diocese and Parishes have identified policies issued for coverage periods from 1955 to 1976, the claims at issue only implicate parish policies for periods from 1970 to 1975.

**The Excelsior Policies**

24.    Excelsior Insurance Company sold Policy No. MP3703317, providing $300,000 per occurrence limits of liability, to St. Peter's Church of Rome in Rome, New York and the Roman Catholic Diocese of Syracuse for the period  October 16, 1972 to October 16, 1975.

**The TIG Policies**

25.    TIG is responsible for two policies sold by Transamerica Insurance Company. Church of St. John the Evangelist in Binghamton, New York purchased Policy No. 5124983 for the policy period December 3, 1970 to December 3, 1973, and which provided $100,000 per person and $300,000 per occurrence limits of liability.  St. Patrick's Church in Syracuse, New York purchased Policy No. 5129993 for the policy period June 1, 1971 to June 1, 1974.  Both policies provide $100,000 per person and $300,000 per occurrence limits of liability.

**The Utica Policy**

26.    Utica Mutual Insurance Company sold Policy No. 547232 FMP to St. Francis Xavier Church in Marcellus, New York and the Roman Catholic Diocese of Syracuse for the policy period February 20, 1973 to February 20, 1976.  The policy provides $300,000 per occurrence limits of liability.

**The Hanover Policy**

27.    The Hanover Insurance Company sold Policy No. 1SMP278778, providing $300,000 per occurrence limits of liability to St. Patrick's Church in Oneida, New York for the policy period October 20, 1970 to October 20, 1973.

21859965.v5

**The Hartford Policy**

28.    Hartford Fire Insurance Company sold Policy No. 07 SMP 102592, which provides $100,000 per occurrence limits to St. Rita's Roman Catholic Church in Chenango Forks, New York, for the period March 23, 1972 to March 23, 1975.

**The Nationwide Policies**

29.    Nationwide sold Policy No. 66SP-55-869 to St. Mary's Church in Utica, New York for the policy period March 1, 1971 to March 1, 1974.  The policy provides $25,000 per person and $50,000 per occurrence limits of liability.

## ABUSE CLAIMS

30.    On January 28, 2019, the New York State Legislature passed the Child Victims Act (A.2683/S.2440) (the "CVA").  The legislation was signed by the governor and became law on February 14, 2019.  The CVA modified New York's statute of limitations and created what was initially a one-year "window" during which victims of child sex abuse could commence previously time-barred civil actions.  The legislation was subsequently amended to extend the window for  a second year through August 13, 2021.[4]

31.    As a result of the CVA, multiple claims and suits were presented to the Diocese alleging that the Diocese and/or DOS Entities are liable for damages stemming from purported negligence in connection with the alleged acts of child sexual abuse ("Abuse Claims").  The Diocese's primary purpose for filing this Chapter 11 Case was to reorganize the Diocese's financial affairs to address and provide a forum for the equitable and expedient resolution of, Abuse Claims.

---

[4] The CVA also extended the statute of limitations for claims that were not time-barred on its date of passage, permitting child victims to commence timely civil actions until they reach 55 years of age.

32.     On November 6, 2020, the Court entered an Order establishing April 15, 2021, as the deadline for filing all claims, including Abuse Claims, in this Chapter 11 Case [Docket No. 214].  Since the Petition Date, approximately 411 proofs of claim asserting Abuse Claims have been filed against the Diocese's estate ("POCs").  The POCs allege various degrees of abuse by perpetrators alleged to be priests of the Diocese, employees of DOS Entities, clerics and sisters of religious orders, and other third parties.  The DOS Entities' liability for Abuse Claims is, from a legal perspective, contingent, unliquidated, and disputed.

33.     The table below illustrates the number of timely and late-filed POCs that implicate the policies issued by each of the Settling Insurers:[5]

| Insurer | Timely Filed POCs | Late-Filed POCs |
|---|---|---|
| Interstate | 113 | 18 |
| LMI | 198 | 33 |
| National Catholic | 20 | 14 |
| Excelsior | 4 | |
| Catholic Mutual | 3 | 5 |
| TIG Insurers | 4 | |
| Utica | 1 | |
| Hanover | 1 | |
| Hartford | 1 | |
| Nationwide | 1 | |

## MEDIATION AND SETTLEMENT EFFORTS

34.     On January 15, 2021, the Diocese commenced the Coverage Action by filing a Complaint against the Settling Insurers and other insurance carrier defendants (the "Insurers") for breach of contract and declaratory judgment, seeking a declaration of the rights, duties, and liabilities of the parties pursuant to the terms of their respective policies and damages [Adv. Dkt. No. 1].

---

[5] Some POCs implicate multiple policies.  For example, many proofs of claim that implicate LMI primary policies also occur in years where Interstate provided excess coverage.  In other instances, proofs of claim may allege abuse spanning policy years covered by different insurers.

35.    On April 12, 2021, the Court entered an *Order Referring This Adversary Proceeding to Mediation* [Adv. Dkt. No. 59] (the "Mediation Order").  The Mediation Order, among other things: (i) referred the claims asserted in the Coverage Action to mediation; (ii) directed the Mediation Parties (as defined in the Mediation Order) and the Committee to confer on the selection of a mediator; and (iii) directed that the Diocese, all insurer defendants, the Committee, counsel for holders of Abuse Claims, and the *ad hoc* committee of Parishes participate in the mediation process.  In accordance with the terms of the Mediation Order, on May 3, 2021, the Court appointed Judge Judith K. Fitzgerald (Ret.) as mediator.

36.    Following more than a year of mediation with Judge Fitzgerald, on July 7, 2022, the Court entered an *Order on Consent of the Mediation Parties Appointing Additional Mediator* [Adv. Dkt. No. 125], which concluded Judge Fitzgerald's role as mediator and appointed Paul Van Osselaer as the new mediator.

37.    In July 2023, the DOS Entities and the Committee announced an agreement on the terms of a partial settlement pursuant to which the DOS Entities would collectively contribute $100 million to the Trust in return for a full release from all Abuse Claims.

38.    Relying on controlling Second Circuit precedent, on May 2, 2024, the Diocese and the Committee filed the *Third Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Syracuse, New York* (the "Third Amended Plan") [Docket No. 1848].

39.    On June 27, 2024, after solicitation of the Third Amended Plan had commenced, the Supreme Court issued its decision in *Harrington v. Purdue Pharma L.P.*, No. 23- 124 (the "*Purdue* Decision"), which called into question the Court's ability to confirm the Third Amended Plan, as proposed.

40.     Following the *Purdue* Decision, the Diocese and the Committee worked to revise the Plan to address the Supreme Court's guidance in *Purdue* and, specifically, to provide that only those Abuse Claimants who consented, or were deemed to consent, would have their Abuse Claims channeled to the Trust and released as against non-debtor DOS Entities.

41.     However, although settlements in principal had been reached with a few of the Insurers with lower Abuse Claim exposure, the Diocese and the Committee had not yet reached resolution with most of the defendants in the Coverage Action.  On October 22, 2024, the Court entered its *Order on Consent of the Mediation Parties Appointing Additional Mediators* [Adv. Dkt. No. 302] appointing Judge Shelley C. Chapman (Ret.) and Mr. Paul A. Finn as a co-mediators with Mr. Van Osselaer.

42.     Addressing the Court's concerns, on November 27, 2024, the Diocese and the Committee filed the current version of the Plan and accompanying disclosure statement [Docket No. 2338] (the "Disclosure Statement").[6]

43.     On December 23, 2024, the Court entered an order approving the Disclosure Statement and settling April 28, 2025 at 10:00 a.m. (prevailing Eastern Time) as the date for the commencement of the hearing on Plan confirmation (the "Confirmation Hearing"). [Docket No. 2398].

44.     Having not yet reached a settlement with the Diocese and the Committee, certain of the Setting Insurers engaged in extensive discovery with the Diocese and, on April 15, 2025, filed objections to the Plan [Docket Nos. 2772, 2787, 2723, 2774, and 2778].[7]

---

[6] On June 10, 2025, the Diocese filed a motion seeking to modify the Plan, in accordance with section 1127 of the Bankruptcy Code, to implement certain provisions required by the Settling Insurers as a condition of settlement. That motion is scheduled to be heard on July 2, 2025. [Docket No. 2924].

[7] On April 18, 2025, three days after the Plan Objection Deadline, Catholic Mutual and Travelers Insurance Company Limited, Travelers Casualty and Surety Company and Traveler's Indemnity Company ("Travelers"), each

45.    In the days leading up to the Confirmation Hearing, in an effort to consensually resolve the plan objections filed by the certain Settling Insurers, the Diocese and the Committee engaged in intensive negotiations with those objecting parties, resulting in agreements being reached as to the material terms of settlements with the Settling Insurers (collectively, the "Insurer Settlements").[8]

46.    The Confirmation Hearing to consider confirmation of the Plan is currently scheduled to resume on July 2, 2025.

## INSURER RESPONSES TO COVERAGE CLAIMS

47.    The Settling Insurers have acknowledged the relevant policies but nevertheless asserted numerous coverage defenses.  Additionally, there remains a divergence in the positions of the parties with respect to several issues, including, but not limited to: (i) the legal liability (if any) of the DOS Entities for Abuse Claims, (ii) the valuation of Abuse Claims, and (iii) the Settling Insurers' responsibility to provide coverage for any liability the DOS Entities may have.

48.    For example, LMI argued that the Diocese was responsible for paying a SIR with respect to each occurrence.  As the SIR ranged from $50,000 to $100,000 during the periods from April 16, 1973 to July 1, 1986, LMI therefore effectively contended that the Diocese would potentially have to pay tens of millions of dollars to satisfy the SIRs.  In addition, LMI contended that their liability is reduced because they only subscribed to cover a portion of losses on certain policies, and because certain subscribing LMI responsible for providing coverage are insolvent.  LMI and Interstate also disputed whether certain claims alleged abuse during their

---

filed a separate joinder to the objection to the Plan filed by the Certain Insurers [Docket Nos. 2807 and 2808, respectively].

[8] Additional settlements had previously been agreed upon with National Catholic, Utica, and Nationwide.

policy periods and suggested that a considerable number of claims in their periods were of low or no value or were filed after the proof of claim deadline.

49.     LMI also contended that coverage for certain claims was barred in whole or in part by certain terms, conditions, limitations, and exclusions under some or all of their policies. For instance, LMI asserted that the Diocese had the burden of proving, among other things, that the abuse was caused by an "occurrence" under the policies. According to LMI, certain claims alleged injuries that were not caused by an "occurrence" to the extent the Diocese might have been aware of the alleged perpetrator's propensity for or history of abuse prior to or during the alleged abuse and failed to take appropriate action in response.

50.     Interstate's policies for the most part provide coverage in excess of LMI's first-layer policies. Accordingly, Interstate argued that many of the defenses asserted by LMI were equally applicable to Interstate. Moreover, Interstate argued that many claims would not result in losses sufficient to hit Interstate's excess layer of coverage for various reasons, including, but not limited to Interstate's argument that each instance of abuse constitutes a separate occurrence under its policies.

51.     Certain of the Settling Insurers who sold insurance policies to Parishes argued that the Diocese was not a named insured under their policies and, therefore, not entitled to coverage for the Abuse Claims.

52.     The Diocese and the Committee dispute the legal and factual basis for many of the defenses asserted by the Settling Insurers. Nevertheless, if the Settling Insurers were to prevail on some or all of their defenses in the Coverage Action it would severely limit their liability to the DOS Entities and could even prevent any recovery in its entirety, consequently shrinking the pool of assets available to satisfy Abuse Claims.

21859965.v5

## SUMMARY OF THE SETTLEMENT AGREEMENTS[9]

53.     The proposed Settlement Agreements provide for total Settlement Proceeds of $61,140,000 to be paid by the Settling Insurers to resolve their coverage obligations and buy back their Subject Policies.  The settlement and sale and buy-back of the Subject Policies, and payment of the Settlement Proceeds, is in each instance contingent upon confirmation of the Plan and the issuance of certain injunctions channeling claims to the Trust and barring their assertion against the Settling Insurers to ensure finality for both the Settling Insurers and the DOS Entities with respect to any potential liability for Abuse Claims.  The Settlement Agreements also provide for the exchange of mutual releases between the DOS Entities and the Settling Insurers.

54.     The Settlement Agreements will resolve the Coverage Action as to the Settling Insurers and provide critical Plan funding. Most importantly, the Committee, on behalf of survivors, supports the Diocese's decision to seek approval of the Insurer Settlement Agreements.

55.     Accordingly, the Diocese respectfully submits that entering into the Settlement Agreements is in the best interest of the estate, an exercise of sound business judgment, and that the Settlement Agreements should be approved in their entirety by the Court.

## RELIEF REQUESTED

56.     Pursuant to sections 105 and 363 of the Bankruptcy Code and Bankruptcy Rule 9019, the Diocese seeks the Court's entry of orders approving and authorizing the Diocese to enter into the Settlement Agreements and granting related relief.

---

[9] The summary contained herein is provided for convenience only and is qualified in its entirety by the provisions of the actual Settlement Agreements.  Interested parties should review the Settlement Agreements in their entirety.

21859965.v5

**BASIS FOR RELIEF**

**A. The Diocese has Articulated a Legitimate Business Reason to Implement the Proposed Settlements by Selling the Subject Policies to the Settling Insurers Pursuant to Section 363(b) of the Bankruptcy Code.**

57.    Section 363(b) of the Bankruptcy Code, provides in relevant part, that a debtor in possession, after notice and a hearing, "may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363(b)(1).  A debtor in possession is given these rights by operation of section 1107(a) of the Bankruptcy Code.  *See* 11 U.S.C. §1107(a).  Moreover, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §105(a).

58.    Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) of the Bankruptcy Code is appropriate if a court finds that the transaction represents a reasonable exercise of business judgment on the part of the debtor.  *See e.g., In re Chateaugay Corp.,* 973 F.2d 141 (2d Cir. 1992); *Comm. of Equity Sec. Holders v. Lionel Corp (In re Lionel Corp.)*, 772 F.2d 1063, 1071 (2d Cir. 1983); *see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) ("the business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company") (internal quotations omitted), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993).

59.    Moreover, courts have recognized that insurance policies are property of a debtor's estate, which may be sold with court approval under section 363 of the Bankruptcy Code.  *See, e.g., MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d

16

89, 93-93 (2d Cir. 1988) (affirming bankruptcy court's approval of insurance settlement and related channeling injunction pursuant to section 363(f) and observing that "[n]umerous courts have determined that a debtor's insurance policies are property of the estate"); *In re Roman Catholic Diocese of Rockville Ctr.*, 665 B.R. 71 (Bankr. S.D.N.Y. 2024); *Estate of Lellock v. Prudential Ins. Co.*, 811 F.2d 186,189 (3d Cir. 1987); *In re Boy Scouts of Am. & Del. BSA, LLC,* 642 B.R. 504, 568-69 (Bankr. D. Del. 2022).

60.     Courts generally show great deference to a debtor in possession's decisions when applying the business judgment standard. *See In re Global Crossing, Ltd.,* 295 B.R. 726, 744 n.58 (Bankr. S.D.N.Y. 2003) ("[T]he Court does not believe that it is appropriate for a bankruptcy court to substitute its own business judgment for that of the [d]ebtors and its advisors, so long as they have satisfied the requirements articulated in the caselaw.").  Deference should be given except in those rare instances where the debtor's business judgment is "so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice." *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.),* 756 F.2d 1043, 1047 (4th Cir. 1985); *see also, In re Integrated Res., Inc.,* 147 B.R. at 656 ("The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.") (internal citations omitted).

61.     The Diocese's decision to sell the Subject Policies to the Settling Insurers is based upon sound business judgment for several reasons.  First, the proposed settlements will result in $61,140,000 in Settlement Proceeds, which the Diocese submits is fair and reasonable consideration.  Second, the contemplated settlements represent a key component of the Diocese's

17

Plan and the Settlement Proceeds received therefrom will constitute a large portion of the funding for a Trust to benefit Abuse Claimants without the risk and delay of post-confirmation coverage litigation.  Third, the Subject Policies' value, and the ability of some Settling Insurers to pay claims thereunder, could decrease over time.  Fourth, litigation regarding coverage for Abuse Claims involves uncertainty, delays and additional costs.  Fifth, and perhaps most importantly, the Committee, which is comprised of Abuse Claimants and represents their collective interests, supports the settlements.

62.    Accordingly, the Diocese submits that a valid business justification exists for settling its claims against the Settling Insurers and entering into the policy buyback transactions contemplated in the Settlement Agreements.

**B.  The Requirements of Bankruptcy Code Section 363(f) are Satisfied.**

63.    Section 363(f) of the Bankruptcy Code permits debtors, with court approval, and subject to the satisfaction of certain enumerated conditions, to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).[10]  Section 363(f) is drafted in the disjunctive, meaning the proposed sale of the Subject Policies back to the Settling Insurers need only satisfy one of the five

---

[10]  Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
(2)    such entity consents;
(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
(4)    such interest is in bona fide dispute; or
(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

statutory requirements. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Scherer v. Fed. Nat'l Mort. Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 827 (N.D. Ill. 1993).

64.    Here, the Diocese intends to implement the proposed settlements by selling the Subject Policies back to the Settling Insurers free and clear of any claims or other interests – for several independent reasons, including: (i) nonbankruptcy law permits a negotiated settlement "of an insured's cause of action against its insurer free and clear of any interest of an injured party whose tort claim would trigger the insurer's duty to defend and indemnify the insured," *see In re Dow Corning Corp.*, 198 B. R. 214, 245 (Bankr. E.D. Mich. 1996); (ii) the only entities with an undisputed interest in the Subject Policies (the DOS Entities) will consent to the sale; and (iii) to the extent any plaintiff may assert that they have an interest in the Subject Policies as the holder of a Abuse Claim, (x) such interest, as well as the underlying Abuse Claim, is subject to a bona fide dispute and (y) Abuse Claimants could be compelled to accept a money satisfaction of their Abuse Claims and their interests (if any) in the Subject Policies. *See In re WBQ P'ship,* 189 B.R. 97, 106-07 (Bankr. E.D. Va. 1995) (finding 363(f)(5) is applicable to claims which can be reduced to money judgment for complete relief). *See also In re P.K.R. Convalescent Centers, Inc.,* 189 B.R. 90 (Bankr.E.D.Va.1995) (allowing the sale of nursing home assets under § 363(f)(5) over objection where the objecting party's interest was reducible to a claim and subject to a hypothetical money satisfaction).    Thus, the sale of the Subject Policies to the Settling Insurers satisfies the disjunctive requirements of sections 363(f)(1), (2), (4), and (5) of the Bankruptcy Code, and the Diocese should be authorized to sell the Subject Policies to the Settling Insurers free and clear of any claims and/or other interests.

**C.  The Settling Insurers are Entitled to the Protections of Bankruptcy Code Section 363(m).**

65.    The Bankruptcy Code does not define "good faith purchaser."  The Second Circuit, however, has "adopted a traditional equitable definition: 'one who purchases the assets for value, in good faith and without notice of adverse claims.'"  *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).  "Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Colony Hill Assocs.,* 111 F.3d 269, 276 (2d Cir. 1997) (citation omitted).

66.    The proposed settlements are the culmination of multiple mediation sessions, over several years, conducted at arms-length, under the supervision of well-credentialed, Court approved, independent mediators, with national reputations and extensive professional experience in mediated negotiations and, in several cases, were agreed upon only following robust discovery and on the eve of a contested confirmation hearing.  As such, the Settling Insurers are entitled to the protections afforded to a good faith purchaser under section 363(m) of the Bankruptcy Code.

**D.  Injunctive Relief is Necessary to Implement the Sale of the Subject Policies Free and Clear of Interests.**

67.    In addition to the Court's power to authorize the sale of the Subject Policies free and clear of claims and/or interests, the Court also has the power to enjoin creditors or any other person from pursuing the Settling Insurers as good faith purchasers of property of the Diocese's estate.  *See, e.g., In re Energy Co-op., Inc.*, 886 F.2d 921, 929 (7th Cir. 1989) ("The power of the court under [§ 105(a)] also includes the power to issue an injunction enjoining third parties from

pursuing actions which are the exclusive property of the debtor estate and are dismissed pursuant

to a settlement agreement"); *MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89,93 (2d Cir.

1998).  Further, when a debtor-in-possession sells estate property pursuant to section 363 of the

Bankruptcy Code, such injunctive relief is often necessary and appropriate. *In re Dow Corning

Corp.,* 198 B.R. at 245 ("In other words, an actual injunction barring creditors from suing a

purchaser of estate assets is sometimes necessary and appropriate to give the "free and clear"

aspect of § 363(f) meaning.").  Accordingly, bankruptcy courts have the power under sections

363 and 105(a) of the Bankruptcy Code to issue a supplemental injunction to prohibit claims

from being asserted against a buyer of estate assets and to channel any such claims to the

proceeds of the sale.  *In re Johns-Manville Corp.* at 93-94 ("The authority to issue the injunction

is thus a corollary to the power to dispose of assets free and clear and to channel claims to the

proceeds.").

68.    In fact, injunctions are routinely granted where insurance policies are sold back to

insurers under sections 105(a) and 363(b) and (f) of the Bankruptcy Code.  Courts addressing the

issue following the Supreme Court's *Purdue* decision have held that *Purdue* does not restrict the

ability of bankruptcy courts to issue injunctive relief to protect asset purchasers, including non-

debtor insurers, from third party claims in conjunction with orders approving settlements where

such a settlement involves a sale "free and clear" of claims or other interests pursuant to section

363(f) of the Bankruptcy Code.  *See*, *e.g.*, *In re Commercial Express*, ___ B.R. ___, 2025 Bankr.

LEXIS 1261 at *21 (Bankr. M.D. Fla. May 22, 2025) ("*Purdue* did not address sales of estate

property and did not involve injunctive relief necessary to a settlement involving estate property .

. . . Section 363(f) expressly authorizes sales free and clear of any interest if such interest is in

bona fide dispute, *§ 363(f)(4)*, or if the holder of the interest could be compelled in a legal or

equitable proceeding to accept a money satisfaction of such interest, *§ 363(f)(5).*"); *In re Hopeman Bros., Inc.*, 667 B.R. 101, 106-108 (Bankr. E.D. Va. 2025) (citing *Markland v. Davis (In re Centro Grp., LLC)*, 2021 U.S. App. LEXIS 32962 (11th Cir. Nov. 5, 2021) in distinguishing injunctions that are integral to the settlement and buy-back of insurance policies from general injunctions in aid of a debtor's reorganization and noting that "the Court has not found, and has not been pointed to, any decision extending *Purdue's* decision to § 363 sales"); *In re Roman Catholic Diocese of Rockville Centre*, 665 B.R. 71, 88-89 (Bankr. S.D.N.Y. 2024) (noting that courts routinely grant injunctive relief without requiring an adversary proceeding as part of a "free and clear" sale); *In re Bird Global, Inc.*, Case No. 23-bk-20514-CLC (Bankr. S.D. Fla. Aug. 2, 2024) (approving bar order and channeling injunction related to insurance settlement and policy buy-back) *aff'd sub nom Wright v. Bird Global, Inc.*, Case No. 24-cv-23086, 2025 U.S. Dist. LEXIS 111111 (S.D. Fla. June 11, 2025); *See In re Dow Corning Corp.,* at 245 ("There is no dispute that a debtor's interest in its insurance policies is property of the estate. Furthermore, estate property can be sold "free and clear of any interest in such property." (internal citations omitted)); *See also In re Sunland, Inc.,* No. 13-13301-tr7, 2014 Bankr. LEXIS 5000 (Bankr. D.N.M. Dec. 11, 2014) ('Such "channeling," "supplemental," or "clarifying" injunctions are relatively common with § 363(f) sale orders.").

69.     Here, as in *Commercial Express*, *Hopeman Bros.*, *Rockville Centre*, and *Bird Global*, the injunctive relief that the Diocese seeks for the benefit of the Settling Insurers is a critical component of the negotiated settlement of the Diocese's insurance coverage claims and sale of its policies back to the Settling Insurers and nothing in the *Purdue* Decision restricts this Court's ability to fashion such relief.  Moreover, the Court can enjoin Abuse Claimants from asserting Abuse Claims (or claims related to Abuse Claims) against the Settling Insurers because

22

none of the Abuse Claimants have a direct right of action against the Settling Insurers.  New York law does not generally allow personal injury plaintiffs to proceed directly against an alleged tortfeasor's insurer.  *Lang v. Hanover Ins. Co.*, 3 N.Y. 3d 350 (N.Y. 2004).  Such direct actions may only be brought to derivatively enforce the rights of the insured for coverage once a plaintiff obtains a judgment, serves the defendant with notice of entry of such judgment, and the judgment remains unsatisfied for thirty days.  N.Y. Insurance Law § 3420(b)(1); *D'Arata v. New York Cent. Mur. Fire Ins. Co.*, 76 N.Y. 2d 659 (N.Y. 1990) (plaintiff proceeding under § 3420(b)(1) "'stands in the shoes of the insured' . . . . as subrogee of the insured's rights. . . .").  None of the Abuse Actions against the Diocese or other Participating Parties have progressed to the point of judgment, much less gone unsatisfied for thirty days.  Accordingly, the only parties that currently hold an "interest" in coverage claims against the Settling Insurers and their policies are the Diocese and the Participating Parties, all of whom have agreed to the injunctive relief sought in this Motion.  Alternatively, to the extent any Abuse Claimant could be said to have an "interest" in such claims or the underlying policies, such an inchoate, non-assertable interest is either (i) subject to bona fide dispute and/or of a nature where the Abuse Claimant could be compelled to accept a money satisfaction, in which case the Court may authorize a sale to the Settling Insurers free and clear pursuant to section 363(f), or (ii) has a zero value and can be enjoined as "fully satisfied" consistent with *Purdue*. 603 U.S. at 206 (expressing no opinion "upon a plan that provides for the full satisfaction of claims against a third-party nondebtor.").

70.    The Plan and the Settlement Agreements contemplate injunctive relief in the form of (i) a Channeling Injunction, channeling the Channeled Claims to the Trust, (ii) a Settling Insurer Injunction, barring the assertion of Barred Claims against the Settling Insurers and certain related parties, and (iii) a Gatekeeper Injunction, requiring any holder of Claims or causes

of action that are released, discharged, or subject to exculpation, the Channeling Injunction or the

Settling Insurer Injunction, to obtain authorization from the Court before bringing such Claim or

cause of action against a Protected Party.

71.    The protection provided by the injunctions requested by the Settling Insurers is

necessary and appropriate to facilitate and protect the integrity of the sale of the Subject Policies

to the Settling Insurers.  The Diocese's ability to successfully provide meaningful recompense

for Abuse Claimants is dependent upon its ability to fund the Plan with the Settlement Proceeds.

The Settling Insurers would not have agreed to settle without the injunctions contemplated in the

Settlement Agreements and have factored the value of that protection into the amounts they are

willing to pay to settle the Coverage Action.  Without the protection of injunctive relief, the

Settling Insurers will not consummate the purchase of the Subject Policies, the Diocese's estate

will not realize the substantial benefit of Settlement Proceeds, and the Plan would likely fail.

72.    The Bankruptcy Court for the Southern District of New York recently issued

injunctions similar to those sought pursuant to the Settlement Agreements and the Plan in

connection with the resolution of the Diocese of Rockville Centre's chapter 11 case.  *See In re*

*Roman Catholic Diocese of Rockville Ctr.*, 665 B.R. 71 (Bankr. S.D.N.Y. 2024) (approving a

gatekeeper injunction as part of its plan of reorganization).  Moreover, both LMI and Interstate

expressly conditioned their agreement to settle on receiving injunctive provisions equivalent to

what they had previously negotiated in *The Diocese of Rochester* case. *See* Docket Nos. 2837

and 2853, respectively (letters advising of settlement on *The Diocese of Rochester* terms).  Judge

Warren recently approved those settlement agreements contemplating similar injunctive relief at

a hearing held on June 18, 2025. *See The Diocese of Rochester*, Case No. 19-20905 (PRW),

Docket No. 3214.

21859965.v5

E.  **Entering into the Settlement Agreements is in the Best Interest of the Diocese's Estate.**

**The Court has authority to approve the proposed settlements pursuant to Bankruptcy Rule 9019 and section 105 of the Bankruptcy Code.**

73.     Bankruptcy Rule 9019 provides, in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Section 105(a) of the Bankruptcy Code further provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

74.     Settlements and compromises are not only permitted in bankruptcy, they are favored and encouraged because they minimize costs of litigation and further parties' interest in expediting administration of the bankruptcy estate. *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) ("In Chapter 11 bankruptcies, settlements also help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization.").

75.     When deciding whether to approve a proposed settlement, a court must determine whether the proposal is "fair and equitable" and "in the best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.* 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991); *In re Texaco*, 84 B.R. 893, 902 (Bankr. S.D.N.Y. 1988).

76.     A court need not conduct an independent investigation in formulating its opinion as to the reasonableness of a settlement. *In re McCoy*, 496 B.R. 678, 683 (Bankr. E.D.N.Y. 2011) (holding that a court need not rule on disputed issues of fact and law or "conduct a 'mini-trial' on the merits of the underlying litigation."). In fact, the court need only determine whether the settlement "fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant*

*Co*., 699 F.2d 599, 613 (2d Cir. 1983) *quoting Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.),

*cert. denied sub. nom. Benson v. Newman*, 409 U.S. 1039 (1972) (proposed settlement approved

where it could not be regarded as below the lowest point in the range of reasonableness); *In re*

*Int'l Distr. Centers, Inc*. 103 B.R. 420, 422-23 (S.D.N.Y. 1989) (affirming bankruptcy court's

approval of proposed settlement on ground that settlement met or exceeded lowest standard of

reasonableness); *In re Best Products Co., Inc*., 168 B.R. 35, 50-51 (Bankr. S.D.N.Y. 1994),

*appeal dismissed*, 177 B.R. 791 (S.D.N.Y. 1995) *aff'd*, 69 F.3d 26 (2d Cir. 1995).

77.    Although it is the movant's burden to establish that the proposed compromise is

fair and equitable and in the best interests of the estate, that "*burden is not high.*" *In re*

*Roqumore*, 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008) (emphasis added).

### The Court should approve the proposed settlements.

78.    Second Circuit precedent suggests the Court should weigh the following factors in

determining the reasonableness of a proposed settlement and whether it is fair and equitable:

(a)    the balance between the possible litigation success and the settlement's future benefits;

(b)    the likelihood of complex and protracted litigation and the consequent inconvenience, expense, and delay;

(c)    the interests of creditors, including the relative benefits to each class of creditors and the degree to which they either do not object to or affirmatively support the proposed settlement;

(d)    whether other parties in interest support the settlement;

(e)    the competency and experience of counsel supporting the settlement;

(f)    the experience and knowledge of the bankruptcy judge reviewing the settlement;

(g)    the nature and breadth of releases to be obtained by officers and directors; and

26

(h)     the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC*, 478 F.3d at 465; *In re Daticon, Inc.,* 2006 Bankr.  LEXIS 3704 (D. Conn. December 22, 2006) at *52, *citing In re Matco Electronics Group, Inc.*, 287 B.R. 68, 75 (Bankr. N.D.N.Y. 2002).

79.     Importantly, courts "can give more weight to one or more of the above-referenced factors than to the other factors."  *In re DeRosa-Grund*, 567 B.R. 773, 785 (Bankr. S.D. Tex. 2017), *citing In re Bard*, 49 Fed. App'x 528, 532-33 (6th Cir. 2002).  Moreover, these factors are not exclusive, a court examining the reasonableness of a compromise may consider "[a]ll other factors bearing on the wisdom of the compromise."  *In re Shankman*, 2010 Bankr.  LEXIS 619 at *7 (Bankr.  S.D. Tex.  March 2, 2010); *In re Roqumore*, 393 B.R. 474 at 479.

80.     Evaluated against the relevant factors, the Diocese respectfully submits that the proposed settlements should be approved:

*(a)     Possible litigation success and the settlements' future benefits*

81.     The Coverage Action remains pending and seeks declaratory relief concerning the Settling Insurers' duties under the Subject Policies with respect to the Abuse Claims and damages relief for breach of contract.

82.     The Diocese submits that it has satisfied all material obligations on its part under Subject Policies and consequently, the Settling Insurers are obligated to pay in full the expenditures made by the Diocese to defend itself against the Abuse Claims.  The Settling Insurers have generally denied coverage is available under the Subject Policies and opposed the relief requested in the Coverage Action.

83.     The Settling Insurers have raised, through reservation of rights letters and other materials and information exchanged through mediation, numerous and complex legal and

27

factual issues that would need to be resolved before a court could make a decision on whether the Subject Policies provide coverage, and the extent of such coverage, if available. While the Diocese believes it has strong arguments in support of coverage, the Settling Insurers are likely to vigorously pursue the defenses proffered to date and litigation inevitably carries certain risks and inherent delays. The nature of the claims and defenses at issue are such that, even if one assumes a relatively low probability that the Settling Insurers will prevail on their coverage defenses, the effect of a successful defense could severely reduce the ability of the Diocese and other DOS Entities to compensate Abuse Claimants. Even if the Diocese were ultimately to prevail, there is no guarantee that the result of litigation would be more favorable than the proposed settlement terms. Accordingly, the Diocese respectfully submits that the potential upside of continued litigation at this point is outweighed by the potential downside, especially in light of the substantial settlement offers currently before the Court.

84.    Conversely, if the proposed settlements are approved, they will: (i) provide a concrete financial benefit to the estate through the contribution of the Settlement Proceeds, which are specifically earmarked for distribution to Abuse Claims; (ii) eliminate the underlying uncertainty of litigation; and (iii) avoid the expenditure of estate resources on expensive and time-consuming coverage litigation.

85.    The $61,140,000 to be received from the Settling Insurers pursuant to the proposed settlements represents a significant step toward funding the Trust and making a meaningful distribution to holders of Abuse Claims. When combined with the additional $100 million contribution contemplated by the DOS Entities in the Plan, a minimum of $161,140,000 will be available to fund the Trust for the benefit of Abuse Claimants.

> **(b)** *The likelihood of complex and protracted litigation*
> *<u>and the consequent inconvenience, expense, and delay</u>*

86.     As discussed above, the claims and causes of action and defenses asserted in the

Coverage Action are multifaceted and complex, and litigating them to conclusion would involve

uncertainty, expense, and delay.  While the Committee has agreed, through the Plan, to accept a

certain degree of risk with respect to the post-confirmation litigation of Insurance Claims against

Non-Settling Insurers, settlement with the Settling Insurers as proposed herein will help to ensure

a baseline level of recovery for Abuse Claimants, regardless of whether the Trust is successful in

achieving an additional recovery from Non-Settling Insurers.

> **(c)** *The interest of creditors and their*
> *<u>response to the compromise and settlement</u>*

87.     The proposed settlements are clearly beneficial to creditors.  Settlement allows for

the payment of a significant sum to the estate for the benefit of Abuse Claimants, the primary

creditor group in this Chapter 11 Case.  Moreover, the Committee, which is comprised entirely

of, and represents all survivors, was integral in negotiating, and fully supports the Insurer

Settlements.

> **(d)** *<u>Whether other parties in interest support the settlement</u>*

88.     The non-debtor DOS Entities who are co-insureds with equal rights to coverage

under the Subject Policies will be parties to the proposed settlements, and they support using the

Settlement Proceeds to satisfy Abuse Claims.  Accordingly, all of the parties in interest most

directly affected by the proposed settlements are in favor of approval.

> **(e)** *<u>The competency and experience of counsel</u>*

89.     Each of the Settling Insurers is represented by experienced bankruptcy and

insurance coverage counsel.  Many of the attorneys representing the Settling Insurers have

represented either the Settling Insurers, or other carriers, in other mass tort cases, including

21859965.v5

chapter 11 cases involving Catholic dioceses.  The Diocese likewise has been represented by experienced bankruptcy counsel (Bond Schoeneck & King, PLLC) familiar with the bankruptcy issues affecting the settlement, and special insurance counsel (Blank Rome LLP) experienced in coverage litigation and complex insurance settlements, including several prior settlements of diocesan insurance claims in bankruptcy, and sophisticated state court litigation counsel (Mackenzie Hughes LLP) familiar with the merits of the underlying Abuse Claims.  The Committee has also had the benefit of bankruptcy and insurance counsel who have been repeat players in diocesan chapter 11 cases (Stinson LLP and Burns Bair, respectively) and has regularly consulted with state court counsel representing a majority of the Abuse Claimants. Counsel for all parties involved participated in the negotiations that resulted in the proposed settlements.

(f)     *Experience and knowledge of the bankruptcy court judge*

90.    This Court is unquestionably experienced in evaluating settlements in a bankruptcy context.

(g)     *The nature and breadth of releases to*
        *be obtained by officers and directors*

91.    The releases that the DOS Entities, on the one hand, and the Settling Insurers, on the other hand, are giving and receiving under the proposed settlements are limited to claims that relate to Abuse Claims or which otherwise impact the Subject Policies and any potential extracontractual allegations that the DOS Entities may have or claim to have against the Settling Insurers based on their conduct with respect to the Subject Policies.

92.    Further, the Plan provides and the Settlement Agreements contemplate, that all Abuse Claimants who have consented to the third-party releases contained in the Plan will have their Abuse Claim channeled to the Trust which is being funded, in part, by the $61,140,000 in

30

Settlement Proceeds from the Settling Insurers.[11]  This approach is consistent with the manner in

which many other diocesan chapter 11 cases involving similar Abuse Claims and insurance

issues have been successfully resolved.  Further, because all Abuse Claimants have now

consented or been deemed to consent to such treatment, the injunctions contemplated in the Plan

and Settlement Agreements are also consistent with the Supreme Court's ruling in *Purdue*.

> (h)  *The extent to which the settlement is*
> *the product of arm's length bargaining*

93.     The proposed settlements were negotiated at arm's length.  The Diocese, the

Committee and each of the Settling Insurers were represented by competent counsel, and the

business terms were negotiated not only by counsel, but also, in the case of the Settling Insurers

and the DOS Entities, by their respective business leaders and representatives, over the course of

many formal and informal mediation sessions and many years, and in several instances were

agreed to only on the proverbial courthouse steps.

94.     Based upon the foregoing, the Diocese respectfully submits that it can satisfy its

burden under Bankruptcy Rule 9019(a) and section 105(a) of the Bankruptcy Code to show

reasonableness and requests that the Court approve the Settlement Agreements in their entirety.

**F.      The Proposed Settlements are not a S*ub Rosa* Plan.**

95.     In *Lionel*, the Second Circuit held that a debtor in possession may enter into

transactions outside the ordinary course of business pursuant to section 363 of the Bankruptcy

Code if there is an articulated business justification for such transaction.  *In re Lionel Corp.*, 722

F.2d 1063, 1069-70 (2d Cir. 1983).  "A debtor cannot, however, enter into a transaction that

---

[11] The Diocese notes that, in addition to contributing part of the additional $100 million in funding for the Trust, the Parishes and other DOS Entities will, pursuant to the proposed settlements, release their interests in coverage under the Subject Policies as co-insureds to facilitate the implementation of the settlement and the payment of the Settlement Proceeds.  By doing so, the DOS Entities are providing a valuable contribution, important to the overall success of the Plan, and thereby giving consideration for any benefit they will receive under a Channeling Injunction included as part of the Plan and any order confirming the Plan.

'would amount to a *sub rosa* plan of reorganization' or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization." *In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009) (quoting *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2d Cir. 2007). "If, however, the transaction has 'a proper business justification' which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized." *Id*.

96.    "A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan." *In re Capmark Financial Group Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010). "To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote." *Id*. (approving settlement with secured lenders involving "cash for collateral" swap over objection by unsecured creditor committee that debtor possessed valid causes of action against lenders and had settled too cheaply where pre-confirmation approval of settlement did not deprive any party of the critical protections of a chapter 11 confirmation process).[12]    Conversely, where a settlement does not (i) dispose of all claims against the debtor, (ii) restrict creditors' rights to vote as they deem fit on a chapter 11 plan, or (iii) dispose of virtually all of a debtor's assets, it does not constitute an impermissible *sub rosa* plan. *Official Comm. of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative)*, 119 F.3d 349, 355 (5th Cir. 1997).

---

[12] *Capmark* also held that a settlement agreement is not a *sub rosa* plan merely because it provides for the exchange of mutual releases. The *Capmark* court recognized that "[r]eleases are a necessary and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties. Without such releases, a settlement would be ineffective." 438 F.3d at 514. Similarly, here, the only way to effectuate a full buyback of the Settling Insurers' policies is to have every insured DOR Entity agree to relinquish their equal rights under such policies. The only practical way to achieve such a result is to provide each of the non-debtor DOR Entities with releases and channeling injunctions in exchange for the substantial contribution of their insurance rights.

97.    Even large and important settlements may be approved prior to confirmation of a plan where such settlements do not dispose of or release the claims of creditors or restrict their rights to vote on an eventual plan of reorganization. *In re Tower Automotive Inc.*, 241 F.R.D. 162, 169 (S.D.N.Y. 2006). For example, in *Tower Automotive*, the court approved a settlement agreement that provided for the use of a substantial portion of the debtor's unencumbered assets to fund payment of at least 20% of retirement obligations that constituted more than half of all unsecured claims against the debtor, reasoning that such payment would "resolve a necessary pre-condition to any proposed plan of reorganization" and was therefore "essential to, and the first step in facilitating, an ultimate plan of reorganization." *Id.* at 169-70. Similarly, here, the settlements with the Settling Insurers are contemplated by and form an essential component of the Plan.

98.    Moreover, where a settlement will be implemented only "in accordance with a confirmed chapter 11 plan" and parties in interest are provided with a full opportunity to vote on such plan, the settlement does not constitute a *sub rosa* plan. *In re Nortel Networks, Inc.*, 522 B.R. 491, 508-09 (Bankr. D. Del. 2014). Here, the sale of the Subject Policies and the releases and injunctions in favor of the Settling Insurers and the DOS Entities are all expressly made contingent upon the confirmation of the Plan, which is already before the Court for consideration and is subject to all applicable confirmation standards under section 1129 of the Bankruptcy Code. Accordingly, approval of the Settlement Agreements will not impair the rights of Abuse Claimants, or any other constituency, to raise any issues in connection with the confirmation of the Plan and the proposed settlements cannot be a *sub rosa* plan.[13]

---

[13] Under substantially similar circumstances, both *The Diocese of Rochester* and *The Roman Catholic Diocese of Rockville Centre, New York* courts approved similar insurer settlements and found that such settlements were not sub rosa plans.

## NOTICE

99.     Notice of this Motion will be given in accordance with any order entered by the Court with respect to the Diocese's pending *Motion to Approve the Form and Manner of Notice of the Diocese's Motion to Approve Proposed Insurance Settlements Filed by The Roman Catholic Diocese of Syracuse, New York* [Docket No. 2927].

100.     In light of the nature of the relief requested herein, the Diocese respectfully submits that such notice is reasonably calculated under the circumstances to apprise any person who may have an interest in the Subject Policies or whose rights may be affected by the proposed settlements of the pendency of this Motion and that no other or further notice is required or necessary.

## CONCLUSION

101.     The proposed settlements are the culmination of years of mediation facilitated by skilled mediators and independent negotiations between the Parties.

102.     Approval of the proposed settlements will provide Abuse Claimants vastly more than the Diocese could have offered when this Chapter 11 Case began and will represent a substantial value recovery for the estate.  Accordingly, the Diocese respectfully submits that for the reasons set forth herein the Court should approve each of the Settlement Agreements with the Settling Insurers.

21859965.v5

**WHEREFORE**, the Diocese respectfully requests that the Court enter orders, substantially in the forms prescribed by or attached to the Settlement Agreements (i) finding that notice of this Motion was adequate under the circumstances; (ii) approving the Settlement Agreements in their entirety; (iii) authorizing the Diocese to enter into the Settlement Agreements; and (iv) granting such other and further relief as the Court deems just and proper.

Dated:  July 1, 2025                          BOND, SCHOENECK & KING, PLLC


By____/s/ Stephen A. Donato_____
Stephen A. Donato (Bar Roll #101522)
Charles J. Sullivan (Bar Roll #507717)
Grayson T. Walter (Bar Roll #518237)
Sara C. Temes (Bar Roll #514148)
Justin S. Krell (Bar Roll #704364)
One Lincoln Center
Syracuse, NY 13202-1355
Telephone: (315) 218-8000
Fax: (315) 218-8100
Emails:      sdonato@bsk.com
             csullivan@bsk.com
             gwalter@bsk.com
             stemes@bsk.com
             jkrell@bsk.com

*Attorneys for The Roman Catholic Diocese of Syracuse, New York*

35